

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 25-11050-dsj

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   BROADWAY REALTY I CO. LLC,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  May 28, 2025

17                  2:03 p.m.

18

19

20

21  B E F O R E :

22  HON. DAVID S. JONES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  Jonathan

1    HEARING re Hybrid Hearing RE: Motion Filed by the Debtors

2    for Entry of Order (I) Authorizing the Debtors to Use Cash

3    Collateral, (I) Scheduling Final Hearing, and (III) Granting

4    Related Relief

5

6    HEARING re Motion of Debtors for Entry of Interim and Final

7    Orders (I) Authorizing Debtors to (A) Continue Using

8    Existing Cash Management System, Bank Accounts, and Business

9    Forms, (B) Implement Changes to Cash Management System in

10   the Ordinary Course of Business; and (JI) Granting Related

11   Relief

12

13   HEARING re Motion Filed by the Debtors for Entry of Order

14   Extending Time to File Schedules of Assets and Liabilities,

15   Schedules of Executory Contracts and Unexpired Leases, and

16   Statements of Financial Affairs

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  GARY HOLTZER

9         MATTHEW PAUL GOREN

10        RICHARD SLACK

11        PHIL DiDONATO

12        ANDREW CLARKE

13        GARRETT A. FAIL

14

15   PAUL HASTINGS LLP

16        Attorneys for Flagstar Bank, N.A.

17        875 15th Street N.W.

18        Washington, D.C. 20005

19

20   BY:  NICHOLAS A. BASSETT

21        BRETT LAWRENCE

22        HARVEY STRICKON

23        JUSTIN RAWLINS

24

25

Page 4

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for U.S. Trustee

3         Alexander Hamilton Custom House

4         One Bowling Green

5         New York, NY 10004

6

7    BY:  RACHEL SIEGEL

8

9    ALSO PRESENT:

10        WILL FARMER

11        MICHAEL FRIEDMAN

12        JILLIAN INGRISANO

13        ROD KAZEMPOUR

14        MATTHEW KLEISSLER

15        OKSANA KOLTKO ROSALUK

16        MATTHEW LASKOWSKI

17        MICHAEL MAGZAMEN

18        DAVID MICHAEL RILEY

19        ABE ROSEN

20        CORINNE SMITH

21

22

23

24

25

```
 1                   P R O C E E D I N G S

 2           THE COURT:  Hello, everybody.  Be seated, please.

 3    Okay.  Judge Jones.  Good day to all of you.  We're here for

 4    first day of hearings on Broadway Realty I Co. LLC, Number

 5    25-11050, and there's a total of 82 cases being jointly

 6    administered by prior order of the Court.  Nice to see

 7    everyone.

 8           Let me get appearances and then we'll take it from

 9    there.

10           MR. HOLTZER:  Good afternoon, Your Honor.  Gary

11    Holtzer, Weil Gotshal & Manges on behalf of the Debtors.

12    With me today are my partners Matt Goren, Richard Slack and

13    Phil DiDonato as well as our associates -- sorry, Phil

14    DiDonato, Andrew Clarke, and Richard Slack, our partner.

15    Thank you.

16           THE COURT:  Great.  And for Flagstar?

17           MR. BASSETT:  Good afternoon, Your Honor.  Nick

18    Bassett from Paul Hastings on behalf of Flagstar Bank.  I'm

19    joined in the courtroom by colleagues Brett Lawrence and

20    Harvey Strickon, and my colleague Justin Rawlins, who's

21    joined from Los Angeles by video.

22           THE COURT:  Great.  Nice to see you.  I see you

23    beautifully.

24           MR. RAWLINS:  Thank you, Your Honor.

25    (indiscernible).
```

Page 6

1           THE COURT:  And a courtroom full of people is

2    looking at a big image of you, so maintain composure at all

3    times.

4           Okay.  U.S. Trustee is here?

5           MS. SIEGEL:  Good afternoon, Your Honor.  Rachel

6    Siegel on behalf of the United States Trustee.

7           THE COURT:  Okay.  Nice to see you.  Anyone else

8    planning to actively participate?

9           Okay.  You're not foreclosed.  No one said yes and

10   if anyone realizes they need to leap up, that's fine.

11          MR. HOLTZER:  Just adding Mr. Fail, Garett Fail, I

12   neglected to mention --

13          THE COURT:  Oh --

14          MR. HOLTZER:  -- partner sitting next to me.

15          THE COURT:  Nice to see you, Mr. Fail.

16          MR. FAIL:  Good afternoon, Your Honor.

17          THE COURT:  Let me say two things that come to

18   mind up front, and then I'm going to turn it over to whoever

19   wants to say something by way of introduction, and then I'll

20   let you drive the proceeding today.

21          So, the thing I wanted to say is that my wonderful

22   former law clerk, who left me fairly recently, is on this --

23   has been working on this case for Weil Gotshal until it

24   filed and she may still be working on it, but I have a one-

25   year no appearance rule.  Her name is (indiscernible).

Page 7

1    She's back there in the back.  Her role won't affect my

2    judgment and we're just adhering to our one-year no

3    appearance rule for my former clerks.

4              Also, want to make known that another of my clerks

5    actually has accepted an offer to join Weil in the still

6    somewhat distant future and she's not working on this case

7    at all, so fortunately I'm blessed with three great law

8    clerks, so persons other than that person are going to work

9    the case.

10             Okay.  So, I think that's not such an uncommon

11   situation around here.  But I like to make it known just to

12   follow the maxim that sunshine is the best disinfectant.

13   Okay?  So, now you know.  I'm not asking you to do anything,

14   just making it known.

15             Having said all that, I'll say I've reviewed the

16   papers.  Somewhat quickly read the, understandably, recently

17   filed, yet thorough objection of Flagstar.  And so I'm

18   pretty ready to go and pretty conversant, but with that

19   said, since it is the first day, I'll turn it over to Mr.

20   Holtzer to make whatever introductory comments he wants

21   first.

22             MR. HOLTZER:  Thank you, Your Honor.  And again,

23   thank you for seeing us today.  Let me give a few

24   introductions, Your Honor.  In the courtroom is Joel Wiener.

25   He's the president and chairman, Zarasai and the Debtors.

Page 8

1    Mr. Wiener has managed, bought, sold, converted to condos,

2    been in the residential real estate market in New York for

3    over 40 years.  We have Ephraim Diamond from Arbel Capital

4    Advisors.  He's the chief restructuring officer and as you

5    may have seen, he's the first day declarant -- first day

6    declarant and today's declarant in support of the limited

7    relief that we're requesting.

8            And we have Adam Kaplan, Your Honor.  He's an

9    internal counsel for the company.  We have representatives

10   from FTI Consulting here as well who are the financial

11   advisors to the company.

12           Let me just start out by saying what our approach

13   to the hearing will be, and if that's acceptable to Your

14   Honor, we will proceed that way.  We'll make a couple of

15   brief opening comments about the business itself, the

16   capital structure, and the events leading up to the Chapter

17   11.  This is laid out in our papers, but there are a couple

18   points that bear emphasizing, Your Honor, and we thought we

19   would start with that.

20           We'll then go through the agenda.  Cash collateral

21   motion first, cash management motion second, and then the

22   motion to extend the deadline to file the schedules, and the

23   SOFA's third.  If that's acceptable to Your Honor, we'll

24   proceed that way.

25           THE COURT:  That is.

Page 9

1          MR. HOLTZER:  The Debtors' business, Your Honor,

2     just a quick couple of facts to give you some context.  The

3     Debtors are the indirect subsidiaries of the Zarasai Group

4     Limited, which was organized in 2012 under the laws of the

5     British Virgin Islands.

6          THE COURT:  Some reporter somewhere will be happy

7     if you spell Zarasai.

8          MR. HOLTZER:  Zarasai is spelled Z-A-R-A-S-A-I.

9     Zarasai, through the Debtors and the other non-debtor

10    subsidiaries, purchases and operates and manages and

11    develops and leases residential real property, as well as

12    conducts sales of residential apartments in the New York

13    City area, Your Honor.

14         You may see in the materials that we filed the

15    name Pinnacle.  It's a name used in some of the intermediate

16    holding companies between Zarasai and the property level

17    borrowers, which are the Debtors here today, just so you get

18    a picture of the company at that level.

19         A couple of quick facts, Your Honor:  96 percent

20    of Zarasai's tenants receive the benefits of rent-stabilized

21    protection; the average occupancy rate for Zarasai is 95

22    percent.

23         Let's talk about the overall capital structure so

24    you can get a sense of that as well.  Zarasai and its subs

25    have approximately $1.1 billion of outstanding funded debt

Page 10

1   obligations.  And so upstairs, all the way at the senior

2   level, Your Honor, in entities that are not debtors here,

3   are two tranches of Israeli bonds, just so that you

4   understand, in the amounts of $243 million and $78 million,

5   respectively.

6        Right now, the company is working with the

7   bondholders to resolve issues with that debt, and there's a

8   standstill in place.  Down at the property level, Your

9   Honor, they're $779 million in debt.  Approximately $564

10  million of mortgage debt are obligations of these Chapter 11

11  Debtors.  And those obligations, the $564 million, were

12  borrowed from Flagstar.

13       The remaining $215 million of mortgage debt, which

14  again are not in debtors, is with various other lenders,

15  including Capital One, Freddie Mac, and Axis Bank.  On the

16  82 Debtors that filed, Your Honor, the only secured

17  indebtedness is the $564 million of mortgage debt that is

18  secured by their properties, again, all with Flagstar Bank

19  as a lender.

20       The mortgage debt is the aggregate amount of

21  individual mortgages on the Debtors' 93 properties.  A

22  number of the Debtors own more than one property, Your

23  Honor.  The Debtors' properties constitute $826 million of

24  the total $1.4 billion aggregate book value of Zarasai.  The

25  Debtors' 93 properties comprise 5,200 of the company's 8,100

Page 11

1   residential units across four boroughs, Your Honor,

2   Manhattan, Brooklyn, Queens, and the Bronx.  The Flagstar

3   portfolio represents just one silo of the Zarasai Pinnacle

4   Enterprise, Your Honor.

5           Now, turning to the circumstances that led to this

6   filing, there are three main areas of that.  One has to do

7   with interest rates, one has to do with legislation, and the

8   third has to do with inflation.  On the interest rate side,

9   Your Honor, the Debtors have financed their property

10  portfolio primarily with loans with interest rates that

11  reset every five years.

12          And as the interest rates began to rise rapidly

13  beginning in 2022, the rates on a large proportion of the

14  Debtors' mortgage debt rose from 3 to 4 percent and then to

15  7.5 percent to 10.25.  The cost of servicing the debt

16  increased approximately 75 percent since 2023.  On the

17  legislation side, there have been material legislation

18  changes on the Tenant Protection Act of 2019.  There's been

19  limited ability to raise rents upon tenant departures, and

20  there's been a limited ability to implement some key condo

21  conversion incentives, Your Honor.

22          But despite these restrictions, Zarasai and its

23  subs have sold 143 units during the period.  On the

24  inflation side, Your Honor, rising interest rates, and

25  changes in legislation in addition to inflation has led to

Page 12

1   higher operating costs and lower rent collection, Your

2   Honor.

3           Finally, let's just touch on engagement with

4   Flagstar so you can understand the sequencing.  In December

5   2024, the Debtors engaged with Flagstar when it became clear

6   that they would be unable to make upcoming interest payments

7   on their mortgage debt, Your Honor.

8           On March 14th, Flagstar delivered a notice of

9   default purporting to accelerate the mortgage debt and

10  shortly thereafter began foreclosure proceedings.  On April

11  1st, Flagstar filed an ex parte application for a receiver

12  in New York Supreme Court for New York County to take

13  control of 21 of the Debtors' properties in Manhattan, Your

14  Honor.

15          The Debtors and their advisors continued to engage

16  with Flagstar to discuss potential restructuring solutions.

17  Unfortunately, we were not able to reach a solution with

18  Flagstar.  On April 4th, Flagstar filed three complaints to

19  initiate foreclosure proceedings in the other boroughs:

20  Brooklyn, Queens, and the Bronx.

21          Flagstar's request for a receiver was denied on

22  April 29th and on May 2nd, Flagstar filed a renewed ex parte

23  request for a receiver in New York Supreme in Manhattan.  On

24  May 13th, a substantially identical motion for a receiver

25  was filed in the Bronx County Action and similar motions

Page 13

1   filed in Queens and Kings County.

2          On May 16th, Your Honor, the New York County

3   receiver motion was granted and on May 21st, we commenced

4   these Chapter 11 cases.

5          THE COURT:  Can I ask, is a human -- is a receiver

6   actually in place running the properties?

7          MR. HOLTZER:  No, Your Honor.  The Debtor --

8          THE COURT:  Okay.

9          MR. HOLTZER:  The Debtors continue to manage their

10  properties.  The receiver was not installed.  The filing

11  occurred to cut that off, Your Honor.

12         THE COURT:  Got it.  Thank you.

13         MR. HOLTZER:  So, we commenced these Chapter 11

14  cases on an expedited basis, in response to your question,

15  to avoid disruption to tenant services and prevent the

16  business disruption and value destruction that would be

17  caused by a receiver taking control of the Debtors'

18  properties.

19         And Your Honor, just so we're clear on your

20  question, the Court did enter an order appointing the

21  receiver and in the state process, steps need to occur after

22  that before the receiver actually takes on the assignment,

23  and that part of it was not completed or at least the

24  receiver did not complete the process or actually begin

25  taking over the properties, Your Honor.

1        So, Your Honor, given the emergency nature of

2   this, we're seeking authorization for four weeks to use cash

3   collateral and continue use of our cash management system

4   and an extension of our time to file our schedules and our

5   SOFAs.

6        And if we need additional first day relief, Your

7   Honor, we'll be back in front of Your Honor asking for that.

8   We're assessing that right now.  It is likely that we will

9   need additional first day relief, but again, we'll file

10  applicable motions and be in front of Your Honor if we need

11  that.

12       The Chapter 11 cases are really going to provide

13  the company with the necessary breathing spell for us to

14  maintain our business as a going concern and develop and

15  execute a business strategy that will maximize the value for

16  everybody, including Flagstar.

17       And with that, Your Honor, we can proceed with our

18  motion for authorization to use cash collateral unless Your

19  Honor would like to proceed --

20       THE COURT:  Well, I just want to briefly offer the

21  floor to the other side for -- not an oration, but if you

22  wanted to say something short and introductory, that would

23  be great.

24       MR. HOLTZER:  Sure.

25       MR. BASSETT:  Your Honor, again for the record,

Page 15

1    it's Nick Bassett from Paul Hastings on behalf of Flagstar

2    Bank.  Consistent with Your Honor's comments, I won't give

3    lengthy remarks and will save kind of the bulk of my

4    comments for what I think will be argument.

5              THE COURT:  I don't want you to be too strictly

6    limited, but I don't mean to be too --

7              MR. BASSETT:  Understood, Your Honor.

8              THE COURT:  -- begrudging, but I want to keep

9    things --

10             MR. BASSETT:  But I do think it is important to

11   kind of give the Court a sense of Flagstar's perspective.

12   And, you know, from Flagstar's perspective, Your Honor, this

13   Chapter 11 case at this point is really one that, in our

14   view, raises a lot more questions than answers.

15             We frankly have questions concerning whether there

16   really is a legitimate bankruptcy restructuring purpose with

17   respect to these Debtors.  And part of the reason I say

18   that, Your Honor, is, you know, you see a lot in the papers

19   and in the comments that were made today about how these

20   Debtors, these 82 Debtors, are part of the broader

21   enterprise involving Mr. Joel Wiener and his management

22   company and other non-debtors that have not filed.

23             At the end of the day, Your Honor, the only

24   Debtors in this case are 82 borrowers on loans held by

25   Flagstar, secured by properties owned by those Debtors.

1          In our view, and we will make this case and bring

2     a motion at the appropriate time, each of these Debtors,

3     possibly with the exception of a small few, are single asset

4     real estate entities that are subject to the provisions that

5     apply to such entities under the Bankruptcy Code.  There has

6     been no substantive consolidation in these cases.  There may

7     have been administrative consolidation, obviously, but each

8     Debtor needs to be viewed separately.

9          And standing alone, these are, in fact, single

10    asset real estate entities that have very simple capital

11    structures.  There is a mortgage loan held by Flagstar, some

12    other vendor creditors, that's it.

13         And part of what animates the history of how we

14    got here, Your Honor, is that what -- the general history of

15    the litigation that Flagstar pursued in foreclosure and

16    receiverships is correct.  I would point out that a

17    receiver, in fact, was appointed and remains in place for

18    certain non-debtors that are not subject to the automatic

19    stay, obviously.  But we've had discussions since the fall

20    and continuing into this year.

21         Not a dime has been paid in interest on Flagstar's

22    loans since January of this year.  Flagstar, through its

23    representatives, has been fighting and clawing to try to get

24    information from the Debtors to try to understand what do

25    the cashflows look like at these properties, where is money

Page 17

1    going, how much rent is being earned on a monthly basis, and

2    how is it being used.

3         And, frankly, the budget that we have now received

4    raises more questions than answers, because apparently

5    there's excess incoming revenue at these properties to fund

6    these cases, but none of that, not a dime, was used to pay

7    debt -- was used to pay debt service prior to the

8    bankruptcy.  We have serious concerns about where that money

9    may have went.

10         We know that other non-debtor affiliates have done

11   things like pay, I think, a $12 million bond payment in the

12   last few weeks.  We have serious questions about whether

13   Debtor cash was used to pay that.  All of that is front and

14   center in the mind of Flagstar as it approaches these cases.

15         I won't get into the further argumentation on the

16   cash collateral motion that's being presented to the Court,

17   the cash management procedures, the extension motion.  We

18   obviously filed our paper, and I'm glad to hear the Court at

19   least had a chance to glance at it.  We'll get to those

20   arguments in due course, but I did want to briefly provide

21   the Court that perspective that we've come to these cases

22   with.

23         THE COURT:  Okay, thank you.  I think you hit

24   about the right degree of depth, and I hope conveyed what

25   you wanted.  I think that was helpful.

Page 18

1          Let me just see, does the U.S. Trustee's Office

2     want to say anything up front?

3          MS. SIEGEL:  No, Your Honor.  Nothing to add from

4     the outset.

5          THE COURT:  Okay, thanks.  So, let me turn it back

6     over to the Debtor and you can proceed in the sequence you

7     described.

8          MR. FAIL:  Thank you, Your Honor.  For the record,

9     Garrett Fail, Weil, Gotshal & Manges for the Debtors.  The

10    next item on the agenda is the cash collateral motion filed

11    at ECF Number 7.  There's a declaration in support of that

12    motion and the other first day motions filed on behalf of

13    Ephraim Diamond.  That's at ECF Number 10; that was filed on

14    May 27.

15         Your Honor, the 82 Debtors seek authority to use

16    cash collateral to maintain and operate their 93 properties

17    and to pay other administrative expenses in accordance with

18    the budget proposed and attached to the motion as amended

19    favorably, as I'll mention in a moment.  The use will

20    preserve and enhance the value of the collateral for the

21    benefit of the Debtors' secured lender, other creditors, and

22    all the parties in interest.

23         As Mr. Holtzer said and as set forth in Mr.

24    Diamond's declaration, the Debtors owe Flagstar

25    approximately $564 million.  And as set forth in Mr.

Page 19

1    Diamond's declaration, the Debtors' books and records

2    reflect a value based on third-party appraisals of

3    approximately $826 million as of the end of the year,

4    December 2024.  Those values result in a $262 million equity

5    cushion, Your Honor.  That's approximately 46 percent equity

6    cushion when you do the math.

7            The collateral here is real estate.  The use of

8    the proceeds proposed will ensure that they are maintained

9    and operated, and as such, they will not deteriorate in

10   value in the 30 days that the Debtors propose to use cash

11   collateral.

12           In addition, as shown in the budget filed with the

13   motion, Flagstar's cash collateral will increase during the

14   proposed 30-day interim period.  The budget file shows an

15   increase from a starting point of $0 on the petition date --

16   and that's because Flagstar has no possession and no control

17   agreements over any cash -- and it shows a starting point of

18   zero and an ending balance of $344,729.  No diminution.  A

19   pure increase.

20           Subsequent to filing the motion and following

21   discussions with Flagstar's advisors, though, and after

22   further review, the Debtors propose to modify the budget to

23   remove certain disbursement line items.  Specifically, the

24   following line items will be removed.  The first is a -- the

25   line labeled, management fees (expense reimbursement), that

Page 20

 1    reflected $88,906 for the period.

 2            THE COURT:  That was payable to Pinnacle?

 3            MR. FAIL:  It was payable to a management company

 4    that's an affiliate.  The name -- the exact name is not

 5    Pinnacle, but it's an affiliate.

 6            THE COURT:  In that family?  Right.

 7            MR. FAIL:  It may be outside the Zarasai family,

 8    but it's still nonetheless an affiliated company.

 9            The second line item that we propose to remove is

10    labeled, asset management fees (direct expenses), and that

11    line item was for $105,000 for the interim period.

12            The Debtors also propose to and will be removing

13    two line items.  One was in -- one was -- they net each

14    other off, but it's labeled insurance claims reserve.  The

15    amount was $106,852.  It's shown as a disbursement and then

16    an add back for potential upside that didn't need to be

17    paid.  The Debtors, upon review with their CRO and financial

18    advisors, believe it's unnecessary to account for this in

19    the interim period.

20            THE COURT:  That's -- I'm sorry, to make sure I

21    have it, that's the insurance claim reserve one?

22            MR. FAIL:  Correct, Your Honor.  The amount is

23    $106,852.

24            THE COURT:  Yep.  I see it.

25            MR. FAIL:  So, net from these changes, Your Honor

Page 21

```
 1   -- and apologize that this is being done orally.  These

 2   changes were being made, as you can imagine, you know, in

 3   the car ride down here.  The total reduction in

 4   disbursements that we're proposing is $193,906 when you add

 5   up the 88 and the 105.

 6          And so Your Honor, the budget that we're proposing

 7   will have a total increase in cash collateral from the

 8   petition date to the end of the interim period, a total

 9   increase of $538,635.  So, a larger increase in cash

10   collateral, no diminution in the cash collateral.

11          THE COURT:  So let me ask.  The big fundamental

12   question that Flagstar raises is that you're combining --

13   you're just amalgamating all 82 entities, which are not --

14   yeah, despite the fact that there's no substantive

15   consolidation here, and they say, no, no, these are -- these

16   should be viewed as -- in silos.  So, what do you have to

17   say about that?

18          MR. FAIL:  Not so, Your Honor.  So, let me

19   clarify.  The budget that is proposed was proposed on an

20   aggregate basis.  The accounting for receipts will be on an

21   individual Debtor basis.  The accounting for disbursements

22   will be on an individual Debtor by Debtor basis.  The budget

23   was proposed on an aggregate because a lot of the numbers

24   could be plugged into 80-something columns.

25          But a number of the items are estimates.  For
```

Page 22

1   example, Your Honor, repairs.  Which unit, which building

2   will need a repair and for how much?  Will it be a boiler in

3   one building and I'll lose something in the light fixture in

4   that same building or will it be in another?

5           The estimate that was put into the budget on an

6   aggregate basis was based on historical performance and the

7   views of management and its advisors of what would be needed

8   in general for the four months.  There's no doubt that

9   whatever would be used and put into the properties would

10  benefit the collateral, whichever piece of collateral it is,

11  and it would be speculation to assume.

12          The same with vacancies, Your Honor.  The Debtors'

13  tenants, some will vacate these very valuable for tenant

14  right properties, but they may do so on the last day of the

15  month, two days before, or we might find out after the fact.

16  Which units need to be repaired?  Is it one that was

17  recently renovated and needs, you know, very little amount

18  of money, or is it one where a tenant has been for 20 years

19  and needs a gut?  What will the cost be will depend on which

20  unit in what building.

21          So, to do an estimate and to do a budget 83 times,

22  82 times, and then be subject to a 10 percent variance or a

23  15 percent variance is unworkable.  And given the fact that

24  it is one lender and one collective borrower organization

25  management company, the Debtors proposed for ease and didn't

Page 23

1    expect that there's really any substantive harm here for

2    doing it as proposed.

3           But rest assured, as we've confirmed to the U.S.

4    Trustee, receipts will be itemized on a Debtor-by-Debtor

5    basis.  Disbursements will be accounted for on a Debtor-by-

6    Debtor basis.  Cash management will be tracked that way.

7    And I don't want to steal my colleagues' thunder, but there

8    are similar motions.  And the cash will be accounted for

9    once it comes into the system.

10          It's impossible to sort it before it comes in.

11   The money comes in after a period -- you know, the money

12   will come into one account, and it will be allocated on a

13   Debtor-by-Debtor basis in another Debtor account.  We're

14   trying to accommodate U.S. Trustee guidelines and assure

15   Flagstar and the Court that money will be in the Debtors'

16   possession.  It just needs to get there.

17          And to get it there without losing it to

18   inefficiencies or mistakes by third parties, that despite

19   best efforts have -- would have a hard time to do it.  We're

20   doing what's best and most efficient for the Debtors to make

21   sure that rent rolls come in and can be used for either

22   additional collateral buffer or for use for the Debtors on a

23   timely basis.  But we're certainly not commingling here.

24          And specifically, Your Honor, we do ask and call

25   out that to the extent that on a cashflow basis or for this

Page 24

1    interim period, one Debtor's cash needs to be used for

2    another Debtor's property, that we would be able to loan

3    from Debtor to Debtor on -- for an administrative expense

4    claim.  Again, it's all Flagstar's purported collateral.

5    Without another source of revenue, you know, I suppose they

6    could come out of pocket and fund it and offer us the funds,

7    but that hasn't been forthcoming.  So, we thought that we

8    would fund the portfolio with its own assets.

9            THE COURT:  Okay.  And do you -- I guess I'm

10   tempted to just kick you out and tell you to talk, but I

11   mean, the -- this is -- ideally, you'll emerge with consent

12   on some terms, right, so that I don't have to adjudicate

13   contested --

14           MR. FAIL:  That was our hope, Your Honor.  We've

15   sought to reach consensus; we've limited those line items.

16   We've read their objection.  The Debtors do believe, though,

17   that given the equity cushion on the real estate portfolio,

18   given the increase in cash collateral, I know that the --

19   that Flagstar likes to view them separately.  So, both of

20   them, you know, we view as adequate protection without

21   diminution, that the additional asks by Flagstar for

22   constraints to restrict payments to the management company,

23   which is necessary -- a necessary cost, the amount being

24   paid under the budget is the 4 percent that's provided by

25   the management contract.

1          We believe -- the Debtors believe that 4 percent

2     is the low end of any management services fee that could be

3     found.  Debtors believe that, you know, any receiver that

4     would be put in would get a fee and would hire its own

5     management company for likely more than 4 percent with less

6     effective services.  Given the Debtors' history with this

7     portfolio and others, it's able to obtain bulk discounts.

8     It has supers that know -- it has professionals that know

9     these buildings and this equipment, some of which is quite

10    dated, and that you're not going to find -- you're not going

11    to find somebody else to do this for 4 percent, Your Honor.

12    So, restricting --

13          THE COURT:  So therefore, clear that, you're

14    saying.

15          MR. FAIL:  I mean, it's impossible not to, Your

16    Honor, from the Debtors' perspective.

17          THE COURT:  Can they live with a temporary

18    cessation in payments pending the final hearing?

19          MR. FAIL:  No, Your Honor.

20          THE COURT:  Why?

21          MR. FAIL:  There -- these expenses go to pay the

22    operations of the management company.  And without these

23    revenues, there are engineers, there are accountants, there

24    are lawyers, there is administrative staff, there are

25    supervisors that -- there are people that are running these

Page 26

1   buildings from the operation center that would not have --

2   you would be cutting off their cash flow.

3           THE COURT:  Okay.

4           MR. FAIL:  And the same with professionals, Your

5   Honor.  We don't think it's controversial.  You know, in the

6   few minutes that we had, we were able to find, you know,

7   examples where, you know, Flagstar's attorneys, you know,

8   have same provisions in plans, carveouts are standard and in

9   DIP, in cash collateral orders.

10          And Your Honor, most importantly, you know, the

11  attorney's fees, the critical vendor payments, the utility

12  deposits are all subject to further order of this Court.

13          THE COURT:  Right.

14          MR. FAIL:  What we did is we built in models to

15  show you that even with those costs, these Debtors would be

16  administratively solvent.  And even after accounting for

17  those costs, should they be approved on a later date, there

18  would be an additional sufficient cushion and an increase in

19  the cash collateral.

20          THE COURT:  Okay.  And what are you looking to

21  escrow as opposed to pay in the next four weeks, if

22  anything?

23          MR. FAIL:  What do you mean --

24          THE COURT:  Maybe -- I said if anything.

25          MR. FAIL:  Yeah, yeah --

Page 27

1            THE COURT:  Don't (indiscernible) if anything.

2            MR. FAIL: Professional fees, for example, and I

3     think there were -- so we could take a look at the line

4     items.  I'll do my best and then --

5            THE COURT:  Yeah --

6            MR. FAIL:  -- when I'm done, I'll turn my head to

7     look for some support.

8            THE COURT:  Yeah, I mean, what I absorb is you

9     want to be paying your management fees, I think, because

10    those are real-time costs.

11           MR. FAIL:  Salary and wages, I believe.  Employee

12    benefits.  I think all of the line items are actual

13    expenses.  But if you give me one moment, I can check with

14    the client.  I think the only ones that I'm aware of that

15    were kind of escrowed, but approvals were the restructuring

16    professional fees, and the rest were -- and I suppose the

17    repairs and maintenances could be accruals for work that is

18    being -- that could be estimated to be done.

19           THE COURT:  Right.

20           MR. FAIL:  So, let's just take a look with my

21    client.  Is that correct?

22           (Counsel and client conferring)

23           MR. FAIL:  There are additional line items like

24    broker fees, so this is a budget that would show for the

25    accrual -- for the accruals, we're not spent, four amounts

1    that would need to be spent.  So for example, you'll see,

2    you know, in week zero, Your Honor, there was $26,000 that

3    needed to be paid.  I think there was a water main break,

4    and New York City sent a letter to the Debtor saying, fix

5    it, or you'll be charged fines and penalties.

6              And there was a water main break, and there are

7    tenants living in the building.  So, that was an emergency

8    expenditure that wasn't planned that came out.  Other

9    amounts are budgeted amounts, an estimate for when they

10   would either be incurred or given the bankruptcy, you know,

11   folks that would otherwise take credit may not.  And so --

12             THE COURT:  Okay.

13             MR. FAIL:  There's not a lot -- there's no --

14   there's not a lot of flexibility left in what we're asking

15   for, Your Honor.

16             THE COURT:  Okay.  Do you want to -- oh, a couple

17   of things.  One is, you didn't proffer the declaration, you

18   just referred to it.  How do you want to handle --

19             MR. FAIL:  Your Honor, with your permission, we

20   could -- we'd move to have that admitted as evidence, into

21   the evidence, and Mr. Diamond is here in the courtroom

22   today.

23             THE COURT:  Okay.  Is there any objection to

24   receiving it?

25             MR. BASSETT:  Your Honor, I do object to certain

Page 29

1    aspects of it; namely, I think this discussion about these

2    vaguely referenced appraisals that are -- form the basis for

3    the alleged cash cushion, I think that's all hearsay.

4    There's been no discussion about what those appraisals

5    actually contain, who prepared them.

6            I also, subject to the kind of general rule at

7    first day hearing that the declaration would otherwise come

8    into evidence only for purposes of today's hearing, I think

9    I would be fine with the balance; however, I do have

10   questions for Mr. Diamond.

11           THE COURT:  Okay.  I ask that as two separate

12   questions.  You answered my second question.  Okay.  So --

13           MR. FAIL:  Your Honor, if I may?  We're happy that

14   it be entered for today's purposes only.  With respect to

15   the statements that are in the declaration regarding the

16   valuation, as Your Honor may have seen, Mr. Diamond is

17   testifying that the Debtors' books and records, including

18   the balance sheet that was attached to his declaration, the

19   Debtors' books and records show an asset value.

20           He was explaining that the asset value was based

21   upon appraisals that were done for the Zarasai organization,

22   and that they were done by third party, subject to audit,

23   and published in the parent's -- in aggregate included as a

24   buildup in the parent's financials.

25           And so, he did not perform the valuation.  I think

1    the reference there was that the books and records of the

2    company show an asset value and I would just -- not to cut

3    off any argument or cross, but notably absent from the

4    objection is an objection to the actual valuation that the

5    Debtors propose, or an alternative valuation.

6              And, you know, Flagstar knows this -- these

7    properties very well, probably has a mark of its own and

8    carries it on its books and records.  And so, we assume if

9    there was an objection to valuation, we would have heard it.

10             For today's purposes, we think that the books and

11   records speak for themselves.

12             THE COURT:  Okay.  I got it.  Look, I'm going to

13   -- any other basis for the objection?

14             MR. BASSETT:  I'll just respond briefly, Your

15   Honor.  I -- the fact that there is a line item in financial

16   statements that refers to a valuation, I think it's not

17   probative of anything.

18             THE COURT:  Right.

19             MR. BASSETT:  If anything's probative, it's the

20   valuation itself and I think that is hearsay, Your Honor, to

21   the point of, you know, we haven't -- Flagstar has not

22   offered any of its own evidence as to valuation.  It's not

23   our burden today, Your Honor.

24             THE COURT:  Understood.  All right.  So, I'm going

25   to overrule the objection and receive the declaration,

Page 31

1    subject to Flagstar's ability to cross examine and will pin

2    down the exact evidentiary weight, if any, that that

3    component is entitled to.  I understand Flagstar's concern

4    and point.

