**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 25-11050 (DSJ) |
| BROADWAY REALTY I CO., LLC, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

## BENCH DECISION[1] AND ORDER

## INTRODUCTION

Before the Court is Debtors' Supplemental Motion for Entry of Final Order (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Related Relief (the "Supplemental Motion" or "Motion," (ECF No. 37). 82 separate but related Debtors voluntarily commenced these Chapter 11 cases on May 21, 2025. The cases are being jointly administered but have not been substantively consolidated. Debtors promptly sought and, with their secured lender's consent at this Court's urging despite the lender's initial strenuous opposition, received authorization to use cash collateral on an interim basis pending a final hearing at which Debtors would seek longer-term authorization. Under that interim authorization, Debtors' authorization to use cash collateral ran only through June 26, but, at the conclusion of the hearing on the Motion,

---

[1] The designation "Bench Decision" denotes a decision that, although in written form, is stylistically similar to an oral decision I might read from the bench, with less formality and comprehensiveness than my usual written decisions. I am employing this format here because this decision is issued under considerable time pressure soon after an extensive evidentiary hearing and with Debtors' authorized interim use of cash collateral expiring imminently, making urgent the timely resolution of this Motion and further action by the parties.

Flagstar consented to, and the Court approved, an extension of that authorization until July 1,

thus giving the Court time to prepare and issue a considered decision.

Debtors filed their Supplemental Motion on June 14, 2025; Debtors' secured lender,

Flagstar Bank, N.A. ("Flagstar") filed an opposition ("Obj.," ECF No. 51) on June 20; Debtors

filed a reply (ECF No. 58) on June 24; and the Court conducted a nearly seven-hour hearing at

which evidence was taken on June 25. At the hearing, the Court received written direct testimony

from Ephraim Diamond, a fact witness and Debtors' representative, and from two valuation

experts, Michelle Zell on behalf of Debtors and Scott Fowler on behalf of Flagstar. The Court

also admitted into evidence voluminous exhibits.

The Court has considered the parties' written submissions and briefing in connection with

the Motion and all evidence adduced at the hearing. This Bench Decision constitutes the Court's

findings of fact and conclusions of law with respect to the Motion.

For reasons detailed below, the Motion is denied.

## JURISDICTION

The Motion is within this Court's jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and

the *Amended Standing Order of Reference M-431* (S.D.N.Y. Jan. 31, 2012 (Preska, C.J.)). This is

a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409.

## BACKGROUND / FINDINGS OF FACT

Each of the 82 Debtors in these jointly administered but not substantively consolidated

cases is a corporation (at least in most instances an LLC) that owns one or a small number of

multifamily residential rental buildings, the vast majority of whose units are rent stabilized. Collectively the Debtors own more than 5,000 rental units in four New York City boroughs; this makes the Debtors substantial providers of much-needed affordable housing in the City. The Debtor corporations are directly or indirectly owned and controlled by a company known as Zarasai, said to be controlled by an individual named Joel Wiener. Zarasai also owns many other entities that are not in bankruptcy. Non-debtor entities affiliated or related to Zarasai and Mr. Wiener provide management and other services for the Debtors, for which they receive payment from Debtors and other Zarasai-controlled or related entities.

Each individual Debtor is financed by its own secured loan now held by Flagstar Bank. This decision at times generically refers to these loans as mortgages. No loan relevant to this case is cross-collateralized and Flagstar has no recourse to any source of payment other than the assets of the relevant borrowing Debtor. Each respective mortgage is secured by the real property owned by the Debtor and by that Debtor's rent proceeds and cash. No Debtor has identified any unencumbered asset that is available for use, among other things, as a means of providing adequate protection of Flagstar's security interests.

Debtors and experts paint a picture of a challenging rent-regulated housing market, in which landlords are experiencing significant cost increases while they have a limited ability to increase their rental income, compounded by sharp increases in Debtors' financing costs due to upward adjustments of the interest rates on much of their debt. Flagstar contends that all Debtors stopped making mortgage payments in January 2025 and that Debtors nonetheless reported no cash on hand as of the May petition date, thus suggesting serious net operating losses by Debtors, and/or some other transfer of Debtors' funds that has not been explained. Debtors do not dispute

3

that they stopped making payments on their mortgages, although there was some suggestion that some payments were made in January 2025.