5            I think at a minimum, some evidentiary

6    significance has been established, at least in that those

7    portions constitute what the Debtor is relying on to back

8    its assertion of adequate protection being provided in the

9    form of an equity cushion.  And that either will or won't

10   hold up, but I think we should establish what the asserted

11   factional basis is and then subject to further development

12   on the record.  Okay?  So, should we call Mr. Diamond now

13   without further ado?

14           (Diamond declaration entered into evidence)

15           MR. FAIL:  Yes, Your Honor.

16           THE COURT:  So, thanks.  So, Mr. Diamond, please

17   -- you'll see the witness stand is right there.  You need to

18   loop around to the front.  And -- are you ready to go?

19           MR. DIAMOND:  Yes.

20           THE COURT:  So, if you were to stand there and

21   raise your right hand and I need to administer the

22   testimonial oath.  Do you solemnly swear or affirm that all

23   the testimony you are about to give before this court will

24   be the truth, the whole truth, and nothing but the truth?

25           THE WITNESS:  I so affirm.

Page 32

```
 1              THE COURT:  Okay.  Thank you.  You can be seated.
 2    That horizontal bar in front of you is a microphone, so try
 3    to talk in its direction and if you have trouble with it --
 4    we have trouble with it, I'll correct you on the fly.
 5              THE WITNESS:  -- move this, just so I can see the
 6    --
 7              THE COURT:  Yes.  You can move it however you
 8    want.  Yes, our setup is poor, but you're stuck with wires.
 9    So, is that going to work?  Yeah, I think usually -- yeah,
10    as best you can.  Sorry.  Yeah.  Is that good?  Okay, great.
11              THE WITNESS:  Little better.
12              THE COURT:  Okay.  Thanks very much and --
13              MR. SLACK:  Your Honor, just want to introduce
14    myself.
15              THE COURT:  -- introduce yourself.  Nice to see
16    you.  Who are you?
17              MR. SLACK:  Richard Slack from Weil Gotshal.
18              THE COURT:  Okay.
19              MR. SLACK:  I'm going to be representing the
20    witness in his testimony, so I wanted to introduce myself,
21    Your Honor, and then turn him over for cross examination.
22    Before we do that, I'd ask permission to put his direct
23    testimony or his declaration in front of him.
24              THE COURT:  Yeah.  Any objection to that?
25              MR. BASSETT:  No objection, Your Honor.  May refer
```

1     to paragraphs.

2               THE COURT:  Yeah, that's fine.  I'm sure that's

3     likely.  You'll have to make a hike around or ask a

4     colleague to --

5               MR. SLACK:  Would you like to copy yourself as

6     well?  Do you have it?

7               THE COURT:  Actually, I don't have a printout, so

8     it would be great.  From time to time, you'll see me not

9     looking at you and staring to my left.  That's where I have

10    all my electronics.

11              MR. SLACK:  May I approach, Your Honor?

12              THE COURT:  You may.  Thank you.

13              MR. BASSETT:  And Your Honor, just to get it out

14    of the way, I think I will need the witness to have a copy

15    of the budget for the cash collateral order he refers to in

16    his declaration.

17              THE COURT:  Okay, great.  So, let's --

18              MR. SLACK:  We can give him that, too.

19              THE COURT:  Okay, great.  Just make sure you're

20    talking about the same thing.

21              MR. BASSETT:  I have a copy of it, yeah.

22              THE COURT:  Yeah.  Okay, thank you.

23              MR. BASSETT:  But if you (indiscernible) budget,

24    that'd be great.  Thank you.

25              THE COURT:  Mr. Bassett, are you going to be doing

1    the questioning?

2            MR. BASSETT:  Yes.

3            THE COURT:  I'll just ask you to do it from the --

4            MR. BASSETT:  Yeah -- yes, Your Honor.

5            THE COURT:  Yeah, I know you're getting set.

6            MR. SLACK:  So, Your Honor, this is the old

7    budget.  We're also going to have a new budget.

8            THE COURT:  Okay.

9            MR. SLACK:  (indiscernible).

10            THE COURT:  Okay.

11            MR. SLACK:  This is the old budget

12    (indiscernible).  Once again, I'm going to approach.

13            THE COURT:  Yes, thank you.

14            MR. SLACK:  This is the revised one.

15            THE COURT:  Okay.  So, while we're -- people are

16    walking around, I'll just say the witness and I have been

17    handed printouts of Mr. Diamond's declaration, which is

18    docketed at ECF Number 10.  Also, a copy of what was just

19    referenced as the old budget, or really, you might call it

20    the original budget.  It's annexed to ECF Number 7, so also

21    docketed in the case.

22            And then we've just been handed a separate

23    document referred to as the new budget or the modified

24    budget.  So, let's mark that because that's not in the

25    record.  We can just call it whatever.  Should we call it a

Page 35

1    Debtor Exhibit A for identification right now?

2              MR. SLACK:  That would be fine, Your Honor.

3              (Debtor Exhibit A marked for identification)

4              MR. BASSETT:  I don't believe I have a copy of the

5    --

6              MR. SLACK:  Revised budget.

7              MR. BASSETT:  The new budget.  Thank you.

8              THE COURT:  Okay, so when you're ready, Mr.

9    Bassett, you can go right ahead.

10             MR. BASSETT:  Thank you, Your Honor.  Again, for

11   the record, Nick Bassett from Paul Hastings on behalf of

12   Flagstar Bank.

13                 CROSS EXAMINATION OF EPHRAIM DIAMOND

14   BY MR. BASSETT:

15   Q    Mr. Diamond, it's nice to see you again.

16   A    Likewise.

17   Q    It's been a while since we've had the pleasure of

18   having one of these exchanges.

19   A    That is true.  That is true.

20   Q    So, Mr. Diamond, you've been the CRO for what, a week

21   now; is that right?

22   A    Correct.

23   Q    And even though you've only been a CRO for about a

24   week, you've been involved with the company since, is it

25   September of 2024; is that correct?

Page 36

1    A    Correct.

2    Q    Prior to that, did you have any involvement with any of

3    the Debtors, the non-debtors, or Mr. Wiener?

4    A    Prior to?

5    Q    Prior to coming on board in September of 2024?

6    A    No.

7    Q    And how long has, to your knowledge, Weil Gotshal been

8    engaged as legal counsel to the Debtors?

9    A    Somewhere after February 25th, I believe.  Or actually,

10   no, I'm sorry.  That was when I was on my 50th birthday,

11   sorry.  Somewhere in the middle of February.

12   Q    Somewhere middle of February?  And --

13   A    I believe.

14   Q    And the Debtors also have FTI as financial advisor; is

15   that right?

16   A    They do.

17   Q    And how long has FTI been engaged, to your knowledge?

18   A    After Weil was engaged.  I don't remember the exact

19   date.

20            THE COURT:  That's all this year?

21            THE WITNESS:  This year, sorry.  Yes, 2025.

22   BY MR. BASSETT:

23   Q    Now, in your declaration, I believe it's maybe

24   Paragraph 18, you talk about how some discussions occurred

25   between the Debtors and Flagstar back in the fall of last

Page 37

1    year, right?

2    A    Correct.

3    Q    And discussions have been ongoing since that time; is

4    that accurate?

5    A    Sporadically, yes.

6    Q    Now, as part of those discussions, including as early

7    as last fall when they began, Flagstar has requested

8    information from the Debtors about revenues and cashflows of

9    the properties, right?

10   A    I don't recall specifically all the types of

11   information, but they certainly requested information.

12   Q    Well, Flagstar specifically wanted to understand what

13   rents were actually being generated by the properties and

14   then what was happening to the rents that were received by

15   the properties, right?

16   A    Correct.

17   Q    And did you provide Flagstar information sufficient to

18   provide that level of information to show how the cash was

19   flowing in each property?

20   A    I did not.

21   Q    Did the Debtors provide that information?

22   A    I understand that at one exchange where the Debtors met

23   with Flagstar, there was information exchanged.  I was not

24   at that meeting.

25   Q    Well, do you have an understanding as to whether or not

Page 38

1    Flagstar has sufficient information to understand,

2    particularly since January of 2025, when rent stopped being

3    paid -- or sorry, when debt service stopped being paid on

4    the bonds, whether Flagstar has had sufficient information

5    to understand what has happened to the rent collected at the

6    properties?

7              MR. SLACK:  Objection to the form, Your Honor.

8              THE WITNESS:  Sorry, can I --

9              THE COURT:  Overruled.

10             THE WITNESS:  Yeah, I'm sorry.  Just, again,

11   what's the reference timeframe?  I'm sorry.

12   BY MR. BASSETT:

13   Q    Since January 2025, you understand that since that

14   point in time, no money has been paid for debt service on

15   Flagstar's loans, correct?

16   A    That is my understanding, yes.

17   Q    Since that point in time, do you have an understanding

18   one way or the other as to whether or not the Debtors have

19   provided Flagstar sufficient information to understand what

20   has happened to the rent received by the properties if it

21   has not been used to pay debt service?

22             MR. SLACK:  Your Honor, I object on the grounds of

23   relevance here.  I mean, obviously Flagstar has some issues

24   in the opening of, you know, counsel's remarks.  He says

25   they have issues about the past, and none of those are an

Page 39

1    issue today.  They may or may not be an issue as we go, but

2    this hearing is not sort of discovery on whatever their

3    issues are, whatever the past has been, and they don't

4    relate to the cash collateral motion, except maybe in the

5    most collateral way, you know, so to speak.  So, we object,

6    you know, to this line of questioning at this point.

7              THE COURT:  Okay, thanks.  I'm going to overrule

8    the objection for the following reason.  The question simply

9    asks about the provision of information over the past four

10   to five months, and I am pretty confident that Flagstar is

11   trying to build the case that I can't rely on the numbers

12   provided or be confident that adequate protection is, in

13   fact, being provided in part based on recent historical

14   money flows and lack of clarity on what those have been.

15             I know that's the position taken in their papers.

16   At the same time, I appreciate your point, and we're on the

17   clock, and it's 2:45, so I expect and hope that you'll have

18   a pretty tight and focused presentation.

19             MR. BASSETT:  It will be tight, Your Honor.

20             THE WITNESS:  Okay, I'm sorry, just, with the

21   colloquy, I -- again, the question was?

22             MR. BASSETT:  Do we have the ability to read that

23   back, Your Honor?

24             THE WITNESS:  Yeah, so I know it was a complicated

25   --

Page 40

1           THE COURT:  We don't.  We don't have a reporter.

2    Let me try to paraphrase because --

3           THE WITNESS:  Yeah --

4           THE COURT:  -- a lot of introductory comments.  Do

5    you know, as far as you know, does Flagstar have enough

6    information about money flows since the start of 2025 to let

7    them know where the money went in the period when they

8    haven't been getting paid on their loans?

9           MR. BASSETT:  Much better.

10          THE WITNESS:  I don't believe so.  I know that,

11   like I said, there was a meeting where, which I did not

12   attend, where there was an exchange of information.  I

13   actually, I'm not certain about what information was

14   exchanged at that meeting, so I can't speak to the scope of

15   that information, but I know that Flagstar has consistently

16   said that they don't have enough information.

17   BY MR. BASSETT:

18   Q    And now, you're familiar with the budget.  I'll refer

19   to the old budget.

20   A    Correct, yes.

21   Q    Put before you, correct?

22   A    Yeah, the old one?

23   Q    Yes.  Now, is it correct that under that budget, it

24   projects that after the first four weeks in this case, after

25   the payment of management fees and after the payment of

Page 41

1    professional fees, that there will be $340,000 approximately

2    in cash remaining; is that correct?

3    A    That's correct.

4    Q    And do you have an understanding of what the Debtors'

5    cashflows were at these properties, say, for the four weeks

6    prior to the bankruptcy filing?

7    A    Not specifically, no.

8    Q    Do you have any understanding as to whether there was a

9    similar -- so before the bankruptcy filing, correct, the

10   Debtors were not paying Weil Gotshal's professional fees, at

11   least not since January, right?

12   A    I don't know.

13   Q    Well, you said they weren't retained until sometime in

14   February.

15   A    In February, yes.  (indiscernible) since whenever they

16   were retained.

17   Q    So, do you understand since January, has there been

18   excess revenue at these properties?

19   A    I don't know.

20   Q    Do you have any understanding if there was excess

21   revenue, what happened to it?

22   A    All I know is they're not in the Debtors' bank

23   accounts.

24   Q    What's not in the Debtors' bank accounts?

25   A    If there was cash, there's no cash remaining in the

Page 42

1    Debtors' bank accounts.

2    Q    But you don't know what happened to cash going back to

3    January 2025?

4    A    I do not.

5    Q    By the way, looking at the budget, do you have a

6    breakdown of all of the receipts and disbursements, each

7    line item, on a property-by-property basis?

8    A    I'm sorry, do I have a line item for each?

9    Q    Let me start that -- revise that.  Sorry.

10   A    Okay.

11   Q    Do you -- so this budget is for all of the Debtors,

12   correct?  All 82 Debtors?

13   A    Correct.

14   Q    Do you have a breakdown of all of the receipts and

15   disbursements, each of the line items in this budget, for

16   each of the 82 Debtors on an individual basis?

17   A    We don't have an aggregate.  We don't have a budget

18   that rolls up -- we don't have 82 budgets that roll into

19   this.  This is an aggregated budget.

20   Q    So, you couldn't tell me, for example, looking at the

21   list of entities, what the projected cash receipts over the

22   next four weeks are going to be for 193 Street Realty Co.

23   LLC?

24   A    Not offhand, no.

25   Q    And you couldn't tell me that for any of the other

Page 43

1    Debtors, right?

2    A    Correct.

3           THE COURT:  I'm sorry, I have to break in for an

4    annoying reason -- to me.  Federal judicial policy bars the

5    remote broadcasting of live testimony to people who aren't

6    case -- are not case participants.  So, it's unclear to me,

7    we may have, because this is hybrid, we may have some non-

8    case participants listening in in a manner that doesn't

9    conform with whatever our federal court mandates, and I'm

10   obliged to enforce that.

11          So, I think what I'll do is let me just say, if

12   you're not a case participant, please log off now and then

13   contact my deputy, Linda Calderon, at the Chamber's email

14   box, and she will tell you when the live testimony has ended

15   and you can reconnect.  Okay?  So, that constitutes my best

16   effort to enforce this policy.  If you are a case

17   participant who's remote, I think you're entitled to remain

18   here, but if you're merely a member of the public observing,

19   you're not allowed to be watching live testimony that way.

20          Okay?  So there, now you can resume.  Sorry about

21   that.

22          MR. BASSETT:  No problem, Your Honor.

23   BY MR. BASSETT:

24   Q    So, I want to ask you some questions about -- and I

25   don't have too much more for you, Mr. Diamond, but I'd like

Page 44

1   to ask you some questions about the management fees that

2   appear on the budget, and I'll focus just on the, I guess,

3   the one that remains in the "new budget," and I believe that

4   would be the -- let me find it -- the line item for

5   management fees (direct expenses).  Is that right?

6   A    You're looking at the old or the new?

7   Q    I'm looking at the old budget.  That's the line --

8   A    Yes.  Yes.  I have it.

9   Q    Now, that's -- those fees are projected to be $308,000

10  over the next four weeks, approximately; is that right?

11  A    Correct.

12  Q    And those fees are paid to a non-debtor affiliate

13  management company pursuant to management agreements; is

14  that right?

15  A    That's correct.

16  Q    And the range of the fee is 3 to 4 percent, and that's

17  -- is that of income generated at the properties?  Is that -

18  -

19  A    Correct.  Trailing income.  Trailing last month's

20  income.

21  Q    Okay.  And have the Debtors done any analysis to figure

22  out how, if at all, that 3 to 4 percent charge on trailing

23  income actually provides benefits to upkeeping the

24  properties?

25  A    Yeah.  Well, most -- yes.  I mean, mostly this 4

Page 45

1   percent management fee is used to pay for the office staff

2   that manages all the buildings.  This is allocated, by the

3   way.  This is only -- this is a portion that's allocated to

4   the 5,200 units of the overall management, asset management,

5   you know, management fee.

6   Q    In terms of the adequate protection analysis, have the

7   Debtors done any analysis to figure out how, if at all, the

8   payment of this management fee helps to increase or maintain

9   the value of the real property?

10  A    Sure.  Can I -- I mean, if you don't pay the accounts

11  payable person, we can't make payments.  If we don't -- we

12  can't -- if we don't have account receivable persons, we

13  can't, you know, we can't function.  If we don't have

14  supervisors, if we don't have, you know, if it's the actual

15  office staff.  It's those salaries.

16  Q    But you're talking about actual expenses; whereas, this

17  management fee is based on a percentage of --

18  A    I'm saying that this this goes to fund the management

19  company, which provides all those services to the building.

20  So we have, last week at 26 -- a water main broke.  We got a

21  notice from the city, the DEP, that they would shut off all

22  water within two days if we didn't get somebody working on

23  it.  So, that runs itself from the building manager and the

24  engineers that work at the building, that ran up to the

25  management company, who then coordinates that response so

Page 46

1     that we can get somebody.

2     Q     Which entity are these management fees being paid to?

3     A     The affiliated non-debtor.

4     Q     And who's the ultimate principal owner of that entity?

5     A     I'm not sure.

6     Q     Is it Mr. Wiener?

7     A     Could be.  I'm not a hundred percent sure.

8     Q     You don't know?

9     A     I don't know.

10    Q     And is it the same management company and the same

11    ownership structure, to your knowledge, that has been in

12    place since January of 2025?

13    A     I believe so, yes.

14    Q     Have you reviewed these management agreements?

15    A     I reviewed -- I've seen one of them.

16    Q     Do you understand that it has a provision saying that

17    the management fees are subordinated to debt service owed on

18    mortgages?

19    A     I mean, I saw that in your objection.

20    Q     You were aware of that prior to my objection?

21    A     I don't know that I focused on that prior.

22    Q     The professional fee escrow, it's $2.4 million for

23    professionals over the next four weeks; is that right?

24    A     Yes.

25    Q     Which professionals are included in that?

Page 47

1   A    It includes counsel, FTI, and we're going to be

2   proposing a, you know, a -- I forget what you call them,

3   case manager, given the size.  I forget the -- I

4   (indiscernible) I forgot the -- you know, the Strettos of

5   the world.  One of those entities.  And it may include my

6   fee, but I'm not sure.  I don't recall if it includes

7   (indiscernible) fee.

8   Q    Now, what analysis, if any, has been done to determine

9   how, if at all, those professional fees will result in

10  benefits for Flagstar's collateral?

11  A    I mean, just overall, the filing of the bankruptcy is

12  beneficial as opposed to the turmoil that a receivership

13  would have caused to the buildings and to the tenants.  You

14  know, given my experiences in this field, you know, whenever

15  a receiver comes in, unfortunately, even the most well-

16  intended receivers, they don't usually do well, at least in

17  the first few months and usually throughout the process.

18       So, we were concerned about, you know, deterioration of

19  the value of these buildings during that receivership.  So,

20  I believe that the filing of the bankruptcy and counsel and

21  professional fees efforts actually enhance and preserve that

22  value.

23  Q    Any analysis beyond that, looking at the particular

24  tasks that these professionals are going to be performing

25  throughout the cases?

1   A    I don't know if I did a task-by-task analysis.

2   Q    Any analysis on a Debtor-by-Debtor basis to see how

3   professional fee services are going to benefit collateral at

4   each Debtor entity?

5   A    I think it's a general observation across the board.

6   Q    I want to talk a little bit about the appraisals that

7   we referenced earlier, and these are, I think, at paragraph

8   -- you referenced them in Paragraph 11 of your declaration.

9   A    One moment.  Okay.

10  Q    So, there were 82 such appraisals; is that correct?

11  A    I'm sorry?

12  Q    There were 82 such appraisals, is that correct?

13  A    I don't know if there were 82 such appraisals.

14  Q    How many were there?

15  A    So, again, I'm not -- what I'm not -- (indiscernible)

16  not as familiar with the appraisals, what I would say is

17  that I think -- well, I'll stop there and then --

18  Q    Well, what are you familiar with?

19  A    The company's books and records.

20  Q    You referenced -- have you ever seen any appraisal

21  document?

22  A    I have seen appraisals, but I'm not sure if they were

23  related to these particular buildings.  So, what you're

24  relying on for your testimony today in your declaration is

25  just that you've seen a line item on financials that refers

Page 49

```
 1    to appraisals that have been done?

 2    A    Yeah, the books and records of the company reflect this

 3    as their book value based on appraisals -- independent

 4    appraisals.

 5    Q    Do you have any idea for what purpose the actual

 6    appraisals that feed into that number on the financial

 7    statements, any idea what purpose that was done for?

 8    A    The company is a public company in Israel, and so they

 9    need to report financials, audited financials every year.

10    So, they undertake these appraisals as part of marking their

11    book.

12    Q    Is there a report or analysis, to your knowledge, that

13    accompanies the actual appraisal that feeds into the

14    financial statements?

15    A    I'm not sure.

16    Q    Do you have any idea what -- do you know who performed

17    the appraisal?

18    A    I'm told Bowery.

19    Q    Do you have any idea what valuation methodology Bowery

20    used?

21    A    I do not.

22    Q    Do you have any understanding of what, if any,

23    assumptions whoever at Bowery may have prepared the

24    appraisal relied upon?

25    A    I do not.
```

Page 50

1    Q    Do you have any idea who specifically at Bowery and

2    what their qualifications are prepared the appraisals?

3    A    (indiscernible).

4    Q    Do you have any idea who specifically at Bowery

5    prepared the appraisals?

6    A    Michelle, but I forget her last name.

7    Q    Do you know anything about her qualifications?

8    A    I do not, sitting here.

9            MR. SLACK:  Your Honor, I'm just going to say that

10   we object to this.  I think it's clear from Mr. Fail's, you

11   know, answers to the questions that Your Honor asked, that

12   what we've put in is the company's books and records, and

13   we've said what they are based on, but we are not putting in

14   the appraisals themselves.  We are putting in the company's

15   books and records, and that is what's being relied on, so --

16           THE COURT:  Yeah, I'm going to interrupt you to

17   agree with you, but this is not a motion to strike or

18   anything.  Look, I think it's fair of you, Mr. Bassett, to

19   establish the contours of what is and isn't shown, and I

20   think you pretty well nailed it.  I mean, I have it.  The

21   Debtor is relying on a book and record-based aggregate

22   number.  The witness's understanding is derived from

23   appraisals, with which he's not personally familiar, and I

24   don't know if you really need more than that.

25           MR. BASSETT:  Understood, Your Honor.  That was --

Page 51

1    I was actually to the end of my questions --

2              THE COURT:  Okay, great.

3              MR. BASSETT:  -- on the topic anyway, so --

4              THE COURT:  Okay.  So I guess that means Mr. Slack

5    did a good job of --

6              MR. BASSETT:  That's right.

7              THE COURT:  -- making a judgment call about when

8    you were straying into too much.

9              MR. BASSETT:  That's right.  I just did have one

10   more question just about the appraisals, but not how they're

11   prepared or anything.

12   BY MR. BASSETT:

13   Q    Do you know, sitting here today, how those appraisals

14   break down on a property-by-property basis?

15   A    I do not.

16   Q    So you couldn't tell me, for example, what the

17   appraised value of the real estate held by Hillside Realty I

18   Co. LLC is?

19   A    No.

20             MR. BASSETT:  I have no further questions.

21             THE COURT:  Okay, thank you.  All right, any

22   redirect?

23             MR. SLACK:  Just briefly, Your Honor.

24              REDIRECT EXAMINATION OF EPHRAIM DIAMOND

25   BY MR. SLACK:

Page 52

1   Q    Mr. Diamond, you were asked about the budget and

2   whether there was a budget breakdown by Debtor.  Can you

3   just explain to the Court why the budget was prepared on an

4   aggregate basis, and in particular, if there were ways that

5   doing it on an aggregate basis made it more accurate and

6   reliable?

7   A    Sure.  You know -- and I think this was -- may have

8   been said earlier as well, which is when trying to devise a

9   budget for these 82 buildings, especially in the short

10  period of 30 days, you know, we -- the company looked --

11  under my direction with FTI and myself, we looked back and

12  tried to understand, like, what are the typical needs of

13  this company, especially for repair.  Like these -- they're

14  not soft costs.  They're real costs and they affect real

15  people, but it's the ones that you can't predict in a kind

16  of real way.  So you know, obviously, cash receipts, those

17  are kind -- assuming people pay their rents, those are kind

18  of standard and so on.  But salaries and wages are pretty

19  much the same.  But when you start to get to repairs and

20  maintenance, apartment renovations, the broker fees, which

21  are just coming into effect starting June 1st, a lot of --

22  and you know, professional fees or some other line items, it

23  just became very difficult to kind of map out within the

24  constraints of what a cash collateral order would be to kind

25  of allocate them in a way that would allow us to effectively

Page 53

1    operate.  So, putting them in the aggregate allows us to

2    have the flexibility to fix, repair, renovate, pay the

3    things that pop up, like for example, the $26,000 that just

4    came out of nowhere Memorial Day weekend.

5                THE COURT:  I think you're right that Mr. Fail

6    argued that, but it matters to have it in the magic

7    testimonial form.  So, let me just ask one clarifying thing

8    before I turn it back to Mr. Slack.  You said the needs of

9    this company, and I think you're really talking about the

10   enterprise --

11               THE WITNESS:  No --

12               THE COURT:  -- as a whole, right?

13               THE WITNESS:  The property (indiscernible), the

14   Debtors.

15               THE COURT:  All of them collectively?

16               THE WITNESS:  Collectively, yes.

17               THE COURT:  Yeah.  Okay.

18   BY MR. SLACK:

19   Q    Now, Mr. Diamond, there was a number of questions that

20   were asked at the beginning about certain information

21   requests prior to the time that you became CRO.  Since

22   you've become CRO, have you taken any steps in trying to

23   address those information questions?

24   A    Absolutely.  We are trying to address everything in a

25   timely manner.  Unfortunately, we ended up filing emergency

Page 54

1   bankruptcy filings and working on this budget, but all of

2   these issues are on my mind just as much as everybody

3   else's.

4   Q    And in particular to these information requests, is

5   that something particularly that you in fact are directing

6   attention and have in fact started collecting information

7   for?

8   A    Yeah, we are starting to collect information for

9   historic cashflows and for all the properties and for all

10  the Debtors.  So, we are undertaking that process, but we

11  got waylaid unfortunately by some of the emergency stuff.

12  Q    Now, just to be --

13          THE COURT:  I'm sorry.

14          MR. SLACK:  Yeah, sorry.

15          THE COURT:  For most of my life, I've been a

16  lawyer who got interrupted, but now I get to interrupt.  So,

17  how long will this process take?

18          THE WITNESS:  You know, I'm consulting with FTI

19  and the internal folks as to being able to gather the

20  information, collate it, and understand it, and then put it

21  into a way that we can understand.  I wish I could sit here

22  today and tell you an exact number of days or weeks or

23  months, but I know it's a priority for me as well.  So, it's

24  on our agenda and it's one of the things that, you know,

25  once we finish today's hearing will probably be the subject

Page 55

1    of a conversation with myself and FTI.

2              THE COURT:  Okay.

3    BY MR. SLACK:

4    Q    There were also a number of questions about the

5    management fees that remain in the revised budget.  And, you

6    know, you were asked some questions about those, and I just

7    want to make sure you have the opportunity to testify fully

8    on that.  Can you explain sort of in your understanding what

9    the management fees that are left, what those represent, and

10   why they're important to the operations of the building?

11   A    Sure.  I mean, the management fees that are -- the line

12   item that remains is -- are really just people for the most

13   part.  It's people, I would say 99 percent value is paying

14   salaries to people who operate, like I said, the accounts

15   payable, accounts receivable teams, in-house paralegals, all

16   the people that run these Debtors on a day-to-day basis.

17   Requests come in.  They -- yes, we get them from the supers,

18   we get them from the engineers, and then they move up and

19   are disbursed and allocated internally to be dealt with.

20   Q    And --

21   A    So --

22   Q    In your experience doing this kind of work, is it your

23   view that those people are in fact essential to running the

24   buildings and keeping and maintaining them?

25   A    When you have an operation like that, absolutely.  I

1   mean, how would you pay a vendor?  I mean, how would I pay

2   that $26,000, you know, to a vendor to fix the water main?

3   It just doesn't happen.  Like, it needs processes, and it

4   needs to go through a system, and people have to approve it

5   and you know, I mean, the only way to maintain these

6   properties is to have the system in place.

7   Q    Now, there's also been, you know, again, a suggestion

8   on this as a 4 percent number, right?  That's a 4 percent

9   number.  Are you familiar with the market for management

10  services if you tried to go out and get those?  And in your

11  view, can you explain to the Court, you know, whether or not

12  the 4 percent is typical?

13           MR. BASSETT:  Objection.  I mean, I think there's

14  two questions.

15           THE COURT:  Oh, just compound?

16           MR. SLACK:  Yeah --

17           THE COURT:  You want to break it out?

18           MR. SLACK:  I can fix it.

19           THE COURT:  Sorry, sustained, and you can just

20  restate them separately.

21  BY MR. SLACK:

22  Q    So, Mr. Diamond, do you have experience with seeking

23  and hiring management companies?

24  A    I do.

25  Q    And do you have a view based on this experience as to,

Page 57

1    you know, whether the 4 percent is typical?

2    A    I would probably say if it was typical, I think it

3    would be hard-pressed to find management companies now that

4    would just take 4 percent.  It would probably be higher at

5    this point for good managers.  But, you know, 4 percent is

6    probably, you know, historically was kind of the number.

7              MR. SLACK:  Okay.  Your Honor, that's it.  Thank

8    you.

9              THE COURT:  Okay, thanks.  Any recross?

10             MR. BASSETT:  No, Your Honor.

11             THE COURT:  Okay, thanks.  So, Mr. Diamond, thanks

12   for your testimony.  You can step down.

13             Is there going to be any other testimony today?

14             MR. FAIL:  No, not from the Debtors, Your Honor.

15             THE COURT:  So, I'm just going to say out loud for

16   my staff who's listening in another room that we can go

17   about the laborious process of letting back in the people we

18   kicked out during the testimony, if any.  Okay?  Thanks very

19   much.

20             Back to Mr. Fail.

21             MR. FAIL:  Thank you, Your Honor.  One of the

22   questions, you know, ties to, I think, one of the later

23   motions with respect to the questions of values by debtor.

24   When the Debtors file their schedules and statements,

25   information such as asset values by debtor will come

Page 58

1    forward, and that's why we sought additional time to

2    translate all of the books and records into the various

3    schedules and statements.  The values are probably one of

4    the easiest things to translate, but the other information

5    takes time to collect.

6              I just want to briefly respond to other points

7    that were requested as additional adequate protection that

8    the Debtors believe are inappropriate, given the equity

9    cushion and just given the current status of the case.  The

10   -- Flagstar has requested that the Debtors enter into

11   stipulations and waivers and releases.  The Debtors'

12   declaration indicates and discloses that they haven't

13   conducted a collateral review yet, and they're not prepared

14   to release any claims that they may have against Flagstar.

15             So, to stipulate as to the validity of liens and

16   claims would be contradictory to the testimony, and we don't

17   believe appropriate.  They've also asked for additional

18   liens on additional collateral.  The Debtors object to the

19   granting of any additional liens or expanding the collateral

20   pool.  These are non-recourse loans and should remain that

21   way, given the equity question and the growing cash

22   collateral pools.

23             THE COURT:  What don't their liens reach?

24             MR. FAIL:  I think they've requested liens on

25   that.

1          THE COURT:  No, no, the current existing liens.

2          MR. FAIL:  They're non-recourse, so to the extent

3    that there is cash that's not their cash collateral, to the

4    extent that there's causes of action that exist, they're not

5    -- it's not their collateral.  They have -- they're mortgage

6    lenders with non-recourse loans, as far as we know.

7          THE COURT:  Are you talking about --

8          MR. FAIL:  -- all rights reserved for them to

9    argue otherwise, Your Honor.

10          THE COURT:  Right.

11          MR. FAIL:  But to expand their collateral package

12    is objectionable to the Debtors at this point.

13          THE COURT:  Okay.

14          MR. FAIL:  Whatever their rights are, they are,

15    and if they're larger than I've stated, then there's no harm

16    in not expanding, but we believe there's certainly no basis

17    to expand --

18          THE COURT:  Okay.

19          MR. FAIL:  -- whatever their rights are.

20          THE COURT:  And are you looking to hold them --

21    hold each of their individual loans solely to the value of

22    the collateral?

23          MR. FAIL:  Well, it seems like we'll be facing 82

24    different SP -- SAR motions that'll be expected to be filed

25    separately, so right now we're not looking to cross-

Page 60

1   collateralize at all.  That's right, Your Honor.  Right.

2   There's no basis to do that, as they've argued, and so right

3   now it's Debtor-by-Debtor, non-recourse loan, property-by --

4   it's property-by-property, not Debtor-by-Debtor.  That's

5   their collateral package.  If they don't have -- they don't

6   have liens on equity.

7                    THE COURT:  Right.

8                    MR. FAIL:  They don't have controls.  They don't

9   have control on cash.  They didn't pre-petition.  They

10  didn't -- they didn't, right?  There's ways that these could

11  have been done differently.  We've all seen structures where

12  people take liens on equity.  We've seen, you know,

13  companies that -- and lenders that require accounts at their

14  depositories.  We've seen control agreements, but not in

15  this case, Your Honor, subject to everybody's rights being

16  reserved, if I'm wrong in my statements, but it's not for

17  today, and we don't think that anything should be granted

18  additionally.