Prior to the bankruptcy, Flagstar commenced one state-court action in each borough in which Debtors owned properties, seeking typical lender relief (either foreclosure or the appointment of a receiver or both). Debtors filed the bankruptcy cases before the state courts ruled on the requested relief.

Flagstar is holding approximately $7 million in funds that it collected pre-petition from Debtors for purposes including paying real estate taxes when due, seemingly under typical mortgage-lender escrow arrangements. Debtors refer to this as the "Tax Advance," and this Bench Decision employs that term without endorsing any party's legal contentions about ownership or entitlement to use of those funds. The next due date for such tax payments is reported to be sometime in July 2025. Debtors seek to compel Flagstar to use the funds to pay Debtors' July tax obligations, while Flagstar objects and notes that Debtors' lack of appreciable cash on hand coupled with their nonpayment of mortgage obligations and their attempt to cause Flagstar nevertheless to pay Debtors' taxes reflects Debtors' ongoing financial non-viability.

Debtors presented abundant and undisputed evidence that they need to use available cash to carry out all their operations – to name but a few pressing needs without which Debtors could not function, building maintenance, provision of utility service, repairs when needed, insurance coverage, and administrative functions including rent collection, record-keeping, payment disbursements, lease issuance and renewal, and all the ordinary-course activities that are incident to running residential rental real estate businesses. The Court does not question Debtors' functional need to fund their operations. Nor, given Debtors' lack of unencumbered funds, does the Court question that Flagstar's cash collateral is the only source each Debtor has to meet its

4

needs. The Court notes, however, that Flagstar objects it has not received information sufficient for it to assess whether Debtors have improperly diverted assets to related non-debtor parties, especially during the approximately four to five months before the bankruptcy when Debtors stopped making required mortgage payments to Flagstar. The Court makes no findings with respect to the possibility of asset diversion, and it makes no findings with respect to whether alternatives such as an infusion of non-debtor funds from other Zarasai-related entities could be arranged. Debtors say no such funds are available or on offer.

The Motion turns on whether Debtors have met their burden to show that their proposed use of cash collateral provides Flagstar with the statutorily required adequate protection of Flagstar's security interest in connection with its loans to Debtors. Additional factual findings are set forth below in tandem with this Bench Decision's discussion of the applicable law.

## THE MOTION AND THE PARTIES' CONTENTIONS

The Motion seeks authorization on a final basis for Debtors to use cash collateral, subject to conditions including adherence to a proposed budget and financial reporting and disclosure requirements. Debtors' proposed budget lists categories of anticipated operating and non-operating disbursements for the next 13 weeks in the total amount of approximately $18.6 million, plus ongoing "bankruptcy disbursements" including escrowed professional-fee fund transfers of more than $9.7 million. The budget shows a starting cash balance of $1,388,568, and an ending balance of $ 1,587,716, notwithstanding that Debtors are not paying their mortgages and contemplate using the $7 million "Tax Advance" held by Flagstar to pay Debtors' July property taxes.

Debtors' Motion attached a proposed order detailing the relief sought. The Motion sought authorization to use cash collateral for an indefinite time, subject to requirements including budget constraints, variance limits, and reporting requirements. In an attempt to show that their proposal adequately protects Flagstar's collateral, Debtors raised multiple contentions, one of which is that their properties' value exceeds the debt owed Flagstar such that there is an adequate equity cushion on each property. These contentions were backed by the declaration of valuation expert Michelle Zell, a qualified and experienced appraiser who has performed valuation analyses for Zarasai for more than 10 years. Debtors further contend that all of their expenditures will benefit Flagstar, and therefore should be permitted.

Flagstar is the sole party to object to Debtors' Motion. This is not surprising because Flagstar is Debtors' apparent sole secured creditor, and thus appears to be the only party that could be adversely affected by Debtors' continuing use of cash collateral.