19                   THE COURT:  Well, let me ask this.  Let me tease

20  out --

21                   MR. FAIL:  Yeah.

22                   THE COURT:  -- something a little bit, leading to

23  a question.  So, I'm just looking at the budget as filed,

24  and the first line, which is cash beginning, was essentially

25  zero as of 25 May.  And then a week in, you're projecting

Page 61

```
1    $300,000, then 299, 357, three weeks in, then $296,000, four

2    weeks in, right?  That was your original schedule.  The

3    numbers are a little bigger with your proposed

4    modifications.  But at any rate, you're looking to generate

5    surplus cash, and you're referring to that as adequate --

6    well, you're looking to use it without regard -- without

7    strict guardrails necessarily on an entity-by-entity basis.

8              So, is it not fair for them at least to have some

9    degree of adequate protection out of those multi-purpose

10   funds?  So like that surplus cash?

11             MR. FAIL:  So, Your Honor, right, so the receipts

12   coming in, total cash receipts total $7.7 million.  The ones

13   --

14             THE COURT:  Right.

15             MR. FAIL:  -- that you were saying is the net

16   cash.

17             THE COURT:  I'm just talking about the net surplus

18   cash line, yeah.

19             MR. FAIL:  So should they get access to it?  Not

20   -- like, for example, in a world where they -- in a world

21   where this all comes from one property --

22             THE COURT:  Right.

23             MR. FAIL:  -- then no, Your Honor.  Their loans

24   were not -- if we're accumulating it, and it's a surplus and

25   everybody else kind of broke even, they are not non-recourse
```

Page 62

1    lenders.  They are not -- they don't have a lien on anything

2    else, and to expand it to the detriment of the unsecured

3    creditors would be inappropriate and -- or to any equity

4    holders, as Mr. Holter, you know, set forth in Mr. Diamond's

5    declaration, there are other parties in interest with

6    economic interest well before ultimate equity here.  There

7    are --

8               THE COURT:  No, I'm very concerned --

9               MR. FAIL:  And so, we cannot give away -- it would

10   be wrong and not a fiduciary duty for the Debtors, not

11   within their fiduciary dues, for these Debtors to pledge

12   assets given this cash collateral is all -- again, is one

13   piece of collateral in a collateral pool that includes a

14   mortgage that is over secured currently, but also, you know,

15   this -- cash collateral is measured on a start and end

16   basis, not in the middle.  So, if you look at the beginning

17   and the end, there is no diminution.

18               If we dropped it down to $10, there would still be

19   an addition and no diminution.  So the Flagstar objection to

20   the use on any particular item, we understand why.  It's

21   emotional, it's a business decision, but the Debtors'

22   business judgment is what matters.  They haven't been

23   displaced.

24               THE COURT:  Right.

25               MR. FAIL:  And so, the Debtors' business judgment

Page 63

1    is that these expenses, as testified to, are necessary and

2    reasonable, and as such, consent is not required.  There is

3    no diminution, and if we spent the additional monies even

4    that we didn't take out, there would still be sufficient

5    cushion, and we would have argued it's appropriate.

6              We're not asking for it, and the cushion is

7    growing, but we do not believe that under these

8    circumstances, expanding the collateral pool is in the right

9    -- is the right thing to do for the constituents and parties

10   in interest in these cases, who are many, and it's certainly

11   not on an interim basis for four weeks' use to maintain the

12   collateral.

13             THE COURT:  Okay.  Let me ask.  Do their liens

14   extend to revenue proceeds of the encumbered properties?

15             MR. FAIL:  Under the Bankruptcy Code definition of

16   cash collateral, Your Honor, we're not challenging that.

17             THE COURT:  Right.

18             MR. FAIL:  We're not challenging that rents from

19   the collateral are cash collateral.  That's why we're

20   starting at zero and saying every dollar in is definition --

21             THE COURT:  Right.

22             MR. FAIL:  -- of Bankruptcy Code cash collateral.

23             THE COURT:  Okay, got it.  But you're, got it, but

24   you're saying don't hamstring us that way; they're overly --

25             MR. FAIL:  Well, yeah, exactly.  Collateral --

1          THE COURT:  They're over secured in other ways.

2          MR. FAIL:  -- secures the obligation that is not

3     -- you know, this collateral isn't necessary to protect

4     against, right?

5          THE COURT:  I got it.  Okay.

6          MR. FAIL:  Okay, and then, Your Honor, just

7     quickly a couple other points that they asked for that we

8     think are inappropriate.  They asked for a super priority

9     administrative claim for the -- for any diminution

10    whatsoever, and we object to that.

11         The Debtors have said in -- through Mr. Diamond

12    that they seek to propose plans and whether it's through a

13    SAR plan or a chapter -- a regular Chapter 11 plan or

14    otherwise, they shouldn't be constrained by super priority

15    administrative claims being given for any diminution when

16    there's no evidence that there's actual impairment; and so

17    to hamstring the Debtors at this point for, again, minimum

18    use for proceeds that are going into the properties and the

19    collateral is just inappropriate in the Debtors' mind.

20         Likewise, we think that events of default typical

21    for long-term consensual use and new money is not

22    appropriate.  This Court is available and has made itself

23    available on shortened notice in the event there's a need to

24    come back.  We'll be here.  The Debtors are New York City

25    debtors, and we can be here if anything's wrong, but we're

Page 65

1    getting authority to use limited funds in accordance with

2    the budget.

3            If something goes wrong, you know, folks know how

4    to find this Court, but automatic events of default and

5    footfalls, you know, should not be permitted to derail

6    operations of fifty -- over 5,000 New York City units.

7            Likewise, it would be totally inappropriate to

8    limit use of any of the Debtors' proceeds for investigations

9    and to limit a challenge period.  I don't expect a committee

10   to be formed, but, Your Honor, for the reasons that we're

11   not granting releases, you know, for the use of surplus

12   collateral, there should be no impairment of the Debtors'

13   rights or defenses vis-à-vis Flagstar, and for the same

14   reasons that this Court would typically never grant 506(c)

15   or marshaling on an interim basis, we would object, as I'm

16   sure the U.S. Trustee would.

17           So, I'm happy to answer any other questions.  We

18   think that the cushion that exists is more than adequate

19   protection for the very, very limited use.  We think all the

20   line items are necessary and appropriate and request that

21   the relief be granted.

22           THE COURT:  Thank you.  Let me ask what, if any,

23   of the additional protection requested or demanded by

24   Flagstar do you think is appropriate, if anything, beyond

25   what you've already offered up?

Page 66

1          MR. FAIL:  We were willing to reduce the variance

2     to 10 percent from 15 percent on an aggregate basis, but I

3     think -- excuse me for one moment, Your Honor.

4          (Counsel conferring)

5          MR. FAIL:  We think that the other obligations,

6     you know, are tremendously burdensome and, we -- you know,

7     without a corresponding benefit.  I'm happy to answer any

8     specifics --

9          THE COURT:  Okay.

10         MR. FAIL:  -- if there are ones that you spotted,

11    but when we went through --

12         THE COURT:  No, let me --

13         MR. FAIL:  -- the categories that I kind of

14    identified are just, you know, over-reaching grabs that just

15    don't apply in these circumstances.

16         THE COURT:  So let me ask, how can I be

17    comfortable --

18         MR. FAIL:  Sorry, Your Honor, my colleague just

19    reminded me.

20         THE COURT:  Okay,

21         MR. FAIL:  If Your Honor feels like a replacement

22    lien on existing collateral to the extent that they were

23    valid liens and that means something to Flagstar without

24    expanding the -- without expanding the collateral pool --

25         THE COURT:  Yeah.

Page 67

1          MR. FAIL:  -- you know, no issues.  Obviously, if

2     something wasn't perfected, you know, we're not giving you

3     money here.  You can see this isn't consensual.

4          THE COURT:  Yeah.

5          MR. FAIL:  If they don't get the benefit of

6     anything unsecured or equity should benefit to the extent

7     that there's something found wrong.

8          THE COURT:  Right.  Let me ask this.  So, we've

9     got -- the situation as I see it is you have a series of

10    specific separate properties, each subject to a specific

11    separate mortgage.  Some may be under secured, some may be

12    really over secured.  You don't know.  We've got just

13    aggregate numbers pulled from public documents.

14         MR. FAIL:  Well, Your Honor --

15         THE COURT:  -- from books and records.  Why --

16         MR. FAIL:  -- I -- there are 82 -- oh, sorry, I

17    apologize for interrupting, Your Honor, but I think Mr.

18    Diamond testified, he couldn't tell you the amounts today,

19    but the Debtors books and records each have an asset value

20    and they'll be listed on the schedules and statements.  And

21    they obviously know the loan value.  So, these values do

22    exist.

23         Today at my fingertips, do I have the

24    (indiscernible), not right before me, and I left my glasses

25    at home, but -- or at the office, but these things exist, so

1   we do know those and I don't want there to be any suggestion

2   there are no -- there is no buildup.  There's a buildup and

3   Mr. Diamond testified, you know, there's no 82 columns that

4   consolidate to this budget.  This budget was prepared for

5   this bankruptcy purpose.  It's a cash collateral budget.

6   So, this budget was prepared in this way for the reasons

7   that I articulated and he covered.

8          THE COURT:  Right.  No, I understand.  I guess my

9   -- but my question was, for purposes of today, what's before

10  me is nothing disaggregated.  And I have to assume that

11  there's some properties that are worth less than the amount

12  of the debt that encumbers them.

13         MR. FAIL:  We don't believe that there's any --

14         THE COURT:  Maybe it's none, but I have to assume

15  it.  And, you know, all I know is the net is you're tell --

16  I believe you, you know.

17         MR. FAIL:  Yeah, we don't believe that any -- and

18  I think -- I thought there was a statement that none of the

19  properties appraised for less than the debt.

20         THE COURT:  Oh, do you have that?  Okay.  If so --

21         MR. FAIL:  I don't know if it's in -- if it's not

22  there, it's not there.

23         THE COURT:  I don't know you've got a --

24         MR. FAIL:  But --

25         THE COURT:  -- more than 200 cumulative --

1          MR. FAIL:  On an interim basis, Your Honor, I

2     still think that with the growing cash, I would hate to

3     cross collateralize because for example, I don't want to cut

4     off the Debtors' ability to sell one that is entirely, you

5     know, net equity.  And it would be wrong to, number one,

6     either take away that net equity from the beneficial owners

7     or to prevent the Debtors from being able to use it and loan

8     net equity, which is free and clear today for no -- where

9     there's no -- there's no act that, that will show that

10    there's a diminution in the value of the other property.

11          If something's underwater, it's underwater.

12    Nothing's happening this week to put it there.  In fact, the

13    only thing that would happen is we cut off repairs,

14    maintenance, or making sure that the rents are collected.

15    And then, then the buildings are selling.  That's the

16    deterioration.  These buildings are otherwise operating

17    properties.  Nothing barring events beyond anybody's

18    control.  Values aren't dropping in 30 days.

19          THE COURT:  Okay.  And what's the first hard

20    payment obligation date that you're looking to meet?

21          MR. FAIL:  There's payroll this week, Your Honor.

22          THE COURT:  So Friday?  Needs to be funded for

23    Friday, I'm guessing?

24          MR. FAIL:  Usually the way payroll works is, I

25    think you have to get it to ADP in advance.  And so just if

Page 70

1    payroll goes out Friday, I suspect that it's going to go out

2    days earlier and have (indiscernible).  It would have to be

3    earlier.

4              THE COURT:  Okay.  I'll just say there was a back

5    and change -- back and forth exchange, which is fine with

6    the CROs and it has to be funded earlier.  Okay.  So, you

7    want an order what, like today or?

8              MR. FAIL:  We think that the order that we

9    submitted is, you know, down the fairway.  There's nothing

10   aggressive in it and it just grants the relief requested,

11   subject to us changing the budget to be more favorable, Your

12   Honor, with the line items that we said as reflected in

13   Exhibit A -- Debtors' Exhibit A in the record.

14             THE COURT:  Do you need a thing entered today,

15   setting aside what the thing will say?

16             MR. FAIL:  If Your Honor can enter it until

17   tomorrow, I'm confident that we could live with that given

18   the hour.

19             THE COURT:  Okay.

20             MR. FAIL:  And we've lived this long without

21   access, Your Honor.  We wouldn't impose on the Court, but we

22   would want relief by tomorrow.

23             THE COURT:  Okay.  All right.  Thanks.  Let me

24   hear from Mr. Bassett.  Oh, before you get going, I'll just

25   -- does the U.S. Trustee want to say something fast that

Page 71

1      would -- should I let you go first or just hear from Mr.

2      Bassett and then let you go clean up?  I could do it either

3      way.

4                  MS. SIEGEL:  I think Mr. Bassett should go first.

5                  THE COURT:  Okay.  You've got it.  Go right ahead.

6                  MR. BASSETT:  Thank you, Your Honor.  I think the

7      -- I think many of the issues have now been canvassed

8      throughout the introductory comments and the dialogue Your

9      Honor has had with my colleague, but I do want to make a few

10     points and emphasize some of the points that we made in our

11     papers.

12                 At the end of the day, Your Honor, the Debtors are

13     required under Section 363(e) of the Bankruptcy Code to

14     provide Flagstar adequate protection for the use of its cash

15     collateral.  And they appear to be sort of conflating two

16     things, neither persuasively or successfully in my view, to

17     get there.

18                 We have to start from the position that Flagstar

19     has liens through its mortgages on the properties, the

20     properties owned by the Debtors.  We also heard counsel

21     acknowledge that Flagstar also has liens on the rental

22     income generated by the properties.  Flagstar is entitled to

23     adequate protection on both.

24                 Now, the arguments you see in the papers and that

25     were made again today are first as to the properties,

Page 72

1    there's this equity cushion.  But Your Honor, I do not think

2    that there is a sufficient record before the Court today to

3    come anywhere close to finding that the Debtors have carried

4    their burden to show that there is actually an equity

5    cushion at these properties.

6            Even on an aggregate basis, all we have -- and

7    this came out during cross examination -- all we have is a

8    line item stuck into financial statements that apparently

9    comes from some valuation reports generated by a company

10   called Bowery Valuation.  They have nothing else whatsoever

11   to substantiate that there was an equity cushion in an

12   aggregate basis and certainly not on a Debtor-by-Debtor

13   basis.

14           There's not even a shred of testimony, financial

15   statement, plug-ins or otherwise, that there's an equity

16   cushion at one Debtor or not another Debtor.  Or likewise --

17   and I agree with Your Honor -- based on that you absolutely

18   have to assume that some of the Debtors there may not be an

19   equity cushion.

20           The other argument they make and that they

21   emphasize is that well, this is simple.  You look at the

22   cash balance at the beginning of the period on the petition

23   date and it's zero dollars.  How that came to be, I don't

24   know.  I guess that's very convenient for the Debtors.  And

25   then, they look at a budget that goes out for the next four

Page 73

1    months and say at the end of that there's a cash balance of

2    $340,000.  Therefore, 340 is greater than zero so there must

3    be adequate protection.

4         I submit that is not at all the correct way to

5    look at it.  The correct way to look at it is that Flagstar

6    has a lien on rental income.  The budget -- the projected

7    receipts of revenue are $7.7 million over the next four

8    weeks.  That $7.7 million is and should be Flagstar's

9    collateral.  To the extent that they are taking portions of

10   that and using it to pay other things, that is diminution in

11   value of our collateral.  It's not zero versus 340K.  It is

12   7.7 million versus the 340K that's left.

13        Now, the only way the Debtors could get out of

14   that being obvious diminution in value is to show that some

15   of those payments, some of the cash, some of the rental

16   income on the properties or the only way they really get out

17   of it is to show that all of it, that all of the rental

18   income is being used for actual and necessary expenses of

19   operating and maintaining the properties.

20        Because theoretically, if they could make that

21   showing I think there's case law that would say that even

22   this isn't enough.  But theoretically to give them the

23   benefit of the doubt, they could then say, well, we're

24   basically taking the cash collateral, the rental income that

25   Flagstar has a lien on, and we're using that to help support

Page 74

1    and bolster the value and maintain the value of the real

2    properties.

3           So it's sort of a net wash, and there is

4    supporting -- you know, support for use of that collateral

5    to provide us adequate protection.  But they haven't made

6    that showing.  They haven't come close to making that

7    showing, particularly as to professional fees, particularly

8    as to these management fees.  Professional fees, Your Honor,

9    I sympathize with the Debtors.

10          They obviously feel like -- and their counsel,

11   they obviously are in a position where they need a way to

12   get paid, but the fact that they need a way to fund their

13   professional fees in these cases does not provide an

14   exception to the adequate protection requirements of Section

15   363(e).

16          They have to show that the ways in which they are

17   going to be spending these professional fees are providing

18   adequate protection and not leading to Flagstar's security

19   interests being subject to diminution in value.

20          THE COURT: Does it help you that they're looking

21   to escrow professional fees rather than pay them?

22          MR. BASSETT:  I think if they were escrowed, and

23   then they needed to later show that the payment of those

24   fees was appropriate on a cash collateral analysis, i.e.,

25   like preserving rights on this argument, then that may work.

Page 75

1    I'd have to confer with my colleagues and my client, but

2    that would be, if it was entirely without prejudice --

3              THE COURT:  All right, and if --

4              MR. BASSETT:  -- may help.

5              THE COURT:  And if they pull -- I mean, the

6    modifications they've made, which are pulling certain lines,

7    but not direct expenses of management fees out, what are

8    they now planning to spend that can't fairly be said to be

9    necessary for the preservation of value of Flagstar through

10   the effective and proper operation of the properties?

11             MR. BASSETT:  I mean, I think it's the remaining

12   management fee line item and also the professional fees.

13             THE COURT:  But I'm sorry, wait.  What if I credit

14   the testimony that the whole enterprise crumbles without the

15   payment of those because those basically are salaries for

16   people who are necessary to run the show, pay the bills,

17   receive rents, account for them, route them, and fix things,

18   and maybe pay some water and utility bills?

19             MR. BASSETT:  I don't think that showing has been

20   made.

21             THE COURT:  I thought I had that testimony, no?  I

22   think -- I'll -- just so you know, you're looking at me,

23   people over there are nodding their heads.  I'm pointing to

24   the Debtors' counsels' table, so they like my question.  But

25   I mean, I have absorbed that.  So, let me know if I'm wrong.

1        MR. GAMBINO:  If the Court were to find that these

2   management fees are actual and necessary expenses of

3   operating and maintaining the real properties, then that's

4   what Your Honor has decided.  And at that point, I think we

5   would generally be okay, as we are with other expenses.

6   Obviously, Flagstar does not want these properties to not be

7   operated for however long this Chapter 11 case proceeds.

8        We obviously do want that to happen, and we

9   understand that actual and necessary expenses will have to

10   be paid for that to happen.  So, to the extent that Your

11   Honor were to find that with respect to the management fees,

12   then I guess at that point it is what it is.

13        What I would say, though, is that at a minimum --

14   and we've asked for this, there -- I think the testimony

15   was, and maybe it's based on the testimony or additional

16   representation, but we've been very concerned about some

17   portion of this management fee going to provide a profit of

18   some kind to insiders, to the management company, and to Mr.

19   Wiener.

20        If it were clearly represented that every dollar

21   spent on management fees is going to fund employee salaries

22   and other actual and necessary expenses of maintaining the

23   properties, then that's a different story.

24        THE COURT:  I'm thinking about how to word that or

25   accomplish that, and I guess you all have a lot more

Page 77

1   experience than I do in crafting this, but what would you

2   suggest?

3               MR. BASSETT:   Judge, one thing I would -- well,

4   one thing I would say, Your Honor, is it sounded like you

5   were suggesting either maybe there could be a day or two

6   that the Court would take before entering the order.   We

7   would be happy to try to work on solving some of these

8   issues after today's hearing, if that's possible.

9               Standing here today, right now, I don't know what

10  the language fix would be, but we would be happy to take

11  that back and consider it.

12              THE COURT:   Okay.   Got it.   So, do you want to

13  make a particular pitch for any of the added protections you

14  inserted in your markup of their proposed cash collateral

15  order?

16              MR. BASSETT:   I mean, the main ones, Your Honor,

17  would be some form of traditional adequate protection.

18              THE COURT:   Meaning?

19              MR. BASSETT:   The two items that we've included in

20  our markup that were addressed by counsel were replacement

21  liens on additional currently unencumbered collateral and a

22  super priority administrative expense claim to the extent of

23  any diminution in value.   It could be limited to the extent

24  of any diminution in value, but I think we're entitled to

25  that protection, particularly where there has been, in my

1     strong view, Your Honor, no showing today that Flagstar is

2     in fact adequately protected under the present

3     circumstances.

4            THE COURT:  Right.  And that's -- I assume --

5            MR. BASSETT:  I think it is appropriate to grant

6     -- and you look at the case law, Your Honor, the case law

7     that involved properties that, you know, where cash

8     collateral is in the form of rental income.  There's a

9     proposal to use that to pay property expenses, even where it

10    has been shown that the rental income is being used to

11    maintain the properties that are also subject to the secure

12    creditor's lien.

13           Courts have still required, in many cases, some

14    additional form of adequate protection, whether that's cash

15    payments, whether it's super priority administrative expense

16    claims, or whether it's replacement liens.  And I think we

17    are absolutely entitled to some of that.

18           From day one, we had a conversation with the

19    Debtors.  We did not get this cash collateral order until, I

20    think, Sunday over the holiday weekend.  From the first

21    moment we got on a call with Debtors' counsel, they said,

22    we're not offering you anything, and I don't think that's a

23    helpful place to be.

24           THE COURT:  Okay, so I'm going to recap.  The most

25    important -- actually, I keep not saying out loud, so I'm

1    going to say out loud the very important premise.  Everyone

2    agrees this enterprise needs money, needs to operate, needs

3    to not render uninhabitable thousands of units across the

4    city, and needs to somehow operate in a way that preserves

5    value for the Debtor and all its creditors, including

6    Flagstar, right?  That's the big picture thing.

7            But absolutely, Flagstar is entitled to adequate

8    protection, and then the question is, what's that mean; and

9    I think the key things you just emphasized are an award of

10   replacement liens, and then you want a super priority admin

11   claim for the extent of diminution of value, right?

12           And I'm going to say, I agree with you that a 10

13   percent variance rather than 15 makes sense.  Is there

14   anything else that's really important to you all?

15           MR. BASSETT:  Let me just check with my

16   colleagues, if you --

17           THE COURT:  I know, I'm asking you to choose your

18   favorite child, but let's hear what else you've got, if

19   anything else is really important.

20           MR. BASSETT:  The other provision that my

21   colleague, Mr. Rawlins flagged from afar is, I think what I

22   already said, but which is, you know, we really do feel

23   strongly about there being a representation of no insider

24   benefit from any of the payments that are going to be made

25   over the next four weeks.  And if there aren't --

Page 80

```
1              THE COURT:  Okay.

2              MR. BASSETT:  -- if there aren't such --

3              THE COURT:  Yeah, so I'll just -- let me be very

4    sort of up front about this.  I'm really persuaded that

5    there's no certainly immediately achievable, better property

6    management, for lack of a better word, arrangement to be

7    had.  I'm not perceiving inflated costs of that and I am

8    also persuaded that what that is funding -- really talking

9    about the management fees line -- is the payment of people

10   who are necessary to the viable operation of the Debtor.

11   So, I'm quite persuaded about that.

12             I agree, this should not be a smokescreen for

13   money to be skimmed off to non-debtor entities or principals

14   thereof or anything like that.  And so, that's just my take.

15   And if -- do you have wording to accomplish that in mind or

16   just a concept?

17             MR. FAIL:  Your Honor, if -- just if I may, right?

18             THE COURT:  Sorry.  Go ahead.  That's Mr. Fail.

19   Say again?

20             MR. FAIL:  Mr. Fail for the record.  I just --

21   there's no basis on which to prevent insider -- payments to

22   insiders on a go-forward basis.  There are family members

23   that do work for the business.

24             THE COURT:  Oh, I'm -- yeah, yeah, I'm sorry.  And

25   I think we --
```

1              MR. FAIL:  I think we -- and I think specifically

2      when people -- when Flagstar is referring to insider and

3      referenced Mr. Wiener, they have a personal loan to Mr.

4      Wiener that is subject to separate litigation, a separate

5      state court action, not tied to the foreclosures and not

6      tied to this case.  There's history -- let's leave it at

7      that -- that isn't related to this.

8              We've had testimony with respect to the payments,

9      but I don't know if one -- if there's a broker that's going

10     to be doing something that's a family member or who's

11     married, right?  This is a family business in one sense with

12     a lot of other employees that are on the payroll.  There's

13     literally no basis in the code to prevent payment to an

14     insider in a normal course --

15             THE COURT:  Well, I --

16             MR. FAIL:  -- certainly not in a cash collateral

17     order for four weeks when we're talking about a total of a

18     couple hundred thousand dollars.  What is the -- there's

19     hundreds of millions of dollars, 500-something million

20     dollars owed to this company, $300,000 over four weeks.  And

21     we're talking about, is there some line item that might be

22     going to an affiliate.  I just -- it just doesn't make sense

23     to me.

24             I also, Your Honor, just don't understand.

25     They're not challenging the value.  They didn't in their

1   papers.  They didn't today.  They know the properties.  They

2   have them on their books.  This isn't the valuation type or

3   it would be different.  And I'm not saying we can't have one

4   on another day, but it's not on day one of the case.  This

5   isn't about valuation or challenging it.

6          THE COURT:  Hang on, hang on.  You're flowing into

7   an impassioned, excellent rebuttal argument that you're

8   going to get to make in a minute.

9          MR. FAIL:  Okay.  I'll stop there.  But with

10  respect to the insider point, I don't know that language is

11  necessarily appropriate.  I'm struggling to understand.

12         THE COURT:  Okay.  I just want to know what's

13  sought, I mean, and I guess one -- we'll hear, and you can

14  tell me why it's a terrible idea.  I mean, a possibility is

15  to say, to the extent payment to service providers are in

16  excess of payments necessary to do the services that benefit

17  the estate, they will go no farther pending further hearing,

18  something like that, which I don't know how you write that

19  up or enforce that, and then I'm entering an order that

20  binds recipients.  So, I'm not sure how much I like that in

21  light of what Mr. Fail points out is a relatively limited

22  authorization of money flow, although it is 7.78 million in

23  revenues overall.  Anyway, okay.  What -- do you have

24  anything to add about this?  Are you -- what -- all of this

25  was me musing in response to your telling me how important

1      it is to not let insiders benefit from these money flows

2      that I'm authorizing.

3              MR. BASSETT:  And I think, Your Honor, a lot of

4      this is flowing from -- I will fairly acknowledge that there

5      is a history here, and a lot of that is animated by the

6      remarks I've made from the outset, which is that we are at a

7      severe information deficiency --

8              THE COURT:  Right.

9              MR. BASSETT:  -- and have been for some time.  And

10     I think related to the concern about where money is going,

11     it would be very helpful, and I think perfectly appropriate

12     as part of any cash collateral order that the Court enters,

13     to require information to be provided to Flagstar concerning

14     the receipts and disbursements at a property-by-property

15     level.

16              I thought I heard Mr. Dimond say that they're not

17     doing that on a post-petition basis.  I think they're doing

18     that as part of their cash management motion that they

19     filed.  And having that concept built into the proposed

20     order, I think, would be helpful to address the concern that

21     we have.

22              THE COURT:  Okay, I've got it.  Anything else you

23     want to add?

24              MR. BASSETT:  I think that's all, Your Honor,

25     other than to say that we very, very much appreciate the

1    Court's time and attention today.

2              THE COURT:  Okay.  Pleasure.  I keep offering my

3    friend from the U.S. Trustee's program an opportunity to

4    speak.  Do you want to speak yet?

5              MS. SIEGEL:  Your Honor, candidly, we don't have a

6    horse in this race.

7              THE COURT:  Okay.

8              MS. SIEGEL:  And the United States Trustee is not

9    taking a position on this motion.  Of course, we reviewed

10   all the papers that everyone filed carefully, and I think,

11   as you know, we're not shy to raise our voice when it is

12   appropriate, but we're not taking a position here.

13             THE COURT:  Okay, great.  And let me ask, somebody

14   made reference to not believing there's going to be a

15   committee.  Has your office figured that out yet?

16             MS. SIEGEL:  No, the deadline to return forms by

17   interested creditors hasn't passed yet.

18             THE COURT:  Okay, so we'll -- so, I'll consider

19   that to be a prediction that may or may not be true.

20             Okay.  Mr. Fail, I --

21             MR. FAIL:  Very briefly.

22             THE COURT:  Yeah, go ahead.  That's fine.

23             MR. FAIL:  Maybe with as much passion, but

24   hopefully quick.  Court -- many courts have said adequate

25   protection of a cushion is sufficient, with far less, and in

Page 85

1   the real estate context, with far less than we've said

2   today.  That's one thing.  I've spoken about the fact --

3           THE COURT:  Can you give me some specifics just so

4   I can go read a case and feel happier and more secure in

5   what you're asking me to do?  Or if it's for heaven's sake,

6   Judge, look at Paragraph 16 of our motion, you know, you can

7   just tell me that.

8           MR. FAIL:  We did cite them in our motion, Your

9   Honor.  I'm looking.

10          THE COURT:  I mean, your adequate protection

11   starts with paragraph -- section starts with Paragraph 30.

12          MR. FAIL:  So, there's a 22 percent cushion that

13   was sufficient in In re Rancher Energy Corp. 2010 Bankruptcy

14   Lexus 5429 at 10.  There was a 23 percent equity cushion

15   that the Debtor could use rental income to pay property and

16   general expenses of the case.  In re Triplett, 87 B.R. 25 at

17   27.  There is In re Precast Structures Inc., 122 B.R. 304 at

18   306, allowing payments of attorney's fees with cash

19   collateral where the value of the secured creditor's

20   collateral exceeded its claim by 13 percent.

21          THE COURT:  So let me ask.  I'm sorry to interrupt

22   you, but my -- I guess the question I have is how robustly

23   was that equity cushion proven up in those cases compared to

24   this one?

25          MR. FAIL:  I don't have that at my fingertips,

Page 86

1    Your Honor.

2            THE COURT:  Yeah.  Okay.

3            MR. FAIL:  But I would also say that with respect

4    to the restrictions that they're seeking to -- since

5    everybody's agreeing basically on the use of cash collateral

6    for everything other than now, apparently attorney's fees

7    and the management fees, it almost doesn't matter.  So, with

8    respect to that, I would just add that the Debtors haven't

9    waived 506(c) and ultimately that wouldn't be a diminution.

10           It would be, you get to charge -- surcharge the

11   collateral and that'll all be determined at a later date.

12   That's not today, right?  SAR isn't today.  Motions to

13   dismiss aren't today.  Recapture of any amounts isn't today.

14   Finding out where money went isn't today.

15           What's important about all that is they didn't

16   have a control agreement.  It's not in their possession.

17   It's not their collateral, which is why we're not talking

18   about it today.  Cash collateral had to be perfected.  This

19   wasn't -- I understand why they're looking for assets, but

20   it isn't a today issue.  There's no need to speculate.

21           And with respect to the benefit of, you know, the

22   expenses of -- general expenses of the case, that'll be

23   determined later, but for use for cash collateral, it is

24   incorrect and cases I've said, you don't have to establish

25   the cash collateral factors in order to use them, and we

Page 87

1    could brief that at a later date.

2           I just want to put on the record that we don't

3    agree necessarily about all of the standards, and I think

4    there's cases that I read on my way down here that said, you

5    know, quite the opposite.  And with respect to these cases,

6    Flagstar has filed foreclosure actions in four boroughs.

7    Jointly, I would say one in each -- one in each county would

8    -- even though they're saying it's 82 different properties,

9    they filed four actions, I believe.

10          And so, they consolidated them, but nonetheless,

11   you know, they're seeking to take them back.  If there's a

12   sale here, their rights to credit bid are preserved.  And if

13   they want to credit bid the full value, you know, then

14   that's a possibility and we can even facilitate their taking

15   title pursuant to a plan, which would alleviate the transfer

16   taxes, which at values that we're talking about are material

17   and would probably satisfy, you know, the attorney's fees

18   and professional fees that are going into it.

19          And then again, with respect to the insider point,

20   there's no basis with respect to this.  And, you know, there

21   are family members and others that are here and there's

22   just, you know, no basis to start weeding through and

23   finding affiliates when that isn't the issue.

24          THE COURT:  Okay.  So, I think -- do you emerge

25   okay with the, changing your proposal of a 15 percent budget

Page 88

1    variance down to 10?

2              MR. FAIL:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. FAIL:  On an aggregate basis.

5              THE COURT:  Right.  And adequate protection in the

6    form of replacement means?

7              MR. FAIL:  To the extent of collateral on existing

8    collateral bond by Debtor; yes, Your Honor.

9              THE COURT:  Yeah.  Okay.  And I think, has your

10   heart grown more receptive to the super priority

11   administrative demand?  I assume not.

12             MR. FAIL:  It's not with our plan for a chapter --

13   not -- we can't, Your Honor.  I mean, especially with the

14   impending SAR motions where we'll have 90 days to confirm a

15   plan, to cut off our legs and to impair the ability with

16   risk for no basis, it's an unfair trade, Your Honor.

17             THE COURT:  Okay.  I got it.

18             MR. FAIL:  And I would also say, Your Honor, to

19   the extent that the code provides them with a super priority

20   claim, at a certain point in time, they'll be entitled to

21   it.  To the extent that this is additional and gratis, it's

22   not needed.

23             THE COURT:  Right.

24             MR. FAIL:  There are code provisions --

25             THE COURT:  No, no --

1          MR. FAIL:   --- that provide for a super priority.

2    Now, if those circumstances are triggered, it'll be what

3    it'll be and our rights will be what they are and so will

4    Flagstar's.  But to pre-ordain them suggests to me that they

5    need something that they wouldn't otherwise have in

6    circumstances.  If it's provided by the code and it is what

7    it is, then they don't need to write it down.  The code

8    speaks.