Flagstar raised numerous objections. By way of non-comprehensive summary, Flagstar strenuously objects that Debtors seek to fund their cases by depleting Flagstar's collateral without providing adequate protection as is required by Bankruptcy Code Section 363(e). Flagstar emphasizes that each Debtor is, in essence, a single-asset real estate debtor, that the cases have not been substantively consolidated, that each Flagstar loan is not cross-collateralized and can be satisfied only from the assets of the specific borrower entity Debtor, and that Debtors have not established (and cannot show) that each Debtor will adequately assure Flagstar of the continued availability and lack of diminution of its collateral as a result of Debtors' proposed use of cash collateral. Flagstar also objects to a lack of transparency and forthcomingness by Debtors and Zarasai about issues including money flows, and Flagstar objects to aspects of Debtors' intended uses of cash collateral, including fully funding the bankruptcy cases' professional fee

and other administrative expenses to the tune of $9.7 million over 13 weeks. Flagstar responded to Ms. Zell's valuation analysis with an evaluative report by appraisal expert Scott Fowler. Mr. Fowler did not generate an independent valuation opinion, but he criticized aspects of Ms. Zell's analysis and provided a "sensitivity analysis" showing changes in valuation that would result if various of Ms. Zell's assumptions were changed. Flagstar further objects to a lack of transparency regarding Debtors' use of funds, both during the months leading to the bankruptcy cases' filing and on an ongoing basis. Flagstar expresses concern that Debtors' expenses may be inappropriately high and appear to include payments to non-debtor "insiders" or affiliates of Debtors.

The evening before the hearing, Debtors submitted a Reply accompanied by a supplemental declaration of Ms. Zell that responded to Mr. Fowler's criticisms.

As noted, on June 25, the Court conducted an evidentiary hearing and heard closing arguments from the parties. Debtors' interim authorization to use cash collateral was set to expire on June 26, but, at the Court's request and with Flagstar's and Debtors' agreement, that authorization was extended to July 1 to allow the Court time to prepare a decision for issuance on or before June 30. The Court reserved decision at the conclusion of the hearing.

## GOVERNING LEGAL STANDARDS

The Motion seeks authorization to use cash collateral pursuant to Bankruptcy Code § 363, which defines "cash collateral" as "cash, . . . deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, . . . rents, or profits of property . . . subject to a security interest as

provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

In general, the trustee, or debtor-in-possession here, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate," with certain exceptions. 11 U.S.C. § 363(b)(1). However, the trustee (or debtor-in-possession) "may not use, sell, or lease cash collateral under paragraph (1) . . . unless – (A) each entity that has an interest in such cash collateral consents, or (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). And, importantly, "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used . . . or proposed to be used . . ., the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Flagstar requests adequate protection, so the Court is required to ("shall") "prohibit or condition" the use of cash collateral in order to provide "adequate protection" of the security holder's interest. Debtors "bear[] the burden to demonstrate that a creditor is adequately protected." *In re South Side House, LLC*, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012); *In re 680 Fifth Ave. Associates*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993).

The Bankruptcy Code identifies three non-exclusive means of providing adequate protection, the third being explicitly flexible as to method: (1) requiring a cash payment or payments by the trustee to the secured party "to the extent that" the Code's automatic stay provision or the collateral's use "results in a decrease in the value of such entity's interest in such property": or (2) providing "an additional or replacement lien"; or (3) granting such other relief . . . "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

## DISCUSSION

It is undisputed that Flagstar holds separate mortgages on an individual basis as against each Debtor, and that each such mortgage and associated documents give Flagstar a security interest that extends to, among other things, each individual Debtor's real property, rents received from or on behalf of tenants or occupants of each such property, and other cash on hand. Bankruptcy Code section 552(b) extends Flagstar's pre-petition security interest in rents to post-petition rents received, creating a distinct security interest also enjoyed by Flagstar. In light of Debtors' report that they had no cash on hand as of the petition date, no prospect of outside cash infusions, and no business operations other than operation of rental buildings and associated services, whatever funds they spend during the bankruptcy cases necessarily will constitute rental income or other proceeds or income of Debtors' property.

Flagstar has repeatedly and strenuously contended, and Debtors have not disputed, that because each loan at issue was issued individually and solely to an individual debtor and without cross-collateralization, each Debtor's status and provision of adequate protection must be viewed on a standalone basis. *See* Flagstar Obj. at 9-10 (citing *In re Dye*, 502 B.R. 47 (Bankr. M.D. Pa. 2013); *In re Southern Illinois Railcar Co.*, 301 B.R. 305 (Bankr. S.D. Ill. 2002); *In re Valley Realty Advisors, LLC*, No. 02-07-BK-04217-CGC, 2008 WL 11628636, at *8 (Bankr. D. Ariz. May 29, 2008)). Further, Flagstar contends and Debtors again do not disagree (although the Motion is filed generally to allow Debtors all to use cash collateral, and the Motion does not propose an alternative of granting relief solely as to some subset of Debtors) that to prevail on the Motion as presented, the Debtors must establish that Flagstar is adequately protected with respect to each one of the 82 Debtors. The Court agrees.