9          THE COURT:  Okay.

10         MR. FAIL:  Thank you, Your Honor.

11         THE COURT:  Let me ask this.  Do I logistically

12   mess things up if I reserve overnight, lean on you to reach

13   consent to some form of adequate protection and present it

14   on that basis, and then rule tomorrow morning if you haven't

15   reached agreement?

16         MR. FAIL:  Respectfully, I just don't see any

17   daylight between the positions at this point.  We're not

18   going to be grant -- I just don't see any daylight.  And I

19   apologize, Your Honor.  We've tried.  You've heard our

20   positions.  If there's a particular point that you think --

21   but no.

22         I mean, expanding collateral, giving rights that

23   aren't code-based, parsing through to find, you know, an

24   affiliate connection and having an EOD based on it for four

25   weeks of maintaining the property, it doesn't make any

1    sense, Your Honor.  And to spend more time negotiating an

2    order --

3              THE COURT:  Okay.  Got it.

4              MR. FAIL:  Thank you very much, Your Honor.

5              THE COURT:  Okay.  Thank you.  All right.  Give me

6    a minute to --

7              MR. FAIL:  I don't know if you have questions

8    about cash management or if you've read them and I don't

9    know that there was --

10             THE COURT:  I --

11             MR. FAIL:  We can have that presented to you and

12   the schedules and statements, I think it's been covered by

13   the declarant.  Happy to open it up again to arguments.

14             THE COURT:  Yeah.  I know we need to get to

15   schedules and we need to get to cash management.  I'm just

16   -- before we do that and my brain wanders, I'm thinking

17   about what I just heard for a minute, so.

18             Okay.  I think -- let me see.  Let me just ask Mr.

19   Bassett, do you disagree that an agreement can be reached if

20   I make you guys talk overnight?  I mean, I'm hearing

21   profound skepticism.  So, that really entails movement on

22   your part, I think.  So, is that a thing that's going to

23   happen or should I just rule?  What's your take?

24             MR. BASSETT:  Your Honor, I think there is no harm

25   in trying.  I think it's possible to get to a deal.  I can't

1  make any promises, obviously, but you know, we've heard,

2  we've now had the benefit of today's hearing.  I think I

3  understand where the Court sits on some of the issues.

4          THE COURT:  Okay.

5          MR. BASSETT:  And with that in mind, I think it

6  could be helpful.

7          THE COURT:  Fair.  Okay.  Let me ask this.  I'm

8  mindful of your need to meet your obligations.  If you have

9  an order by, say noon tomorrow, is that going to be okay for

10  you logistically?

11          MR. FAIL:  We'll make it work, Your Honor.

12          THE COURT:  Okay.  So, here's what I'm going to

13  do.  I'm going to give -- I'm going to reserve.  We can --

14  I'm going to give you a time.

15          Okay.  So, I have a -- let's say 9:30 tomorrow by

16  Zoom.  You don't all have to trundle down here again.  I'll

17  be ready to rule at that time.  I have a 10:00 calendar

18  that's fairly populated with things, but none of them --

19  well, it could go on a bit, so I'll get you in before then.

20  So, 9:30 by Zoom and I'm just going to say a few preliminary

21  things which might inform your thinking and might lead to a

22  consensual order, in which case I'll be fine if it's in

23  keeping with what I have in mind.  Okay?

24          So, I'll just reiterate.  It's very clear to me

25  that the Debtors have made their showing that -- of

Page 92

1    necessity for the continued use of cash collateral that's

2    required to meet the requirements of 363 and the items that

3    the Debtors agreed to pull out of their budget for the -- on

4    the interim basis, I think are appropriate concessions on

5    their part.  And I'm satisfied that the remainder of those

6    items are appropriate and necessary expenditures in the uses

7    of cash collateral.

8            And I'll say specifically that includes when there

9    was the request about insider limitations, when you really

10   look at it, I mean the -- I credit the testimony that the

11   fees being charged on management fees are not going to be

12   improved upon.  And I credit the testimony that those

13   payments fund necessary and beneficial expenses that benefit

14   the estate as a whole, Debtors, all the creditors, and

15   Flagstar.

16           And I don't -- I think it's too -- let me start

17   over.  I don't think there's actual practical adequate

18   protection benefit to adding the requested string of a

19   limitation on insider expenditures.  And the reason is I've

20   reviewed the budget and I'm satisfied that the numbers are

21   reasonable and that that which is being funded solely on an

22   interim basis is sufficient -- is sufficiently justified to

23   make -- to give me confidence that this isn't a mask for

24   skimming profits off to some unknown destination.

25           I think this is -- this has been presented and

Page 93

1    shown to be to my satisfaction a reasonable statement of

2    necessary money flows for the benefit of the estate.  And I

3    think it just would be a tortured exercise to try to advise

4    a restriction, but also -- on top of that, but also, I have

5    confidence that it's an unnecessary exercise given the

6    reasonable seeming purposes for which the interim

7    expenditures are proposed to be made.

8             So, I'm comfortable with that.  I did want to drop

9    to a 10 percent budget variance and the budget's important.

10   Honestly, I'm really just used to seeing 10 percent

11   variances, so I don't think that's a major concession, but

12   that's fine.  I'm definitely fine with the proposed

13   replacement lien, and I'm going to misarticulate it, but the

14   replacement lien concept as cabined by Debtors.

15            So, to the extent there's diminution in some

16   collateral, but there's additional revenues, those -- there

17   would be a replacement lien on that.  And I'm not yet sure

18   what I'm going to do with the requests for an administrative

19   super-pri.  I think that's a third rail for the Debtor.  I

20   know it's a third rail for the Debtor and I don't -- I want

21   to think about that more, so I don't actually want to say

22   anything about it.  I will say -- except that -- for the

23   following.

24            I'm really not sure, based on what I've heard,

25   that Flagstar needs it, and I'm very concerned about the

Page 94

1    impact that would have on remaining constituencies in the

2    case, none of whom are present.  My understanding is that

3    the budget contemplates payment -- or, excuse me, reserving

4    or escrowing of funds for an intended use of payment of

5    estate professionals, but not disbursements and I'm fine

6    with that.  I think better to start squirreling funds away.

7           I would -- I think that should be without

8    prejudice to any further possible litigation or order of the

9    Court with regard to the disposition of those funds, right?

10   So, I think -- I do think that gives some added protection

11   to Flagstar as well, that that money is not out the door,

12   and it's a substantial chunk of change, all right?

13          So, I will -- I'm tempted to just say, oh, for

14   heaven's sake, and make it a ruling, but I'm not going to.

15   I'm just going to -- I'm just going to leave it at that.  I

16   will say you all are stuck with each other and I'll try to

17   be quite attentive and help you get where you need to be,

18   but if you can reach agreement on this, I think that would

19   be a great start because, you know, at the end of the day,

20   you all agree that, oh, my gosh, this enterprise needs to

21   function.

22          Oh, I do want to say, I think it's -- the

23   evidentiary basis for it is thin, but I think I'm prepared

24   to accept the showing of a cumulative basis, equity in

25   excess of the debt amount, and the reason for that is that

Page 95

1    although it's thin, I give some weight to the books and

2    records which reportedly was used in, among other things,

3    public, reporting in Israel and publicly traded parent

4    companies.  I think Flagstar presented no contrary evidence,

5    so we have one of those situations where there's a

6    (indiscernible) feather but there's -- say you've got an

7    evidentiary teeter-totter with, say, a feather on one side

8    of the teeter-totter, and that side has swung down.  There's

9    been no contrary evidence presented, so I'm satisfied on

10   this interim basis to go on that basis.

11          So, I know Flagstar came in very hard on that

12   point, and you know, maybe just hearing those words from my

13   mouth will bring it to the table a little more.  That's

14   without prejudice to any further showing or further

15   litigation down the road, but for an interim basis with a

16   company that desperately needs to get off the ground, I'm

17   willing to make that finding.

18          And I will say impressionistically that sense is

19   reinforced by the constructive acknowledgement of Flagstar

20   that somehow or other, you know, the operation needs to

21   continue, needs to be funded, and, it doesn't seem at all

22   possible in the amount of time available to permit an

23   evidentiary showing on an entity-by-entity basis over 82

24   separate Debtor entities.

25          So, I don't think that's, in the circumstances of

1   this case, a realistic ask, and for the limited period we're

2   talking about, I think reasonably, even if there's a few

3   isolated underwater properties of necessity, there's going

4   to be enough over water given my crediting of the cumulative

5   number provided that I'm satisfied there's some reasonable

6   equity cushion.

7          So, I think what that boils down to is I'm

8   encouraging you to come up with a consensual order and the

9   only ask that I consider really strongly in play that I've

10  hedged my bets on is the super-priority demand, and so we'll

11  see where we get, okay?  I think that's about all my brain

12  is prepared to generate now, so I should stop talking and

13  let you do your work, and I'll be ready with supplemental

14  remarks and a quick ruling in the morning, unless I hear a

15  happy white puff of smoke that you've worked it out, okay?

16  In which case, email promptly our chamber's email address to

17  say we have a deal if that happens, because that would be

18  helpful, all right?

19          And I think that's what I need to do on that, and

20  then we need to move on to cash management and schedules.

21          MR. FAIL:  Thanks, Your Honor.  We'll turn the

22  podium over to Andrew Clarke.

23          MR. CLARKE:  May it please the Court, Andrew

24  Clarke of Weil Gotshal & Manges LLP on behalf of the

25  Debtors.  I'll be addressing both the cash management motion

Page 97

1    and the motion to extend the time for filing of schedules

2    and statements, and I'll try to keep it brief, Your Honor,

3    noting the time that we've already taken today.

4            Starting with the cash management motion, I

5    understand Your Honor's already read the papers, but I'll

6    give a high-level overview of the cash management system.

7            The Debtors' cash management system involves

8    accounts at both the Debtors and the Debtors' non-debtor

9    affiliates, principally the immediate parent company of the

10   Debtor.  The Debtors receive rents via a payment processor.

11   Those rents generally are transferred to the account held by

12   the immediate parent non-debtor affiliate, except for a

13   handful of debtors which receive funds directly into their

14   accounts.

15           Going forward in these Chapter 11 cases, the

16   Debtors propose to continue that cash management system with

17   certain modifications.  The Debtors will open two new

18   accounts at one of the Debtors, which we refer to as the

19   centralized operating account and the centralized

20   disbursement account.

21           The Debtors will cause all funds that are received

22   into the non-debtor accounts on account of rents to be

23   transferred to the centralized operating account.  All money

24   that is transferred into the non-debtor account while it is

25   there, it will be held in trust on behalf of the Debtors and

Page 98

1    then when it is transferred to the centralized account, it

2    will also be held by that Debtor in trust for the relevant

3    Debtor that those rents are attributed to.

4          In addition, the Debtors hold a number of escrow

5    accounts, which are money market savings accounts for the

6    purposes of holding security deposits of the Debtors'

7    tenants.  We've shared a copy of the motion with the U.S.

8    Trustee and the U.S. Trustee has asked for certain security

9    deposits that are held in accounts of non-debtor affiliates.

10   There are only a handful.  There are, I think, six or so

11   accounts that hold security deposits to be transferred down

12   to the Debtors as well.

13         So, we're prepared to open a new security account

14   at the Debtor level for those security deposits to be

15   transferred into.  And as my colleague, Mr. Fail alluded

16   earlier, what the Debtors' system proposes is to continue

17   what the Debtors believe is the most efficient and the best

18   available method for conducting cash management.

19         Any changes will take a significant amount of time

20   and administrative effort, and the Debtors have concerns

21   that directing changes to their payment processor to send

22   this money to other accounts and opening up multiple other

23   accounts will cause rents to be potentially lost or sent to

24   the wrong accounts.

25         They have had issues in the past when they sought

Page 99

1    to change the system.  So, what the Debtors will do is

2    they'll routinely transfer all money that is sent to those

3    non-debtor HoldCo accounts down to the Debtor levels.  This

4    will be a manual process, and the Debtors are aiming to do

5    this on a daily basis, but we haven't said daily, just in

6    case it doesn't happen daily, but the intent is certainly to

7    do it daily.

8           So, the Debtors respectfully request the Court to

9    enter the order, which appears at Exhibit A of the motion.

10   There is one additional paragraph that we have agreed with

11   the U.S. Trustee that I can read into the record, either now

12   or -- I understand counsel for Flagstar, Mr. Bassett, may

13   have something to say in response, and the U.S. Trustee,

14   maybe should say --

15          THE COURT:  Well, let's hear your paragraph now

16   that you've raised it.

17          MR. CLARKE:  So, the paragraph is, to require

18   reporting of the Debtors for each amount received into the

19   central disbursement account and the central operating

20   account on a monthly basis to the U.S. Trustee.  The wording

21   reads, "The Debtor shall provide the Office of the United

22   States Trustee with a schedule on a monthly basis outlining

23   (i) amounts received in the centralized operating account" -

24   - that's capitalized for the record -- "that are held in

25   trust on a Debtor-by-Debtor basis; and (ii) disbursements

Page 100

1    made from the centralized disbursement account" -- again,

2    for the record, that is capitalized -- "on a Debtor-by-

3    Debtor basis, accounting for which Debtor payments are made

4    for."

5            And then the second comment from the U.S. Trustee

6    was just to add the words (indiscernible) to the list of

7    authorized depositories.

8            THE COURT:  Okay.  Let me ask.  I guess the

9    contemplation is that if there's a water main break at the

10   property owned by a particular Debtor entity, funds

11   generated from other Debtor entities might need to be drawn

12   upon to pay for that repair, yes?  I just, I mean -- or more

13   -- to put it more generally, I think you're not restricting

14   the use of funds on a particular Debtor by the source of

15   those funds, right?  Like it can transcend Debtors?

16           MR. CLARKE:  The intention is that it's held in

17   trust on behalf of the Debtor.  So, once the money goes into

18   the centralized account, then if a disbursement, say a water

19   main break occurs, amounts attributable to that Debtor will

20   be transferred to the centralized disbursement account and

21   then paid out, and it will be recorded as attributable to

22   that Debtor.

23           However, if there are not sufficient funds, the

24   Debtors reserve their rights to use funds in the interim

25   period attributable to another Debtor.

Page 101

1          THE COURT:  That's the scenario that I was --

2          MR. CLARKE:  Yeah.

3          THE COURT:  -- probably inartfully getting at.

4     So, I read your proposed order as not ruling out that

5     possibility, that in case of crisis, you can dip into other

6     available funds as needed, as long as you're recording it

7     correctly, right?

8          MR. CLARKE:  Yes, that's correct.

9          THE COURT:  Okay.  So, I mean --

10         MR. FAIL:  And subject to the cash collateral

11    order, if entered, Your Honor.

12         THE COURT:  Yeah.  That was Mr. Fail.  I got it.

13    Okay.  So, I just want to make sure I am understanding

14    correctly, and I guess I was.  All right.  Anything else you

15    want to add about cash management?

16         MR. CLARKE:  That is all for cash management for

17    now, Your Honor.

18         THE COURT:  Okay, thanks.  Let me hear from Mr.

19    Bassett or a colleague.  Mr. Bassett, you're --

20         MR. BASSETT:  I have the --

21         THE COURT:  You're just the person today.

22         MR. BASSETT:  -- heavy workload today.

23         THE COURT:  Okay, great.

24         MR. BASSETT:  So, I'll be very brief, Your Honor.

25    I won't reiterate what we had in our papers.  I do want to

Page 102

1     make a comment.  So, I didn't hear about the language that

2     the U.S. Trustee had requested, but Flagstar assumes the

3     Debtors do not have a problem with that when we request the

4     same information that's being provided to the U.S. Trustee.

5              THE COURT:  Oh, yeah, right.  Yeah, I would expect

6     that.  Yes.

7              MR. BASSETT:  As to comments about, you know, how

8     the cash is going to be placed into a centralized account

9     and used to fund expenses of different Debtors, I just want

10    to make the comment that, again, Flagstar's view strongly

11    held is that these are single asset real estate entities,

12    and we reserve all rights as to that argument,

13    notwithstanding any relief that may be granted today.

14             The other two points to be raised in our papers,

15    Your Honor, just briefly, there was a line.  I don't know if

16    I'm understanding this correctly or not, frankly, but I

17    think it was Paragraph 14 of the motion, which, as I read

18    it, suggests that cash is going to continue post-petition to

19    flow into non-debtor accounts and then pass to these newly

20    created debtor accounts.  If that is what's happening, we

21    have an issue with that and don't think that any cash should

22    be going to non-debtor bank accounts on a post-petition

23    basis.

24             THE COURT:  I'm looking at Paragraph 14.

25    (indiscernible).

Page 103

1          MR. BASSETT:  Paragraph 14 of the motion, I

2     believe, Your Honor.  Maybe I'm misreading it.  If counsel

3     could just clarify.

4          MR. FAIL:  That's the sweeps -- Mr. Fail for the

5     record.  That's the sweeps that Mr. Clarke described, the

6     manual sweeps to avoid ministerial errors on part of the

7     third party who collects the rents for the Debtors, the

8     payment processor.  Attempts to transfer, attempts to switch

9     accounts to have it rerouted, have in the past led to

10    mistakes and not receipt of the funds.

11         MR. BASSETT:  I don't know how that's not a

12    problem, Your Honor.  If somebody were to --

13         MR. FAIL:  It's the way the cash flows, Your

14    Honor.

15         THE COURT:  Yeah, hang on.  Don't talk over each

16    other.  I mean, honestly, I'm just trying to understand it.

17    I get the idea that each entity has revenue flows, puts

18    money into a centralized account.  They're held in trust and

19    then disbursements as needed are made on behalf of the

20    necessary respective Debtor with, at least where possible,

21    there being no flows that, you know, escape the limits of a

22    particular Debtor.  Do I have that right, Mr. Fail?

23         MR. FAIL:  Your Honor, so there's 5,200 units.

24    Different people pay different ways.  Some people drop a

25    check off with a super.  Some give it to a regional office

Page 104

1    and the monies get routed to -- and some people pay by

2    government checks and some people pay by wires and they go

3    through ClickPay, a service provider.  That service provider

4    then routes the funds for the different buildings,

5    individual buildings, to one option.  For a few Debtors,

6    they have their own bank account.  Those Debtors get their

7    funds deposited to the Debtor bank account.

8            For most, though, the funds get -- a number of

9    buildings' rents get deposited in its immediate HoldCo which

10   has the bank account.  The Debtor doesn't have a bank

11   account.

12           THE COURT:  And that's a non-debtor entity?

13           MR. FAIL:  It's a non-debtor entity, as Mr. Clarke

14   and the papers said, and so to change -- and there's, let's

15   say, five of those that aggregate for the 82 buildings.  And

16   so what -- rather than having them redirect and enter into

17   the system for 82 buildings, to have them sent into another

18   account and risk the loss of funds on a timely or permanent

19   basis due to ministerial errors through the third party,

20   we're saying leave it as it but on a daily routine basis

21   monies will be manually swept because they can identify the

22   building associated with the rental income.

23           It'll be swept from the intermediate HoldCo into

24   the Debtor entity's new account because it didn't have an

25   account, that will (indiscernible) hold for all and rather

Page 105

1   than having five separate ones, we're putting one.  We could

2   just as easily create 82 but it's a ministerial nightmare.

3            THE COURT:  When will the Debtor-specific accounts

4   exist?  Do they exist now or they're being set up?

5            MR. FAIL:  They're in -- Mr. Clarke --

6            MR. CLARKE:  It'll take probably three days, Your

7   Honor.  They're being set up right now with JPMorgan Chase

8   Bank.

9            THE COURT:  All right.  So, forgive me my brain

10   needs to catch up to where you are.  So, when you --

11   Paragraph 14 refers to -- and thank you for your patience,

12   Mr. Bassett.  When you refer to a centralized operating

13   account and centralized disbursing account and a centralized

14   account holder --

15            MR. BASSETT:  And Your Honor, it's the second --

16   just for the record, it's the sentence that caught my eye.

17            THE COURT:  Once these accounts are opened?

18            MR. BASSETT:  Yes.

19            THE COURT:  Yeah.  Debtors propose to conduct

20   routine transfers of all funds into the HoldCo account, so

21   you got excited about HoldCo, right?

22            MR. BASSETT:  That's right.

23            THE COURT:  Yeah.  Me, too.  Okay.  And then I'm

24   hoping that I can take comfort in the next sentence, which

25   talks about holding those funds in trust with the respective

Page 106

1    Debtors.

2            MR. BASSETT:  That's once they get to the

3    centralized account holder, which is the Debtor account.

4    So, if somebody -- like if there's bondholders, right,

5    Israeli bondholders or some other creditor who get a

6    judgment against this non-debtor HoldCo --

7            THE COURT:  Yeah.  Let me stick with Mr. Bassett.

8    I'm sorry.  I don't want to keep interrupting.  So, you're

9    concerned about --

10           MR. BASSETT:  Your Honor, I think --

11           THE COURT:  -- the HoldCo diverting the assets

12   and/or being subject to some attachment or something?

13           MR. BASSETT:  I'm just worried about Debtor funds

14   being held for any period of time in non-debtor bank

15   accounts.  I don't know how that makes sense, Your Honor.  I

16   don't know if the U.S. Trustee has a view on that either,

17   but --

18           THE COURT:  I mean, I think the answer is, that

19   I've heard is, this is how we do it.  If you change it,

20   you'll create mayhem and a big mess and money will go

21   missing and we can't function, I'm going to guess.  So --

22   right?  I mean, that's -- but let me -- so, having said

23   that, I don't want to keep going back and forth -- I'm going

24   to go back and forth.

25           Are we talking about an operation like a three-day

Page 107

1   bridge period until you get the individual accounts and then

2   we're going to replace it, or no?

3              MR. CLARKE:  No, Your Honor.  So, amounts will

4   continue to flow from the payment processor to the HoldCo

5   accounts at the non-debtor immediate parent.  At that point,

6   they will be held in trust and Mr. Bassett's clients can

7   take comfort that they'll be held in trust on behalf of the

8   Debtors.  And then they'll be transferred down on the daily

9   basis to the --

10             THE COURT:  So, is there ever a minute where

11  Debtor money is sitting with a HoldCo account that's not on

12  a trust basis?

13             MR. CLARKE:  No, Your Honor.  So, as soon as the

14  funds hit the account from the payment processor, they will

15  be held by the non-debtor in trust.  In a way, it is no

16  different to the payment processor itself actually holding

17  the funds or any other third party that holds funds.  I

18  think the way we can look at this is the non-debtor

19  affiliate is effectively part of the payment processor in

20  this go-forward system that we propose.

21             THE COURT:  And is there an attachment risk if

22  some creditor of the HoldCo shows up?

23             MR. CLARKE:  We believe not because the funds are

24  held in trust on behalf of the Debtor.

25             THE COURT:  Okay.

Page 108

1          MR. FAIL:  This was our -- Your Honor, Mr. Fail

2     again.  This was our attempt to work within the parameters

3     to make it bankruptcy proof and remote.  Our words in

4     putting in the order saying that the intermediate HoldCos on

5     a post-petition basis will be held in trust was to try to

6     prevent creditors of the HoldCo to have access.

7          We share the same goal of preventing use by a non-

8     debtor of the post-petition receipts.  We share the same

9     goal.

10          THE COURT:  Okay.

11          MR. FAIL:  It's just simply a matter of, is it

12     worth the operational risk of losing the actual cash and the

13     Debtors believe it isn't.  But we understand the risk and

14     that's why there's a daily sweep to minimize.

15          THE COURT:  And can I get a representation that

16     the funds held in these HoldCo accounts will not be

17     alienated to any principal equity holder, owner, or other

18     affiliate of those HoldCos?

19          MR. FAIL:  Yes, Your Honor.

20          THE COURT:  Okay.  Thanks.  Okay.  So, you can

21     keep going.  Hopefully, I helped at least a little but I --

22          MR. FAIL:  Yeah, we share -- on this one we're

23     aligned in substance, Your Honor.

24          THE COURT:  Okay.

25          MR. BASSETT:  Thank you, Your Honor.  There was

1    nothing in the papers that said that these accounts -- or

2    that these accounts, the funds in these accounts would be

3    held in trust.  So, that clarification --

4              THE COURT:  Okay, great.

5              MR. BASSETT:  -- I think is helpful.

6              The last point, Your Honor, is really a practical

7    one, not a legal one frankly, but to the extent that these

8    funds are going to be -- that the bank accounts used for the

9    funds on a post-petition basis are going to be deposited

10   into a U.S. Trustee authorized account, Flagstar has one of

11   those accounts.  We've made that request to the Debtors as

12   an offer to them.  I think they rejected it, but that's more

13   of a practical request than a legal one.

14             I think it would help in terms of the information

15   issues that we've had, give us visibility into the inflows

16   and outflows, et cetera.

17             THE COURT:  Okay, I -- so if they -- yes.  So, if

18   they make their accounts with you, you'll have access to the

19   information about money flows directly.  That's the point.

20   Okay.  I don't know if I -- I mean, I don't know if I can

21   require that, but noted.  I think that's maybe a point for

22   discussion.

23             MR. BASSETT:  Understood, Your Honor.  I just

24   wanted to flag that he had raised --

25             THE COURT:  Okay.

Page 110

1          MR. BASSETT:  -- our papers and made the proposal

2     to the Debtors, but that's all I had on the cash management

3     motion, Your Honor.

4          THE COURT:  Okay, great.  I think I'm ready to

5     rule.  I could hear more from Debtors, but I don't think I

6     need to, so I'm going to approve the cash management motion

7     subject to the modifications including -- oh, sorry.  Go

8     ahead, miss -- oh, you do want to be heard.  I'm sorry.  Go

9     ahead.

10          MS. SIEGEL:  Sorry, Your Honor.  Rachel Siegel on

11     behalf of the U.S. Trustee.  Yes, briefly.  We did want to

12     be heard on this motion.  Our concerns are with disclosure

13     of funds received and disbursed on a Debtor-by-Debtor basis.

14     Some of the language that I think we agreed to that Mr.

15     Clarke represented does adequately address that concern.  I

16     agree that Mr. Bassett's point about clarifying that the

17     funds will always be held in trust for the Debtors is a

18     helpful addition.

19          The only other thing I would add is I'm not sure I

20     saw language representing that the sweeps were necessarily

21     on a day-to-day basis.  I know that's been stated.  I think

22     if some language like daily or as soon thereafter as

23     reasonably practical would suffice for us, but I think we do

24     want to make sure that we're clear that these sweeps are to

25     be occurring as often as possible so that money is in Debtor

Page 111

1    accounts as quickly as possible.

2              THE COURT:  Right.  I think that's a point well

3    taken.  I mean, Debtors are nodding.  Is that -- can you

4    work out language for to that effect?

5              MR. FAIL:  As soon as it's practicable should

6    suffice.  It's the intention of doing that.  Daily, I can't

7    promise.

8              THE COURT:  Okay.  Can you live with as soon as

9    practicable?

10             MS. SIEGEL:  I can, Your Honor.

11             THE COURT:  Okay, great.  I'm sorry, I try to be

12   very good about never cutting the U.S. Trustee's program

13   out, but you said something about not having a dog today and

14   I --

15             MS. SIEGEL:  In the cash collateral motion.

16             THE COURT:  Yes.  I over generalized.  Okay.  Now

17   I understand.  Thank you.  Okay.  Okay, so I'll resume.  I'm

18   going to grant the motion with the modifications including

19   the language just read.  Please add language regarding

20   making the sweeps as soon as practicable.  Let's see.  I

21   will emphasize this is -- that the clarifications and

22   discussion on the record with regard to the workings of

23   Paragraph 14 and the HoldCo accounts are integral to my

24   ruling and should just be considered part of the ruling of

25   the Court.

Page 112

1          You can just add language to your proposed order

2     that the Court rendered an oral ruling, which is

3     incorporated herein.  That'll be good enough that I'll

4     specifically intend that that probably was incorporated.

5          A couple of things, Mr. Bassett raised that I

6     should touch on.  I think first off, yes, he should have

7     visibility in money flows, at least to the extent of getting

8     reports that the U.S. Trustee program is getting.  When I

9     say he, I mean Flagstar.  The HoldCo protections, the

10    limitation on access and alienability of money to the extent

11    it's sitting in the HoldCos is very important and critical

12    to the operation, which I've just discussed.

13         And I want to just say out of my own mouth

14    something that I know is very important to Flagstar.  This

15    is without prejudice to any rights, either at the time of

16    the final hearing or any other aspect of the case,

17    specifically with regard to any motion that Flagstar may

18    want to bring and with regard to the single asset real

19    estate character of the individual Debtors in Flagstar's

20    view.

21         So those, I am abundantly not ruling with respect

22    to that.  The same goes for my sort of preliminary remarks

23    with respect to cash collateral.  I think that was siloed to

24    the interim nature of the application and the cash

25    collateral needs of these Debtors collectively, but it's,

Page 113

1    you know, those are real arguments that I'm just leaving for

2    another day, but reserving, okay?  I think that's all I need

3    to do on this.

4              So, you can submit an order with those

5    modifications and we'll get it processed, all right?  And

6    now we're down to extending that time on the schedules.

7              MR. CLARKE:  Thank you, Your Honor.  For the

8    record again, it's Mr. Clarke for the Debtors.

9              Your Honor, in the extension motion for the

10   schedules and statements, we're seeking extension by 30 days

11   to July 7, 2025.  The principal reason for this is that

12   there are 82 Debtors and frankly, Your Honor, it is going to

13   take the Debtors and the Debtors' advisors some time to

14   gather all the information.

15             What we have focused here and which I know is very

16   important to Flagstar is accuracy of information.  So, the

17   Debtors need time in order to compile the information on an

18   accurate basis.  They cannot simply do this in the current

19   prescribed 14-day period.  As Mr. Diamond's declaration and

20   evidence proffered on the stand today represents, the

21   Debtors filed these cases on an expedited basis.

22             There was limited preparation and the Debtors are

23   currently in the process of reconciling all the information.

24   And this relief to extend the time to file schedules and

25   statements is routine relief.  We do not see it as

Page 114

1     controversial and we respectfully request the Court to enter

2     the order proposed in the motion.

3                    THE COURT:  Okay, thanks.  Let me ask a curiosity

4     question.  Is there an existing accounting team that's just

5     going to continue in service to the estate or do you need to

6     superimpose new accounting services?  How is that going to

7     work?

8                    MR. CLARKE:  So, the Debtors have FTI as a

9     financial advisor involved in the company.

10                   THE COURT:  Right.

11                   MR. CLARKE:  They have been there from my

12    understanding every day over the past couple of weeks and

13    they will continue to do so and the Debtors also have their

14    own internal accounting team that are working closely with

15    FTI.

16                   THE COURT:  Okay, thanks.  I do want to say --

17    this isn't a challenging question about your motion but I

18    want to exhort the Debtors before you all leave today to be

19    fully transparent, provide information as Flagstar wants it

20    to the best of your ability.  I've blessed monthly reporting

21    requirements.  A month might be a long time but I know you

22    need time to provide the information.  So, try to keep them

23    apprised in real time and not just -- you know, take a

24    cooperative open approach, not a grudging monthly, here's

25    the bare minimum we have to give you approach, okay?

Page 115

1              MR. CLARKE:  Thank you, Your Honor.  We'll take

2     that on board.  May it please the Court.

3              THE COURT:  Right, thank you.  All right.  Let's

4     hear from Flagstar.

5              MR. BASSETT:  Just a few brief points on this

6     motion, Your Honor.  I'm going to keep kind of beating the

7     same drum here but as much as the Debtors want to talk about

8     how these are complicated, there's 82 entities, it's --

9     there's a lot of information to sort through, it's

10    extraordinarily complicated.  This is a very, very simple

11    capital structure.

12             It's not complicated.  You have 82 Debtors, each

13    with mortgages.  They collect rents.  Those rents go

14    somewhere.  I asked Mr. Diamond on the stand.  He may have

15    been appointed six days ago, but he's been in the loop

16    working with the Debtors since last fall.

17             In our view, it is -- defies explanation that the

18    information, the very simple information that Flagstar had

19    been requesting for months was never provided, defies

20    explanation that the Debtors don't have available in short

21    order an ability to track what was received from each

22    property, where it went, and provide the necessary financial

23    statements, schedules, and statements of financial affairs,

24    Your Honor.

25             So, I frankly don't think that there's a basis,

Page 116

1    you know, based on the evidentiary showing before the Court

2    to grant the extension.  To the extent the Court is inclined

3    to do that, which I understand is routine in many cases,

4    we'd like to make abundantly clear that we expect that

5    before we're back at a second day hearing for any further

6    extension of the use of cash collateral, that the

7    information will have been provided by that time, and we

8    also reserve all rights with respect to discovery.

9            So, they can provide whatever financial reporting

10   that they're required to provide on a monthly basis, and we

11   plan to -- hopefully we can, you know, all work along

12   smoothly and consensually in this case, we share that

13   desire, Your Honor.  But to the extent we can't, we're going

14   to reserve all rights to take discovery leading up to the

15   second day hearing, and we're going to ask for any and all

16   information that we deem appropriate in advance of that,

17   regardless of whether it's required by these orders.

18           So, those are my only comments on that motion,

19   Your Honor.

20           THE COURT:  Okay.  Can you put on your translator

21   hat for a minute?  So, you kind of criticized a lot,

22   understandably.  I mean, I think they're telling me to get

23   the information and have it accurately requires this time,

24   and -- which I understand Flagstar's frustration and

25   longstanding efforts to get information that one would think

Page 117

1    should have been forthcoming, but we're here now.

2              So, is this really that I should absorb what

3    you're saying and understand -- I mean, I take very

4    seriously that your reservation of discovery rights and your

5    we need this information before final approval point.  Is

6    there -- do you really want me not to grant an extension?  I

7    guess that's the question.