Debtors have raised multiple arguments as to why their proposal affords adequate protection, but at the hearing they emphasized two main points. The first is that all of their payments either should not trigger adequate protection requirements or constitute adequate protection payments because all contemplated expenditures are eligible for surcharge under Bankruptcy Code Section 506(c). Debtors' rationale is that all such payments benefit Flagstar's interests by preserving and increasing each Debtor's value compared to the alternative of a liquidation. Debtors further contend that the value of each Debtor is adequate to afford an equity cushion above the amount of debt outstanding with respect to each property. This Bench Decision first discusses Debtors' equity cushion contentions, then the Section 506(c) contentions, and then proceeds to discuss Debtors' remaining contentions and any other necessary topics.

*Equity Cushion.* First, as to the asserted equity cushion with respect to each Debtor, Debtors have not met their burden of establishing the existence of an equity cushion, at least a sufficient one, to alone constitute adequate protection of Flagstar's security interests. Even fully crediting the analysis and testimony of Debtors' valuation expert Michelle Zell, Debtors acknowledge that a subset of Debtors have an equity cushion of less than 18%. (This Bench Decision speaks in generalities in deference to the parties' sealing request during briefing and the hearing in light of their view that public release of more specific valuation information would harm the parties' commercial interests.) Although some courts will consider an equity cushion above 15% to be sufficient, many demand 20%, *see, e.g.*, *In re Fortune Smooth (U.S.) Ltd.*, 1993 Bankr. LEXIS 2377, *19 (Bankr. S.D.N.Y. 1993); *Mendoza v. Temple-Inland Mortg. Corp.*, 111 F.3d 1264, 1272 (5th Cir. 1997). This Court need not decide whether a figure below 20% could be adequate because, for a subset of Debtors, an insufficient equity cushion is present even crediting Ms. Zell's analysis in full. Debtors, perhaps in recognition of this vulnerability,

suggested at argument as a further condition to ensure adequate protection that Debtors with equity cushions higher than 15% could provide intercompany loans to Debtors with lower equity cushions to protect Flagstar's interests, but this suggestion was not developed in detail or accompanied by financial information to show that such a measure could be feasible to implement. And, even if this were so, the Court is concerned that leveling all equity cushions at 15% imposes serious risk on Flagstar given Debtors' seeming ongoing negative cash flow even during a period when they ceased paying their mortgage obligations, and given how speculative (at best) it is to think that favorable deal terms could be achieved given the acknowledged challenges facing the rent-regulated housing real estate market, and given Ms. Zell's assumption that a robust marketing period would be required to achieve the sale outcomes she projects.

This conclusion makes it unnecessary to decide a topic of considerable evidentiary attention during the hearing, namely, Flagstar's attempt through Mr. Fowler to critique and persuade the Court to disregard or downward-adjust Ms. Zell's valuation analysis. The Court does find that Ms. Zell is a well-qualified valuation expert who presented generally reasonable analyses. Mr. Fowler, also a well-qualified valuation expert, identified various debatable assumptions in Ms. Zell's analysis and calculated valuation changes that would result from substituting other assumptions he suggested were more reasonable, but he acknowledged that Ms. Zell used generally appropriate analytical methods and the Court concludes (with no intended future collateral estoppel effect and subject to possible revisitation in later proceedings if necessary to a future decision) that there was not one obligatory valuation method or set of assumptions from which Ms. Zell's analysis departed in a definitively incorrect manner. The Court's overall impression is that Ms. Zell's testimony explained reasonable grounds for her assumptions. There may be room for disagreement, especially as to her assumed capitalization

rates,[2] but the Court need not make an adverse finding because, as noted, even crediting her analysis Debtors have not established a sufficient equity cushion as to each property to establish adequate protection to Flagstar based solely on the asserted existence of an equity cushion.