8              MR. BASSETT:  I understand and appreciate, Your

9    Honor, that the Court is likely to grant the extension and

10   that the Debtors are going to need time to prepare the

11   information.

12             THE COURT:  Okay.

13             MR. BASSETT:  But again, in our view, the requests

14   made today were supported only by the testimony that was

15   presented in the evidentiary showing, and we come from a

16   perspective where it doesn't seem like there is a great

17   justification for continue delay based on the history that

18   we personally experienced.  That's the only point, Your

19   Honor, and I understand the Court is going to grant the

20   extension, but we're going to reserve all rights.

21             THE COURT:  Okay.  Does the Debtor want to add

22   anything?

23             MR. FAIL:  I don't think we need to, Your Honor.

24   Thank you.

25             THE COURT:  Okay.  All right.  So, look, Mr.

Page 118

1   Bassett, I think your points are very well taken and I'm

2   going to grant the motion essentially.  So, I -- and as to

3   your point about the evidentiary basis, I have received the

4   declaration of Mr. Diamond in support.  He tells me that

5   these cases were filed on an emergency basis.  You're right

6   that the capital structure is simple, but it is far-flung

7   and they're going to need to do granular work on an entity-

8   by-entity basis and verify it, and a 30-day extension is not

9   out of an acceptable or normal range for that volume of

10  detailed and meticulous work, which I hope will be

11  forthcoming.

12          I hope and trust that the work, in fact, will be

13  detailed, careful, and meticulous, and helpful, and I'm

14  willing, and I think the code permits granting that

15  extension.  It's, as Debtors' papers point out, quite

16  commonly afforded in a variety of cases.  So, full stop.

17          That said, I do take Flagstar's concern seriously.

18  We're going to be coming up on a final hearing on cash

19  collateral reasonably soon and assuming interim gets

20  approved, and at that time Flagstar is going to be entitled

21  to more information and to more rigorously press the

22  question of adequate protection than they've had an

23  opportunity to do thus far.

24          So, the information is really going to be needed

25  and should be coming quickly and even on a rolling basis, if

Page 119

1   possible.  That was the upshot of what I said earlier today.

2   And likewise, all reservations of rights, of course.  It

3   doesn't need to be said, but I underscore that you've said

4   it and I get it.  So, we'll just see where we go from here.

5   But for now, I'm going to approve the scheduled extension.

6          All right.  It occurs to me to talk to you about

7   one more thing before I go, and then I will exit and let you

8   all do what you need to do.  But do you want to talk about

9   dates going forward?  So, assume I'm going to approve some

10  form of cash collateral order, details to be followed, and

11  I'll tell you I'm out of the country June 13th to 23rd, so I

12  can see you very quickly when I'm back, and I assume I can't

13  see you before.

14         Oh, I do have coverage for emergencies.  One of my

15  wonderful colleagues has my back while I'm away.

16         MR. FAIL:  Your Honor, I think we were looking at

17  June 25 or 26 as the third, you know, for the 30-day mark.

18  If any of those work for you and Flagstar.

19         THE COURT:  Both are available.  I have a shorter

20  calendar on the 25th and 26th, so -- yeah, Ms. Calderon,

21  who's a scheduling maestro, urges me to go for 6/25.  Okay.

22         MR. FAIL:  Thank you.

23         THE COURT:  All right.  Anything else we need to

24  do today before we adjourn?  All right.  I do hope you

25  manage to work well together and successfully.  Thank you

Page 120

1    for your efforts.  And with that, we're adjourned.

2                    MR. FAIL:  Thank you, Your Honor.

3                    MR. HOLTZER:  Thank you, Judge.

4                    (Whereupon these proceedings were concluded at

5    4:30 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                          RULINGS

4                                                Page      Line

5   Cash management motion, granted          111        18

6

7   Motion to extend time, granted           118         2

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 122

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 2, 2025

| & | | | |
|---|---|---|---|
| **&**   3:3 5:11 18:9 96:24 | **14**   102:17,24 103:1 105:11 111:23 113:19 | **23**   85:14 | **330**   122:21 |

**&**   3:3 5:11
18:9 96:24

**0**

**0**   19:15

**1**

**1.1**   9:25
**1.4**   10:24
**10**   18:13 22:22
34:18 62:18
66:2 79:12
85:14 88:1
93:9,10
**10.25.**   11:15
**10004**   1:14 4:5
**10153**   3:6
**105**   21:5
**105,000**   20:11
**106,852**   20:15
20:23
**10:00**   91:17
**11**   8:17 10:10
13:4,13 14:12
15:13 48:8
64:13 76:7
97:15
**111**   121:5
**11501**   122:23
**118**   121:7
**12**   17:11
**12151**   122:6
**122**   85:17
**13**   85:20
**13th**   12:24
119:11

**14**   102:17,24
103:1 105:11
111:23 113:19
**143**   11:23
**14th**   12:8
**15**   22:23 66:2
79:13 87:25
**15th**   3:17
**16**   85:6
**16th**   13:2
**18**   36:24 121:5
**193**   42:22
**193,906**   21:4
**1st**   12:11 52:21

**2**

**2**   121:7 122:25
**2.4**   46:22
**20**   22:18
**200**   68:25
**20005**   3:18
**2010**   85:13
**2012**   9:4
**2019**   11:18
**2022**   11:13
**2023**   11:16
**2024**   12:5 19:4
35:25 36:5
**2025**   1:16
36:21 38:2,13
40:6 42:3
46:12 113:11
122:25
**21**   12:13
**215**   10:13
**21st**   13:3
**22**   85:12

**23**   85:14
**23rd**   119:11
**243**   10:4
**25**   60:25 85:16
119:17
**25-11050**   1:3
5:5
**25th**   36:9
119:20
**26**   45:20
119:17
**26,000**   28:2
53:3 56:2
**262**   19:4
**26th**   119:20
**27**   18:14 85:17
**28**   1:16
**296,000**   61:1
**299**   61:1
**29th**   12:22
**2:03**   1:17
**2:45**   39:17
**2nd**   12:22

**3**

**3**   11:14 44:16
44:22
**30**   19:10,14
52:10 69:18
85:11 113:10
118:8 119:17
**300**   122:22
**300,000**   61:1
81:20
**304**   85:17
**306**   85:18
**308,000**   44:9

**330**   122:21
**340**   73:2
**340,000**   41:1
73:2
**340k**   73:11,12
**344,729**   19:18
**357**   61:1
**363**   71:13
74:15 92:2

**4**

**4**   11:14 24:24
25:1,5,11
44:16,22,25
56:8,8,12 57:1
57:4,5
**40**   8:3
**46**   19:5
**4:30**   120:5
**4th**   12:18

**5**

**5,000**   65:6
**5,200**   10:25
45:4 103:23
**500**   81:19
**506**   65:14 86:9
**50th**   36:10
**538,635**   21:9
**5429**   85:14
**564**   10:9,11,17
18:25

**6**

**6/25**   119:21

**7**

**7**   18:11 34:20
113:11

| | | | |
|---|---|---|---|
| **7.5**  11:15 | **9:30**  91:15,20 | accordance | accrual  27:25 |
| **7.7**  61:12 73:7 | **a** | 18:17 65:1 | accruals  27:17 |
| 73:8,12 | abe  4:19 | account  20:18 | 27:25 |
| **7.78**  82:22 | ability  11:19 | 23:12,13 45:12 | accumulating |
| **75**  11:16 | 11:20 31:1 | 75:17 97:11,19 | 61:24 |
| **767**  3:5 | 39:22 69:4 | 97:20,22,23,24 | accuracy |
| **779**  10:9 | 88:15 114:20 | 98:1,13 99:19 | 113:16 |
| **78**  10:4 | 115:21 | 99:20,23 100:1 | accurate  37:4 |
| **8** | able  12:17 24:2 | 100:18,20 | 52:5 113:18 |
| **8,100**  10:25 | 25:7 26:6 | 102:8 103:18 | 122:4 |
| **80**  21:24 | 54:19 69:7 | 104:6,7,10,11 | accurately |
| **82**  5:5 10:16 | absent  30:3 | 104:18,24,25 | 116:23 |
| 15:20,24 18:15 | absolutely | 105:13,13,14 | achievable |
| 21:13 22:22 | 53:24 55:25 | 105:20 106:3,3 | 80:5 |
| 42:12,16,18 | 72:17 78:17 | 107:11,14 | acknowledge |
| 48:10,12,13 | 79:7 | 109:10 | 71:21 83:4 |
| 52:9 59:23 | absorb  27:8 | accountants | acknowledge... |
| 67:16 68:3 | 117:2 | 25:23 | 95:19 |
| 87:8 95:23 | absorbed | accounted  23:5 | act  11:18 69:9 |
| 104:15,17 | 75:25 | 23:8 | action  12:25 |
| 105:2 113:12 | abundantly | accounting | 59:4 81:5 |
| 115:8,12 | 112:21 116:4 | 21:20,21 26:16 | actions  87:6,9 |
| **826**  10:23 19:3 | accelerate  12:9 | 100:3 114:4,6 | actively  6:8 |
| **83**  22:21 | accept  94:24 | 114:14 | actual  27:12 |
| **87**  85:16 | acceptable | accounts  2:8 | 30:4 45:14,16 |
| **875**  3:17 | 8:13,23 118:9 | 41:23,24 42:1 | 49:5,13 64:16 |
| **88**  21:5 | accepted  7:5 | 45:10 55:14,15 | 73:18 76:2,9 |
| **88,906**  20:1 | access  61:19 | 60:13 97:8,14 | 76:22 92:17 |
| **9** | 70:21 108:6 | 97:18,22 98:5 | 108:12 |
| **90**  88:14 | 109:18 112:10 | 98:5,9,11,22 | actually  7:5 |
| **93**  10:21,25 | accommodate | 98:23,24 99:3 | 13:6,22,24 |
| 18:16 | 23:14 | 102:19,20,22 | 29:5 33:7 36:9 |
| **95**  9:21 | accompanies | 103:9 105:3,17 | 37:13 40:13 |
| **96**  9:19 | 49:13 | 106:15 107:1,5 | 44:23 47:21 |
| **99**  55:13 | accomplish | 108:16 109:1,2 | 51:1 72:4 |
| | 76:25 80:15 | 109:2,8,11,18 | 78:25 93:21 |
| | | 111:1,23 | 107:16 |

| | | | |
|---|---|---|---|
| **adam** 8:8 | 73:3 74:5,14 | **advisors** 8:4,11 | **aggressive** |
| **add** 18:3 20:16 | 74:18 77:17 | 12:15 19:21 | 70:10 |
| 21:4 82:24 | 78:14 79:7 | 20:18 22:7 | **ago** 115:15 |
| 83:23 86:8 | 84:24 85:10 | 113:13 | **agree** 50:17 |
| 100:6 101:15 | 88:5 89:13 | **afar** 79:21 | 72:17 79:12 |
| 110:19 111:19 | 92:17 118:22 | **affairs** 2:16 | 80:12 87:3 |
| 112:1 117:21 | **adequately** | 115:23 | 94:20 110:16 |
| **added** 77:13 | 78:2 110:15 | **affect** 7:1 | **agreed** 92:3 |
| 94:10 | **adhering** 7:2 | 52:14 | 99:10 110:14 |
| **adding** 6:11 | **adjourn** | **affiliate** 20:4,5 | **agreeing** 86:5 |
| 92:18 | 119:24 | 44:12 81:22 | **agreement** |
| **addition** 11:25 | **adjourned** | 89:24 97:12 | 86:16 89:15 |
| 19:12 62:19 | 120:1 | 107:19 108:18 | 90:19 94:18 |
| 98:4 110:18 | **adjudicate** | **affiliated** 20:8 | **agreements** |
| **additional** 14:6 | 24:12 | 46:3 | 19:17 44:13 |
| 14:9 23:22 | **admin** 79:10 | **affiliates** 17:10 | 46:14 60:14 |
| 24:21 26:18 | **administer** | 87:23 97:9 | **agrees** 79:2 |
| 27:23 58:1,7 | 31:21 | 98:9 | **ahead** 35:9 |
| 58:17,18,19 | **administered** | **affirm** 31:22 | 71:5 80:18 |
| 63:3 65:23 | 5:6 | 31:25 | 84:22 110:8,9 |
| 76:15 77:21 | **administrative** | **afforded** | **aiming** 99:4 |
| 78:14 88:21 | 16:7 18:17 | 118:16 | **alexander** 4:3 |
| 93:16 99:10 | 24:3 25:24 | **afternoon** 5:10 | **alienability** |
| **additionally** | 64:9,15 77:22 | 5:17 6:5,16 | 112:10 |
| 60:18 | 78:15 88:11 | **agenda** 8:20 | **alienated** |
| **address** 53:23 | 93:18 98:20 | 18:10 54:24 | 108:17 |
| 53:24 83:20 | **administrativ...** | **aggregate** | **aligned** 108:23 |
| 96:16 110:15 | 26:16 | 10:20,24 21:20 | **alleged** 29:3 |
| **addressed** | **admitted** 28:20 | 21:23 22:6 | **alleviate** 87:15 |
| 77:20 | **ado** 31:13 | 29:23 42:17 | **allocate** 52:25 |
| **addressing** | **adp** 69:25 | 50:21 52:4,5 | **allocated** 23:12 |
| 96:25 | **advance** 69:25 | 53:1 66:2 | 45:2,3 55:19 |
| **adequate** | 116:16 | 67:13 72:6,12 | **allow** 52:25 |
| 24:20 31:8 | **advise** 93:3 | 88:4 104:15 | **allowed** 43:19 |
| 39:12 45:6 | **advisor** 36:14 | **aggregated** | **allowing** 85:18 |
| 58:7 61:5,9 | 114:9 | 42:19 | **allows** 53:1 |
| 65:18 71:14,23 | | | |

alluded  98:15
alternative
  30:5
amalgamating
  21:13
amended  18:18
amount  10:20
  20:15,22 22:17
  24:23 68:11
  94:25 95:22
  98:19 99:18
amounts  10:4
  27:25 28:9,9
  67:18 86:13
  99:23 100:19
  107:3
analysis  44:21
  45:6,7 47:8,23
  48:1,2 49:12
  74:24
andrew  3:12
  5:14 96:22,23
angeles  5:21
animated  83:5
animates  16:13
annexed  34:20
annoying  43:4
answer  65:17
  66:7 106:18
answered
  29:12
answers  15:14
  17:4 50:11
anybody's
  69:17
anything's
  30:19 64:25

anyway  51:3
  82:23
apartment
  52:20
apartments
  9:12
apologize  21:1
  67:17 89:19
apparently
  17:4 72:8 86:6
appear  44:2
  71:15
appearance
  6:25 7:3
appearances
  5:8
appears  99:9
applicable
  14:10
application
  12:11 112:24
apply  16:5
  66:15
appointed
  16:17 115:15
appointing
  13:20
appraisal
  48:20 49:13,17
  49:24
appraisals
  19:2 29:2,4,21
  48:6,10,12,13
  48:16,22 49:1
  49:3,4,6,10
  50:2,5,14,23
  51:10,13

appraised
  51:17 68:19
appreciate
  39:16 83:25
  117:8
apprised
  114:23
approach  8:12
  33:11 34:12
  114:24,25
approaches
  17:14
appropriate
  16:2 58:17
  63:5 64:22
  65:20,24 74:24
  78:5 82:11
  83:11 84:12
  92:4,6 116:16
approval  117:5
approvals
  27:15
approve  56:4
  110:6 119:5,9
approved
  26:17 118:20
approximately
  9:25 10:9
  11:16 18:25
  19:3,5 41:1
  44:10
april  12:10,18
  12:22
arbel  8:3
area  9:13
areas  11:6

argue  59:9
argued  53:6
  60:2 63:5
argument  15:4
  30:3 72:20
  74:25 82:7
  102:12
argumentation
  17:15
arguments
  17:20 71:24
  90:13 113:1
arrangement
  80:6
articulated
  68:7
aside  70:15
asked  50:11
  52:1 53:20
  55:6 58:17
  64:7,8 76:14
  98:8 115:14
asking  7:13
  14:7 28:14
  63:6 79:17
  85:5
asks  24:21 39:9
aspect  112:16
aspects  29:1
asserted  31:10
assertion  31:8
assessing  14:8
asset  16:3,10
  20:10 29:19,20
  30:2 45:4
  57:25 67:19
  102:11 112:18

**assets**  2:14
  24:8 62:12
  86:19 106:11
**assignment**
  13:22
**associated**
  104:22
**associates**  5:13
**assume**  22:11
  30:8 68:10,14
  72:18 78:4
  88:11 119:9,12
**assumes**  102:2
**assuming**
  52:17 118:19
**assumptions**
  49:23
**assure**  23:14
**assured**  23:3
**attached**  18:18
  29:18
**attachment**
  106:12 107:21
**attempt**  108:2
**attempts**  103:8
  103:8
**attend**  40:12
**attention**  54:6
  84:1
**attentive**  94:17
**attorney**  4:2
**attorney's**
  26:11 85:18
  86:6 87:17
**attorneys**  3:4
  3:16 26:7

**attributable**
  100:19,21,25
**attributed**  98:3
**audit**  29:22
**audited**  49:9
**authority**
  18:15 65:1
**authorization**
  14:2,18 82:22
**authorized**
  100:7 109:10
**authorizing**
  2:2,7 83:2
**automatic**
  16:18 65:4
**available**  64:22
  64:23 95:22
  98:18 101:6
  115:20 119:19
**avenue**  3:5
**average**  9:21
**avoid**  13:15
  103:6
**award**  79:9
**aware**  27:14
  46:20
**axis**  10:15

**b**

**b**  1:21 2:9
**b.r.**  85:16,17
**back**  7:1,1 14:7
  18:5 20:16
  31:7 36:25
  39:23 42:2
  52:11 53:8
  57:17,20 64:24
  70:4,5 77:11

  87:11 106:23
  106:24 116:5
  119:12,15
**balance**  19:18
  29:9,18 72:22
  73:1
**bank**  2:8 3:16
  5:18 10:15,18
  15:2 35:12
  41:22,24 42:1
  102:22 104:6,7
  104:10,10
  105:8 106:14
  109:8
**bankruptcy**
  1:1,12,23
  15:16 16:5
  17:8 28:10
  41:6,9 47:11
  47:20 54:1
  63:15,22 68:5
  71:13 85:13
  108:3
**bar**  32:2
**bare**  114:25
**barring**  69:17
**bars**  43:4
**based**  19:2
  22:6 29:20
  39:13 45:17
  49:3 50:13,21
  56:25 72:17
  76:15 89:23,24
  93:24 116:1
  117:17
**basically**  73:24
  75:15 86:5

**basis**  13:14
  17:1 21:20,21
  21:22 22:6
  23:5,6,13,23
  23:25 29:2
  30:13 31:11
  42:7,16 48:2
  51:14 52:4,5
  55:16 59:16
  60:2 61:7
  62:16 63:11
  65:15 66:2
  69:1 72:6,12
  72:13 80:21,22
  81:13 83:17
  87:20,22 88:4
  88:16 89:14
  92:4,22 94:23
  94:24 95:10,10
  95:15,23 99:5
  99:20,22,25
  100:3 102:23
  104:19,20
  107:9,12 108:5
  109:9 110:13
  110:21 113:18
  113:21 115:25
  116:10 118:3,5
  118:8,25
**bassett**  3:20
  5:17,18 14:25
  15:1,7,10
  28:25 30:14,19
  32:25 33:13,21
  33:23,25 34:2
  34:4 35:4,7,9
  35:10,11,14

36:22 38:12
39:19,22 40:9
40:17 43:22,23
50:18,25 51:3
51:6,9,12,20
56:13 57:10
70:24 71:2,4,6
74:22 75:4,11
75:19 77:3,16
77:19 78:5
79:15,20 80:2
83:3,9,24
90:19,24 91:5
99:12 101:19
101:19,20,22
101:24 102:7
103:1,11
105:12,15,18
105:22 106:2,7
106:10,13
108:25 109:5
109:23 110:1
112:5 115:5
117:8,13 118:1
**bassett's** 107:6
110:16
**bear** 8:18
**beating** 115:6
**beautifully**
5:23
**began** 11:12
12:10 37:7
**beginning**
11:13 53:20
60:24 62:16
72:22

**begrudging**
15:8
**behalf** 5:11,18
6:6 15:1 18:12
35:11 96:24
97:25 100:17
103:19 107:7
107:24 110:11
**believe** 20:18
24:16 25:1,1,3
27:11 35:4
36:9,13,23
40:10 44:3
46:13 47:20
58:8,17 59:16
63:7 68:13,16
68:17 87:9
98:17 103:2
107:23 108:13
**believing** 84:14
**beneficial**
47:12 69:6
92:13
**benefit** 18:21
22:10 48:3
66:7 67:5,6
73:23 79:24
82:16 83:1
86:21 91:2
92:13,18 93:2
**benefits** 9:20
27:12 44:23
47:10
**best** 7:12 23:19
23:20 27:4
32:10 43:15
98:17 114:20

**bets** 96:10
**better** 32:11
40:9 80:5,6
94:6
**beyond** 47:23
65:24 69:17
**bid** 87:12,13
**big** 6:2 21:11
79:6 106:20
**bigger** 61:3
**billion** 9:25
10:24
**bills** 75:16,18
**binds** 82:20
**birthday** 36:10
**bit** 48:6 60:22
91:19
**blessed** 7:7
114:20
**board** 36:5
48:5 115:2
**boiler** 22:2
**boils** 96:7
**bolster** 74:1
**bond** 17:11
88:8
**bondholders**
10:7 106:4,5
**bonds** 10:3
38:4
**book** 10:24
49:3,11 50:21
**books** 19:1
29:17,19 30:1
30:8,10 48:19
49:2 50:12,15
58:2 67:15,19

82:2 95:1
**boroughs** 11:1
12:19 87:6
**borrowed**
10:12
**borrower**
22:24
**borrowers**
9:17 15:24
**bought** 8:1
**bowery** 49:18
49:19,23 50:2
50:4 72:10
**bowling** 1:13
4:4
**box** 43:14
**brain** 90:16
96:11 105:9
**break** 28:3,6
43:3 51:14
56:17 100:9,19
**breakdown**
42:6,14 52:2
**breathing**
14:13
**brett** 3:21 5:19
**bridge** 107:1
**brief** 8:15 87:1
97:2 101:24
115:5
**briefly** 14:20
17:20 30:14
51:23 58:6
84:21 102:15
110:11
**bring** 16:1
95:13 112:18

british 9:5
broadcasting
43:5
broader 15:20
broadway 1:7
5:4
broke 45:20
61:25
broker 27:24
52:20 81:9
bronx 11:2
12:20,25
brooklyn 11:2
12:20
budget 17:3
18:18 19:12,14
19:22 21:6,19
21:22 22:5,21
24:24 27:24
33:15,23 34:7
34:7,11,19,20
34:23,24 35:6
35:7 40:18,19
40:23 42:5,11
42:15,17,19
44:2,3,7 52:1,2
52:3,9 54:1
55:5 60:23
65:2 68:4,4,5,6
70:11 72:25
73:6 87:25
92:3,20 93:9
94:3
budget's 93:9
budgeted 28:9
budgets 42:18

buffer 23:22
build 39:11
building 22:1,3
22:4,20 28:7
45:19,23,24
55:10 104:22
buildings 25:9
26:1 45:2
47:13,19 48:23
52:9 55:24
69:15,16 104:4
104:5,9,15,17
buildup 29:24
68:2,2
built 26:14
83:19
bulk 15:3 25:7
burden 30:23
72:4
burdensome
66:6
business 2:8,10
8:15 9:1 13:16
14:14,15 62:21
62:22,25 80:23
81:11

c

c 3:1 5:1 65:14
86:9 122:1,1
cabined 93:14
calderon 43:13
119:20
calendar 91:17
119:20
call 23:24
31:12 34:19,25
34:25 47:2

51:7 78:21
called 72:10
candidly 84:5
canvassed 71:7
capital 8:3,16
9:23 10:15
16:10 115:11
118:6
capitalized
99:24 100:2
car 21:3
careful 118:13
carefully 84:10
carried 72:3
carries 30:8
carveouts 26:8
case 1:3 6:23
7:6,9 15:13,24
16:1 34:21
39:11 40:24
43:6,6,8,12,16
47:3 58:9
60:15 73:21
76:7 78:6,6
81:6 82:4 85:4
85:16 86:22
91:22 94:2
96:1,16 99:6
101:5 112:16
116:12
cases 5:5 13:4
13:14 14:12
16:6 17:6,14
17:21 47:25
63:10 74:13
78:13 85:23
86:24 87:4,5

97:15 113:21
116:3 118:5,16
cash 2:2,8,9
8:20,21 14:2,3
14:18 17:13,16
17:17 18:10,16
19:10,13,17
21:7,9,10 23:6
23:8 24:1,18
26:2,9,19 29:3
33:15 37:18
39:4 41:2,25
41:25 42:2,21
52:16,24 58:21
59:3,3 60:9,24
61:5,10,12,16
61:18 62:12,15
63:16,19,22
68:5 69:2
71:14 72:22
73:1,15,24
74:24 77:14
78:7,14,19
81:16 83:12,18
85:18 86:5,18
86:23,25 90:8
90:15 92:1,7
96:20,25 97:4
97:6,7,16
98:18 101:10
101:15,16
102:8,18,21
103:13 108:12
110:2,6 111:15
112:23,24
116:6 118:18
119:10 121:5

cashflow   23:25
cashflows
    16:25 37:8
    41:5 54:9
catch   105:10
categories
    66:13
caught   105:16
cause   97:21
    98:23
caused   13:17
    47:13
causes   59:4
center   17:14
    26:1
central   99:19
    99:19
centralized
    97:19,19,23
    98:1 99:23
    100:1,18,20
    102:8 103:18
    105:12,13,13
    106:3
certain   16:18
    19:23 28:25
    40:13 53:20
    75:6 88:20
    97:17 98:8
certainly   23:23
    37:11 59:16
    63:10 72:12
    80:5 81:16
    99:6
certified   122:3
cessation   25:18

cetera   109:16
chairman   7:25
challenge   65:9
challenging
    63:16,18 81:25
    82:5 114:17
chamber's
    43:13 96:16
chance   17:19
change   70:5
    94:12 99:1
    104:14 106:19
changes   2:9
    11:18,25 20:25
    21:2 98:19,21
changing
    70:11 87:25
chapter   8:16
    10:10 13:4,13
    14:12 15:13
    64:13,13 76:7
    88:12 97:15
character
    112:19
charge   44:22
    86:10
charged   28:5
    92:11
chase   105:7
check   27:13
    79:15 103:25
checks   104:2
chief   8:4
child   79:18
choose   79:17
chunk   94:12

circumstances
    11:5 63:8
    66:15 78:3
    89:2,6 95:25
cite   85:8
city   9:13 28:4
    45:21 64:24
    65:6 79:4
claim   20:21
    24:4 64:9
    77:22 79:11
    85:20 88:20
claims   20:14
    58:14,16 64:15
    78:16
clarification
    109:3
clarifications
    111:21
clarify   21:19
    103:3
clarifying   53:7
    110:16
clarity   39:14
clarke   3:12
    5:14 96:22,23
    96:24 99:17
    100:16 101:2,8
    101:16 103:5
    104:13 105:5,6
    107:3,13,23
    110:15 113:7,8
    114:8,11 115:1
clawing   16:23
clean   71:2
clear   12:5
    13:19 25:13

50:10 69:8
91:24 110:24
116:4
clearly   76:20
clerk   6:22
clerks   7:3,4,8
clickpay   104:3
client   27:14,21
    27:22 75:1
clients   107:6
clock   39:17
close   72:3 74:6
closely   114:14
code   16:5
    63:15,22 71:13
    81:13 88:19,24
    89:6,7,23
    118:14
collate   54:20
collateral   2:3
    8:20 14:3,18
    17:16 18:10,16
    18:20 19:7,11
    19:13 21:7,10
    21:10 22:10,10
    23:22 24:4,18
    26:9,19 33:15
    39:4,5 47:10
    48:3 52:24
    58:13,18,19,22
    59:3,5,11,22
    60:5 62:12,13
    62:13,15 63:8
    63:12,16,19,19
    63:22,25 64:3
    64:19 65:12
    66:22,24 68:5

71:15 73:9,11
73:24 74:4,24
77:14,21 78:8
78:19 81:16
83:12 85:19,20
86:5,11,17,18
86:23,25 88:7
88:8 89:22
92:1,7 93:16
101:10 111:15
112:23,25
116:6 118:19
119:10
**collateralize**
60:1 69:3
**colleague** 5:20
33:4 66:18
71:9 79:21
98:15 101:19
**colleagues** 5:19
23:7 75:1
79:16 119:15
**collect** 54:8
58:5 115:13
**collected** 38:5
69:14
**collecting** 54:6
**collection** 12:1
**collective**
22:24
**collectively**
53:15,16
112:25
**collects** 103:7
**colloquy** 39:21
**columns** 21:24
68:3

**combining**
21:12
**come** 6:17
17:21 23:12,21
24:6 29:7
55:17 57:25
64:24 72:3
74:6 96:8
117:15
**comes** 23:9,10
23:11 47:15
61:21 72:9
**comfort** 105:24
107:7
**comfortable**
66:17 93:8
**coming** 36:5
52:21 61:12
118:18,25
**commenced**
13:3,13
**comment**
100:5 102:1,10
**comments** 7:20
8:15 15:2,4,19
40:4 71:8
102:7 116:18
**commingling**
23:23
**committee**
65:9 84:15
**commonly**
118:16
**companies**
9:16 56:23
57:3 60:13
95:4

**company** 8:9
8:11 9:18 10:6
14:13 15:22
20:3,8 22:25
24:22 25:5,22
30:2 35:24
44:13 45:19,25
46:10 49:2,8,8
52:10,13 53:9
72:9 76:18
81:20 95:16
97:9 114:9
**company's**
10:25 48:19
50:12,14
**compared**
85:23
**compile** 113:17
**complaints**
12:18
**complete** 13:24
**completed**
13:23
**complicated**
39:24 115:8,10
115:12
**component**
31:3
**composure** 6:2
**compound**
56:15
**comprise** 10:25
**concept** 80:16
83:19 93:14
**concern** 14:14
31:3 83:10,20
110:15 118:17