*Section 506(c).* The other main form of adequate protection asserted by Debtors is that all of their expenditures will increase the value of Debtors' properties by preserving them as going concerns, such that the payments in Debtors' view are permissible surcharges under § 506(c) and should be credited as adequate protection payments or deemed not to require separate adequate protection. Debtors' initial Supplemental Motion brief devoted just two paragraphs to this contention (ECF No. 37 at 19-20) but their reply leads with this argument and devotes eight pages to it (Reply at 4-11).

Section 506(c) provides: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c).

At a broad level, the Court finds it intuitively logical that actual and necessary expenses of maintaining Debtors' properties and operating their businesses will support the market values of the properties in a manner that may ultimately benefit Flagstar at least to some extent. Nevertheless, the Court concludes that Debtors' § 506(c) contention is overbroad and unsupported, particularly insofar as it seeks to deem payment of Debtors' professional fees as a

---

[2] Flagstar presented copies of email correspondence between Ms. Zell and Mr. Moshe Weinberger, Debtors' CFO, discussing a change in assumed capitalization rates before Ms. Zell's analysis was complete. These communications at least raise a question of possible manipulation to reach a desired outcome, but Ms. Zell testified that the purpose of the communications was simply to keep Mr. Weinberger apprised of her work. The Court makes no adverse credibility finding based merely on these question-raising emails, but today's ruling is without prejudice to future development of this issue if further valuation litigation proves necessary.

form of adequate protection or surchargeable payment, but also as to the extent of certain other payments.

As to whether or how section 506(c) fits within the Bankruptcy Code's adequate protection framework, first, the only prong of the section 361 definition of adequate protection that could be implicated is the third subsection, which provides that courts may provide adequate protection by "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3). Because this subsection calls for the "granting" of "other relief," section 506(c) is at best an uneasy fit, although Debtors cite some courts that have considered surchargeable payments under section 506(c) to be relevant to adequate protection analysis. Supp. Mot. at 4 (citing *In re Croatan Surf Club, LLC,* No. 11-00194-8-SWH, 2012 Bankr. LEXIS 2369, at *24 (Bankr. E.D.N.C. May 25, 2012); *In re KNM Roswell Ltd. P'ship,* 126 B.R. 548, 557 (Bankr. N.D. Ill. 1991); *In re Smithville Crossing, LLC,* Case No. 11-02573-8-JRL, 2011 Bankr. LEXIS 4605 (Bankr. E.D.N.C. Sept. 28, 2011)).

Even assuming without deciding that surchargeable payments could constitute a form of adequate protection in some circumstances, Debtors' contentions here present a number of difficulties. First the language of section 506(c) and case law applying it contemplates a retrospective charge to a secured creditor, not advance funding by that creditor in the first place. Again, section 506(c) provides that "[t]he trustee **may recover** from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim," language that seems to contemplate an initial payment by a trustee or debtor-in-possession for which recovery or compensation may be sought under section 506(c). *See In re Towne, Inc.,* 536 F. App'x 265, 268

13

(3d Cir. 2013) ("Section 506(c) is designed to allow a claimant who has expended funds to preserve or dispose of secured collateral to recover those funds from the secured creditor who directly benefitted from them, thus prevent[ing] a windfall to the secured creditor at the expense of the claimant.") (internal citation omitted).

Additionally, Flagstar observes that, given Debtors' valuation-backed contention that many of their properties are worth significantly more than the debt that encumbers them, value and recovery enhancement would benefit general unsecured creditors or other lower-priority claimants, not Flagstar, whose security is already protected to the extent a robust enough equity cushion already exists. And courts have explained that "benefit to the secured creditor must be shown in the quantitative, not a[ny] qualitative or generalized, sense." *In re Flagstaff Foodservice Corp.,* 29 B.R. 215, 219 (Bankr. S.D.N.Y. 1983) (quoting *Dozoryst v. First National Savings and Loan of Downers Grove*, 21 B.R. 392, 394 (N.D. Ill.1982)) (internal quotations omitted). "Further, the secured creditor cannot be required to bear the expenses which benefit the entire estate under the theory that the expenses were incurred to preserve the assets of the estate as a whole." *In re Chicago Lutheran Hosp. Ass'n,* 89 B.R. 719, 728 (Bankr. N.D. Ill. 1988). Some courts have emphasized that the proper inquiry under section 506(c) is whether a "direct benefit" was conferred to the secured creditor and not "whether [a secured creditor] benefited or could reasonably have been expected to benefit . . . ." *In re Towne, Inc.,* 536 F. App'x 265, 268–69 (3d Cir. 2013) (internal citations and quotations omitted); *see also In re Gen Crescenzi*, No. 95 Civ. 2119 (DLC), 1995 WL 753906, at *5 (S.D.N.Y. Dec. 19, 1995) ("The issue is whether payment of [certain expenses] satisfy Section 506(c)'s requirement that the expense directly benefit the secured claimant.")); *In re C.S. Assocs.,* 29 F.3d 903, 906 (3d Cir. 1994) (finding that payment of real estate taxes did not confer a direct benefit to the secured creditor.)