**concerned**
47:18 62:8
76:16 93:25
106:9
**concerning**
15:15 83:13
**concerns** 17:8
98:20 110:12
**concession**
93:11
**concessions**
92:4
**concluded**
120:4
**condo** 11:20
**condos** 8:1
**conduct**
105:19
**conducted**
58:13
**conducting**
98:18
**conducts** 9:12
**confer** 75:1
**conferring**
27:22 66:4
**confidence**
92:23 93:5
**confident**
39:10,12 70:17
**confirm** 88:14
**confirmed** 23:3
**conflating**
71:15
**conform** 43:9
**connection**
89:24

consensual
64:21 67:3
91:22 96:8
consensually
116:12
consensus
24:15
consent  24:11
63:2 89:13
consider  77:11
84:18 96:9
considered
111:24
consistent  15:2
consistently
40:15
consolidate
68:4
consolidated
87:10
consolidation
16:6,7 21:15
constituencies
94:1
constituents
63:9
constitute
10:23 31:7
constitutes
43:15
constrained
64:14
constraints
24:22 52:24
constructive
95:19

consulting
8:10 54:18
contact  43:13
contain  29:5
contemplates
94:3
contemplation
100:9
contested
24:13
context  9:2
85:1
continue  2:7
13:9 14:3
95:21 97:16
98:16 102:18
107:4 114:5,13
117:17
continued
12:15 92:1
continuing
16:20
contours  50:19
contract  24:25
contracts  2:15
contradictory
58:16
contrary  95:4
95:9
control  12:13
13:17 19:16
60:9,14 69:18
86:16
controls  60:8
controversial
26:5 114:1

convenient
72:24
conversant
7:18
conversation
55:1 78:18
conversion
11:21
converted  8:1
conveyed
17:24
cooperative
114:24
coordinates
45:25
copy  33:5,14
33:21 34:18
35:4 98:7
corinne  4:20
corp  85:13
correct  16:16
20:22 27:21
32:4 35:22,25
36:1 37:2,16
38:15 40:20,21
40:23 41:2,3,9
42:12,13 43:2
44:11,15,19
48:10,12 73:4
73:5 101:8
correctly  101:7
101:14 102:16
corresponding
66:7
cost  11:15
22:19 24:23

costs  12:1
26:15,17 27:10
52:14,14 80:7
counsel  8:9
27:22 36:8
47:1,20 66:4
71:20 74:10
77:20 78:21
99:12 103:2
counsel's  38:24
counsels  75:24
country  119:11
122:21
county  12:12
12:25 13:1,2
87:7
couple  8:14,17
9:2,19 28:16
64:7 81:18
112:5 114:12
course  2:10
17:20 81:14
84:9 119:2
court  1:1,12
5:2,6,16,22 6:1
6:7,13,15,17
8:25 9:6 12:12
13:5,8,12,20
14:20 15:5,8
15:11 17:16,18
17:21,23 18:5
20:2,6,20,24
21:11 23:15
24:9 25:13,17
25:20 26:3,12
26:13,20,24
27:1,5,8,19

| | | | |
|---|---|---|---|
| 28:12,16,23 | 80:18,24 81:5 | **courts** 78:13 | **cumulative** |
| 29:11 30:12,18 | 81:15 82:6,12 | 84:24 | 68:25 94:24 |
| 30:24 31:16,20 | 83:8,12,22 | **coverage** | 96:4 |
| 31:23 32:1,7 | 84:2,7,13,18 | 119:14 | **curiosity** 114:3 |
| 32:12,15,18,24 | 84:22,24 85:3 | **covered** 68:7 | **current** 58:9 |
| 33:2,7,12,17 | 85:10,21 86:2 | 90:12 | 59:1 113:18 |
| 33:19,22,25 | 87:24 88:3,5,9 | **crafting** 77:1 | **currently** |
| 34:3,5,8,10,13 | 88:17,23,25 | **create** 105:2 | 62:14 77:21 |
| 34:15 35:8 | 89:9,11 90:3,5 | 106:20 | 113:23 |
| 36:20 38:9 | 90:10,14 91:3 | **created** 102:20 | **cushion** 19:5,6 |
| 39:7 40:1,4 | 91:4,7,12 94:9 | **credit** 28:11 | 24:17 26:18 |
| 43:3,9 50:16 | 96:23 99:8,15 | 75:13 87:12,13 | 29:3 31:9 58:17 |
| 51:2,4,7,21 | 100:8 101:1,3 | 92:10,12 | 63:5,6 65:18 |
| 52:3 53:5,12 | 101:9,12,18,21 | **crediting** 96:4 | 72:1,5,11,16 |
| 53:15,17 54:13 | 101:23 102:5 | **creditor** 106:5 | 72:19 84:25 |
| 54:15 55:2 | 102:24 103:15 | 107:22 | 85:12,14,23 |
| 56:11,15,17,19 | 104:12 105:3,9 | **creditor's** | 96:6 |
| 57:9,11,15 | 105:17,19,23 | 78:12 85:19 | **custom** 4:3 |
| 58:23 59:1,7 | 106:7,11,18 | **creditors** 16:12 | **cut** 13:11 30:2 |
| 59:10,13,18,20 | 107:10,21,25 | 18:21 62:3 | 69:3,13 88:15 |
| 60:7,19,22 | 108:10,15,20 | 79:5 84:17 | **cutting** 26:2 |
| 61:14,17,22 | 108:24 109:4 | 92:14 108:6 | 111:12 |
| 62:8,24 63:13 | 109:17,25 | **crisis** 101:5 | |
| 63:17,21,23 | 110:4 111:2,8 | **critical** 26:11 | **d** |
| 64:1,5,22 65:4 | 111:11,16,25 | 112:11 | **d** 5:1 121:1 |
| 65:14,22 66:9 | 112:2 114:1,3 | **criticized** | **d.c.** 3:18 |
| 66:12,16,20,25 | 114:10,16 | 116:21 | **daily** 99:5,5,6,7 |
| 67:4,8,15 68:8 | 115:2,3 116:1 | **cro** 20:17 | 104:20 107:8 |
| 68:14,20,23,25 | 116:2,20 117:9 | 35:20,23 53:21 | 108:14 110:22 |
| 69:19,22 70:4 | 117:12,19,21 | 53:22 | 111:6 |
| 70:14,19,21,23 | 117:25 119:19 | **cros** 70:6 | **date** 19:15 21:8 |
| 71:5 72:2 | 119:23 | **cross** 30:3 31:1 | 26:17 36:19 |
| 74:20 75:3,5 | **court's** 84:1 | 32:21 35:13 | 69:20 72:23 |
| 75:13,21 76:1 | **courtroom** | 59:25 69:3 | 86:11 87:1 |
| 76:24 77:6,12 | 5:19 6:1 7:24 | 72:7 | 122:25 |
| 77:18 78:4,24 | 28:21 | **crumbles** | **dated** 25:10 |
| 79:17 80:1,3 | | 75:14 | **dates** 119:9 |

| | | | |
|---|---|---|---|
| **david** 1:22 | 17:10,13 18:6 | 12:13,15 13:9 | 100:15,24 |
| 4:18 | 21:21,22,22 | 13:17 15:17,20 | 102:3,9 103:7 |
| **day** 5:3,4 7:19 | 23:4,4,5,6,13 | 15:20,22,24,25 | 104:5,6 105:19 |
| 8:5,5 14:6,9 | 23:13,13 24:3 | 16:2,18,24 | 106:1 107:8 |
| 15:23 18:12 | 24:3 28:4 31:7 | 18:9,15,21,24 | 108:13 109:11 |
| 19:14 22:14 | 35:1,3 44:12 | 19:1,10,22 | 110:2,5,17 |
| 29:7 53:4 | 46:3 48:2,2,4 | 20:12,17 22:12 | 111:3 112:19 |
| 55:16,16 71:12 | 50:21 52:2 | 22:25 23:15,20 | 112:25 113:8 |
| 77:5 78:18 | 57:23,25 60:3 | 23:22 24:16 | 113:12,13,13 |
| 82:4,4 94:19 | 60:3,4,4 72:12 | 25:1,3,6,16 | 113:17,21,22 |
| 106:25 110:21 | 72:12,16,16 | 26:15 29:17,19 | 114:8,13,18 |
| 110:21 113:2 | 79:5 80:10,13 | 30:5 36:3,3,8 | 115:7,12,16,20 |
| 113:19 114:12 | 85:15 88:8 | 36:14,25 37:8 | 117:10 118:15 |
| 116:5,15 118:8 | 93:19,20 95:24 | 37:21,22 38:18 | **december** 12:4 |
| 119:17 | 97:8,10,12,22 | 41:4,10,22,24 | 19:4 |
| **daylight** 89:17 | 97:24 98:2,3,9 | 42:1,11,12,16 | **decided** 76:4 |
| 89:18 | 98:14 99:3,3 | 43:1 44:21 | **decision** 62:21 |
| **days** 19:10 | 99:21,25,25 | 45:7 53:14 | **declarant** 8:5,6 |
| 22:15 45:22 | 100:2,3,3,10 | 54:10 55:16 | 8:6 90:13 |
| 52:10 54:22 | 100:11,14,17 | 57:14,24 58:8 | **declaration** |
| 69:18 70:2 | 100:19,22,25 | 58:10,11,18 | 18:11,24 19:1 |
| 88:14 105:6 | 102:19,20,22 | 59:12 62:10,11 | 28:17 29:7,15 |
| 113:10 115:15 | 103:20,22 | 62:21,25 64:11 | 29:18 30:25 |
| **deadline** 8:22 | 104:7,10,12,13 | 64:17,19,24,25 | 31:14 32:23 |
| 84:16 | 104:24 105:3 | 65:8,12 67:19 | 33:16 34:17 |
| **deal** 90:25 | 106:3,6,13,14 | 69:4,7 70:13 | 36:23 48:8,24 |
| 96:17 | 107:5,11,15,18 | 71:12,20 72:3 | 58:12 62:5 |
| **dealt** 55:19 | 107:24 108:8 | 72:18,24 73:13 | 113:19 118:4 |
| **debt** 9:25 10:7 | 110:13,13,25 | 74:9 75:24 | **deem** 116:16 |
| 10:9,10,13,17 | 117:21 | 78:19,21 86:8 | **default** 12:9 |
| 10:20 11:14,15 | **debtor's** 24:1,2 | 91:25 92:3,14 | 64:20 65:4 |
| 12:7,9 17:7,7 | **debtors** 2:1,2,6 | 93:14 96:25 | **defenses** 65:13 |
| 38:3,14,21 | 2:7,13 3:4 5:11 | 97:7,8,8,10,13 | **deficiency** 83:7 |
| 46:17 68:12,19 | 7:25 9:1,3,9,17 | 97:16,17,18,21 | **defies** 115:17 |
| 94:25 | 10:2,11,14,16 | 97:25 98:4,6 | 115:19 |
| **debtor** 1:9 9:9 | 10:21,22,23,25 | 98:12,16,17,20 | **definitely** |
| 13:7 16:8 | 11:9,14 12:5 | 99:1,4,8,18 | 93:12 |

definition
  63:15,20
degree  17:24
  61:9
delay  117:17
delivered  12:8
demand  88:11
  96:10
demanded
  65:23
denied  12:21
dep  45:21
department
  4:1
departures
  11:19
depend  22:19
deposited
  104:7,9 109:9
depositories
  60:14 100:7
deposits  26:12
  98:6,9,11,14
depth  17:24
deputy  43:13
derail  65:5
derived  50:22
described  18:7
  103:5
desire  116:13
desperately
  95:16
despite  11:22
  21:14 23:18
destination
  92:24

destruction
  13:16
detailed
  118:10,13
details  119:10
deteriorate
  19:9
deterioration
  47:18 69:16
determine  47:8
determined
  86:11,23
detriment  62:2
develop  14:14
development
  31:11
develops  9:11
devise  52:8
dialogue  71:8
diamond  8:3
  18:13 28:21
  29:10,16 31:12
  31:14,16,19
  35:13,15,20
  43:25 51:24
  52:1 53:19
  56:22 57:11
  64:11 67:18
  68:3 115:14
  118:4
diamond's
  18:24 19:1
  34:17 62:4
  113:19
didonato  3:11
  5:13,14

different  59:24
  76:23 82:3
  87:8 102:9
  103:24,24
  104:4 107:16
differently
  60:11
difficult  52:23
dime  16:21
  17:6
diminution
  19:18 21:10
  24:21 62:17,19
  63:3 64:9,15
  69:10 73:10,14
  74:19 77:23,24
  79:11 86:9
  93:15
dimond  83:16
dip  26:9 101:5
direct  20:10
  32:22 44:5
  75:7
directing  54:5
  98:21
direction  32:3
  52:11
directly  97:13
  109:19
disaggregated
  68:10
disagree  90:19
disbursed
  55:19 110:13
disbursement
  19:23 20:15
  97:20 99:19

100:1,18,20
disbursements
  21:4,21 23:5
  42:6,15 83:14
  94:5 99:25
  103:19
disbursing
  105:13
discloses  58:12
disclosure
  110:12
discounts  25:7
discovery  39:2
  116:8,14 117:4
discuss  12:16
discussed
  112:12
discussion  29:1
  29:4 109:22
  111:22
discussions
  16:19 19:21
  36:24 37:3,6
disinfectant
  7:12
dismiss  86:13
displaced
  62:23
disposition
  94:9
disruption
  13:15,16
distant  7:6
district  1:2
diverting
  106:11

docketed   34:18
  34:21
document
  34:23 48:21
documents
  67:13
dog   111:13
doing   23:2,20
  33:25 52:5
  55:22 81:10
  83:17,17 111:6
dollar   63:20
  76:20
dollars   72:23
  81:18,19,20
door   94:11
doubt   22:8
  73:23
drawn   100:11
drive   6:20
drop   93:8
  103:24
dropped   62:18
dropping
  69:18
drum   115:7
dsj   1:3
due   17:20
  104:19
dues   62:11
duty   62:10

**e**

e   1:21,21 3:1,1
  5:1,1 71:13
  74:15 121:1
  122:1

earlier   48:7
  52:8 70:2,3,6
  98:16 119:1
early   37:6
earned   17:1
ease   22:25
easiest   58:4
easily   105:2
ecf   18:11,13
  34:18,20
economic   62:6
ecro   1:25
effect   52:21
  111:4
effective   25:6
  75:10
effectively
  52:25 107:19
efficient   23:20
  98:17
effort   43:16
  98:20
efforts   23:19
  47:21 116:25
  120:1
either   23:21
  28:10 31:9
  69:6 71:2 77:5
  99:11 106:16
  112:15
electronics
  33:10
else's   54:3
email   43:13
  96:16,16
emerge   24:11
  87:24

emergencies
  119:14
emergency
  14:1 28:7
  53:25 54:11
  118:5
emotional
  62:21
emphasize
  71:10 72:21
  111:21
emphasized
  79:9
emphasizing
  8:18
employee
  27:11 76:21
employees
  81:12
encouraging
  96:8
encumbered
  63:14
encumbers
  68:12
ended   43:14
  53:25
energy   85:13
enforce   43:10
  43:16 82:19
engage   12:15
engaged   12:5
  36:8,17,18
engagement
  12:3
engineers
  25:23 45:24

  55:18
enhance   18:20
  47:21
ensure   19:8
entails   90:21
enter   13:20
  58:10 70:16
  99:9 104:16
  114:1
entered   29:14
  31:14 70:14
  101:11
entering   77:6
  82:19
enterprise   11:4
  15:21 53:10
  75:14 79:2
  94:20
enters   83:12
entirely   69:4
  75:2
entities   10:2
  16:4,5,10
  21:13 42:21
  47:5 80:13
  95:24 100:11
  102:11 115:8
entitled   31:3
  43:17 71:22
  77:24 78:17
  79:7 88:20
  118:20
entity   46:2,4
  48:4 61:7,7
  95:23,23
  100:10 103:17
  104:12,13

118:7,8
entity's  104:24
entry  2:2,6,13
eod  89:24
ephraim  8:3
  18:13 35:13
  51:24
equipment
  25:9
equity  19:4,5
  24:17 31:9
  58:8,21 60:6
  60:12 62:3,6
  67:6 69:5,6,8
  72:1,4,11,15
  72:19 85:14,23
  94:24 96:6
  108:17
errors  103:6
  104:19
escape  103:21
escrow  26:21
  46:22 74:21
  98:4
escrowed
  27:15 74:22
escrowing  94:4
especially  52:9
  52:13 88:13
essential  55:23
essentially
  60:24 118:2
establish  31:10
  50:19 86:24
established
  31:6

estate  8:2 16:4
  16:10 19:7
  24:17 51:17
  82:17 85:1
  92:14 93:2
  94:5 102:11
  112:19 114:5
estimate  22:5
  22:21 28:9
estimated
  27:18
estimates
  21:25
et  109:16
event  64:23
events  8:16
  64:20 65:4
  69:17
everybody  5:2
  14:16 54:2
  61:25
everybody's
  60:15 86:5
evidence  28:20
  28:21 29:8
  30:22 31:14
  64:16 95:4,9
  113:20
evidentiary
  31:2,5 94:23
  95:7,23 116:1
  117:15 118:3
ex  12:11,22
exact  20:4 31:2
  36:18 54:22
exactly  63:25

examination
  32:21 35:13
  51:24 72:7
examine  31:1
example  22:1
  27:2 28:1
  42:20 51:16
  53:3 61:20
  69:3
examples  26:7
exceeded  85:20
excellent  82:7
except  39:4
  93:22 97:12
exception  16:3
  74:14
excess  17:5
  41:18,20 82:16
  94:25
exchange
  37:22 40:12
  70:5
exchanged
  37:23 40:14
exchanges
  35:18
excited  105:21
excuse  66:3
  94:3
execute  14:15
executory  2:15
exercise  93:3,5
exhibit  35:1,3
  70:13,13 99:9
exhort  114:18
exist  59:4
  67:22,25 105:4

105:4
existing  2:8
  59:1 66:22
  88:7 114:4
exists  65:18
exit  119:7
expand  59:11
  59:17 62:2
expanding
  58:19 59:16
  63:8 66:24,24
  89:22
expect  23:1
  39:17 65:9
  102:5 116:4
expected  59:24
expedited
  13:14 113:21
expenditure
  28:8
expenditures
  92:6,19 93:7
expense  19:25
  24:3 77:22
  78:15
expenses  18:17
  20:10 25:21
  27:13 44:5
  45:16 63:1
  73:18 75:7
  76:2,5,9,22
  78:9 85:16
  86:22,22 92:13
  102:9
experience
  55:22 56:22,25
  77:1

**experienced**
117:18
**experiences**
47:14
**explain** 52:3
55:8 56:11
**explaining**
29:20
**explanation**
115:17,20
**extend** 8:22
63:14 97:1
113:24 121:7
**extending** 2:14
113:6
**extension** 14:4
17:17 113:9,10
116:2,6 117:6
117:9,20 118:8
118:15 119:5
**extent** 23:25
59:2,4 66:22
67:6 73:9
76:10 77:22,23
79:11 82:15
88:7,19,21
93:15 109:7
112:7,10 116:2
116:13
**extraordinarily**
115:10
**eye** 105:16

**f**

**f** 1:21 122:1
**facilitate** 87:14
**facing** 59:23

**fact** 16:9,17
21:14 22:15,23
30:15 39:13
54:5,6 55:23
69:12 74:12
78:2 85:2
118:12
**factional** 31:11
**factors** 86:25
**facts** 9:2,19
**fail** 3:13 6:11
6:11,15,16
18:8,9 20:3,7
20:22,25 21:18
24:14 25:15,19
25:21 26:4,14
26:23,25 27:2
27:6,11,20,23
28:13,19 29:13
31:15 53:5
57:14,20,21
58:24 59:2,8
59:11,14,19,23
60:8,21 61:11
61:15,19,23
62:9,25 63:15
63:18,22,25
64:2,6 66:1,5
66:10,13,18,21
67:1,5,14,16
68:13,17,21,24
69:1,21,24
70:8,16,20
80:17,18,20,20
81:1,16 82:9
82:21 84:20,21
84:23 85:8,12

85:25 86:3
88:2,4,7,12,18
88:24 89:1,10
89:16 90:4,7
90:11 91:11
96:21 98:15
101:10,12
103:4,4,13,22
103:23 104:13
105:5 108:1,1
108:11,19,22
111:5 117:23
119:16,22
120:2
**fail's** 50:10
**fair** 50:18 61:8
91:7
**fairly** 6:22 75:8
83:4 91:18
**fairway** 70:9
**fall** 16:19
36:25 37:7
115:16
**familiar** 40:18
48:16,18 50:23
56:9
**family** 20:6,7
80:22 81:10,11
87:21
**far** 40:5 59:6
84:25 85:1
118:6,23
**farmer** 4:10
**farther** 82:17
**fast** 70:25
**favorable**
70:11

**favorably**
18:19
**favorite** 79:18
**feather** 95:6,7
**february** 36:9
36:11,12 41:14
41:15
**federal** 43:4,9
**fee** 25:2,4
44:16 45:1,5,8
45:17 46:22
47:6,7 48:3
75:12 76:17
**feed** 49:6
**feeds** 49:13
**feel** 74:10
79:22 85:4
**feels** 66:21
**fees** 19:25
20:10 26:11
27:2,9,16,24
40:25 41:1,10
44:1,5,9,12
46:2,17 47:9
47:21 52:20,22
55:5,9,11 74:7
74:8,8,13,17
74:21,24 75:7
75:12 76:2,11
76:21 80:9
85:18 86:6,7
87:17,18 92:11
92:11
**fiduciary**
62:10,11
**field** 47:14

**fifth** 3:5
**fifty** 65:6
**fighting** 16:23
**figure** 44:21
  45:7
**figured** 84:15
**file** 2:14 8:22
  14:4,9 19:14
  57:24 113:24
**filed** 2:1,13
  6:24 7:17 9:14
  10:16 12:11,18
  12:22,25 13:1
  15:22 17:18
  18:10,12,13
  19:12 59:24
  60:23 83:19
  84:10 87:6,9
  113:21 118:5
**filing** 11:6
  13:10 19:20
  41:6,9 47:11
  47:20 53:25
  97:1
**filings** 54:1
**final** 2:3,6
  25:18 112:16
  117:5 118:18
**finally** 12:3
**financed** 11:9
**financial** 2:16
  8:10 20:17
  30:15 36:14
  49:6,14 72:8
  72:14 114:9
  115:22,23
  116:9

**financials**
  29:24 48:25
  49:9,9
**find** 22:15
  25:10,11 26:6
  44:4 57:3 65:4
  76:1,11 89:23
**finding** 72:3
  86:14 87:23
  95:17
**fine** 6:10 29:9
  33:2 35:2 70:5
  84:22 91:22
  93:12,12 94:5
**fines** 28:5
**fingertips**
  67:23 85:25
**finish** 54:25
**first** 5:4 7:19
  7:21 8:5,5,21
  14:6,9 18:12
  19:24 29:7
  40:24 47:17
  60:24 69:19
  71:1,4,25
  78:20 112:6
**five** 11:11
  39:10 104:15
  105:1
**fix** 28:4 53:2
  56:2,18 75:17
  77:10
**fixture** 22:3
**flag** 109:24
**flagged** 79:21
**flagstar** 3:16
  5:16,18 7:17

10:12,18 11:2
  12:4,5,8,11,16
  12:18,18,22
  14:16 15:1,25
  16:11,15,22
  17:14 18:24
  19:16 21:12
  23:15 24:19,21
  30:6,21 35:12
  36:25 37:7,12
  37:17,23 38:1
  38:4,19,23
  39:10 40:5,15
  58:10,14 62:19
  65:13,24 66:23
  71:14,18,21,22
  73:5,25 75:9
  76:6 78:1 79:6
  79:7 81:2
  83:13 87:6
  92:15 93:25
  94:11 95:4,11
  95:19 99:12
  102:2 109:10
  112:9,14,17
  113:16 114:19
  115:4,18
  118:20 119:18
**flagstar's**
  12:21 15:11,12
  16:21 19:13,21
  24:4 26:7 31:1
  31:3 38:15
  47:10 73:8
  74:18 89:4
  102:10 112:19
  116:24 118:17

**flexibility**
  28:14 53:2
**floor** 14:21
**flow** 26:2
  82:22 102:19
  107:4
**flowing** 37:19
  82:6 83:4
**flows** 39:14
  40:6 83:1 93:2
  103:13,17,21
  109:19 112:7
**flung** 118:6
**fly** 32:4
**focus** 44:2
**focused** 39:18
  46:21 113:15
**folks** 28:11
  54:19 65:3
**follow** 7:12
**followed**
  119:10
**following**
  19:20,24 39:8
  93:23
**footfalls** 65:5
**foreclosed** 6:9
**foreclosure**
  12:10,19 16:15
  87:6
**foreclosures**
  81:5
**foregoing**
  122:3
**forget** 47:2,3
  50:6

**forgive** 105:9
**forgot** 47:4
**form** 29:2 31:9
  38:7 53:7
  77:17 78:8,14
  88:6 89:13
  119:10
**formed** 65:10
**former** 6:22
  7:3
**forms** 2:9
  84:16
**forth** 18:23,25
  62:4 70:5
  106:23,24
**forthcoming**
  24:7 117:1
  118:11
**fortunately** 7:7
**forward** 58:1
  80:22 97:15
  107:20 119:9
**found** 25:3
  67:7
**four** 11:1 14:2
  22:8 26:21
  27:25 39:9
  40:24 41:5
  42:22 44:10
  46:23 61:1
  63:11 72:25
  73:7 79:25
  81:17,20 87:6
  87:9 89:24
**frankly** 15:15
  17:3 102:16
  109:7 113:12

115:25
**freddie** 10:15
**free** 69:8
**friday** 69:22,23
  70:1
**friedman** 4:11
**friend** 84:3
**front** 6:18 14:7
  14:10 17:13
  18:2 31:18
  32:2,23 80:4
**frustration**
  116:24
**fti** 8:10 36:14
  36:17 47:1
  52:11 54:18
  55:1 114:8,15
**full** 6:1 87:13
  118:16
**fully** 55:7
  114:19
**function** 45:13
  94:21 106:21
**fund** 17:5 24:6
  24:8 45:18
  74:12 76:21
  92:13 102:9
**fundamental**
  21:11
**funded** 9:25
  69:22 70:6
  92:21 95:21
**funding** 80:8
**funds** 24:6
  61:10 65:1
  94:4,6,9 97:13
  97:21 100:10

100:14,15,23
  100:24 101:6
  103:10 104:4,7
  104:8,18
  105:20,25
  106:13 107:14
  107:17,17,23
  108:16 109:2,8
  109:9 110:13
  110:17
**further** 17:15
  19:22 26:12
  31:11,13 51:20
  82:17 94:8
  95:14,14 116:5
**future** 7:6

**g**

**g** 5:1
**gambino** 76:1
**garett** 6:11
**garrett** 3:13
  18:9
**gary** 3:8 5:10
**gather** 54:19
  113:14
**general** 16:14
  22:8 29:6 48:5
  85:16 86:22
**generalized**
  111:16
**generally** 76:5
  97:11 100:13
**generate** 61:4
  96:12
**generated**
  37:13 44:17
  71:22 72:9

100:11
**getting** 34:5
  40:8 65:1
  101:3 112:7,8
**give** 7:23 9:2
  15:2,11 27:13
  31:23 33:18
  62:9 73:22
  85:3 90:5
  91:13,14 92:23
  95:1 97:6
  103:25 109:15
  114:25
**given** 14:1
  22:23 24:17,18
  25:6 28:10
  47:3,14 58:8,9
  58:21 62:12
  64:15 70:17
  93:5 96:4
**gives** 94:10
**giving** 67:2
  89:22
**glad** 17:18
**glance** 17:19
**glasses** 67:24
**go** 7:18 8:20
  25:21 31:18
  35:9 39:1 56:4
  56:10 57:16
  70:1 71:1,2,4,5
  80:18,22 82:17
  84:22 85:4
  91:19 95:10
  104:2 106:20
  106:24 107:20
  110:7,8 115:13

119:4,7,21
**goal** 108:7,9
**goes** 45:18 65:3
  70:1 72:25
  100:17 112:22
**going** 6:18 7:8
  14:12,14 17:1
  25:10,10 30:12
  30:24 32:9,19
  33:25 34:7,12
  39:7 42:2,22
  47:1,24 48:3
  50:9,16 57:13
  57:15 64:18
  70:1,24 74:17
  76:17,21 78:24
  79:1,12,24
  81:9,22 82:8
  83:10 84:14
  87:18 89:18
  90:22 91:9,12
  91:13,13,14,20
  92:11 93:13,18
  94:14,15,15
  96:3 97:15
  102:8,18,22
  106:21,23,23
  107:2 108:21
  109:8,9 110:6
  111:18 113:12
  114:5,6 115:6
  116:13,15
  117:10,19,20
  118:2,7,18,20
  118:24 119:5,9
  119:9

**good** 5:3,10,17
  6:5,16 32:10
  51:5 57:5
  111:12 112:3
**goren** 3:9 5:12
**gosh** 94:20
**gotshal** 3:3
  5:11 6:23 18:9
  32:17 36:7
  96:24
**gotshal's** 41:10
**government**
  104:2
**grabs** 66:14
**grant** 65:14
  78:5 89:18
  111:18 116:2
  117:6,9,19
  118:2
**granted** 13:3
  60:17 65:21
  102:13 121:5,7
**granting** 2:3
  2:10 58:19
  65:11 118:14
**grants** 70:10
**granular** 118:7
**gratis** 88:21
**great** 5:16,22
  7:7 14:23
  32:10 33:8,17
  33:19,24 51:2
  84:13 94:19
  101:23 109:4
  110:4 111:11
  117:16

**greater** 73:2
**green** 1:13 4:4
**ground** 95:16
**grounds** 38:22
**group** 9:3
**growing** 58:21
  63:7 69:2
**grown** 88:10
**grudging**
  114:24
**guardrails**
  61:7
**guess** 24:9 44:2
  51:4 68:8
  72:24 76:12,25
  82:13 85:22
  100:8 101:14
  106:21 117:7
**guessing** 69:23
**guidelines**
  23:14
**gut** 22:19
**guys** 90:20

**h**

**hamilton** 4:3
**hamstring**
  63:24 64:17
**hand** 31:21
**handed** 34:17
  34:22
**handful** 97:13
  98:10
**handle** 28:18
**hang** 82:6,6
  103:15
**happen** 56:3
  69:13 76:8,10

90:23 99:6
**happened** 38:5
  38:20 41:21
  42:2
**happening**
  37:14 69:12
  102:20
**happens** 96:17
**happier** 85:4
**happy** 9:6
  29:13 65:17
  66:7 77:7,10
  90:13 96:15
**hard** 23:19
  57:3 69:19
  95:11
**harm** 23:1
  59:15 90:24
**harvey** 3:22
  5:20
**hastings** 3:15
  5:18 15:1
  35:11
**hat** 116:21
**hate** 69:2
**head** 27:6
**heads** 75:23
**hear** 17:18
  70:24 71:1
  79:18 82:13
  96:14 99:15
  101:18 102:1
  110:5 115:4
**heard** 30:9
  71:20 83:16
  89:19 90:17
  91:1 93:24

106:19 110:8
110:12
**hearing** 2:1,1,3
2:6,13 8:13
25:18 29:7,8
39:2 54:25
77:8 82:17
90:20 91:2
95:12 112:16
116:5,15
118:18
**hearings** 5:4
**hearsay** 29:3
30:20
**heart** 88:10
**heaven's** 85:5
94:14
**heavy** 101:22
**hedged** 96:10
**held** 15:24
16:11 51:17
97:11,25 98:2
98:9 99:24
100:16 102:11
103:18 106:14
107:6,7,15,24
108:5,16 109:3
110:17
**hello** 5:2
**help** 73:25
74:20 75:4
94:17 109:14
**helped** 108:21
**helpful** 17:25
78:23 83:11,20
91:6 96:18
109:5 110:18

118:13
**helps** 45:8
**high** 97:6
**higher** 12:1
57:4
**hike** 33:3
**hillside** 51:17
**hire** 25:4
**hiring** 56:23
**historic** 54:9
**historical** 22:6
39:13
**historically**
57:6
**history** 16:13
16:14 25:6
81:6 83:5
117:17
**hit** 17:23
107:14
**hold** 31:10
59:20,21 98:4
98:11 104:25
**holdco** 99:3
104:9,23
105:20,21
106:6,11 107:4
107:11,22
108:6,16
111:23 112:9
**holdcos** 108:4
108:18 112:11
**holder** 105:14
106:3 108:17
**holders** 62:4
**holding** 9:16
98:6 105:25

107:16
**holds** 107:17
**holiday** 78:20
**holter** 62:4
**holtzer** 3:8
5:10,11 6:11
6:14 7:20,22
9:1,8 13:7,9,13
14:24 18:23
120:3
**home** 67:25
**hon** 1:22
**honestly** 93:10
103:16
**honor** 5:10,17
5:24 6:5,16
7:22,24 8:8,14
8:18,23 9:1,13
9:19 10:2,9,16
10:23 11:1,4,9
11:21,24 12:2
12:7,14 13:2,7
13:11,19,25
14:1,7,7,10,17
14:19,25 15:7
15:12,18,23
16:14 18:3,8
18:15 19:5
20:22,25 21:6
21:18 22:1,12
23:24 24:14
25:11,16,19
26:5,10 28:2
28:15,19,25
29:13,16 30:15
30:20,23 31:15
32:13,21,25

33:11,13 34:4
34:6 35:2,10
38:7,22 39:19
39:23 43:22
50:9,11,25
51:23 57:7,10
57:14,21 59:9
60:1,15 61:11
61:23 63:16
64:6 65:10
66:3,18,21
67:14,17 69:1
69:21 70:12,16
70:21 71:6,9
71:12 72:1,17
74:8 76:4,11
77:4,16 78:1,6
80:17 81:24
83:3,24 84:5
85:9 86:1 88:2
88:8,13,16,18
89:10,19 90:1
90:4,24 91:11
96:21 97:2
101:11,17,24
102:15 103:2
103:12,14,23
105:7,15
106:10,15
107:3,13 108:1
108:19,23,25
109:6,23 110:3
110:10 111:10
113:7,9,12
115:1,6,24
116:13,19
117:9,19,23

119:16 120:2
**honor's**  15:2
97:5
**hope**  17:24
24:14 39:17
118:10,12
119:24
**hopefully**
84:24 108:21
116:11
**hoping**  105:24
**horizontal**
32:2
**horse**  84:6
**hour**  70:18
**house**  4:3
55:15
**human**  13:5
**hundred**  46:7
81:18
**hundreds**
81:19
**hybrid**  2:1
43:7
**hyde**  2:25
122:3,8

**i**

**i.e.**  74:24
**idea**  49:5,7,16
49:19 50:1,4
82:14 103:17
**ideally**  24:11
**identical**  12:24
**identification**
35:1,3
**identified**
66:14

**identify**  104:21
**ii**  99:25
**iii**  2:3
**image**  6:2
**imagine**  21:2
**immediate**
97:9,12 104:9
107:5
**immediately**
80:5
**impact**  94:1
**impair**  88:15
**impairment**
64:16 65:12
**impassioned**
82:7
**impending**
88:14
**implement**  2:9
11:20
**important**
15:10 55:10
78:25 79:1,14
79:19 82:25
86:15 93:9
112:11,14
113:16
**importantly**
26:10
**impose**  70:21
**impossible**
23:10 25:15
**impressionis...**
95:18
**improved**
92:12

**inappropriate**
58:8 62:3 64:8
64:19 65:7
**inartfully**
101:3
**incentives**
11:21
**inclined**  116:2
**include**  47:5
**included**  29:23
46:25 77:19
**includes**  47:1,6
62:13 92:8
**including**
10:15 14:16
29:17 37:6
79:5 110:7
111:18
**income**  44:17
44:19,20,23
71:22 73:6,16
73:18,24 78:8
78:10 85:15
104:22
**incoming**  17:5
**incorporated**
112:3,4
**incorrect**  86:24
**increase**  19:13
19:15,19 21:7
21:9,9 24:18
26:18 45:8
**increased**
11:16
**incurred**  28:10
**indebtedness**
10:17

**independent**
49:3
**indicates**  58:12
**indirect**  9:3
**indiscernible**
5:25 6:25 27:1
33:23 34:9,12
41:15 47:4,7
48:15 50:3
53:13 67:24
70:2 95:6
100:6 102:25
104:25
**individual**
10:21 21:21,22
42:16 59:21
104:5 107:1
112:19
**inefficiencies**
23:18
**inflated**  80:7
**inflation**  11:8
11:24,25
**inflows**  109:15
**inform**  91:21
**information**
16:24 37:8,11
37:11,17,18,21
37:23 38:1,4
38:19 39:9
40:6,12,13,15
40:16 53:20,23
54:4,6,8,20
57:25 58:4
83:7,13 102:4
109:14,19
113:14,16,17