Accepting the Debtors' position would require the Court to conclude that Flagstar is at least reasonably expected to benefit from all of Debtors' contemplated expenditures throughout these 82 cases, including even Debtors' professional expenses for all aspects of the cases—those incurred litigating against Flagstar and those incurred funding and running potentially protracted bankruptcy cases to which Flagstar objects, with Flagstar stayed from collecting on its entitlements or otherwise securing timely relief. More typically and more readily, the proper analysis under section 506(c) is not hypothetical and prospective, but rather is retrospective and concrete, assessing whether a particular expenditure was "reasonable" and "necessary" and was devoted to "preserving" or "disposing of" property in a manner that directly benefitted the secured creditor.

Debtors identify case law holding that section 506(c) nevertheless provides an exception in some circumstances to the rule that cash collateral must be adequately protected, but those authorizations concerned much more targeted uses of funds than Debtors propose here, and Debtors excessively stretch the authority on which they rely. For example, one case that Debtors invoke explains that the debtor "must prove that the expenditures in question are '(1) reasonable, (2) necessary, and (3) beneficial to the secured creditor.'" *In re KNM Roswell Ltd. P'ship,* 126 B.R. 548, 557 (Bankr. N.D. Ill. 1991) (quoting *In re Chicago Lutheran Hospital Association,* 89 B.R. 719, 727 (Bankr. N.D. Ill.1988)). Even that court concluded that the expenses were not covered by section 506(c) because the Debtor "offer[ed] virtually no evidence as to why this expenditure was reasonable, necessary or beneficial to [secured creditor]. [Debtor] does tell us its claim consists of $85,374.62 for 'payroll and related taxes/benefits,' $2,716.09 for 'travel and expenses reimbursements,' and $17,391.08 for 'insurance.' But it provides nothing which either

shows how it came up with those numbers or which corroborates them." *In re KNM Roswell Ltd. P'ship,* 126 B.R. 548, 557 (Bankr. N.D. Ill. 1991).

Debtors' contentions here have similar (and other) deficiencies. First, the payments in *KNM* at least were quantified and arguably of direct benefit to a secured creditor. Debtors here propose a sweeping conclusion that every dime spent by the estate – even millions of dollars of professional fees and other administrative expenses – will benefit Flagstar, on the speculative premise that the ultimate outcome of these cases will yield a better recovery for Flagstar than any alternative, notwithstanding that Debtors' own valuation suggests there is "upside" value to many Debtors' estates that will benefit unsecured creditors rather than Flagstar. That stretches section 506(c) beyond recognition, beyond its plain terms, and beyond any use of the statute known to this Court. As noted, case law recognizes that under section 506(c) "the secured creditor cannot be required to bear the expenses which benefit the entire estate under the theory that the expenses were incurred to preserve the assets of the estate as a whole." *In re Chicago Lutheran Hosp. Ass'n,* 89 B.R. at 728; *see also In re Stearns Bldg.*, No. 98-1257, 1998 WL 661071, at *7 (6th Cir. Sept. 3, 1998) (at secured lender's request, barring debtor from using rent to pay professional fees after payment of necessary expenses); *Putnal v. SunTrust Bank*, 489 B.R. 285, 291 (M.D. Ga. 2013) (permitting use of rents to operate and maintain property but not for estate administrative expenses).