113:23 114:19
114:22 115:9
115:18,18
116:7,16,23,25
117:5,11
118:21,24
**ingrisano** 4:12
**initiate** 12:19
**ins** 72:15
**inserted** 77:14
**insider** 79:23
80:21 81:2,14
82:10 87:19
92:9,19
**insiders** 76:18
80:22 83:1
**installed** 13:10
**insurance**
20:14,21
**integral** 111:23
**intend** 112:4
**intended** 47:16
94:4
**intent** 99:6
**intention**
100:16 111:6
**interest** 11:7,8
11:10,12,24
12:6 16:21
18:22 62:5,6
63:10
**interested**
84:17
**interests** 74:19
**interim** 2:6
19:14 20:11,19
21:8 24:1

63:11 65:15
69:1 92:4,22
93:6 95:10,15
100:24 112:24
118:19
**intermediate**
9:15 104:23
108:4
**internal** 8:9
54:19 114:14
**internally**
55:19
**interrupt**
50:16 54:16
85:21
**interrupted**
54:16
**interrupting**
67:17 106:8
**introduce**
32:13,15,20
**introduction**
6:19
**introductions**
7:24
**introductory**
7:20 14:22
40:4 71:8
**investigations**
65:8
**involved** 35:24
78:7 114:9
**involvement**
36:2
**involves** 97:7
**involving**
15:21

**islands** 9:5
**isolated** 96:3
**israel** 49:8 95:3
**israeli** 10:3
106:5
**issue** 39:1,1
86:20 87:23
102:21
**issues** 10:7
38:23,25 39:3
54:2 67:1 71:7
77:8 91:3
98:25 109:15
**it'll** 89:2,3
104:23 105:6
**item** 18:10
20:9,11 30:15
42:7,8 44:4
48:25 55:12
62:20 72:8
75:12 81:21
**itemized** 23:4
**items** 19:23,24
20:13 21:25
24:15 27:4,12
27:23 42:15
52:22 65:20
70:12 77:19
92:2,6

**j**

**january** 16:22
38:2,13 41:11
41:17 42:3
46:12
**ji** 2:10
**jillian** 4:12

**job** 51:5
**joel** 7:24 15:21
**join** 7:5
**joined** 5:19,21
**jointly** 5:5 87:7
**jonathan** 1:25
**jones** 1:22 5:3
**jpmorgan**
105:7
**judge** 1:23 5:3
77:3 85:6
120:3
**judgment** 7:2
51:7 62:22,25
106:6
**judicial** 43:4
**july** 113:11
**june** 52:21
119:11,17
122:25
**justice** 4:1
**justification**
117:17
**justified** 92:22
**justin** 3:23
5:20

**k**

**kaplan** 8:8
**kazempour**
4:13
**keep** 15:8
78:25 84:2
97:2 106:8,23
108:21 114:22
115:6
**keeping** 55:24
91:23

**key**  11:20 79:9
**kick**  24:10
**kicked**  57:18
**kind**  15:3,11
  27:15 29:6
  52:15,17,17,23
  52:24 55:22
  57:6 61:25
  66:13 76:18
  115:6 116:21
**kings**  13:1
**kleissler**  4:14
**know**  7:13
  15:12,18 17:10
  21:2 22:17
  23:11 24:5,18
  24:20 25:3,8,8
  26:5,6,7,7,10
  28:2,10 30:6
  30:21 34:5
  38:24 39:5,6
  39:15,24 40:5
  40:5,7,10,15
  41:12,19,22
  42:2 45:5,13
  45:14 46:8,9
  46:21 47:2,4
  47:14,14,18
  48:1,13 49:16
  50:7,11,24
  51:13 52:7,10
  52:16,22 54:18
  54:23,24 55:6
  56:2,5,7,11
  57:1,5,6,22
  59:6 60:12
  62:4,14 64:3

65:3,3,5,11
66:6,6,14 67:1
67:2,12,21
68:1,3,15,15
68:16,21,23
69:5 70:9
72:24 74:4
75:22,25 77:9
78:7 79:17,22
81:9 82:1,10
82:12,18 84:11
85:6 86:21
87:5,11,13,17
87:20,22 89:23
90:7,9,14 91:1
93:20 94:19
95:11,12,20
102:7,15
103:11,21
106:15,16
109:20,20
110:21 112:14
113:1,15
114:21,23
116:1,11
119:17
**knowledge**
  36:7,17 46:11
  49:12
**known**  7:4,11
  7:14
**knows**  30:6
**koltko**  4:15

**l**

**labeled**  19:25
  20:10,14

**laborious**
  57:17
**lack**  39:14 80:6
**laid**  8:17
**language**  77:10
  82:10 102:1
  110:14,20,22
  111:4,19,19
  112:1
**large**  11:13
**larger**  21:9
  59:15
**laskowski**  4:16
**law**  6:22 7:7
  73:21 78:6,6
**lawrence**  3:21
  5:19
**laws**  9:4
**lawyer**  54:16
**lawyers**  25:24
**lead**  91:21
**leading**  8:16
  60:22 74:18
  116:14
**lean**  89:12
**leap**  6:10
**leases**  2:15
  9:11
**leave**  81:6
  94:15 104:20
  114:18
**leaving**  113:1
**led**  11:5,25
  103:9
**ledanski**  2:25
  122:3,8

**left**  6:22 28:14
  33:9 55:9
  67:24 73:12
**legal**  36:8
  109:7,13
  122:20
**legislation**  11:7
  11:17,17,25
**legitimate**
  15:16
**legs**  88:15
**lender**  10:19
  18:21 22:24
**lenders**  10:14
  59:6 60:13
  62:1
**lengthy**  15:3
**letter**  28:4
**letting**  57:17
**level**  9:16,18
  10:2,8 37:18
  83:15 97:6
  98:14
**levels**  99:3
**lexus**  85:14
**liabilities**  2:14
**lien**  62:1 66:22
  73:6,25 78:12
  93:13,14,17
**liens**  58:15,18
  58:19,23,24
  59:1 60:6,12
  63:13 66:23
  71:19,21 77:21
  78:16 79:10
**life**  54:15

**light** 22:3
82:21
**likely** 14:8 25:5
33:3 117:9
**likes** 24:19
**likewise** 35:16
64:20 65:7
72:16 119:2
**limit** 65:8,9
**limitation**
92:19 112:10
**limitations**
92:9
**limited** 8:6 9:4
11:19,20 15:6
24:15 65:1,19
77:23 82:21
96:1 113:22
**limits** 103:21
**linda** 43:13
**line** 19:23,24
19:25 20:9,11
20:13 24:15
27:3,12,23
30:15 39:6
42:7,8,15 44:4
44:7 48:25
52:22 55:11
60:24 61:18
65:20 70:12
72:8 75:12
80:9 81:21
102:15 121:4
**lines** 75:6
**list** 42:21 100:6
**listed** 67:20

**listening** 43:8
57:16
**literally** 81:13
**litigation** 16:15
81:4 94:8
95:15
**little** 22:17
32:11 48:6
60:22 61:3
95:13 108:21
**live** 25:17 43:5
43:14,19 70:17
111:8
**lived** 70:20
**living** 28:7
**llc** 1:7 5:4
42:23 51:18
**llp** 3:3,15
96:24
**loan** 16:11 24:2
60:3 67:21
69:7 81:3
**loans** 11:10
15:24 16:22
38:15 40:8
58:20 59:6,21
61:23
**log** 43:12
**logistically**
89:11 91:10
**long** 36:7,17
54:17 64:21
70:20 76:7
101:6 114:21
**longstanding**
116:25

**look** 16:25 27:3
27:7,20 30:12
50:18 62:16
72:21,25 73:5
73:5 78:6 85:6
92:10 107:18
117:25
**looked** 52:10
52:11
**looking** 6:2
26:20 33:9
42:5,20 44:6,7
47:23 59:20,25
60:23 61:4,6
69:20 74:20
75:22 85:9
86:19 102:24
119:16
**loop** 31:18
115:15
**los** 5:21
**lose** 22:3
**losing** 23:17
108:12
**loss** 104:18
**lost** 98:23
**lot** 15:14,18
21:23 28:13,14
40:4 52:21
76:25 81:12
83:3,5 115:9
116:21
**loud** 57:15
78:25 79:1
**low** 25:2
**lower** 12:1

**m**

**mac** 10:15
**made** 15:19
21:2 52:5
64:22 71:10,25
74:5 75:6,20
79:24 83:6
84:14 91:25
93:7 100:1,3
103:19 109:11
110:1 117:14
**maestro**
119:21
**magic** 53:6
**magzamen**
4:17
**main** 11:6 28:3
28:6 45:20
56:2 77:16
100:9,19
**maintain** 6:2
14:14 18:16
45:8 56:5
63:11 74:1
78:11
**maintained**
19:8
**maintaining**
55:24 73:19
76:3,22 89:25
**maintenance**
52:20 69:14
**maintenances**
27:17
**major** 93:11
**make** 7:4,11,20
8:14 12:6 16:1

| | | | |
|---|---|---|---|
| 20:20 23:20 | 83:18 86:7 | mask 92:23 | means 51:4 |
| 33:3,19 45:11 | 90:8,15 92:11 | material 11:17 | 66:23 88:6 |
| 55:7 71:9 | 96:20,25 97:4 | 87:16 | measured |
| 72:20 73:20 | 97:6,7,16 | materials 9:14 | 62:15 |
| 77:13 81:22 | 98:18 101:15 | math 19:6 | meet 69:20 |
| 82:8 89:25 | 101:16 110:2,6 | matt 5:12 | 91:8 92:2 |
| 90:20 91:1,11 | 121:5 | matter 1:5 | meeting 37:24 |
| 92:23 94:14 | manager 45:23 | 86:7 108:11 | 40:11,14 |
| 95:17 101:13 | 47:3 | matters 53:6 | member 43:18 |
| 102:1,10 108:3 | managers 57:5 | 62:22 | 81:10 |
| 109:18 110:24 | manages 9:10 | matthew 3:9 | members |
| 116:4 | 45:2 | 4:14,16 | 80:22 87:21 |
| makes 79:13 | mandates 43:9 | maxim 7:12 | memorial 53:4 |
| 106:15 | manges 3:3 | maximize | mention 6:12 |
| making 7:14 | 5:11 18:9 | 14:15 | 18:19 |
| 51:7 69:14 | 96:24 | mayhem | merely 43:18 |
| 74:6 111:20 | manhattan | 106:20 | mess 89:12 |
| manage 13:9 | 11:2 12:13,23 | mean 15:6 | 106:20 |
| 119:25 | manner 43:8 | 24:11 25:15 | met 37:22 |
| managed 8:1 | 53:25 | 26:23 27:8 | method 98:18 |
| management | manual 99:4 | 38:23 44:25 | methodology |
| 2:8,9 8:21 14:3 | 103:6 | 45:10 46:19 | 49:19 |
| 15:21 17:17 | manually | 47:11 50:20 | meticulous |
| 19:25 20:3,10 | 104:21 | 55:11 56:1,1,5 | 118:10,13 |
| 22:7,25 23:6 | map 52:23 | 56:13 75:5,11 | michael 4:11 |
| 24:22,25 25:2 | march 12:8 | 75:25 77:16 | 4:17,18 |
| 25:5,22 27:9 | mark 30:7 | 79:8 82:13,14 | michelle 50:6 |
| 40:25 44:1,5 | 34:24 119:17 | 85:10 88:13 | microphone |
| 44:13,13 45:1 | marked 35:3 | 89:22 90:20 | 32:2 |
| 45:4,4,5,8,17 | market 8:2 | 92:10 100:12 | middle 36:11 |
| 45:18,25 46:2 | 56:9 98:5 | 101:9 103:16 | 36:12 62:16 |
| 46:10,14,17 | marking 49:10 | 106:18,22 | million 10:4,4 |
| 55:5,9,11 56:9 | markup 77:14 | 109:20 111:3 | 10:9,10,11,13 |
| 56:23 57:3 | 77:20 | 112:9 116:22 | 10:17,23 17:11 |
| 74:8 75:7,12 | married 81:11 | 117:3 | 18:25 19:3,4 |
| 76:2,11,17,18 | marshaling | meaning 77:18 | 46:22 61:12 |
| 76:21 80:6,9 | 65:15 | | 73:7,8,12 |

| | | | n |
|---|---|---|---|
| 81:19 82:22 | **money** 16:25 | 71:19 115:13 | |
| **millions** 81:19 | 17:8 22:18 | **motion** 2:1,6 | **n** 3:1 5:1 121:1 |
| **mind** 6:18 | 23:11,11,15 | 2:13 8:21,21 | 122:1 |
| 17:14 54:2 | 38:14 39:14 | 8:22 12:24 | **n.a.** 3:16 |
| 64:19 80:15 | 40:6,7 64:21 | 13:3 14:18 | **n.w.** 3:17 |
| 91:5,23 | 67:3 79:2 | 16:2 17:16,17 | **nailed** 50:20 |
| **mindful** 91:8 | 80:13 82:22 | 18:10,12,18 | **name** 6:25 9:15 |
| **mineola** 122:23 | 83:1,10 86:14 | 19:13,20 39:4 | 9:15 20:4,4 |
| **minimize** | 93:2 94:11 | 50:17 83:18 | 50:6 |
| 108:14 | 97:23 98:5,22 | 84:9 85:6,8 | **nature** 14:1 |
| **minimum** 31:5 | 99:2 100:17 | 96:25 97:1,4 | 112:24 |
| 64:17 76:13 | 103:18 106:20 | 98:7 99:9 | **necessarily** |
| 114:25 | 107:11 109:19 | 102:17 103:1 | 61:7 82:11 |
| **ministerial** | 110:25 112:7 | 110:3,6,12 | 87:3 110:20 |
| 103:6 104:19 | 112:10 | 111:15,18 | **necessary** |
| 105:2 | **monies** 63:3 | 112:17 113:9 | 14:13 24:23,23 |
| **minute** 82:8 | 104:1,21 | 114:2,17 115:6 | 63:1 64:3 |
| 90:6,17 107:10 | **month** 22:15 | 116:18 118:2 | 65:20 73:18 |
| 116:21 | 114:21 | 121:5,7 | 75:9,16 76:2,9 |
| **minutes** 26:6 | **month's** 44:19 | **motions** 12:25 | 76:22 80:10 |
| **misarticulate** | **monthly** 17:1 | 14:10 18:12 | 82:16 92:6,13 |
| 93:13 | 99:20,22 | 23:8 57:23 | 93:2 103:20 |
| **misreading** | 114:20,24 | 59:24 86:12 | 115:22 |
| 103:2 | 116:10 | 88:14 | **necessity** 92:1 |
| **missing** 106:21 | **months** 22:8 | **mouth** 95:13 | 96:3 |
| **mistakes** 23:18 | 39:10 47:17 | 112:13 | **need** 6:10 |
| 103:10 | 54:23 73:1 | **move** 28:20 | 13:21 14:6,9 |
| **models** 26:14 | 115:19 | 32:5,7 55:18 | 14:10 20:16 |
| **modifications** | **morning** 89:14 | 96:20 | 22:2,16 28:1 |
| 61:4 75:6 | 96:14 | **movement** | 31:17,21 33:14 |
| 97:17 110:7 | **mortgage** | 90:21 | 49:9 50:24 |
| 111:18 113:5 | 10:10,13,17,20 | **multi** 61:9 | 64:23 70:14 |
| **modified** 34:23 | 11:14 12:7,9 | **multiple** 98:22 | 74:11,12 86:20 |
| **modify** 19:22 | 16:11 59:5 | **musing** 82:25 | 89:5,7 90:14 |
| **moment** 18:19 | 62:14 67:11 | | 90:15 91:8 |
| 27:13 48:9 | **mortgages** | | 94:17 96:19,20 |
| 66:3 78:21 | 10:21 46:18 | | 100:11 110:6 |

113:2,17 114:5
114:22 117:5
117:10,23
118:7 119:3,8
119:23
**needed** 22:7
28:3 74:23
88:22 101:6
103:19 118:24
**needs** 16:8
22:17,19 23:16
24:1 52:12
53:8 56:3,4
69:22 79:2,2,2
79:4 93:25
94:20 95:16,20
95:21 105:10
112:25
**neglected** 6:12
**negotiating**
90:1
**neither** 71:16
**net** 20:13,25
61:15,17 68:15
69:5,6,8 74:3
**never** 65:14
111:12 115:19
**new** 1:2,14 3:6
4:5 8:2 9:12
12:12,12,23
13:2 28:4 34:7
34:23 35:7
44:3,6 64:21
64:24 65:6
97:17 98:13
104:24 114:6

**newly** 102:19
**nice** 5:6,22 6:7
6:15 32:15
35:15
**nicholas** 3:20
**nick** 5:17 15:1
35:11
**nightmare**
105:2
**nodding** 75:23
111:3
**non** 9:9 15:22
16:18 17:10
36:3 43:7
44:12 46:3
58:20 59:2,6
60:3 61:25
80:13 97:8,12
97:22,24 98:9
99:3 102:19,22
104:12,13
106:6,14 107:5
107:15,18
108:7
**noon** 91:9
**normal** 81:14
118:9
**notably** 30:3
**noted** 109:21
**nothing's**
69:12
**notice** 12:8
45:21 64:23
**noting** 97:3
**notwithstand...**
102:13

**number** 5:4
10:22 18:11,13
21:25 34:18,20
49:6 50:22
53:19 54:22
55:4 56:8,9
57:6 69:5 96:5
98:4 104:8
**numbers** 21:23
39:11 61:3
67:13 92:20
**ny** 1:14 3:6 4:5
122:23

**o**

**o** 1:21 5:1
122:1
**oath** 31:22
**object** 28:25
38:22 39:5
50:10 58:18
64:10 65:15
**objection** 7:17
24:16 28:23
30:4,4,9,13,25
32:24,25 38:7
39:8 46:19,20
56:13 62:19
**objectionable**
59:12
**obligation** 64:2
69:20
**obligations**
10:1,10,11
66:5 91:8
**obliged** 43:10
**observation**
48:5

**observing**
43:18
**obtain** 25:7
**obvious** 73:14
**obviously** 16:7
16:19 17:18
38:23 52:16
67:1,21 74:10
74:11 76:6,8
91:1
**occupancy**
9:21
**occur** 13:21
**occurred** 13:11
36:24
**occurring**
110:25
**occurs** 100:19
119:6
**offer** 7:5 14:20
24:6 109:12
**offered** 30:22
65:25
**offering** 78:22
84:2
**offhand** 42:24
**office** 18:1 45:1
45:15 67:25
84:15 99:21
103:25
**officer** 8:4
**oh** 6:13 28:16
56:15 67:16
68:20 70:24
80:24 94:13,20
94:22 102:5
110:7,8 119:14

okay   5:3 6:4,7
  6:9 7:10,13
  13:8 17:23
  18:5 24:9 26:3
  26:20 28:12,16
  28:23 29:11,12
  30:12 31:12
  32:1,10,12,18
  33:17,19,22
  34:8,10,15
  35:8 39:7,20
  42:10 43:15,20
  44:21 48:9
  51:2,4,21
  53:17 55:2
  57:7,9,11,18
  59:13,18 63:13
  63:23 64:5,6
  66:9,20 68:20
  69:19 70:4,6
  70:19,23 71:5
  76:5 77:12
  78:24 80:1
  82:9,12,23
  83:22 84:2,7
  84:13,18,20
  86:2 87:24,25
  88:3,9,17 89:9
  90:3,5,18 91:4
  91:7,9,12,15
  91:23 96:11,15
  100:8 101:9,13
  101:18,23
  105:23 107:25
  108:10,20,20
  108:24 109:4
  109:17,20,25

  110:4 111:8,11
  111:16,17,17
  113:2 114:3,16
  114:25 116:20
  117:12,21,25
  119:21
oksana   4:15
old   34:6,11,19
  40:19,22 44:6
  44:7 122:21
once   23:9
  34:12 54:25
  100:17 105:17
  106:2
ones   27:14
  52:15 61:12
  66:10 77:16
  105:1
ongoing   37:3
open   90:13
  97:17 98:13
  114:24
opened   105:17
opening   8:15
  38:24 98:22
operate   18:16
  53:1 55:14
  79:2,4
operated   19:9
  76:7
operates   9:10
operating   12:1
  69:16 73:19
  76:3 97:19,23
  99:19,23
  105:12

operation   26:1
  55:25 75:10
  80:10 95:20
  106:25 112:12
operational
  108:12
operations
  25:22 55:10
  65:6
opportunity
  55:7 84:3
  118:23
opposed   26:21
  47:12
opposite   87:5
option   104:5
oral   112:2
orally   21:1
oration   14:21
ordain   89:4
order   2:2,13
  5:6 13:20
  26:12 33:15
  52:24 70:7,8
  77:6,15 78:19
  81:17 82:19
  83:12,20 86:25
  90:2 91:9,22
  94:8 96:8 99:9
  101:4,11 108:4
  112:1 113:4,17
  114:2 115:21
  119:10
orders   2:7 26:9
  116:17
ordinary   2:10

organization
  22:24 29:21
organized   9:4
original   34:20
  61:2
outflows
  109:16
outlining   99:22
outset   18:4
  83:6
outside   20:7
outstanding
  9:25
overall   9:23
  45:4 47:11
  82:23
overly   63:24
overnight
  89:12 90:20
overrule   30:25
  39:7
overruled   38:9
overview   97:6
owe   18:24
owed   46:17
  81:20
own   10:22 24:8
  25:4 30:7,22
  104:6 112:13
  114:14
owned   15:25
  71:20 100:10
owner   46:4
  108:17
owners   69:6
ownership
  46:11

| **p** |
|---|

**p**  3:1,1 5:1
**p.m.**  1:17
**package**  59:11
   60:5
**page**  121:4
**paid**  16:21
   20:17 24:24
   28:3 38:3,3,14
   40:8 44:12
   46:2 74:12
   76:10 100:21
**paper**  17:18
**papers**  7:16
   8:17 15:18
   39:15 71:11,24
   82:1 84:10
   97:5 101:25
   102:14 104:14
   109:1 110:1
   118:15
**paragraph**
   36:24 48:7,8
   85:6,11,11
   99:10,15,17
   102:17,24
   103:1 105:11
   111:23
**paragraphs**
   33:1
**paralegals**
   55:15
**parameters**
   108:2
**paraphrase**
   40:2

**parent**  95:3
   97:9,12 107:5
**parent's**  29:23
   29:24
**parsing**  89:23
**part**  13:23
   15:17,20 16:13
   37:6 39:13
   49:10 55:13
   83:12,18 90:22
   92:5 103:6
   107:19 111:24
**parte**  12:11,22
**participant**
   43:12,17
**participants**
   43:6,8
**participate**  6:8
**particular**
   47:23 48:23
   52:4 54:4
   62:20 77:13
   89:20 100:10
   100:14 103:22
**particularly**
   38:2 54:5 74:7
   74:7 77:25
**parties**  18:22
   23:18 62:5
   63:9
**partner**  5:14
   6:14
**partners**  5:12
**party**  19:2
   29:22 103:7
   104:19 107:17

**pass**  102:19
**passed**  84:17
**passion**  84:23
**past**  38:25 39:3
   39:9 98:25
   103:9 114:12
**patience**
   105:11
**paul**  3:9,15
   5:18 15:1
   35:11
**pay**  17:6,7,11
   17:13 18:17
   25:21 26:21
   38:21 45:1,10
   52:17 53:2
   56:1,1 73:10
   74:21 75:16,18
   78:9 85:15
   100:12 103:24
   104:1,2
**payable**  20:2,3
   45:11 55:15
**paying**  27:9
   41:10 55:13
**payment**  17:11
   40:25,25 45:8
   69:20 74:23
   75:15 80:9
   81:13 82:15
   94:3,4 97:10
   98:21 103:8
   107:4,14,16,19
**payments**  12:6
   24:22 25:18
   26:11 45:11
   73:15 78:15

   79:24 80:21
   81:8 82:16
   85:18 92:13
   100:3
**payroll**  69:21
   69:24 70:1
   81:12
**penalties**  28:5
**pending**  25:18
   82:17
**people**  6:1
   25:25 34:15
   43:5 52:15,17
   55:12,13,14,16
   55:23 56:4
   57:17 60:12
   75:16,23 80:9
   81:2 103:24,24
   104:1,2
**perceiving**
   80:7
**percent**  9:19
   9:22 11:14,15
   11:16 19:5
   22:22,23 24:24
   25:1,5,11
   44:16,22 45:1
   46:7 55:13
   56:8,8,12 57:1
   57:4,5 66:2,2
   79:13 85:12,14
   85:20 87:25
   93:9,10
**percentage**
   45:17
**perfected**  67:2
   86:18

| | | | |
|---|---|---|---|
| **perfectly**  83:11 | **persuasively** | **pledge**  62:11 | **portion**  45:3 |
| **perform**  29:25 | 71:16 | **plug**  72:15 | 76:17 |
| **performance** | **petition**  19:15 | **plugged**  21:24 | **portions**  31:7 |
| 22:6 | 21:8 60:9 | **pm**  120:5 | 73:9 |
| **performed** | 72:22 83:17 | **pocket**  24:6 | **position**  39:15 |
| 49:16 | 102:18,22 | **podium**  96:22 | 71:18 74:11 |
| **performing** | 108:5,8 109:9 | **point**  15:13 | 84:9,12 |
| 47:24 | **phil**  3:11 5:13 | 16:16 19:15,17 | **positions**  89:17 |
| **period**  11:23 | 5:13 | 30:21 31:4 | 89:20 |
| 19:14 20:1,11 | **picture**  9:18 | 38:14,17 39:6 | **possession** |
| 20:19 21:8 | 79:6 | 39:16 57:5 | 19:16 23:16 |
| 23:11 24:1 | **piece**  22:10 | 59:12 64:17 | 86:16 |
| 40:7 52:10 | 62:13 | 76:4,12 82:10 | **possibility** |
| 65:9 72:22 | **pin**  31:1 | 87:19 88:20 | 82:14 87:14 |
| 96:1 100:25 | **pinnacle**  9:15 | 89:17,20 95:12 | 101:5 |
| 106:14 107:1 | 11:3 20:2,5 | 107:5 109:6,19 | **possible**  77:8 |
| 113:19 | **pitch**  77:13 | 109:21 110:16 | 90:25 94:8 |
| **permanent** | **place**  10:8 13:6 | 111:2 117:5,18 | 95:22 103:20 |
| 104:18 | 16:17 46:12 | 118:3,15 | 110:25 111:1 |
| **permission** | 56:6 78:23 | **pointing**  75:23 | 119:1 |
| 28:19 32:22 | **placed**  102:8 | **points**  8:18 | **possibly**  16:3 |
| **permit**  95:22 | **plan**  64:13,13 | 58:6 64:7 | **post**  83:17 |
| **permits**  118:14 | 87:15 88:12,15 | 71:10,10 82:21 | 102:18,22 |
| **permitted**  65:5 | 116:11 | 102:14 115:5 | 108:5,8 109:9 |
| **person**  7:8 | **planned**  28:8 | 118:1 | **potential**  12:16 |
| 45:11 101:21 | **planning**  6:8 | **policy**  43:4,16 | 20:16 |
| **personal**  81:3 | 75:8 | **pool**  58:20 | **potentially** |
| **personally** | **plans**  26:8 | 62:13 63:8 | 98:23 |
| 50:23 117:18 | 64:12 | 66:24 | **practicable** |
| **persons**  7:8 | **play**  96:9 | **pools**  58:22 | 111:5,9,20 |
| 45:12 | **please**  5:2 | **poor**  32:8 | **practical**  92:17 |
| **perspective** | 31:16 43:12 | **pop**  53:3 | 109:6,13 |
| 15:11,12 17:21 | 96:23 111:19 | **populated** | 110:23 |
| 25:16 117:16 | 115:2 | 91:18 | **pre**  60:9 89:4 |
| **persuaded** | **pleasure**  35:17 | **portfolio**  11:3 | **precast**  85:17 |
| 80:4,8,11 | 84:2 | 11:10 24:8,17 | **predict**  52:15 |
| | | 25:7 | |

**prediction**
84:19
**prejudice** 75:2
94:8 95:14
112:15
**preliminary**
91:20 112:22
**premise** 79:1
**preparation**
113:22
**prepare** 117:10
**prepared** 29:5
49:23 50:2,5
51:11 52:3
58:13 68:4,6
94:23 96:12
98:13
**prescribed**
113:19
**present** 4:9
78:2 89:13
94:2
**presentation**
39:18
**presented**
17:16 90:11
92:25 95:4,9
117:15
**preservation**
75:9
**preserve** 18:20
47:21
**preserved**
87:12
**preserves** 79:4
**preserving**
74:25

**president** 7:25
**press** 118:21
**pressed** 57:3
**pretty** 7:18,18
39:10,18 50:20
52:18
**prevent** 13:15
69:7 80:21
81:13 108:6
**preventing**
108:7
**pri** 93:19
**primarily**
11:10
**principal** 46:4
108:17 113:11
**principally**
97:9
**principals**
80:13
**printout** 33:7
**printouts**
34:17
**prior** 5:6 17:7
36:2,4,5 41:6
46:20,21 53:21
**priority** 54:23
64:8,14 77:22
78:15 79:10
88:10,19 89:1
96:10
**probably** 30:7
54:25 57:2,4,6
58:3 87:17
101:3 105:6
112:4

**probative**
30:17,19
**problem** 43:22
102:3 103:12
**procedures**
17:17
**proceed** 8:14
8:24 14:17,19
18:6
**proceeding**
6:20
**proceedings**
12:10,19 120:4
122:4
**proceeds** 19:8
63:14 64:18
65:8 76:7
**process** 13:21
13:24 47:17
54:10,17 57:17
99:4 113:23
**processed**
113:5
**processes** 56:3
**processor**
97:10 98:21
103:8 107:4,14
107:16,19
**professional**
27:2,16 41:1
41:10 46:22
47:9,21 48:3
52:22 74:7,8
74:13,17,21
75:12 87:18
**professionals**
25:8 26:4

46:23,25 47:24
94:5
**proffer** 28:17
**proffered**
113:20
**profit** 76:17
**profits** 92:24
**profound**
90:21
**program** 84:3
111:12 112:8
**projected**
42:21 44:9
73:6
**projecting**
60:25
**projects** 40:24
**promise** 111:7
**promises** 91:1
**promptly**
96:16
**proof** 108:3
**proper** 75:10
**properties**
10:18,21,23,25
12:13 13:6,10
13:18,25 15:25
16:25 17:5
18:16 22:9,14
30:7 37:9,13
37:15 38:6,20
41:5,18 44:17
44:24 54:9
56:6 63:14
64:18 67:10
68:11,19 69:17
71:19,20,22,25

72:5 73:16,19
74:2 75:10
76:3,6,23 78:7
78:11 82:1
87:8 96:3
**property** 9:11
9:16 10:8,22
11:9 24:2
37:19 42:7,7
45:9 51:14,14
53:13 60:3,4,4
61:21 69:10
78:9 80:5
83:14,14 85:15
89:25 100:10
115:22
**proportion**
11:13
**proposal** 78:9
87:25 110:1
**propose** 19:10
19:22 20:9,12
30:5 64:12
97:16 105:19
107:20
**proposed**
18:18 19:8,14
21:19,19,23
22:25 23:2
61:3 77:14
83:19 93:7,12
101:4 112:1
114:2
**proposes** 98:16
**proposing** 21:4
21:6 47:2

**protect** 64:3
**protected** 78:2
**protection**
9:21 11:18
24:20 31:8
39:12 45:6
58:7 61:9
65:19,23 71:14
71:23 73:3
74:5,14,18
77:17,25 78:14
79:8 84:25
85:10 88:5
89:13 92:18
94:10 118:22
**protections**
77:13 112:9
**proven** 85:23
**provide** 14:12
17:20 37:17,18
37:21 71:14
74:5,13 76:17
89:1 99:21
114:19,22
115:22 116:9
116:10
**provided** 24:24
31:8 38:19
39:12,13 83:13
89:6 96:5
102:4 115:19
116:7
**provider** 104:3
104:3
**providers**
82:15

**provides** 44:23
45:19 88:19
**providing**
74:17
**provision** 39:9
46:16 79:20
**provisions**
16:4 26:8
88:24
**public** 43:18
49:8 67:13
95:3
**publicly** 95:3
**published**
29:23
**puff** 96:15
**pull** 75:5 92:3
**pulled** 67:13
**pulling** 75:6
**purchases** 9:10
**pure** 19:19
**purported**
24:4
**purporting**
12:9
**purpose** 15:16
49:5,7 61:9
68:5
**purposes** 29:8
29:14 30:10
68:9 93:6 98:6
**pursuant**
44:13 87:15
**pursued** 16:15
**put** 22:5,9 25:4
32:22 40:21
50:12 54:20

69:12 87:2
100:13 116:20
**puts** 103:17
**putting** 50:13
50:14 53:1
105:1 108:4

**q**

**qualifications**
50:2,7
**queens** 11:2
12:20 13:1
**question** 13:14
13:20 21:12
29:12 39:8,21
51:10 58:21
60:23 68:9
75:24 79:8
85:22 114:4,17
117:7 118:22
**questioning**
34:1 39:6
**questions**
15:14,15 17:4
17:12 29:10,12
43:24 44:1
50:11 51:1,20
53:19,23 55:4
55:6 56:14
57:22,23 65:17
90:7
**quick** 9:2,19
84:24 96:14
**quickly** 7:16
64:7 111:1
118:25 119:12
**quite** 25:9
80:11 87:5

94:17 118:15

**r**

**r**  1:21 3:1 5:1
 9:8 122:1
**race**  84:6
**rachel**  4:7 6:5
 110:10
**rail**  93:19,20
**raise**  11:19
 31:21 84:11
**raised**  99:16
 102:14 109:24
 112:5
**raises**  15:14
 17:4 21:12
**ran**  45:24
**rancher**  85:13
**range**  44:16
 118:9
**rapidly**  11:12
**rate**  9:21 11:8
 61:4
**rates**  11:7,10
 11:12,13,24
**rather**  74:21
 79:13 104:16
 104:25
**rawlins**  3:23
 5:20,24 79:21
**reach**  12:17
 24:15 58:23
 89:12 94:18
**reached**  89:15
 90:19
**reaching**  66:14
**read**  7:16
 24:16 39:22