Also here, in addition to not providing a breakdown of the budget on a property-by-property basis, Debtors do not detail the basis or rationale for the budget, nor the necessity or benefit or reasonableness of their proposed expenditures. For example, both experts observed that Debtors' reported payroll expenses are unusually high, and Debtors pay a 4% management fee to an insider even though their own expert assumed that a 3% fee was more typical and

16

would be assumed by a prospective purchaser for valuation purposes. The evidentiary deficiencies in Debtors' proof appear at least partly of their own making. Mr. Diamond, Debtors' Chief Restructuring Officer ("CRO"), testified that the Debtors created a forward-looking budget for 2025 on a property-by-property basis. However, Debtors choose not to provide that in support of their motion or consolidated budget. Additionally, Mr. Diamond testified that he was unable to provide a breakdown of the professional fees. He admitted that the budget anticipates a $35,000 monthly compensation from Debtors for his firm even though that monthly payment covers services the firm provides for non-debtors as well as Debtors. Mr. Diamond explained that his maximum contractual compensation amount was included in the budget to account for the possibility that actual Debtor costs may reach that level, and that he would actually pro-rate billing among Debtors and non-debtors, but the blanket budgeted amount cannot be tested given the prospective and vague information now available.

In short, Debtors have failed to meet their burden to show that all of their proposed expenditures are "necessary" and "reasonable" and of clear benefit to Flagstar. The Court therefore cannot find that the proposed expenditures are eligible for surcharge under section 506(c). By necessary extension, the Court cannot conclude that the expenditures either do not trigger adequate protection requirements or constitute a form of adequate protection, even assuming that section 506(c)-eligible expenditures could have such an effect on adequate protection analysis where proven.

These conclusions make it unnecessary to decide another of Flagstar's contentions, which is an objection to Debtors' intended provision for flexibility to allow large repair or other costs that an individual Debtor may encounter to be partly funded by inter-company loans or transfers.

The Court does note, without ruling on this basis, that there is commercial logic akin to an insurance function in proceeding as Debtors propose. No more need be said here.

*Whether the total is greater than the sum of its parts.* The Court has attempted to assess whether the mix of elements Debtors propose – equity cushions that on many but not all properties exceed even 20% combined with benefit to Flagstar of certain expenses – could satisfy adequate protection requirements even though neither element alone is sufficient. The Court has been unable to do so, in part because Debtors' contentions are based on the undifferentiated, unproven, and questionable premise that their expenditures as a whole will benefit Flagstar. The Code, however, affords flexibility as to how a debtor provides adequate protection, so long as the result is the "indubitable equivalent" of Flagstar's "interest in such property." 11 U.S.C. § 361(3). If the Debtors present a more nuanced and less speculative package that they can show collectively affords adequate protection, the Court will consider it.

*Other contentions.* Debtors' Reply refers to a third "distinct reason" they assert they should win. Reply at 3. That is that "Debtors could be liable to Flagstar for diminution only if Flagstar could later demonstrate that the value of its collateral was impaired as a result of the debtor's actual use of [the] collateral." Reply at 3 (internal punctuation and quotation marks omitted; quoting *Branch Baking & Trust Co. v. Beaman (In re Constr. Supervision Servs.)*, 2016 U.S. Dist. LEXIS 61444, *23-24 (E.D.N.C. 2016)). That ignores that section 363(c) expressly requires conditioning permission to use cash collateral on terms that will adequately protect security interests – an explicitly prospective enterprise, not one that requires secured lenders to wait and "later demonstrate" impairment of their security interest. Moreover, Debtors cannot prevail based on their assertion that their budgeted uses of cash collateral will "preserve and enhance the value of Flagstar's collateral" such that Flagstar's collateral will not be diminished.

This argument is at least thematically similar to Debtors' section 506(c) argument that all their expenditures will benefit Flagstar by enhancing enterprise values and debtor recoveries, and the argument is flawed for reasons already stated as to the section 506(c) argument: the budgeted expenses are for every dime Debtors spend in the case including for administrative reasons that do not directly enhance Flagstar's collateral; the asserted benefit is speculative and not proven; and, accepting Debtors' own contention that there are significant equity cushions as to many of their properties, the "upside" benefit of Debtors' activities logically would flow to unsecured creditors rather than to Flagstar.

Debtors' other contentions in their initial Supplemental Motion submission do not appear (at least with any prominence) in their Reply and were not emphasized (or mentioned) during the hearing. They thus may have been abandoned. In any event, they do not change the outcome.