85:4 87:4 90:8
97:5 99:11
101:4 102:17
111:19
**reads**  99:21
**ready**  7:18
 31:18 35:8
 91:17 96:13
 110:4
**real**  8:2 9:11
 16:4,10 19:7
 24:17 27:10
 45:9 51:17
 52:14,14,16
 74:1 76:3 85:1
 102:11 112:18
 113:1 114:23
**realistic**  96:1
**realizes**  6:10
**really**  14:12
 15:13,16 23:1
 34:19 50:24
 53:9 55:12
 67:12 73:16
 79:14,19,22
 80:4,8 90:21
 92:9 93:10,24
 96:9 109:6
 117:2,6 118:24
**realty**  1:7 5:4
 42:22 51:17
**reason**  15:17
 39:8 43:4
 92:19 94:25
 113:11
**reasonable**
 63:2 92:21

93:1,6 96:5
**reasonably**
 96:2 110:23
 118:19
**reasons**  65:10
 65:14 68:6
**rebuttal**  82:7
**recall**  37:10
 47:6
**recap**  78:24
**recapture**
 86:13
**receipt**  103:10
**receipts**  21:20
 23:4 42:6,14
 42:21 52:16
 61:11,12 73:7
 83:14 108:8
**receivable**
 45:12 55:15
**receive**  9:20
 30:25 75:17
 97:10,13
**received**  17:3
 37:14 38:20
 97:21 99:18,23
 110:13 115:21
 118:3
**receiver**  12:11
 12:21,23,24
 13:3,5,10,17
 13:21,22,24
 16:17 25:3
 47:15
**receivers**  47:16
**receivership**
 47:12,19

**receiverships**
 16:16
**receiving**  28:24
**recent**  39:13
**recently**  6:22
 7:16 22:17
**receptive**  88:10
**recipients**
 82:20
**reconciling**
 113:23
**reconnect**
 43:15
**record**  14:25
 18:8 31:12
 34:25 35:11
 50:21 70:13
 72:2 80:20
 87:2 99:11,24
 100:2 103:5
 105:16 111:22
 113:8 122:4
**recorded**
 100:21
**recording**
 101:6
**records**  19:1
 29:17,19 30:1
 30:8,11 48:19
 49:2 50:12,15
 58:2 67:15,19
 95:2
**recourse**  58:20
 59:2,6 60:3
 61:25
**recross**  57:9

**redirect** 51:22
51:24 104:16
**reduce** 66:1
**reduction** 21:3
**refer** 32:25
40:18 97:18
105:12
**reference** 30:1
38:11 84:14
**referenced**
29:2 34:19
48:7,8,20 81:3
**referred** 28:18
34:23
**referring** 61:5
81:2
**refers** 30:16
33:15 48:25
105:11
**reflect** 19:2
49:2
**reflected** 20:1
70:12
**regard** 61:6
94:9 111:22
112:17,18
**regarding**
29:15 111:19
**regardless**
116:17
**regional**
103:25
**regular** 64:13
**reimbursement**
19:25
**reinforced**
95:19

**reiterate** 91:24
101:25
**rejected**
109:12
**relate** 39:4
**related** 2:4,10
48:23 81:7
83:10
**relatively**
82:21
**release** 58:14
**releases** 58:11
65:11
**relevance**
38:23
**relevant** 98:2
**reliable** 52:6
**relied** 49:24
50:15
**relief** 2:4,11
8:7 14:6,9
65:21 70:10,22
102:13 113:24
113:25
**rely** 39:11
**relying** 31:7
48:24 50:21
**remain** 43:17
55:5 58:20
**remainder**
92:5
**remaining**
10:13 41:2,25
75:11 94:1
**remains** 16:17
44:3 55:12

**remarks** 15:3
38:24 83:6
96:14 112:22
**remember**
36:18
**reminded**
66:19
**remote** 43:5,17
108:3
**remove** 19:23
20:9
**removed** 19:24
**removing**
20:12
**render** 79:3
**rendered** 112:2
**renewed** 12:22
**renovate** 53:2
**renovated**
22:17
**renovations**
52:20
**rent** 9:20 12:1
17:1 23:21
38:2,5,20
**rental** 71:21
73:6,15,17,24
78:8,10 85:15
104:22
**rents** 11:19
37:13,14 52:17
63:18 69:14
75:17 97:10,11
97:22 98:3,23
103:7 104:9
115:13,13

**repair** 22:2
52:13 53:2
100:12
**repaired** 22:16
**repairs** 22:1
27:17 52:19
69:13
**replace** 107:2
**replacement**
66:21 77:20
78:16 79:10
88:6 93:13,14
93:17
**report** 49:9,12
**reportedly**
95:2
**reporter** 9:6
40:1
**reporting** 95:3
99:18 114:20
116:9
**reports** 72:9
112:8
**represent** 55:9
**representation**
76:16 79:23
108:15
**representatives**
8:9 16:23
**represented**
76:20 110:15
**representing**
32:19 110:20
**represents**
11:3 113:20
**request** 12:21
12:23 65:20

92:9 99:8
102:3 109:11
109:13 114:1
**requested**  37:7
37:11 58:7,10
58:24 65:23
70:10 92:18
102:2
**requesting**  8:7
115:19
**requests**  53:21
54:4 55:17
93:18 117:13
**require**  60:13
83:13 99:17
109:21
**required**  63:2
71:13 78:13
92:2 116:10,17
**requirements**
74:14 92:2
114:21
**requires**
116:23
**rerouted**  103:9
**reservation**
117:4
**reservations**
119:2
**reserve**  20:14
20:21 89:12
91:13 100:24
102:12 116:8
116:14 117:20
**reserved**  59:8
60:16

**reserving**  94:3
113:2
**reset**  11:11
**residential**  8:2
9:11,12 11:1
**resolve**  10:7
**respect**  15:17
29:14 57:23
76:11 81:8
82:10 86:3,8
86:21 87:5,19
87:20 112:21
112:23 116:8
**respectfully**
89:16 99:8
114:1
**respective**
103:20 105:25
**respectively**
10:5
**respond**  30:14
58:6
**response**  13:14
45:25 82:25
99:13
**rest**  23:3 27:16
**restate**  56:20
**restrict**  24:22
**restricting**
25:12 100:13
**restriction**
93:4
**restrictions**
11:22 86:4
**restructuring**
8:4 12:16
15:16 27:15

**result**  19:4
47:9
**resume**  43:20
111:17
**retained**  41:13
41:16
**return**  84:16
**revenue**  17:5
24:5 41:18,21
63:14 73:7
103:17
**revenues**  25:23
37:8 82:23
93:16
**review**  19:22
20:17 58:13
**reviewed**  7:15
46:14,15 84:9
92:20
**revise**  42:9
**revised**  34:14
35:6 55:5
**richard**  3:10
5:12,14 32:17
**ride**  21:3
**right**  10:6 14:8
17:24 20:6
22:14 24:12
26:13 27:19
30:18,24 31:17
31:21 35:1,9
35:21 36:15
37:1,9,15
41:11 43:1
44:5,10,14
46:23 51:6,9
51:21 53:5,12

56:8 59:10,25
60:1,1,2,7,10
61:2,11,14,22
62:24 63:8,9
63:17,21 64:4
67:8,24 68:8
70:23 71:5
75:3 77:9 78:4
79:6,11 80:17
81:11 83:8
86:12 88:5,23
90:5 94:9,12
96:18 100:15
101:7,14 102:5
103:22 105:7,9
105:21,22
106:4,22 111:2
113:5 114:10
115:3,3 117:25
118:5 119:6,23
119:24
**rights**  59:8,14
59:19 60:15
65:13 74:25
87:12 89:3,22
100:24 102:12
112:15 116:8
116:14 117:4
117:20 119:2
**rigorously**
118:21
**riley**  4:18
**rise**  11:12
**rising**  11:24
**risk**  88:16
104:18 107:21
108:12,13

| | **s** | | |
|---|---|---|---|
| **road** 95:15 | | **schedules** 2:14 | 111:20 113:25 |
| 122:21 | **s** 1:22 3:1 5:1 | 2:15 8:22 14:4 | 119:4,12,13 |
| **robustly** 85:22 | 9:8 | 57:24 58:3 | **seeing** 7:23 |
| **rod** 4:13 | **sake** 85:5 | 67:20 90:12,15 | 93:10 |
| **role** 7:1 | 94:14 | 96:20 97:1 | **seek** 18:15 |
| **roll** 42:18 | **salaries** 45:15 | 113:6,10,24 | 64:12 |
| **rolling** 118:25 | 52:18 55:14 | 115:23 | **seeking** 14:2 |
| **rolls** 23:21 | 75:15 76:21 | **scheduling** 2:3 | 56:22 86:4 |
| 42:18 | **salary** 27:11 | 119:21 | 87:11 113:10 |
| **room** 57:16 | **sale** 87:12 | **scope** 40:14 | **seem** 95:21 |
| **rosaluk** 4:15 | **sales** 9:12 | **seated** 5:2 32:1 | 117:16 |
| **rose** 11:14 | **sar** 59:24 64:13 | **second** 8:21 | **seeming** 93:6 |
| **rosen** 4:19 | 86:12 88:14 | 20:9 29:12 | **seems** 59:23 |
| **route** 75:17 | **satisfaction** | 100:5 105:15 | **seen** 8:5 29:16 |
| **routed** 104:1 | 93:1 | 116:5,15 | 46:15 48:20,22 |
| **routes** 104:4 | **satisfied** 92:5 | **section** 71:13 | 48:25 60:11,12 |
| **routine** 104:20 | 92:20 95:9 | 74:14 85:11 | 60:14 |
| 105:20 113:25 | 96:5 | **secure** 78:11 | **sell** 69:4 |
| 116:3 | **satisfy** 87:17 | 85:4 | **selling** 69:15 |
| **routinely** 99:2 | **save** 15:3 | **secured** 10:16 | **send** 98:21 |
| **rule** 6:25 7:3 | **savings** 98:5 | 10:18 15:25 | **senior** 10:1 |
| 29:6 89:14 | **saw** 46:19 | 18:21 62:14 | **sense** 9:24 |
| 90:23 91:17 | 110:20 | 64:1 67:11,12 | 15:11 79:13 |
| 110:5 | **saying** 8:12 | 85:19 | 81:11,22 90:1 |
| **ruling** 94:14 | 25:14 28:4 | **secures** 64:2 | 95:18 106:15 |
| 96:14 101:4 | 45:18 46:16 | **security** 74:18 | **sent** 28:4 98:23 |
| 111:24,24 | 61:15 63:20,24 | 98:6,8,11,13 | 99:2 104:17 |
| 112:2,21 | 78:25 82:3 | 98:14 | **sentence** |
| **rulings** 121:3 | 87:8 104:20 | **see** 5:6,22,22 | 105:16,24 |
| **run** 55:16 | 108:4 117:3 | 6:7,15 9:14 | **separate** 29:11 |
| 75:16 | **says** 38:24 | 15:18 18:1 | 34:22 67:10,11 |
| **running** 13:6 | **scenario** 101:1 | 20:24 28:1 | 81:4,4 95:24 |
| 25:25 55:23 | **schedule** 61:2 | 31:17 32:5,15 | 105:1 |
| **runs** 45:23 | 99:22 | 33:8 35:15 | **separately** |
| | **scheduled** | 48:2 67:3,9 | 16:8 24:19 |
| | 119:5 | 71:24 89:16,18 | 56:20 59:25 |
| | | 90:18 96:11 | |

september
  35:25 36:5
sequence  18:6
sequencing
  12:4
series  67:9
serious  17:8,12
seriously  117:4
  118:17
service  17:7
  38:3,14,21
  46:17 82:15
  104:3,3 114:5
services  13:15
  25:2,6 45:19
  48:3 56:10
  82:16 114:6
servicing  11:15
set  18:23,25
  34:5 62:4
  105:4,7
setting  70:15
setup  32:8
severe  83:7
share  108:7,8
  108:22 116:12
shared  98:7
sheet  29:18
short  14:22
  52:9 115:20
shortened
  64:23
shorter  119:19
shortly  12:10
show  26:15
  27:24 29:19
  30:2 37:18

69:9 72:4
  73:14,17 74:16
  74:23 75:16
showing  73:21
  74:6,7 75:19
  78:1 91:25
  94:24 95:14,23
  116:1 117:15
shown  19:12
  20:15 50:19
  78:10 93:1
shows  19:14,17
  107:22
shred  72:14
shut  45:21
shy  84:11
side  11:8,17,24
  14:21 95:7,8
siegel  4:7 6:5,6
  18:3 71:4 84:5
  84:8,16 110:10
  110:10 111:10
  111:15
signature
  122:6
significance
  31:6
significant
  98:19
silo  11:3
siloed  112:23
silos  21:16
similar  12:25
  23:8 41:9
simple  16:10
  72:21 115:10
  115:18 118:6

simply  39:8
  108:11 113:18
single  16:3,9
  102:11 112:18
sit  54:21
sits  91:3
sitting  6:14
  50:8 51:13
  107:11 112:11
situation  7:11
  67:9
situations  95:5
six  98:10
  115:15
size  47:3
skepticism
  90:21
skimmed  80:13
skimming
  92:24
slack  3:10 5:12
  5:14 32:13,17
  32:17,19 33:5
  33:11,18 34:6
  34:9,11,14
  35:2,6 38:7,22
  50:9 51:4,23
  51:25 53:8,18
  54:14 55:3
  56:16,18,21
  57:7
small  16:3
smith  4:20
smoke  96:15
smokescreen
  80:12

smoothly
  116:12
sofa's  8:23
sofas  14:5
soft  52:14
sold  8:1 11:23
solely  59:21
  92:21
solemnly  31:22
solution  12:17
solutions  12:16
  122:20
solvent  26:16
solving  77:7
somebody
  25:11 45:22
  46:1 84:13
  103:12 106:4
something's
  69:11
somewhat  7:6
  7:16
sonya  2:25
  122:3,8
soon  107:13
  110:22 111:5,8
  111:20 118:19
sorry  5:13
  20:20 32:10
  36:10,11,21
  38:3,8,10,11
  39:20 42:8,9
  43:3,20 48:11
  54:13,14 56:19
  66:18 67:16
  75:13 80:18,24
  85:21 106:8

| | | | |
|---|---|---|---|
| 110:7,8,10 | spent 27:25 | statement | strictly 15:5 |
| 111:11 | 28:1 63:3 | 68:18 72:15 | strike 50:17 |
| sort 23:10 39:2 | 76:21 | 93:1 | string 92:18 |
| 55:8 71:15 | spoken 85:2 | statements | strong 78:1 |
| 74:3 80:4 | sporadically | 2:16 29:15 | strongly 79:23 |
| 112:22 115:9 | 37:5 | 30:16 49:7,14 | 96:9 102:10 |
| sought 24:15 | spotted 66:10 | 57:24 58:3 | structure 8:16 |
| 58:1 82:13 | squirreling | 60:16 67:20 | 9:23 46:11 |
| 98:25 | 94:6 | 72:8 90:12 | 115:11 118:6 |
| sounded 77:4 | stabilized 9:20 | 97:2 113:10,25 | structures |
| source 24:5 | staff 25:24 | 115:23,23 | 16:11 60:11 |
| 100:14 | 45:1,15 57:16 | states 1:1,12 | 85:17 |
| southern 1:2 | stand 31:17,20 | 4:1 6:6 84:8 | struggling |
| sp 59:24 | 113:20 115:14 | 99:22 | 82:11 |
| speak 30:11 | standard 26:8 | status 58:9 | stuck 32:8 72:8 |
| 39:5 40:14 | 52:18 | stay 16:19 | 94:16 |
| 84:4,4 | standards 87:3 | steal 23:7 | stuff 54:11 |
| speaks 89:8 | standing 16:9 | step 57:12 | subject 16:4,18 |
| specific 67:10 | 77:9 | steps 13:21 | 22:22 26:12 |
| 67:10 105:3 | standstill 10:8 | 53:22 | 29:6,22 31:1 |
| specifically | staring 33:9 | stick 106:7 | 31:11 54:25 |
| 19:23 23:24 | start 8:12,19 | stipulate 58:15 | 60:15 67:10 |
| 37:10,12 41:7 | 40:6 42:9 | stipulations | 70:11 74:19 |
| 50:1,4 81:1 | 52:19 62:15 | 58:11 | 78:11 81:4 |
| 92:8 112:4,17 | 71:18 87:22 | stop 48:17 82:9 | 101:10 106:12 |
| specifics 66:8 | 92:16 94:6,19 | 96:12 118:16 | 110:7 |
| 85:3 | started 54:6 | stopped 38:2,3 | submit 73:4 |
| speculate | starting 19:15 | story 76:23 | 113:4 |
| 86:20 | 19:17 52:21 | strategy 14:15 | submitted 70:9 |
| speculation | 54:8 63:20 | straying 51:8 | subordinated |
| 22:11 | 97:4 | street 3:17 | 46:17 |
| spell 9:7 14:13 | starts 85:11,11 | 42:22 | subs 9:24 |
| spelled 9:8 | state 13:21 | strettos 47:4 | 11:23 |
| spend 75:8 | 81:5 | strickon 3:22 | subsequent |
| 90:1 | stated 59:15 | 5:20 | 19:20 |
| spending 74:17 | 110:21 | strict 61:7 | subsidiaries |
| | | | 9:3,10 |

substance
108:23
substantial
94:12
substantially
12:24
substantiate
72:11
substantive
16:6 21:14
23:1
successfully
71:16 119:25
suffice 110:23
111:6
sufficient
26:18 37:17
38:1,4,19 63:4
72:2 84:25
85:13 92:22
100:23
sufficiently
92:22
suggest 77:2
suggesting
77:5
suggestion
56:7 68:1
suggests 89:4
102:18
suite 122:22
sunday 78:20
sunshine 7:12
super 64:8,14
77:22 78:15
79:10 88:10,19
89:1 93:19

96:10 103:25
superimpose
114:6
supers 25:8
55:17
supervisors
25:25 45:14
supplemental
96:13
support 8:6
18:11 27:7
73:25 74:4
118:4
supported
117:14
supporting
74:4
suppose 24:5
27:16
supreme 12:12
12:23
surcharge
86:10
sure 14:24
20:20 23:21
33:2,19 45:10
46:5,7 47:6
48:22 49:15
52:7 55:7,11
65:16 69:14
82:20 93:17,24
101:13 110:19
110:24
surplus 61:5
61:10,17,24
65:11

suspect 70:1
sustained
56:19
swear 31:22
sweep 108:14
sweeps 103:4,5
103:6 110:20
110:24 111:20
swept 104:21
104:23
switch 103:8
swung 95:8
sympathize
74:9
system 2:8,9
14:3 23:9 56:4
56:6 97:6,7,16
98:16 99:1
104:17 107:20

**t**

t 122:1,1
table 75:24
95:13
take 5:8 12:12
27:3,20 28:11
54:17 57:4
60:12 63:4
69:6 77:6,10
80:14 87:11
90:23 98:19
105:6,24 107:7
113:13 114:23
115:1 116:14
117:3 118:17
taken 39:15
53:22 97:3
111:3 118:1

takes 13:22
58:5
talk 9:23 24:10
32:3 36:24
48:6 90:20
103:15 115:7
119:6,8
talking 33:20
45:16 53:9
59:7 61:17
80:8 81:17,21
86:17 87:16
96:2,12 106:25
talks 105:25
task 48:1,1
tasks 47:24
taxes 87:16
team 114:4,14
teams 55:15
tease 60:19
teeter 95:7,8
tell 24:10 42:20
42:25 43:14
51:16 54:22
67:18 68:15
82:14 85:7
119:11
telling 82:25
116:22
tells 118:4
temporary
25:17
tempted 24:10
94:13
tenant 11:18
11:19 13:15
22:13,18

**tenants** 9:20
22:13 28:7
47:13 98:7
**term** 64:21
**terms** 24:12
45:6 109:14
**terrible** 82:14
**testified** 63:1
67:18 68:3
**testify** 55:7
**testifying**
29:17
**testimonial**
31:22 53:7
**testimony**
31:23 32:20,23
43:5,14,19
48:24 57:12,13
57:18 58:16
72:14 75:14,21
76:14,15 81:8
92:10,12
117:14
**thank** 5:15,24
7:22,23 13:12
17:23 18:8
32:1 33:12,22
33:24 34:13
35:7,10 51:21
57:7,21 65:22
71:6 89:10
90:4,5 105:11
108:25 111:17
113:7 115:1,3
117:24 119:22
119:25 120:2,3

**thanks** 18:5
31:16 32:12
39:7 57:9,11
57:11,18 70:23
96:21 101:18
108:20 114:3
114:16
**that'd** 33:24
**theoretically**
73:20,22
**thereof** 80:14
**thin** 94:23 95:1
**thing** 6:21
33:20 53:7
63:9 69:13
70:14,15 77:3
77:4 79:6 85:2
90:22 110:19
119:7
**things** 6:17
15:9 17:11
28:17 53:3
54:24 58:4
67:25 71:16
73:10 75:17
79:9 89:12
91:18,21 95:2
112:5
**think** 7:10 15:4
15:10 17:11,23
17:25 26:5
27:3,9,12,14
28:3 29:1,3,8
29:25 30:10,16
30:20 31:5,10
32:9 33:14
43:11,17 48:5

48:7,17 50:10
50:18,20 52:7
53:5,9 56:13
57:2,22 58:24
60:17 64:8,20
65:18,19,24
66:3,5 67:17
68:18 69:2,25
70:8 71:4,6,7
72:1 73:21
74:22 75:11,19
75:22 76:4,14
77:24 78:5,16
78:20,22 79:9
79:21 80:25
81:1,1 83:3,10
83:11,17,20,24
84:10 87:3,24
88:9 89:20
90:12,18,22,24
90:25 91:2,5
92:4,16,17,25
93:3,11,19,21
94:6,7,10,10
94:18,22,23
95:4,25 96:2,7
96:11,19 98:10
100:13 102:17
102:21 106:10
106:18 107:18
109:5,12,14,21
110:4,5,14,21
110:23 111:2
112:6,23 113:2
115:25 116:22
116:25 117:23
118:1,14

119:16
**thinking** 76:24
90:16 91:21
**third** 8:23 11:8
19:2 23:18
29:22 93:19,20
103:7 104:19
107:17 119:17
**thorough** 7:17
**thought** 8:18
24:7 68:18
75:21 83:16
**thousand**
81:18
**thousands** 79:3
**three** 7:7 11:6
12:18 61:1
105:6 106:25
**thunder** 23:7
**tied** 81:5,6
**ties** 57:22
**tight** 39:18,19
**time** 2:14 14:4
16:2 23:19
27:10 33:8,8
37:3 38:14,17
39:16 53:21
58:1,5 83:9
84:1 88:20
90:1 91:14,17
95:22 97:1,3
98:19 106:14
112:15 113:6
113:13,17,24
114:21,22,23
116:7,23
117:10 118:20

121:7
**timeframe**
  38:11
**timely**  23:23
  53:25 104:18
**times**  6:3 22:21
  22:22
**title**  87:15
**today**  5:12
  6:20 7:23 9:17
  15:19 28:22
  30:23 39:1
  48:24 51:13
  54:22 57:13
  60:17 67:18,23
  68:9 69:8 70:7
  70:14 71:25
  72:2 77:9 78:1
  82:1 84:1 85:2
  86:12,12,13,13
  86:14,18,20
  97:3 101:21,22
  102:13 111:13
  113:20 114:18
  117:14 119:1
  119:24
**today's**  8:6
  29:8,14 30:10
  54:25 77:8
  91:2
**together**
  119:25
**told**  49:18
**tomorrow**
  70:17,22 89:14
  91:9,15

**top**  93:4
**topic**  51:3
**tortured**  93:3
**total**  5:5 10:24
  21:3,7,8 61:12
  61:12 81:17
**totally**  65:7
**totter**  95:7,8
**touch**  12:3
  112:6
**track**  115:21
**tracked**  23:6
**trade**  88:16
**traded**  95:3
**traditional**
  77:17
**trailing**  44:19
  44:19,22
**tranches**  10:3
**transcend**
  100:15
**transcribed**
  2:25
**transcript**
  122:4
**transfer**  87:15
  99:2 103:8
**transferred**
  97:11,23,24
  98:1,11,15
  100:20 107:8
**transfers**
  105:20
**translate**  58:2
  58:4
**translator**
  116:20

**transparent**
  114:19
**tremendously**
  66:6
**tried**  52:12
  56:10 89:19
**triggered**  89:2
**triplett**  85:16
**trouble**  32:3,4
**true**  35:19,19
  84:19 122:4
**trundle**  91:16
**trust**  97:25
  98:2 99:25
  100:17 103:18
  105:25 107:6,7
  107:12,15,24
  108:5 109:3
  110:17 118:12
**trustee**  4:2 6:4
  6:6 23:4,14
  65:16 70:25
  84:8 98:8,8
  99:11,13,20,22
  100:5 102:2,4
  106:16 109:10
  110:11 112:8
**trustee's**  18:1
  84:3 111:12
**truth**  31:24,24
  31:24
**try**  16:23,24
  32:2 40:2 77:7
  93:3 94:16
  97:2 108:5
  111:11 114:22

**trying**  23:14
  39:11 52:8
  53:22,24 90:25
  103:16
**turmoil**  47:12
**turn**  6:18 7:19
  18:5 27:6
  32:21 53:8
  96:21
**turning**  11:5
**two**  6:17 10:3
  20:13 22:15
  29:11 45:22
  56:14 71:15
  77:5,19 97:17
  102:14
**type**  82:2
**types**  37:10
**typical**  52:12
  56:12 57:1,2
  64:20
**typically**  65:14

**u**

**u.s.**  1:23 4:2
  6:4 18:1 23:3
  23:14 65:16
  70:25 84:3
  98:7,8 99:11
  99:13,20 100:5
  102:2,4 106:16
  109:10 110:11
  111:12 112:8
**ultimate**  46:4
  62:6
**ultimately**  86:9
**unable**  12:6

unclear  43:6
uncommon
  7:10
under  9:4 16:5
  24:24 40:23
  52:11 63:7,15
  67:11 71:13
  78:2
underscore
  119:3
understand
  10:4 12:4
  16:24 31:3
  37:12,22 38:1
  38:5,13,19
  41:17 46:16
  52:12 54:20,21
  62:20 68:8
  76:9 81:24
  82:11 86:19
  91:3 97:5
  99:12 103:16
  108:13 111:17
  116:3,24 117:3
  117:8,19
understanda...
  7:16 116:22
understanding
  37:25 38:16,17
  41:4,8,20
  49:22 50:22
  55:8 94:2
  101:13 102:16
  114:12
understood
  15:7 30:24
  50:25 109:23

undertake
  49:10
undertaking
  54:10
underwater
  69:11,11 96:3
unencumbered
  77:21
unexpired  2:15
unfair  88:16
unfortunately
  12:17 47:15
  53:25 54:11
uninhabitable
  79:3
unit  22:1,20
united  1:1,12
  4:1 6:6 84:8
  99:21
units  11:1,23
  22:16 45:4
  65:6 79:3
  103:23
unknown
  92:24
unnecessary
  20:18 93:5
unsecured  62:2
  67:6
unworkable
  22:23
upcoming  12:6
upkeeping
  44:23
upshot  119:1
upside  20:16

upstairs  10:1
urges  119:21
use  2:2 14:2,3
  14:18 18:15,19
  19:7,10 23:22
  61:6 62:20
  63:11 64:18,21
  65:1,8,11,19
  69:7 71:14
  74:4 78:9
  85:15 86:5,23
  86:25 92:1
  94:4 100:14,24
  108:7 116:6
used  9:15 17:2
  17:6,7,13 22:9
  23:21 24:1
  38:21 45:1
  49:20 73:18
  78:10 93:10
  95:2 102:9
  109:8
uses  92:6
using  2:7 73:10
  73:25
usually  32:9
  47:16,17 69:24
utility  26:11
  75:18

**v**

vacancies
  22:12
vacate  22:13
vaguely  29:2
valid  66:23
validity  58:15

valuable  22:13
valuation
  29:16,25 30:4
  30:5,9,16,20
  30:22 49:19
  72:9,10 82:2,5
value  10:24
  13:16 14:15
  18:20 19:2,10
  29:19,20 30:2
  45:9 47:19,22
  49:3 51:17
  55:13 59:21
  67:19,21 69:10
  73:11,14 74:1
  74:1,19 75:9
  77:23,24 79:2
  79:11 81:25
  85:19 87:13
values  19:4
  57:23,25 58:3
  67:21 69:18
  87:16
variance  22:22
  22:23 66:1
  79:13 88:1
  93:9
variances
  93:11
variety  118:16
various  10:14
  58:2
vendor  16:12
  26:11 56:1,2
verify  118:8
veritext  122:20

**versus** 73:11
73:12
**viable** 80:10
**video** 5:21
**view** 15:14
16:1 24:19,20
55:23 56:11,25
71:16 78:1
102:10 106:16
112:20 115:17
117:13
**viewed** 16:8
21:16
**views** 22:7
**virgin** 9:5
**vis** 65:13,13
**visibility**
109:15 112:7
**voice** 84:11
**volume** 118:9

**w**

**wages** 27:11
52:18
**wait** 75:13
**waived** 86:9
**waivers** 58:11
**walking** 34:16
**wanders** 90:16
**want** 7:4 14:20
15:5,8 17:20
18:2 23:7 27:9
28:16,18 32:8
32:13 43:24
48:6 55:7
56:17 58:6
68:1 69:3 70:7
70:22,25 71:9

76:6,8 77:12
79:10 82:12
83:23 84:4
87:2,13 93:8
93:20,21 94:22
101:13,15,25
102:9 106:8,23
110:8,11,24
112:13,18
114:16,18
115:7 117:6,21
119:8
**wanted** 6:21
14:22 17:25
32:20 37:12
109:24
**wants** 6:19
7:20 114:19
**wash** 74:3
**washington**
3:18
**watching**
43:19
**water** 28:3,6
45:20,22 56:2
75:18 96:4
100:9,18
**way** 6:19 8:14
8:24 10:1 23:6
33:14 38:18
39:5 42:5
43:19 45:3
52:16,25 54:21
56:5 58:21
63:24 68:6
69:24 71:3
73:4,5,13,16

74:11,12 79:4
87:4 103:13
107:15,18
**waylaid** 54:11
**ways** 52:4
60:10 64:1
74:16 103:24
**we've** 16:19
17:21 23:3
24:14,15,16
34:22 35:17
50:12,13 60:11
60:12,14 67:8
67:12 70:20
76:14,16 77:19
81:8 85:1
89:19 91:1,2
97:3 98:7
109:11,15
**weeding** 87:22
**week** 28:2
35:20,24 45:20
60:25 69:12,21
**weekend** 53:4
78:20
**weeks** 14:2
17:12 26:21
40:24 41:5
42:22 44:10
46:23 54:22
61:1,2 63:11
73:8 79:25
81:17,20 89:25
114:12
**weight** 31:2
95:1

**weil** 3:3 5:11
6:23 7:5 18:9
32:17 36:7,18
41:10 96:24
**went** 17:9 40:7
66:11 86:14
115:22
**whatsoever**
64:10 72:10
**whichever**
22:10
**white** 96:15
**wiener** 7:24
8:1 15:21 36:3
46:6 76:19
81:3,4
**willing** 66:1
95:17 118:14
**wires** 32:8
104:2
**wish** 54:21
**witness** 31:17
31:25 32:5,11
32:20 33:14
34:16 36:21
38:8,10 39:20
39:24 40:3,10
53:11,13,16
54:18
**witness's** 50:22
**wonderful**
6:21 119:15
**word** 76:24
80:6
**wording** 80:15
99:20

**words** 95:12
100:6 108:3
**work** 7:8 27:17
32:9 45:24
55:22 74:25
77:7 80:23
91:11 96:13
108:2 111:4
114:7 116:11
118:7,10,12
119:18,25
**worked** 96:15
**working** 6:23
6:24 7:6 10:6
45:22 54:1
114:14 115:16
**workings**
111:22
**workload**
101:22
**works** 69:24
**world** 47:5
61:20,20
**worried**
106:13
**worth** 68:11
108:12
**write** 82:18
89:7
**wrong** 60:16
62:10 64:25
65:3 67:7 69:5
75:25 98:24

| x |
|---|

**x** 1:4,10 121:1

**y**

**yeah** 21:14
26:25,25 27:5
27:8 32:9,9,10
32:24 33:2,21
33:22 34:4,5
38:10 39:24
40:3,22 44:25
49:2 50:16
53:17 54:8,14
56:16 60:21
61:18 63:25
66:25 67:4
68:17 80:3,24
80:24 84:22
86:2 88:9
90:14 101:2,12
102:5,5 103:15
105:19,23
106:7 108:22
119:20
**year** 6:25 7:2
16:20,22 19:3
36:20,21 37:1
49:9
**years** 8:3 11:11
22:18
**yep** 20:24
**york** 1:2,14 3:6
4:5 8:2 9:12
12:12,12,23
13:2 28:4
64:24 65:6

| z |
|---|

**z** 9:8

**zarasai** 7:25
9:3,7,8,9,16,21
9:24 10:24
11:3,22 20:7
29:21
**zarasai's** 9:20
**zero** 19:18 28:2
60:25 63:20
72:23 73:2,11
**zoom** 91:16,20

| à |
|---|

**à** 65:13