Debtors argue that their projections reflect an increase in available cash from zero as of the Petition Date to, collectively, approximately $908,000 as of June 29 and approximately $1.587 million at the end of an initial 13-week budgeting period. This argument fails to establish adequate protection or a lack of need for adequate protection. First, an aggregate increase in available cash does not establish that each individual Debtor's available cash will increase throughout the case, or even in the case's first 13 weeks. Second, Debtors' figures ignore that they have incurred either substantial operating losses or diversions of assets since the start of 2025, and it is not credible or evidence-supported to assert that that trend is not ongoing at least as to some Debtors. Third, and relatedly, Debtors' projection of a net increase in available cash across all Debtors masks ongoing losses, including by assuming that Flagstar will release to Debtors or otherwise use the roughly $7 million in "Tax Advance" funds (Debtors' term) that

Flagstar holds to pay Debtors' property taxes, at best a one-time payment source while Debtors continue to accrue but seemingly not reserve for additional tax liabilities.

Debtors also argue that the "equities of the case" support use of cash collateral. Debtors' initial brief cites just one case for this proposition, and even according to Debtors' own description that case was premised on the existence of a large equity cushion so that the use of rents would not harm the secured lender. Supp. Mot. at 20-21 (quoting *In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) ("if a creditor were sufficiently oversecured, the debtor could argue that the equities tipped in favor of allowing it to tap into rents that would otherwise be cash collateral because the creditor would be adequately protected and not harmed.")). As discussed above, Debtors have not established that Flagstar is oversecured on each of its 82 loans, so the possibility identified by the *680 Fifth Ave.* court is not present here.

Debtors' remaining arguments concern ancillary issues that need not be reached in light of the Court's conclusions stated above. Debtors argue that a proposed escrow of funds to support their professional expenses is appropriate, noting that fee awards ultimately require Court approval. That does not pertain to the statutory requirement, not met here, that use of cash collateral is only permissible if a secured claimant's interest is adequately protected. Here, it is not.

As noted, Debtors also defend their proposed mechanism for allowing intercompany fund advances to meet unexpected, large needs that are likely to arise at particular properties whose identity cannot be predicted in advance. This decision already stated some tentative openness to that approach, but, again, this issue does not eliminate the fundamental problem that Debtors have failed to show their proposal will afford Flagstar the required adequate protection of their interests in each of the respective 82 Debtors.

*Next steps.* The Court is keenly aware that Debtors provide more than 5,000 units of affordable housing in New York City, and any disruption of Debtors' operations could have serious impact on tenants as well as other stakeholders. The Court urges Flagstar and Debtors to take immediate steps to ensure that needed services continue without interruption. This may include a further short-term on-consent extension of authorization to use cash collateral pending further steps. The Court anticipates swiftly approving any such on-consent proposal that is on reasonable terms. If Flagstar does not so consent, the Court will entertain, on shortened notice if necessary, an emergency application for more targeted relief to avoid potentially serious near-term harms that would likely follow cessation or disruption of Debtors' operations.

Further, this decision is without prejudice to renewal of the Motion in whole or in part. It appears likely that some subset of Debtors have significant equity cushions that may alone suffice to adequately protect Flagstar's interests. Debtors' motion sought relief for all 82 Debtors, and the Court was not asked to or given sufficient information to determine how or whether to rule with respect to individual Debtors.

As to the Motion as presented, however, the Court concludes that it must follow the statutory command that use of cash collateral "shall" be prohibited unless it can be approved on conditions sufficient to afford adequate protection, a requirement that Debtors have failed thus far to show they have met.

## CONCLUSION

For the reasons stated above, the Supplemental Motion is denied, without prejudice. This Bench Decision and Order constitutes the order resolving the Motion as well as the Court's

decision. Accordingly, the time to bring any appeal commences upon entry of this Bench Decision and Order.

The Court will conduct a status conference via Zoom before the July 4 holiday weekend. The parties are to contact chambers to schedule that conference. The Court is available at most times on June 30 through July 2. The parties are encouraged to pick the earliest possible time that will allow them to have assessed this decision and engaged in a pre-conference "meet and confer" discussion regarding next steps.

So ordered.

Dated: New York, New York
        June 29, 2025

                                        *s/ David S. Jones*
                                        Honorable David S. Jones
                                        United States Bankruptcy Judge