Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 25-11050-dsj

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    BROADWAY REALTY I CO., LLC

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                   United States Bankruptcy Court

12                   One Bowling Green

13                   New York, NY 10004-1408

14

15                   June 25, 2025

16                   11:34 AM

17

18

19

20

21   B E F O R E :

22   HON DAVID S. JONES

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: F. FERGUSON

Page 2

1    HEARING re Motion of Debtors for Entry of Interim and Final

2    Orders (I) Authorizing Debtors to (A) Continue Using Cash

3    Management System, Bank Accounts, and Business Forms; (B)

4    Implement Changes to Cash Management System in the Ordinary

5    Course of Business; and (II) Granting Related Relief

6

7    HEARING re Hybrid Hearing RE: Motion Filed by the Debtors

8    for Entry of Order (I) Authorizing the Debtors to Use cash

9    Collateral, (II) Scheduling Final Hearing, and (III)

10   Granting Related Relief

11

12   HEARING re Application Filed by the Debtors Seeking an Order

13   (I) Authorizing and Approving the Appointment of Stretto,

14   Inc. as Claims and Noticing Agent to the Debtors and (II)

15   Granting Related Relief

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   WEIL, GOTSHAL & MANGES, LLP

4         Attorney for Debtor

5         767 Fifth Avenue

6         New York, NY 10163

7

8   BY:  RICHARD W. SLACK

9         GARRETT A. FAIL

10        LUNA BARRINGTON

11

12   PAUL HASTINGS LLP

13         Attorney for Flagstar

14         875 15th Street, N.W.

15         Washington, DC 20005

16

17   BY:  NICHOLAS A. BASSETT

18         KENNETH PASQUALE

19

20   CHAPMAN AND CUTLER, LLP

21         Attorney for Mishmeret Trust Company Services, Ltd.

22         1270 Avenue of the Americas

23         New York, NY 10020

24

25   BY:  MICHAEL FRIEDMAN

Page 4

1    A P P E A R A N C E S :

2

3    UNITED STATES DEPARTMENT OF JUSTICE

4         Attorney for United States Trustee

5         One Bowling Green

6         New York, NY 10004

7

8    BY:  RACHAEL SIEGEL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1              I N D E X

2                                                    PAGE

3  WITNESS(ES):              DX   CX   RDX  RCX

4  EPHRAIM DIAMOND

5      By Ms. Barrington      *         92

6      By Mr. Bassett             44        94

7  MICHELLE ZELL

8      By Mr. Slack           *

9      By Mr. Pasquale            100

10  SCOTT FOWLER

11      By Mr. Pasquale        *         194

12      By Mr. Slack               161

13

14              E X H I B I T S

15  NO.          DESCRIPTION                PAGE

16  Exhibits FX-1-5, 9-124                 27

17  Exhibits 1-94                          28

18  ECF Docket No. 10, Paragraphs 1-6      40

19  ECF Docket No. 40                      29

20

21  (* Direct Examination via Declaration)

22

23

24

25

1                        P R O C E E D I N G S

2              THE COURT:  All right.  Thanks for your patience

3      as we got set up to proceed, and this is Judge Jones.  We'll

4      call the one case on the calendar for 11 o'clock, Broadway

5      Realty I Co., LLC, Number 25-11050.  We have your

6      appearances.  So let me just informally understand.  I think

7      we've got Mr. Bassett and Mr. Pasquale or Pasquale, do you

8      pronounce your E at the end?

9              MR. PASQUALE:  Pasquale, Your Honor.

10             THE COURT:  Pasquale.

11             MR. PASQUALE:  Thank you.

12             THE COURT:  -- for Flagstar, and who are the part

13     main player is going to be today for debtors?

14             MR. FAIL:  Good morning Your Honor.  Garrett Fail,

15     Weil Gotshal & Manges, for the debtors, joined by my

16     partners Richard Slack and Luna Barrington, along with Gary

17     Holtzer and Matthew Goran here today.  We also have two of

18     the debtors' declarants and witnesses today, Mr. Ephraim

19     Diamond, the debtors' CRO and Ms. Michelle Zell, the

20     debtors' independent appraiser and expert witness.

21             THE COURT:  Okay.  Great.  Thank you.  All right.

22     So everyone's been working very hard to get to this moment.

23     So let me acknowledge that and thank you for your efforts.

24     I'm not going to say a lot up front.  We just had a

25     conference yesterday to get ourselves ready to start.  Oh, I

Page 7

1    guess I should disclose one more thing.  I already disclosed

2    that a former clerk of mine now works for a Weil, but is not

3    appearing before me in this case, although I confess she's

4    present.  I can see her.  But now I have another current

5    clerk -- oh, I have another clerk who eventually will work

6    for Weil, and I now have another clerk, to even things out,

7    who is married to someone who worked on these matters on the

8    Flagstar side of the ledger.  So that clerk likewise is not

9    working.  Thankfully, I have three clerks.  So I have my

10   wonderful clerk, Ms. Falana, available and unimpaired and

11   able to work as well as my interns.

12            Okay.  So all of that is -- I'm not asking to do

13   anything, but I am just making that known as part of my

14   assessment and to let you know that I'm running my chambers

15   properly and keeping people who should be screened off this

16   screened off it.

17            Okay.  So that said, I think I will turn it over

18   to folks to proceed.  Well, I'm sorry, first I should ask,

19   are there matters I need to address with regard to the late-

20   night filings?

21            MR. SLACK:  Your Honor, Richard Slack, from Weil,

22   for the debtors.  So one of the questions Your Honor had at

23   the status conference concerned confidentiality.  So we did

24   meet and confer.  I think where we came out jointly is that

25   I think we were all prepared to address confidentiality the

Page 8

1    way that the Court suggested yesterday.  I do think both

2    parties have the desire to keep their confidential

3    information confidential.  And I would point out that in

4    particular, there's going to be a lot of discussion of

5    valuation.  And obviously in this case, the debtors would

6    anticipate that the values of the properties are going to be

7    important in the marketplace.  So those are -- you know,

8    those kinds of -- that kind of information remains

9    confidential.  We'd like to keep it as confidential as we

10   can, again by doing what the Court had suggested.  But that

11   also may come up not just in testimony, but in the closing

12   arguments that --

13            THE COURT:  Yeah, thank you.  I think that makes

14   sense to me.  And I want to acknowledge there's no way

15   you're going to be able to do closing arguments without

16   talking about the substance of the valuations and what they

17   do or don't adequately demonstrate.  So that makes sense to

18   me.

19            MR. SLACK:  The other issue that may not arise,

20   Your Honor, and, you know, is that we do have on the exhibit

21   list that we exchanged yesterday some very large Excels.

22   That doesn't necessarily mean that somebody is going to try

23   to introduce them.  When you print out those Excels, because

24   there's multiple tabs, it looks like an inch kind of thick

25   for some of them.  And if we get there, I know that we had

Page 9

1    discussed that perhaps those would need to be, you know,

2    shown electronically, if not just from the bulkiness of the

3    paper, also for the ease of presentation.  Now those may not

4    come up, and if they don't, then that's a non-issue.  But,

5    and maybe we just address it if --

6             THE COURT:  Okay.  So we'll cross that bridge if

7    and when we get to it.  If all else fails, I can descend and

8    stare at somebody's laptop or something.  You know, we'll

9    figure it out.

10             MR. SLACK:  So the other issues that we discussed

11    with respect to exhibits, and I think the parties have

12    resolved all the exhibit issues and we can go over that now

13    or later, except two issues.  One is our issue and one is

14    theirs.  It's not really an exhibit issue for Flagstar, but

15    Flagstar is going to be arguing that some parts of the Zell

16    reply declaration should not be admitted.  Obviously, we

17    have a strong disagreement there.  So we can hear that when

18    Ms. Zell comes up.  We can hear that now, I think.  And then

19    the other issue that we have is really with a very limited

20    section of one of Mr. Fowler's charts.  So we have an issue

21    with that, with a particular chart coming in.  And we're

22    prepared to discuss that now or again, wait until we deal

23    with Mr. Fowler on the stand.

24             THE COURT:  Okay, and am I right, the sequence is

25    we're going to start with debtor proffering the

1    declarations, plural, of Ms. Zell and a cross of Ms. Zell,

2    and then we'll flip.  Is that the sequence?

3              MR. SLACK:  Yeah.  So I think -- Your Honor, I

4    think what the debtors propose, just because there's three

5    witnesses, there's no big surprise here.  We're going to --

6    we are going to start with the testimony of Mr. Diamond, the

7    CRO.  We'll proffer his declaration and essentially put him

8    up for cross-examination immediately.  And then we move to

9    our second witness, Ms. Zell, and then obviously it'll flip

10   to Mr. Fowler.

11             THE COURT:  Okay.  That's fine.  Do you all have a

12   preference, knowing up front what's in and out, particularly

13   from the Zell declaration?

14             MR. PASQUALE:  Yes, Your Honor.

15             THE COURT:  You want to know now?

16             MR. PASQUALE:  I would like to.

17             THE COURT:  Yeah, I'd like to know now, too.  And

18   that'll make -- that may help.  So I'm happy -- I'm ready to

19   hear about what's appropriately in or excluded from the Zell

20   declaration.  Are there other evidentiary issues I'm going

21   to be nailing down up front?

22             MR. BASSETT:  Your Honor, again, Nick Bassett,

23   from Paul Hastings, for Flagstar.  Just one point of

24   clarification.  I think the agreement, or what we had talked

25   about in advance for the purpose of trying to streamline

1   today's hearing as much as possible, is that to the extent

2   that there are no objections to either side's exhibits,

3   which I think Mr. Slack just acknowledged, with a few

4   exceptions that we'll talk about, we would just go ahead and

5   have those moved into evidence.

6          THE COURT:  Yeah.  I like that best.  I mean, I

7   certainly like that as a lawyer.  Just so if there's no

8   disagreement, you don't have to remember to formally

9   introduce every last one.  Oh, the U.S. trustee's office is

10  at the ready and standing up.  Let me let you go ahead, Ms.

11  Siegel.

12         MS. SIEGEL:  Thank you, Your Honor.  Rachael

13  Siegel, on behalf of the United States trustee, if I may be

14  heard very briefly on the evidentiary issues.

15         THE COURT:  Sure.

16         MS. SIEGEL:  The United States trustee is not

17  objecting to any of the evidence today being filed under

18  seal and treated as confidential.  But we did want to put on

19  the record that all parties should be able to reserve their

20  rights to challenge whether such information is confidential

21  under Section 107(b) if anyone seeks to admit it for any

22  other purpose in the future.  And I spoke with counsel.  I

23  believe both Flagstar and the debtors are fine with that.

24  But I just wanted to get it on the record before we delve

25  into the details.

Page 12

1            THE COURT:  I got it.  No, I appreciate your

2      raising that, and that's a pretty standard feature of my

3      confidentiality orders.  But let's make sure everyone's okay

4      with that.  Both sides?

5            MR. SLACK:  Yes, Your Honor.

6            MR. BASSETT:  Yes, Your Honor.

7            THE COURT:  Okay.  So that with that proviso,

8      which is well taken, then let's go ahead.  So maybe I'm

9      thinking let's just recite what exhibits for each side are

10     going to be received in evidence, and I'll say some

11     appropriate words to reflect that they're received so you

12     have that on the record, and then we can talk about

13     objections to the contents of the Zell declaration, the

14     second Zell declaration and anything else anyone wants to

15     raise.  And you can do it collectively.  If you just want to

16     Say everything on debtors' list is received except for, if

17     there are exceptions, that's probably easiest.

18            MR. SLACK:  So, Your Honor, we are looking at

19     Flagstar's exhibit list and as I understand it, Flagstar's

20     withdrawing Exhibits 6, 7 and 8.

21            MR. PASQUALE:  That's correct, Your Honor.  Sorry.

22            THE COURT:  Okay.  We have confirmation.  Thank

23     you, Mr. Pasquale.

24            MR. SLACK:  And we are okay with all the other

25     exhibits coming in with the exception again of a very

Page 13

```
 1    limited objection to Exhibit 1, which is the declaration of

 2    Mr. Fowler.  And let me quickly -- we can deal with that

 3    one, I hope relatively quickly.  We may not, but Mr. Fowler

 4    has attached to his declaration an exhibit which is Exhibit

 5    E, overall capital capitalization rate comparisons, and our

 6    objection to Exhibits 6, 7 and 8 on the Flagstar exhibit

 7    list, which were withdrawn were appraisals done by third

 8    parties for Flagstar.  And obviously we view those as

 9    hearsay, and so those were withdrawn.  What I would point

10    out is that Exhibit E has three columns that relate to

11    Flagstar and also set forth information from Flagstar

12    appraisals.  And you know, we think that all of that

13    information is again hearsay.  And the important piece

14    there, Your Honor, is -- and I don't want there to be any

15    mistake in the record -- is that that information, you know,

16    doesn't come in for the truth of the matter.

17              THE COURT:  Right.  Can I ask -- let me -- I have

18    maybe the -- in the possibly incorrect sense that I can cut

19    through this.  So let me try, but don't be shy about telling

20    me if I'm wrong.  So these are exhibits to an expert report,

21    right?  Experts are entitled to rely on hearsay and non,

22    non-admissible material as long as they just identify what

23    it is.  I think I can properly receive the matters that you

24    are raising a concern about in Exhibit E as in that spirit,

25    as not in just what you said, not freestanding or
```

Page 14

1    independent evidence as to actual valuation, but rather just

2    going to assumptions baked into the expert's analysis.  Is

3    that right, in your view?

4           MR. SLACK:  Yes, Your Honor.  I mean, so it's not

5    just the values.  It's also -- I mean, all of the

6    information is hearsay.  But it's our view that if the

7    expert wants to include hearsay, the expert can rely on the

8    hearsay evidence.  But the evidence itself is -- I think

9    you're right.  It doesn't come in for the truth of either

10   the truth values or in this case the cap rates or anything

11   else.

12          THE COURT:  Right.  But I can make a determination

13   of the reliability or nonreliability of the expert opinion

14   as a whole, based though it may be in part on inadmissible

15   underlying assumptions, right?

16          MR. SLACK:  I would say, Your Honor, that what you

17   can do is certainly recognize that information is coming

18   from a source, that we don't have any -- that we don't have

19   any basis for knowing whether it's accurate or not.

20          THE COURT:  Right.  I would say that goes to

21   weight, and I'm highly confident that you'll be arguing

22   strenuously about that if you think it's important.  And

23   I'll welcome that.  And I'll say more generally, I'm looking

24   at Exhibit E.  It's an 81-entry chart called overall

25   capitalization rate comparisons.  And anything that's

Page 15

1    particularly thorny in your point of view, just let me know.

2    Okay?

3              MR. SLACK:  Your Honor, we are comfortable with

4    that resolution.  So thank you, Your Honor.

5              THE COURT:  Great.

6              MR. SLACK:  The next is the Zell reply declaration

7    and obviously it's going to be the application of Flagstar.

8    I would just make a preliminary comment that, you know,

9    obviously in our view, the entire reply is just that.  It's

10   reply.  You know, we received the report on Friday.  We had

11   no idea what was going to be in the report.  It has an

12   extensive discussion of criticizing Ms. Zell's methodology

13   and every piece of that methodology.  And so it's our view

14   that literally everything in the report is, you know, just

15   that reply.  And I would say this, Your Honor, there's no

16   new opinions, and from our standpoint, you know, if they

17   were to drop the Fowler declaration attacking, you know, Ms.

18   Zell's methodology, we would drop the reply.  The reply

19   literally is just that, reply.  Anyhow, I'll turn it over to

20   them and then.

21             THE COURT:  Yeah, let's do that.  So we'll hear --

22   I don't -- yeah, let's hear from Mr. Pasquale about what

23   portions of the reply declaration of Ms. Zell are objected

24   to, and then we'll take it from there.

25             MR. PASQUALE:  Thank you, Your Honor.  Ken

Page 16

1    Pasquale, Paul Hastings, for Flagstar.  Your Honor, just for

2    the record, we're talking about debtor Exhibit 7, 8 and 9.

3    And yes, Your Honor, we do object to the majority of Ms.

4    Zell's reply declaration being admitted, in particular

5    paragraphs -- the only paragraphs that are truly rebuttal

6    are Paragraphs 41 through 50.  So the majority of the

7    declaration is not rebuttal.

8           We would also object, Your Honor, to the debtors'

9    reply objection to the extent that it refers to the Zell

10   reply declaration.  And just, Your Honor, we just have to

11   note that the reply itself was 25 pages.  Your Honor's rules

12   limit replies to 15 pages.  We didn't see a request for an

13   extension, a page limit extension.  But let's leave that

14   there.

15          Your Honor, Ms. Zell's reply declaration and

16   towards the end of Paragraph 1 on Page 2 actually says, I

17   submit this declaration to respond to the Fowler report.

18   But the first 40 paragraphs improperly attempt to clarify

19   and expand upon Ms. Zell's expert report by explaining her

20   methodologies and her data selections.  I think it's really

21   important to note, Your Honor, only after I took Ms. Zell's

22   deposition in preparing for today and only after Mr. Fowler

23   critiqued pursuant to the schedule set by this court for

24   expert reports.

25          What the debtors are trying to do through the

Page 17

1   reply declaration is particularly improper here given the

2   procedure that we're following, which is direct testimony

3   through declaration, the initial declarations and expert

4   reports.  Through the reply, Ms. Zell is trying to clean up

5   deficiencies in her report that an expert is not entitled to

6   revisit.  Her direct testimony was closed when the report

7   was submitted.

8           Your Honor, there's analogous case law under Rule

9   26(e) of the Federal Rules of Civil Procedure, which as Your

10  Honor knows is about supplementing expert reports.  But that

11  that case law supports exclusion of the non-rebuttal

12  portions of Ms. Zell's reply declaration.  Here's a quote

13  from a case:

14          Rule 26(e) is not "a vehicle to permit a party to

15      serve a deficient opening report and then remedy the

16      deficiency through the expediency of a supplemental

17      report."  Lidle, 2009 WL 490201, at *5 (S.D.N.Y. 2009).

18          Judge Glenn fairly recently issued a similar

19  decision, In re Norske, 2023 WL 6885830, in which Judge

20  Glenn precluded expert testimony submitted through a

21  supplemental report.

22          The majority of Ms. Zell's reply does not rebut

23  Mr. Fowler's report.  You could just turn the pages, Your

24  Honor, notwithstanding the headings.  It just explains what

25  she did.  All of that should have been in her initial

Page 18

1    report, and that is what -- yes, Your Honor?

2            THE COURT:  I mean, would this be appropriate for

3    redirect exam?

4            MR. PASQUALE:  Would -- what she --

5            THE COURT:  I mean -- so I'm sorry, the

6    Paragraphs, say, 2 through 40 of the declaration, right, the

7    contents that you're characterizing as attempts to bolster

8    or clarify her opinion through further explanation, right?

9            MR. PASQUALE:  I think that would depend on

10   whether --

11           THE COURT:  What came out in the cross.

12           MR. PASQUALE:  -- cross-examination if actually

13   touching upon each of those areas.  But I think in that

14   regard, yes, I do think that.  My issue is with this is

15   being -- the process -- and we did talk about this as a

16   status conference a bit.  It's all coming in as direct.

17           THE COURT:  Right.

18           MR. PASQUALE:  And Your Honor, we did receive

19   this, you know, just after 6 o'clock last night when we were

20   preparing to deal with the report that we had and then had,

21   you know, 20 pages or so, whatever it was here, to deal

22   with.

23           THE COURT:  Yeah, it's 18.

24           MR. PASQUALE:  That's not the way the rules work,

25   Your Honor.  The rebuttal portion, again, I'm not going so

Page 19

```
 1    far as to say.  But when you read the declaration, it's only

 2    those few paragraphs they're actually rebutting.  There's

 3    actually a paragraph that actually comments on the

 4    deposition itself and questions I asked Ms. Zell.

 5              THE COURT:  Okay, and so what you want is for me

 6    to -- you could word it different ways, but either strike I

 7    think it's really Paragraphs 2 through 40, because Paragraph

 8    1 is introductory, or exclude those paragraphs from evidence

 9    while receiving the remainder.

10              MR. PASQUALE:  That's correct, Judge.

11              THE COURT:  Which translates to Paragraphs 1 and

12    41 through 50, right?

13              MR. PASQUALE:  That's correct.

14              THE COURT:  Okay.  Let me -- oh, Mr. Bassett has a

15    further thought.

16              MR. PASQUALE:  I did mention the comments, the

17    references to the reply declaration in the reply objection.

18              THE COURT:  Oh, right, and so correlating -- well,

19    wait a minute.  You mean in the reply brief?

20              MR. PASQUALE:  The debtors' submission last night.

21              THE COURT:  You said reply declaration.  Yeah,

22    yeah.

23              MR. PASQUALE:  It's a reply --

24              THE COURT:  You used the word declaration, but

25    okay, got it.  So --
```

Page 20

1            MR. PASQUALE:  (Indiscernible) references --

2            THE COURT:  Yeah.

3            MR. PASQUALE:  -- reply declaration in the reply

4    objection.

5            THE COURT:  What do you want those to be done

6    specifically?  I mean, that's briefing and argument, not

7    evidence.  But it would be disregard it as -- or strike it.

8    I don't know what you want.

9            MR. PASQUALE:  Those references would be stricken

10   because this declaration would not be in the record itself.

11           THE COURT:  Okay.  Let me hear from debtors'

12   counsel on this.

13           MR. PASQUALE:  Thank you, Your Honor.

14           THE COURT:  Thanks.

15           MR. SLACK:  Your Honor, that's a very broad-brush

16   argument, and quite frankly, it is just wrong on its face in

17   every respect.  So let me start by saying, Your Honor, that

18   in terms of timing, when they took Ms. Zell's deposition,

19   they had not submitted an expert report.  We didn't get the

20   expert report until Friday.  That expert report is --

21           THE COURT:  (Indiscernible) because everyone's

22   talking about days of the week.  So today is Wednesday, June

23   25th.

24           MR. SLACK:  Right.

25           THE COURT:  Friday was June 20th, and that's the

1    date we're talking about?

2            MR. SLACK:  That's the date we received the expert

3    report for the first time.

4            THE COURT:  And her deposition occurred when?

5            MR. SLACK:  The day before.

6            THE COURT:  Okay.

7            MR. FAIL:  At night.

8            MR. SLACK:  What's that?

9            MR. FAIL:  In the evening.

10           MR. SLACK:  Yeah.  It was the day before, their

11   deposition.  So, Your Honor, we didn't see this expert

12   report.  We didn't know that they were going to file an

13   expert report.  We didn't know for sure.  We didn't know

14   what the expert report was going to say.  Was it going to

15   have its own appraisal?  Was it going to attack Ms. Zell's

16   work, which it did, did not have its own appraisal or market

17   value.

18           So what did it do?  Well, what it did do in very

19   broad brush is it disagreed with every aspect of Ms. Zell's

20   methodology.  And if you go through the 26 pages, it starts

21   out and there's two sections, which of course we'll get to

22   in Mr. Fowler's, it starts out by saying that he disagrees

23   with her methodology.  And let me just -- sometimes you have

24   to understand what we're talking about.  When you're doing

25   this kind of valuation, there's essentially three pieces.

Page 22

1    There's you have to figure out what the revenues are, you

2    have to figure out what a market expense is and then you

3    have to apply a cap rate.  And the methodology is attacked

4    by -- that Ms. Zell used is attacked in Mr. Fowler's report

5    in every aspect.  And so --

6            THE COURT:  Yeah.  You know, I'm going to jump in.

7    Look, I think I agree with you for the most part and I

8    should say I have read the reply declaration of Ms. Zell

9    which was provided last night, and so we're proceeding in a

10   rush.  I have two paragraphs that I have some concerns

11   about.  So I'm going to set those aside.  But I'm just going

12   to flip through it.

13           So Paragraph 1 is sort of an introductory

14   paragraph.  Paragraph 2 begins with a topic sentence, "Mr.

15   Fowler's attacks throughout the Fowler report are completely

16   unjustified."  And she explains or, well, attests that she's

17   used the same methodology that she has applied I guess in

18   other settings, I'll just say.  Paragraphs 3 and 4 strike me

19   as argumentative.  They're not really expert opinions.  They

20   explain that Ms. Zell's valuations in her words have been

21   used to fulfill financial reporting obligations and that

22   they've been reviewed annually by auditors and so forth and

23   sort of reality tested by pressures in the market.  That

24   strikes me as hearsay.  And I don't think that goes to the

25   basis of the analysis performed.  I think it's sort of

Page 23

1   hearsay bolstering.  So I'm a little bit inclined to not

2   receive three and four as pure argument and not a statement

3   of the witness's opinions or the grounds for them.  I'll put

4   a pin in that and you can tell me -- you can argue about

5   that later if you want.

6          But then the rest, flipping through, starting with

7   Paragraph 5, I read as further explanations by way of

8   responses to specific criticisms leveled by Mr. Fowler.  And

9   so the portion that Flagstar thinks is proper is beginning

10  at Paragraph 41, which sets forth Ms. Zell's specific

11  criticisms of Mr. Fowler's analysis.  But I think it's also

12  fair and appropriate for Ms. Zell to expand on her analysis

13  and her basically to say why it is that her work stands up

14  notwithstanding Mr. Fowler's criticisms.  So I think it'll

15  be helpful to the Court, and it's a fair extension of her

16  prior decision, prior opinion, in light of criticisms that

17  have come in.

18         I will say there's also a efficiency of judicial

19  proceedings benefit because I think otherwise we'd probably

20  have to elicit this exact same substance in the form of live

21  redirect, and here it's available for reference in an

22  efficient manner.  That's my -- I'll call that a tentative,

23  and I'll let Flagstar push back on that, but not yet,

24  because first I have to let Mr. Slack push back on my more

25  narrow reaction to Paragraphs 3 and 4.

Page 24

1           MR. SLACK:  So, Your Honor, I don't think three

2    and four are hearsay, and here's why they are appropriate

3    rebuttal.  Essentially, what Mr. Fowler did was, as a

4    litigation advocate, come forward and criticize Ms. Zell's

5    work.  You could call it peer review.  But what Ms. Zell

6    says in her reply is, I've been valuing these buildings for

7    12 years, and I've been doing it for public reporting

8    purposes.  And that means that there's an element of

9    importance, and the auditors actually look at her work, ask

10   for full appraisals, and hire their own independent, you

11   know, appraiser to come in and look at her work.  So that's

12   done every year, and there's multiple valuations using the

13   exact same methodology.

14           What she says, Your Honor, is not once -- and this

15   isn't hearsay.  This is not once have I had to change my

16   valuation results because of my work getting peer reviewed,

17   which is, of course, what Mr. Fowler is.  So it lends us to

18   be able to argue to the Court, and it'll come out in

19   closing, well, gee, Your Honor, you know, if Ms. Zell's work

20   has gone through peer review without change for years, and

21   it's been peer reviewed by auditors and independent

22   accountants, why is Mr. Fowler, as a litigation expert, now

23   all of a sudden finding criticisms that have never been made

24   before in a work.  That's reply.  It's appropriate reply,

25   and Your Honor should want to take that into consideration

Page 25

1    in weighing the evidence.

2            THE COURT:  Okay.  Let me hear from Flagstar on my

3    unenthusiastic reaction to their broader objection, coupled

4    with the exchange I just had with Mr. Slack about Paragraphs

5    3 and 4.

6            MR. PASQUALE:  Your Honor, I first want to just --

7    Mr. Slack referred to Mr. Fowler as a litigation advocate.

8    He's here as an expert witness rendering an opinion --

9            THE COURT:  Right.  Oh, yes.  Can I just say

10   you're not -- no one's going to gain traction by criticizing

11   the fact that either witness is a retained expert and

12   presenting expert testimony on behalf of the other.

13           MR. PASQUALE:  But with respect to your ruling,

14   thank you for listening to the argument.  You know, I have

15   my opinions on that.  But, Your Honor, we're fine proceeding

16   the way you've laid out.  I will handle the reply in

17   cross-examination.

18           THE COURT:  Right.

19           MR. PASQUALE:  And look, as far as three and four,

20   I do agree with the Court that they're hearsay.  But

21   frankly, Your Honor, I think the fact, and you'll hear this

22   today, that Ms. Zell has been appraising these properties

23   for that long is actually a problem, not a benefit.  So

24   we'll leave that as well.

25           THE COURT:  Okay.  So in light of that, I'll just

Page 26

1    collapse that to the reply declaration is received.  The

2    objection is overruled.  I had concerns about two specific

3    paragraphs, but we'll address that through questioning and

4    argument, and it'll go to weight.  Okay.  So thanks.  Let's

5    see.  Are you ready to call the witness, or do we have other

6    -- oh, we have to deal with exhibits, right?  Or anything

7    more to deal with?

8            MR. SLACK:  No, I think -- well, you haven't dealt

9    with our exhibits.

10           THE COURT:  Well, so --

11           MR. SLACK:  As I understand it, there's no

12   (indiscernible) objection.

13           THE COURT:  Oh, I haven't said the magic words

14   that debtors' exhibits X, y and Z are received, right?  So

15   you need that.

16           MR. SLACK:  Well, I was actually giving our

17   objections to Flagstar's.

18           THE COURT:  Oh, sorry.

19           MR. SLACK:  So we've gotten that far.

20           THE COURT:  Okay.  Thanks.  Sorry.  I lost track.

21   Go ahead.

22           MR. SLACK:  Yeah.  So, and what I said was, is

23   that with your comment as to one --

24           THE COURT:  You said six, seven, and eight --

25           MR. SLACK:  -- we're okay, and then they've

Page 27

1    withdrawn six, seven, and eight and all the other exhibits

2    we are fine with having come, you know, into evidence at the

3    hearing.

4              THE COURT:  Okay.  So to make sure we have

5    clarity, I'm just going to say I've received an exhibit

6    list, and I'm not looking at the docket to see if it's

7    publicly docketed, but the exhibit list designates Exhibits

8    Number FX-1 through FX-124.  F stands for Flagstar.  And all

9    of those are agreed to be received, with the exception of

10   exhibits FX-6, 7, and 8, which have been withdrawn.  That's

11   what's in my head.  And does that seem right to you?  Mr.

12   Bassett?

13             MR. BASSETT:  That's right, Your Honor.

14             THE COURT:  Okay.  So those are received; in other

15   words, 1 through 124, with the exception of 6, 7 and 8.

16   Okay.

17             (Exhibits FX-1-5 and FX-124 entered into

18             evidence.)

19             MR. SLACK:  My understanding is other than the

20   reply, there was no other objection to our exhibits.  We did

21   meet and confer.  So we would ask that, you know, now all of

22   our Exhibits 1 through 94 are admitted.

23             THE COURT:  Okay.  Can you just confirm that's

24   okay with you?

25             MR. BASSETT:  That's correct, Your Honor.

Page 28

1           THE COURT:  Okay.  So those are received as well.

2     All right.  Thanks.  Now --

3           (Exhibits 1-94 entered into evidence.)

4           MR. PASQUALE:  We are ready for witnesses, Your

5     Honor?

6           THE COURT:  Yes, I'm ready, and you're going to

7     call Mr. Diamond first?

8           MR. SLACK:  Yeah.  So I'm going to -- I'm going to

9     turn over the podium to my partner, Luna Barrington.

10          THE COURT:  Okay.  Great.

11          MS. BARRINGTON:  Good morning, Your Honor.  Luna

12    Barrington, for the record, for the debtors.  At this time,

13    Your Honor, we'd like to offer Mr. Ephraim Diamond's

14    declaration in support of the debtors' motion for authority

15    to use cash collateral into evidence.  For the record, we

16    had also offered Mr. Diamond's first-day declaration into

17    evidence and would just like to note that for the record,

18    since that was --

19          THE COURT:  Okay.  So is his declaration docketed?

20    Can you give me an ECF number?

21          MS. BARRINGTON:  Yes, of course.  It's docketed at

22    ECF 40 and his first-day declaration, if it's helpful for

23    Your Honor, is docketed at ECF 10.

24          THE COURT:  Okay, and you want both admitted for

25    purposes of today, I assume?

Page 29

1              MR. FAIL:  Yes, please.

2              THE COURT:  Okay.  Is there any objection?

3              MR. BASSETT:  Your Honor, I could be mistaken, but

4     I don't believe the first-day declaration was on their

5     exhibit list, and we would have an issue potentially with

6     all of that coming into evidence.

7              THE COURT:  You, I'm sorry, would or wouldn't?

8              MR. BASSETT:  I haven't had a chance to consider

9     it because I didn't know that it was on their list.

10             THE COURT:  Okay.  For now, let's -- so what

11    I'm -- implicit in that is that you don't object to ECF

12    Number 40, right?

13             MR. BASSETT:  That's correct, Your Honor.

14             THE COURT:  Okay.  So I'm going to receive ECF

15    Number 40.

16             (Exhibit Docket ECF Number 40 entered into

17             evidence.)

18             THE COURT:  Let me reserve on ECF Number 10 and

19    see if you really need it.  It's docketed.  I can take

20    judicial notice of the fact of contents in it without

21    assuming they're truth or evidentiary, but I don't know if -

22    - do you know for sure you want to rely on it?

23             MR. SLACK:  Yeah, I mean, Your Honor, the point is

24    that it's our understanding in something like this where you

25    have a declaration that's come in, in a hearing with

Page 30

1  Flagstar.  Flagstar didn't object to it.  It came in.  It's

2  already part of the record, so it doesn't need to be --

3            THE COURT:  Am I right?  It's part of the record

4  at the first-day hearings or no?

5            MR. BASSETT:  It is part of the record of the

6  first-day hearings.  However, I specifically recall saying

7  on the record that we did not have an objection.  I actually

8  did raise a hearsay objection, but other than that I did not

9  have an objection at the time to that declaration coming

10 into evidence, so long as it was only for purposes of the

11 first-day hearing, and I'm confident that was in fact the

12 ruling.  And moreover, Your Honor, that's appropriate

13 considering we had received that first-day declaration, you

14 know, a couple of days before the first-day hearing,

15 obviously had not had the opportunity to prepare a robust

16 cross-examination in response to that declaration.  And I

17 have not prepared to cross-examine the witness as to all the

18 contents of that declaration today either because I did not

19 know it was being offered as part of his testimony.

20           THE COURT:  Let me ask you to hold on a second.

21 I'm clicking to open up the more recent one, Number 40.

22 Well, I'll just ask the question to the debtors' side that

23 I'm trying to answer for myself.  Is anything in the more

24 recent declaration that's at ECF Number 40 incorporate the

25 earlier one?

Page 31

1              MS. BARRINGTON:  Your Honor, I don't believe

2    expressly incorporated.  But again, that first declaration

3    was offered into evidence at the first-day hearing.

4              THE COURT:  Okay.

5              MR. FAIL:  Which sought -- that first-day hearing

6    sought use of cash collateral on an interim -- on a final

7    basis.

8              THE COURT:  No.  Yes.  That's why I asked about

9    the first --

10             MR. FAIL:  And while we certainly agree that it

11   didn't apply for all purposes at the time, the context was,

12   you may remember --

13             THE COURT:  Okay.  Hang on.  Hang on.

14             MR. FAIL:  -- litigation --

15             THE COURT:  That's Mr. Fail supplementing.  No,

16   Ms. Barrington's got this amply.  So let's stick to the one

17   lawyer thing.  But all right, was there any meet and confer

18   discussion of the first-day declaration in connection with

19   this hearing specifically?

20             MS. BARRINGTON:  Not specifically, Your Honor.

21             THE COURT:  Okay.  I think I'm going to -- subject

22   to -- I'm going to sustain the objection because it does not

23   appear on -- wait, does it appear on the exhibit list?

24             MR. BASSETT:  No, Your Honor.

25             THE COURT:  Okay.  So I'm going to sustain the

Page 32

1    objection.  I think the contemplation was the parties would

2    do proffers.  We also had to -- had a number of conferences,

3    and this hasn't been raised previously.  And we did attempt

4    to define the scope of the evidentiary basis, and I don't

5    recall this being raised as something that was intended to

6    be relied on.  I think it's potentially unfairly sprawling

7    and kind of last-minute litigation hurdle to Flagstar to ask

8    to have it -- were it to be admitted now, notwithstanding

9    that it wasn't on the exhibit list and wasn't identified as

10   a proposed component of Mr. Diamond's testimony.  So I'm

11   going to exclude it for purposes of this hearing.

12           Now, I'll say some words that might give the

13   debtors slight comfort, but that's without prejudice to

14   further argument later or at least in part, if there's

15   particular facts that you need to make your case.  And I'm

16   not sure if that's the case, but for now, let's stick to the

17   evidentiary contours of the hearing.  Yeah.  Mr. Slack wants

18   to push back?

19           MR. SLACK:  Can I take one minute and point

20   something out, Your Honor?

21           THE COURT:  Sure.

22           MR. SLACK:  So in our motion that we made at

23   Paragraph 15, so this is in our motion for this hearing.

24           THE COURT:  (Indiscernible) but go ahead and tell

25   me what it says.

Page 33

1          MR. SLACK:  It says additional information

2    regarding the debtors' business capital structure and the

3    circumstances leading to the commencement of these Chapter

4    11 cases is set forth in the declaration of Ephraim Diamond

5    pursuant to Local Bankruptcy Rule 1007-2 in support of the

6    debtors' Chapter 11 petitions and first-day relief sworn to

7    on the day hereof.

8          THE COURT:  Sorry.  I'm sorry.  What are you --

9          MR. BASSETT:  Your Honor, that's the first-day.

10         MR. SLACK:  Oh, that's the first-day one.  I

11   apologize.

12         MR. BASSETT:  The first-day --

13         THE COURT:  Yeah, I was looking at the motion

14   on -- the supplemental motion, and it doesn't have that.

15         MR. SLACK:  Oh, I'm sorry.  But, Your Honor, I

16   guess the point is this is a supplemental motion to that

17   motion.

18         MR. BASSETT:  Your Honor, we dealt with this at

19   the first-day hearing, and I was very -- I think the record

20   was very clear.

21         THE COURT:  All right.  Look, let's do this,

22   because I -- we're burning a lot of time on preliminaries.

23   I'm going to not admit it now.  We'll see where it goes.  If

24   there's content in that declaration that needs to be brought

25   out on recross, that's fine.  You can do that.  Excuse me.

Page 34

1    Redirect.  Or if you want to call and -- actually, you know

2    what I'll do?  If you want to call Mr. Diamond and ask

3    questions and bring things out on live direct in light of

4    this ruling, you can do that, and we can get whatever key

5    substance you need on the record that way.  I think it would

6    be prejudicial not to let you have additional fact testimony

7    because the purpose is to present written direct in advance.

8    I'm going to let you supplement with live oral unless

9    Flagstar wants to stand down on this and go straight to

10   cross.  But I don't want to prejudice you from presenting

11   factual information you need.  But I --

12           MR. SLACK:  So I apologize, Your Honor, because I

13   read from the wrong motion.  But it is in our supplemental

14   motion.  It's Paragraph 8 in our supplemental motion.  And

15   we also, in addition to it being in there --

16           THE COURT:  Let me ask, what do you need to get

17   out of the first-day declaration?  What are you relying on

18   it for now?

19           MR. SLACK:  So, I mean that's a fair question,

20   Your Honor.  I mean, from our standpoint, it literally sets

21   forth the background so that we didn't have to repeat the

22   same background that we did in the original motion.  So all

23   the background in context, that forms the basis, quite

24   frankly, for the motion and for the relief we sought

25   originally.  And now the reason you do that is because, you

Page 35

 1    know, you don't want to have to repeat all of that

 2    background.  But the debtors certainly plan to argue that in

 3    the context of this case, and that's the information that

 4    came in the first-day declaration, that this -- you know,

 5    that the use of cash collateral makes sense.

 6            I would also point out that it's not even just

 7    Paragraph 8.  There's also a footnote where we say

 8    throughout that the definitions are going to be the ones

 9    that we had, including in the first-day declaration, because

10    again, the whole idea is not to repeat all that background,

11    but to use it.  And what I find a little bit -- and I just

12    have to say what I find a little bit odd is there was no

13    objection to it.  I can't think of what the objection would

14    be to it at this point for this.  So, again, we understand,

15    Your Honor, but we would certainly say that it should be

16    admitted.

17            THE COURT:  All right.  Well, let me just say

18    Paragraph 8 of the supplemental motion, a pretty general

19    statement.  And it begins, as set forth in the declaration

20    of Ephraim Diamond pursuant to Local Bankruptcy Rule 1007-2,

21    that's the first-day declaration, and in testimony at the

22    first-day hearing, debtors demonstrated that other cash

23    collateral would increase.  That's the invocation.  Would

24    increase, I should say, between the petition date and the

25    end of the interim period.  And then you again reference to

Page 36

1    it in same declaration in the following paragraph.  Oh, no,

2    sorry.  Then you pivot to the next declaration for Mr.

3    Diamond.

4           All right.  Well, look, Mr. Bassett, let me just

5    flip to you.  So I just want to make sure this isn't -- even

6    though you've got me to endorse your position already, but

7    I'm essentially being asked to reconsider that.  What's that

8    going to do to the efficacy of today's hearing?  And what's

9    the harm, really?

10          MR. BASSETT:  The harm, Your Honor, and the basis

11   for the objection is prejudice.  The reference to

12   declarations, exhibits, any other evidentiary matter or any

13   other facts in a brief does not make them evidence.

14          THE COURT:  Right.

15          MR. BASSETT:  Does not make them part of the

16   record at a hearing.  As Your Honor appropriately

17   recognized, we had procedures that were painstakingly

18   discussed through a lengthy status conference before the

19   Court and agreed upon by the parties.  There was a deadline

20   to exchange witness and exhibit lists.  This is not on their

21   exhibit list.  And Your Honor, it's more than -- the issue,

22   too, is the first-day hearing.  It went as all first-day

23   hearings do, which is on very, very short notice.

24          THE COURT:  Right.

25          MR. BASSETT:  So we had received his first-day

Page 37

1   declaration on the eve of that hearing.  Yes, I did

2   cross-examine Mr. Diamond, but that was on a moment's

3   notice.  For that reason, when the Court asked if Flagstar

4   objected to the declaration coming into evidence, it was

5   with the caveat that it would only be for purposes of the

6   first-day hearing.  Had I known that they were going to

7   offer that same testimony for the second-day hearing, I

8   would have looked over it in detail and been prepared to

9   address whatever I needed to address, either through

10   objections to testimony coming in on direct or through

11   cross-examination.

12         Now, the debtors seem to really think that they

13   need something in that declaration.  If they can point out

14   what it is they're relying upon, maybe that would help.  But

15   at this juncture, Your Honor, it's simply prejudicial.

16         THE COURT:  Okay.  Yeah, yeah.  Go ahead, Ms.

17   Barrington.

18         MS. BARRINGTON:  Your Honor, I believe that at the

19   deposition, Mr. Diamond's declaration, first-day

20   declaration, was entered into as an exhibit.

21         THE COURT:  As an exhibit?

22         MS. BARRINGTON:  Yes.

23         MR. BARRETT:  Because I asked him -- that's

24   because I asked him questions about it, Your Honor.  I don't

25   know --

Page 38

1          THE COURT:  So, yeah, admission -- so, yeah, the

2    use of a document as an exhibit at a deposition doesn't

3    establish admissibility at the subsequent hearing.

4          All right.  I mean, I'm -- I will admit -- I'm

5    just going to admit I find this frustrating because we

6    worked very hard to tee this up and be ready to present

7    testimony and get your issues resolved, which are very

8    time-sensitive and important.  Was there -- so I think what

9    Mr. Bassett said is right, that we had a lengthy discovery

10   conference and then a follow-up yesterday at which -- but is

11   there anything -- did I specifically identify a requirement

12   to identify declarations on which -- that were going to be

13   submitted as direct --

14         MR. BASSETT:  Yes, Your Honor.

15         THE COURT:  -- today?

16         MR. BASSETT:  The deadline for the debtors to

17   submit their declarations in support of their supplemental

18   cash collateral motion was a week before last Friday.

19         THE COURT:  Right, and that appears where?  On the

20   transcript of the June 13th --

21         MR. BASSETT:  Yes, Your Honor.  Yes, Your Honor.

22         MR. SLACK:  So what we were supposed to do, Your

23   Honor, is identify witnesses, which Mr. Diamond is.  And

24   again, I'm really at a loss here to understand the

25   prejudice.  You have a document which was disclosed as part

Page 39

1    of the supplemental motion.  And the key about calling it a

2    supplemental motion, Your Honor, is it adds on to the first

3    day.  It's not a motion in and of itself.  There was no --

4    and since it was already admitted, there was no reason that

5    it has to be readmitted as part of the same process.  You

6    had a motion.  You now have the supplemental motion.  And

7    the idea that somehow there's a procedural issue with

8    continuing to refer to a document which was admitted into

9    evidence in the original already, it doesn't make, to me, a

10   lot of sense.

11            THE COURT:  All right.  Yeah, let me jump in.

12   Let's do the painful exercise of looking at the first-day

13   declaration and explain to me what you actually need, and

14   then I'll ask Mr. Bassett to explain what the problem is on

15   a more -- in a less sort of academic, broad level.

16            MR. SLACK:  So Your Honor, we're happy to do that.

17   Would you like us to take a five- or ten-minute break?

18            THE COURT:  Yeah.  Look, let's -- yeah, let me --

19   that's a good idea.  Let me -- I'm going to take a short

20   break.  Let's let the debtor team look through it and figure

21   out what they want to rely on.  While you're doing that,

22   please talk to the Flagstar team.  I will say I really don't

23   want, you know, Flagstar to be prejudiced or blindsided, but

24   I also don't want them to be unreasonably obstructionist and

25   keep necessary and fairly objective background information

Page 40

1    out of the record just because it wasn't listed.  Okay.  So

2    see where you can get.  I'll give you, I'll say, five

3    minutes because saying more makes it even worse.  I'll send

4    somebody out to stare at you at 12:30.  It's now 12:23 and a

5    half.  And we'll try to resume on the record quickly.

6            MR. SLACK:  Thank you, Your Honor.

7            THE COURT:  Okay.  Thank you all.  So we're

8    adjourned temporarily.

9            CLERK:  All rise.

10      (Recess)

11            THE COURT:  Okay.  Back on the record after a

12   break.  Did anything beneficial happen?

13            MS. BARRINGTON:  Yes, Your Honor.  I think you'll

14   be pleased to hear that we have agreed to just submit Mr.

15   Diamond's first-day declaration, Paragraphs 1 through 6, and

16   Flagstar does not object to that.

17            MR. BASSETT:  No objection, Your Honor.

18            THE COURT:  Okay.  So, thanks.  Okay.  So I will

19   receive the first-day declaration, which is at ECF Number

20   10, solely Paragraphs 1 through 6, and I think I've already

21   said that ECF Number 40, the supplemental declaration is

22   also received.

23            (Exhibit Docket ECF Number 10, Paragraphs 1-6

24            entered into evidence.)

25            MS. BARRINGTON:  Thank you, Your Honor.

1              THE COURT:  Okay.  Thanks.  All right.  And thank

2     you -- sorry.  Thank you for working that out.  Okay.  Now I

3     think you're ready to call Mr. Diamond, yes?

4              MS. BARRINGTON:  Yes.  Mr. Diamond is available

5     for cross-examination.

6              THE COURT:  Okay.  Oh, come on up.  I'm sorry,

7     sir.  And you have to make your way around, and you're

8     heading for that spot there, which is the witness stand.

9     And please remain standing and raise your right hand.  Do

10    you solemnly swear or affirm that all the testimony you are

11    about to give before this Court will be the truth, the whole

12    truth and nothing but the truth?

13             MR. DIAMOND:  I so affirm.

14             THE COURT:  Thank you very much, and you can be

15    seated.  And then please just state your name for the

16    record.  And just so you understand, that little horizontal

17    thing in front of you is a microphone, and things go best if

18    you speak in its direction.

19             MR. DIAMOND:  My name?

20             THE COURT:  Yes.  So say your name and just -- and

21    spell it, if you would, just for the record.

22             MR. DIAMOND:  Ephraim Diamond, E-P-H-R-A-I-M, D-I-

23    A-M-O-N-D.

24             THE COURT:  Perfect.  Thank you.

25             MS. BARRINGTON:  Your Honor, before he begins, may

Page 42

1    I just approach with copies of the declaration for the

2    witness?

3              THE COURT:  Yes.

4              MR. BASSETT:   Thank you.

5              MR. DIAMOND:   Thank you.

6              THE COURT:  Oh, right.  Before we get going on

7    examination, so the federal -- who was it -- the U.S. court

8    system has decreed that testimony that occurs live in court

9    is not allowed to be broadcast.  So at this point, we have

10   to kick all non-case participants who are watching remotely

11   out, and they're going to go into either a waiting room or

12   they can be readmitted later at the conclusion of the

13   testimonial portion of the hearing.  This could last a

14   while.  I have no idea.  It could.  So my courtroom deputy

15   will be taking care of that.  Of course, the testimony can

16   proceed live once that's done.  Let me just ask if we're

17   set.

18             MR. FRIEDMAN:  Your Honor?

19             THE COURT:  Yeah, who's that?

20             MR. FRIEDMAN:  Michael Friedman, of Chapman and

21   Cutler.  I don't believe you asked for notice of appearance

22   from Zoom participants.   But I did file a notice of

23   appearance in this case on behalf of Mishmeret Trust Company

24   Services, Limited.

25             THE COURT:  Okay.  Thanks.  Then I'll deem you a

Page 43

1   case participant and therefore entitled to watch remotely.

2          MR. FRIEDMAN:  Thank you, Your Honor.

3          THE COURT:  So the requirement is that, again,

4   non-case participants, which means members of the press,

5   members of the public are not entitled to watch sort of --

6   and I'll leave it to that.  I don't want to have to get into

7   parsing who is and isn't a participant, but I'm comfortable

8   with Mr. Friedman qualifying.

9          MR. FRIEDMAN:  Thank you, Your Honor.

10          THE COURT:  All right.  Yes.  Oh, and I got

11   confirmation from a knowledgeable staff on that point.

12   Okay.  We can go ahead now.  Thanks very much.

13          MR. BASSETT:  Thank you, Your Honor.  May my

14   colleague approach Your Honor with copies --

15          THE COURT:  Yes.

16          MR. BASSETT:  -- (indiscernible) for

17   cross-examination?

18          THE COURT:  Yes, and I was going to say, and

19   you'll provide for opposing counsel, but I see you just did.

20          MR. BASSETT:  We have two for the Court, and we

21   have one for the witness, if that --

22          THE COURT:  Okay.  Great.  You can hand me both.

23   Thank you.  I'll just memorialize, counsel for Flagstar has

24   distributed to the witness and court personnel and debtors'

25   counsel a binder called "E. Diamond Exam Materials" that I

Page 44

1  assume is going to be exhibits about which the witness will

2  be questioned.  And you can go ahead, Mr. Bassett.

3          MR. BASSETT:  Thank you, Judge.

4              CROSS-EXAMINATION OF EPHRAIM DIAMOND

5  BY MR. BASSETT:

6  Q    Mr. Diamond, good afternoon.

7  A    Good afternoon.

8  Q    Now, Mr. Diamond, if you -- I was going to tell you to

9  turn to Tab 1 in your binder, but I know you also have a

10  copy of your most recent declaration in front of you.  Can

11  you please turn to the exhibit A to that declaration, sir?

12  A    Okay.

13  Q    Now, Mr. Diamond, what appears at Exhibit A here, that

14  is the cash collateral budget that you are offering to the

15  Court as part of the debtors' request for relief at the

16  second-day hearing, right?

17  A    That's correct.

18  Q    And is it correct, Mr. Diamond, that you present the

19  information that's contained in this budget on a

20  consolidated basis across all the debtors, right?

21  A    That's correct.

22  Q    Okay.  But you are in fact aware, Mr. Diamond, that the

23  debtors do, in the ordinary course, generate property by

24  property budgets for each debtor?

25  A    They generate property by property like P&Ls every

Page 45

1   month for the debtors.  And they're the debtors -- well,

2   before they were debtors, but they had prepared a kind of

3   pro forma budget ahead of time on a debtor-by-debtor basis.

4   Q    And in fact, the debtors in the ordinary course would

5   create an annual budget on a property-by-property basis,

6   correct?

7   A    Again, I can only -- what I know is that they had one

8   thinking ahead towards '25.

9   Q    And so in fact they had a property-by-property budget

10  that they created in December of 2004 looking ahead to 2025,

11  right?

12  A    I don't know when it was created, but they had one that

13  was looking forward to 2025.  I don't remember the exact

14  month.

15  Q    So the debtors did create property-by-property budgets

16  looking forward to 2025?

17  A    Correct.

18  Q    And now in your declaration at, if you go back to

19  Paragraph 6, you (indiscernible) do a consolidated budget is

20  because for certain types of expenses such as repairs and

21  capex, you "cannot practically forecast them at an

22  individual entity level," right?

23  A    That is correct.

24  Q    Okay.  But you are aware, aren't you, that these

25  property-by-property budgets for 2025 that you say exist

Page 46

1    actually do include forecast for repairs on a property-

2    by-property budget, correct?

3    A    What they contain is the realities, the actual numbers

4    from the prior year.  And then they use that as a plugin for

5    each property, as, you know, for the forward looking,

6    correct?

7    Q    So it's a budget for 2025 on a property-by-property

8    basis, correct?

9    A    That is -- well, yes.

10   Q    And it includes --

11   A    You characterize that as a budget, but it's a buildup

12   of what they anticipate the cost will be next year.

13   Q    And it includes, among other line items of expenses in

14   that budget, repairs, correct?

15   A    Correct.

16   Q    It also includes, on a property-by-property basis,

17   projected expenditures for capex, right?

18   A    Again, it's based on the historicals.  And then they

19   plug that number in with maybe some adjustments for the

20   future, correct?

21   Q    Are you aware that I took the deposition of the

22   Pinnacle Management company's chief financial officer two

23   days after yours?

24   A    I'm aware generally that you did, yes.

25   Q    Are you aware that he told me that the debtors'

Page 47

1    property-by-property budgets, including capex?

2              MS. BARRINGTON:  Objection, Your Honor.

3              THE COURT:  Basis?

4              MS. BARRINGTON:  He's asking Mr. Diamond whether

5    or not he read the deposition of this chief financial

6    officer.  I'm not -- I'm not sure --

7              MR. BASSETT:  I didn't ask him if you read it,

8    Your Honor.  I just asked if he was aware of the testimony.

9              THE COURT:  So yeah, that's --

10             MS. BARRINGTON:  It assumes facts not in evidence.

11             MR. BASSETT:  The entire deposition transcript is

12   in evidence, Your Honor?

13             THE COURT:  Is?  Is or is not in evidence?

14             MR. BASSETT:  It is.

15             THE COURT:  Who's the individual?

16             MR. BASSETT:  It's the chief financial officer of

17   the Pinnacle Management company.  It's the one deposition

18   that the Court --

19             THE COURT:  No, I know.  Yes, and that's in

20   evidence for this proceeding?

21             MR. BASSETT:  Yes, the entire deposition.

22             MS. BARRINGTON:  Your Honor, it's also hearsay.  I

23   mean, he's asking Mr. Diamond whether or not it's true that

24   Mr. Weinberger testified to a certain fact.

25             MR. BASSETT:  I asked if he was aware of the

Page 48

1    testimony.  I didn't ask him (indiscernible) --

2              THE COURT:  Look, yeah, hang on.  I'm not sure

3    what the -- what's the relevance of the question being put

4    in terms of testimony of another person as opposed to

5    just --

6              MR. BASSETT:  Well, you know what, Your Honor,

7    that whole deposition transcript is in the record.  I'll

8    reference it during argument, and I can move on.

9              THE COURT:  Okay.  Well, you can -- if you want

10   it, you can just ask the question about the substance of the

11   question you just put, just without the attribution.

12             MR. BASSETT:  That's fine, Your Honor.

13             THE COURT:  Okay.

14             MS. BARRINGTON:  Thank you, Your Honor.

15   BY MR. BASSETT:

16   Q    Now, Mr. Diamond, as you testified previously in this

17   case, and as set forth in your declaration that's before

18   you, as part of the debtors cash management system, the

19   debtors are commingling their funds into a central operating

20   account and then also a central disbursement account at

21   JPMorgan, right?

22   A    I'm sorry.  Can you repeat?  Are they --

23   Q    So as part of their cash management system, they are as

24   part of that process commingling their funds into both a

25   centralized operating account and a centralized disbursement

Page 49

1    account that are at JPMorgan, correct?  At JPMorgan,

2    correct?

3    A    That's correct.

4    Q    And now before the funds go into the centralized

5    operating account, they first flow into various holdco

6    accounts, correct?

7    A    That is correct.

8    Q    And when the debtors' funds are in those holdco

9    accounts, they are sometimes commingled with funds of other

10   debtors, correct?

11   A    The way the rents -- so to explain the way the rents

12   come in through the click pay system is that tenants pay

13   their rents and then they -- those rents go into the

14   centralized bank accounts and then every day we sweep out

15   the debtors' monies into the Chase account that you

16   referenced, correct?

17   Q    But when they're in holdco accounts, they're in there

18   with funds of other debtors?

19   A    Correct.  But they're being held in trust for the

20   debtors.

21   Q    And they also may be in those same holdco accounts with

22   non-debtor funds, correct?

23   A    Presumably.  I don't know.

24   Q    Now in addition, as part of the relief that the debtors

25   are seeking at the second-day hearing here today, the

Page 50

1   debtors are requesting permission to use funds that are in

2   the centralized operating account for the debtors to allow

3   debtors to pay expenses for other debtors such as for

4   repairs and taxes, correct?

5   A    We are asking for that permission in case that

6   situation were to arise where we otherwise would have no

7   other access to cash at that particular debtor in case of an

8   emergency.  So for instance, at the end of the month when we

9   paid payroll and the water breaks or the elevator breaks on

10  a day like today and we need to do an emergency repair, we

11  may, if necessary, we're asking for permission to borrow

12  money from one debtor so that we can fix the elevator so our

13  80-year-old tenants don't need to walk up with their

14  groceries.  Yes.

15  Q    Right, and so in that situation, to the extent that

16  happens, those payments would be accounted for, as you

17  propose in the motion and in the proposed order,

18  intercompany claims between the debtors that would be given

19  administrative expense status, correct?

20  A    It's my understanding that we've asked for them to have

21  -- I think you think you call it administrative priority

22  expense.  Exactly.

23  Q    But they would be accounted for by intercompany claims?

24  A    They'd be accounted for as an, I guess, an intercompany

25  claim.  Yes.

Page 51

1   Q    You are aware that each of the 82 debtors in this case

2   is a limited liability company, correct?

3   A    Correct.

4   Q    And you understand that the debtors as limited

5   liability companies are governed by limited liability

6   company operating agreements?

7   A    Presumably.

8   Q    Do you know whether the debtors' intercompany -- or

9   sorry, strike that.

10       Do you know whether the debtors' limited liability

11  company operating agreements allow them to commingle their

12  funds with those of their affiliates?

13           MS. BARRINGTON:  Objection, Your Honor.  I think

14  this is now going beyond the scope of the supplemental

15  declaration that Mr. Diamond proffered.  I mean, perhaps if

16  the first-day declaration had been brought in in full, this

17  may have been appropriate.  But it's not within the scope of

18  the supplemental declaration, nor are they within the scope

19  of the background information that we entered into evidence

20  as part of the first-day hearing declaration.

21           THE COURT:  Can I get your response?  And also, I

22  need to hear the question again.

23           MR. BASSETT:  The question was whether or not --

24  he's already testified about the fact that funds are

25  commingled into a central operating account and then there's

Page 52

1    intercompany claims that are potentially going to be

2    developed per the order.

3             THE COURT:  Right.

4             MR. BASSETT:  I asked him if he's aware of the

5    limited liability company operating agreements that govern

6    the debtors.  And then I asked him a further question of

7    whether or not he's aware if those operating agreements have

8    provisions as to commingling of funds.  And I'm going to ask

9    him also as to intercompany claims.  And Your Honor, in the

10   second-day declaration that's before the witness and is

11   behind Tab 1 in our binder, there's an entire section on

12   cash management that talks about these centralized accounts,

13   and it also goes to generally the budget that he attaches to

14   his declaration.

15            THE COURT:  Yeah, I think you're right.  I'm going

16   to overrule the objection.  This is pertinent to the budget

17   whose approval is sought, which is attached to the

18   declaration, as well as to the direct testimony about cash

19   management.

20            MR. BASSETT:  And again, just in addition to that,

21   Your Honor, I just acknowledge that in the relief that

22   they're seeking before the Court, they are asking for

23   permission to do these intercompany --

24            THE COURT:  Well, now, you're repeating argument

25   points, so you can just -- but you can just -- why don't you

Page 53

1    restate your question?

2    BY MR. BASSETT:

3    Q    So the question was, do you know whether the debtors'

4    operating agreements permit them to commingle funds?

5    A    I do not.

6    Q    Do you know whether the debtors' operating agreements

7    permit them to make loans to other entities?

8    A    I do not.

9    Q    You are aware that the lead debtor in the caption of

10   this case is an entity named Broadway Realty I Co., LLC; is

11   that right?

12   A    That is correct.

13   Q    I'd like you to look behind Tab 7 of your binder,

14   please.

15        MR. BASSETT:  This document, for the record, is in

16   evidence at FX-42 that was admitted at the beginning of

17   today's proceedings.

18   BY MR. BASSETT:

19   Q    Mr. Diamond, have you seen this document before?

20   A    Sitting here, I can't say that I have.

21   Q    And you see at the top of the first page, it says

22   "Fourth Amended and Restated Operating Agreement of Broadway

23   Realty I Co., LLC"?

24   A    Yes.

25   Q    I'd like to direct your attention to internal Page 8 of

Page 54

```
 1   the document.  Actually, Page 7.  And there's a provision

 2   that says "Article 9: Separateness".  Do you see that?

 3   A    Yes.

 4   Q    Mr. Diamond, could you read for me the first paragraph

 5   under that separateness before it gets to Section 9.1?

 6   A    "In order to preserve and ensure its separate and

 7   distinct limited liability company identity, in addition to

 8   the other provisions set forth in this agreement, and

 9   notwithstanding anything to the contrary contained elsewhere

10   in this agreement, the company shall conduct its affairs in

11   accordance with the following provisions."

12   Q    Mr. Diamond, could you go to the next page and read

13   Section 9.7 for me?

14   A    9-point?

15   Q    9.7.

16   A    "It has not made and will not make any loans or

17   advances to any third party, including any affiliate of the

18   company or constituent party of the company, and shall not

19   acquire obligations or securities of its affiliates."

20   Q    Mr. Diamond, were you aware of this provision in this

21   or any other operating agreement of the debtors prior to

22   filing the motion for use of cash collateral?

23   A    Was I aware of --

24   Q    This provision?

25   A    I don't -- not that I can say no.
```

Page 55

1    Q    Are you aware of whether the other operating agreements

2    for the debtors contain provisions similar to this one?

3    A    I do not.

4    Q    Mr. Diamond, could you please read the first sentence

5    of Section 9.9 up to the provided?  Actually, can you please

6    read Section 9.9 for me?

7    A    The whole thing?

8         THE COURT:  You mean aloud or do you want him to

9    familiarize himself with it pending a question?

10        MR. BASSETT:  You know what?  I'll do it a quick

11   way.

12   BY MR. BASSETT:

13   Q    Mr. Diamond, Section 9.9, it states, "It will maintain

14   all of its books, records, financial statements and bank

15   accounts separate from those of its affiliates," and then it

16   goes on.  Do you see that language, Mr. Diamond?

17   A    I do.

18   Q    Were you aware of this provision before the debtors

19   filed their cash collateral motion?

20   A    Not that I can recall.

21   Q    Do you know whether other operating agreements of the

22   debtors contain provisions similar to this one?

23   A    I do not.

24   Q    Mr. Diamond, you are aware that Flagstar has

25   outstanding loans to each of the debtor entities, correct?

Page 56

1    A    Correct.

2    Q    And I assume you understand that those loans are

3    memorialized by certain agreements?

4    A    Yes.

5    Q    Do you know whether the agreements governing Flagstar's

6    loans contain any restrictions on the debtors' ability to

7    commingle their funds?

8    A    I can't recall that.

9    Q    Do you know whether those agreements contain any

10   restrictions on the debtors' ability to make intercompany

11   loans?

12   A    Offhand, I don't know.

13   Q    Mr. Diamond, I'd like to direct your attention to the

14   document behind Tab 8 in your binder?

15            THE COURT:  Before you move on, can I ask, what's

16   the exhibit number of the document we were just -- you were

17   just questioning based on?

18            MR. BASSETT:  Yes, Your Honor.  That was FX-42.

19            THE COURT:  Thank you.

20            THE WITNESS:  So what am I turning to?

21   BY MR. BASSETT:

22   Q    Sorry.  Tab 8 in your binder, please, sir.  Do you

23   recognize this document, Mr. Diamond?

24   A    I don't recognize it, but I see what it is.

25   Q    And if I would -- if you could turn the page, so the

Page 57

1    document says CMEA Page 6 at the bottom, which is about six

2    pages in.

3    A    Okay.

4    Q    You see it contains a list of attached schedules?

5    A    Sorry, CMEA Page 8, you said?

6    Q    Page 6.  I'm sorry.

7    A    Okay.

8    Q    And you see that there's a reference to an Exhibit C?

9    A    I do.

10   Q    If you turn to CMEA Page 8, you see where it says

11   "Mortgage, assignment of leases and rents and security

12   agreement" at the top?

13   A    I do.

14   Q    And then there's a reference below to the borrower

15   being Broadway Realty I Co., LLC.

16   A    I do.

17   Q    That's the lead debtor in this case, correct?

18   A    Correct.

19   Q    Mr. Diamond, I would like you now to turn to page --

20   CMEA Page 40 at the bottom.

21   A    Okay.

22   Q    Do you see where it says "Article 9: Single-purpose

23   Entity"?

24   A    Yes.

25   Q    And then Section 9.2, it says, "Single-purpose entity.

Page 58

```
 1   Borrower represents warrants and covenants that borrower did
 2   not previously and in the future will not and shall not, so
 3   long as loan is outstanding," and then it goes on.  And it
 4   says in C, "Take any actions or suffer any omissions that
 5   would cause its assets to be commingled with the assets of
 6   another person or which would render it difficult to
 7   segregate and identify its assets, including any of the
 8   following."  Do you see that?
 9   A    I do.
10   Q    Were you aware of this provision and Flagstar's loan
11   documents before filing the motion with the Court?  The cash
12   collateral motion?
13   A    I don't believe so.
14   Q    Are you aware of whether this provision appears in
15   every one of Flagstar's loan documents?
16   A    I don't know.
17   Q    On Page 41, Section 7, it says, "Investments," and it
18   says, "Make a loan or advance to a person or purchase or
19   otherwise acquire any capital stock, assets, obligations or
20   other securities of, or make any capital contributions to,
21   or otherwise invest in or acquire any interest in any
22   person."  Do you see that?
23   A    I do.
24   Q    Were you aware of this provision before filing the
25   motion for use of cash collateral with the Court?
```

Page 59

1   A     No.

2   Q     Do you know whether it appears in any of the other loan

3   documents of Flagstar?

4   A     I do not.

5               THE COURT:  Sorry.  Where did that passage come

6   from?

7               MR. BASSETT:  It was on Page 41, Your Honor.

8   Subsection seven of Section 9.2.

9               THE COURT:  Okay.  Thank you.

10  BY MR. BASSETT:

11  Q     Mr. Diamond, isn't it true that the debtors started

12  preparing for bankruptcy about around the time that Flagstar

13  initiated its receivership proceedings against the debtors

14  in March of 2025?

15  A     It's true that as a result of the filing, it became

16  a -- we started contemplating whether that would have to be

17  a necessary path for us.

18  Q     And it's correct that the debtors started working on,

19  for example, the 13-week cash flow forecast by mid-April?

20  A     I don't remember the exact date.

21  Q     Fair to say that the debtors had been working on that

22  budget for several weeks at least prior to filing their

23  Chapter 11 petitions?

24  A     Certainly a couple of weeks.

25  Q     Take a look at Tab 10 in your binder.

Page 60

1          MR. BASSETT:  And this is FX-40.  And for the

2     record, Your Honor, I don't know if I said it or not, but

3     the last document that the witness was being asked about was

4     FX-43.

5          THE COURT:  Thank you.

6     BY MR. BASSETT:

7     Q    Mr. Diamond.  FX-40 is an email chain that you were

8     included on, correct?

9     A    Correct.

10    Q    And the subject matter is form 13-week budget.

11    A    Yes.

12    Q    And the email change started back on April 3rd of 2025,

13    right?  If you go to the --

14    A    Yes.

15    Q    Now, when preparing your budget, whether it was since

16    April 3rd, leading to the petition date, or at any given

17    point in time, as part of that exercise, as part of

18    preparing the budget, you reviewed the debtors' past

19    performance, correct?

20    A    We started to request that information, yes.

21    Q    As part of preparing your budget, you generally review

22    the debtors' past performance, correct?

23    A    Correct.

24    Q    And that's because the debtors' past performance

25    obviously bears on their expected future performance,

Page 61

1    correct?

2    A    Sure.

3    Q    Now, when it comes to recent past performance, you've

4    told me, including in your deposition, that the debtors

5    generated positive net operating income of approximately $2

6    to $3 million per month for each month in 2025 from January

7    through May, correct?

8    A    Collectively, yes.

9    Q    The debtors collectively, on a per month basis, in 2025

10   generated about $2 to $3 million per month in net operating

11   income, correct?

12   A    Correct.

13           MS. BARRINGTON:  Objection, Your Honor.  Again, I

14   think this is now going beyond the scope of his supplemental

15   motion declaration, which does not talk about what revenue

16   was generated from before the debtors filed for bankruptcy;

17   prepetition, in other words.  This declaration only focuses

18   on the budget on a going-forward basis.

19           THE COURT:  No, I understand.  I guess the issue

20   is -- an issue in the case is -- well, what is the response

21   to that?

22           MR. BASSETT:  The response to that, Your Honor, is

23   that he is the witness who is being offered to testify about

24   the budget they're asking the Court to approve.  He's the

25   individual who has testified that he prepared that budget is

Page 62

1    purportedly standing behind reasonableness.  And that is a

2    central issue for the Court today.  We're talking about the

3    budget.  We're talking about valuation issues.  Those are

4    the (indiscernible) --

5                 THE COURT:  Yeah.  How does your question go to

6    the reasonableness or achievability or other attributes of

7    the budget that are in dispute on the motion?

8                 MR. BASSETT:  Because he just, as I just

9    established, he testified that you have to look at past --

10   past performance obviously bears on future performance.  And

11   to the extent that there are unsettled or unknown issues

12   that he couldn't figure out with respect to what happened in

13   the past, it bears on the accuracy of the forecast.

14                THE COURT:  Okay.  Yeah, I'm going to overruled

15   the objection.  I think that's a fair question for the

16   reason stated.

17   BY MR. BASSETT:

18   Q    So you testified that for the first five months in

19   2025, on a collective basis, the debtors generated

20   approximately $2 to $3 million in net operating income,

21   correct?

22   A    Correct.

23   Q    All right.  Now, you also have acknowledged, including

24   at the first-day hearing in this case when I cross-examined

25   you, that the debtors did not pay any debt service to

Page 63

1      Flagstar since January 2025, right?

2              MS. BARRINGTON:  Objection.  Again, I mean, Your

3      Honor, this -- on relevance.  We're talking about the

4      go-forward budget here in these proceedings.  I'm not sure

5      what any decisions that the debtors made prepetition factors

6      into the go-forward budget in this case.

7              MR. BASSETT:  Your Honor, I'd like to --

8              THE COURT:  Yeah, I mean -- well, I should let you

9      explain the relevance of your own question.  So let me do

10     that.

11             MR. BASSETT:  I think it'll become very clear.

12     Yeah, I think it'll become very clear shortly how this is

13     all relevant, Your Honor.  First of all, as I said and as

14     the witness acknowledged, you cannot project a budget on a

15     go-forward basis without understanding the debtors' past

16     financial performance and the accuracy of that performance

17     because if there are questions about it, then obviously that

18     bears on whether or not it makes sense to look at past

19     projections in formulating a go-forward budget.  In

20     addition, they've relied on and testified to this Court the

21     fact that their purportedly was a $0 cash balance at the --

22     that's a repeated statement they made.

23             THE COURT:  Right.

24             MR. BASSETT:  There's a $0 cash balance in the

25     petition date.  And the questions I'm going to ask go

Page 64

1    directly to that.

2            THE COURT:  Okay.  I'm going to overrule the

3    objection.  But I'm also going to say, bear in mind that you

4    risk opening the door to revisiting the first-day

5    declaration.

6            MR. BASSETT:  Understood, Your Honor.

7            THE COURT:  I should say reopening the door to my

8    prior evidentiary ruling excluding most of that.  So go

9    ahead.

10   BY MR. BASSETT:

11   Q    And the question was, sir, that you've acknowledged in

12   your deposition and during your first day testimony that

13   despite having that operating income of $2 to $3 million per

14   month in 2025, the debtors did not pay any debt service to

15   Flagstar, correct?

16   A    From my understanding, and that was before I was CRO.

17   But my understanding is that in January, some of the debt

18   service was in fact paid.

19   Q    Okay.  But after some point in January, including in

20   February, March, April and May, the debtors have not paid

21   any debt service to Flagstar, correct?

22   A    To the best of my knowledge.

23   Q    Okay, and as we were just discussing in the colloquy

24   that occurred a moment ago, you've also represented to the

25   Court that at least your position is that the debtors had a

Page 65

1   $0 cash balance collectively on the petition date, correct?

2   A    That is correct.

3   Q    Okay.  So in other words, by the time of the petition

4   date, this $2 to $3 million in net operating income that the

5   debtors had collectively been generating per month was gone,

6   correct?

7              MS. BARRINGTON:  Objection.  Again, Your Honor, I

8   don't see the relevance of this testimony.  We are again

9   asking questions about prepetition.  The first-day

10  declaration they wanted struck.

11             THE COURT:  Yeah, I'm going to --

12             MR. BASSETT:  And Your Honor, apologies

13  (indiscernible) --

14             THE COURT:  It's cumulative.  Yeah.  Yeah.  Isn't

15  it?  I mean, is this -- does this really add anything to

16  what you just got, Mr. Bassett?

17             MR. BASSETT:  It certainly goes to -- the

18  questions that I'm going to ask certainly go to the

19  credibility of the witness.  And, Your Honor, they have been

20  stressing to the Court part -- one of the arguments that

21  they have relied upon from day one in this case, which is

22  wrong as a matter of law, don't get me wrong, is that on the

23  petition date, the debtors had zero money.

24             THE COURT:  Yeah.

25             MR. BASSETT:  They had zero dollars, and therefore

Page 66

1   any positive cash flow that occurs going forward is adequate

2   protection for Flagstar.  I think that's fundamentally not

3   true.

4           THE COURT:  So you've just established that there

5   was aggregate net positive cash flow of $2 to $3 million a

6   month, at least according to this witness and yet a zero

7   cash balance collectively among the debtors.

8           MR. BASSETT:  I have limited questions about where

9   it went, Your Honor.  I have four questions, three

10  questions.

11          MR. FAIL:  Your Honor, Garrett Fail, Weil, for the

12  debtors.  This is like partial testimony going in from the

13  first-day hearing because there was also testimony at the

14  first-day hearing that cash collateral balance is zero.

15  There was testimony in the first-day declaration that was

16  not admitted today and is not part of the testimony that

17  there were a number of debtor accounts.  Certain debtor

18  accounts for deposits was talked about.  Other deposits,

19  other banks, other debtors had deposits.  There's testimony,

20  right?  It's in the record, but it's not before you today

21  right now.  But it wasn't that cash was zero.  So I want to

22  make it very clear.  This is not what the testimony was.

23  There's no evidence, and we're not going to hear it through

24  this question, that cash collateral, meaning cash in

25  Flagstar's possession, where they had possession and a lien

Page 67

1    or a DACA, will come out.  There is also no evidence --

2              THE COURT:  Hang on.  Does this go to the --

3              MR. FAIL:  I don't know where this is going is my

4    point.

5              THE COURT:  No.  What's your -- I'm just trying to

6    resolve an objection.

7              MR. FAIL:  It's a misstatement.  It's a

8    misstatement of the record that there was testimony

9    exclusively that there was zero cash.  There was testimony

10   that there was cash in bank accounts, not with

11   (indiscernible) --

12             THE COURT:  Hang on.  Let me shut you down,

13   because you're getting into argument.  So --

14             MR. FAIL:  Well, this is going nowhere.  There's a

15   difference between cash and cash collateral, and I think

16   there's no cash collateral --

17             THE COURT:  No, no, no.  Stop.  Stop, Mr. Fail.

18   Okay.  Let me just hear the question again.  I want to

19   get -- I've heard so much.  I need to get my head around the

20   question.

21             MR. BASSETT:  He's testified that there was a $2

22   to $3 million net operating income.  There's $2 to $3

23   dollars per month collectively in that operating income at

24   the debtors.

25             THE COURT:  Okay, and what's your next question?

Page 68

1          MR. BASSETT:  My next question was, and he already

2     testified that there was a $0 cash balance on the petition

3     date.  He just testified to that.

4          THE COURT:  Yeah, I know.  I'm waiting to -- and

5     your --

6          MR. BASSETT:  Sorry, Your Honor.  And then my next

7     question was, and so whatever net operating income that the

8     debtors generated according to you was gone as of the

9     petition date.

10         THE COURT:  You can ask that question.  I mean,

11    where I started was when I called this cumulative, it seems

12    like that's a kind of a necessary implication of the two

13    prior answers you elicited.

14         MR. BASSETT:  I'm just trying to put two and two

15    together, Your Honor.  I apologize.  And I have three more

16    questions on this topic.

17         THE COURT:  Okay.  So you can -- so I'm perceiving

18    that you're withdrawing that question in light of my

19    observation, and now you can ask your next one.

20         MR. BASSETT:  (Indiscernible), Your Honor.

21    BY MR. BASSETT:

22    Q    And you don't know where the $2 to $3 million in that

23    operating income per month went, correct?  You testified to

24    that at the first-day hearing, right?

25    A    Do I know --

Page 69

1    Q    You don't know where the $2 to $3 million per month and

2    net operating income at the debtors went, do you?

3    A    I do not.

4    Q    And you told me at your deposition that you asked the

5    CFO where it went, the CFO of the debtors' management

6    company, correct?

7    A    That is correct.

8    Q    You aware that I took his deposition?  You are now,

9    correct?

10          MS. BARRINGTON:  Objection, Your Honor.  I think

11   we're back at the same place where he's asking --

12          MR. BASSETT:  One more question --

13          THE COURT:  Hang on.  Hang on.  Was that a

14   question?  Are you aware that the deposition was taken, full

15   stop?

16          MR. BASSETT:  He is (indiscernible) aware,

17   correct?

18          THE COURT:  That's not objectionable.  So you're

19   aware that there was a deposition?

20          THE WITNESS:  I heard that his deposition was

21   taken.  Yes.

22          THE COURT:  Okay.

23   BY MR. BASSETT:

24   Q    Would it surprise you if no one -- would it surprise

25   you if he testified that no one had ever asked him what

Page 70

1    happened to that money?

2    A    It would.

3    Q    Thank you.

4         MR. BASSETT:  I'm done, Your Honor.

5    BY MR. BASSETT:

6    Q    Now, I want to focus your attention on the budget

7    attached as Exhibit A to your declaration.  In particular,

8    I'd like to focus your attention on the line item in the

9    budget for professional fees, which is Line 23 in the very

10   small fonts.

11   A    Okay.

12   Q    Now, over the next 13 weeks, according to that line

13   item, the debtors are projecting more than $9.7 million in

14   professional fees, correct?

15   A    Correct.

16   Q    And that that professional fee line item includes

17   projected fees for Weill & Gotshal, the debtors' counsel,

18   correct?

19   A    Correct.

20   Q    It also includes projected fees for FTI, correct?

21   A    Correct.

22   Q    And for Stretto, the claims agent?

23   A    For?

24   Q    Stretto.

25   A    Yes.

Page 71

1    Q    And it also includes the fees of your firm, Arbel

2    Capital Advisors, right?

3    A    Correct.

4    Q    Now, your budget does not actually break down those

5    fees, but they're all embedded in that $9.7 million number,

6    right?

7    A    Correct.

8    Q    And when I asked you at your deposition, you were not

9    able to tell me with any precision how that actually breaks

10   down among those firms, correct?

11   A    Correct.  I mean, yes.

12   Q    Now, I'd like to ask you some more questions about your

13   firm, by the way, just for the record, is called Arbel

14   Capital Advisors, correct, Mr. Diamond?

15   A    Correct.

16   Q    Okay.  Okay if I refer to that as Arbel for short?

17   A    Yes.

18   Q    Now, Arbel is engaged to provide services

19   simultaneously to all the debtors, to Zarasai Group, the

20   holding company, and to Zarasai's other non-debtor

21   subsidiaries, correct?

22   A    Correct.

23   Q    And those non-debtor affiliates would include LLCs that

24   own other properties that are subject to mortgage loans by

25   entities other than Flagstar, correct?

Page 72

1    A    Correct.

2    Q    Some of those other non-debtor affiliates would include

3    entities that are obligated on the Israeli bonds that we've

4    heard about, correct?

5    A    Yes.

6    Q    Now, I want to direct your attention please to Tab 18

7    in your binder.  Mr. Diamond, do you recognize this as the

8    organizational chart that you attach to your first-day

9    declaration?

10   A    Yes.

11   Q    And this shows Zarasai and then the debtor subsidiaries

12   and then intermediate non-debtor holding companies, correct?

13   A    Correct.

14   Q    I'd like to now direct your attention to -- and it

15   doesn't -- it does not include any non-debtor subsidiaries

16   other than those holding companies, right?

17   A    It does not include?

18   Q    Other non-debtor subsidiaries, other than holding

19   companies; for example, other property companies that are

20   non-debtors?

21   A    It doesn't appear to, no.

22   Q    Okay, I'd like to direct your attention to Tab 20 in

23   the binder, please, sir.

24            MR. BASSETT:  And just for the record, this Tab 20

25   has been marked as -- has been admitted as FX Exhibit 2.

Page 73

1              THE COURT:  What was 18?

2              MR. BASSETT:  That was just a reference to an

3    exhibit, or a document on the docket that was not -- it's

4    not admitted into evidence.

5              THE COURT:  Okay.

6    BY MR. BASSETT:

7    Q    Now, Mr. Diamond, FX Exhibit 2 displays the entire

8    organizational chart for the Zarasai Group, including both

9    debtor and non-debtor subsidiaries, correct?

10   A    I can't tell you it has every single one, but it

11   certainly has a lot.

12   Q    And so in addition to the debtors, there are, I don't

13   know, dozens of additional non-debtor subsidiaries.  Is that

14   fair to say?

15   A    It certainly has a number of them.  I don't know how

16   many exactly.  A lot of them are holding companies it looks

17   like, but --

18   Q    And now -- but this includes, for example, other LLCs

19   that are obligated on non-Flagstar mortgages, correct?

20             MS. BARRINGTON:  Objection, Your Honor.  Again,

21   now I think we're going beyond the scope of his supplemental

22   declaration and the paragraphs of his declaration from the

23   first day that were admitted.  None of the declarations

24   speak to the organizational structure of Zarasai.

25             MR. BASSETT:  Your Honor, the relevance --

1          THE COURT:  I'm going to sustain the objection

2    (indiscernible) --

3          MR. BASSETT:  I'd just ask for a little bit of

4    latitude to build to where I'm going.  This is very

5    relevant.  I'm asking about his fees that he charges to the

6    debtors, and he said he represents debtors and non-debtors.

7    This is going to be very, very relevant.

8          MS. BARRINGTON:  Your Honor, Mr. Bassett objected

9    to the entirety of the first-day declaration going in.

10          THE COURT:  Yeah, I know.  Yeah.  So let's ask

11   when do you -- why do you need this as a predicate for the

12   fee question?  The fee question, I agree, sounds relevant.

13   And if this --

14          MR. BASSETT:  The predicate to it is he said he's

15   representing all debtors and non-debtors.  There's never

16   been any evidence put before this Court that actually shows

17   the full picture of the non-debtor subsidiaries beneath

18   Zarasai.  That's why the contrast between this document and

19   the one I showed before I think is very important.

20          THE COURT:  Okay.  Hang on a sec.  Let me -- am I

21   right we're looking at Tab 20 of the witness binder you

22   prepared for Mr. Diamond, and what we're looking at is an

23   org chart that's in evidence, right, as FX-2?

24          MR. BASSETT:  That's correct.  FX-2 is in

25   evidence.  So it's relevant on that basis.

Page 75

1          MS. BARRINGTON:  Your Honor, my objection is in

2     part relevance, but it's also just outside the scope of his

3     --

4          THE COURT:  Yeah.  No, I understand you're raising

5     a scope of objection.

6          MS. BARRINGTON:  Yeah.

7          MR. BASSETT:  Your Honor, if I may (indiscernible)

8     --

9          THE COURT:  Yeah.  I'm going to sustain the

10    objection.  But you can get -- but I agree that what you're

11    building to is relevant and so I'll just let you get there.

12    BY MR. BASSETT:

13    Q    So, Mr. Diamond, under your -- well, by the way, could

14    you please turn to the Tab 14 of your binder?

15    A    Okay.

16          MR. BASSETT:  And for the record, the document

17    behind Tab 14 has been admitted into evidence as FX-15.

18    BY MR. BASSETT:

19    Q    Mr. Diamond, is this the current engagement letter

20    under which Arbel is providing services to debtors and

21    non-debtors?

22    A    It looks to be so, yes.

23    Q    And under this engagement letter, Arbel is entitled to

24    be compensated $35,000 per month, correct?

25    A    Correct.

Page 76

1    Q    And that compensates Arbel for work that's done both

2    for advising the debtors and for advising its non-debtor

3    affiliates, correct?

4    A    Correct.

5    Q    Now, since the petition date in this case, which was

6    May 21st, Arbel has in fact performed work both for debtors

7    and for non-debtors, correct?

8    A    Probably about 97 percent for the debtors and 3 percent

9    for not.

10   Q    I want to direct your attention to the document behind

11   Tab 15 in your binder.

12   A    Okay.

13            MR. BASSETT:   This has been admitted into evidence

14   as FX-10.

15   BY MR. BASSETT:

16   Q    This is an email chain involving you and members of the

17   Pinnacle Management Company team, correct?

18   A    It appears to be, yes.

19   Q    And if you go to the second page of the document,

20   you'll see about midway down the page, May 23, 2025, at

21   12:30 a.m., you sent an email that starts with, "Pinnacle

22   team."  Do you see that?

23   A    Which one?  I'm sorry?

24   Q    Second page, midway down on May 23, 2025.

25            THE COURT:   I'm just going to say for transcript

Page 77

```
 1    purposes, it's got a Bates stamp of Pinnacle 031498 at the

 2    bottom.

 3              THE WITNESS:  Okay.

 4    BY MR. BASSETT:

 5    Q    You see where it says Pinnacle Team?

 6    A    Correct.  Yes.

 7    Q    That's an email you wrote, correct?

 8    A    Yes.

 9    Q    And you say in the second sentence, "I wanted to

10    provide a brief update and, more importantly, make sure we

11    are all on the same page and keeping focus on the myriad

12    work streams taking place," right?

13    A    Yes.

14    Q    Now I want you to go to the next page.  The bottom of

15    the next page, Bates labeled Pinnacle 00031499.  There's a

16    reference to non-bankruptcy workstreams.  Do you see that?

17    Bottom of the page?

18    A    Yes.

19    Q    And then it's underneath that there's a reference to

20    working company-wide cash flow model.  Do you see that?

21    A    I do.

22    Q    And then on the next page you say you'll have FTI focus

23    their attention on this.  You see that?

24    A    Yes.

25    Q    And then the next bullet talks about Bond E.  And then
```

Page 78

1    within that description there's a reference to potential

2    workout options with the Bond E holders.  You see that?

3    A    I do.

4    Q    And then the next bullet talks about identifying the

5    Cond C CRO.  Do you see that?

6    A    I do.

7    Q    The debtors are not obligated on the Bond E bonds,

8    correct?

9    A    They are not.

10   Q    So this is an example of you and Arbel performing work

11   postpetition that relates to both debtors and non-debtors,

12   correct?

13   A    It's an email, the debtor asking the management company

14   to focus on a number of other workstreams, correct?

15   Q    Now --

16            THE COURT:  If you're pivoting topics, I just want

17   to ask about break timing.  It's 1:22.  I'm very -- I'm

18   flexible, but I also want to be kind to people and have you

19   think about an appropriate break point.

20            MR. BASSETT:  Sure, Your Honor.  I don't have a

21   whole lot more for the cross.  But I could definitely be at

22   a breaking point within like two minutes after another

23   question.

24            THE COURT:  That's fine.  Do you know how long the

25   total cross will be?

Page 79

1           MR. BASSETT:  Probably 10 more minutes.

2           THE COURT:  I'd rather get it done.  The debtors

3    are nodding.  Yeah, let's just keep going.

4    BY MR. BASSETT:

5    Q    Now, as you testified previously, your engagement

6    letter entitles you, Arbel, to compensation of $35,000 per

7    month for the work that you're performing for debtors and

8    non-debtors, correct?

9    A    Correct.

10   Q    But yet in your budget, which is attached as Exhibit A

11   to your declaration in the professional fees line item, you

12   have included the entire $35,000 per month fee in the

13   debtors' budget, correct?

14   A    I don't recall.

15   Q    You recall I took your deposition in this matter,

16   correct?

17   A    Yes.

18          MR. BASSETT:  Your Honor, may I approach?

19          THE COURT:  Yes.  Can you get there just by

20   reference to the budget?  Okay.  Go ahead.

21          MS. BARRINGTON:  Is this impeachment?

22          THE COURT:  I think it's refreshing recollection.

23   He just -- didn't he say he doesn't recall?

24          MS. BARRINGTON:  Yeah.  I'm not sure what the

25   impeachment is if he said --

1          THE COURT:  But you can refresh with a deposition

2     transcript.  So yeah.

3          MS. BARRINGTON:  Okay.

4          THE COURT:  Make sure -- and if you would, just

5     provide a -- I see copies coming.  Just provide everyone

6     with a page and line reference, too.  Okay.  That's fine for

7     now.

8     BY MR. BASSETT:

9     Q    I'd like to direct your attention, Mr. Diamond, to Page

10    54, starting at Line 11.

11    A    Thirty?

12    Q    Fifty-four.

13    A    Say again?

14    Q    Fifty-four, Line 11.

15    A    Thank you.

16    Q    And I will read some testimony for you and then ask you

17    a question, okay, sir?

18    A    Okay.

19    Q    Page 54, line 11:

20         "Q   I would like to -- I'm going to ask you some

21    questions about several line items on this budget, but I'd

22    like to start with Line 23, which says restructuring

23    professional fees escrows.  Do you see that?

24         "A   I do.

25         "Q   Now Is it correct, Mr. Diamond, that the debtors,

Page 81

1    according to this budget, are projecting professional fees

2    of approximately $9.7 million over the 13-week period

3    beginning on June 29th?

4         "A   That's correct.

5         "Q   Who -- what are the different professionals whose

6    fees are covered by this estimate in Row 23?

7         "A   It includes Weil Gotshal, proposed counsel for the

8    debtors, FTI, Stretto, I think Arbel Capital as well.

9         "Q   When you say Arbel Capital, that would be your

10   $35,000 per month fee?

11        "A   Correct."

12        And then if you go down to Line 55, or sorry, on Page

13   55, Line 19:

14        "Q   And then on Arbel, that's your fee.  So just so

15   I'm clear, this is 13 weeks, that's approximately, I think a

16   little over three months.

17        "A   Yes.

18        "Q   So this would include maybe a little more than

19   $105,000 of your fee?

20        "A   Yeah, sadly for me, yes."

21        See that?

22   A    I do.

23   Q    Does that refresh your recollection that in fact the

24   line item appearing on Line 23 of the budget includes the

25   entirety of Arbel's $35,000 per month restructuring fee?

1   A    It could very well be the budget includes all $35,000

2   because, you know, which is -- you know, the budget is what

3   we call a restrictive budget, right?  It's not you had

4   referenced earlier the budget, you know, that we prepare

5   ahead of time, you know, to look into the future.  The cash

6   collateral budget, on the other hand, is what you would

7   think of as more of a restrictive budget, meaning if it's in

8   the budget, you can pay it.  If it's not in the budget, you

9   can't pay it.

10       So for purposes of preparing a budget that is a cash

11  collateral budget, we need to assume maximalist positions so

12  that we can be in a position to in order to be able to make

13  the payments we need.  So to go to your earlier question, if

14  I may, you had asked about the aggregate on renovations and

15  capex, and the answer to that is correct.  I can look back

16  and say, well, Building A only needed $1,000 on renovations

17  or capex last year.  But in a budget that is meant to be,

18  how can I pay for things within the bankruptcy, within

19  limits that are imposed by the cash collateral order and the

20  budget, if not for the fact that I can aggregate them in

21  some way, I would have to take maximalist positions in each

22  and every one of the debtors.  So I would need $75,000 for

23  every budget line item for every debtor because maybe an

24  elevator will break, maybe the water main break.

25       So again, the budget contains $35,000 because it could

Page 83

1   very well be that 99 percent or maybe even 100 percent of my

2   time for a particular week or month in the budget will be

3   only on the debtors.  And so, yes, it may include it.  But

4   the reason is because of the restrictive nature of this

5   budget.

6           MR. BASSETT:  Your Honor, I'd move to strike the

7   entire answer beyond yes.

8           THE COURT:  Overruled.  Yeah.

9   BY MR. BASSETT:

10  Q    Does the inclusion of the $35,000 per month fee in Line

11  23 of your budget contemplate Arbel billing the debtors for

12  time that you're spending on non-debtor work?

13  A    I contemplate splitting it depending on the average

14  workload.

15          THE COURT:  I'm sorry.  I just didn't understand

16  the answer.

17          THE WITNESS:  Sorry.  So if I end up spending

18  sometime on non-debtor work, I would allocate some portion

19  of it to the non-debtors.

20  BY MR. BASSETT:

21  Q    But at present purposes, the entire amount has been

22  included in the budget, correct?

23  A    Given recent, you know, last month experience, it's

24  proving I'm right.

25  Q    Now, FTI, like Arbel, is also engaged simultaneously to

Page 84

1    perform services for both debtors and non-debtors, including

2    Zarasai and the other non-debtor property companies,

3    correct?

4    A    I don't recall their engagement letter offhand.

5    Q    You don't recall telling me in your deposition that you

6    understood FTI to be --

7    A    I think they are working -- they are working for some,

8    I believe.  I don't remember their engagement letter --

9    Q    Have you ever seen their engagement letter?

10            THE COURT:  Hang on.  Just don't talk over each

11   other.  Just a cautionary note for the transcript.

12            THE WITNESS:  I'm sorry.  Can you hear me?

13            THE COURT:  Oh, I hear you.  Yes, I hear you fine.

14            THE WITNESS:  Oh, okay.

15            THE COURT:  That's as much to Mr. Bassett as you.

16   You're starting to talk like New Yorkers so rapidly, so you

17   have to squelch that.  Go ahead.

18   BY MR. BASSETT:

19   Q    Have you ever seen FTI's engagement letter?

20   A    I may have seen a copy.

21   Q    Turn to Tab 16 in your binder.

22            MR. BASSETT:  For the record, this is FX-14.

23   BY MR. BASSETT:

24   Q    Is this the FTI engagement letter you've seen, sir?

25   A    I can't say it's the specific one I've seen, but it

Page 85

1    seems similar.  Yes.

2    Q    Now, I want to shift and talk about proposed counsel's

3    fees, Weil Gotshal's fees.  Now, those fees make up the

4    single largest portion of the $9.7 million projected

5    professional fee figure on your budget, correct?

6    A    Correct.

7    Q    And you understand, do you not, that Weil Gotshal is

8    simultaneously representing both the debtors and Zarasai and

9    the other non-debtor affiliates, correct?

10   A    I do.

11   Q    If you turn to the document behind Tab 17 in your

12   binder, do you recognize this --

13            MR. BASSETT:  Which for the record is FX Exhibit

14   13.

15   BY MR. BASSETT:

16   Q    Do you recognize this as Weil's engagement letter?

17   A    Again, I don't know if I specifically have seen this

18   document, but something similar yes.

19   Q    Now, we spent some time at your deposition talking

20   about how you would ensure that fees that Weil is billing to

21   debtors and non-debtors are not all charged to the debtors.

22   You remember that?

23   A    I do.

24   Q    And what you told me was that you, I think the word you

25   used was you would -- you presume that you would find a way

Page 86

1   to allocate their time accordingly, correct?

2   A    I'll take your word that that's the word I used.

3   Q    But you couldn't tell me, and I assume you can't tell

4   me today how much time Weil has actually accrued in fees for

5   non-debtors versus debtors since the beginning of the

6   Chapter 11 case, correct?

7   A    The allocation between that?

8   Q    How much time they've incurred performing work for

9   debtors versus non-debtors since the commencement of the

10  Chapter 11 case.

11  A    I couldn't -- I cannot tell you sitting here how much

12  they have billed again for the debtors and for the

13  non-debtors.

14  Q    And are you aware that in the fee application that --

15  or not the fee application, the retention application that

16  Weil filed, they represented that they had been paid over

17  $2.4 million actually on account of services they performed

18  for the debtors in the 90 days prior to the petition date?

19          MS. BARRINGTON:  Objection, Your Honor, again,

20  relevance as it relates to what occurred prepetition.  And I

21  think Mr. Diamond testified he doesn't know.

22          THE COURT:  What's the relevance?  I mean I get

23  generically you're probing the reasonableness of the budget,

24  including the slice going to Weil.  But --

25          MR. BASSETT:  Just one more question, Your Honor.

Page 87

```
 1              THE COURT:  Wait.  I need to do something with
 2     this objection.
 3              MR. BASSETT:  Yeah.  So the relevance, Your Honor,
 4     is that what I'm trying to establish is that to the extent
 5     that there is, as the witness testified, a plan to ensure
 6     that Weil's fees are that are billed to the estate are only
 7     for work performed for the debtors, I want to see if that
 8     same practice was followed prior to the bankruptcy
 9     (indiscernible) any division of fees.
10              THE COURT:  I think I'm going to sustain the
11     objection because it's backward-looking.  So you can put --
12     you just articulated a reasonable and fair ground of inquiry
13     that's forward-looking.  So you can just put it that way.
14     BY MR. BASSETT:
15     Q    Okay.  Now, as you said before, most of the projected
16     $9.7 million in professional fees are attributable to Weil,
17     correct?
18     A    Correct.
19     Q    But you can't tell me -- you can't put a dollar number
20     on it, correct?
21     A    You can't put an exact dollar on it.  No.
22     Q    And would you agree with me that as far as your budget
23     is concerned, the most substantial portion of Weil's fees
24     that you are anticipating consists of fees they will incur
25     in litigating against Flagstar?
```

1  A     The answer is they will -- a substantial portion of the

2  Weil's fees anticipate Flagstar litigating against the

3  debtors and having to respond to that litigation.  The

4  company has no plans to litigate against Flagstar and this

5  debtor.

6  Q     And does that -- sorry.

7  A     Yeah.

8  Q     (Indiscernible) finished?  I apologize.  And the fees

9  that you project for Weil Gotshal also include general

10  administrative costs of running a Chapter 11 case, correct?

11  A     Correct, for 82 debtors, 83 debtors.

12  Q     Now, Weil's fees do not include services unrelated to

13  the bankruptcy for property level legal advice, correct?

14  For example, if there's a slip-and-fall case at a particular

15  debtor, that would be handled by an ordinary course

16  professional, correct?

17  A     Correct.  Other than perhaps a question related to the

18  bankruptcy, how to handle on the bankruptcy.  But you know,

19  the actual handling of that litigation would be outside

20  professionals.

21  Q     The day-to-day legal services related to the day-to-day

22  operations of the properties would be within the ordinary

23  course professionals (indiscernible), correct?

24  A     Correct.  Like L&T lawyers.

25  Q     Now, Mr. Diamond, we talked about this a bit in your

Page 89

1   deposition, but do you recall telling me that the debtors

2   intend to use their Chapter 11 cases to ultimately execute a

3   business strategy that in your mind would benefit all

4   stakeholders?

5   A    Yes.

6   Q    But the debtors have not yet decided what that strategy

7   is going to be, correct?

8   A    I mean, we've been formulating those plans internally.

9   We've been speaking with potential bankers and brokers to

10  work through that and figure out the best -- you know, yeah,

11  we're working on it, but yes, the answer is yes.

12  Q    Well, you've not arrived at a particular strategy,

13  correct?

14  A    We have -- well, I don't know how to -- the answer is

15  we are evaluating various different approaches and working

16  with and interviewing professionals to guide us and to

17  choose the path that we want.  But yes, we are working

18  towards maximizing the value for all stakeholders here.

19  Q    And you told me in your deposition, but by the end of

20  the 13-week budget, you hope to at that point have engaged

21  some additional professionals, correct?

22  A    The answer is yes.

23            THE COURT:  Okay.  Thanks.  Let me ask debtors how

24  they want to proceed.  Do you -- I don't know how much, if

25  any, redirect you want to have and if you want to take a

1    lunch break first or proceed right now.

2              MS. BARRINGTON:  Your Honor, I think we can do our

3    redirect after the lunch break if that's okay with Your

4    Honor.

5              THE COURT:  Yeah, that's fine, and that is fine.

6    And how long do people want for lunch?  I think you all

7    brought food in except for the government employees in our

8    midst.  But I have here.  So we --

9              WOMAN 1:  (Indiscernible)

10             THE COURT:  Okay.  So we're good likewise.  So, I

11   mean, is a half hour good?

12             MS. BARRINGTON:  Yes, Your Honor.

13             THE COURT:  Do you want to argue for less, or is

14   that good?

15             MS. BARRINGTON:  I think this might be one thing

16   that we'll reach agreement on, hopefully.

17             THE COURT:  Okay.

18             MR. BASSETT:  We're fine with a half hour.

19             THE COURT:  Okay.  A half hour it is.  It's 1:37.

20   I'll see you at 2:07.  And, Mr. Diamond, you can leave your

21   materials here.  Everyone can leave materials here if you

22   want.  Oh, I was supposed to tell you, please be tidy about

23   the courthouse.  You're all going to go eat.  Throw your

24   stuff away in trash cans provided.  Occasionally, other less

25   wonderful people trash our beautiful historic building.  And

Page 91

1  we're -- and it makes us crazy.  So be tidy, and I'll see

2  you in a half hour.  Oh, and I really should say, on a

3  serious matter, Mr. Diamond should not discuss his testimony

4  pending redirect, which I bet is what Mr. Bassett was going

5  to ask to be said.

6          MR. BASSETT:  Correct, Your Honor.  Thank you.

7          THE COURT:  Yes.  Okay.  So you remain -- you'll

8  remain under oath, and you'll just -- we'll resume in a half

9  hour.  Okay.  Thank you very much, and we're adjourned.

10     (Recess)

11          THE COURT:  I know there's been discussion of

12  this.  It's warm in here.  I want to acknowledge this.

13  We're going to -- we've already gotten our maintenance

14  people to max the cooling capacity of this old building, but

15  we're going to ask them if they can even do even more max,

16  kind of like a superpriority.

17          So we'll see.  And if you're -- particularly if

18  you're in the gallery and you want to take your jacket off

19  because you're just sad, that's okay with me.  I kind of

20  like participants to be jacketed up, just like I have to be.

21  So if you're -- if you've got an active speaking role, you

22  can suffer along with me, but otherwise, you can make

23  yourself more comfortable.

24          Okay, and with that, I think we're up to --

25  welcome back, Mr. Diamond.  You remain under oath or

Page 92

1    affirmation, and Ms. Barrington, you can proceed with

2    redirect.

3            MS. BARRINGTON:   Thank you, Your Honor, and I'll

4    be brief.

5                REDIRECT EXAMINATION OF EPHRAIM DIAMOND

6    BY MS. BARRINGTON:

7    Q    Mr. Diamond, can I ask that you turn to Tab 7 of your

8    binder?

9            MS. BARRINGTON:   And for your reference, Your

10   Honor, this is Exhibit 42, which was admitted into evidence.

11   BY MS. BARRINGTON:

12   Q    And do you recall being asked some questions about this

13   document by Mr. Bassett?

14   A    I do.

15   Q    And can you just read for the Court, what date was this

16   document entered into?  I'll just refer you to the first

17   paragraph there.

18   A    September 28, 2012.

19   Q    And is that a date prior to the date that the debtors

20   filed for bankruptcy in this case?

21   A    Yes.

22   Q    Now I'd like to ask that you turn to Page 10 of the

23   document and I'd like to refer you to Section 10.6.  And

24   this is a provision that's titled "Benefits of Agreement, No

25   Third-party Rights."  Could you please read this provision

Page 93

1    out loud for the record?

2    A    "Benefits of agreement, no third-party rights.  None of

3    the provisions of this agreement shall be for the benefit or

4    enforceable by any creditor of the company or by any

5    creditor of the member, and, two, nothing in this agreement

6    shall be deemed to create any right in any person (other

7    than the member or any officer, director, employee or agent

8    of the company, nor any employee, representative, agent or

9    affiliate of the members) not a party hereto and this

10   agreement shall not be construed in any respect to be a

11   contract in whole or in part, for the benefit of any third

12   party."

13   Q    Thank you, Mr. Diamond.  You can set that document

14   aside now.  Do you recall some questions from Mr. Bassett

15   about the debtors' cash management system?

16   A    Yes.

17   Q    And to date have the revenues from each debtor covered

18   those individual debtors' expenses, to your knowledge?

19   A    So in the current cash management, that system that we

20   have, as I said before, we take in the money from the rents

21   and we put them into the new JPMorgan Chase receipts account

22   or operating account.  And then we track that by debtor on a

23   daily basis.  And then we also, as we need to make

24   expenditures, we transfer money into the disbursement

25   account and we note by debtor.  And so as of my last -- as

Page 94

1   of the last time I looked, each debtor has been able to

2   cover its particular expenses that we've paid through the

3   revenues of that particular debtor.

4   Q    Thank you.  Thank you, Mr. Diamond.  And last question.

5   Well, maybe not the last one.  Second to last.  So you were

6   crossed on some questions about the professional fees and as

7   it relates to debtor versus non-debtor work?

8   A    Yes.

9   Q    Is it your understanding that those professional fees

10  are currently being held in escrow?

11  A    The professional fees are all being held in escrow,

12  yes.

13  Q    And are those professional fees subject to review and

14  approval by the Court?

15  A    I believe so.  Yes.

16          MS. BARRINGTON:  Thank you.  No further questions,

17  Your Honor.

18          THE COURT:  Okay, any recross?

19          MR. BASSETT:  Just --

20          THE COURT:  Bearing in mind the scope limitations.

21          MR. BASSETT:  Yes, Your Honor.  Just three

22  questions, two question maybe.

23              RECROSS-EXAMINATION OF EPHRAIM DIAMOND

24  BY MR. BASSETT:

25  Q    Mr. Diamond, could you please turn to -- well, before

Page 95

1    having your attention turned to a particular document, you

2    were just asked some questions about the operating agreement

3    that was behind Tab 7 of the binder.  I'd like you to now

4    turn to Tab 8 of the binder.

5          MS. BARRINGTON:  Your Honor, I think this is

6    outside the scope.  I didn't question the witness about this

7    document.

8          MR. BASSETT:  Well (indiscernible) sorry, Your

9    Honor.  I need to ask the question.

10         THE COURT:  I think I can anticipate that Mr.

11   Bassett's going to tell me that the loan documents include

12   similar restrictions to what was just disavowed as being

13   enforceable by third parties in Tab 7, right?  That's what

14   you're going to show me?

15         MR. BASSETT:  Yes, Your Honor.  I haven't even

16   asked the question yet.

17         THE COURT:  Yeah, I know.

18         MR. BASSETT:  It goes directly to the question she

19   asked him about the other agreement.  There's a

20   cross-reference.

21         MR. FAIL:  This was a prepetition document

22   (indiscernible) --

23         MR. BASSETT:  (Indiscernible)

24         THE COURT:  Yeah.  Let me ask you to put your

25   question.  But I will say my memory is Mr. Diamond testified

Page 96

1    he wasn't familiar with the contents of this document, so

2    that you may have a problem with being outside the scope of

3    the witness's knowledge.

4              MR. BASSETT:  She asked him to read a provision

5    from the operating company agreement.

6              THE COURT:  Okay.

7              MR. BASSETT:  Talked about no third-party

8    beneficiaries.  I'm going to focus --

9              THE COURT:  Okay.  Well, let me let you ask a

10   question because we're talking -- we're spending a lot of

11   words on a question that hasn't been asked yet.  So go ahead

12   and ask your question.

13   BY MR. BASSETT:

14   Q    Mr. Diamond, please direct your attention to Page 40 of

15   this document.

16   A    Page what?

17             THE COURT:  Four-oh.  Sorry.  Forty.  Okay.

18   BY MR. BASSETT:

19   Q    Do you recall earlier you read Section 9.2, or I may

20   have read it, Section 9.2 of this agreement, the preliminary

21   lead-in paragraph?  Do you recall that from your direct

22   testimony, Mr. Diamond?

23   A    Yes.

24   Q    I'd now like you to read Section 9.21.

25   A    "Organizational documents.  Either, A, fail to provide

1    in its organizational documents for restrictions

2    substantially similar to those set forth in this section,

3    or, B, amend any provisions of its organizational documents

4    so that borrower is no longer in compliance with the

5    section?

6             MR. BASSETT:  Thank you.  No further question.

7             THE COURT:  Okay.  Thanks.  I'm hoping the answer

8    is no any re-redirect?

9             MS. BARRINGTON:  Nothing further, Your Honor.

10            THE COURT:  Okay.  Great.  Okay.  Mr. Diamond,

11   thank you very much for your testimony.  You're free to step

12   down.  Do you want that binder to exit with -- leave the

13   table, the witness stand with Mr. Diamond?

14            MS. BARRINGTON:  Yes, please, Your Honor.

15            THE COURT:  Okay.  So you can carry that binder

16   with you.  Thank you for your testimony today.  You're

17   welcome to stay or not, whatever you prefer for the

18   remainder of the hearing.

19            MR. DIAMOND:  Can I stay and loosen my tie, Your

20   Honor?

21            THE COURT:  Yes.  You're now in the people in the

22   back who get to do things like that.  Let me take a minute

23   before we get going.  It occurs to me on timing, I could be

24   wrong, I don't know how long you'll be spending on cross,

25   but I feel like we're inching along somewhat.  So happy

1    news.  I told you I had a hearing tomorrow at 2:00.  That

2    has cleared up.  So I do want to stick to a hard stop at

3    6:30 today and ideally we'd be done earlier, but at the

4    current rate of progress, I doubt that.  But tomorrow

5    afternoon is fully in play for whatever spillover is

6    necessary, which could include closings or whatever.  So I

7    want to tell you sooner rather than later that's the case.

8    I have a morning calendar, but I could start -- depending on

9    how far we get today, I could start if -- you know, I mean,

10   I have in mind 1:00 would be quite doable.  A little earlier

11   would be less happily doable, but doable.  What do you

12   think, Mr. Slack?

13            MR. SLACK:  I think we should try to finish today.

14            THE COURT:  That's great.  I mean finishing is

15   always objective one.  So again -- and Mr. Pasquale agrees.

16   Okay.  So let's keep going.  We just spent a lot of time

17   with Mr. Diamond, sort of more than I anticipated.  And

18   we'll see how we do with the experts.  But I'll turn it over

19   to you and, and see what happens.

20            MR. SLACK:  Your Honor, the debtors' next witness

21   is Ms. Zell.  So we'll call her stand.

22            THE COURT:  Yes.  Great.  Ms. Zell, welcome.

23   Please come up to the witness stand.  You come around this

24   way and go there.  I'm just going to let people know this

25   nice person is in charge of the entire building and he is

Page 99

1    going to try to make it cooler.  But we'll just keep going

2    with the hearing while he does that.  So thanks very much.

3              Okay.  Please raise your right hand, Ms. Zell.  Do

4    you solemnly swear or affirm that all the testimony you are

5    about to give before this Court will be the truth, the whole

6    truth and nothing but the truth?

7              MS. ZELL:  (Indiscernible)

8              THE COURT:  Thank you.  You can be seated.  And

9    please just state and spell your name for the record.

10             MS. ZELL:  Suer.  My name is Michelle Zell.  It's

11   M-I-C-H-E-L-L-E, Z-E-L-L.

12             THE COURT:  Okay.  Thanks.

13             MR. SLACK:  Your Honor, we've already done the

14   work on the declaration, so I'd just like permission to put

15   her declarations in front of her for her testimony.

16             THE COURT:  Yes, that's fine.  And so we're

17   talking about Ms. Zell's initial and then reply

18   declarations, right?

19             MR. SLACK:  That's correct, Your Honor.

20             THE COURT:  Okay.  Thanks.  Okay.  So all the

21   participants already have those.  Ms. Zell has been handed

22   copies of her declarations that are her direct testimony.

23   I'm sure that's known to Ms. Zell.  We're relying on those

24   as your direct testimony.  And you're going to be

25   cross-examined by counsel for Flagstar now.  And then you'll

Page 100

1    have debtors' counsel will have an opportunity to redirect

2    after that.  Okay.  Mr. Pasquale?

3              MR. PASQUALE:  Thank you, Your Honor.  Your Honor,

4    may we approach with just some exhibits?

5              THE COURT:  Yes.

6              CROSS-EXAMINATION OF MICHELLE ZELL

7    BY MR. PASQUALE:

8    Q    Ms. Zell, good afternoon.

9    A    Hi.

10   Q    It's not as bad as this looks, I promise.

11             THE COURT:  All right.  Thank you very much.

12   BY MR. PASQUALE:

13   Q    Ms. Zell, this is your first time serving as an expert

14   witness, correct?

15   A    Yes.

16   Q    And it's the first time you're testifying at a hearing?

17   A    Yes.

18   Q    And in your role as an expert witness in this matter,

19   it's the first time you've done an analysis to determine an

20   equity cushion, right?

21   A    Yes.

22   Q    In fact, you hadn't even heard of the term equity

23   cushion until you took this engagement, right?

24   A    Correct.

25   Q    I think, you know, there was some argument this

Page 101

1    morning, but to just get it through your testimony, Zarasai

2    has been a client of yours for the last 12 years; is that

3    right?

4    A    Yes.

5    Q    And you've been doing valuations of Zarasai properties

6    since 2012?

7    A    Yes.

8    Q    Now, the debtor properties are a subset of the Zarasai

9    properties, right?

10   A    Yes.

11   Q    And you've been doing valuations of the debtor

12   properties as part of your work for Zarasai, correct?

13   A    Yes.

14   Q    Now, you said in your declaration that you decided to

15   serve as an expert witness here for the debtors because you

16   have been providing those valuations of the properties to

17   Zarasai for that period of time; is that correct?

18   A    Well, it's because I have familiarity with the

19   properties, having appraised them and toured them multiple

20   times.

21   Q    And Zarasai asked you to serve as an expert witness for

22   it in this proceeding, right?

23   A    Well, I was engaged by Weil.  Yes.

24   Q    Yes, but Zarasai is who approached you and said they

25   would like you to serve as an expert witness for them in

Page 102

1    this proceeding, right?

2    A    Well, they approached me and told me that they wanted

3    to, you know, talk to me.  I don't remember the exact term

4    that was used, but yes.

5    Q    And then you connected with Weil, and then Bowery and

6    yourself were retained to serve as an expert here?

7    A    Yes.

8    Q    Do you know, as you sit here today, what Bowery is

9    being compensated for your service as an expert witness?

10   A    Not in total, no.

11   Q    Do you know at all?

12   A    Well, we had an initial engagement letter that called

13   for a retainer.

14   Q    How much was the retainer?

15   A    $10,000.

16   Q    Okay, and do you recall f the engagement letter has an

17   hourly rate?

18   A    Yes.

19   Q    What's the hourly rate?

20   A    $500.

21   Q    Now, when I -- withdrawn.

22        How much time have you put in to date serving as an

23   expert?

24   A    I have a running total at home, but I don't know it

25   offhand.

Page 103

1    Q    You have an estimate?

2    A    I don't know.  Forty, 50 hours, I guess.

3         THE COURT:  We're going to call that sort of a

4    guesstimate.  I assume that's -- your tone of voice suggests

5    that's not a super precise number in your mind.  I just want

6    to nail that down.

7         THE WITNESS:  Yes.  I don't know the total.

8         THE COURT:  Okay.

9    BY MR. PASQUALE:

10   Q    And Ms. Zell, you're being paid by Zarasai to serve as

11   an expert in this matter, right?

12   A    I don't recall who the engagement letter states is

13   responsible for payment.

14   Q    Let me ask you to turn please to Flagstar Exhibit 16.

15        THE COURT:  That's in this binder?

16        MR. PASQUALE:  Yes, it is, Your Honor.

17   BY MR. PASQUALE:

18   Q    Are you there, Ms. Zell?

19   A    Yes.

20   Q    Okay.  If you would look at the second page -- well,

21   let me go back.  I'm sorry.  What is Exhibit 16?

22   A    It is our engagement letter.  Bowery's engagement

23   letter.

24   Q    With respect to your expert services in this matter; is

25   that right?

Page 104

1    A    Yes.

2    Q    Okay.  If you turn to the second page, the first full

3    paragraph is Entitled Responsibility for payment".  Do you

4    see that?

5    A    Yes.

6    Q    Okay, and about in the middle of the paragraph it says

7    the company shall be responsible for payment.  Do you see

8    that?

9    A    Yes.

10   Q    And who is the company for purposes of your engagement

11   letter?

12   A    I assumed it was Pinnacle.

13   Q    If I can refer you to the first page of the engagement

14   letter, in the very first paragraph, do you see the

15   parenthetical sort of in the middle?  It says, Such entities

16   collectively the propcos, and together with Zarasai, the

17   company."  Do you see that?

18   A    Yes.

19   Q    Does that refresh your recollection that Zarasai is

20   paying -- is compensating you for your services?  I

21   apologize.

22   A    May I read -- just read the paragraph, please?

23   Q    Of course, of course.

24   A    Okay.  I've read it.

25   Q    Okay.  My question was, does it refresh your

Page 105

1   recollection that Zarasai is compensating Bowery and

2   yourself for your services as an expert witness?

3                   THE COURT:  Is this this document in evidence?

4                   MR. PASQUALE:  Yes, Your Honor.

5                   THE COURT:  Okay.

6                   THE WITNESS:  It does appear that the propcos and

7   the company and Zarasai together make the company, the

8   propcos and Zarasai.

9   BY MR. PASQUALE:

10  Q    Thank you, Ms. Zell.  Now, Ms. Zell, you were also

11  handed your declaration with the attachments as your report

12  and your also your supplemental reply.  So we're going to be

13  looking at those, as you would expect, a great deal.  So to

14  start, just a couple of questions to get this out of the way

15  frankly.  In Paragraph 13 of your initial declaration, you

16  have a comment about the possibility of the debtor

17  properties being converted to condominiums.  Do you recall

18  that?

19  A    Yes.

20  Q    Okay.  You didn't do any analysis at all to support the

21  statement that if any of the debtors' properties are

22  converted to condominium -- condominiums, excuse me, the

23  converted properties likely will have greater values than

24  the values in your report, right?

25  A    I did not.

Page 106

1   Q    And in the next paragraph, Paragraph 14, you have a

2   statement with respect to distressed sales.  Do you see

3   that?

4   A    Yes.

5   Q    And you're aware of certain distressed sales, but

6   beyond your general knowledge, you didn't do any, excuse me,

7   any analysis to support the statement in Paragraph 14,

8   right?

9   A    Correct.

10  Q    Ms. Zell, what are the Uniform Standards of

11  Professional Appraisal Practice?

12  A    USPAP is a set of guidelines and ethics that appraisers

13  abide by when doing their applause appraisal work.

14  Q    And one of the one of the requirements for appraisals

15  under USPAP is for a certification to be provided with an

16  appraisal report, right?

17  A    Yes.

18  Q    Now here your report, your expert report is a

19  restricted appraisal report, right?

20  A    Yes.

21  Q    Can you explain for the Court please what the

22  difference is between a full appraisal report and a

23  restricted appraisal report?

24  A    Sure.  USPAP calls for two appraisal reports.  One is a

25  restricted appraisal report and the other is an appraisal

Page 107

1    report.  An appraisal report summarizes all of the data and

2    content and logic that the appraiser uses to come to their

3    value conclusion.  A restricted report states the value and

4    the conclusions, but doesn't necessarily explain all of the

5    rationale behind that value.  The rest of the information is

6    retained in our work file and the restricted report states

7    that.

8    Q    So the methodology used underlying either type of

9    report should be the same, correct?

10   A    Yes.  It's the same methodology.

11   Q    And a certification is required for a restricted

12   appraisal report, right?

13   A    Yes.

14   Q    And you do provide a certification in your expert

15   report here, Right?  Let me ask you to turn a page from

16   where we were in your declaration to the.  To the letter

17   which is past.  The COVID page of your report is a June 13th

18   letter to Mr. Holtzer.  Excuse me, at Weil Gotshal.  Now, in

19   the third paragraph of this letter, which you signed, you

20   reference USPAP and that your report is intended to comply

21   with USPAP, right?

22   A    Yes.

23   Q    In the one, two, fourth paragraph in the second line.

24   Can you read the sentence into the record, please?  That

25   starts with as such.

Page 108

1   A    As such, it presents limited, not detailed discussions

2   of the data, reasoning and analyses that were used in the

3   appraisal process to develop the appraiser's opinion of

4   value.

5   Q    And by that you mean that the presentation is limited,

6   not the analysis, right?

7   A    I think.

8   A    Yes.

9   A    That not all of the information that we use to derive

10  the values is contained within the report.

11  Q    Now look at, please back to the declaration attached to

12  your report.  There, Paragraph 10.  This is your declaration

13  that you signed, right?

14  A    Yes.

15  Q    And you say in the first sentence of Paragraph 10, the

16  report details the methodology I employed and the inputs and

17  assumptions used in determining the value of each of the

18  debtor properties and sets forward to the valuation for each

19  of the debtor properties on a property-by-property basis.

20  Does your report detail your methodology?

21  A    Detail some of it, but not all of it.  Not all of it.

22  Q    And you understand, in fact, you expressly stated in

23  your report at page one of the numbered pages that the

24  intended use of your report was for litigation proceedings,

25  right?

Page 109

1    A    Yes.

2    Q    Can you understand and you stated in your report that

3    the intended users.  Users, excuse me, of your report would

4    include opposing counsel and the court, right?

5    A    Yes.

6    Q    And you don't know --

7              MR. PASQUALE:  I'm sorry, Your Honor?

8              THE COURT:  Oh, I said ouch, my leg.  But what tab

9    are we at?

10              MR. PASQUALE:  We're looking at the report.  So it

11    is -- I'm sorry, it's one of the debtors' exhibits.  Give me

12    one moment.

13              THE COURT:  Yeah, I'm just flipping around trying

14    to find it.

15              MR. PASQUALE:  I've read it, but I think it's

16    number one.  Sorry, I lost my place.

17              THE COURT:  Okay, got it.  Go ahead.

18              MR. PASQUALE:  Yes, it's debtors' Exhibit 1.

19              THE COURT:  Actually, if somebody has an extra,

20    extra copy, can you just run it up here?  Because I'm not

21    laying my hands on it immediately.  It's not in the Flagstar

22    binder.

23              MR. PASQUALE:  It is not.  It was not.

24              THE COURT:  Okay, you distracted me by handing me

25    a giant binder that didn't include it.  Yeah, sorry for the

Page 110

1   delay, but I want to make sure I have one.

2            MR. SLACK:  Your Honor --

3            THE COURT:  Okay, that's great.  Thank you.

4   Thanks so much.  Okay, go ahead.

5   BY MR. PASQUALE:

6   Q    And Michelle, you don't know whether a restricted

7   appraisal report is appropriate for litigation proceedings,

8   right?

9   A    Well, it is the appraisers discretion what the format

10  of the report that the appraiser chooses to perform.  But

11  I'm not aware that restricted appraisals are not permitted

12  in litigation.

13  Q    Right.  One way or the other.  Sorry, that was.  Yes,

14  yes.  Thank you.  Now, last night, you through counsel, we

15  were served with a reply declaration.  Did you draft that

16  declaration?

17  A    Yes.

18           MR. SLACK:  Your Honor, I think that federal rules

19  don't allow the counsel to go into this.  I mean, he got an

20  answer that she drafted it, but I don't think the federal

21  rules allow this kind of backup information about a 26

22  doesn't allow this on experts.

23           MR. PASQUALE:  I didn't even ask.

24           THE COURT:  Yeah, I mean, that's a statement,

25  right?  I think the question posed was fine.  The answer was

Page 111

1   fine, and we'll see what the next question is.  But I think

2   that was sort of a preemptive strike on a line of invasion

3   of privilege that counsel's worried about.  We'll see where

4   you go.

5   BY MR. PASQUALE:

6   Q    And fair to say, Ms. Zell, that your reply goes into

7   detail explaining your methodology and the choices that you

8   made as to certain data inputs, right?

9   A    Yes.

10  Q    You could have included all of that in your restricted

11  appraisal report, right?

12  A    Yes.

13  Q    You could have described your methodology in detail,

14  right?

15  A    Yes.  It is summarized within the report, but it is

16  more in detail.  Yes, and more in response to Mr. Fowler's

17  report.

18  Q    Right.  But in your judgment, you could have expressed

19  as much detail as to your methodology and your data

20  decisions in your initial report as you wanted to, right?

21  A    Yes.  It's the appraiser's discretion.

22  Q    And you chose not to do that, Right.

23  A    For brevity purposes, yes.

24  Q    Now, I asked you a couple of questions about

25  certifications before.  Your certification is on page 17 of

Page 112

1    your report.  And one of the things you certified is that

2    you personally inspected the subject properties with the

3    exception of three of them, right?

4    A    Yes.

5    Q    But you haven't inspected any of the subject properties

6    specifically in connection with your report, right?

7    A    Not in connection with this specific engagement.

8    Q    And you haven't recently inspected any of the

9    properties for any purpose, right?

10   A    I don't remember the exact dates that I inspected each

11   of these.

12   Q    Right.  And as of when I spoke with you at your

13   deposition, you couldn't recall when you last inspected any

14   of the properties, correct?

15   A    I don't remember the date.

16   Q    Have you since checked your records to see when you

17   last inspected any of the debtor properties?

18   A    I did not, but I did check that 3545 3544th street was

19   inspected by somebody else at Bowery, and I think it was

20   2024.

21   Q    2024?

22   A    Yes.

23   Q    But not by you.

24   A    No, not by me.

25   Q    Now, Ms. Zell, the recent work you've done, and by that

Page 113

1    I mean first quarter 2025 and fourth quarter of 2024 in

2    particular, that it was withdrawing.  Let me, let me do that

3    better.  The recent valuation work that you've done by that

4    period, I mean the first quarter of 2025 and the final

5    quarter of 2024 of the Zarasai properties as not appraisal

6    work governed by USPAP.  Right.

7    A    Well, those engagements were for a different use and

8    user and client, and they were performed for IFRS, which is

9    -- which are accounting standards.  And the auditor uses the

10   valuations and then signs the certification for the

11   financial statements.  So it's for a different purpose.

12   Q    Right, but the answer to my question then, then was

13   yes.  Right.  You.  They were not appraisals done subject to

14   use path.

15   A    Correct.

16   Q    And what you did is prepare spreadsheets that contain

17   certain information and indicating your review.  Excuse me,

18   your views of the property values.  Right?

19   A    Yes.

20   Q    And just to be clear, you did not provide us

21   certifications with those spreadsheets to your client?

22   A    With the spreadsheets?

23   Q    No.  With the full appraisals that were requested by

24   the auditors?

25   A    Yes.

Page 114

1           MR. PASQUALE:  Move to strike the latter part of

2      that answer.  I'm not asking about any full appraisals.

3      We're talking about the spreadsheets.

4           THE COURT:  Overruled.

5      BY MR. PASQUALE:

6      Q    Now let me ask you to turn to your reply declaration.

7      Again, as I said, we're going to be going back and forth a

8      bit.  In Paragraph 3 on the top of Page 3 of your apply

9      declaration, you reference appraisal reports I prepare for

10     the accounting firm.  Do you see that?

11     A    The appraisal reports for a random selection of

12     properties.

13     Q    No.  I'm sorry.  So just to be sure we're in the same

14     document, this is debtors' Exhibit 7, which is your reply

15     declaration.

16     A    Yes.

17     Q    Okay.  The end of Paragraph 3, which is the top of Page

18     3.

19     A    Yes.

20     Q    Okay, and there's a sentence that starts with the words

21     the appraisal.  The appraisal reports.

22     A    Yes.

23     Q    Okay.  So I'm referring you to that sentence where you

24     say the appraisal reports I prepare for the accounting firm.

25     A    Yes.

Page 115

1   Q    Okay.  My question is, are those appraisal reports the

2   spreadsheets that we were just discussing.

3   A    Or something else that refers to the appraisal reports

4   that I Prepare at the request of the auditors who receive

5   the spreadsheet, and then request a random sample of

6   appraisal reports.

7   Q    So not referring to the spreadsheet valuations in that

8   paragraph.

9   A    I'd like to read all of paragraph three, please.  Could

10  you repeat the question, please?

11  Q    Yeah.  I just wanted you, if you would, to confirm for

12  the record that when you're referring to appraisal reports,

13  you are not referring to the spreadsheets of value that we

14  discussed a few minutes ago.

15  A    Right.  The beginning of paragraph three refers to the

16  spreadsheets, and the end where it says reports refers to

17  the reports.

18  Q    Now, let me ask you to turn to the big binder, please.

19  Exhibit 5.  Flagstar Exhibit 5.  And this document is in

20  evidence.  Ms. Zell, this is a letter you wrote to Mr.

21  Wiener dated May 30, 2025, right?

22  A    Yes.

23  Q    Who is Mr. Wiener?

24  A    Joel Wiener?

25  Q    Yes.  Who is he?

Page 116

1   A    I don't know the structure of Pinnacle, but he works it

2   for Pinnacle.

3   Q    Am I correct that this letter essentially was a cover

4   letter explanation of the spreadsheet of values that you

5   prepared of the debtor properties as of March 30, 2025?

6   A    This was a letter explaining the changes in value for

7   Zarasai between year end and Q1.

8   Q    And you presented those values in a spreadsheet format

9   to Zarasai?

10  A    Yes.

11  Q    Okay, and did you present that spreadsheet to Zarasai,

12  on or about May 30, 2025?

13  A    I don't remember when this spreadsheet was sent.

14  Q    You don't remember if it was before or after this

15  letter?

16  A    It was before this letter.

17  Q    Were you working on the valuation spreadsheet during

18  the month of May 2020?

19  A    I don't remember.  Probably.  But the date of value was

20  March 31st.

21  Q    Were you working on your spreadsheet of values as of

22  the end of the first quarter of 2025 at the same time you

23  were preparing your expert report here?

24  A    No.

25  Q    Did you conclude the first quarter 2025 valuation and

Page 117

1   then start work on the expert report?

2   A    Yes.

3   Q    Now, as reflected in the May 30 letter, Flagstar

4   Exhibit 5, the property values that you determined for

5   Zarasai were done using the income approach, right?

6   A    Well, there's an appraisal process, so I engage the

7   entire appraisal process for every -- at every date at which

8   I'm asked to prepare values.  So we use the income approach

9   as well as the sales comparison approach.

10  Q    And the sales comparison approach you use as a

11  reasonableness test on your income approach, right?

12  A    Yes.  Well, there's a reconciliation process whereby

13  the appraiser can, you know, concludes there's two different

14  methodologies for determining value.  So the appraiser, the

15  last step of the appraisal process before you report the

16  value is to reconcile the value.  So there's elements of the

17  income approach and the sales comparison approach in the

18  final valuation.

19  Q    We're going to talk about that reconciliation in a

20  little bit.  Now, one of the inputs to apply under the

21  income approach is determining net operating income, or NOI,

22  for the property, right?

23  A    Yes.

24  Q    And another input is determining the capitalization

25  rate, or cap rate for a property, right?

Page 118

1    A    Yes.

2    Q    What is a cap rate?

3    A    Cap rate is a return on investment.  It is a fraction

4    that appraisers use to -- we divide the NOI by the cap rate,

5    which yields an indication of stabilized value.

6    Q    And under the income approach, you, Ms. Zell, apply a

7    quantitative and a qualitative analysis to determine value,

8    right?

9    A    Yes.

10   Q    And in applying that process, you determine NOI and you

11   divide it by a cap rate to result in a property value

12   subject to the reconciliation that you mentioned.  That

13   accurate?

14   A    That is the value via the income approach.  Yes.

15            THE COURT:  Can you put that as an example for me?

16   You have a hundred.  You have a hundred thousand dollars in

17   NOI on a property and a 6 percent cap rate.  So is it that

18   your resulting number you're looking at is six thousand

19   dollars?  Six percent of the hundred thousand value or NOI?

20            THE WITNESS:  100,000.  By 0.06.

21            THE COURT:  By 0.06.  Okay.  So which will be

22   roughly, what, some big number.  Okay, and thank you.

23            THE WITNESS:  My pleasure.

24   BY MR. PASQUALE:

25   Q    Now, as you were determining the property values of the

Page 119

1    Zarasai properties for the first quarter of 2025, you were

2    keeping Zarasai informed on the progress of your work,

3    right?

4    A    Yes.

5    Q    Would you turn to the big binder?  Exhibit 20, Tab 20.

6    And this is Exhibit 20 is in evidence.  It's an email dated

7    May 13, 2025, from yourself to Moshe Weinberger.  See that?

8    A    Yes.

9    Q    And who is Mr. Weinberger?

10   A    He works at Pinnacle.

11   Q    You know his position.

12   A    I gathered from these court proceedings earlier that

13   he's the CFO.

14   Q    You didn't know that until this morning?

15   A    I never knew anybody's title.

16   Q    And in this email, you're writing to Mr. Weinberger and

17   you use the word in the first section of the email, suggest,

18   when you're discussing cap rates.  Do you see that?

19   A    Yes.

20   Q    Why are you suggesting cap rates to Mr. Weinberger?

21   A    That was where I was in the appraisal process at that

22   time, looking at all of the data that I had collected

23   regarding cap rates from different sources.  And I was at

24   that point I was leaning towards a 7 percent cap rate for

25   the Bronx.

Page 120

1   Q    You're asking or expecting -- withdrawn.

2        Were you anticipating that Mr. Weinberg would provide

3   you input to help you decide which cap rate to use?

4   A    No.

5   Q    Is it your standard practice to advise Mr. Weinberger

6   of inputs in your analysis while you are in the process of

7   determining property values?

8   A    You say the question again.

9   Q    Sure.  Is it your standard practice to advise Mr.

10  Weinberger of inputs in your analysis, such as the cap rates

11  here, while you are in the process of determining property

12  values of the Zarasai portfolio?

13  A    Well, I will let him know you know where the values are

14  at certain times so that you know he's not surprised at the

15  end because it's we're usually running on a tight timeline.

16  Q    So when you say certain times, you need certain times

17  in your process of determining the values, right?

18  A    Yes.

19  Q    Now let me ask you to turn to and you could there's no

20  text in any of these, but Exhibits 21, 22, and 23 in your

21  binder.  And you've seen those before, Ms. Zell.  Right.

22  They're emails you sent to Ms. Excuse me, Mr. Weinberger.

23  Attaching iterations of your spreadsheet of values, right?

24  A    Yes.

25  Q    And in the in Exhibit 21 in the subject you write see

Page 121

1    attached.  And let's discuss -- did you ever discuss the

2    spreadsheet at May 19th or May 20th with Mr. Weinberger?

3    A    I don't think so.

4    Q    And why were you sending him the this various

5    iterations of your spreadsheet?

6    A    Yes.  We were getting close on timing, and I wanted him

7    to see where I was at that time.

8    Q    Now, in updating your spreadsheet of values for the

9    first quarter ended 2025, you determined to leave NOI

10   unchanged from your December 24th spreadsheet valuation,

11   right?

12   A    Yes.

13   Q    And you did that because you didn't expect there to be

14   any material change between the end of December and the end

15   of March, right?

16   A    Yes.

17   Q    But you did change the cap rates from what you applied

18   year end 2024 to what you applied first quarter 2025?

19   A    I think so.  I think I raised all of them, but I don't

20   know exactly for sure.

21   Q    Why don't you turn to Flagstar Exhibit 5, May 30th

22   Letter, and I'll refer you to the end of the first

23   paragraph.  My question is, does that refresh -- excuse me,

24   refresh your recollection as to whether you increased cap

25   rates for the spreadsheet valuation you did in the first

Page 122

1    quarter of 2025, and in fact, you did raise the rates by as

2    stated in the document, 25 basis points in Upper Manhattan

3    and so on for the different markets, right?

4    A    Yes.

5    Q    Now, by leaving NOI the same and increasing the cap

6    rate, fair to say that the result is a decrease in your

7    property values for each of the debtor properties as of

8    March 30 compared to December 2024, right?

9    A    Yes.  If you keep NOI the same, raise the cap rate, the

10   value will decrease.

11   Q    Now, in your expert report, which was as of June 1,

12   2025, right?  That's the effective date.

13   A    Yes.

14   Q    So just a couple of months after the values in your

15   spreadsheet as of the end of the first quarter of 2025,

16   right?

17   A    Yes.

18   Q    Now, in your report, you did update noise for the

19   debtor properties, right?

20   A    Yes.

21   Q    And in revising your NOI analysis from what you had

22   done as of the end of the first quarter of 2025, you used

23   your judgment to stabilize expenses and revenue for the

24   property, right?  For the various properties.

25   A    Yes.  We stabilize expenses.  Same methodology that we

Page 123

1   use every time.

2   Q    What does stabilize mean?

3   A    Stabilized means the property is operating in an

4   equilibrium status and it is.  The assumptions are market

5   oriented, so they would reflect how a market participant

6   would value the property.

7   Q    And when -- excuse me.  And by stabilizing the expenses

8   for purposes of your expert report to reach the property

9   values that you express there, you decreased many expenses

10  below their actual amounts, right?

11  A    I know I decreased some, yes.

12  Q    For example, you applied a 3 percent management fee to

13  all of the debtor properties, right?

14  A    Yes.

15  Q    And you used the 3 percent, even though you know that

16  Pinnacle is charging the debtors a 4 percent management fee

17  in its contract, right?

18  A    Well, I've never received the contract, and until these

19  proceedings started, I didn't.  I never calculated their

20  reported management fees because I've always used 3 percent

21  management fees to value the properties.  And that's how my

22  firm and market participants would underwrite management

23  fees for rent stabilized buildings.

24  Q    You don't have any doubt that 4 percent is the actual

25  management fee being charged to the debtors debtor entities,

Page 124

1    right?

2    A    Their historicals indicate 4 percent.

3    Q    And you're aware that the debtors' position in this

4    very Court is that 4 percent is the lowest management fee

5    that could possibly be found, right?

6    A    I'm not aware of that.

7    Q    And you're aware that in Mr. Fowler's report, he has a

8    chart of comparable expenses which shows across the

9    comparable companies, an average management fee of 4.07

10   percent, right?

11   A    May I reference that in here?

12   Q    Yes, that should be in there as Exhibit 1, and it would

13   be Appendix C of Mr. Fowler's report.

14   A    I see his expense comparables range from 1.95 to 6.

15   Q    Right.  And pretty sure my question was the average was

16   4.07 percent.

17   A    Okay.

18   Q    Have you seen that before right now?

19   A    Yes.

20   Q    Now, another thing, another area that you adjust is you

21   use a $200 per unit expense reserve, which in your opinion,

22   accounts for general turnover in units and capital

23   expenditures, right?

24   A    Yes.  It's a reserve fund used for capital

25   expenditures.

Page 125

1    Q    Thank you.  And that's the low end of what you believe

2    is typical range, which is 200 to 250 per unit for a

3    reserve, right.

4    A    Typically we see 200 to 250.

5    A    Yes.

6    Q    And you say in your reply declaration in Paragraph 14,

7    that's a standard Bowery practice to use $200 per unit,

8    right?

9    A    Yes.

10   Q    But isn't it true that many other appraisers use a $250

11   per unit reserve?

12   A    Some might.  If, let's say, a building had large units,

13   for example.

14   Q    And you reviewed some of.  I believe your reply

15   declaration says you did a sampling.  Some of your appraisal

16   reports done in 2024 for Flagstar.  Right.  Of the debtor

17   properties.

18   A    Yes.

19   Q    How many did you review?

20   A    Well, I didn't review them.  I just looked at them.

21   I'd say almost all of them used a 3 percent management fee.

22   Q    Are you aware that --

23   A    Sorry, reserves.

24   Q    You're aware that 43 out of 44 of those reports apply

25   to $250 per unit reserve?

Page 126

1    A    No.

2    Q    And you wouldn't refute -- well, withdrawn.

3         It wouldn't surprise you if Bowery itself has used the

4    $250 per unit reserve in some of its appraisal reports,

5    right, and everything comes back to the appraisal process.

6         A    So I would want to understand why they chose that

7    number.

8    Q    But it wouldn't surprise you if that was the case?

9    A    Correct.

10   Q    Now, there's also an item known as vacancy and

11   collection loss, right?

12   A    Yes.

13   Q    What is that?

14   A    That is a stabilized.  So to back up one, one moment

15   you have a rent roll, and then you apply rent to currently

16   vacant units, and then you deduct a vacancy and collection

17   loss from that total potential income.  So that accounts for

18   units that become vacant over time, as well as collection

19   loss from tenants who don't pay.

20   Q    And you applied a 2 percent vacancy rate and 1 percent

21   loss rate, right in your report.

22   A    Yes.

23   A    I know it totals 3 percent.

24   Q    But it is two separate components.  It's 2 percent and

25   1 percent to add to the 3 percent, correct?

Page 127

1    A    Yes.

2    Q    We ask you to turn to your reply declaration again,

3    Paragraph 10 on page 5.  And this is a paragraph in

4    Paragraph 10.  You are discussing the vacancy and collection

5    loss, right?

6    A    Yes.

7    Q    Okay, and in the middle of the paragraph you say actual

8    vacancy rates are considered and analyzed, but not

9    necessarily utilized.  Market participants will look to a

10   market level V&CL factor to determine effective gross

11   income.  See that?

12   A    Yes.

13   Q    And that's accurate, Right.  What is your opinion as to

14   what the market V&CL is?

15   A    V&CL, excuse me, for rent stabilized buildings, 2 or 3

16   percent.

17   Q    Two or 3 percent?

18   A    Well, I use 3 percent for most of the buildings.  There

19   are some extenuating circumstances where I use something

20   slightly different.

21   Q    And that's combining the two again, it's the vacancy

22   and the collection loss.  When you say 2 or 3 percent,

23   right?

24   A    Yes.

25   Q    Now, on page two of your report.  I'm sorry, I know we

Page 128

1   keep bouncing around at the top of the page.  It's actually

2   numbered page two in your report.  Sorry, I lost my place.

3   Give me one moment.  Ah, okay.  More in the middle of the

4   page.  Under local market conditions, you have a paragraph

5   that starts as of mid-2025.  Do you see that?

6   A    Yes.

7   Q    And the last sentence of that paragraph says vacancy is

8   steady at 2.8 percent.  You see that?

9   A    Yes.

10  Q    What vacancy rate is that reflecting?

11  A    I believe that it is a CoStar market report from the

12  entire New York multifamily market.  So it represents all

13  multifamily properties, including.

14  Q    Free market buildings, and that that reflects that 2.8

15  percent reflects only the vacancy portion of the V&CL,

16  right?

17  A    Yes.

18  Q    And wouldn't you agree with me that that's the market?

19  That is the market would be 2.8 percent.

20  A    That would be the average for the market, including

21  free market buildings, which have much higher rents and have

22  higher vacancy.

23  Q    So.  So free market rents and buildings would not be

24  appropriate comparables for the debtor properties, right?

25  A    No, that's not what I'm saying.  They're saying this

Page 129

1    vacancy right here that they're talking about includes free

2    market buildings.

3    Q    And so it should not be used to apply to the debtor

4    properties.

5    A    This vacancy right here?

6    Q    Yes.

7    A    Well, that's one factor that we consider.  But we also

8    consider the in-place number of vacant units at each

9    property as well as our market knowledge of rent stabilized

10   buildings owned by other operators and their vacancy rates.

11   Q    So this 2.8 percent market rate is something you

12   considered but didn't necessarily adopt, is that right?

13   A    Yes.

14   Q    Going back once again to your reply declaration, that

15   same Paragraph 10 we were looking at the top of page 6.

16   This is your.  The last sentence of Paragraph 10.  See that?

17   Can you read that last sentence of Paragraph 10 into record,

18   please?  Starts with the word ultimately.

19   A    Ultimately, every Property and market is unique.  When

20   concluding to a vacancy and collection loss factor or any

21   other concluded assumption.

22   Q    Your statement there is not limited to V&CLs, right?

23   You say or any other concluded assumption, right?

24   A    Sorry, can you say that again?

25   Q    The statement you have at the end of Paragraph 10, you

Page 130

1   didn't intend to limit to the V&CL factor, you say at the

2   end of the sentence or any other concluded assumption,

3   right?

4   A   Well, we have to take every property in relation to the

5   market in which it competes.  So vacancy and collection loss

6   is one variable that we consider within the market.

7   Q   But every property and market is unique with respect to

8   every one of the factors that you apply in reaching values

9   for properties, right?

10  A   Yes.

11  Q   And so with every property being unique, what did you

12  need to do, 83 separate appraisal reports to properly

13  determine a value for the debtor properties?

14  A   No, because I understand the variables that operate

15  within each.  You know, within each of the properties, I

16  have my individual spreadsheet that I analyze for each

17  asset.

18  Q   Okay, well, let's limit -- and thank you for that with

19  respect to the other values, but let's limit my questions

20  and your answers for the moment to the report itself.

21  A   Okay.

22  Q   Because in your spreadsheets, you're not giving

23  appraised values, giving indications about.

24  A   Right, sorry, I meant my individual.  I have an

25  individual Excel spreadsheet for each of the.  Each property

Page 131

1    within Zarasai.  That's what I meant by spreadsheet.

2    Q    And that spreadsheet that you just referred to,

3    different than the one I referred to?

4    A    Yes.

5    Q    Is that what you consider your work file?

6    A    That's part of the work file.

7    Q    What else is part of the work file?

8    A    Comparable data that we.  That I pull.  Investor survey

9    data, discussions with market participants.  The work file

10   is everything that we use to determine our value.

11   Q    But now, going back to where we were, you said that you

12   could.  Because you understand and have a separate work file

13   for each of the properties that you can apply, you don't

14   need to do separate appraisal reports to reach an appraised

15   value for each property.  Is that fair?

16   A    No, because I do appreciate -- well, I don't do an

17   appraisal report.  I do an analysis.

18   Q    Okay.  What you did here in your expert report is one

19   restricted appraisal report, right.  For all 83 of the

20   debtor properties that you value?

21   A    Yes.

22   Q    And you took assumptions that we've been discussing

23   some of them, and we'll continue to discuss them with

24   respect to revenue and expenses and apply that across all

25   83.  Right.

Page 132

```
 1    A    Not all.  Like I said, market.  Market participants.

 2    In my experience, in my 22 years generally apply a 3 percent

 3    vacancy and collection loss factor.  So that's what I

 4    applied to most of the properties.  And there are some

 5    extenuating circumstances where it varies.

 6    Q    Okay.  I'm speaking more broadly now.  I'm not limited

 7    to the V&CL.

 8    A    Okay.

 9    Q    All of the factors for revenue and expenses, you made

10    determinations in your professional judgment, and those

11    determinations that you made in your restricted appraisal

12    report, you apply to all 83 properties, right?

13    A    Yes.

14    A    I'm not understanding the question because I'm through

15    the same process for each of them.

16    Q    Yeah, well, you didn't do an individual process for

17    each of them.  Right.  You did it.  You did an overall

18    process and applied those factors to reach values for the 83

19    properties?

20    A    No, I did an individual spreadsheet, which I believe

21    each of my work.  Each of those spreadsheets were provided,

22    so.

23    Q    And none of that is described in your report, is it?

24    A    Not sure.

25    Q    You're not sure.
```

Page 133

1   A     Well, the process that I go through, you know, the

2   typical appraisal process that appraisers use is described,

3   and so how would I not derive an individual value for each

4   property without doing it for each property?  Because I

5   ascribed a value for each property.

6   Q     Right, you applied the math from your.  Your

7   determination of revenue and expenses to each property.  I

8   agree.  But those determinations of the factors you applied

9   across, subject to the markets and the cap rate, which we'll

10  discuss, you apply that across all 83 properties?

11  A     Well, they are influenced by the historical income and

12  expenses as well, and vary based on the individual

13  characteristics of.  Of each building.  For example,

14  payroll.  If there are, you know, two supers living in the

15  building, then my payroll expense would be lower than what a

16  market participant would underwrite.

17  Q     We'll talk about payroll in a minute as well.  Let's

18  talk for a minute about the work files.  The work files that

19  you have are not work files that underlie your report here.

20  Right.  These are work files that you keep in the normal

21  course of your.  Your practice.  Let me withdraw that and

22  try again.  Do you have work files that you prepared solely

23  with respect to the expert report that you provided here?

24  A     They were provided as -- I don't know the term, but

25  they were provided.

Page 134

1   Q    I understand.  No, that's not my question.  The work

2   files that you have that were provided, were they prepared

3   solely with respect to the expert report that we're

4   discussing now?

5   A    Well, I've been appraising these properties for 12

6   years, so my Excel is.  Is a living document.  And every

7   time I'm asked to provide valuations, I use the same model

8   and start from that, right?

9   Q    So the answer is no, they weren't prepared just for

10   purposes of the report.  These are, these are spreadsheets

11   you've been using for at least 12 years, right?

12          MR. SLACK:  Objection, to the form.

13          THE COURT:  Overruled.

14          THE WITNESS:  Well, I start fresh every time.  But

15   it's the same spreadsheet.  That's how most appraisers work.

16   They have templates that they use over and over again.

17   BY MR. PASQUALE:

18   Q    I'm just trying to establish, and I think, I think we

19   have agreement that you did not prepare new spreadsheets and

20   start a new analysis for purposes of your expert report

21   here.

22          THE COURT:  Hang on a sec.  Before you answer, I

23   think Mr. Slack has an objection.  What's that?

24          MR. SLACK:  I'm just -- I'm objecting to the form.

25   I think it's misstating what Ms. Zell said.

Page 135

1              THE COURT:  Sorry (indiscernible) --

2              MR. SLACK:  I think, I think Ms. Zell says she has

3     a template and she just has -- we can read it back that,

4     that it's a living document, but she starts there.  And for

5     each engagement she starts -- she said she starts fresh.

6              THE WITNESS:  I didn't -- I didn't say that.

7              MR. SLACK:  She said that --

8              THE COURT:  Yeah, hang on.  So I'll just

9     characterize that as an objection of mischaracterizes.

10             MR. SLACK:  That's exactly right.

11             MR. PASQUALE:  Happy to rephrase the question.

12             THE COURT:  Yeah, why don't -- why don't you -- I

13    was trying to decide if the question was premised on

14    characterization of testimony or was a new question.  But if

15    you ask a new question, we solve that.

16    BY MR. PASQUALE:

17    Q    You do not prepare new spreadsheets for each of the

18    debtor property.  You did not prepare new spreadsheets for

19    each of the debtors properties in preparing your expert

20    report in this matter.  Right.

21    A    Well, I did the same thing I do every time.  I, you

22    know -- I use the same spreadsheet, but I update the

23    relevant information that I need to prepare a value as of

24    that data value.

25    Q    Thank you.  I understand that.  So you're starting with

Page 136

1    an existing spreadsheet and you are updating it for certain

2    inputs.

3    A    I'm updating it for the inputs that I need for that

4    valuation.

5    Q    That is what you did for the expert before.

6    A    Yes.

7    Q    Thank you.  And the work files that we've been

8    referring to here, these go back 12 years to when you first

9    started valuing the debtor properties, right?

10   A    Most of them, yes.

11   Q    In fact, I think most, if not all actually refer to

12   your prior firm on the first link of the spreadsheet.  The

13   Leitner firm.  Right?

14   A    They do.

15            MR. SLACK:  Your Honor, I would just say the

16   relevance here of, of going back and talking about her

17   spreadsheets and what they look like 12 years ago.  I think

18   we're a little far afield.

19            THE COURT:  What's the -- yeah, let me hear.

20   What's the relevance?

21            MR. PASQUALE:  Works files.  Her work files.  Not

22   only in her testimony here, but our supplemental report.

23   This is the backup for.  And that's what I'm trying to.

24            THE COURT:  Okay.  Yeah.  I'm going to overrule.

25   I will say we're -- I want to make sure we remain

Page 137

1    purposeful, so.  But I, you know, overrule the objection.

2    BY MR. PASQUALE:

3    Q    You understand that under USPAP record keeping Rule 12,

4    when you use a restricted appraisal report like you did

5    here, your work file needs to show the methodology you

6    apply, right?

7    A    I haven't reviewed USPAP Rule 12.

8    Q    Does that sound right to you?

9    A    Yes, I have USPAP in here.

10   Q    You do?  You do?  Let's do that.  The Exhibit 19, Page

11   12.

12   A    Yes.

13   Q    You see, in the middle of the page, there are numbers

14   on the left-hand column, 344 to 346.  Really 345, first

15   sentence.  No, it's both 344 to 346.  Excuse me.

16   A    Yes.

17   Q    And this references that a restricted.  That the work

18   file in support of a restrictive appraisal report has to be.

19   What would be adequate to support an appraisal report,

20   Right?

21   A    Yes.

22   Q    And you would need the methodology shown in order to do

23   a full appraisal report, right?

24            MR. SLACK:  Objection to the form.

25            THE WITNESS:  You asked the last question.

Page 138

1          THE COURT:  I'm sorry, what's the objection?

2          MR. SLACK:  I mean, I'm reading.  He's making it

3    sound like he's reading the document.

4          THE COURT:  Yeah, it's -- the questions are

5    paraphrasing, so.  Yeah, let's -- but I'm going to overrule

6    the objection.  But just make sure the witness understands.

7    You're being asked if you agree with the characterization of

8    language.  You see here on this.  On Lines 344 to 346 of

9    Page 12 of Exhibit 19.

10          THE WITNESS:  Could you repeat the

11    characterization?

12          MR. PASQUALE:  Let me make -- let me ask a new

13    question.

14          THE COURT:  Or you can just ask using the words

15    which might avoid equivalent.

16          MR. PASQUALE:  Yes, Your Honor.

17    BY MR. PASQUALE:

18    Q    But let me go back.  The USPAP standard here that we

19    were looking at says a work file in support of a restricted

20    appraisal report or an oral appraisal report must be

21    sufficient for the appraiser to produce an appraisal report.

22    You see that.  What is your understanding of what the work

23    file would be?  What.  What a sufficient work file would be

24    to produce an appraisal report.

25    A    That would depend on the property being appraised.

Page 139

1   Q    You would need to show your methodology, right?

2   A    Yes.

3   Q    And you would need to show all the inputs to that

4   analysis.

5   A    Well, again, you're talking in general about a work

6   file needed for any, you know, any appraisal report.  So.

7   Yes.  You would need your support for your assumptions.

8   Q    So you would agree with me, right?  That that support

9   that you just mentioned needs to be in your work files to

10  support the restricted appraisal report that you issued as

11  your expert report.

12  A    Yes.  But you know, the work file is more than just the

13  spreadsheet.  And again, I'm talking about the individual

14  property spreadsheets.  There's a work file.

15  Q    Yeah, understood.  Yes, I use the word work file, so I

16  understand that means more than the spreadsheet.  Thank you.

17  You mentioned a few minutes ago payroll as one of the

18  expense inputs and you did stabilize payroll expenses across

19  the debtor properties, right?

20  A    Yes.

21  Q    And payroll is salaries for the building staff and that

22  differs.  I think you said this a moment ago on a, on a

23  building by building or unit by unit basis, right?

24  A    Yes.

25  Q    Now, you assumed for the debtors properties that other

Page 140

1    company wide expenses were run through payroll, right?

2    A    Yes, that's what their appraisal states.

3    Q    What other company wide expenses are run through the

4    debtor payroll?

5    A    I don't know.  Their historical payroll expenses appear

6    very high to me, so I assumed that there was something else

7    in there.

8    Q    So you reduced the payroll from the actual when you did

9    your stabilization process, right?

10   A    Yes.  To a market-oriented payroll?  I reduced most of

11   them.  I'm not sure if I reduced every single one.

12   Q    When you say most of them, you mean across the 83

13   properties?

14   A    Yes.

15   Q    Now let's talk about revenue for a minute.  One of the

16   things you did is apply a 2.69 percent growth factor right.

17   A    To the rent stabilized income.  Yes.

18   Q    Thank you.  Can you explain what the purpose is of your

19   growth factor?

20   A    Yes.  Appraisals are forward looking over the next

21   year.  So in order to project kind of an average income for

22   rent stabilized units which are subject to certain increases

23   for one- and two-year leases per the law, we as a firm and

24   other firms that I've worked for as well would grow the rent

25   stabilized rent to kind of normalize it over the upcoming

1    year for what you would assume the rent.  The average rent

2    would, would, would be.  So according to the rent guideline

3    boards, currently the allowable annual increase for a one-

4    year renewal is 2.75 and for a two-year renewal is 5.25.  So

5    that 2.69 is in kind of average growth rate for the rent

6    stabilized.

7    Q    Income, you assumed half of the tenants would renew at

8    a one-year lease and half would renew it a two-year lease,

9    right?

10   A    Yes.

11   Q    Now, you could have done an analysis of the actual

12   leases at the property.  Right?  To see when they actually

13   expire.

14   A    Yes.

15   Q    But you chose not to do that in your judgment, right?

16   A    That's not market oriented.  And a lot of these

17   buildings are very large, so I don't think that would, that

18   would produce meaningfully different.

19   A    Rates.  Yeah.

20   Q    And you said a moment ago that this growth factor is

21   something Bowery, your firm, typically does.  But you don't

22   know if other appraisers use that same assumption, do you?

23   A    I don't.  That's how BG did it when I worked there, as

24   well as Leitner Group when I worked there.  And Bowery does

25   that as well.

Page 142

1          THE COURT:  I'm sorry, can I ask another dumb

2     question, wanting to understand how this works.  So you're

3     assuming an average growth factor, meaning increase in rent

4     rolls of 2.69 percent.  Right.  Does it matter when that

5     rent increase gets realized by unit or, or cumulatively?  Or

6     do you just figure, ah, that increase will be realized at

7     some point in the coming year and that's good enough?

8          THE WITNESS:  That's what we do.  Yes, Your Honor.

9          THE COURT:  Okay.  So if everybody renews 11

10    months out, the actual 12-month increase will be 112 of that

11    product.  Right.  But you're just assuming it'll net out, I

12    guess.

13         THE WITNESS:  Yes, Your Honor, because the leases

14    roll at all different times.  A lot of the buildings are

15    pretty large.  Yes.  You know, 100 units or if you.

16         THE COURT:  Said you're projecting revenue over

17    the coming year, why does 2.69 somehow capture the reality

18    that the rent, the lease renewals will be sprinkled

19    throughout the period?  I'm sorry, I make.  I wouldn't.  I

20    still remember being a lawyer and being driven mad by quite

21    judicial behavior like this.  But I really want to figure it

22    out.  So, so how does your number account for the reality or

23    likelihood that leases re-up sprinkled throughout the year?

24         THE WITNESS:  Well, according to rent

25    stabilization, tenants have the right to renew their lease

Page 143

1   every year.  You know, every year for a one or a two-year

2   term.

3            THE COURT:  Right, right.  And the increase will

4   be is up to a capped amount set by the hours that be.

5   Right.  So my question is.  Oh, are you, are you doing

6   something to not simply assume a full year's worth of rent

7   jump and the full amount allowed by regs, given the fact

8   that some apartments will turn over earlier and some won't

9   turn over until 11 months out?

10           THE WITNESS:  Yes, Your Honor, we take half of the

11   one-year rent growth.  So the one-year rent is 2.75.  So we

12   take half of that and then we take.  We assume that.

13           THE COURT:  Oh, I see.  It's a blend.  It's half

14   of the one year and half of the two year.

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  I got it.  Thank you.  By one

17   and two year.  What I'm talking about.  I'll just make sure

18   I'm right.  Is the permissible increase for either a one or

19   a two-year renewal.  And you just assume it's a 50/50 mix.

20           THE WITNESS:  Yes, of course.

21           THE COURT:  Okay.

22           THE WITNESS:  Yes.

23           THE COURT:  Thanks.  Go ahead.  Sorry for that

24   detour, but I need to understand this stuff.  Okay.  Go

25   ahead.

Page 144

BY MR. PASQUALE:

Q    And Ms. Zell, I was just asking before the judge asks

his questions and just want to be sure we have it in the

record whether, you know, I think you said you don't know

whether other appraisal, other appraisers.  Excuse me.  Do

it the way you just described for the court.

A    I don't know.  As I said, the past two firms I worked

for also did it the same.  And this is how Bowery operates.

Q    You do know that Mr. Fowler cites to at least three

other firms, including your prior firm, Leitner Berman, that

does not apply the growth factor the way you described.

A    Well, Leitner Berman is a different firm than where I

used to work.

Q    Oh, I'm sorry.  That's my mistake.

A    Yes.  I read his report and I saw that there are some

firms that did not do that.

Q    Now, let's talk a bit about the cap rates.  Now, you

performed an income approach on each of the properties,

Right.  And you analyzed sales data to check the

reasonableness of your income analysis, right?

A    Yes.

Q    Now, the cap rates you applied are on page five of your

report, I think, apologies, page eight of your report.  And

you have a little box sort of at the first third of the page

called concluded cap rates.

Page 145

1   A    Yes.

2   Q    And these are the cap rates you ultimately applied to

3   reach your property values in your expert report, right?

4   A    Yes.

5   Q    Now, in your May 30th letter that we looked at

6   previously, that's exhibit five in the binder.  And please

7   feel free to turn back to it in the first paragraph and

8   please take as much time as you need to read it.  But you

9   actually, you say that you were raising the cap rates for

10  the first quarter of 2025 from your December 31, 2024 values

11  because of "declining market conditions for rent stabilized

12  assets," right?

13  A    Yes.

14  Q    And that was true at the time, right?

15  A    Yes.

16  Q    And you go on to elaborate on the reasons you are

17  increasing cap rates the way we discussed a little bit

18  earlier.  And the second Reason at the bottom of the first

19  page of your letter is the continued deterioration of the

20  rent stabilized market, right?

21  A    Yes.

22  Q    Okay.  Could you read the next sentence into the

23  record, please?  The one that starts with the word owners.

24  A    Sure.  Owners are unable to raise rents and expenses,

25  particularly taxes, insurance and utilities have increased

Page 146

1   significantly.

2            MR. SLACK:  Your Honor, at the risk of maybe being

3   the only one, we've been going a long while and whenever

4   there's maybe a break, we could get an idea like where we

5   are on the witness.

6            THE COURT:  And try to figure that out.  Fine.  If

7   you're in the midst of a line that you want to see through

8   quickly, that's fine, Mr. Pasquale.  Or else let's take

9   stock and figure out break time.

10           MR. PASQUALE:  If I can ask one more question.

11           MR. SLACK:  Yeah, sure.

12  BY MR. PASQUALE:

13  Q    To close this out, at least on this particular thing

14  and what you just read and what you describe in the last

15  paragraph on the first full page of your letter, that's all

16  true today, right?  The deteriorating market conditions that

17  owners are unable to raise rents, et cetera, that's all

18  true?

19  A    Yes.

20           MR. PASQUALE:  Now's a fine time, Your Honor.

21           THE COURT:  Okay, great.  Let's see, I'm going to

22  say let's take a five-minute break in the sense that that

23  really means somewhat more than five, but less than 10,

24  ideally.  Okay.  So thanks very much.  You remain under

25  oath, Ms. Zell, so just don't talk to anybody about your

1    midstream testimony.  And with that, we'll go off the record

2    and come back.  And I'll be back in about eight minutes.

3         (Recess)

4              THE COURT:  Okay.  Back on the record following a

5    break.  Reminder, Ms. Zell, you remain under oath and you

6    can resume, Mr. Pasquale.

7              MR. PASQUALE:  Thank you, Your Honor.

8    BY MR. PASQUALE:

9    Q    Ms. Zell, we were starting to discuss cap rates when we

10   took a break.  According to your report on Page 6, you have

11   a one sentence underneath the heading capitalization rate

12   analysis describing what you did, is that right?

13   A    Yes.

14   Q    And you examined data from investor surveys, right?

15   A    Yes.  Among other things.

16   Q    Yep.  Yep.  You extracted data from recent sales of

17   similar properties, what you say there.  And you had some

18   discussions with brokers and market participants, right?

19   A    Yes.

20   Q    The investor surveys that you looked at, they're set

21   out on Page 6 and 7 of your report, right?

22   A    Yes.

23   Q    And that's in the charts, the bottom of Page 6 and the

24   top of Page 7?

25   A    Yes.

Page 148

1    Q    And those are relying on various market reports from

2    PwC, Cetus and IRR, right?

3    A    Yes.

4    Q    Now, you don't know which, if any of those surveys

5    include rent stabilized multifamily properties, right?

6    A    I don't know off the top of my head.  They include

7    sales from, you know, the Markets that each of these

8    companies tracks.

9    Q    By these companies, you mean PwC, Cetus and IRR, right?

10   A    Yes.

11   Q    And all of the debtor properties are rent stabilized

12   multifamily properties, right?

13   A    Yes.  They all have at least some rent stabilized

14   units, yes.

15   Q    Well, they all have at least a majority.  Majority of

16   rent stabilized units, right?

17   A    Well, there might be a few in Manhattan that have a mix

18   or maybe even more free market, but that's just a few.

19   Q    But you don't know that as you sit here today that's

20   the case.

21   A    I know that they have some free market, I just don't

22   know the percentage.

23   Q    And only two of the surveys that you looked at are

24   limited at all to the New York market, right?

25   A    Yes.

Page 149

1   Q    And those two New York surveys, they do not include

2   rent stabilized multifamily properties, do they?

3   A    I don't know.

4   Q    Well, the debtor properties wouldn't be considered a

5   class A property, would they?

6   A    Probably not.

7   Q    Or a class B property?

8   A    I don't know.

9   Q    Now, you also relied upon CoStar data, right?

10  A    Yes.

11  Q    What is CoStar?

12  A    CoStar is a subscription service, a company that

13  compiles information about commercial real estate, sales,

14  rents, transactions.

15  Q    And you looked at, and I'm looking at your report in

16  the middle of page seven.  40 cap.  That what you've

17  entitled the section cap rate sales.  40 affordable number

18  of sales from CoStar data, right?

19  A    Yes.

20  Q    Any of those 40 affordable sales pertain to rent

21  stabilized multifamily units?

22  A    I have to check the list.  You know, I don't remember.

23  Q    Did you do anything in your analysis to verify that the

24  CoStar data was reliable for your purposes?  The purposes

25  being the preparation of your report.

1   A     Relating to these sales here?

2   Q     Excuse me.  Relating to the analysis that you did, did

3   you do anything to verify the CoStar data?  Well.

4   A     Not for this analysis here where we look at market rate

5   versus affordable cap rates, but I do.  For the sales that I

6   track on CoStar, referenced on page eight, eight and

7   forward.

8   Q     That's your, your sales comparable approach, which

9   we'll talk about in a second.  That's what you're referring

10  to, right?

11  A     Yes, but I also look at those cap rates.

12  Q     Yes, no, I understand.  We're going to talk about that

13  in a second.  For purposes of the chart you have on page

14  seven, you didn't do anything to verify the reliability of

15  the data that you report on page seven of your report?

16  A     No.  We just searched on CoStar for market rate and a

17  CoStar.  One of the categories that you can filter by is a

18  forecast affordable.

19  Q     And as a result of the review, the analysis you did of

20  the CoStar data you applied a 25 basis points premium,

21  right.  To account for the difference between market rate

22  and affordable.

23  A     Yes.

24  Q     Now, the broker conversations that you considered are

25  on page four or discussed to some extent on page four of

Page 151

1    your report, right?

2    A    Yes.

3    Q    And what the brokers told you was one of the data

4    points that you considered right in setting your own cap

5    rates.

6    A    Yes.

7    Q    But fair to say you did not give much weight to the

8    broker comments because you believe from your experience

9    that cap rates stated by brokers are too high, right?

10   A    No, I would say in my experience of analyzing broker

11   cap rates and appraiser cap rates, in my experience, broker

12   cap rates are higher than appraiser cap rates because one of

13   the reasons is because brokers do not apply reserves as an

14   expense category.

15   Q    And in fact, the rates that you report that brokers

16   told you on page four, they're all about 1 percent higher

17   than your concluded cap rates that you set out on page

18   eight, right?

19   A    Well, for Queens it's the same.

20   Q    And the others are about 1 percent higher, right.

21   A    Bronx is about 80 basis points higher on a blended

22   rate.  Yes.  The rest are about 100.

23   Q    And that's what we just discussed.  That's what you

24   have under your the section of your report called

25   capitalization rate analysis, right?  There's nothing more

Page 152

1    prior to your concluded cap rates chart that we looked at a

2    moment ago.

3    A     Within that section?  No, but then there's cap rates

4    reported in my comparable sales, so I use those as well.

5    Q     The one you answered which is under that section,

6    that's.  Those are all the things that you considered and

7    then resulted in your concluded cap rates, right?

8    A     Well, I also considered the sales cap rates here which

9    are for brevity, I just included them in the sales

10   comparison approach section.

11   Q     We're going to get to that right now.  So you, your

12   sales comparison approach, you use to assess the

13   reasonableness of your income capitalization approach,

14   right?

15   A     Well, I believe I also say earlier that one of the

16   method, one of the sources of cap rates that I use Is sales

17   from CoStar and from our own files and those are presented

18   in the sales comparison approach section.

19   Q     But under your heading on page eight, under sales

20   comparison approach, you expressly say that it's done in

21   order to assess the reasonableness of our value conclusion

22   via the income capitalization approach, right?

23   A     Yes.

24   Q     And this is an analysis starting on page 8 and going to

25   page 13 of various sales in the locations of the debtor

Page 153

1  properties that you believe are comparable sales to those of

2  the debtor properties, right?

3  A   For the most part, yes.  They contain a majority of

4  rent stabilized units.  So yes.

5  Q   And as reflected in your report, for each of the, of

6  the locations, the jurisdiction, so to speak, you

7  established a minimum, maximum, median and average cap rate

8  based on those sales, right?

9  A   Yes.

10 Q   And you did that where you had the data for 2024 and

11 2025 sales?

12 A   Yes.

13 Q   And you'd agree with me that for every market that you

14 analyzed other than the Bronx, your concluded cap rate on

15 page eight is lower than the medium and lower than the

16 average of the comparable sales that you report?

17 A   Yes.

18 Q   And you actually say so in multiple paragraphs in your

19 reply declaration, right?

20 A   Yes.

21 Q   Let's start with Paragraph 22 of your reply

22 declaration.  Let me know when you're there.

23 A   I'm there.

24 Q   Okay.  Thank you.  In Paragraph 22 of your reply

25 declaration, you note that the cap rates for comparable

Page 154

1    sales in Brooklyn range from 5.4 percent to 8.5 percent, and

2    you say you reconciled to a 6 percent cap rate.  Do you see

3    that?

4    A    Yes.

5    Q    But the median of your comparable sales for 2024 is 7

6    percent and the average is 6.88 percent, right?

7    A    Yes.

8    Q    How did you reconcile those higher cap rates to 6

9    percent?

10   A    Because I look.  Well, first of all, I take into

11   account all of the other cap rate data that we already

12   mentioned, and then I look at each sale and for some of

13   them, or Bowery did the appraisal.  So I would, you know,

14   think I would look at that appraisal and compare that

15   property to the subject, you know, the average subject

16   properties.  And having toured them, I can, I know that

17   they, I know the condition.  I know that they are well

18   maintained.  I know that ownership has, you know, has their,

19   I would say their papers in order, which we, you know, we

20   appraise a lot of rent stabilized buildings.  So we see a

21   whole variety of different types of owners, and a lot of

22   them do not have their papers in order.  And I, you know,

23   look at the listing for each one on CoStar, I look at the

24   photos, I look at the om, if it's available, and I compare

25   each property as to the subject buildings.  And then I

Page 155

1    reconcile to a cap rate.  And for some of the properties

2    that CoStar has a cap rate for, they don't provide any data

3    for that cap rate.  Sometimes there's an om, an offering

4    memorandum by the brokers, and if there is, I recreate a pro

5    forma using the same methodology that I use to value the

6    subject properties.

7        So I apply a growth rate to the rent stabilized rents,

8    I apply market expenses, and I'm able to compare the CoStar

9    cap rate reported with an appraiser cap rate.  And most of

10   the time the appraiser cap rate is lower than what's

11   reported on CoStar because they just report a cap rate, but

12   they don't say how they get to that cap rate.  And cap rates

13   are directly related to the income and expenses that are

14   analyzed in that cap rate.  So that's how I look.  You know,

15   I look at this property that sold, I know this one

16   particular owner is selling a lot of buildings.  They're

17   just liquidating all of their assets in the city.  And that

18   has a seven and a half cap rate.  Then there's a 6.2,

19   there's a 5.59, there's an 8, there's a 7, and there's an

20   8.44 from CoStar.

21       So I look at all that information and I reconcile to a

22   6 cap rate because I know these, the subject properties, a

23   lot of them are in good locations.  And then I looked at the

24   sale data, and for the Brooklyn properties, the Brooklyn

25   debtor properties, my average, the average value per unit is

Page 156

1    $132,000.  And I look at all these sale prices and the

2    average is $131,000 per unit.  And it's not reasonable to

3    me, based on my experience, that the debtor properties would

4    sell for less than that.  They are in good condition,

5    they're well maintained, and their paperwork is in order.

6         So that's how I reconciled to my values for each of the

7    debtor properties.  And I always like to think that I'm

8    providing a value, I'm not providing a cap rate.  Cap rate

9    is certainly part of the equation of the valuation, but in

10   the end, I'm determining a value.

11   Q    Ms. Zell, that lengthy response, none of what you just

12   said is in your report at all.  Right?  You don't explain

13   that process in your report.

14   A    Correct.

15   Q    You don't even explain it in your reply declaration?

16   A    Well, I tried to, but I guess it didn't come across

17   there.

18   Q    A reader of your report would not know how you reached

19   your conclusion.

20   A    I suppose not if you read it and you didn't understand

21   it or, you know, didn't follow my logic.

22   Q    Well, because in fact, the data that you report in your

23   report does not reconcile on its face to the cap rate that

24   you chose, does it?

25           MR. SLACK:  Objection to the form of the question.

1   I think that's the objection.  I think that misstates the,

2   the data that we've just looked at and spent time with.

3            THE COURT:  Well, I'm going to overrule that

4   objection.  I mean, I think you're kind of hitting a point

5   somewhat repeatedly.  I think you've established that the

6   face at least the face of the report doesn't reveal the full

7   analytical path that Ms. Zell just described.

8            MR. PASQUALE:  Thank you, Your Honor.

9   BY MR. PASQUALE:

10  Q    Based on that comment, I'll move on.  What is a band of

11  investment analysis?

12  A    It is an analysis to determine market cap rates,

13  analyzing typical terms for mortgage and equity rates.

14  Q    And you testified earlier that the methodology that you

15  applied in your expert report, restricted appraisal report,

16  is the same that you would use in a full appraisal report,

17  right?

18  A    Yes.

19  Q    In a full appraisal report, you would do a band of

20  investment analysis, right?

21  A    That is part of our Bowery template to include that.

22  Yes, but I did not.  For this analysis and this intended use

23  and user, I did not think that was necessary to develop a

24  credible opinion of value.

25  Q    So you did not apply the same methodology with respect

Page 158

1   to the ban of investment that you would normally apply in

2   your expert report, right?

3   A    Yes, because I didn't find that necessary for this

4   purpose and this use and user.

5            MR. PASQUALE:  Your Honor, can I have just a

6   minute?

7            THE COURT:  Yes.

8            MR. PASQUALE:  I have no other questions.  Thank

9   you.

10           THE COURT:  Okay.  Thanks.  Redirect?

11           MR. SLACK:  Your Honor, before I redirect, can I

12   take two minutes to talk to colleagues?

13           THE COURT:  Yes, I'm inclined to sit in place so

14   that we don't blow a lot more time, but that's fine.  And

15   you can either step out, but don't go into the construction

16   zone, as you've been told, or whisper here.  Your choice.

17   If anybody else wants to just run down the hall, you may and

18   close the door behind you.  That's for air conditioning

19   reasons.  I've learned that basically we were sitting in our

20   house on a hot day with our front door wide open, thus

21   letting hot air in and our cold air out.  So now we have

22   solved for that by closing the door.  Oh.  So I don't know

23   if I need to say this, but we can just go off the record

24   briefly and we'll resume when counsel's back.

25           (Recess)

Page 159

1          THE COURT:  Mr. Slack, any redirect?

2          MR. SLACK:  No, Your Honor.

3          THE COURT:  Okay, thank you.  Ms. Zell, thank you

4    for your testimony today.  You are welcome to stand down and

5    you're welcome to stay and see what happens, or not.  Your

6    choice.  Okay.  Thank you.  Same question I had at the end

7    of the last witness.  Should Ms. Zell take all those papers

8    with her?  Are they needed for the next witness?  Okay.  So

9    you can just clear the space of whatever you've got up

10   there.

11         MR. PASQUALE:  I can take that large one back.

12         THE COURT:  Thank you very much.  Okay.  Do we

13   need to do anything before the next witness is called?

14   Maybe not --

15         MR. PASQUALE:  I'm done.

16         MR. SLACK:  Go ahead.

17         MR. PASQUALE:  No, I didn't know if you wanted

18   officially (indiscernible) --

19         THE COURT:  Oh, we said that that was established.

20         MR. PASQUALE:  Yeah, Sorry.

21         THE COURT:  Yep.

22         MR. PASQUALE:  Your Honor, Flagstar would call

23   Scott A. Fowler to the stand.  His report is already in

24   evidence.

25         THE COURT:  Okay.

Page 160

1           MR. PASQUALE:  Exhibit 1.

2           THE COURT:  Thanks.  I thinking you have to go

3     loop around, Mr. Fowler, or you -- if you can fit through

4     that teeny gap, you can.  But the government will not repay

5     you for ripping your suit.  Okay.  Remain standing, if you

6     would.  Let's see.  Do you -- ready?  Please raise your

7     right hand.  Do you solemnly swear or affirm the testimony

8     you're about to give shall be the truth, the whole truth and

9     nothing but the truth?

10          MR. FOWLER:  (indiscernible)

11          THE COURT:  You can be seated.  And please state

12    your name for the record.

13          MR. FOWLER:  Scott Fowler.

14          THE COURT:  Thank you.

15          MR. PASQUALE:  Your Honor, if I could ask just for

16    a minute.  We just want to get Mr. Fowler his report with

17    the exhibits were just.

18          THE COURT:  Yes, that's fine.  And I think

19    everybody's drinking water, so I should just say a word that

20    that's fine.  Especially given the heat and -- yeah,

21    whatever papers need to get in various people's hands,

22    please take care of that and then we can get going.

23          THE WITNESS:  Thank you, Your Honor.  Mr. Fowler

24    now has a copy of --

25          THE COURT:  Okay, great.  Sorry.  I think we

Page 161

1    did -- we already receive in evidence the direct that I

2    memorialized.  That that's been done.

3              MR. SLACK:  I think it's one of the exhibits.

4              THE COURT:  Oh, it's in as an exhibit.  Okay.  So

5    we'll proceed.  Yep, that's right.  Okay.  So I think you

6    understand.  I know you understand this, Mr. Fowler, but

7    you're testimony, your direct testimony takes the form of

8    the declaration you've provided.  That's now before you and

9    Mr. Slack, it appears, is going to cross-examine you.

10                   CROSS-EXAMINATION OF SCOTT FOWLER

11   BY MR. SLACK:

12   Q    Good afternoon, Mr. Fowler.

13   A    Good afternoon.

14   Q    Your declaration that you prepared is in front of you

15   and attaches an Exhibit B, correct?  Exhibit B as in boy?

16   A    Yes.

17   Q    And that Exhibit B is entitled "Appraisal Review of

18   Debtors' Properties," is that right?  You go to the very

19   first page of Exhibit B.

20   A    That's correct.

21   Q    And your appraisal review is 26 pages excluding

22   attachments, correct?

23   A    The actual appraisal review process goes to 18.

24   Q    So you agree with me that every page from 2 until 26 is

25   labeled appraisal review and (Indiscernible) Real Estate

Page 162

1    Advisory, correct?

2    A    Yes.

3    Q    But Mr. Fowler, your view, which you told me at your

4    deposition is that as you did here, that the first part up

5    to Page 18 is actually what you would call an appraisal

6    review, correct?

7    A    Yes.

8    Q    And from 19 to 26 of this, notwithstanding that it's

9    labeled at the top Appraisal review.  It's your view that

10   that second piece is something you've entitled a sensitivity

11   analysis, correct?

12   A    Yes, it's an assumption and sensitivity analysis.  It's

13   an extension of the review in my report.

14   Q    Yes.

15            THE COURT:  Can you just make sure you speak up

16   and maybe aim at that horizontal bar?  Thank you.  You just

17   moved it hopefully towards yourself.

18   BY MR. SLACK:

19   Q    So, Mr. Fowler, let's focus for a second on that first

20   part, which is as you, as you said up to Page 18 and what

21   you've identified as an appraisal review.  Okay.

22   A    Okay.

23   Q    Now, when you conduct an appraisal review, you are

24   acting as an appraiser, correct?

25   A    Yes.  It's an appraisal function.

Page 163

1   Q    And just to be clear, when you are doing your

2   sensitivity analysis from 19 on, you are not acting as an

3   appraiser, correct?

4   A    That's right.  I wanted to be clear about that.  I

5   didn't complete the analysis as I would a normal appraisal.

6   I focused on certain assumptions.

7   Q    So when you're acting as an appraiser, you have to

8   comply with USPAP, correct?

9   A    Yes.

10   Q    So the first part of your analysis when you do an

11   appraisal review is one where you've complied with USPAP,

12   correct?

13   A    Yes.

14   Q    And I know we've had some testimony on it, but USPAP is

15   the Uniform Standards of Professional Appraisal Practice,

16   correct?

17   Q    Correct.

18   Q    Now, your appraisal review was prepared for use in this

19   litigation, correct?

20   A    Correct.  It was prepared, completed to inform the

21   court in this matter.  Yes.

22   Q    And as an appraiser, when you are actually acting as an

23   appraiser, whether you're doing an appraisal report or a

24   restricted report or an appraisal review, as an appraiser,

25   you should not act as an advocate, correct?

Page 164

1   A    As an appraiser, you're just.  Yet you're not acting as

2   an advocate.

3   Q    And so again, just in contrast, from 19 on, when you're

4   doing a sensitivity analysis and not acting as an appraiser,

5   at least under USPAP, there's no restriction as to whether

6   you can act as an advocate, correct?

7   A    There's no restriction.  But in this manner, I mean,

8   I'm certainly just calling balls and strikes right down the

9   middle.  I'm doing the same thing I would do.  It's if I was

10  hired by the debtors or Flagstar.

11  Q    And all I'm asking is whether.  Is whether under USPAP,

12  you're no longer shackled by USPAP, though, as to whether to

13  be an advocate, correct?

14  A    You're no longer shackled.  You're no longer having to

15  comply with USPAP in the back half.

16  Q    Now, again, focusing on this first part of your report,

17  which is the appraisal review.  If you could turn to page

18  three of your report.

19          THE COURT:  Mr. Slack, before you go on, I just

20  want to make sure I absorb what you just got across

21  beautifully.  So the question about the USPAP standards

22  applying in the bar, I'll call it a bar on acting as an

23  advocate, applies to the USPAP governed portion of the

24  report, which is up through 18, but does not apply to the

25  Page 19 through 26.  Is that what you just established?

Page 165

1    Okay, I thought so.  I wanted to make sure I had it right.

2    Go ahead.  Thank you very much.

3    BY MR. SLACK:

4    Q    Now, Mr. Fowler, if you look at page three, I'd like to

5    focus your attention to the box on the left that says

6    purpose of review.  You see that?

7    A    I do.

8    Q    And in that purpose of review, again in your mind, only

9    relates to those pages for your actual appraisal review up

10   to Page 18, correct?

11   A    That's correct.  This is for the appraisal review.

12   Q    And one of the items there is the last sentence in the

13   purpose of review.  You see that sentence?

14   A    Yes.

15   Q    And that sentence is bolded, is it not?

16   A    It is.

17   Q    And is it bolded because it's meant to be an important

18   sentence.

19   A    It's there because I don't want to be misleading.

20   Q    And can you just -- one of us is going to read it, but

21   I'm going to have you at least do the first one.  So can you

22   read that sentence into the record?

23   A    This review does not include an independent opinion of

24   market value.

25   Q    Ad the fact is, is that an -- under USPAP, an appraisal

Page 166

1   review typically does not include an independent opinion of

2   market value, correct?

3   A    Sometimes it can, but I would say, on average, more

4   often than not, it doesn't.

5   Q    And so just to be clear, in fact, you did not provide

6   an opinion of market value of the debtors' properties as

7   part of the appraisal review, correct?

8   A    Not as part of the appraisal review process.

9   Q    So we're talking about the appraisal review process,

10  right?  Okay.

11  A    Right.  That's what I said.

12  Q    So let's also then turn to the second piece of your

13  report, which starts at Page 19 and Page 19 itself.  Let's

14  start there.  Actually, you know what?  I'm going to

15  backtrack and I apologize for it.  Let's actually go to the

16  page four.  Let's stick with the appraisal review.  That'll

17  be cleaner.  Let's go to page 4 of the appraisal review

18  section.  And you have a comment at page four.  You see the

19  comment box?

20  A    Yes.

21  Q    And your comment, at least the first part or the first

22  sentence says, I'll read this one.  The restricted appraisal

23  report provides an aggregate value for the subject

24  properties based on individual appraisals that may or may

25  not be commensurate with market value.  Do you see that?

Page 167

1   A    Yes.

2   Q    And Mr. Fowler, you would agree then that at least with

3   respect to your conclusions in the appraisal review, that

4   Ms. Zell's valuations in fact could be commensurate with

5   market value, correct?

6   A    In the review, I'm not saying her value is wrong or

7   right.  I'm just -- the review is focusing on the quality of

8   her report.

9   Q    That's all we're talking about, is that nothing in the

10  review you know is such that you're, you're saying that Ms.

11  Zell's valuations are not market, correct?

12  A    No, in the review, you do not comment on that.

13  Q    Okay, now let's go to 19 and go to the second piece.

14  So Page 19 starts what you've referred to as sensitivity

15  analysis.  Sensitivity analysis, Correct.

16  A    Assumptions and sensitivity analysis.  Yes.

17  Q    And in the, if you could go to the second paragraph of

18  your assumptions and sensitivity analysis box, you have a

19  sentence that says, I am not acting in the capacity of an

20  appraiser.  You see that I do.  So with respect to the

21  sensitivity analysis, you are not acting as an appraiser, as

22  I think you've already testified to, correct?

23  A    Right.  And this is to put the reader on notice that

24  this is not following us.  I'm doing things commensurate

25  with doing a value, but I'm not following all the standards

Page 168

1    or developing a full report.

2    Q    And again, because you're not acting as an appraiser,

3    you're not required to comply with use pap in your analysis,

4    correct?

5    A    That's right.  I don't have to -- I do not have to

6    follow all the steps in use path.  I can follow some, but I

7    don't have to adhere to everything.

8    Q    So later on in that sentence you say, "The work

9    presented is not intended to be an opinion of market value

10   and should not be construed as such."  Do you see that

11   sentence?

12   A    I see it.

13   Q    And that this whole pair, this whole part of this, this

14   paragraph is also bolded, correct?

15   A    Yes.  I want to be very clear as to what I'm doing.  So

16   my report is not misleading.

17   Q    Okay.  Fair enough.  And when it talks about the work

18   presented, that's your sensitivity analysis, correct?

19   A    Yes.

20   Q    And so what this part of this sentence is saying is

21   that the sensitivity analysis is not intended to be an

22   opinion of market value, correct?

23   A    Right.  It's not an opinion of market value consistent

24   with USPAP.  It's a value analysis, but not a market value

25   under USPAP.

Page 169

1    Q    It's not a market value analysis, correct?

2    A    It's not a market value you have to find by USPAP.

3    Correct.

4              THE COURT:  I'm sorry, I couldn't hear the --

5              THE WITNESS:  It's not a market value as defined

6    by USPAP.

7    BY MR. SLACK:

8    Q    Now, this has an opinion of market value.  It doesn't

9    say an opinion of market value as defined by USPAP, correct?

10   A    It's not a market value in compliance with USPAP.

11   Q    Thank you.  Now, you also say that at the end, that

12   your sensitivity analysis should not be construed as such,

13   correct?

14   A    Yes.  I want to be clear that it's not intended to be

15   compliant with the use path.

16   Q    Essentially, you were.  You were warning that the

17   sensitivity analysis should not be construed as an opinion

18   of market value of the debtors' properties, because that is,

19   in fact, an important limitation of your sensitivity

20   analysis, correct?

21   A    I'm putting in my notice.  It's not a market.  Or

22   that's not a market value in compliance with USPAP.  Yes.

23   Q    Now, you keep saying in compliance with USPAP, but

24   again, this doesn't say anything about USPAP, correct?

25   A    It says USPAP on the last sentence, not intended to

Page 170

1    comply with USPAP, and should not be construed as market

2    value.

3    Q    This sentence that we're talking about, where it's

4    talking about market value, Right.  You just added that,

5    right?

6              MR. PASQUALE:  Objection, Your Honor.

7              THE COURT:  I'm going to sustain on the grounds

8    that that was a compound question, so break it down.  So

9    it's also getting argumentative, but you can ask it.  I

10   mean, that's fine.

11             MR. SLACK:  I'll just ask a couple more questions

12   here.  Your Honor, on this particular, we've got more.

13   We've got more language.

14   BY MR. SLACK:

15   Q    The sentence here where it says it's not intended to be

16   an opinion of market value, you see, that does not.  Does

17   not mention USPAP, correct?

18   A    Oh, I see.  Yeah, it's not intended to be an opinion of

19   market value.  That's part of the bolded paragraph.  Yes.

20   Q    And in fact, if the idea is to make sure that a reader

21   is very clear, as you just said, if it was limited in any

22   way, you would want to make sure that limitation was also in

23   there and bolded, correct?

24   A    Yes.  I want to be clear, I'm not following us here so

25   that a reader doesn't pick it up and assume I'm doing so

Page 171

1    right.

2    Q    Now, in the next sentence, you actually do say that

3    your sensitivity analysis is not intended to comply with

4    USPAP, correct?

5    A    Yes.  It's part of that paragraph.

6    Q    Right.  And Then it has an and.  So it's not supposed

7    to comply with USPAP.  And then an and, right?  You see the

8    and.

9    A    Yes.

10   Q    So separate and apart from not complying with USPAP, it

11   says should not be construed as market value.  Do you see

12   that?

13   A    Yes.  That's after the and.

14   Q    Now, so the fact is that your sensitivity analysis does

15   not set forth an opinion of market value of the debtors

16   properties, correct?

17   A    It sets forth an analysis based on certain assumptions

18   employed in Ms. Zell's report.  And if changed to a market

19   levels, what the impact would be --

20          MR. SLACK:  Your Honor, can I ask for -- this is

21   an important question.  Can I ask for an answer to my

22   question?  I'm happy to --

23          THE COURT:  I think that was --

24          MR. SLACK:  No, I don't think.

25          THE COURT:  What was your question?  Give me --

Page 172

1    give me again.

2            MR. SLACK:  And in fact your sensitivity analysis

3    does not set forth any opinion of market value of the

4    debtors' properties, correct?

5            THE COURT:  Okay, let's -- I'm not going to strike

6    the prior answer, but you can just pose that again.  And so

7    if you can answer that question directly, Mr. Fowler, would

8    you mind just asking again so we're clear.

9    BY MR. SLACK:

10   Q    And in fact your sensitivity analysis does not set

11   forth any opinion of market value of the debtor properties,

12   correct?

13   A    The sensitivity analysis does not set forth a USPAP

14   compliant value.  It sets forth the changes how the changes

15   in assumptions would affect value if employed at market

16   levels in Ms. Zell's report.

17           THE COURT:  So I think Mr. Slack's about to say

18   that you still haven't answered the question.  So just more

19   simply, is there anything that you've provided in the

20   assumptions and sensitivity analysis that constitutes an

21   assessment of your own.  Of the properties, plural, market

22   value?

23           THE WITNESS:  Yes, Your Honor, there's -- there

24   are two analyses in here where I change assumptions and we

25   get an input or a value output based on those assumption

Page 173

1    changes.  What I'm putting the reader on notice is I didn't

2    complete a full appraisal.  I just isolated these

3    assumptions that I think are erroneous and this is to show

4    the impact.

5              THE COURT:  So if you change this variable in this

6    way, the following overall impact is where you get as a

7    result.  Right?

8              THE WITNESS:  That's exactly right.

9              THE COURT:  Okay.

10             MR. SLACK:  (Indiscernible) you could keep --

11             THE COURT:  If I'm not -- I didn't mean to hijack

12   your questioning.  If you have more questions you want to

13   ask, feel free.

14   BY MR. SLACK:

15   Q    Do you remember having your deposition taken just a

16   couple of days ago?

17   A    I do.

18             THE COURT:  No, that's great.  Thank you.  And I

19   think the witness has just been handed a binder that I

20   surmise has the transcript in it.

21             MR. SLACK:  Would you also like.

22             THE COURT:  Yeah, I'd love one.  If you've got an

23   extra.  If it's targeted, you can just ask your question.  I

24   don't want to waste a lot of time.

25   BY MR. SLACK:

Page 174

1   Q    So if you could turn to page (indiscernible) -- you

2   remember me asking and answering in the following way.

3   Again, it says and should not be construed as market value.

4   Do you see that answer?  I haven't disputed that yet.  It's

5   not a market value.  It's a sensitivity analysis.  And so

6   it's fair to say that you do not provide in your report nor

7   do you opine on a market value for each of the debtors

8   properties, correct?  I am not providing a market value.

9   I'm providing a sensitivity analysis based on market

10  supported assumptions.

11          THE COURT:  You need to tie a question to that.

12  BY MR. SLACK:

13  Q    Yeah, I'm saying did.  Does that accurately reflect the

14  testimony you gave?

15          MR. PASQUALE:  Your Honor, it's improper

16  impeachment.  It's nothing inconsistent with what Mr. Fowler

17  said a moment ago.

18          THE COURT:  No, that's overruled because I think

19  there's been at a minimum an effort not to acknowledge that

20  nothing in here constitutes any form of market value.

21          MR. SLACK:  Thank you, Your Honor.

22          THE COURT:  So the question is, does that.  Did

23  Mr. Slack just correctly recite the questions and answers

24  and given at your deposition?

25          THE WITNESS:  Yeah, I think that's right.  And

Page 175

1    that's what I'm saying now.  I didn't find a market value.

2    Market value is what's specifically defined in use path.

3    I'm doing a sensitivity of her value.  Her value?  It's not

4    market value.  It's a calculated value based on assumption

5    changes.  But it's not a USPAP opinion.  A market value.

6    BY MR. SLACK:

7    Q    So isn't it true that at your deposition when we talked

8    about market value, defined it without reference to use

9    path?

10   A    My deposition.  I remember you asked me to define

11   market value.  And I said I think it would be in this sales

12   report.  And I tried to give you my best off the top of my

13   head deposition.

14   Q    And market value to you means what the property could

15   achieve on the open market, not under distress, under a

16   normal marketing period, things of that nature.  It's an

17   opinion, not a fact.  That's your view of market value,

18   correct?

19   A    That's not the exact mark definition of market value

20   that I typically see, but it is similar.  But

21   (indiscernible) --

22   Q    All right, let's take a look at your.

23         THE COURT:  Oh, hang on a sec.  I think you cut

24   off an incomplete answer.  So let's let Mr. Fowler answer,

25   but briefly.

1           THE WITNESS:  But it's very similar.

2           THE COURT:  Okay.  Thanks.  Go ahead, Mr. Slack.

3    BY MR. SLACK:

4    Q    Well, those weren't my words.  So let's take a look at

5    Page 69.  And I'd like you to focus on Line 19 and the

6    following question and answer:

7           "Q    Is there a general definition of market value in

8    your view for an appraiser?

9           "A    Yeah.  It's what the property could achieve on the

10   open market, not under distress, under a normal marketing

11   period, things of that nature.  It's an opinion, it's not

12   fact."

13          Did you -- did I ask that question and you give that

14   answer at your deposition.

15   A    Right.  That's when I remember replying to you that

16   this is generally what I think it is.  Yes, but I didn't --

17   I know that there'll be a defined market value definition in

18   her report that lists all five criteria.  I just couldn't

19   cite it off the top of my head.

20   Q    Now, so let's turn to the conclusion paragraphs that

21   you have in your sensitivity analysis.  That's at 26.  So

22   you see that paragraph?

23   A    Yes.

24   Q    Now the first part of that paragraph I'll read.  I may

25   make you do some reading, but I'll read it.  It says, it is

1    noted that some of the sensitivity analyses yield results

2    inconsistent with market data.  You see that?

3    A    I do.

4    Q    That accurately states, you know, some of the

5    sensitivity analyses in your report.

6    A    Yes.  In one of my analyses there's some inconsistent

7    results that looked strange.  So you didn't rely on them.

8    Q    And then it says here, as stated, I did not complete a

9    formal valuation.  See that?

10   A    Yes.

11   Q    So your sensitivity analysis was not a formal

12   valuation, correct?

13   A    It's not a formal valuation as an appraiser.  Yes, or

14   in providing market value, which says in the sentence as

15   well.

16   Q    Well, this is where I'm going to say that at least

17   sentence structure.  You say three things.  You say, the

18   first is I did not complete a formal valuation.  You see

19   that?  Yes.  And that's true.  You did not complete a formal

20   valuation, correct?

21   A    Right.  This was an analysis focusing on certain

22   assumptions.

23   Q    And the second thing you said, independent of that is

24   develop an opinion of market value.  So it's again true that

25   you did not in your sensitivity analysis develop an opinion

Page 178

1    of market value, correct?

2    A    No.  I think we've been on the same page there.  Not

3    market value.

4    Q    And then the third thing you say again is I'm not

5    acting in the capacity of appraiser, correct?

6    A    Yes.

7    Q    So now, so as I think you just agreed, an appraisal is

8    an opinion, not a fact, correct?

9    A    Yes.  An appraisal is an opinion.

10   Q    And two appraisers can have very different opinions as

11   to market value, correct?

12   A    Yet two appraisers could have different opinions.

13   Q    And in fact Two appraisers could look at the exact same

14   data for the exact same property and reasonably arrive at

15   different cap rates and market values, correct?

16   A    Sure.  An appraiser will select the data they have,

17   analyze that and base their opinions on that.  It's possible

18   it could be different.

19   Q    Now, Mr. Fowler, prior to your retention, you are not

20   familiar with any of the debtors' properties, is that right?

21   A    That's right.

22   Q    And.  And you'd never visited any of the debtors

23   properties before you were retained, correct?

24   A    Not to my knowledge.  I've done a lot of work in New

25   York, so it's possible I've seen them as comps, but I.  Not

1   that I sit here today that I can state.

2   Q    And you've never spoken with any of the debtors

3   regarding the properties, correct?

4   A    No.

5   Q    And after you were retained, you visited only three of

6   the debtors' properties personally, correct?

7   A    I personally visited the exterior three.  Yes.

8   Q    Right.  That was my next question.  Is it in your

9   visits you only saw the exterior, correct?

10  A    Yes.

11  Q    Now let's take a look at Exhibit A of your declaration.

12  And that's your resume and background, correct?

13  A    Yes.

14  Q    What I'd like to focus you on is your list of expert

15  testimony.  You see your list starting at Page 3 of the

16  different expert testimony you've given.

17  A    Yes.

18  Q    And I hope I've counted this right.  I think there are

19  22 expert retentions, is that correct?  Let me ask it this

20  way because then we could probably.  You agree?  It's

21  approximately 22.

22  A    I'll agree.

23  Q    And isn't it true that there is only one such retention

24  that involved multifamily residential property in New York,

25  is that correct?

Page 180

1   A      Yes.  For New York isolated to residential.  Yes.

2   Q      And that was the Bagley case on Page 4, correct?

3   A      Yes, a task working on behalf of the attorney general.

4   Q      And even in the Bagley case, you did not prepare any

5   appraisals of multifamily residential properties, correct?

6   A      No, it was more of a feasibility analysis.  So a lot of

7   the same things, but not a formal appraisal.

8   Q      Now, one of the critiques that you had of Ms. Zell's

9   report is that you think that Ms. Zell did not include

10  capital expenditures in her analysis, is that correct?

11  A      That's correct.

12  Q      And as of today, you are neither your appraisal review

13  or anywhere else in your report.  Do you quantify the amount

14  of capital expenditures that you think the debtors'

15  properties would need?  That's correct, right?

16  A      No, I do not have the data to quantify it.  We request

17  requested a capital budget but was told it didn't Exist.

18  Q      Now, you also have criticized Ms. Zell's use of a 3

19  percent management fee, is that correct?

20  A      Yes.

21  Q      And in your sensitivity analysis you used a 4 percent

22  management fee, correct?

23  A      That's correct.

24  Q      You also had comments with respect to Ms. Zell's use of

25  a 3 percent vacancy and loss collection fee in calculating

Page 181

```
1    revenue, correct?

2    A    Yes.

3    Q    And you criticized Ms. Zell's use of a $200 loss

4    reserve, correct?

5    A    It's replacement reserves, but yes.

6    Q    Now, in preparing your sensitivity analyses, you

7    reviewed certain appraisals commissioned by Flagstar for

8    some of the debtors properties, correct?

9    A    I didn't review them per se.  I looked at them and

10   reviews a.

11   Q    Very appraiser word and I didn't mean it.  You looked

12   at them and read them?

13   A    Yes.  You can understand why we are very specific on

14   that.

15   Q    And if you, if you turn to Exhibit B at Page 20 of 26

16   of your report, you discuss, you discuss certain appraisals.

17   I'm looking now at about two-thirds of the way down, there's

18   three bullets and you list and bullet three different

19   appraisers who had done work for Flagstar and whose

20   appraisals you had read.  And I think we'll stop with red

21   had, had read as part of your work, correct?

22   A    Yes.

23   Q    And if you look at the sentence right below the three

24   bullets, you write, I concur with the methodology employed

25   by the three firms above, which is based on typical
```

Page 182

1    valuation methodology.  You see that?

2    A    I see it.

3    Q    And you're referring to the bulleted firms above,

4    correct?

5    A    I'm referring to the bulleted firms above in

6    conjunction with this section related to rent.  Yes.

7    Q    So you had determined that these three firms used a

8    methodology that, that you concurred with.

9    A    The way they calculated rent was consistent with how I

10   do it.  And so that was the comparison part.  For comparison

11   purposes.  Yes.

12   Q    Now just to be clear though, and this I think is, is in

13   your.  One of the answers you just gave, you did not do an

14   appraisal review of any of the Flagstar appraisals that were

15   done by these firms, correct?

16   A    No, I did not do a formal review.

17   Q    Now I'm showing you what is marked as exhibits, not

18   exhibit -- I'm sorry.  It's been marked.  It's marked as a

19   Flagstar produced document, FBNA 762.

20           MR. PASQUALE:  Can you provide a copy for us,

21   please?

22           MR. SLACK:  Yes, yes, yes.

23           THE COURT:  So while a copy is being provided to

24   Flagstar's counsel, I'll just say I've been handed a

25   multipage document which begins with Bates FBNA 40762.  It's

Page 183

1    got the word market valuation analysis at the top pertaining

2    to 1042 Union Street in Brooklyn.  And this is not an

3    exhibit.  This is --

4              MR. SLACK:  It has not been put into evidence.  We

5    don't plan to put into evidence.

6              THE COURT:  Okay.

7    BY MR. SLACK:

8    Q    Mr. Fowler, do you recognize what I put before you?

9              MR. SLACK:  And I don't know whether, Your Honor,

10   since we haven't put it into evidence, whether we should

11   separately market or -- I mean, again, it's not going into

12   evidence, so we're just using it for cross.  So I don't know

13   how you'd like procedurally to do it.  I did put the Bates,

14   the first --

15             THE COURT:  (Indiscernible) yeah, I just did

16   redundantly what you did and put the first Bates number.

17   Let's just say the last Bates number is FBNA 0000866.  So it

18   appears to be a 104-ish, 5-ish-page document.  And I think

19   both parties have it.  That's good enough for record

20   purposes.

21             MR. PASQUALE:  Yes, Your Honor.

22             THE COURT:  Okay.  So let's just proceed that way.

23   BY MR. SLACK:

24   Q    Mr. Fowler, this is an appraisal by Salerno prepared by

25   Flagstar, right?  Or prepared for Flagstar?

Page 184

1   A    Yes.  It's a August 2024 appraisal.  Yes.

2   Q    And this is one of the appraisals that you list in the

3   bullets that we just read on Page 20, correct?

4   A    That's correct.

5   Q    And if you turn to Page 69 of this appraisal, by the

6   way, this is an appraisal with this -- this is an appraisal

7   of one of the debtor properties, correct?

8   A    Yes.

9   Q    And so let's turn to Page 69.  And does page 69 discuss

10  this appraisals vacancy and credit loss percentage that they

11  applied?

12  A    It does.

13  Q    And does -- this Appraisal applied a 2.5 percent

14  vacancy and credit loss, correct?

15  A    It did.

16  Q    And again, Ms. Zell's was 3 percent, correct?

17  A    That's right.

18  Q    So Ms. Zell actually had a higher one, correct?

19  A    Yes, 50 basis points higher.

20  Q    And if you turn to page 70, page 70 has a series of the

21  operating expense analysis that was used in this appraisal,

22  correct?

23  A    That's right.

24  Q    And take a look at number seven, which is on page 71.

25  A    Yes.

Page 185

1    Q    And that relates to management fees, correct?

2    A    Yes.

3    Q    And this appraisal says typical management costs in the

4    area range between two and a half to four and a half of EGI.

5    You see that?

6    A    Yes.

7    Q    And what is EGI?

8    A    Effective gross income.

9    Q    That's the same measure that --

10            THE COURT:  Louder.

11            THE WITNESS:  Effective gross income.

12            THE COURT:  Thank you.

13   BY MR. SLACK:

14   Q    That's the same measure that Ms. Zell was using to

15   create a percentage, correct?

16   A    I think it's labeled a little differently, but it's the

17   same thing.

18   Q    And at least.  At least this appraisal used a 3 percent

19   as a market management fee, correct?

20   A    It did.

21   Q    And then if you take a look further down, number 11.

22   And number 11 has reserves for replacement.  You see that?

23   A    I do.

24   Q    And again, just to refresh everybody, Ms. Zell used a

25   $200 reserve replacement, correct?

Page 186

```
 1    A    She did.

 2    Q    And what's the reserve replacement that's used in this?

 3    A    It's 191.

 4    Q    175.

 5    A    I'm sorry, 170.  Yes.

 6    Q    175 per unit, correct?

 7    A    Yes.  100.  It averages 191.

 8    Q    It's actually a lower expense than Ms. Zell used as

 9    her.

10            THE COURT:  Hang on, hang on.  I'm looking at a

11    sentence.  I mean, I just want to make sure we're accurate.

12    I think, Mr. Pasquale, you can supplement.  If I don't do

13    what you were going to do -- there's a sentence.  The

14    expense comparables range from $175 to $219 per unit,

15    averaging $191 per unit.  That's right.

16            MR. SLACK:  I think it's above it, Your Honor.

17    I'm sorry.  I should have been more precise.

18            THE COURT:  Oh, okay.

19            MR. SLACK:  The sentence says we have stabilized

20    this expense at --

21            THE COURT:  Oh, right.

22            MR. SLACK:  -- 3500 or 175 per unit for a building

23    with a central heating system, which is less costly to

24    maintain than individual boilers.

25            THE COURT:  Okay, and this comes from -- again,
```

Page 187

1    not in evidence, but Bates number FBNA 0000832, within this.

2         MR. SLACK:  I think the only point, Your Honor,

3    just to that is this is the same data that, you know, we've

4    established that.  That Mr. Fowler was looking at for other,

5    you know, other assumptions.

6         THE COURT:  Right.  Let me, like my well-trained

7    civil litigator self, has a strong urge to try to clarify

8    the -- what it is we've just been engaged in.  I think this

9    is impeachment based on a document, not an evidence that is

10   referred to in the experts report.  And you're calling out

11   things that you.  I think you're going to argue, reinforce

12   the methods used by Ms. Zell and poke holes in Mr. Fowler's

13   criticisms, is that right?

14        MR. SLACK:  It is, it is, Your Honor.  I mean, I

15   think we've established earlier, very early in the day that

16   you can have hearsay and create data points.  And so this is

17   one of the hearsay data points.  We're just filling out that

18   there are other data points that support Ms. Zell's.

19        THE COURT:  I've got it.  Yeah.  No, I've got it.

20   I'm sorry to cut you off.  And this ties to you established

21   this was the report referenced at Page 20 of 26.  And Mr.

22   Fowler's assumptions and sensitivity analysis.  Right.

23   Okay.  So --

24   BY MR. SLACK:

25   Q    Let's move on from this document.  Let's look at

Page 188

1    another.  One of the appraisals appraisers that you bullet

2    in here as having read and concurred with their methodology,

3    at least in some respect, was Leitner Berman.  So let's have

4    you look at a Leitner Berman Flagstar appraisal with respect

5    to these debtor properties, which is labeled, I should say

6    date stamped FBNA 1 through FBNA 157.

7              MR. SLACK:  And we'll get those around before I.

8              THE COURT:  Thank you.

9    BY MR. SLACK:

10   Q    Mr. Fowler, is this another appraisal that you and I

11   use the word red as part of the work you did for this

12   matter?

13   A    Yes, it looks like the one.  Yes.

14   Q    And if you could turn to Page 85, tell me when you're

15   there.

16   A    I just want to be sure --

17             THE COURT:  Mr. Fowler reviews the document, which

18   is totally appropriate.  I'm just going to say for ease of

19   future reference, this pertains to a six-story apartment

20   building located at 1820 Cortelyou Road in Brooklyn.

21             THE WITNESS:  This isn't the appraisal I

22   referenced.  If you're referring to the three --

23             MR. SLACK:  This is a different one.  Let's put

24   another one -- let's put another Leitner Berman appraisal

25   report produced by Flagstar.  It's FBNA 867 through 101.

Page 189

```
 1    No, that's --  I don't know.  Yeah.  1015.  Yes.

 2            THE COURT:  Yeah, I'm just going to say, Mr.

 3    Fowler's report drops a footnote noting that the Leitner

 4    Berman appraisal he refers to is regarding 2535 Hillside

 5    Avenue.

 6            THE WITNESS:  And this isn't it either --

 7            MR. SLACK:  Okay, well, let's --

 8            THE COURT:  All right, let me ask my kind counsel

 9    from Weil to take away these things that I think are now

10    falling by the wayside just to clutter reduce.  Thank you.

11    Well, unless you're going to use them.

12    BY MR. SLACK:

13    Q    I am going to say this.  Is this one of the -- putting

14    aside whether it's in the, in the bullets.  Is this one of

15    the appraisals, Flagstar appraisals that you read as part of

16    work that you did?

17    A    Yes, I think this is one of the ones that was produced.

18    Yes, just not the one I noticed.

19    Q    So just to cut through it a little bit because --

20    A    I don't --

21    Q    Expect they're very different.  Let's look at the first

22    one that we did, which is FBNA 1 through 157, which is the

23    appraisal report for 1820, except I can't pronounce it

24    (indiscernible) Road, Brooklyn, New York.  And if you could

25    turn to Page 85.  Are you with me, Mr. Fowler?
```

Page 190

1    A    Yes, I'm on.

2    Q    You see, there's a chart of stabilized income and

3    expenses.  You see that?

4    A    Yes.

5    Q    Just as a general matter, that means that they've, you

6    know, they put in here what they consider to be a market

7    income and expenses, correct?

8    A    Yeah.  This is an equilibrium analysis, essentially.

9    Q    And the equal equilibrium analysis, as I think we've

10   had some testimony at various times today, is attempting to

11   be essentially a market analysis of income and expenses.

12   A    That's fair.

13   Q    Okay.  So at least in this appraisal, if you take a

14   look at the income side, there's a line that says less

15   residential VC loss at 3 percent.  Do you see that?

16   A    Yes.

17   Q    And that's the same vacancy and collection loss that

18   we've had some discussion about, correct?

19   A    That is the same.  Yes.

20   Q    And that is -- and that 3 percent that's used in this

21   appraisal is the same that Ms. Zell used in her analysis,

22   correct?

23   A    That's correct.

24   Q    And then if you look a little further below, there's

25   something called management.  You see that?  And that's the

1    management fee, correct?

2    A    Yes.

3    Q    Now, this is a little more difficult, and maybe you'll

4    recall what it is, and if not, we can get a calculator.  But

5    if you're figuring out the percentage of the management fee,

6    you would take the number here, the 20,000, and you would

7    divide that by the effective gross income, correct?

8    A    Yes.

9    Q    And when you do that, would you accept my

10   representation that it's about 2.9 percent?

11   A    I can't do the math in my head, but I assume that's

12   probably right.  I'll give you the benefit of the doubt.

13   Q    And Ms. Zell used a 3 percent management fee very

14   similar to this, correct?

15   A    Yes.  You use 3 percent.

16   Q    One more thing that I want to look at is Page 86, and

17   Page 86 has some assumptions and analysis dealing with

18   comparable sale capitalization rates.  Do you see that?

19   A    Yes.

20   Q    And one of the data points that's used in this is

21   investor surveys, correct?

22   A    Yes.  Apartment surveys.  Yes.

23   Q    And again, just to refresh things, Ms. Zell also looked

24   at investor surveys, correct?

25   A    She looks at a multitude of surveys, many more than

Page 192

1  this, but yes.

2  Q    Okay.  So now let's look at one more.  This will be the

3  last of the appraisal reports.  And this is by the third

4  appraiser in your bullets CBRE PRI.  And it's FBNA 7306.

5  And are you familiar with this analysis?

6  A    Yes, I'm on Page 88 in the vacancy rate.

7          MR. SLACK:  May I have one second, Your Honor?  I

8  apologize.

9          THE COURT:  Yes.

10         MR. SLACK:  Your Honor, I'm actually going to.

11  I'm actually going to move on and not cross on it.  We've

12  already done, I think what I needed to do there.

13  BY MR. SLACK:

14  Q    Now, one of Your critiques of Ms. Zell relates to

15  capitalization rates.  Is that true?

16  A    Yes.

17  Q    And as we just talked about, you criticized Ms. Zell's

18  report's use of survey data, correct?

19  A    I think it's okay to use survey data.  I critique the

20  way she used the survey data.

21  Q    So the survey data was one of the Data points in Ms.

22  Zell's analysis, correct?

23  A    Yes, it was one of her prominent points, yes.

24  Q    And Ms. Zell also considered comparable transactions,

25  correct?

Page 193

1    A    Yes, that's what she stated.

2    Q    And Ms. Zell also considered market data, correct?

3    A    I think the two things you gave me are one and the

4    same.  I think that.

5    Q    Okay, and Ms. Zell considered discussions with brokers,

6    correct?

7    A    Yes, he had brokers opinions in there.

8    Q    When you looked at cap rates, you looked at those same

9    categories of data, correct?

10   A    Yeah, I think -- I mean, I had -- I think I had some

11   cites of some articles, et cetera, that she didn't have, or

12   some podcasts that came from one of her sources, et cetera.

13   But I used -- I think I used everything she did, but added a

14   little bit more.  Although I didn't specifically quote the

15   survey data, I saw it in her report.

16          MR. SLACK:  Can I have two minutes, Your Honor?

17          THE COURT:  Yes.  We can go off the record.  And

18   anyone who wants to stretch in place --

19       (Recess)

20          THE COURT:  Okay.  Let's go back on the record,

21   please.  Ready?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.  Are we back on?  Okay, great.

24   Mr. Slack, you can go right ahead.

25          MR. SLACK:  No further questions, Your Honor.

Page 194

1           THE COURT:  Okay.  Thank you very much.  Redirect?

2           MR. PASQUALE:  Very brief, Your Honor.

3               REDIRECT EXAMINATION OF SCOTT FOWLER

4    BY MR. PASQUALE:

5    Q    Mr. Fowler, you were asked a few questions about your

6    litigation experience with multifamily residential

7    properties in New York.  Do you have experience with respect

8    to -- in New York with respect to multifamily residential

9    properties other than litigation?

10   A    Yes, I just recently, in the last year completed a

11   analysis of a large multifamily or rent-stabilized portfolio

12   in the Bronx.  I'm starting one next week, working with an

13   owner on developing strategies to help them figure out how

14   to kind of revamp their assets and which assets to sell.  As

15   part of that, they've asked us to do a deep capex dive

16   because they know they have some issues there and want to

17   understand what it's going to cost, if that's going to

18   impact their value.

19   So I'm starting that next week.  I manage -- I review

20   appraisals, manage the valuation process for Goldman Sachs

21   and KKR along with my team.  With that, I review rent

22   stabilized properties on an ongoing basis.  And I guess the

23   first New York multifamily work I ever did was assisting on

24   a litigation deal back in 1995 when I was just out of

25   school.  So I've been active in the market since then.

Page 195

1    Q    Thank you.  Let me ask you to turn to Page 20 of 26 of

2    your report.

3    A    Yes.

4    Q    Okay.  You were asked some questions on the bottom of

5    the page regarding the three appraisal firms.  Do you recall

6    that?

7    A    Yes.

8    Q    Okay, and you were pointed to the first sentence at the

9    bottom of the page where it says you concurred with the

10   methodology.

11   A    Yes.

12   Q    What methodology did you concur with?

13   A    I concurred with the methodology of how they calculated

14   rent in their state in their stabilized statement.

15   Q    Anything else about the methodology in the reports that

16   you looked at that you concurred with?

17   A    No, that was all I concurred with.

18   Q    Now turn to Page 26.  Oh, let's stay there for a

19   minute.  I'm sorry.  You were shown a document not in

20   evidence, a Salerno market valuation analysis with the Bates

21   stamp FBNA 762 on the bottom.

22   A    Yes.

23   Q    Remember that?  Is that one of the evaluation reports

24   that you cite in the footnotes on page 20?

25   A    Let me make sure.  Actually, I cite to 4/16, 4/22.  It

1    looks like this is a different one.

2    Q    The different property?

3    A    Yes.

4    Q    Now let's turn to Page 26 of 26, your report.  And you

5    recall you were asked a question regarding your conclusion

6    section on Page 26.

7    A    Yes.

8    Q    And I think --I don't remember if you were asked to

9    read or it was read into the record the first sentence of

10   your conclusion.  Instead, it is noted that some of the

11   sensitivity analyses yield results inconsistent wit market

12   data.  You remember that?

13   A    That's correct.

14   Q    Can you explain what you meant by that sentence?

15   A    So I ran two analyses.  I ran what we called the anchor

16   risk sensitivity analysis, then a modified analysis.  In the

17   anchor sensitivity analysis, I simply took the current rent

18   roll.  I did exactly what Ms. Zell did, except I didn't

19   inflate the rents.  I took current expenses from 2024 and I

20   inflated them up to May.  So I basically took 3 percent

21   divided by 12 times 5 so that the expenses and rent roll

22   were commensurate as the same date.  I used Ms. L's taxes

23   because she stated that she had got current taxes that

24   wouldn't have been reflected in the 24 statements.  I

25   trended the other expenses with the inflation where pay we

Page 197

1    had payroll was all over the place here.  There's obviously

2    something going on with payroll stuff's being ran through

3    there that shouldn't be or something.  I don't -- so we

4    looked at some other comps and said okay, we're going to cap

5    payroll at 1,200 bucks a unit.

6        So anything over 1,200 bucks, we just put it there.  If

7    it was less than $1,200, we left it where it was.  Then I

8    took that and put a market applied cap rate.  I thought that

9    was.  That would be consistent with the assumptions I was

10   using.  In fact, you have to be consistent with the

11   assumptions you're using.  I looked at the appraisal I

12   looked at recently.  You know, we were talking about 3, 3

13   percent cap rates, et cetera and the low reserves.  Well,

14   those were all commensurate with a cap rate of 7 percent.

15   You have to look at the cash flow risk and the cap rate.  So

16   I took my calculated NOI, put a cap rate to it and got a

17   value.  As I said, some of those expenses were --

18            THE COURT:  Let me just jump in because we're

19   getting into a narrative answer that may start to flow into

20   advocacy.  So let's just (indiscernible) yeah, keep framing

21   the information that's coming with questioning.

22   BY MR. PASQUALE:

23   Q    My question is, you know, in your sentence you say some

24   of the sensitivity analysis yield results inconsistent with

25   market data.  So based on what you just described, which of

Page 198

1   the sensitivity analysis that you did yield results

2   inconsistent with market data?

3   A    In the anchor sensitivity analysis, the first one, some

4   of them showed some really low values because the expenses

5   were so high.  I had no insight in how to adjust them.  So

6   we just ultimately didn't use that, looking at our

7   undersecured assets.

8   Q    Could you just to be clear for the record, you report

9   both the Ankara analysis and the modified analysis in your

10  exhibits?

11  A    Yes.

12          MR. PASQUALE:  Nothing else, Your Honor.

13          THE COURT:  Okay.  Thank you.  Any recross?

14          MR. SLACK:  No, Your Honor.

15          THE COURT:  Okay.  Thank you very much, Mr.

16  Fowler.  You can stand down, take your possessions with you.

17  Thank you for your testimony.  And you seem to be here from

18  Houston, so I guess we got your weather and you got your

19  weather too.  Thanks.

20          MR. FOWLER:  You have it worse than I do, right?

21          THE COURT:  Yeah.  Okay.  So do people want to

22  take -- well, let me take a minute and ask how people want

23  to proceed.  It's 5:20.  Do you want to -- I know Mr. Slack

24  has been very consistent in wanting to finish today.  I'm

25  all yours if you want to break and think and do some do

1   arguments tomorrow by Zoom.  That's an option too.  The by

2   Zoom might be of interest.  But if you want to -- if you're

3   able to argue now and just get it done, that's fine.  I'm

4   going to reserve -- I'm going to talk to you at some point

5   about when you need me to decide by which I think is very

6   soon.  So how do you want to proceed?  Do you want to do --

7   does everyone want to confer for five minutes about how you

8   want to proceed and then we'll take it from there.

9            MR. PASQUALE:  Thank you, Your Honor.

10           THE COURT:  Yes?

11           MR. SLACK:  Well, Your Honor -- sorry

12   (indiscernible)

13           THE COURT:  But I won't run away yet.  Yeah.  What

14   do you think?

15           MR. FAIL:  I think we want to proceed from the

16   debtors -- Garrett Fail.  We want to proceed.  We could take

17   five minutes to each circle up and then we're ready to go on

18   our side.

19           THE COURT:  Okay.

20           MR. PASQUALE:  Well, I'd like to confer with my

21   team, Your Honor, before we --

22           THE COURT:  Although I will say if either side

23   wants to go forward, we should go forward.

24           MR. PASQUALE:  Fair enough.

25           MR. FAIL:  We want to move forward.

Page 200

1          THE COURT:  Yeah.  So let's just do that.  Okay.

2    Do you want to break?  I think all that's left is closing

3    arguments.

4          MR. FAIL:  A break will be sufficient.

5          THE COURT:  You said ten?

6          MR. FAIL:  If you want five, we'll do five.

7          THE COURT:  Yeah, yeah, let's do five.

8          MR. FAIL:  Five minutes.

9          THE COURT:  Yeah.  For staff and other reasons, I

10   want to hard stop it by 6:30.  And if we can finish a little

11   before that, that would be great.  It'll be very brief and

12   then we'll get going.  All right, thank you.  See you in a

13   few.

14      (Recess)

15          THE COURT:  Okay.  Back on the record after a

16   break.  And Mr. Fail in position, ready to wrap up.  So let

17   me just give you some time constraints.  It's 5:30.  I've

18   told you, we lose people -- I'm going to be out of here in

19   an hour.  So I would suggest each side aim for maybe 20

20   minutes max aside and then we have a little rebuttal.  Does

21   that work?

22          MR. FAIL:  (Indiscernible) let me back up and say

23   I'll be incredibly brief, I think and questions that the

24   Court may have.

25          THE COURT:  Okay.  That's fine.  Yeah.  And I want

1    to say -- I do want to say out loud I am committed to giving

2    you all the time you want and need.  If what I'm describing

3    is inadequate, I will gladly reconvene tomorrow --

4                MR. FAIL:  (Indiscernible) speak for themselves.

5    I'll reserve right for a rebuttal, but I think you're going

6    to be quite (indiscernible) answering any questions

7    (indiscernible).

8                THE COURT:  Oka.  That's fine.  So let's proceed.

9                MR. FAIL:  And if we run out of time, and if

10   Flagstar needs more time (indiscernible) --

11               THE COURT:  Right.  It's a serious offer.  But I'd

12   be delighted to finish today too.  So I'll stop talking and

13   let you talk.  Go right ahead.

14               MR. FAIL:  Thank you, Your Honor.  Both parties

15   here have spent the first month of these cases fighting over

16   the debtors use of cash collateral.  They did a lot of

17   discovery, they filed a lot of paper.  We sat through a lot

18   of testimony on two occasions.  But I think we should step

19   back for a moment to frame the issue that's before the court

20   and establish the framework for review.  The debtors did it

21   in their reply.

22               First, the debtors do not need to provide adequate

23   protection for any expenses that are chargeable under 506.

24   So we can talk about which are if there's a serious

25   question, but the debtors have detailed basis to support

Page 202

1    that.  They all are.  We haven't heard a single valid

2    argument against it in the papers or in court or on the

3    first day.  And we can talk about more right now about the

4    budget format.  But I don't think, and we don't think it

5    matters.  The categories in the budget are obvious.  They're

6    consistent across the properties.  Further distinction is

7    without any difference.

8           Number two, the debtors are not required to

9    protect against any diminution in value that they do not

10   cause like market value dropping.  So there is no need

11   whatsoever to speculate about that.  Value could go up, it

12   could go down, just like interest rates.  That is not what

13   the case law says.  Flagstar is entitled to adequate

14   protection for the uses in the budget will preserve,

15   maintain and enhance the value of the properties for the

16   reasons that we've set forth in the papers and in the

17   declaration.

18           THE COURT:  Wait a minute.  On your second point,

19   if you're -- to the extent you're relying on an equity

20   cushion, is that -- does that hold true?

21           MR. FAIL:  It does, Your Honor, because the case

22   law says what we are.  What a debtor could be liable for is

23   for the diminution as a result of its use.  And the case law

24   distinguishes cases where the debtors, for example, fail to

25   provide security and something happens, windows break, doors

Page 203

1   break, they fail to buy insurance and they are responsible

2   for that.  But in cases where, in real estate cases that we

3   cite and we'll give you -- Your Honor can -- we'll see it,

4   you know, when he reviews the pleadings again in the reply

5   we cite cases that clearly say market valuation isn't

6   something that we're protecting for.

7           Especially here when the alternative, if someone,

8   if Flagstar were to file a motion to list day would be to

9   default back to months of a foreclosure proceeding where the

10  properties would continue to, let's say, not be sold for

11  many months.  Like the time element here isn't what we're

12  protecting against, it's for use.  That's, that's what

13  adequate protection is about.  It's to make sure that the

14  debtors are maintaining the machinery, an automobile,

15  something where there could be a decrease.  And what we

16  haven't heard is any argument that it could decrease.

17          In fact, what we're spending a month trying to

18  fight to do is to preserve the collateral.  And all of the

19  testimony says that when we pay the supers and the porters

20  and the garbage people and make sure there's water and fix

21  an elevator and install fire alarms and clear tax liens,

22  that this is exactly the stuff that could be diminution that

23  we're adequately protecting.  That's why some cases say very

24  clearly, like the point that I made is point number one,

25  some cases, they are very clear.

Page 204

1          506(c) surchargeable expenses are not.  You don't

2     provide adequate protection for that.  That would be

3     circular and wouldn't work.  And so other cases say it

4     slightly differently, but there is an abundance of them.

5     And then we cite that in our supplemental brief, it says

6     you, you don't basically give adequate protection.  Or other

7     cases say that we cite in our supplemental brief, they say

8     that it is adequate protection when you use cash collateral

9     to maintain the buildings.

10          So whichever way the Court wants to adopt, and we

11    recommend the adopts both for, you know, sake of belts and

12    suspenders, the Court is, is certainly justified under the

13    cases to say that the budgeted uses operating dispenses.

14    Non-operating, non-operating disbursements.  Non-operating

15    disbursements.  We've been through them on the first-day

16    hearing, they're in the budget.  They haven't been talked

17    about because it's not really in dispute.  They are all

18    necessary to preserve the case.  One item has been flagged

19    in the papers as professional fees.  And I think we've

20    addressed that in our reply.  I'm happy to engage in a

21    dialogue back and forth.

22          THE COURT:  Give me a thumbnail, a thumbnail about

23    why it's okay for you to use cash collateral for purposes of

24    funding professional fees in the case.

25          MR. FAIL:  I'll come back to it again later.  But

Page 205

1     in general, for the 506(c) surcharge purpose, while we're on

2     that, while we're on that point in number one, the debtors'

3     perspective in this case is, and it hasn't been challenged,

4     is that the alternative to chapter seven is of a receiver, a

5     third party who may try his best but does not have the

6     experience that these debtors management team has in

7     managing a portfolio and other New York City apartments.

8     That allows for intimate knowledge of tenants receivables

9     and the intricacies of older properties.

10         Properties in New York City and the rent

11    stabilization intricacies that go along with it.  They file

12    these cases to avoid value destruction.  It's the premise of

13    these cases being in chapter 11 in and of itself.  Different

14    from other cases where, you know, a secured party might say,

15    I'm a little bit of an ancillary person, I have a lean on

16    machinery, don't surcharge me.  There's a fight over whether

17    the administration of the case should be borne by that

18    creditor.  The Chapter 11 case is what preserves the going

19    concern, non fire sale value of these cases.  That's one

20    argument that hasn't been rebutted by testimony.

21         The second argument is, Your Honor, as an example

22    of where value will increase from these cases.  It's

23    undisputed that Flagstar wanted a disposition of these

24    properties.  They commenced four foreclosure, three or four

25    foreclosure actions in different boroughs.  I guess four out

Page 206

1    of five boroughs.  So four foreclosure actions for the 93

2    properties, right?  Their goal was to sell them all.  The

3    court could take judicial notice.  It's in our paper.  There

4    are city and state taxes that get paid when you transfer.

5    Those could be mitigated or avoided if we transfer them.

6    And I don't know why we wouldn't pursue into.  I don't know

7    why Flagstar wouldn't.  A person would pay more if they

8    could pay us and not to pay us being the debtors versus

9    paying New York City and New York state.  We should capture

10   that value.  It's incremental.  It is a multiple of the

11   professional fees that we're talking about here across the

12   board.  All professional fees, not just those related to

13   sales.

14          But in addition, Your Honor, let's go back like

15   it'll be point number three.  There's an equity cushion.  So

16   even if you don't subscribe to the 506(c) for a piece of the

17   professional fees and even like there is an equity cushion

18   and the equity cushion would allow us to spend it.  That's

19   what equity cushions are for.  That's what use of cash

20   collateral is for.  It's not prescribed.  Courts don't then

21   go look at the debtors' business judgment and question the

22   debtors' business judgment on line, item by line item.  And

23   there is no real challenge about a Line item that's valid.

24   That's why we're just moving forward.  And you didn't hear

25   any testimony about it today?  It's the debtors' business

Page 207

1    judgment.  And I've just flagged a couple of items on, on

2    why, if those would be 506(c) surchargeable.  So let's move

3    on to number three.

4              THE COURT:  Oh, wait, are you moving on to equity

5    cushion now?

6              MR. FAIL:  Yes, but reserving all rights.  I had

7    additional arguments in the papers and, and we rely on --

8              THE COURT:  Yeah, I have questions about equity

9    cushion.  I want to --

10             MR. FAIL:  I want to move on to that as well.  But

11   I'll answer your questions.

12             THE COURT:  No, I want you to argue in the

13   sequence you want and just tell me when it's moving on.

14             MR. FAIL:  Okay.  It's your turn.  It's your court

15   (indiscernible).

16             THE COURT:  (Indiscernible) Not your reply, your

17   supplemental motion, Paragraphs 40 and 41, you say 71 of the

18   82 debtors have an equity cushion greater than 18 percent.

19   And that leaves 11 of the 82 not having that right.  And I

20   think there's no dispute these are not cross collateralized

21   and they're individual debtors with no substantive

22   consolidation.  So I want to know what I'm to do with your

23   equity cushion argument in light of that.

24             MR. FAIL:  I think if you agree with my first

25   argument, then it's a non-issue.  I think if you agree with

Page 208

1    my second argument, it's a non-issue.  And I think when we

2    get to the equity cushion, you accept that there is an

3    equity cushion.  You can look at the totality of the

4    circumstances of these cases.  What's the alternative,

5    Judge, we haven't got an offer from Flagstar to do it.  What

6    would they do in the receiver context?  What are the

7    alternatives here?

8            THE COURT:  And I just say I get that.  It seems

9    to me extraordinarily messy.  If these cases implode for

10   lack of debtors being able to use cash collateral.

11           MR. FAIL:  It seems like you agree with the

12   equities of the case number four perhaps.

13           THE COURT:  Yeah, I don't want to endorse

14   application of the doctrine fully on the fly, but is

15   Flagstar wrong that these are independent, freestanding

16   debtors with independent freestanding loans backed by

17   nothing other than the assets of the respective debtor

18   entity?  And if so, that question might conclude that today.

19           MR. FAIL:  So --

20           THE COURT:  Well, how might it -- but how might it

21   is because how might it conclude that each and every debtor

22   presents adequate protection in the form of an equity

23   cushion?  Which is a thing.

24           MR. FAIL:  Your right.  Declaration and testimony

25   is the equity cushion, full stop, period.  Each debtor has

Page 209

1    one.  Then if there is any diminution as a result to some

2    portion of a -- some portion of an expense that's paid that

3    somehow isn't 506(c) surchargeable, any amount that's within

4    the cushion is not an issue.

5            Any amount that's not, Your Honor, then there was

6    a failure of adequate protection.  But, but what we've also

7    known, and that's the reason that -- let me answer

8    (indiscernible) we don't know that today is what I said to

9    you.  Yes, there are separate companies, they're separate

10   LLCs.  But what we've said repeatedly and what we put in our

11   reply is as Flagstar knows from the discovery that was

12   given, they're looking for monies that came in and weren't

13   spent on the properties in 2025, the period in time in which

14   their debt interest wasn't paid.

15           But what they will see and saw from what was given

16   to them from 2024 when interest and debt was paid is that

17   cash flow from operations from these companies did not

18   generate sufficient amounts to on their own pay for the

19   debtors expenses, including their principal and interest.

20   So one day maybe if Flagstar is not satisfied in full, we

21   can have a conversation and we'll have a trial.  Perhaps

22   another one on is there subcon.

23           What are intercompany accounts?  Are their claims

24   against other companies for receivables?  But our position

25   is and, and professional fees will come down dramatically if

Page 210

1   we're not fighting at the same time over things is let's

2   stage it, let's see if we can take Flagstar out and at what

3   value and debtor by debtor pursuant to their mortgages and

4   for any company that where they are satisfied, alleged

5   missing, missing money or excess money is irrelevant.

6          So there's no point in conducting a forensic

7   exercise on 93 properties today.  If we sell, pick your

8   number and they get paid off on that property by property.

9   We'll find out later.  But for now we've asked, we're not

10  hiding it, we're saying and we've asked for relief and

11  you've given it on an interim basis.  We may need to borrow

12  and loan money to each other on an intercompany basis.

13         We've said it will be junior to Flagstar, it will

14  be an administrative expense claim but it benefits Flagstar

15  in general.  And we have testimony and we cited in our reply

16  from Flagstar that they view this as a portfolio for the

17  same reasons that we just told you.  They commenced four

18  actions, not 93 for foreclosures.  They value the debtors

19  kind of their investments with the debtors collectively.  So

20  I don't want to say right now what we're going to argue and

21  find later.  I think we don't have to argue over that.

22         THE COURT:  Well, let me just slow down and say I

23  am looking at your own brief which characterizes the Zelle

24  report.  And to the extent you're asking me to rely on an

25  equity cushion, which you are --

Page 211

1           MR. FAIL:  There's one other --

2           THE COURT:  I will say -- hang on.  I will say I'm

3    -- I think you're right, that it's pretty accepted that an

4    equity cushion of 20 percent is sufficient.  You're at --

5    you're using a lower number, which I'm not so sure I'm ready

6    to endorse.  But even if I give you the 18 percent you're

7    suggesting in your brief, 11 of the 82 properties.

8           MR. FAIL:  I don't think we were suggesting 18 in

9    our reply.  You know, we adopt the case law cited by

10   Flagstar in their.  In their opposition that courts, you

11   know, debate whether or not 12 or 13 percent.  I think 12

12   percent.  So we'll take that as finding cases and --

13          THE COURT:  Well, whatever.  Yeah.  Whatever it

14   is.  Let me get to the point.  No matter how you slice the

15   case law, as I read your brief characterizing Ms. Zell's

16   analysis, 11 of the 82 debtors have an equity cushion below

17   18 percent.  And given that seeming reality, I'm not sure

18   how I can conclude that again.

19          MR. FAIL:  Your Honor --

20          THE COURT:  -- that equity cushion alone will get

21   you to adequate protection for Flagstar.

22          MR. FAIL:  Let me walk you through how we got

23   there.

24          THE COURT:  Yep.

25          MR. FAIL:  Number one, again, the only diminution

Page 212

1    we're protecting for is if there's something that's not 560

2    surchargeable.  We think there -- everything is.  Number

3    two, we cannot -- we're not looking at market values today

4    versus market values later.  The city can suffer an attack.

5    We can have a different kind of mayor.  Interest rates may

6    change.  That's not what we're here.  We're not obligated to

7    protect for that.  They don't get a claim under 507 for

8    failure to, you know, ensure an immediate transfer of

9    property today.  That's not what adequate protection is

10   about.  The case law says that.

11          So the limited dollar amounts, you know, I haven't

12   found -- we don't believe there's any diminution yet.  The

13   other third important part that we build into our reply in

14   the equity cushion section is like, let's.  Let's not adopt

15   what Flagstar wants to do by looking at the dollars going

16   out the door.  Our position has been consistent.  That is

17   not appropriate.  You cannot look at the line item that says

18   professional fees, say take that out and expect anything

19   else to maintain the same.

20          The case law is very clear about this.  They have

21   a lien on collateral.  This isn't a retailer, this isn't a

22   food store where someone has a lien on groceries and when

23   they're sold it turns to cash.  The cash, the groceries go

24   away.  Normally in a retailer you give a replacement lien on

25   new collateral, but the old collateral is gone.  If the cash

Page 213

1    is spent, it's gone.  Cases are clear.  In the general

2    constantly perpetual generating cash flow scenario like real

3    estate, you don't distinguish the cash and call it

4    diminution from the collateral.  You put them and look at

5    them together.  If I handed, if we handed back Flagstar the

6    property today, it would be an income generating producing

7    property.

8          If we gave it in a month, it'll be the same as

9    long as it's maintained and managed.  So our point here is

10   that you can't look to the cash that comes in and say don't

11   spend the professional fees because you could also say don't

12   pay the management fee.  And if you don't, I promise you

13   that you won't get the rents.  Because Mr. Diamond could

14   have testified that one member of management goes out and

15   walks the buildings and comes back with envelopes of cashes

16   and checks.  The guy won't go out without paying him his

17   fees, his salary.

18         So it all goes together that 506(c) is surcharge

19   is not part of any expense.  Under 506(c) (indiscernible)

20   isn't required to be protected.  You don't protect against

21   things that we're not responsible for.  And then you look at

22   the asset in totality.  What is their collateral?  It's

23   operating apartment buildings.  You can't look at any one

24   expense at any one point in time or this falls apart.  You

25   don't want to pay the water and it gets shut off, then you

Page 214

1   suffer harm from that.  But if you do pay the water that.

2   That's why the cases say when you do pay the water you're

3   not charged for that.  It's not diminution.  The same

4   argument goes for the professional fees that go for this

5   case.  These cases won't exist without professionals

6   administering it.  The cost could come down if we're not

7   litigating and challenged at every turn.

8          But the debtors' goal is to exit this as quickly

9   as possible with a value maximizing return.  So we cite

10  cases and implore the court to review them.  But you do not

11  have to adopt and endorse the position taken by Flagstar

12  that Collateral is viewed different from the cash

13  collateral.  And somehow every dollar of cash collateral

14  needs to be hoarded.  In fact, if anything, when you look at

15  the cash position, you look at the starting point and the

16  end point.  And at the end point there will be cash left

17  over in our budget line item.  So, so our perspective, what

18  is their collateral?  Their collateral is loan.

19          THE COURT:  What's -- how do you define the --

20          MR. FAIL:  Without prejudice to what the documents

21  say in collateral review, it is the real property.  And the

22  bankruptcy code defines cash collateral as the proceeds from

23  the collateral, which means rents.

24          THE COURT:  Right.

25          MR. FAIL:  No doubt that's what we're here for, to

Page 215

1    use the rents.  We're also.  I didn't come up.  It didn't

2    come up.  We should raise it.  Now.  The money that the

3    debtors prepaid to Flagstar being held by Flagstar, not set

4    off by Flagstar, is cash collateral that's in their

5    possession.  And the request of the debtors in the motion is

6    to have that applied for the purpose.  But for which it was

7    prefunded to pay taxes in municipal charges.  There's no

8    reason that it should be treated any different than

9    postpetition cash collateral.  That's prepetition cash

10   collateral.

11           THE COURT:  What about their argument that your

12   contention that you're cash flow positive relies on

13   inconsistent treatment of the escrow tax money?

14           MR. FAIL:  It's not inconsistent, right?  Your

15   Honor, we could be criticized for either way.  That's the

16   beauty of being lawyers.  If I had put the 7 -- if I had put

17   $7.5 million or whatever the number is at the first-day

18   hearing, they could have said that's not cash collateral.  I

19   don't.  They could have said I set it off prepetition.  They

20   didn't.

21           So we didn't make a fight on the first day.  We

22   came here now looking for a fight and taking the easiest

23   path.  The taxes weren't due on the first day of these

24   cases.  We didn't plan to use it in the first four weeks of

25   these cases and we didn't make a fight.  What we did is we

1    flagged it.  We said we have no cash of our own in our

2    possession.  That's that they have a lien on.  There is no

3    cash collateral in our possession.  There's 7.5 plus we

4    found that there's some other reserves we might come back

5    for and we reserve rights against that that Flagstar has.

6    And as typical as I understand it for lenders that do not

7    want to take the money in on their books and then have to

8    come out of pocket to then fund expenses, they left it out

9    there knowing the obvious risk that it could be applied for

10   the purposes for which it was put up, they're no worse off.

11            They want this to be paid.  If we didn't pay it,

12   they would pay it because otherwise they're just going to

13   take a property back with a lien that's primes them and with

14   interest that's punitive.  So I don't think it's a real

15   fight.  I think it was an objection that no one should stand

16   on.

17            Okay.  So I think if you wanted to show zero and

18   that we got 7.5 and it went out the door under our case law

19   that we cite, I mean 506(c) by its terms includes real

20   estate taxes.  So there's no question we're allowed to use

21   it.  There's no question it's surchargeable and there's no

22   question we don't have to protect against it.  So I could

23   have put it in at the beginning and show it gone at the end.

24   And it's a so what?  It's appropriate.  We can submit

25   another budget and put it in and show and going out.  That's

 1    okay as long as we're happy they've admitted that we have

 2    access to it.

 3                THE COURT:  Why is 506(c) eligible recoveries

 4    excluded from cash collateral?  I asked that the case law

 5    from you, but really (indiscernible) -

 6                MR. FAIL:  (Indiscernible) eye rolls because I

 7    could see over my glasses.

 8                THE COURT:  No, no, I didn't see an eye roll.  I'm

 9    saying could well be mentally eye rolling.  You were very

10    polite.  However, I really want to walk through of how I can

11    the case rely on your 506(c) argument and take things off

12    the table of cash collateral.  Excuse me, of adequate

13    protection analysis.

14                MR. FAIL:  The case law that talks about it says

15    two -- like I said, two things.  Some cases say that by

16    using it you are providing the adequate protection.  By

17    using the cash.  By using cash you're actually providing

18    adequate protection because you're showing that you can

19    maintain the value of the properties.

20                And Your Honor, to the extent that the utilities

21    show up in these cases I'm previewing right now, there's a

22    line item in the budget that says pay current utilities.

23    We're going to object to posting more money on the side and

24    wasting limited funds in an escrow for utilities.  We think

25    that the budget and authorization to pay postpetition

1    utilities timely is the adequate protection that they need.

2    There's money funded, it's in the budget and if you approve

3    it, it'll be paid.

4           So the same case that follows this approach.  I

5    can -- if you give me a second in our reply.  So on

6    Paragraph 8 of our reply we say Flagstar is not entitled to

7    adequate protection for expenses surchargeable.  See In re

8    Croatan Surf Club LLC.  t's an Eastern District North

9    Carolina, it appears, saying it finds, "Debtors use of cash

10   collateral for costing associated with the maintenance and

11   operation of the property need not be adequately protected."

12   And that's in the context of real estate taxes.

13          The next case we cite is In re Nancy M. Roswell

14   Limited Partnership.  It's an Illinois case stating that

15   506(c) is an exception to the rule.  The cash collateral may

16   not be used absent adequate protection.  We cite In re

17   Smithville Crossing LLC for finding that a secured creditor

18   ultimately benefits --

19          THE COURT:  I think I'm just -- thank you.  I

20   mean, you're reviewing basically reply Paragraphs 8 and 9.

21   Right?  So you're going to.  That's where I'm going to find

22   your law you're relying on.

23          MR. FAIL:  Yes, Your Honor.  You asked for

24   examples.

25          THE COURT:  No, I did.  You were starting to do

Page 219

1   what I asked for and I realized that would burn some time

2   and that's the place to look.  Okay.  Thanks.

3            MR. FAIL:  And then we go into, you know, why it

4   wouldn't make sense in Paragraph 10, how it would render

5   506(c) meaningless if we had to provide adequate protection

6   in a 507 claim for everything that we did spend, so which it

7   can't be the case.  And so I think that's how you reconcile

8   intellectually that it has to be the case.  Otherwise there

9   would be no meaning to a surcharge if every dollar that went

10  out the door, they got a superpriority admin claim for,

11  there's no surcharge.  You'd have to pay it back.  But that

12  can't be the case.

13           We also distinguish and rebut arguments where

14  Flagstar said at one point you could only surcharge if you

15  have an equity cushion.  And then they say but you can only

16  surcharge if you don't.  Well, how does that make sense?

17  You can only surcharge when you have excess money and don't

18  necessarily need to, or you can when there's no equity

19  cushion, in which case, great.  But I think the cases are

20  agnostic.  As long as it benefits the property, 506(c)

21  applies.

22           THE COURT:  Okay.  Yeah, go --

23           MR. FAIL:  No, that's okay.

24           THE COURT:  Keep going and --

25           MR. FAIL:  Your Honor seems to be --

Page 220

1                  THE COURT:  Well, I'm trying to --

2                  MR. FAIL:  Please.

3                  THE COURT:  -- drive towards conclusion.  No, no,

4      it's not a question.  It's a --

5                  MR. FAIL:  Almost there.

6                  THE COURT:  Move along apace and yet make sure you

7      cover what you want.

8                  MR. FAIL:  Thanks, Your Honor.

9                  THE COURT:  (Indiscernible)

10                 MR. FAIL:  I think Ms. Zell's testimony spoke for

11     itself.  She's a qualified expert.  She's an expert

12     appraiser.  She's an expert appraiser in residential

13     multifamily, residential multifamily with rent stabilization

14     and these specific properties.  Her report is compliant with

15     the relevant standards.  The attempts to discredit her fell

16     flat.  I don't think we need to say anything more about

17     that.

18                 There's only one value.  There's only one value

19     that's before the Court, the market value provided by the

20     independent expert.  The Flagstar expert was not testifying

21     as an independent.  His document says you have a choice.

22     You're either an independent appraiser or you're not acting

23     as one and you're acting as an advocate.  It's not a

24     question.  It's not imputing integrity.  You get a choice.

25     They chose not to put in their own value and they chose to

Page 221

1    engage and pay for an advocate.

2          As a result, they got no credible testimony of

3    competing value and they got no input out of the exercise of

4    sensitivity analysis that shows what ifs and could ofs if it

5    was relevant.  But he can't testify that it's relevant

6    because his governing body precludes him from doing so

7    because he didn't do the work to fact check the data and to

8    do his own report.

9          So the end of the report could fall by the

10   wayside, the sensitivity analysis.  The criticism fell flat

11   before us all here.  And I think we're left with Michelle

12   Zell's valuations that stand to establish the cushion on the

13   portfolio-wide and debtor-by-debtor basis.  Wrapping up,

14   Your Honor --

15          THE COURT:  I'm sorry.  I've been harping on this.

16   I'll harp a little.

17          MR. FAIL:  That's okay.

18          THE COURT:  I agree.  I think you're accurately

19   characterizing the record as to a portfolio-wide basis.  And

20   I continue to be not persuaded that unless aided by your

21   506(c) point, there's an equity cushion with respect to an

22   unknown subset of the --

23          MR. FAIL:  I'll take a win any way I can.

24          THE COURT:  (Indiscernible) I'll say 71 of 83 or

25   whatever.

Page 222

1          MR. FAIL:  Well, Your Honor, I'll take a win any

2     way that I can get it, number one.  Number two, I think that

3     the universe of concern is limited by Flagstar's admission

4     the 12 percent and below.  And so we have a small number of

5     properties.  I think we're talking about 15 properties

6     below, but I can check and do the math.  And so if your

7     concern is there, I think we still have, you know, all the

8     other arguments about 506(c) and for looking at the

9     properties in general, not just the use of cash.

10          So all of my arguments still apply, but also the

11    equities of the case.  And Your Honor, you know, if your

12    choice is to, you know, make this job easier, we've

13    requested already the ability to make inter-debtor loans,

14    right?  So it is a concession that we can offer today.  I

15    want to make this easy for the Court and to offer an

16    alternative.  It would be practical for the debtors who have

17    an equity cushion in the Zell report of less than 15

18    percent.  I'm trying to be incredibly constructive.  So

19    please don't take my speed and my tone to be anything other

20    than speed.

21          THE COURT:  I'm with you.  I just want to hear

22    what you're getting to.  I'm very excited about this.

23          MR. FAIL:  For the debtors of less than 15

24    percent, with 15 percent cushion, they can not fund their

25    professional fees but can be funded by debtors who have an

Page 223

```
 1    equity cushion above 15 percent and they can loan that money

 2    to the non- -- to the debtors who have the lesser extent.

 3              So now we've taken the problem away, Judge.  To

 4    the extent that the professional fees -- I'm just going to

 5    recap.  To the extent that the professional fees are issues

 6    that are giving you harm because operating and non-operating

 7    disbursements and prepetition critical vendor claims to the

 8    extent necessary are obviously valuable to the debtors'

 9    properties, then we're left with people fighting over U.S.

10    trustee and professional fees.  No one's saying U.S. trustee

11    other than me, but they're in there in the line items of why

12    should we be paying that.  They're very happy not to pay

13    them but I think they want to see that --

14              MS. SIEGEL:  Probably (indiscernible) --

15              THE COURT:  Yes (indiscernible).

16              MR. FAIL:  So for debtors less than -- with

17    cushions of less than 15 percent, those debtors can for the

18    time being, without permanence of rights to have to pay

19    later on in allocation, those debtors can borrow money on an

20    intercompany basis from the debtors with the excess cap, the

21    excess cushion, and we've resolved the issue entirely.

22              THE COURT:  I will just comment that I'm not

23    hearing any offer on the table to fund through loans from

24    affiliated non-debtor entities.  Is that a nonstarter for

25    you?
```

Page 224

1           MR. FAIL:  Your Honor, if there was cash, if there

2      was cash available to avoid this bankruptcy, we would have

3      avoided the bankruptcy.  We are where we are, and these

4      debtors do not have access to other sources of funds as I

5      stand here today, certainly not to fund the debtors'

6      professional expenses.

7           But honestly, Your Honor, I don't know why they

8      would.  The case law with these cushions do not require them

9      to, and so they are appropriately saying -- and let's just

10     remember who they are because, as we set forth in the

11     first-day declaration, as you heard when we started this,

12     there is publicly funded debt that is the economic

13     beneficiary of this cushion.  It's not a family, it's not --

14     there's people in the middle.  There's publicly traded

15     securities that are the economic beneficiaries here.

16     They're not in a position, number one, to come out of pocket

17     Number two, we don't have approvals to do what we need to do

18     to do that and cross-collateralization, I'm sure Flagstar

19     would love it.

20           THE COURT:  Okay.

21           MR. FAIL:  They could certainly enhance.  But

22     that's not what they were entitled to, certainly not with

23     their (indiscernible) threats and (indiscernible) --

24           THE COURT:  Yeah.  I don't need more of an

25     explanation given the hour, but I'll take that as a no

Page 225

1    coupled with justification that you could elaborate on if I

2    let you.

3           MR. FAIL:  Thank you, Your Honor.  I could respond

4    to a couple of things that you know came up in Mr. Diamond's

5    declaration.  I'll limit them to very little.  Number one,

6    the prepetition agreements that are the LLC agreements do

7    not require -- they're prepetition agreements.  We've

8    reached other agreements.  They cited the CEMA and the loan

9    agreement.  We've been payment defaulted.  So you know, it's

10   one more default that doesn't stop this.  I would also note

11   that the resolutions attached to the debtors' petitions

12   authorize the debtors to do all the necessary things in

13   furtherance of the case.  So I think for a couple of

14   reasons, you know, there's no there there.

15          On the cash collateral, we've already been

16   through.  There's no cash that was collateral other than the

17   amounts that Flagstar's holding and receiving to release.

18   And professional fees, you know, they're subject to Court

19   approval.  There's no issue that can't be reviewed and

20   resolved at the time if anybody thinks that we're doing

21   something and charging these debtors for something else.

22   It's an absolute red herring.  And with respect to the CRO's

23   $35,000, I think we spent more time talking about it than

24   the $105,000 that could possibly be charged in the period.

25   So, Your Honor, I'm happy to answer any other questions.

Page 226

1    Otherwise, I'll reserve time for rebuttal.

2              THE COURT:  Thank you.  I'll leave it at that for

3    now.  Thanks.

4              MR. FAIL:  Thank you, Your Honor.

5              THE COURT:  Let me hear from Flagstar, please.

6              MR. BASSETT:  So, Your Honor, there was a lot

7    said, and we have little time left.  So I guess I'll try my

8    best to address all the arguments that I need to in turn.

9    But, Your Honor, I just want to start.  You know, we've been

10   at this for over six hours now.  There's a lot of evidence,

11   a lot of arguments.  Mr. Fail had a lot to say.  But at the

12   end of the day, I don't think the basic facts of how we got

13   here and what frame this bankruptcy are disputed.  We've

14   said this before.  I'll say it again because it permeates

15   every aspect of what the Court is being asked to rule on

16   today.  There are 82 separate debtor entities.  They are

17   separate legal entities governed by their own corporate

18   governance documents, some of which I discussed today.  They

19   own separate properties that are subject to separate loans

20   by my client, Flagstar, and that these loans, Your Honor,

21   are not cross-collateralized.

22              The debtors have filed for bankruptcy.  They're

23   now asking the court permission to use cash collateral

24   without Flagstar's consent.  They have to satisfy the

25   requirements of the Bankruptcy Code.  It is their burden to

Page 227

1    show that they are entitled to use Flagstar's cash

2    collateral under section 363(e) of the Bankruptcy Code.  And

3    because these are separate debtors with separate loans and

4    no cross-collateralization, they have to do that on a

5    debtor-by-debtor basis.  They have eschewed that

6    responsibility from the beginning.  They came at the first

7    day, try to do valuation on an aggregate basis.  Both

8    budgets, Your Honor, are consolidated, and that is

9    important.  It's not, you know, noise, I believe as the

10   debtors describe it in their papers.

11          You heard the CRO testified the debtors do

12   maintain budgets on a property-by-property basis and could

13   present their go-forward budgets in that way.  The debtors

14   have operating agreements that the Court saw and there's

15   loan docs for Flagstar's loans that require separateness,

16   specifically require separateness, prohibit commingling and

17   prevent intercompany loans.

18          So Your Honor, they are asking the Court in

19   particular for permission, and this has come up over and

20   over again, including in Mr. Fail's proposal to deal with

21   the debtors where there is clearly no equity cushion.  This

22   idea of having one debtor pay the expenses of another in

23   exchange for an administrative expense plan.  Your Honor,

24   that is completely impermissible.  There's no basis for it.

25   Their own corporate governance docs don't allow for.  This

Page 228

1    is not breaching an agreement.  It is their own corporate

2    governance documents.  They don't allow for it.

3         And what Mr. Fail kept saying over and over again

4    was it comes down to 506(c), whether these expenses are

5    actual and necessary expenses of operating these debtors.  I

6    would ask the Court how is it possible that one debtor

7    providing money to another debtor in exchange for an

8    intercompany claim benefits the transferring debtor.  It

9    cannot possibly be an actual and necessary expense of the

10   transferring debtor to fund its affiliates' liabilities.

11   Absolutely is not.  There's no argument to the contrary.

12        Your Honor, I just want -- I want to mention the

13   cases on cross-collateralization.  They're in our brief.

14   The In re Dye case, others we cite.  It is very, very clear.

15   Courts have dealt with exact exactly this situation.  We

16   have a lender with multiple loans secured by multiple

17   assets.  If there's no cross-collateralization, you've got

18   to do it on an individual asset-by-asset basis; here,

19   property-by-property.

20        THE COURT:  I'm just going to comment.  I thought

21   your briefing on this point was logical but accompanied by

22   surprisingly little case law, and your brief commented that

23   you too found it surprising there wasn't that much case law.

24   And you say that's because it's such an obvious proposition.

25   On the other hand, I'm not hearing meaningful pushback from

Page 229

1   the debtors with contrary law.  So that's just an

2   observation.

3              MR. BASSETT:  On what point, Your Honor?

4              THE COURT:  On I think Mr. Bassett is talking

5   about the cases that they cite regarding the necessity of

6   doing each separate debtor as a separate entity and

7   (indiscernible) --

8              MR. BASSETT:  Your Honor, these estates are not

9   substantially consolidated.

10             THE COURT:  No, I know.

11             MR. BASSETT:  They are administratively

12  consolidated.  I don't know why --

13             THE COURT:  I get it.  I get the logic of your

14  point.

15             MR. BASSETT:  I don't know why there was a case

16  talking about it in a case where the estates are not

17  substantively consolidated because it's each an individual

18  estate with an individual motion requesting use of cash

19  collateral.  It would make no sense, absent subcon, to pull

20  in other estates and factor them in as part of the analysis.

21  But to (indiscernible) --

22             THE COURT:  Yeah.  I'm not sure if my comment and

23  question is really for you or so much as to flag it for Mr.

24  Fail to give me what he's got because I find the logic

25  (indiscernible) less extensive than I would have thought.

Page 230

1            MR. BASSETT:  And Your Honor, on the issue of

2       cross-collateralization and the need to look at each loan

3       and each obligation separately, again, there's the In re Dye

4       case that we cite, In re Southern Illinois Rail Car Company

5       case, the Valley Realty Advisors case.  These cases are

6       cited in our papers.

7            Your Honor, another argument that the debtors have

8       led with from day one in this case is this argument that

9       it's, I guess, you know, I'll give them sort of credit for

10      its simplicity, but the argument that, look, we have a

11      budget starting with zero cash immediately on the petition

12      date, and as long as we have a positive cash balance as we

13      go forward, that in and of itself is adequate protection.

14           Mr. Fail was suggesting that, well, we don't have,

15      you know, replacement liens on the -- I'm not sure exactly

16      his argument, but he's ignoring section 552(b) in the

17      Bankruptcy Code, which clearly gives Flagstar liens on the

18      rental income from these properties.  But, Your Honor, on

19      this point, I think we need to also just take a step back

20      because Your Honor was correct on the tax advance point.

21      I'm going to get to that in a little bit more detail in a

22      second.

23           But before I talk about how tax advance is used to

24      manipulate their budget, in the first instance, the tax

25      advance issue is a showstopper, Your Honor, to the tune of

Page 231

1    $7.3 million.  Mr. Fail said that he thinks that Flagstar

2    has conceded that the tax advance is cash collateral that

3    they can use to fund their case.  We have not conceded that.

4    The preliminary statement of our objection specifically

5    reserves on that it is their burden to demonstrate that it

6    is cash collateral that they can use.

7          And I'm just going to -- if the Court will indulge

8    me, Your Honor, if you look at exhibit, it's FX-43.  This is

9    the loan documents that are all admitted into evidence for

10    each of the 82 debtors.  And I will take the Court to the

11    provision of these loan documents that deals with the tax

12    advance.  So it's Exhibit 43, page -- CMEA, Page 23 at the

13    bottom, and it's Section 4.7.  Section 4.7 talks about

14    creating an escrow fund for the tax advance.  That's the

15    aggregate $7.3 and some odd excess.  There is language --

16          THE COURT:  Flagstar, you said?

17          MR. BASSETT:  It's Flagstar 43, Your Honor.

18          THE COURT:  Oh, 43.

19          MR. FAIL:  Do you need a copy of that?

20          THE COURT:  No, I'm wrestling with the

21    (indiscernible) I got it.  Go ahead.  I'm with you.

22          MR. BASSETT:  It talks, Your Honor, about

23    establishing an escrow fund for --

24          THE COURT:  (Indiscernible)

25          MR. BASSETT:  Yeah.  I apologize again.  It's Page

Page 232

1     23 at the bottom, and then it's Section 4.7 on that page.

2              THE COURT:  What page?

3              MR. BASSETT:  Twenty-three, at the bottom.

4              THE COURT:  (Indiscernible)

5              MR. BASSETT:  Yeah.  So that entire Section 4.7 is

6     the section that creates this escrow fund containing the

7     "tax advance" of $7.3 million that the parties have been

8     referring to.  What it talks about is that on a monthly

9     basis, a portion of the payments that the debtors make to

10    Flagstar will be set aside in this escrow fund.  And if you

11    look at Paragraph 2, it says, "Provided there are sufficient

12    amounts in the escrow fund and no event of default exists,

13    lenders shall pay the real estate taxes as they come due on

14    their respective due dates on behalf of the borrower," and

15    then it goes on.  It's undisputed, Your Honor, that events

16    in default have existed on these loans since early 2025.

17             In addition, Your Honor, I'll point the Court to

18    the end of that paragraph, the second to last sentence,

19    where it says, "The escrow fund shall not constitute a trust

20    fund and may be commingled with other monies held by

21    lender."

22             Your Honor, the funds in the escrow fund are not

23    property in the estate.  Even absent the language I just

24    read, if you look at Judge Glenn's -- there's a whole body

25    of case law on this, Your Honor.  Hudge Glenn's recent

Page 233

1    decision in the O'Toole v. Cabrera case, in the In re Kaspar

2    bankruptcy, 667 B.R. 195 from February of 2025.  So all

3    kinds of case law for the proposition that funds held in

4    escrow, even if the debtor has a contingent right to

5    repossess those funds on the occurrence of some future

6    event, are not property of the estate.

7            Here, they don't even have that contingent right

8    because there's an event of default.  And these funds are

9    clearly, as the document says, not required to be held in

10   trouble.  Here, they don't even have that right.  So they

11   cannot use -- they have no ability to use -- a precondition

12   for money being cash collateral is that it is property of

13   the estate on which a secured lender holds a lien.  This

14   property is not even property of the estate.

15           Now, Your Honor, even if it were, it is

16   extraordinarily, and notwithstanding the gymnastics that Mr.

17   Fail did to get around this, it is extraordinarily

18   misleading at best how the debtors characterize this in

19   their budget.  They set zero cash on the petition date.

20   Look at their first four weeks budget.  We went from zero

21   dollars to a few hundred thousand dollars.  Now they're

22   saying we have whatever it is at the beginning of the next

23   period in their bank accounts.  And if you look at the

24   inflows and outflows over the next 13 weeks, we're going to

25   get a receipt of $7.3 million, which is obviously going to

Page 234

1    offset $7.3 million in expenses.  And only with that do they

2    get to a $200,000 positive cash balance, net positive cash

3    increase over that period.  It doesn't take a mathematician

4    to realize that if you subtract the $7.3 million from the

5    $200,000, you get the negative $7.1 million.  That's their

6    true cash flow for the period, even if you were to assume,

7    which you should not, that the $7.3 million is property

8    would be a statement that the debtors are free  to use.

9            I also just want to address again this notion and

10   highlight a case for the Court.  The idea that simply

11   looking, even if you disregard the first two arguments I've

12   made and they really had an increase in cash balance, the

13   idea that that in and of itself for a lender secured by a

14   property and its rental income is enough for adequate

15   protection, it's just wrong.  We cite the Wolf v. First

16   Merit Bank case in our objection.  Basically the same exact

17   situation where the court flatly rejected that argument

18   because the lender has a lien on the rent, and if the debtor

19   was not using the rent to pay its expenses, the lender would

20   be entitled to the full amount of that rent.  You can't just

21   look at an increase in cash balance, which again, you don't

22   even get there if you disregard the first two points that I

23   just made.

24            There are a couple more points I have to hit on.

25   You know, this idea of 506(c) and the corollary point that

Page 235

1    they had made, you know, originally that, well, if a debtor

2    spends cash collateral on the actual and necessary expenses

3    of operating properties, that in and of itself is adequate

4    protection.  They're now sort of like making the same

5    argument through 507(c).

6           Your Honor, setting aside the legal issues that

7    the Court went through with Mr. Fail, on the facts, they

8    don't come close to satisfying their burden as to all of the

9    expenses in their budget.  First of all, I already mentioned

10   this at the outset, but the intercompany claims, the idea

11   that one debtor paying the expenses of another is somehow an

12   actual necessary expense of the transferring debtor, there's

13   no conceivable rebuttal for that in my mind, Your Honor.

14   The second point on the professional fees --

15          THE COURT:  Before you -- oh, sorry.  I was going

16   to ask if you (indiscernible) another example.  And you are.

17   Go ahead.

18          MR. BASSETT:  On the professional fees, Your

19   Honor, by the way, for the entire argument that all the fees

20   in the budget are actual and necessary expenses, you know

21   which testimony there is in the record?  There's a single

22   paragraph, Paragraph 5 of Mr. Diamond's second declaration.

23   It talks in like one, maybe two sentences that all the

24   expenses in the budget are actual and necessary.  And it

25   says including and lists of various expenses.

Page 236

1          What is transparently and conspicuously not there,

2     any reference to professional fees.  Professional fees, make

3     no mistake, make up the by far largest category of the

4     debtors' go-forward budget at $9.7 million.  When I asked

5     Mr. Diamond about it, he didn't even know how they broke

6     down.  He couldn't say what was Weil's percentage.  He

7     couldn't say what was FTI's.  He even admitted, shockingly

8     on the stand, that of his $35,000 fee that he gets for

9     representing both debtors and non-debtors, he was tagging

10    the debtors with the entire thing and he flailed a little

11    bit and his explanation was, well, I've got to put in some

12    cushion, like I'm going to, you know, kind of --

13          THE COURT:  I think that's -- I will say, I don't

14    think that's -- I mean, I guess that's an uncharitable

15    articulation of what he said.  That's the way I'll put it,

16    which is that because the stated budget amount is a max, he

17    has to book it in the full amount, but that he will apply

18    appropriate pro rata breakdowns of his fees for debtors and

19    non-debtors.

20          MR. BASSETT:  I'll leave his testimony what it

21    was, Your Honor.  But I appreciate that.  So on the

22    professional fees, again, their burden to show that they're

23    actual and necessary expenses.  As Mr. Diamond, he confirmed

24    when he talked about actual and necessary expenses of

25    managing these properties.  The type of ordinary course

Page 237

1   professional who is representing debtors in ongoing disputes

2   with tenants or otherwise, not covered by Weil.  He's not

3   covered by the $9.7 million.  When I asked him what's the

4   lion's share of these fees, he said, well, we think mostly

5   fighting with Flagstar.  And he also mentioned general

6   administrative expenses.

7            Your Honor, we started case law in our papers.

8   The Putnam v. SunTrust Bank case, In re Towne, is a case, a

9   seminal case from the Third Circuit in 2013.  In re Towne

10  sharply limited, in the Court's words, the scope of Section

11  506(c), in particular its applicability to professional fees

12  and was very, very narrow in its application, only applying

13  that where there was a clear nexus between the fees provided

14  and a benefit to the secured lender's collateral.  In that

15  case, the Court noted, among other things that where the

16  debtor was actually antagonistic to the creditor that those

17  fees would not qualify under 506(c).  Mr. Diamond admitted

18  that that's what most of the fees would be.

19           Your Honor, I'm going to turn it over to my to my

20  colleague just for a couple of brief comments because he's

21  much, much more up to speed on the equity cushion and expert

22  issues than I am.

23           THE COURT:  Okay.

24           MR. BASSETT:  But Your Honor, I respectfully

25  submit on those issues, the tax advance issue, which is a

Page 238

1    sort of a showstopper, and the professional fees and the

2    conflating of the budget together, it's not following the

3    requirements of the Bankruptcy Code, Your Honor.

4              THE COURT:  Hang on.  Before you sit, I know -- I

5    appreciate your talking really fast of necessity by due to

6    deadlines of timing.  I think I just want to get a

7    high-level overview of the structure of your argument.  I

8    think it's basically that the 506(c) argument is overstated

9    because they include a lot of expenditures in the budget

10   that don't qualify, and then on top of that I'm going to

11   hear from Mr. Pasquale about why the equity cushion

12   situation isn't satisfactory here and is there any other big

13   picture items --

14             MR. BASSETT:  Well, there's $7.3 million

15   (indiscernible) --

16             THE COURT:  And the fact of the inconsistent

17   treatment of the --

18             MR. BASSETT:  Not just the inconsistent treatment,

19   Your Honor.  They cannot use it because it's not property of

20   the estate.

21             THE COURT:  It's not property of the estate.  It's

22   yours, and they can't be using that money in your pocket to

23   fund their operations, you say, right?

24             MR. BASSETT:  That's right.

25             THE COURT:  So I have your -- so that's the

1    high-level overview.

2            MR. BASSETT:  Yes.

3            THE COURT:  Okay.  Remember I have to extract and

4    contextualize everything I'm hearing.  Let me ask on the

5    506(c) piece, do you agree as a principled matter or matter

6    of law that legitimate 506(c) qualifying expenses sort of

7    don't require additional adequate protection?

8            MR. BASSETT:  So I would say that I have a

9    conceptual issue with that in that I think the way most

10   cases look at it, a better way to look at it is that if you

11   can really show that these are actual and necessary

12   expenses, then they may in and of themselves provide

13   adequate protection to the creditor's collateral.  I mean,

14   that's looking at it from, you know, kind of the flip side

15   of the same coin.

16           THE COURT:  That might be either the same or

17   similar wording to what the debtors would have me conclude

18   about their expenditures.  They're saying, look, Judge, all

19   of this collateral we're spending is necessary to prevent a

20   cataclysm.

21           MR. BASSETT:  But what I will also say about

22   Section 506(c), Your Honor, is that the way that is

23   typically applied, and we put this in our paper, is it's --

24   you know, usually it's after the fact, right?

25           THE COURT:  Yeah (indiscernible) make this point

Page 240

1    (indiscernible) --

2              MR. BASSETT:  And the debtors --

3              THE COURT:  And I'm wondering about taking it into

4    account and crediting it up front.

5              MR. BASSETT:  Right.

6              THE COURT:  Are you telling me I can't and

7    shouldn't do that as a matter of principle and law at all?

8              MR. BASSETT:  I think if you find that the

9    expenditures are actual and necessary expenses of operating

10   the property and give an actual commensurate benefit to the

11   collateral --

12             THE COURT:  I can deem that (indiscernible)

13   adequate protection.

14             MR. BASSETT:  -- I think you can find that, but it

15   is their burden to prove that with respect to all of the

16   expenses in their budget.

17             THE COURT:  Okay.  Got it.  Let me -- I know -- I

18   promise I'll get Mr. Pasquale his time.  What does Flagstar

19   actually want to happen here?  It seems to me the logical

20   implication of your position is that the debtors can't spend

21   any money, that their operations are frozen.  No repair can

22   be done whenever something inevitably breaks in one of these

23   90 whatever properties, and the nice person won't be walking

24   the halls collecting rent, et cetera.  So what's your end

25   game?

Page 241

1          MR. BASSETT:  So, Your Honor, is there's really

2     two things.  First of all, the overlay is to

3     (indiscernible), number one.  Number two, in terms of what

4     would happen if debtors are not able to use cash collateral,

5     first thing is, it could actually provide Flagstar with

6     meaningful adequate protection.  We've had no outreach from

7     them, no conversations since last time we mentioned

8     cross-collateralization, which would be an option.  We

9     mentioned replacement liens on any unencumbered collateral

10    that exists.  There's now --

11          THE COURT:  I got it.  So you're embellishing.

12    But option one is this will induce the debtors to come up

13    with something better for you.

14          MR. BASSETT:  Well, if they provide adequate

15    protection, then we don't have the issue like no adequate

16    protection.  That's the first logical path forward.  The

17    second is, Your Honor, it's no secret.  Flagstar filed

18    receivership applications against all 82 debtors, and in

19    reaction to that, debtors decided to file for bankruptcy and

20    avail themselves of the automatic stay.  That was their

21    fateful decision.  They now have to comply with the

22    requirements of the Bankruptcy Code.

23          If they are not, in accordance with the Bankruptcy

24    Code, able to find a way to fund the cases for some of these

25    debtors, then I think where we're headed is either Flagstar

Page 242

1   gets relief from the automatic stay to continue those, or

2   the cases are dismissed.  That's what the law requires.  And

3   that's also consistent with looking at these debtors on an

4   entity-by-entity basis.  There's no logical way.  There's no

5   logical reason to say that We've now filed cases that are

6   administratively consolidated for 82 debtors.  So it's an

7   all or nothing proposition.  They're looking at this on a

8   holistic basis where they're trying to restructure all 82

9   entities, but legally, they're separate.

10          THE COURT:  No, I get that.  Okay.  So if that

11  happens, is Flagstar going to consent to a provisional,

12  interim period of use of cash collateral to just pave over

13  the transition of time between (indiscernible) --

14          MR. BASSETT:  I'd imagine -- I'd imagine that

15  Flagstar would, Your Honor.  I'd have to obviously

16  understand the details and all of that.  The devil would be

17  the details, but I think we would contemplate that.

18          THE COURT:  All right.  Let me hear from the

19  patient Mr. Pasquale.  Thank you.  Oh, before you get going,

20  let me go off the record a second.

21      (Recess)

22          THE COURT:  We'll go back on.  But let's try to

23  wrap up.  Our kind and diligent public servant helping us

24  out here I promised to leave now, but she's agreed to go

25  over.  Go ahead.

Page 243

1            MR. PASQUALE:  Your Honor, Ken Pasquale, from Paul

2    Hastings, for Flagstar.  I've already crossed out, like,

3    three-quarters of what I was going to say.  So let me just

4    hit a couple of points for Your Honor to keep in mind as you

5    evaluate the expert testimony today.  I certainly heard

6    different testimony than Mr. Fail apparently heard, because

7    I don't think anything's a fait accompli in this Court.

8            There are issues with respect to Ms. Zell's

9    presentation and her conclusions.  She's, of course,

10   eminently, eminently qualified.  We didn't attack

11   qualifications whatsoever.  However, she's not independent.

12   Your Honor, she testified and made a point that she has been

13   working for Zarasai, the parent of these debtors, for more

14   than 12 years.  As Your Honor well knows, it's, you know,

15   pretty rare when we use someone who is affiliated with a

16   client to serve as an expert witness because it raises

17   issues.  It raises issues because she owes a duty to that

18   client, so to speak.  She has been working with them for so

19   long.  Her relationship with them is evident by the fact

20   that she's sharing work product with them before she

21   finalizes it, and we have those documents in evidence.  So I

22   just think there are things that Your Honor has to keep in

23   mind.  And of course, the Zarasai is paying her

24   compensation.  This is not a debtor expense direction.  Your

25   Honor, her report, as you heard a number of times.

Page 244

1          THE COURT:  I'm sorry, I have to jump on that.

2          MR. PASQUALE:  Yes, please.

3          THE COURT:  There was ambiguity.  You looked at

4    the retainer and it said the company defined as Zarasai and

5    constituent --

6          MR. PASQUALE:  And the debtor entities.

7          THE COURT:  And the debtor entities --

8          MR. PASQUALE:  They were defined as propcos, but

9    it was the entity as a whole.

10         THE COURT:  Yeah.  Right.  So I think it's a

11   little not established that it was solely Zarasai as an

12   entity.  But anyway, go ahead.

13         MR. PASQUALE:  Fair enough, Your Honor.  Not

14   arguing what the document says.  We agree.  As for the

15   details, Your Honor, you heard -- you know, I took Ms. Zell

16   through and Mr. Fowler's report in and of itself, you know,

17   raises points with respect to the various inputs in her

18   analysis.  She expressed judgment that she was applying, but

19   whenever Ms. Zell applied her judgment, it was to pick

20   either the higher revenue option or the lower expense

21   option.  And obviously that results in higher values at the

22   end of the day.

23         I think cap rates is where the rubber meets the

24   road.  We've heard a lot about that.  There's a lot in the

25   reports about the cap rates.  But Ms. Zell essentially

Page 245

1   confirmed that although the data she reviewed showed higher

2   cap rates, she reconciled -- that's the word Ms. Zell

3   used -- her cap rates to maintain a lower cap rate across

4   the jurisdictions.  And she explained in a lengthy response,

5   in response to one of my questions that one of the reasons

6   was those properties were in good condition.  But she also

7   said she hadn't inspected the properties longer than she

8   could remember.  She couldn't remember the last time she was

9   at the properties.  So how could she evaluate good

10   condition?  And there was no methodology for that

11   reconciliation in her report or in her reply declaration.

12   It was just a reduction off of what all the data that Ms.

13   Zell otherwise collected on the cap rate.

14          So Mr. Fowler looked at all those inputs.  Your

15   Honor, he explains it in detail in his report and on the cap

16   rates in particular, he adds 1 percent to each of the cap

17   rates and then applies the adjustments that he made to Ms.

18   Zell's values and to get to the equity cushions themselves.

19   Your Honor, when you look at -- excuse me, I lost my page

20   here.  Moving too quickly.  Apologies, Your Honor.  I had

21   Mr. Fowler's last page where he does the adjustments here.

22   It's the very last page of his report, in the exhibit on the

23   right-hand side.

24          You'll recall Mr. Fowler mentioning the anchor of

25   modified analysis.  And that's what is shown on the right

Page 246

```
 1   side of the page.  And when the adjustments are made for all

 2   of the factors that we discussed today, and we have them

 3   certainly in the documents, by my count, Mr. Fowler has

 4   eight properties that would have a equity cushion over 15

 5   percent.  And I know Your Honor is already counted based on

 6   Ms. Zell's conclusion, but all of that, our proposition, and

 7   I think the evidence shows the Court should scrutinize.  And

 8   I think I skipped over a point before that I wanted to make,

 9   and that is the nature of her report and the presentation as

10   a restricted appraisal report, we do cite some cases in our

11   agenda where courts have (indiscernible) --

12             THE COURT:  Yeah, I've got your arguments about

13   that.

14             MR. PASQUALE:  Yes.

15             THE COURT:  I mean, which I'll characterize it as

16   courts view it, I think you said, with suspicion or

17   skepticism.  But they don't flatly bar it.  And I'll

18   consider it just bearing that case law (indiscernible).

19             MR. PASQUALE:  Exactly.  I would agree with that

20   entirely, Your Honor.  So unless the Court has any

21   questions, I'll just stop there.

22             THE COURT:  Let me -- I had one.  Can you tell me

23   what the dollar impact would be on the asserted equity

24   cushion if I imposed a cap rate increase as Mr. Fowler

25   suggests but don't adopt his other criticisms?
```

Page 247

1          MR. PASQUALE:  I do not.  I do not have the answer

2     for that, Your Honor.  We obviously could ask Mr. Fowler to

3     calculate that and let the Court know.  But I do not know

4     that.

5          THE COURT:  I mean, yeah, because I read the

6     report as giving at blanket --

7          MR. PASQUALE:  Yes.

8          THE COURT:  This is bad, this is bad, this is bad,

9     this is bad.  And when you adjust for these whatever seven

10    bad things, you end up at seven (indiscernible) --

11         MR. PASQUALE:  Would you like us to do that, Your

12    Honor?  We'll do it on notice to the other side.

13         THE COURT:  Sure.  Why don't you give it to me?

14    And this is not to foreshadow that I'm going to necessarily

15    rule based on directing that such a modification is

16    necessary.  But I'm curious what the result would be.  You

17    could do it in, say, a number of increments from -- I don't

18    know.  We'll see what's the flat line.  Say a half of a

19    percent, 1 percent.  No need to go higher than 1 percent

20    because that's what it recommends.

21         MR. PASQUALE:  That's where Mr. Fowler was,

22    frankly.

23         THE COURT:  Yeah.

24         MR. PASQUALE:  So a half percent and 1 percent

25    increase --

Page 248

1          THE COURT:  Yeah.

2          MR. PASQUALE:  -- in the cap rate only across all

3    the jurisdictions is what Your Honor would like to see.

4          THE COURT:  Yeah, I'm curious.  And don't

5    accompany it with any argument.  Just say I do math, this is

6    what the math says, on notice of the other side.  And then

7    we can try to avoid the flare-up of further argument.

8          MR. PASQUALE:  I think we can just do it in a

9    spreadsheet that's labeled (indiscernible) --

10         THE COURT:  Okay.  Yeah.  However you want to do

11   it.

12         MR. PASQUALE:  Without any other commentary.

13         THE COURT:  Okay.  That's great.  And I think you

14   were trying to stop talking other than that, yes?

15         MR. PASQUALE:  I think that was it, Your Honor.

16   Thank you.

17         THE COURT:  Okay.  Mr. Bassett, you're good?

18         MR. BASSETT:  I am good, Your Honor.

19         THE COURT:  Okay.  Thanks.  So let's give Mr. Fail

20   an opportunity to rebut.

21         MR. FAIL:  Thanks again, Your Honor.  Garrett

22   Fail, for the record.  I think we've been going very

23   quickly, but it's -- and I think perhaps that's why some

24   stuff got confused.  And I think it's important to slow it

25   down and break it down.

Page 249

```
 1                    THE COURT:  Right.
 2                    MR. FAIL:  We're talking -- there's been talk by
 3       Mr. Bassett about using 506(c) language, but saying kind of
 4       like benefiting the estates and that the debtor that lends
 5       money, has to prove it benefits his property.  That's not
 6       true.  That's not the case.  That's not what we're arguing.
 7       So let's break it down.  What we're saying that professional
 8       fees benefit on a debtor-by-debtor basis, and it's justified
 9       under 506(c).  If you agree with that, we're done.  If you
10       don't, then we move to the next step.  And in that step, the
11       debtors with cushions over 15 percent, it's their cushion.
12       They could light it on fire.  They could go and invest.
13                    THE COURT:  Right.  No, I -- yeah.
14                    MR. FAIL:  So if they want to pay professional
15       fees, it's their business judgment.  I think it's the -- the
16       CRO says so.  He runs these businesses for a living.
17       There's no question.  So for the ones above 15 percent, it's
18       not a 506(c) question.  It doesn't have to benefit them.  We
19       say it does.  But if you don't buy it, you don't buy it and
20       it doesn't matter.  The professional fees can be paid.
21       We're asking these cash collateral on a nonconsensual basis.
22       That's why we're here.  And we're choosing to use it on the
23       professionals.  With the ones that are less than 15 percent
24       --
25                    THE COURT:  Hang on a second.  Can I just.
```

Page 250

```
 1              MR. FAIL:  Of course.  I'm sorry.  I said I would

 2     go slow and I talked (indiscernible) --

 3              THE COURT:  Yeah.  No, I just want to say that you

 4     are going at a very solicitous clip.  Basically you're

 5     saying, look, we have a bunch of debtor entities.  A lot of

 6     them have a robust equity cushion.  Some don't.  To the

 7     extent there's concern about adequate protection existing as

 8     to the lesser funded ones, the overfunded ones can do

 9     whatever they want with such a much --

10              MR. FAIL:  (Indiscernible)

11              THE COURT:  -- including forking it over on an

12     (indiscernible) --

13              MR. FAIL:  I mean, it's unquestionable.

14              THE COURT:  That's what you're saying.

15              MR. FAIL:  Yeah.  We don't have to subcon.

16              THE COURT:  Okay, and you don't need to satisfy

17     adequate protection or you're not jeopardizing the existence

18     of adequate protection (indiscernible) --

19              MR. FAIL:  No, because there's a cushion.  We've

20     already established it.

21              THE COURT:  Right.

22              MR. FAIL:  It's round one.  They have the cushion.

23     It's above your comfort zone.  And we could do the

24     debtors -- each debtor -- each debtor, I'll say --

25              THE COURT:  Okay.
```

Page 251

1          MR. FAIL:  -- can do what it wants to lend.

2          THE COURT:  I just (indiscernible) --

3          MR. FAIL:  Why would a debtor do that?  Just to

4     round out because it's in our papers.  Why would one debtor

5     lend to another?  For the same reason, you know, for a

6     reason that we said we are marketing and Mr. Diamond said

7     he's examining all options.  Well, there are people that go

8     and sell onesies and twosies of buildings.  These debtors

9     operate as part of a company, run an enterprise that is one

10    of the largest portfolios of residential, multifamily

11    rent-stabilized properties in New York City.  There's value

12    to selling things together in a non-fire sale way.  You want

13    to fire sale it and firebomb it?  That'll destroy value

14    together.  But done correctly, with professional help, you

15    could sell a portfolio to a large investor that can see a

16    return on investment.  Each individual debtor benefits by

17    having its property sold with another.  I also want to point

18    out, which you can see --

19         E COURT:  That's not evidence-backed, right?  I

20    mean that's sort of speculative.  I mean, I get the argument

21    and --

22         MR. FAIL:  Well, it wasn't crossed.  No one

23    crossed on it.  But I could see if it's in Mr. Diamond's

24    declaration.  We could both see if it's there.  But you're

25    also a bankruptcy judge in the Southern District of New York

Page 252

1    and can take judicial notice and experience that portfolios

2    could have value greater than onesies and twosies.  It's the

3    reason that we sell things as going concerns rather than --

4    I mean it's literally every 363 motion I've ever written,

5    there's value to going concerns.  It's the purpose of a

6    Chapter 11 reorg to get a going concern more than a Chapter

7    7.  I mean --

8              THE COURT:  No, I got it.  Look, I mean, that part

9    is very persuasive to me, that there's value to be had in

10   achieving property sales through a Chapter 11 process.

11             MR. FAIL:  So it could easily be a business

12   judgment of one debtor.  Also want to point out, Your Honor,

13   that just because there's a lower equity cushion doesn't

14   mean that there's still value.  They're not necessarily

15   correlated.  Value could be the most expensive one.  You can

16   see that the sheet is what it is, right?  You can draw

17   whatever conclusions.  But the 506(b) point is important

18   because it's not relevant once we made our proposal.  So the

19   proposal we made makes sense.  That's why we offered it.  It

20   solves the problem.  It adopts your view of concern of below

21   15 percent and it changes it to business judgment.  It

22   accommodates.  It doesn't adopt it, it addresses your

23   concern and it follows the case law that a cushion is there

24   to be spent.

25             Think about a normal case with a retailer.  They

Page 253

1    don't say that it has to be spent.  They don't dictate to

2    what it goes to, which professionals or which rent or which

3    utility.  Money is commingled.  And while we're talking

4    about what we see in this Court, in the mother court of the

5    Southern District, of mega cases, I've never seen, in all of

6    the mega cases I've done, cash collateral restrict by

7    debtor.  They're not subcon cases.  I've worked on the

8    largest.  They're not subcon.  But I've never ever done a

9    debtor case and I've done them here for 22 years, the

10   largest in history, I've never done a debtor-by-debtor, cash

11   flow on a cash collateral, ever, because it doesn't matter.

12   And if Your Honor wanted one, Mr. Diamond said we could do

13   it.  The numbers would change.  We would jack up and

14   overestimate beyond the cash flow what we would need so that

15   we could spend it.  We could do the process.  We could make

16   93 rows for you.  We could overestimate every cost so we

17   could stay within the budget.  If that was important for any

18   reason, we could generate it and we would stay within.  We

19   would set a variance so we don't bust.

20          But there's no question, an elevator breaks.  An

21   old lady's not, you know, carrying her stuff up, so we hire

22   an extra pointer to be there in 104 degree heat in Brooklyn

23   so that she doesn't have to carry up her bags in addition to

24   walking up the stairs.  Which one's going to go down, Your

25   Honor?  You pick.  Which one?  Which one should I just --

Page 254

1              THE COURT:  Look, I understand the point

2       (indiscernible).

3              MR. FAIL:  Okay.  I'll move on.  I'll move on.

4              THE COURT:  I mean, you say it's

5       (indiscernible) --

6              MR. FAIL:  I think the 506 was important.

7              THE COURT:  Yeah.

8              MR. FAIL:  Mr. Bassett raised for the first time,

9       to my knowledge, that they're contesting that the tax money

10      is not cash collateral.  I don't see it in their reply, in

11      their objection.  Maybe they can point us to it.  We don't

12      see.  I didn't see it.  My colleagues didn't see it.  I'm

13      happy to be pointed to it.

14             But I would also say we saw that provision in the

15      CEMA.  It's defined the term escrow fund.  It's the typical

16      piece that does not say it should be held in escrow, which

17      would be something that you would expect them to say in a

18      reply if it was true, that no, there's no privity.  It was

19      held by somebody that's not mutual.  But they didn't.  And

20      they didn't say we set it off because when we accelerated

21      your debt prepetition, we swept it and we set it off.  They

22      didn't say it because they don't account for it that way.

23      Their books and records, I bet you, will account for it

24      separately and they haven't said otherwise.

25             So this argument that it isn't cash collateral is

Page 255

1    not based on that document, Your Honor.  That document says

2    it's not held in trust.  An escrow is held in trust.  It may

3    be commingled, it may be held separately, but it's a reserve

4    fund.  It's a reserve fund to pay the taxes.  We prefunded

5    the taxes in the order and we think it should be used for it

6    and we think that there's a basis for it.  We don't see an

7    objection.  If they wanted to join issue on it, we would

8    have had more discovery around how they actually hold it.

9    We don't hear a representation.

10             THE COURT:  Let me ask --

11             MR. FAIL:  It's important enough for $7.5 million

12   that you would have thought that they would put on something

13   that says, hey, wait a minute.  So I don't think this tactic

14   (indiscernible) --

15             THE COURT:  What about the basic point that you're

16   sort of having it both ways.  You come in, you report a zero

17   cash balance and now you say but wait (indiscernible) --

18             MR. FAIL:  We reported zero cash balance for cash

19   in our possession.  It's true, we don't have possession of

20   it.  We told you and the Court and everybody else, we dealt

21   with the U.S. trustee and we had Mr. Diamond testify.  Cash

22   management, banks not at debtor entities.  Banks at debtor

23   entities for security deposits and for certain debtors that

24   were acquired that came with their own banks and the vast

25   majority don't have bank accounts in their names.  The

Page 256

1    reason we're doing the new cash management system in the

2    cash sweep.

3              THE COURT:  And what's wrong with their objection

4    that you're masking (indiscernible) --

5              MR. FAIL:  I'm not masking --

6              THE COURT:  Wait, wait, wait, let me finish.  That

7    you're using the covering of the tax -- of the use of --

8    you're using that money, proposing to use that money to

9    cover your tax obligation that's coming up to you in July in

10   a way that masks true operating (indiscernible) --

11             MR. FAIL:  I'll rewrite it and stand behind our

12   points.  Number one, it's 506(c) surchargeable.  It's not

13   diminution.  I could have started with it.  It doesn't count

14   as diminution because it's in 506(c).  There's no world in

15   which I have to repay them for it.  If it's cash collateral,

16   I get to use it.  And there's a line of cases that say you

17   don't get to get adequate protection or it is adequate

18   protection.  You don't get the 507 claim for it.

19             THE COURT:  No, wait, I'm translating this to I

20   think you're telling me --

21             MR. FAIL:  I could start with it and end with it.

22   And you don't get to count in your math as diminution.

23   That's what the cases say.  I didn't make it up.  So I can

24   start with it.  But what I didn't do is pick a fight on day

25   one and say (indiscernible) --

Page 257

1          THE COURT:  Why doesn't it matter -- I'm sorry,

2     that you're crediting that as part of your operating

3     revenues, even though it's starting off in a place that's

4     off your books?

5          MR. FAIL:  I don't know if we put it as operating

6     revenues.  I think, Your Honor, if you look at the budget,

7     it says something like restructuring upside or

8     restructuring.  It's an initiative or something.  It's not

9     an operating -- oh, NOI.  So like maybe NOI is below it as

10    an accounting matter.  We're not taking it in as rental

11    income.

12         THE COURT:  I'm not being -- yeah, I don't want to

13    --

14         MR. FAIL:  Sorry (indiscernible).

15         THE COURT:  -- use fancy terms because things will

16    go badly if I try to do that.  But you've got a universe of

17    expenses in the projected 13 weeks and you're projecting

18    $200,000 positive and that --

19         MR. FAIL:  It'd be the same --

20         THE COURT:  -- gets your net without -- well, but

21    you're spending -- you're asking Flagstar to spend over $7

22    million sitting in there non-trust pocket (indiscernible)

23    tax obligations.

24         MR. FAIL:  It's your -- we did not say that we're

25    $200,000 positive.  We said you have a starting at zero and

Page 258

1    you have $200,000 at the end.  If I start with seven

2    something, 7.5, you still have $200,000 at the end.  But our

3    argument supported by the case law is you look at collateral

4    value and Ms. Zell testified to it.  Her value isn't

5    affected if I lump up a couple of months' rent or if I

6    redeploy it.  There's value to the collateral and the

7    collateral value we just established either has a cushion or

8    it's below the cushion level you were comfortable with.  But

9    it's above 15 percent or below.  Once we're there

10   (indiscernible) --

11            THE COURT:  Let's say you're grabbing 5 percent

12   from the (indiscernible) I said I was comfortable with 20.

13   I might be that comfortable with 15.  But --

14            MR. FAIL:  I wasn't impugning --

15            THE COURT:  Yeah.

16            MR. FAIL:  You pick your number.  I'm offering to

17   fund below 15.

18            THE COURT:  I got it.

19            MR. FAIL:  I'm not offering to fund below 20.

20            THE COURT:  Yeah, I --

21            MR. FAIL:  I don't -- I can't do it.  We're not --

22   we're not funding below -- above (indiscernible).

23            THE COURT:  Okay.  Okay.  I got it.  So I think I

24   have your answer on the tax treatment, which is, look, it's

25   not cash burn.  It's benefiting the estate.  It's benefiting

Page 259

1    the creditor and --

2            MR. FAIL:  Yeah, and we didn't have it and it

3    sounds like we're fighting over it.  So if I showed it, I

4    guarantee you the fight would have been we showed it and we

5    don't have it.  So there's no hiding it.  We flagged it.

6    It's not a disclosure issue.  It's open and notorious.  In

7    terms of the value on an individual basis, that's the whole

8    Zell report.  We could do the budget as I pointed out, but

9    it doesn't make sense.  The lending issue we talked about

10   being an admin expense, not a 506(c) charge from the lender

11   perspective.

12           The points on corporate governance, the managing

13   member of this isn't here objecting.  The managing member

14   has authorized it in connection with the bankruptcy filings.

15   And no one above is -- you know Mr. Friedman was on the

16   phone.  No one's complaining about governance.  So that's

17   that point.  In terms of breaching a prepetition agreement,

18   we owe $500, $600 million as the debtors under that

19   agreement.  We're obviously not following it.  It's another

20   breach.  It's a non-issue.  We're in bankruptcy court.  You

21   know, you know that.  We talked about the benefits to the

22   person whose lending money being increasing.  Let me just

23   see if there was any other points.  The 552 issue is a red

24   herring.  We've said it's cash collateral.  There's no

25   question that postpetition rents defined in the Bankruptcy

Page 260

1    Code is cash collateral.  That's why we're here seeking to

2    use it.  We talked about the CEMA not mattering.

3                    THE COURT:  Okay.

4                    MR. SLACK:  Garrett?

5                    MR. FAIL:  Just one moment, Your Honor.

6                    THE COURT:  Yeah.

7                    MR. FAIL:  And then before we close, I'll just

8    turn it over, with your permission, to Mr. Slack to just

9    address the cap rate issue.

10                   THE COURT:  Okay.

11                   MR. FAIL:  Thank you.

12                   THE COURT:  I urge speed, but thanks.

13                   MR. SLACK:  Thank you.  It's late, and I'm going

14   to make two quick points and I'm actually going to direct

15   Your Honor to the record rather than make the independent

16   arguments and go through it.

17                   THE COURT:  Great.

18                   MR. SLACK:  But with respect to the cap rates,

19   Your Honor, I think Ms. Zell spent a lot of time going

20   through it.  I would take exception to the idea that all of

21   the data was higher and she picked a lower cap rate.  That's

22   just not true if you look at her declaration.  When she did

23   the comps, there were comps that were lower.  There were

24   comps about right where her number was and there were comps

25   higher.  And what the other thing she testified to, and I

Page 261

```
 1    think it's important to look at this, is that when you're

 2    doing this holistically, you do a sales comparison check and

 3    it's a per unit sales.  She has a whole section beginning at

 4    26 of her reply declaration.  But the point of it is, Your

 5    Honor, is that when you get to a cap rate or you're trying

 6    to figure out whether you get to a cap rate and she

 7    testified to it better than I can, you look at the sales

 8    data and you do it on a per unit basis.  And when she did

 9    that with each of her boroughs and her number was either

10    lower or right in line with that.

11                THE COURT:  No, I recall that testimony.  The

12    number she chose led to a comparable per unit value as in

13    actual market tested.

14                MR. SLACK:  Exactly, Your Honor --

15                THE COURT:  (Indiscernible)

16                MR. SLACK:  And what I think is important is she

17    doesn't exercise -- and again, I don't want to just repeat

18    the testimony that now we have on the record.  But at

19    Paragraph 41, she basically talks about Mr. Fowler saying

20    when you do the same test with all of his assumptions in his

21    sensitivity analysis, he's nowhere near the -- and she's got

22    a chart.  It's Exhibit A.  So again, she explains it.  I'm

23    not going to go through it again.  But she actually does the

24    work to look at if you do the same analysis on the

25    reasonableness test to where Mr. Fowler came out doing his
```

Page 262

1    what if analysis, he is way below, I mean, way below in the

2    boroughs the averages for (indiscernible).  She sets that

3    out in her -- and so again, you can't -- you know, if you

4    don't accept the idea that she just took -- you know, all

5    the data was one side, she took it and made a low -- first

6    off, that's not true.  And then of course, she did do the

7    reasonableness that she testified to it --

8             THE COURT:  Well, I want to let you make your

9    record, but I'm going to say I found her testimony quite

10   persuasive on the whole.  I think my concern is I maybe have

11   some concerns at the margins and I do have some concerns

12   that even assuming all of her conclusions, you're a

13   little -- you're thin on an equity cushion standpoint.  But

14   I don't think I need a blow-by-blow walkthrough defending

15   her assumptions.  I mean, I think you did a nice job

16   eliciting from her an explanation of how and what she did

17   and why.

18            MR. SLACK:  So Your Honor, then I'll stop with

19   what I said about the cap rates.  Thank you, Your Honor.

20            THE COURT:  Okay.  Thanks.  Okay.  I bet Mr.

21   Bassett is desperately hoping I'm going to let him have like

22   a minute or two.  So you can do that.

23            MR. BASSETT:  Thank you.  Thank you, Judge.

24            THE COURT:  I'm assuming it's Mr. Bassett because

25   he looks more like he's going to pop up than Mr. Pasquale

Page 263

1    does.  Keep it tight.

2             MR. BASSETT:  Thank you, Honor.

3             THE COURT:  And narrow in scope because we can't

4    (indiscernible).

5             MR. BASSETT:  It'll be very tight and very narrow

6    in scope.  I just want to respond to a couple of things that

7    Mr. Fail said.  There was a lot of discussion about how from

8    a value maximizing proposition, these entities need to be

9    looked at as a portfolio.  And there's obviously maybe value

10   in pursuing strategic transactions that involve all of them.

11   Again, that may be true, but it's not an excuse to ignore

12   the separateness between these entities for the requirements

13   of the Bankruptcy Code.

14             But I also want to point out, Your Honor,

15   regardless of what happens after today's hearing, Flagstar

16   has always been, continues to be open and willing to having

17   discussions with the debtors about an overall value

18   maximizing proposition.  We're going to listen.  It's been

19   radio silence.  And I want to tell you, Your Honor, this is

20   something that the Court can, and I think should infer from

21   the evidence.  It's not just about the debtors.  It's about

22   Zarasai --

23             THE COURT:  Oh, okay.  Hang on.

24             MR. BASSETT:  (Indiscernible)

25             THE COURT:  I don't want to get into a whole thing

Page 264

1   about -- but I will say I know you've brought out that a lot

2   of money left the estate between (indiscernible) --

3           MR. BASSETT:  No, it's not -- I'm not going there.

4           THE COURT:  Okay.  Go ahead.

5           MR. BASSETT:  What I'm going to say is every

6   single engagement letter for every professional in this case

7   is for debtors and non-debtors.  The overall objective for

8   Mr. Wiener and his companies is all of them.  It's not just

9   about the debtors, Your Honor.  And I think that's part of

10  the problem.

11          Now, the last point I want to make is on the tax

12  advance.  It is their burden to demonstrate that cash

13  collateral is in fact cash collateral.  They cannot use

14  money that's not property in the estate to fund their cases.

15  This cash is sitting in an escrow account at Flagstar.

16          THE COURT:  Isn't theirs.  Yeah.

17          MR. BASSETT:  They have no ability to use it.

18  It's their burden to demonstrate that.  There's like two

19  paragraphs, maybe one paragraph in Mr. Diamond's declaration

20  that talks about how this is cash they believe they have

21  access to.  They don't.  It's a showstopper.  Your Honor's

22  exactly right.  But if they do have access to it, there is

23  no excuse for not putting that on the top of their budget.

24  That's all I have, and I really appreciate your time.

25          THE COURT:  Okay.  Thanks very much.  Let me ask

Page 265

1   you to take a seat, and I want to talk scheduling and how

2   long I have to do what I need to do.  First, let me just say

3   thank you for your arguments and for the evidence presented.

4   I reserve decision.  And now let's go into conference mode

5   and talk about how long I have to do what I need to do.  So

6   I know my first question is, I think the interim

7   authorization to use adequate protection, I was told

8   earlier, runs through tomorrow.  So I think really, the

9   first question is for Flagstar.  Can you live with a little

10  more time or not tacked onto that to let me do some work?

11          MR. BASSETT:  I'd like to understand how much time

12  we're talking about, Your Honor.

13          THE COURT:  I know you do.  Well, look, I could --

14  if I had to, I could manage some sort of oral ruling

15  tomorrow afternoon.  I'd feel a lot better about what I had

16  to do if I could do it either Friday or Monday.

17          MR. BASSETT:  You know, I haven't talked to my

18  client, but I'm pretty confident that'll be okay.

19          THE COURT:  Okay.  I'm going to take that as a

20  yes.  I'll tell you, you'll get a better decision on Monday

21  than you do on Friday.  So that would help me.  Let me ask

22  the debtors, assuming now that I've stuck Flagstar with the

23  answer they just gave me, if you can live with waiting until

24  Monday.

25          MR. FAIL:  Your Honor, does Flagstar have an issue

Page 266

1    pre- -- like the budget was for four weeks, so we still have

2    money left over that we haven't spent, and it's a timing

3    issue, and so we can continue, obviously, to spend that, but

4    to the extent that we need more money for payroll,

5    utilities, whatever else that's on the operating budget --

6              THE COURT:  Yeah.  Tell me (indiscernible) --

7              MR. FAIL:  You know, there's a budget, and so it's

8    four weeks.  So could we roll it forward one more week and

9    increase the amounts, or are we just tapped at the old money

10   and --

11             THE COURT:  Oh.

12             MR. FAIL:  It doesn't just roll forever.

13             THE COURT:  Yeah.  I got it.  When's your next

14   payroll?  Do you know?

15             MR. FAIL:  I don't.  One moment.  We can stretch

16   with what we have through this Friday, but if -- so, we can

17   stretch to pay for what we have to pay for this Friday.

18             THE COURT:  I got it.  Will Flagstar -- I don't

19   know if this is going to meet your needs, but I'll ask.

20   Will Flagstar consent to pro rata expenditure of additional

21   funds through as necessary just to meet actual and necessary

22   expenses through Tuesday of next week with an eye to a

23   decision Monday?

24             MR. BASSETT:  Yes, Your Honor.

25             THE COURT:  Okay.  Does that cover debtors?

Page 267

1            MR. FAIL:  Thank you, Your Honor.

2            THE COURT:  Okay.  Thank you all.  All right.

3    Listen, I really appreciate the arguments.  It's a long day.

4    It's hot in here, for which I am sorry, but it's even hotter

5    outside.  I am going to -- you may be wondering what time

6    does he have in mind Monday.  I think when I'm ready is the

7    answer.  I have an open schedule, so try to keep yourselves

8    available and I will let you know.  It's almost for sure

9    going to be an oral decision that I generate, and I'll

10   summon you by Zoom and not make you run down here.  Okay.

11           MR. BASSETT:  Thank you.

12           MR. PASQUALE:  Your Honor, I just wanted to

13   mention the information you asked (indiscernible) we get it

14   to the Court and the parties tomorrow?

15           THE COURT:  Yeah.  Tomorrow's fine.  I mean, I'm

16   honestly not sure it's going to be something I rely on.  But

17   it's -- I'm curious.  Okay.  All right.  Thank you all very

18   much.

19           MR. PASQUALE:  Thank you.

20           THE COURT:  Take care and have a great night, and

21   you're to see me sprinting out momentarily.  So --

22           MR. FAIL:  Thank you very much, Your Honor.

23           THE COURT:  Thank you very much.  I won't chat

24   with you, but --

25           MR. PASQUALE:  Thank you, Your Honor.

Page 268

1          MR. SLACK:  Thank you, Your Honor.

2          THE COURT:  Thank you.  We're adjourned.

3          (Whereupon, at 6:59 p.m., these proceedings were

4    concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 269

1          C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *[signature: Sonya M. Ledanski Hyde]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 30, 2025

[& - 2]                                                                                       Page 1

| & | | | |
|---|---|---|---|
| **&**   3:3 6:15 70:17 | 108:12,15 127:3,4 129:15 129:16,17,25 146:23 219:4 | **11501**   269:23 | **15th**   3:14 |
| **0** | **10,000**   102:15 | **11:34**   1:16 | **16**   84:21 103:14,21 |
| **0**   63:21,24 65:1 68:2 | **10.6.**   92:23 | **12**   24:7 101:2 134:5,11 136:8 | **161**   5:12 |
| **0.06.**   118:20,21 | **100**   5:9 83:1 142:15 151:22 186:7 | 136:17 137:3,7 137:11 138:9 | **17**   85:11 111:25 |
| **0000832**   187:1 | | 142:10 196:21 | **170**   186:5 |
| **0000866** 183:17 | **100,000**   118:20 | 211:11,11 222:4 243:14 | **175**   186:4,6,14 186:22 |
| **00031499** 77:15 | **10004**   4:6 | **12151**   269:6 | **18**   18:23 72:6 |
| **031498**   77:1 | **10004-1408** 1:13 | **124**   27:8,15,17 | 73:1 161:23 162:5,20 |
| **1** | **10020**   3:23 | **1270**   3:22 | 164:24 165:10 |
| **1**   13:1 16:16 19:8,11 22:13 | **1007-2**   33:5 35:20 | **12:23**   40:4 | 207:18 211:6,8 211:17 |
| 27:8,15,22 40:15,20 44:9 | **101**   188:25 | **12:30**   40:4 76:21 | **1820**   188:20 189:23 |
| 52:11 90:9 109:18 122:11 | **1015**   189:1 | **13**   59:19 60:10 70:12 81:2,15 | **19**   81:13 137:10 138:9 |
| 124:12 126:20 126:25 151:16 | **10163**   3:6 | 85:14 89:20 105:15 119:7 | 162:8 163:2 164:3,25 |
| 151:20 160:1 188:6 189:22 | **104**   183:18 253:22 | 152:25 211:11 233:24 257:17 | 166:13,13 167:13,14 |
| 245:16 247:19 247:19,24 | **1042**   183:2 | **131,000**   156:2 | 176:5 |
| **1,000**   82:16 | **105,000**   81:19 225:24 | **132,000**   156:1 | **191**   186:3,7,15 |
| **1,200**   197:5,6,7 | **107**   11:21 | **13th**   38:20 107:17 | **194**   5:11 |
| **1-5**   5:16 27:17 | **11**   6:4 33:4,6 59:23 80:10,14 | **14**   75:14,17 84:22 106:1,7 | **195**   233:2 |
| **1-6**   5:18 40:23 | 80:19 86:6,10 88:10 89:2 | 125:6 | **1995**   194:24 |
| **1-94**   5:17 28:3 | 142:9 143:9 185:21,22 | **15**   16:12 32:23 75:17 76:11 | **19th**   121:2 |
| **1.95**   124:14 | 205:13,18 207:19 211:7 | 222:5,17,23,24 223:1,17 246:4 | **1:00**   98:10 |
| **10**   5:18 28:23 29:18 40:20,23 | 211:16 252:6 252:10 | 249:11,17,23 252:21 258:9 | **1:22**   78:17 |
| 59:25 76:14 79:1 92:22 | **112**   142:10 | 258:13,17 | **1:37**   90:19 |
| | | **157**   188:6 189:22 | **2** |
| | | | **2**   16:16 18:6 19:7 22:14 61:5,10 62:20 64:13 65:4 |

66:5 67:21,22
68:22 69:1
72:25 73:7
74:23,24
126:20,24
127:15,22
161:24 232:11
**2.4** 86:17
**2.5** 184:13
**2.69** 140:16
141:5 142:4,17
**2.75** 141:4
**2.75.** 143:11
**2.8** 128:8,14,19
129:11
**2.9** 191:10
**20** 18:21 72:22
72:24 74:21
119:5,5,6
181:15 184:3
187:21 195:1
195:24 200:19
211:4 258:12
258:19
**20,000** 191:6
**200** 124:21
125:2,4,7
181:3 185:25
**200,000** 234:2
234:5 257:18
257:25 258:1,2
**20005** 3:15
**2004** 45:10
**2009** 17:17,17
**2012** 92:18
101:6

**2013** 237:9
**2020** 116:18
**2023** 17:19
**2024** 112:20,21
113:1,5 121:18
122:8 125:16
145:10 153:10
154:5 184:1
196:19 209:16
**2025** 1:15
45:10,13,16,25
46:7 59:14
60:12 61:6,9
62:19 63:1
64:14 76:20,24
113:1,4 115:21
116:5,12,22,25
119:1,7 121:9
121:18 122:1
122:12,15,22
128:5 145:10
153:11 209:13
232:16 233:2
269:25
**20th** 20:25
121:2
**21** 120:20,25
**219** 186:14
**21st** 76:6
**22** 120:20
132:2 153:21
153:24 179:19
179:21 253:9
**23** 70:9 76:20
76:24 80:22
81:6,24 83:11
120:20 231:12

232:1
**24** 196:24
**24th** 121:10
**25** 1:15 16:11
45:8 122:2
150:20
**25-11050** 1:3
6:5
**250** 125:2,4,10
125:25 126:4
**2535** 189:4
**25th** 20:23
**26** 17:9,14
21:20 110:21
161:21,24
162:8 164:25
176:21 181:15
187:21 195:1
195:18 196:4,4
196:6 261:4
**27** 5:16
**28** 5:17 92:18
**29** 5:19
**29th** 81:3
**2:00** 98:1
**2:07** 90:20

| 3 |
|---|

**3** 22:18 23:25
25:5 61:6,10
62:20 64:13
65:4 66:5
67:22,22 68:22
69:1 76:8
114:8,8,17,18
123:12,15,20
125:21 126:23
126:25 127:15

127:17,18,22
132:2 179:15
180:18,25
184:16 185:18
190:15,20
191:13,15
196:20 197:12
197:12
**30** 115:21
116:5,12 117:3
122:8 269:25
**300** 269:22
**30th** 121:21
145:5
**31** 145:10
**31st** 116:20
**330** 269:21
**344** 137:14,15
138:8
**345** 137:14
**346** 137:14,15
138:8
**35,000** 75:24
79:6,12 81:10
81:25 82:1,25
83:10 225:23
236:8
**3500** 186:22
**3544th** 112:18
**3545** 112:18
**363** 227:2
252:4
**3rd** 60:12,16

| 4 |
|---|

**4** 22:18 23:25
25:5 123:16,24
124:2,4 166:17

180:2,21
**4.07**   124:9,16
**4.7**   231:13
232:1,5
**4.7.**   231:13
**4/16**   195:25
**4/22**   195:25
**40**   5:18,19
16:18 18:6
19:7 28:22
29:12,15,16
30:21,24 40:21
57:20 60:1,7
96:14 149:16
149:17,20
207:17
**40762**   182:25
**41**   16:6 19:12
23:10 58:17
59:7 207:17
261:19
**42**   53:16 56:18
92:10
**43**   60:4 125:24
231:8,12,17,18
**44**   5:6 125:24
**490201**   17:17

**5**

**5**   17:17 23:7
115:19,19
117:4 121:21
127:3 183:18
196:21 235:22
258:11
**5.25.**   141:4
**5.4**   154:1

**5.59**   155:19
**50**   16:6 19:12
103:2 184:19
**50/50**   143:19
**500**   102:20
259:18
**506**   201:23
204:1 205:1
206:16 207:2
209:3 213:18
213:19 216:19
217:3,11
218:15 219:5
219:20 221:21
222:8 228:4
234:25 237:11
237:17 238:8
239:5,6,22
249:3,9,18
252:17 254:6
256:12,14
259:10
**507**   212:7
219:6 235:5
256:18
**54**   80:10,19
**55**   81:12,13
**552**   230:16
259:23
**560**   212:1
**5:20**   198:23
**5:30**   200:17

**6**

**6**   12:20 13:6
18:19 27:10,15
40:15,20 45:19
57:1,6 118:17

124:14 129:15
147:10,21,23
154:2,8 155:22
**6.2**   155:18
**6.88**   154:6
**600**   259:18
**667**   233:2
**6885830**   17:19
**69**   176:5 184:5
184:9,9
**6:30**   98:3
200:10
**6:59**   268:3

**7**

**7**   12:20 13:6
16:2 27:10,15
53:13 54:1
58:17 92:7
95:3,13 114:14
119:24 147:21
147:24 154:5
155:19 197:14
215:16 252:7
257:21
**7.1**   234:5
**7.3**   231:1,15
232:7 233:25
234:1,4,7
238:14
**7.5**   215:17
216:3,18
255:11 258:2
**70**   184:20,20
**71**   184:24
207:17 221:24
**7306**   192:4

**75,000**   82:22
**762**   182:19
195:21
**767**   3:5

**8**

**8**   12:20 13:6
16:2 27:10,15
34:14 35:7,18
53:25 56:14,22
57:5,10 95:4
152:24 155:19
218:6,20
**8.44**   155:20
**8.5**   154:1
**80**   50:13
151:21
**81**   14:24
**82**   51:1 88:11
207:18,19
211:7,16
226:16 231:10
241:18 242:6,8
**83**   88:11
130:12 131:19
131:25 132:12
132:18 133:10
140:12 221:24
**85**   188:14
189:25
**86**   191:16,17
**867**   188:25
**875**   3:14
**88**   192:6

**9**

**9**   16:2 54:2,14
57:22 218:20

**9-124** 5:16
**9.1** 54:5
**9.2** 57:25 96:19
  96:20
**9.2.** 59:8
**9.21.** 96:24
**9.7** 54:13 70:13
  71:5 81:2 85:4
  87:16 236:4
  237:3
**9.7.** 54:15
**9.9** 55:5,6,13
**90** 86:18
  240:23
**92** 5:5
**93** 206:1 210:7
  210:18 253:16
**94** 5:6 27:22
**97** 76:8
**99** 83:1

**a**

**a.m.** 76:21
**abide** 106:13
**ability** 56:6,10
  222:13 233:11
  264:17
**able** 7:11 8:15
  11:19 24:18
  71:9 82:12
  94:1 155:8
  199:3 208:10
  241:4,24
**above** 181:25
  182:3,5 186:16
  223:1 249:17
  250:23 258:9
  258:22 259:15

**absent** 218:16
  229:19 232:23
**absolute**
  225:22
**absolutely**
  228:11
**absorb** 164:20
**abundance**
  204:4
**academic**
  39:15
**accelerated**
  254:20
**accept** 191:9
  208:2 262:4
**accepted** 211:3
**access** 50:7
  217:2 224:4
  264:21,22
**accommodates**
  252:22
**accompanied**
  228:21
**accompany**
  248:5
**accompli** 243:7
**accordance**
  54:11 241:23
**account** 48:20
  48:20,25 49:1
  49:5,15 50:2
  51:25 86:17
  93:21,22,25
  142:22 150:21
  154:11 240:4
  254:22,23
  264:15

**accountants**
  24:22
**accounted**
  50:16,23,24
**accounting**
  113:9 114:10
  114:24 257:10
**accounts** 2:3
  49:6,9,14,17
  49:21 52:12
  55:15 66:17,18
  67:10 124:22
  126:17 209:23
  233:23 255:25
**accrued** 86:4
**accuracy** 62:13
  63:16
**accurate** 14:19
  118:13 127:13
  186:11 269:4
**accurately**
  174:13 177:4
  221:18
**achievability**
  62:6
**achieve** 175:15
  176:9
**achieving**
  252:10
**acknowledge**
  6:23 8:14
  52:21 91:12
  174:19
**acknowledged**
  11:3 62:23
  63:14 64:11

**acquire** 54:19
  58:19,21
**acquired**
  255:24
**act** 163:25
  164:6
**acting** 162:24
  163:2,7,22
  164:1,4,22
  167:19,21
  168:2 178:5
  220:22,23
**actions** 58:4
  205:25 206:1
  210:18
**active** 91:21
  194:25
**actual** 14:1
  46:3 88:19
  123:10,24
  127:7 140:8
  141:11 142:10
  161:23 165:9
  228:5,9 235:2
  235:12,20,24
  236:23,24
  239:11 240:9
  240:10 261:13
  266:21
**actually** 16:16
  18:12 19:2,3,3
  24:9 25:23
  26:16 30:7
  34:1 39:13
  46:1 54:1 55:5
  71:4,9 74:16
  86:4,17 109:19

128:1 136:11
141:12 145:9
153:18 162:5
163:22 166:14
166:15 171:2
184:18 186:8
192:10,11
195:25 217:17
237:16 240:19
241:5 255:8
260:14 261:23
**ad**   165:25
**add**   65:15
126:25
**added**   170:4
193:13
**addition**   34:15
49:24 52:20
54:7 63:20
73:12 206:14
232:17 253:23
**additional**   33:1
34:6 73:13
89:21 207:7
239:7 266:20
**address**   7:19
7:25 9:5 26:3
37:9,9 226:8
234:9 260:9
**addressed**
204:20
**addresses**
252:22
**adds**   39:2
245:16
**adequate**   66:1
137:19 201:22

202:13 203:13
204:2,6,8
208:22 209:6
211:21 212:9
217:12,16,18
218:1,7,16
219:5 230:13
234:14 235:3
239:7,13
240:13 241:6
241:14,15
250:7,17,18
256:17,17
265:7
**adequately**
8:17 203:23
218:11
**adhere**   168:7
**adjourned**
40:8 91:9
268:2
**adjust**   124:20
198:5 247:9
**adjustments**
46:19 245:17
245:21 246:1
**admin**   219:10
259:10
**administering**
214:6
**administration**
205:17
**administrative**
50:19,21 88:10
210:14 227:23
237:6

**administrativ...**
229:11 242:6
**admissibility**
38:3
**admissible**
13:22
**admission**   38:1
222:3
**admit**   11:21
33:23 38:4,5
**admitted**   9:16
16:4 27:22
28:24 32:8
35:16 39:4,8
53:16 66:16
72:25 73:4,23
75:17 76:13
92:10 217:1
231:9 236:7
237:17
**adopt**   129:12
204:10 211:9
212:14 214:11
246:25 252:22
**adopts**   204:11
252:20
**advance**   10:25
34:7 58:18
230:20,23,25
231:2,12,14
232:7 237:25
264:12
**advances**
54:17
**advice**   88:13
**advise**   120:5,9

**advising**   76:2,2
**advisors**   71:2
71:14 230:5
**advisory**   162:1
**advocacy**
197:20
**advocate**   24:4
25:7 163:25
164:2,6,13,23
220:23 221:1
**affairs**   54:10
**affect**   172:15
**affected**   258:5
**affiliate**   54:17
93:9
**affiliated**
223:24 243:15
**affiliates**   51:12
54:19 55:15
71:23 72:2
76:3 85:9
228:10
**affirm**   41:10
41:13 99:4
160:7
**affirmation**
92:1
**affordable**
149:17,20
150:5,18,22
**afield**   136:18
**afternoon**   44:6
44:7 98:5
100:8 161:12
161:13 265:15
**agenda**   246:11

agent  2:14
70:22 93:7,8
aggregate  66:5
82:14,20
166:23 227:7
231:15
agnostic
219:20
ago  64:24
115:14 136:17
139:17,22
141:20 152:2
173:16 174:17
agree  22:7
25:20 31:10
74:12 75:10
87:22 128:18
133:8 138:7
139:8 153:13
161:24 167:2
179:20,22
207:24,25
208:11 221:18
239:5 244:14
246:19 249:9
agreed  27:9
36:19 40:14
178:7 242:24
agreement
10:24 53:22
54:8,10,21
57:12 90:16
92:24 93:2,3,5
93:10 95:2,19
96:5,20 134:19
225:9 228:1
259:17,19

agreements
51:6,11 52:5,7
53:4,6 55:1,21
56:3,5,9 225:6
225:6,7,8
227:14
agrees  98:15
ah  128:3 142:6
ahead  11:4,10
12:8 26:21
32:24 37:16
43:12 44:2
45:3,8,10 64:9
79:20 82:5
84:17 96:11
109:17 110:4
143:23,25
159:16 165:2
176:2 193:24
201:13 231:21
235:17 242:25
244:12 264:4
aided  221:20
aim  162:16
200:19
air  158:18,21
158:21
alarms  203:21
alleged  210:4
allocate  83:18
86:1
allocation  86:7
223:19
allow  50:2
51:11 110:19
110:21,22
206:18 227:25

228:2
allowable
141:3
allowed  42:9
143:7 216:20
allows  205:8
aloud  55:8
alternative
203:7 205:4
208:4 222:16
alternatives
208:7
ambiguity
244:3
amend  97:3
amended  53:22
americas  3:22
amount  83:21
143:4,7 180:13
209:3,5 234:20
236:16,17
amounts
123:10 209:18
212:11 225:17
232:12 266:9
amply  31:16
analogous  17:8
analyses  108:2
172:24 177:1,5
177:6 181:6
196:11,15
analysis  14:2
22:25 23:11,12
100:19 105:20
106:7 108:6
118:7 120:6,10
122:21 131:17

134:20 139:4
141:11 144:20
147:12 149:23
150:2,4,19
151:25 152:24
157:11,12,20
157:22 162:11
162:12 163:2,5
163:10 164:4
167:15,15,16
167:18,21
168:3,18,21,24
169:1,12,17,20
171:3,14,17
172:2,10,13,20
174:5,9 176:21
177:11,21,25
180:6,10,21
183:1 184:21
187:22 190:8,9
190:11,21
191:17 192:5
192:22 194:11
195:20 196:16
196:16,17
197:24 198:1,3
198:9,9 211:16
217:13 221:4
221:10 229:20
244:18 245:25
261:21,24
262:1
analytical
157:7
analyze  130:16
178:17

analyzed   127:8
144:19 153:14
155:14
analyzing
151:10 157:13
anchor   196:15
196:17 198:3
245:24
ancillary
205:15
ankara   198:9
annual   45:5
141:3
annually   22:22
answer   30:23
82:15 83:7,16
88:1 89:11,14
89:22 97:7
110:20,25
113:12 114:2
134:9,22
171:21 172:6,7
174:4 175:24
175:24 176:6
176:14 197:19
207:11 209:7
225:25 247:1
258:24 265:23
267:7
answered
152:5 172:18
answering
174:2 201:6
answers   68:13
130:20 174:23
182:13

antagonistic
237:16
anticipate   8:6
46:12 88:2
95:10
anticipated
98:17
anticipating
87:24 120:2
anybody
146:25 158:17
225:20
anybody's
119:15
anything's
243:7
anyway   244:12
apace   220:6
apart   171:10
213:24
apartment
188:19 191:22
213:23
apartments
143:8 205:7
apologies
65:12 144:23
245:20
apologize
33:11 34:12
68:15 88:8
104:21 166:15
192:8 231:25
apparently
243:6
appear   31:23
31:23 72:21

105:6 140:5
appearance
42:21,23
appearances
6:6
appearing   7:3
81:24
appears   38:19
44:13 58:14
59:2 76:18
161:9 183:18
218:9
appendix
124:13
applause
106:13
applicability
237:11
application
2:12 15:7
86:14,15,15
208:14 237:12
applications
241:18
applied   22:17
121:17,18
123:12 126:20
132:4,18 133:6
133:8 144:22
145:2 150:20
157:15 184:11
184:13 197:8
215:6 216:9
239:23 244:19
applies   164:23
219:21 245:17

apply   22:3
31:11 114:8
117:20 118:6
125:24 126:15
129:3 130:8
131:13,24
132:2,12
133:10 137:6
140:16 144:11
151:13 155:7,8
157:25 158:1
164:24 222:10
236:17
applying
118:10 164:22
237:12 244:18
appointment
2:13
appraisal
21:15,16
106:11,13,16
106:19,22,23
106:24,25,25
107:1,12 108:3
110:7 111:11
113:5 114:9,11
114:21,21,24
115:1,3,6,12
117:6,7,15
119:21 125:15
126:4,5 130:12
131:14,17,19
132:11 133:2
137:4,18,19,23
138:20,20,21
138:24 139:6
139:10 140:2

144:5 154:13
154:14 157:15
157:16,19
161:17,21,23
161:25 162:5,9
162:21,23,25
163:5,11,15,18
163:23,24
164:17 165:9
165:11,25
166:7,8,9,16
166:17,22
167:3 173:2
178:7,9 180:7
180:12 182:14
183:24 184:1,5
184:6,6,13,21
185:3,18 188:4
188:10,21,24
189:4,23
190:13,21
192:3 195:5
197:11 246:10

**appraisals**
13:7,12 24:10
106:14 110:11
113:13,23
114:2 140:20
166:24 180:5
181:7,16,20
182:14 184:2
184:10 188:1
189:15,15
194:20

**appraise**
154:20

**appraised**
101:19 130:23
131:14 138:25

**appraiser**   6:20
24:11 107:2
110:10 117:13
117:14 138:21
151:11,12
155:9,10
162:24 163:3,7
163:22,23,24
164:1,4 167:20
167:21 168:2
176:8 177:13
178:5,16
181:11 192:4
220:12,12,22

**appraiser's**
108:3 111:21

**appraisers**
106:12 110:9
118:4 125:10
133:2 134:15
141:22 144:5
178:10,12,13
181:19 188:1

**appraising**
25:22 134:5

**appreciate**
12:1 131:16
236:21 238:5
264:24 267:3

**approach**   42:1
43:14 79:18
100:4 117:5,8
117:9,10,11,17
117:17,21

118:6,14
144:18 150:8
152:10,12,13
152:18,20,22
218:4

**approached**
101:24 102:2

**approaches**
89:15

**appropriate**
12:11 18:2
23:12 24:2,24
30:12 51:17
78:19 110:7
128:24 188:18
212:17 216:24
236:18

**appropriately**
10:19 36:16
224:9

**approval**   52:17
94:14 225:19

**approvals**
224:17

**approve**   61:24
218:2

**approving**
2:13

**approximately**
61:5 62:20
81:2,15 179:21

**april**   59:19
60:12,16 64:20

**arbel**   71:1,13
71:16,18 75:20
75:23 76:1,6
78:10 79:6

81:8,9,14
83:11,25

**arbel's**   81:25

**area**   124:20
185:4

**areas**   18:13

**argue**   23:4
24:18 35:2
90:13 187:11
199:3 207:12
210:20,21

**arguing**   9:15
14:21 244:14
249:6

**argument**   20:6
20:16 23:2
25:14 26:4
32:14 48:8
52:24 67:13
100:25 202:2
203:16 205:20
205:21 207:23
207:25 208:1
214:4 215:11
217:11 228:11
230:7,8,10,16
234:17 235:5
235:19 238:7,8
248:5,7 251:20
254:25 258:3

**argumentative**
22:19 170:9

**arguments**
8:12,15 65:20
199:1 200:3
207:7 219:13
222:8,10 226:8

226:11 234:11
246:12 260:16
265:3 267:3
**arrive** 178:14
**arrived** 89:12
**article** 54:2
57:22
**articles** 193:11
**articulated**
87:12
**articulation**
236:15
**ascribed** 133:5
**aside** 22:11
93:14 189:14
200:20 232:10
235:6
**asked** 19:4
31:8 36:7 37:3
37:23,24 42:21
47:8,25 50:20
52:4,6 60:3
69:4,25 71:8
82:14 92:12
95:2,16,19
96:4,11 101:21
111:24 117:8
134:7 137:25
138:7 175:10
194:5,15 195:4
196:5,8 210:9
210:10 217:4
218:23 219:1
226:15 236:4
237:3 267:13
**asking** 7:12
47:4,23 50:5

50:11 52:22
61:24 65:9
69:11 74:5
78:13 114:2
120:1 144:2
164:11 172:8
174:2 210:24
226:23 227:18
249:21 257:21
**asks** 144:2
**aspect** 21:19
22:5 226:15
**asserted**
246:23
**assess** 152:12
152:21
**assessment**
7:14 172:21
**asset** 130:17
213:22 228:18
228:18
**assets** 58:5,5,7
58:19 145:12
155:17 194:14
194:14 198:7
208:17 228:17
**assignment**
57:11
**assisting**
194:23
**associated**
218:10
**assume** 28:25
44:1 56:2
82:11 86:3
103:4 141:1
143:6,12,19

170:25 191:11
234:6
**assumed**
104:12 139:25
140:6 141:7
**assumes** 47:10
**assuming**
29:21 142:3,11
262:12,24
265:22
**assumption**
129:21,23
130:2 141:22
162:12 172:25
175:4
**assumptions**
14:2,15 108:17
123:4 131:22
139:7 163:6
167:16,18
171:17 172:15
172:20,24
173:3 174:10
177:22 187:5
187:22 191:17
197:9,11
261:20 262:15
**attach** 72:8
**attached** 13:4
52:17 57:4
70:7 79:10
108:11 121:1
225:11
**attaches** 52:13
161:15
**attaching**
120:23

**attachments**
105:11 161:22
**attack** 21:15
212:4 243:10
**attacked** 22:3
22:4
**attacking**
15:17
**attacks** 22:15
**attempt** 16:18
32:3
**attempting**
190:10
**attempts** 18:7
220:15
**attention** 53:25
56:13 70:6,8
72:6,14,22
76:10 77:23
80:9 95:1
96:14 165:5
**attests** 22:16
**attorney** 3:4,13
3:21 4:4 180:3
**attributable**
87:16
**attributes** 62:6
**attribution**
48:11
**auditor** 113:9
**auditors** 22:22
24:9,21 113:24
115:4
**august** 184:1
**authority**
28:14

**authorization**
217:25 265:7
**authorize**
225:12
**authorized**
259:14
**authorizing**
2:2,8,13
**automatic**
241:20 242:1
**automobile**
203:14
**avail** 241:20
**available** 7:10
23:21 41:4
154:24 224:2
267:8
**avenue** 3:5,22
189:5
**average** 83:13
124:9,15
128:20 140:21
141:1,5 142:3
153:7,16 154:6
154:15 155:25
155:25 156:2
166:3
**averages** 186:7
262:2
**averaging**
186:15
**avoid** 138:15
205:12 224:2
248:7
**avoided** 206:5
224:3

**aware** 44:22
45:24 46:21,24
46:25 47:8,25
51:1 52:4,7
53:9 54:20,23
55:1,18,24
58:10,14,24
69:8,14,16,19
86:14 106:5
110:11 124:3,6
124:7 125:22
125:24

**b**

**b** 1:21 2:3 5:14
11:21 97:3
149:7 161:15
161:15,17,19
181:15 230:16
252:17
**b.r.** 233:2
**back** 23:23,24
32:18 40:11
45:18 60:12
69:11 82:15
91:25 97:22
103:21 108:11
114:7 126:5,14
129:14 131:11
135:3 136:8,16
138:18 145:7
147:2,2,4
158:24 159:11
164:15 193:20
193:23 194:24
200:15,22
201:19 203:9
204:21,25

206:14 213:5
213:15 216:4
216:13 219:11
230:19 242:22
**backed** 208:16
251:19
**background**
34:21,22,23
35:2,10 39:25
51:19 179:12
**backtrack**
166:15
**backup** 110:21
136:23
**backward**
87:11
**bad** 100:10
247:8,8,8,9,10
**badly** 257:16
**bagley** 180:2,4
**bags** 253:23
**baked** 14:2
**balance** 63:21
63:24 65:1
66:7,14 68:2
230:12 234:2
234:12,21
255:17,18
**balls** 164:8
**ban** 158:1
**band** 157:10
157:19
**bank** 2:3 49:14
55:14 67:10
233:23 234:16
237:8 255:25

**bankers** 89:9
**bankruptcy**
1:1,11,23 33:5
35:20 59:12
61:16 77:16
82:18 87:8
88:13,18,18
92:20 214:22
224:2,3 226:13
226:22,25
227:2 230:17
233:2 238:3
241:19,22,23
251:25 259:14
259:20,25
263:13
**banks** 66:19
255:22,22,24
**bar** 162:16
164:22,22
246:17
**barrett** 37:23
**barrington**
3:10 5:5 6:16
28:9,11,12,21
31:1,20 37:17
37:18,22 40:13
40:25 41:4,25
47:2,4,10,22
48:14 51:13
61:13 63:2
65:7 69:10
73:20 74:8
75:1,6 79:21
79:24 80:3
86:19 90:2,12
90:15 92:1,3,6

92:9,11 94:16
95:5 97:9,14
**barrington's**
31:16
**base** 178:17
**based** 14:14
46:18 56:17
133:12 153:8
156:3 157:10
166:24 171:17
172:25 174:9
175:4 181:25
187:9 197:25
246:5 247:15
255:1
**basic** 226:12
255:15
**basically** 23:13
158:19 196:20
204:6 218:20
234:16 238:8
250:4 261:19
**basis** 14:19
22:25 31:7
32:4 34:23
36:10 44:20
45:3,5 46:8,16
47:3 61:9,18
62:19 63:15
74:25 93:23
108:19 122:2
139:23 150:20
151:21 184:19
194:22 201:25
210:11,12
221:13,19
223:20 227:5,7

227:12,24
228:18 232:9
242:4,8 249:8
249:21 255:6
259:7 261:8
**bassett** 3:17
5:6 6:7 10:22
10:22 12:6
19:14 27:12,13
27:25 29:3,8
29:13 30:5
31:24 33:9,12
33:18 36:4,10
36:15,25 38:9
38:14,16,21
39:14 40:17
42:4 43:13,16
43:20 44:2,3,5
47:7,11,14,16
47:21,25 48:6
48:12,15 51:23
52:4,20 53:2
53:15,18 55:10
55:12 56:18,21
59:7,10 60:1,6
61:22 62:8,17
63:7,11,24
64:6,10 65:12
65:16,17,25
66:8 67:21
68:1,6,14,20
68:21 69:12,16
69:23 70:4,5
72:24 73:2,6
73:25 74:3,8
74:14,24 75:7
75:12,16,18

76:13,15 77:4
78:20 79:1,4
79:18 80:8
83:6,9,20
84:15,18,22,23
85:13,15 86:25
87:3,14 90:18
91:4,6 92:13
93:14 94:19,21
94:24 95:8,15
95:18,23 96:4
96:7,13,18
97:6 226:6
229:3,4,8,11
229:15 230:1
231:17,22,25
232:3,5 235:18
236:20 237:24
238:14,18,24
239:2,8,21
240:2,5,8,14
241:1,14
242:14 248:17
248:18 249:3
254:8 262:21
262:23,24
263:2,5,24
264:3,5,17
265:11,17
266:24 267:11
**bassett's** 95:11
**bates** 77:1,15
182:25 183:13
183:16,17
187:1 195:20
**bear** 64:3

**bearing** 94:20
246:18
**bears** 60:25
62:10,13 63:18
**beautiful** 90:25
**beautifully**
164:21
**beauty** 215:16
**beginning** 23:9
53:16 81:3
86:5 115:15
216:23 227:6
233:22 261:3
**begins** 22:14
35:19 41:25
182:25
**behalf** 11:13
25:12 42:23
180:3 232:14
**behavior**
142:21
**believe** 11:23
29:4 31:1
37:18 42:21
58:13 84:8
94:15 125:1,14
128:11 132:20
151:8 152:15
153:1 212:12
227:9 264:20
**belts** 204:11
**beneath** 74:17
**beneficial**
40:12
**beneficiaries**
96:8 224:15

**beneficiary**
224:13
**benefit** 23:19
25:23 89:3
93:3,11 191:12
237:14 240:10
249:8,18
**benefiting**
249:4 258:25
258:25
**benefits** 92:24
93:2 210:14
218:18 219:20
228:8 249:5
251:16 259:21
**berman** 144:10
144:12 188:3,4
188:24 189:4
**best** 11:6 41:17
64:22 89:10
175:12 205:5
226:8 233:18
**bet** 91:4 254:23
262:20
**better** 113:3
239:10 241:13
261:7 265:15
265:20
**beyond** 51:14
61:14 73:21
83:7 106:6
253:14
**bg** 141:23
**big** 10:5 115:18
118:22 119:5
238:12

**billed** 86:12
87:6
**billing** 83:11
85:20
**binder** 43:25
44:9 52:11
53:13 56:14,22
59:25 72:7,23
74:21 75:14
76:11 84:21
85:12 92:8
95:3,4 97:12
97:15 103:15
109:22,25
115:18 119:5
120:21 145:6
173:19
**bit** 18:16 23:1
35:11,12 74:3
88:25 114:8
117:20 144:17
145:17 189:19
193:14 205:15
230:21 236:11
**blanket** 247:6
**blend** 143:13
**blended**
151:21
**blindsided**
39:23
**blow** 158:14
262:14,14
**board** 206:12
**boards** 141:3
**body** 221:6
232:24

**boilers** 186:24
**bolded** 165:15
165:17 168:14
170:19,23
**bolster** 18:7
**bolstering** 23:1
**bond** 77:25
78:2,7
**bonds** 72:3
78:7
**book** 236:17
**books** 55:14
216:7 254:23
257:4
**borne** 205:17
**boroughs**
205:25 206:1
261:9 262:2
**borrow** 50:11
210:11 223:19
**borrower**
57:14 58:1,1
97:4 232:14
**bottom** 57:1,20
77:2,14,17
145:18 147:23
195:4,9,21
231:13 232:1,3
**bouncing**
128:1
**bowery** 102:5
102:8 105:1
112:19 125:7
126:3 141:21
141:24 144:8
154:13 157:21

**bowery's**
103:22
**bowling** 1:12
4:5
**box** 144:24
165:5 166:19
167:18
**boy** 161:15
**breach** 259:20
**breaching**
228:1 259:17
**break** 39:17,20
40:12 71:4
78:17,19 82:24
82:24 90:1,3
146:4,9,22
147:5,10 170:8
198:25 200:2,4
200:16 202:25
203:1 248:25
249:7
**breakdowns**
236:18
**breaking** 78:22
**breaks** 50:9,9
71:9 240:22
253:20
**brevity** 111:23
152:9
**bridge** 9:6
**brief** 19:19
36:13 77:10
92:4 194:2
200:11,23
204:5,7 210:23
211:7,15
228:13,22

237:20
**briefing** 20:6
228:21
**briefly** 11:14
158:24 175:25
**bring** 34:3
**broad** 20:15
21:19 39:15
**broadcast** 42:9
**broader** 25:3
**broadly** 132:6
**broadway** 1:7
6:4 53:10,22
57:15
**broke** 236:5
**broker** 150:24
151:8,10,11
**brokers** 89:9
147:18 151:3,9
151:13,15
155:4 193:5,7
**bronx** 119:25
151:21 153:14
194:12
**brooklyn**
154:1 155:24
155:24 183:2
188:20 189:24
253:22
**brought** 33:24
51:16 90:7
264:1
**brush** 20:15
21:19
**bucks** 197:5,6
**budget** 44:14
44:19 45:3,5,9

45:19 46:2,7
46:11,14 52:13
52:16 59:22
60:10,15,18,21
61:18,24,25
62:3,7 63:4,6
63:14,19 70:6
70:9 71:4
79:10,13,20
80:21 81:1,24
82:1,2,3,4,6,7
82:8,8,10,11
82:17,20,23,25
83:2,5,11,22
85:5 86:23
87:22 89:20
180:17 202:4,5
202:14 204:16
214:17 216:25
217:22,25
218:2 230:11
230:24 233:19
233:20 235:9
235:20,24
236:4,16 238:2
238:9 240:16
253:17 257:6
259:8 264:23
266:1,5,7
**budgeted**
204:13
**budgets** 44:24
45:15,25 47:1
227:8,12,13
**build** 74:4
212:13

**building** 75:11
82:16 90:25
91:14 98:25
125:12 133:13
133:15 139:21
139:23,23
186:22 188:20
**buildings** 24:6
123:23 127:15
127:18 128:14
128:21,23
129:2,10
141:17 142:14
154:20,25
155:16 204:9
213:15,23
251:8
**buildup** 46:11
**bulkiness** 9:2
**bullet** 77:25
78:4 181:18
188:1
**bulleted** 182:3
182:5
**bullets** 181:18
181:24 184:3
189:14 192:4
**bunch** 250:5
**burden** 226:25
231:5 235:8
236:22 240:15
264:12,18
**burn** 219:1
258:25
**burning** 33:22
**business** 2:3,5
33:2 89:3

206:21,22,25
249:15 252:11
252:21
**businesses**
249:16
**bust** 253:19
**buy** 203:1
249:19,19

**c**

**c** 3:1 4:1 6:1
57:8 58:4 78:5
99:11 124:13
204:1 205:1
206:16 207:2
209:3 213:18
213:19 216:19
217:3,11
218:15 219:5
219:20 221:21
222:8 228:4
234:25 235:5
237:11,17
238:8 239:5,6
239:22 249:3,9
249:18 256:12
256:14 259:10
269:1,1
**cabrera** 233:1
**calculate** 247:3
**calculated**
123:19 175:4
182:9 195:13
197:16
**calculating**
180:25
**calculator**
191:4

| | | | |
|---|---|---|---|
| calendar  6:4 | 155:1,2,3,9,9 | care  42:15 | 233:1,3 234:10 |
| 98:8 | 155:10,11,12 | 160:22 267:20 | 234:16 237:7,8 |
| call  6:4 23:22 | 155:12,14,18 | carolina  218:9 | 237:8,9,15 |
| 24:5 26:5 28:7 | 155:22 156:8,8 | carry  97:15 | 246:18 249:6 |
| 34:1,2 41:3 | 156:23 157:12 | 253:23 | 252:23,25 |
| 50:21 82:3 | 178:15 193:8 | carrying | 253:9 258:3 |
| 98:21 103:3 | 197:4,8,13,14 | 253:21 | 264:6 |
| 159:22 162:5 | 197:15,16 | case  1:3 6:4 7:3 | cases  33:4 89:2 |
| 164:22 213:3 | 223:20 244:23 | 8:5 14:10 17:8 | 201:15 202:24 |
| called  14:24 | 244:25 245:2,3 | 17:11,13 32:15 | 203:2,2,5,23 |
| 43:25 68:11 | 245:3,13,15,16 | 32:16 35:3 | 203:25 204:3,7 |
| 71:13 102:12 | 246:24 248:2 | 42:10,23 43:1 | 204:13 205:12 |
| 144:25 151:24 | 260:9,18,21 | 43:4 48:17 | 205:13,14,19 |
| 159:13 190:25 | 261:5,6 262:19 | 50:5,7 51:1 | 205:22 208:4,9 |
| 196:15 | capacity  91:14 | 53:10 57:17 | 211:12 213:1 |
| calling  39:1 | 167:19 178:5 | 61:20 62:24 | 214:2,5,10 |
| 164:8 187:10 | capex  45:21 | 63:6 65:21 | 215:24,25 |
| calls  106:24 | 46:17 47:1 | 76:5 86:6,10 | 217:15,21 |
| cans  90:24 | 82:15,17 | 88:10,14 92:20 | 219:19 228:13 |
| cap  14:10 22:3 | 194:15 | 98:7 126:8 | 229:5 230:5 |
| 117:25 118:2,3 | capital  13:5 | 148:20 180:2,4 | 239:10 241:24 |
| 118:4,11,17 | 33:2 58:19,20 | 202:13,21,23 | 242:2,5 246:10 |
| 119:18,20,23 | 71:2,14 81:8,9 | 204:18,24 | 253:5,6,7 |
| 119:24 120:3 | 124:22,24 | 205:3,17,18 | 256:16,23 |
| 120:10 121:17 | 180:10,14,17 | 208:12 211:9 | 264:14 |
| 121:24 122:5,9 | capitalization | 211:15 212:10 | cash  2:2,4,8 |
| 133:9 144:17 | 13:5 14:25 | 212:20 214:5 | 28:15 31:6 |
| 144:22,25 | 117:24 147:11 | 216:18 217:4 | 35:5,22 38:18 |
| 145:2,9,17 | 151:25 152:13 | 217:11,14 | 44:14 48:18,23 |
| 147:9 149:16 | 152:22 191:18 | 218:4,13,14 | 50:7 52:12,18 |
| 149:17 150:5 | 192:15 | 219:7,8,12,19 | 54:22 55:19 |
| 150:11 151:4,9 | capped  143:4 | 222:11 224:8 | 58:11,25 59:19 |
| 151:11,11,12 | caption  53:9 | 225:13 228:14 | 63:21,24 65:1 |
| 151:12,17 | capture  142:17 | 228:22,23 | 66:1,5,7,14,21 |
| 152:1,3,7,8,16 | 206:9 | 229:15,16 | 66:24,24 67:9 |
| 153:7,14,25 | car  230:4 | 230:4,5,5,8 | 67:10,15,15,16 |
| 154:2,8,11 | | 231:3 232:25 | 68:2 77:20 |

| | | | |
|---|---|---|---|
| 82:5,10,19 | **category** | 113:10 | **characteristics** |
| 93:15,19 | 151:14 236:3 | **certifications** | 133:13 |
| 197:15 201:16 | **cause** 58:5 | 111:25 113:21 | **characterizat...** |
| 204:8,23 | 202:10 | **certified** 112:1 | 135:14 138:7 |
| 206:19 208:10 | **cautionary** | 269:3 | 138:11 |
| 209:17 212:23 | 84:11 | **cetera** 146:17 | **characterize** |
| 212:23,25 | **caveat** 37:5 | 193:11,12 | 46:11 135:9 |
| 213:2,3,10 | **cbre** 192:4 | 197:13 240:24 | 233:18 246:15 |
| 214:12,13,15 | **cema** 225:8 | **cetus** 148:2,9 | **characterizes** |
| 214:16,22 | 254:15 260:2 | **cfo** 69:5,5 | 210:23 |
| 215:4,9,9,12 | **central** 48:19 | 119:13 | **characterizing** |
| 215:18 216:1,3 | 48:20 51:25 | **chain** 60:7 | 18:7 211:15 |
| 217:4,12,17,17 | 62:2 186:23 | 76:16 | 221:19 |
| 218:9,15 222:9 | **centralized** | **challenge** | **charge** 98:25 |
| 224:1,2 225:15 | 48:25,25 49:4 | 11:20 206:23 | 259:10 |
| 225:16 226:23 | 49:14 50:2 | **challenged** | **chargeable** |
| 227:1 229:18 | 52:12 | 205:3 214:7 | 201:23 |
| 230:11,12 | **certain** 45:20 | **chambers** 7:14 | **charged** 85:21 |
| 231:2,6 233:12 | 47:24 56:3 | **chance** 29:8 | 123:25 214:3 |
| 233:19 234:2,2 | 66:17 106:5 | **change** 24:15 | 225:24 |
| 234:6,12,21 | 111:8 113:17 | 24:20 60:12 | **charges** 74:5 |
| 235:2 241:4 | 120:14,16,16 | 121:14,17 | 215:7 |
| 242:12 249:21 | 136:1 140:22 | 172:24 173:5 | **charging** |
| 253:6,10,11,14 | 163:6 171:17 | 212:6 253:13 | 123:16 225:21 |
| 254:10,25 | 177:21 181:7 | **changed** | **chart** 9:21 |
| 255:17,18,18 | 181:16 255:23 | 171:18 | 14:24 72:8 |
| 255:21 256:1,2 | **certainly** 11:7 | **changes** 2:4 | 73:8 74:23 |
| 256:15 258:25 | 14:17 31:10 | 116:6 172:14 | 124:8 150:13 |
| 259:24 260:1 | 35:2,15 59:24 | 172:14 173:1 | 152:1 190:2 |
| 264:12,13,15 | 65:17,18 73:11 | 175:5 252:21 | 261:22 |
| 264:20 | 73:15 156:9 | **chapman** 3:20 | **charts** 9:20 |
| **cashes** 213:15 | 164:8 204:12 | 42:20 | 147:23 |
| **cataclysm** | 224:5,21,22 | **chapter** 33:3,6 | **chase** 49:15 |
| 239:20 | 243:5 246:3 | 59:23 86:6,10 | 93:21 |
| **categories** | **certification** | 88:10 89:2 | **chat** 267:23 |
| 150:17 193:9 | 106:15 107:11 | 205:4,13,18 | **check** 112:18 |
| 202:5 | 107:14 111:25 | 252:6,6,10 | 144:19 149:22 |

221:7 222:6
261:2
**checked**
112:16
**checks** 213:16
**chief** 46:22
47:5,16
**choice** 158:16
159:6 220:21
220:24 222:12
**choices** 111:7
**choose** 89:17
**chooses** 110:10
**choosing**
249:22
**chose** 111:22
126:6 141:15
156:24 220:25
220:25 261:12
**circle** 199:17
**circuit** 237:9
**circular** 204:3
**circumstances**
33:3 127:19
132:5 208:4
**cite** 176:19
195:24,25
203:3,5 204:5
204:7 214:9
216:19 218:13
218:16 228:14
229:5 230:4
234:15 246:10
**cited** 210:15
211:9 225:8
230:6

**cites** 144:9
193:11
**city** 155:17
205:7,10 206:4
206:9 212:4
251:11
**civil** 17:9 187:7
**claim** 50:25
210:14 212:7
219:6,10 228:8
256:18
**claims** 2:14
50:18,23 52:1
52:9 70:22
209:23 223:7
235:10
**clarification**
10:24
**clarify** 16:18
18:8 187:7
**clarity** 27:5
**class** 149:5,7
**clean** 17:4
**cleaner** 166:17
**clear** 33:20
63:11,12 66:22
81:15 113:20
159:9 163:1,4
166:5 168:15
169:14 170:21
170:24 172:8
182:12 198:8
203:21,25
212:20 213:1
228:14 237:13
**cleared** 98:2

**clearly** 203:5
203:24 227:21
230:17 233:9
**clerk** 7:2,5,5,6
7:8,10 40:9
**clerks** 7:9
**click** 49:12
**clicking** 30:21
**client** 101:2
113:8,21
226:20 243:16
243:18 265:18
**clip** 250:4
**close** 121:6
146:13 158:18
235:8 260:7
**closed** 17:6
**closing** 8:11,15
24:19 158:22
200:2
**closings** 98:6
**club** 218:8
**clutter** 189:10
**cmea** 57:1,5,10
57:20 231:12
**code** 214:22
226:25 227:2
230:17 238:3
241:22,24
260:1 263:13
**coin** 239:15
**cold** 158:21
**collapse** 26:1
**collateral** 2:9
28:15 31:6
35:5,23 38:18
44:14 54:22

55:19 58:12,25
66:14,24 67:15
67:16 82:6,11
82:19 201:16
203:18 204:8
204:23 206:20
208:10 212:21
212:25,25
213:4,22
214:12,13,13
214:18,18,21
214:22,23
215:4,9,10,18
216:3 217:4,12
218:10,15
225:15,16
226:23 227:2
229:19 231:2,6
233:12 235:2
237:14 239:13
239:19 240:11
241:4,9 242:12
249:21 253:6
253:11 254:10
254:25 256:15
258:3,6,7
259:24 260:1
264:13,13
**collateralizat...**
224:18 227:4
228:13,17
230:2 241:8
**collateralized**
207:20 226:21
**colleague**
43:14 237:20

colleagues
  158:12 254:12
collected
  119:22 245:13
collecting
  240:24
collection
  126:11,16,18
  127:4,22
  129:20 130:5
  132:3 180:25
  190:17
collective
  62:19
collectively
  12:15 61:8,9
  65:1,5 66:7
  67:23 104:16
  210:19
colloquy   64:23
column   137:14
columns   13:10
combining
  127:21
come   8:11 9:4
  13:16 14:9
  23:17 24:4,11
  24:18 27:2
  29:25 41:6
  49:12 59:5
  67:1 98:23,23
  107:2 147:2
  156:16 204:25
  209:25 214:6
  215:1,2 216:4
  216:8 224:16
  227:19 232:13

235:8 241:12
  255:16
comes   9:18
  61:3 126:5
  186:25 213:10
  213:15 228:4
comfort   32:13
  250:23
comfortable
  15:3 43:7
  91:23 258:8,12
  258:13
coming   9:21
  12:25 14:17
  18:16 29:6
  30:9 37:4,10
  80:5 142:7,17
  197:21 256:9
commenced
  205:24 210:17
commencem...
  33:3 86:9
commensurate
  166:25 167:4
  167:24 196:22
  197:14 240:10
comment   15:8
  26:23 105:16
  157:10 166:18
  166:19,21
  167:12 223:22
  228:20 229:22
commentary
  248:12
commented
  228:22

comments   19:3
  19:16 151:8
  180:24 237:20
commercial
  149:13
commingle
  51:11 53:4
  56:7
commingled
  49:9 51:25
  58:5 232:20
  253:3 255:3
commingling
  48:19,24 52:8
  227:16
commissioned
  181:7
committed
  201:1
companies
  51:5 72:12,16
  72:19,19 73:16
  84:2 124:9
  148:8,9 209:9
  209:17,24
  264:8
company   3:21
  42:23 47:17
  51:2,6,11 52:5
  54:7,10,18,18
  69:6 71:20
  76:17 77:20
  78:13 88:4
  93:4,8 96:5
  104:7,10,17
  105:7,7 140:1
  140:3 149:12

210:4 230:4
  244:4 251:9
company's
  46:22
comparable
  124:8,9 131:8
  150:8 152:4
  153:1,16,25
  154:5 191:18
  192:24 261:12
comparables
  124:14 128:24
  186:14
compare
  154:14,24
  155:8
compared
  122:8
comparison
  117:9,10,17
  152:10,12,18
  152:20 182:10
  182:10 261:2
comparisons
  13:5 14:25
compensated
  75:24 102:9
compensates
  76:1
compensating
  104:20 105:1
compensation
  79:6 243:24
competes
  130:5
competing
  221:3

compiles
149:13
complaining
259:16
complete   163:5
173:2 177:8,18
177:19
completed
163:20 194:10
completely
22:15 227:24
compliance
97:4 169:10,22
169:23
compliant
169:15 172:14
220:14
complied
163:11
comply   107:20
163:8 164:15
168:3 170:1
171:3,7 241:21
complying
171:10
component
32:10
components
126:24
compound
170:8
comps   178:25
197:4 260:23
260:23,24,24
conceded
231:2,3

conceivable
235:13
conceptual
239:9
concern   13:24
205:19 222:3,7
250:7 252:6,20
252:23 262:10
concerned   7:23
87:23
concerns   22:10
26:2 252:3,5
262:11,11
concession
222:14
conclude
116:25 208:18
208:21 211:18
239:17
concluded
129:21,23
130:2 144:25
151:17 152:1,7
153:14 268:4
concludes
117:13
concluding
129:20
conclusion
42:12 107:3
152:21 156:19
176:20 196:5
196:10 220:3
246:6
conclusions
107:4 167:3
243:9 252:17

262:12
concur   181:24
195:12
concurred
182:8 188:2
195:9,13,16,17
cond   78:5
condition
154:17 156:4
245:6,10
conditioning
158:18
conditions
128:4 145:11
146:16
condominium
105:22
condominiums
105:17,22
conduct   54:10
162:23
conducting
210:6
confer   7:24
27:21 31:17
199:7,20
conference
6:25 7:23
18:16 36:18
38:10 265:4
conferences
32:2
confess   7:3
confident
14:21 30:11
265:18

confidential
8:2,3,9,9 11:18
11:20
confidentiality
7:23,25 12:3
confirm   27:23
115:11
confirmation
12:22 43:11
confirmed
236:23 245:1
conflating
238:2
confused
248:24
conjunction
182:6
connected
102:5
connection
31:18 112:6,7
259:14
consent   226:24
242:11 266:20
consider   29:8
129:7,8 130:6
131:5 190:6
246:18
consideration
24:25
considered
127:8 129:12
149:4 150:24
151:4 152:6,8
192:24 193:2,5
considering
30:13

**consistent**
168:23 182:9
197:9,10
198:24 202:6
212:16 242:3
**consists** 87:24
**consolidated**
44:20 45:19
227:8 229:9,12
229:17 242:6
**consolidation**
207:22
**conspicuously**
236:1
**constantly**
213:2
**constituent**
54:18 244:5
**constitute**
232:19
**constitutes**
172:20 174:20
**constraints**
200:17
**construction**
158:15
**constructive**
222:18
**construed**
93:10 168:10
169:12,17
170:1 171:11
174:3
**contain** 46:3
55:2,22 56:6,9
113:16 153:3

**contained**
44:19 54:9
108:10
**containing**
232:6
**contains** 57:4
82:25
**contemplate**
83:11,13
242:17
**contemplating**
59:16
**contemplation**
32:1
**content** 33:24
107:2
**contention**
215:12
**contents** 12:13
18:7 29:20
30:18 96:1
**contesting**
254:9
**context** 31:11
34:23 35:3
208:6 218:12
**contextualize**
239:4
**contingent**
233:4,7
**continue** 2:2
131:23 203:10
221:20 242:1
266:3
**continued**
145:19

**continues**
263:16
**continuing**
39:8
**contours** 32:17
**contract** 93:11
123:17,18
**contrary** 54:9
228:11 229:1
**contrast** 74:18
164:3
**contributions**
58:20
**conversation**
209:21
**conversations**
150:24 241:7
**converted**
105:17,22,23
**cooler** 99:1
**cooling** 91:14
**copies** 42:1
43:14 80:5
99:22
**copy** 44:10
84:20 109:20
160:24 182:20
182:23 231:19
**corollary**
234:25
**corporate**
226:17 227:25
228:1 259:12
**correct** 12:21
19:10,13 27:25
29:13 44:17,18
44:21 45:6,17

45:23 46:2,6,8
46:14,15,20
49:1,2,3,6,7,10
49:16,19,22
50:4,19 51:2,3
53:12 55:25
56:1 57:17,18
59:18 60:8,9
60:19,22,23
61:1,7,11,12
62:21,22 64:15
64:21 65:1,2,6
68:23 69:6,7,9
69:17 70:14,15
70:18,19,20,21
71:3,7,10,11
71:14,15,21,22
71:25 72:1,4
72:12,13 73:9
73:19 74:24
75:24,25 76:3
76:4,7,17 77:6
77:7 78:8,12
78:14 79:8,9
79:13,16 80:25
81:4,11 82:15
83:22 84:3
85:5,6,9 86:1,6
87:17,18,20
88:10,11,13,16
88:17,23,24
89:7,13,21
91:6 99:19
100:14,24
101:12,17
106:9 107:9
112:14 113:15

| | | | |
|---|---|---|---|
| 116:3 126:9,25 | **correctly** | 111:24 122:14 | 28:1,6,10,19 |
| 156:14 161:15 | 174:23 251:14 | 170:11 173:16 | 28:24 29:2,7 |
| 161:20,22 | **correlated** | 207:1 225:4,13 | 29:10,14,18 |
| 162:1,6,11,24 | 252:15 | 234:24 237:20 | 30:3,20 31:4,8 |
| 163:3,8,12,16 | **correlating** | 243:4 258:5 | 31:13,15,21,25 |
| 163:17,19,20 | 19:18 | 263:6 | 32:21,24 33:8 |
| 163:25 164:6 | **cortelyou** | **coupled** 25:3 | 33:13,21 34:16 |
| 164:13 165:10 | 188:20 | 225:1 | 35:17 36:14,19 |
| 165:11 166:2,7 | **cost** 46:12 | **course** 2:5 | 36:24 37:3,16 |
| 167:5,11,15,22 | 194:17 214:6 | 21:21 24:17 | 37:21 38:1,15 |
| 168:4,14,18,22 | 253:16 | 28:21 42:15 | 38:19 39:11,18 |
| 169:1,3,9,13 | **costar** 128:11 | 44:23 45:4 | 40:7,11,18 |
| 169:20,24 | 149:9,11,12,18 | 88:15,23 | 41:1,6,11,14 |
| 170:17,23 | 149:24 150:3,6 | 104:23,23 | 41:20,24 42:3 |
| 171:4,16 172:4 | 150:16,17,20 | 133:21 143:20 | 42:6,7,8,19,25 |
| 172:12 174:8 | 152:17 154:23 | 236:25 243:9 | 43:3,10,15,18 |
| 175:18 177:12 | 155:2,8,11,20 | 243:23 250:1 | 43:20,22,24 |
| 177:20 178:1,5 | **costing** 218:10 | 262:6 | 44:15 47:3,9 |
| 178:8,11,15,23 | **costly** 186:23 | **court** 1:1,11 | 47:13,15,18,19 |
| 179:3,6,9,12 | **costs** 88:10 | 6:2,10,12,21 | 48:2,9,13 |
| 179:19,25 | 185:3 | 8:1,10,13 9:6 | 51:21 52:3,15 |
| 180:2,5,10,11 | **counsel** 11:22 | 9:24 10:11,15 | 52:22,24 55:2 |
| 180:15,19,22 | 20:12 43:19,23 | 10:17 11:6,15 | 56:15,19 58:11 |
| 180:23 181:1,4 | 43:25 70:17 | 12:1,7,22 | 58:25 59:5,9 |
| 181:8,21 182:4 | 81:7 99:25 | 13:17 14:12,20 | 60:5 61:19,24 |
| 182:15 184:3,4 | 100:1 109:4 | 15:5,21 16:23 | 62:2,5,14 63:8 |
| 184:7,14,16,18 | 110:14,19 | 18:2,5,11,17 | 63:20,23 64:2 |
| 184:22 185:1 | 182:24 189:8 | 18:23 19:5,11 | 64:7,25 65:11 |
| 185:15,19,25 | **counsel's** 85:2 | 19:14,18,21,24 | 65:14,20,24 |
| 186:6 190:7,18 | 111:3 158:24 | 20:2,5,11,14 | 66:4 67:2,5,12 |
| 190:22,23 | **count** 246:3 | 20:21,25 21:4 | 67:17,25 68:4 |
| 191:1,7,14,21 | 256:13,22 | 21:6 22:6 | 68:10,17 69:13 |
| 191:24 192:18 | **counted** | 23:15 24:18 | 69:18,22 73:1 |
| 192:22,25 | 179:18 246:5 | 25:2,9,18,20 | 73:5 74:1,10 |
| 193:2,6,9 | **country** 269:21 | 25:25 26:10,13 | 74:16,20 75:4 |
| 196:13 230:20 | **couple** 30:14 | 26:18,20,24 | 75:9 76:25 |
| | 59:24 105:14 | 27:4,14,23 | 78:16,24 79:2 |

| | | | |
|---|---|---|---|
| 79:19,22 80:1 | 170:7 171:23 | 224:20,24 | 260:10,12,17 |
| 80:4 83:8,15 | 171:25 172:5 | 225:18 226:2,5 | 261:11,15 |
| 84:10,13,15 | 172:17 173:5,9 | 226:15,23 | 262:8,20,24 |
| 86:22 87:1,10 | 173:11,18,22 | 227:14,18 | 263:3,20,23,25 |
| 89:23 90:5,10 | 174:11,18,22 | 228:6,20 229:4 | 264:4,16,25 |
| 90:13,17,19 | 175:23 176:2 | 229:10,13,22 | 265:13,19 |
| 91:7,11 92:15 | 182:23 183:6 | 231:7,10,16,18 | 266:6,11,13,18 |
| 94:14,18,20 | 183:15,22 | 231:20,24 | 266:25 267:2 |
| 95:10,17,24 | 185:10,12 | 232:2,4,17 | 267:14,15,20 |
| 96:6,9,17 97:7 | 186:10,18,21 | 234:10,17 | 267:23 268:2 |
| 97:10,15,21 | 186:25 187:6 | 235:7,15 | **court's** 237:10 |
| 98:14,22 99:5 | 187:19 188:8 | 236:13 237:15 | **courthouse** |
| 99:8,12,16,20 | 188:17 189:2,8 | 237:23 238:4 | 90:23 |
| 100:5,11 103:3 | 192:9 193:17 | 238:16,21,25 | **courtroom** |
| 103:8,15 105:3 | 193:20,23 | 239:3,16,25 | 42:14 |
| 105:5 106:21 | 194:1 197:18 | 240:3,6,12,17 | **courts** 206:20 |
| 109:4,8,13,17 | 198:13,15,21 | 241:11 242:10 | 211:10 228:15 |
| 109:19,24 | 199:10,13,19 | 242:18,22 | 246:11,16 |
| 110:3,24 114:4 | 199:22 200:1,5 | 243:7 244:1,3 | **covenants** 58:1 |
| 118:15,21 | 200:7,9,15,24 | 244:7,10 246:7 | **cover** 94:2 |
| 119:12 124:4 | 200:25 201:8 | 246:12,15,20 | 116:3 220:7 |
| 134:13,22 | 201:11,19 | 246:22 247:3,5 | 256:9 266:25 |
| 135:1,8,12 | 202:2,18 | 247:8,13,23 | **covered** 81:6 |
| 136:19,24 | 204:10,12,22 | 248:1,4,10,13 | 93:17 237:2,3 |
| 138:1,4,14 | 206:3 207:4,8 | 248:17,19 | **covering** 256:7 |
| 142:1,9,16 | 207:12,14,16 | 249:1,13,25 | **covid** 107:17 |
| 143:3,13,16,21 | 208:8,13,20 | 250:3,11,14,16 | **crazy** 91:1 |
| 143:23 144:6 | 210:22 211:2 | 250:21,25 | **create** 45:5,15 |
| 146:6,21 147:4 | 211:13,20,24 | 251:2,19 252:8 | 93:6 185:15 |
| 157:3 158:7,10 | 214:10,19,24 | 253:4,4 254:1 | 187:16 |
| 158:13 159:1,3 | 215:11 217:3,8 | 254:4,7 255:10 | **created** 45:10 |
| 159:12,19,21 | 218:19,25 | 255:15,20 | 45:12 |
| 159:25 160:2 | 219:22,24 | 256:3,6,19 | **creates** 232:6 |
| 160:11,14,18 | 220:1,3,6,9,19 | 257:1,12,15,20 | **creating** |
| 160:25 161:4 | 221:15,18,24 | 258:11,15,18 | 231:14 |
| 162:15 163:21 | 222:15,21 | 258:20,23 | **credibility** |
| 164:19 169:4 | 223:15,22 | 259:20 260:3,6 | 65:19 |

credible
  157:24 221:2
credit  184:10
  184:14 230:9
crediting  240:4
  257:2
creditor  93:4,5
  205:18 218:17
  237:16 259:1
creditor's
  239:13
criteria  176:18
critical  223:7
criticism
  221:10
criticisms  23:8
  23:11,14,16
  24:23 187:13
  246:25
criticize  24:4
criticized
  180:18 181:3
  192:17 215:15
criticizing
  15:12 25:10
critique  192:19
critiqued
  16:23
critiques  180:8
  192:14
cro  6:19 10:7
  64:16 78:5
  227:11 249:16
cro's  225:22
croatan  218:8
cross  9:6 10:1
  10:8 18:11,12

25:17 30:16,17
34:10 37:2,11
41:5 43:17
44:4 62:24
78:21,25 95:20
97:24 99:25
100:6 161:9,10
183:12 192:11
207:20 224:18
226:21 227:4
228:13,17
230:2 241:8
crossed  94:6
  243:2 251:22
  251:23
crossing
  218:17
cumulative
  65:14 68:11
cumulatively
  142:5
curious  247:16
  248:4 267:17
current  7:4
  75:19 93:19
  98:4 196:17,19
  196:23 217:22
currently
  94:10 126:15
  141:3
cushion  100:20
  100:23 202:20
  206:15,17,18
  207:5,9,18,23
  208:2,3,23,25
  209:4 210:25
  211:4,16,20

212:14 219:15
219:19 221:12
221:21 222:17
222:24 223:1
223:21 224:13
227:21 236:12
237:21 238:11
246:4,24
249:11 250:6
250:19,22
252:13,23
258:7,8 262:13
cushions
  206:19 223:17
  224:8 245:18
  249:11
cut  13:18
  175:23 187:20
  189:19
cutler  3:20
  42:21
cx  5:3

**d**

d  5:1 6:1 41:22
  41:23
daca  67:1
daily  93:23
data  16:20
  107:1 108:2
  111:8,19
  119:22 131:8,9
  135:24 144:19
  147:14,16
  149:9,18,24
  150:3,15,20
  151:3 153:10
  154:11 155:2

155:24 156:22
157:2 177:2
178:14,16
180:16 187:3
187:16,17,18
191:20 192:18
192:19,20,21
192:21 193:2,9
193:15 196:12
197:25 198:2
221:7 245:1,12
260:21 261:8
262:5
date  21:1,2
35:24 59:20
60:16 63:25
65:1,4,23 68:3
68:9 76:5
86:18 92:15,19
92:19 93:17
102:22 112:15
116:19 117:7
122:12 188:6
196:22 230:12
233:19 269:25
dated  115:21
119:6
dates  112:10
232:14
david  1:22
day  21:5,10
28:16,22 29:4
30:4,6,11,13
30:14 31:3,5
31:18 33:6,7,9
33:10,12,19
34:17 35:4,9

| | | | |
|---|---|---|---|
| 35:21,22 36:22 | 255:20 | 208:21,25 | 55:22 56:6,10 |
| 36:22,25 37:6 | **debate** 211:11 | 210:3,3 221:13 | 59:11,13,18,21 |
| 37:7,19 39:3 | **debt** 62:25 | 221:13 222:13 | 60:18,22,24 |
| 39:12 40:15,19 | 64:14,17,21 | 223:24 226:16 | 61:4,9,16 |
| 44:16 49:14,25 | 209:14,16 | 227:5,5,22 | 62:19,25 63:5 |
| 50:10 51:16,20 | 224:12 254:21 | 228:6,7,8,10 | 63:15 64:14,20 |
| 52:10 62:24 | **debtor** 1:9 3:4 | 229:6 233:4 | 64:25 65:5,23 |
| 64:4,12 65:9 | 9:25 16:2 | 234:18 235:1 | 66:7,12,19 |
| 65:21 66:13,14 | 39:20 44:24 | 235:11,12 | 67:24 68:8 |
| 66:15 68:24 | 45:3,3 49:22 | 237:16 243:24 | 69:2,5 70:13 |
| 72:8 73:23 | 50:7,12 53:9 | 244:6,7 249:4 | 70:17 71:19 |
| 74:9 88:21,21 | 55:25 57:17 | 249:8,8 250:5 | 72:20 73:12 |
| 88:21,21 | 66:17,17 71:20 | 250:24,24 | 74:6,6,6,15,15 |
| 158:20 187:15 | 71:23 72:2,11 | 251:3,4,16 | 75:20,21 76:2 |
| 202:3 203:8 | 72:12,15,18 | 252:12 253:7,9 | 76:6,7,8 78:7 |
| 204:15 209:20 | 73:9,9,13 | 253:10,10 | 78:11,11 79:2 |
| 215:17,21,23 | 74:17 76:2 | 255:22,22 | 79:7,8,13 |
| 224:11 226:12 | 78:13 82:23 | **debtors** 2:1,2,7 | 80:25 81:8 |
| 227:7 230:8 | 83:12,18 84:2 | 2:8,12,14 6:13 | 82:22 83:3,11 |
| 244:22 256:24 | 85:9 88:5,15 | 6:15,18,19,20 | 83:19 84:1,1 |
| 267:3 | 93:17,22,25 | 7:22 8:5 10:4 | 85:8,21,21,21 |
| **days** 20:22 | 94:1,3,7,7 | 11:23 12:16 | 86:5,5,9,9,12 |
| 30:14 46:23 | 101:8,11 | 16:8,25 19:20 | 86:13,18 87:7 |
| 86:18 173:16 | 105:16 108:18 | 20:11 26:14 | 88:3,11,11 |
| **dc** 3:15 | 108:19 112:17 | 28:12,14 30:22 | 89:1,6,23 |
| **deadline** 36:19 | 116:5 122:7,19 | 32:13 33:2,6 | 92:19 93:15,18 |
| 38:16 | 123:13,25 | 35:2,22 37:12 | 98:20 100:1 |
| **deadlines** | 125:16 128:24 | 38:16 43:24 | 101:15 105:21 |
| 238:6 | 129:3 130:13 | 44:15,20,23 | 109:11,18 |
| **deal** 9:22 13:2 | 131:20 135:18 | 45:1,1,2,4,15 | 114:14 123:16 |
| 18:20,21 26:6 | 136:9 139:19 | 46:25 48:18,19 | 123:25 124:3 |
| 26:7 105:13 | 140:4 148:11 | 49:8,10,15,18 | 135:19 139:25 |
| 194:24 227:20 | 149:4 152:25 | 49:20,24 50:1 | 161:18 164:10 |
| **dealing** 191:17 | 153:2 155:25 | 50:2,3,3,18 | 166:6 169:18 |
| **deals** 231:11 | 156:3,7 172:11 | 51:1,4,8,10 | 171:15 172:4 |
| **dealt** 26:8 | 184:7 188:5 | 52:6 53:3,6 | 174:7 178:20 |
| 33:18 228:15 | 202:22 208:17 | 54:21 55:2,18 | 178:22 179:2,6 |

180:14 181:8
199:16 201:16
201:20,22,25
202:8,24
203:14 205:2,6
206:8,21,22,25
207:18,21
208:10,16
209:19 210:18
210:19 211:16
214:8 215:3,5
218:9 222:16
222:23,25
223:2,8,16,17
223:19,20
224:4,5 225:11
225:12,21
226:22 227:3
227:10,11,13
227:21 228:5
229:1 230:7
231:10 232:9
233:18 234:8
236:4,9,9,10
236:18,19
237:1 239:17
240:2,20 241:4
241:12,18,19
241:25 242:3,6
243:13 249:11
250:24 251:8
255:23 259:18
263:17,21
264:7,7,9
265:22 266:25
**december**
45:10 121:10

121:14 122:8
145:10
**decide** 120:3
135:13 199:5
**decided** 89:6
101:14 241:19
**decision** 17:19
23:16 233:1
241:21 265:4
265:20 266:23
267:9
**decisions** 63:5
111:20
**declarants**
6:18
**declaration**
5:21 9:16 10:7
10:13,20 12:13
12:14 13:1,4
15:6,17,23
16:4,7,10,15
16:17 17:1,3
17:12 18:6
19:1,17,21,24
20:3,10 22:8
26:1 28:14,16
28:19,22 29:4
29:25 30:9,13
30:16,18,24
31:2,18 33:4
33:24 34:17
35:4,9,19,21
36:1,2 37:1,4
37:13,19,20
39:13 40:15,19
40:21 42:1
44:10,11 45:18

48:17 51:15,16
51:18,20 52:10
52:14,18 61:15
61:17 64:5
65:10 66:15
70:7 72:9
73:22,22 74:9
79:11 99:14
101:14 105:11
105:15 107:16
108:11,12
110:15,16
114:6,9,15
125:6,15 127:2
129:14 153:19
153:22,25
156:15 161:8
161:14 179:11
202:17 208:24
224:11 225:5
235:22 245:11
251:24 260:22
261:4 264:19
**declarations**
10:1 17:3
36:12 38:12,17
73:23 99:15,18
99:22
**declining**
145:11
**decrease** 122:6
122:10 203:15
203:16
**decreased**
123:9,11
**decreed** 42:8

**deduct** 126:16
**deem** 42:25
240:12
**deemed** 93:6
**deep** 194:15
**default** 203:9
225:10 232:12
232:16 233:8
**defaulted**
225:9
**defending**
262:14
**deficiencies**
17:5
**deficiency**
17:16
**deficient** 17:15
**define** 32:4
175:10 214:19
**defined** 169:5
169:9 175:2,8
176:17 244:4,8
254:15 259:25
**defines** 214:22
**definitely**
78:21
**definition**
175:19 176:7
176:17
**definitions**
35:8
**degree** 253:22
**delay** 110:1
**delighted**
201:12
**delve** 11:24

**demonstrate**
8:17 231:5
264:12,18
**demonstrated**
35:22
**department**
4:3
**depend** 18:9
138:25
**depending**
83:13 98:8
**deposition**
16:22 19:4
20:18 21:4,11
37:19 38:2
46:21 47:5,11
47:17,21 48:7
61:4 64:12
69:4,8,14,19
69:20 71:8
79:15 80:1
84:5 85:19
89:1,19 112:13
162:4 173:15
174:24 175:7
175:10,13
176:14
**deposits** 66:18
66:18,19
255:23
**deputy** 42:14
**derive** 108:9
133:3
**descend** 9:7
**describe**
146:14 227:10

**described**
111:13 132:23
133:2 144:6,11
157:7 197:25
**describing**
147:12 201:2
**description**
5:15 78:1
**designates**
27:7
**desire** 8:2
**desperately**
262:21
**despite** 64:13
**destroy** 251:13
**destruction**
205:12
**detail** 37:8
108:20,21
111:7,13,16,19
230:21 245:15
**detailed** 108:1
201:25
**details** 11:25
108:16 242:16
242:17 244:15
**deteriorating**
146:16
**deterioration**
145:19
**determination**
14:12 133:7
**determinations**
132:10,11
133:8
**determine**
100:19 118:7

118:10 127:10
130:13 131:10
157:12
**determined**
117:4 121:9
182:7
**determining**
108:17 117:14
117:21,24
118:25 120:7
120:11,17
156:10
**detour** 143:24
**develop** 108:3
157:23 177:24
177:25
**developed** 52:2
**developing**
168:1 194:13
**devil** 242:16
**dialogue**
204:21
**diamond** 5:4
6:19 10:6 28:7
33:4 34:2
35:20 36:3
37:2 38:23
41:3,4,13,19
41:22,22 42:5
43:25 44:4,6,8
44:13,18,22
47:4,23 48:16
51:15 53:19
54:4,12,20
55:4,13,16,24
56:13,23 57:19
59:11 60:7

71:14 72:7
73:7 74:22
75:13,19 80:9
80:25 86:21
88:25 90:20
91:3,25 92:5,7
93:13 94:4,23
94:25 95:25
96:14,22 97:10
97:13,19 98:17
213:13 236:5
236:23 237:17
251:6 253:12
255:21
**diamond's**
28:13,16 32:10
37:19 40:15
225:4 235:22
251:23 264:19
**dictate** 253:1
**difference**
67:15 106:22
150:21 202:7
**different** 19:6
81:5 89:15
113:7,11
117:13 119:23
122:3 127:20
131:3 141:18
142:14 144:12
154:21 178:10
178:12,15,18
179:16 181:18
188:23 189:21
196:1,2 205:13
205:25 212:5
214:12 215:8

243:6
**differently**
185:16 204:4
**differs** 139:22
**difficult** 58:6
191:3
**diligent** 242:23
**diminution**
202:9,23
203:22 209:1
211:25 212:12
213:4 214:3
256:13,14,22
**direct** 5:21
17:2,6 18:16
34:3,7 37:10
38:13 52:18
53:25 56:13
72:6,14,22
76:10 80:9
96:14,21 99:22
99:24 161:1,7
260:14
**directing**
247:15
**direction** 41:18
243:24
**directly** 64:1
95:18 155:13
172:7
**director** 93:7
**disagreed**
21:19
**disagreement**
9:17 11:8
**disagrees**
21:22

**disavowed**
95:12
**disbursement**
48:20,25 93:24
**disbursements**
204:14,15
223:7
**disclose** 7:1
**disclosed** 7:1
38:25
**disclosure**
259:6
**discovery** 38:9
201:17 209:11
255:8
**discredit**
220:15
**discretion**
110:9 111:21
**discuss** 9:22
91:3 121:1,1
131:23 133:10
147:9 181:16
181:16 184:9
**discussed** 9:1
9:10 36:18
115:14 145:17
150:25 151:23
226:18 246:2
**discussing**
64:23 115:2
119:18 127:4
131:22 134:4
**discussion** 8:4
15:12 31:18
91:11 190:18
263:7

**discussions**
108:1 131:9
147:18 193:5
263:17
**dismissed**
242:2
**dispenses**
204:13
**displays** 73:7
**disposition**
205:23
**dispute** 62:7
204:17 207:20
**disputed** 174:4
226:13
**disputes** 237:1
**disregard** 20:7
234:11,22
**distinct** 54:7
**distinction**
202:6
**distinguish**
213:3 219:13
**distinguishes**
202:24
**distracted**
109:24
**distress** 175:15
176:10
**distressed**
106:2,5
**distributed**
43:24
**district** 1:2
218:8 251:25
253:5

**dive** 194:15
**divide** 118:4,11
191:7
**divided** 196:21
**division** 87:9
**doable** 98:10
98:11,11
**docket** 5:18,19
27:6 29:16
40:23 73:3
**docketed** 27:7
28:19,21,23
29:19
**docs** 227:15,25
**doctrine**
208:14
**document** 38:2
38:25 39:8
53:15,19 54:1
56:14,16,23
57:1 60:3 73:3
74:18 75:16
76:10,19 85:11
85:18 92:13,16
92:23 93:13
95:1,7,21 96:1
96:15 105:3
114:14 115:19
122:2 134:6
135:4 138:3
182:19,25
183:18 187:9
187:25 188:17
195:19 220:21
233:9 244:14
255:1,1

**documents**
58:11,15 59:3
95:11 96:25
97:1,3 214:20
226:18 228:2
231:9,11
243:21 246:3
**doing** 8:10
21:24 24:7
39:21 101:5,11
106:13 133:4
143:5 163:1,23
164:4,9 167:24
167:25 168:15
170:25 175:3
221:6 225:20
229:6 256:1
261:2,25
**dollar** 87:19,21
212:11 214:13
219:9 246:23
**dollars** 65:25
67:23 118:16
118:19 212:15
233:21,21
**don't** 37:24
**door** 64:4,7
158:18,20,22
212:16 216:18
219:10
**doors** 202:25
**doubt** 98:4
123:24 191:12
214:25
**dozens** 73:13
**draft** 110:15

**drafted** 110:20
**dramatically**
209:25
**draw** 252:16
**drinking**
160:19
**drive** 220:3
**driven** 142:20
**drop** 15:17,18
**dropping**
202:10
**drops** 189:3
**dsj** 1:3
**due** 215:23
232:13,14
238:5
**dumb** 142:1
**duty** 243:17
**dx** 5:3
**dye** 228:14
230:3

**e**

**e** 1:21,21 3:1,1
4:1,1 5:1,14
6:1,1,8 13:5,10
13:24 14:24
17:9,14 41:22
43:25 77:25
78:2,7 99:11
99:11,11 227:2
251:19 269:1
**earlier** 30:25
82:4,13 96:19
98:3,10 119:12
143:8 145:18
152:15 157:14
187:15 265:8

**early** 187:15
232:16
**ease** 9:3 188:18
**easier** 222:12
**easiest** 12:17
215:22
**easily** 252:11
**eastern** 218:8
**easy** 222:15
**eat** 90:23
**ecf** 5:18,19
28:20,22,23
29:11,14,16,18
30:24 40:19,21
40:23
**economic**
224:12,15
**ecro** 1:25
**effective**
122:12 127:10
185:8,11 191:7
**efficacy** 36:8
**efficiency**
23:18
**efficient** 23:22
**effort** 174:19
**efforts** 6:23
**egi** 185:4,7
**eight** 26:24
27:1 144:23
147:2 150:6,6
151:18 152:19
153:15 246:4
**either** 11:2
14:9 19:6
25:11 30:18
37:9 42:11

96:25 107:8
143:18 158:15
189:6 199:22
215:15 220:22
239:16 241:25
244:20 258:7
261:9 265:16
**elaborate**
145:16 225:1
**electronically**
9:2
**element** 24:8
203:11
**elements**
117:16
**elevator** 50:9
50:12 82:24
203:21 253:20
**elicit** 23:20
**elicited** 68:13
**eliciting**
262:16
**eligible** 217:3
**email** 60:7,12
76:16,21 77:7
78:13 119:6,16
119:17
**emails** 120:22
**embedded** 71:5
**embellishing**
241:11
**emergency**
50:8,10
**eminently**
243:10,10
**employed**
108:16 171:18

172:15 181:24
**employee** 93:7
93:8
**employees** 90:7
**ended** 121:9
**endorse** 36:6
208:13 211:6
214:11
**enforceable**
93:4 95:13
**engage** 117:6
204:20 221:1
**engaged** 71:18
83:25 89:20
101:23 187:8
**engagement**
75:19,23 79:5
84:4,8,9,19,24
85:16 100:23
102:12,16
103:12,22,22
104:10,13
112:7 135:5
264:6
**engagements**
113:7
**enhance**
202:15 224:21
**ensure** 54:6
85:20 87:5
212:8
**entered** 27:17
28:3 29:16
37:20 40:24
51:19 92:16
**enterprise**
251:9

**entire** 15:9
47:11,21 52:11
73:7 79:12
83:7,21 98:25
117:7 128:12
232:5 235:19
236:10
**entirely** 223:21
246:20
**entirety** 74:9
81:25
**entities** 53:7
55:25 71:19
72:3 104:15
123:25 223:24
226:16,17
242:9 244:6,7
250:5 255:22
255:23 263:8
263:12
**entitled** 13:21
17:5 43:1,5
75:23 104:3
149:17 161:17
162:10 202:13
218:6 224:22
227:1 234:20
**entitles** 79:6
**entity** 45:22
53:10 57:23,25
208:18 229:6
242:4,4 244:9
244:12
**entry** 2:1,8
14:24
**envelopes**
213:15

**ephraim** 5:4
6:18 28:13
33:4 35:20
41:22 44:4
92:5 94:23
**equal** 190:9
**equation** 156:9
**equilibrium**
123:4 190:8,9
**equities** 208:12
222:11
**equity** 100:20
100:22 157:13
202:19 206:15
206:17,18,19
207:4,8,18,23
208:2,3,22,25
210:25 211:4
211:16,20
212:14 219:15
219:18 221:21
222:17 223:1
227:21 237:21
238:11 245:18
246:4,23 250:6
252:13 262:13
**equivalent**
138:15
**erroneous**
173:3
**es** 5:3
**eschewed**
227:5
**escrow** 94:10
94:11 215:13
217:24 231:14
231:23 232:6

232:10,12,19
232:22 233:4
254:15,16
255:2 264:15
**escrows** 80:23
**especially**
160:20 203:7
**essentially**
10:7 21:25
24:3 36:7
116:3 169:16
190:8,11
244:25
**establish** 38:3
87:4 134:18
201:20 221:12
**established**
62:9 66:4
153:7 157:5
159:19 164:25
187:4,15,20
244:11 250:20
258:7
**establishing**
231:23
**estate** 87:6
149:13 161:25
203:2 213:3
216:20 218:12
229:18 232:13
232:23 233:6
233:13,14
238:20,21
258:25 264:2
264:14
**estates** 229:8
229:16,20

249:4
**estimate** 81:6
  103:1
**et** 146:17
  193:11,12
  197:13 240:24
**ethics** 106:12
**evaluate** 243:5
  245:9
**evaluating**
  89:15
**evaluation**
  195:23
**eve** 37:1
**evening** 21:9
**event** 232:12
  233:6,8
**events** 232:15
**eventually** 7:5
**everybody**
  142:9 185:24
  255:20
**everybody's**
  160:19
**everyone's**
  6:22 12:3
  20:21
**evidence** 11:5
  11:17 12:10
  14:1,8,8 19:8
  20:7 25:1 27:2
  27:18 28:3,15
  28:17 29:6,17
  30:10 31:3
  36:13 37:4
  39:9 40:24
  47:10,12,13,20

51:19 53:16
66:23 67:1
73:4 74:16,23
74:25 75:17
76:13 92:10
105:3 115:20
119:6 159:24
161:1 183:4,5
183:10,12
187:1,9 195:20
226:10 231:9
243:21 246:7
251:19 263:21
265:3
**evident** 243:19
**evidentiary**
  10:20 11:14
  29:21 32:4,17
  36:12 64:8
**exact** 23:20
  24:13 45:13
  59:20 87:21
  102:3 112:10
  175:19 178:13
  178:14 228:15
  234:16
**exactly** 50:22
  73:16 121:20
  135:10 173:8
  196:18 203:22
  228:15 230:15
  246:19 261:14
  264:22
**exam** 18:3
  43:25
**examination**
  5:21 10:8

18:12 25:17
30:16 37:11
41:5 42:7
43:17 44:4
92:5 94:23
100:6 161:10
194:3
**examine** 30:17
  37:2 161:9
**examined**
  62:24 99:25
  147:14
**examining**
  251:7
**example** 59:19
  72:19 73:18
  78:10 88:14
  118:15 123:12
  125:13 133:13
  202:24 205:21
  235:16
**examples**
  218:24
**excel** 130:25
  134:6
**excels** 8:21,23
**except** 9:13
  12:16 90:7
  189:23 196:18
**exception**
  12:25 27:9,15
  112:3 218:15
  260:20
**exceptions**
  11:4 12:17
**excess** 210:5
  219:17 223:20

223:21 231:15
**exchange** 25:4
  36:20 227:23
  228:7
**exchanged**
  8:21
**excited** 222:22
**exclude** 19:8
  32:11
**excluded** 10:19
  217:4
**excluding** 64:8
  161:21
**exclusion**
  17:11
**exclusively**
  67:9
**excuse** 33:25
  105:22 106:6
  107:18 109:3
  113:17 120:22
  121:23 123:7
  127:15 137:15
  144:5 150:2
  217:12 245:19
  263:11 264:23
**execute** 89:2
**exercise** 39:12
  60:17 210:7
  221:3 261:17
**exhibit** 8:20
  9:12,14 12:19
  13:1,4,4,6,10
  13:24 14:24
  16:2 27:5,7
  29:5,16 31:23
  32:9 36:20,21

37:20,21 38:2
40:23 44:11,13
56:16 57:8
70:7 72:25
73:3,7 79:10
85:13 92:10
103:14,21
109:18 114:14
115:19,19
117:4 119:5,6
120:25 121:21
124:12 137:10
138:9 145:6
160:1 161:4,15
161:15,17,19
179:11 181:15
182:18 183:3
231:8,12
245:22 261:22
**exhibits**  5:16
5:17 9:11 11:2
12:9,20,25
13:6,20 26:6,9
26:14 27:1,7
27:10,17,20,22
28:3 36:12
44:1 100:4
109:11 120:20
160:17 161:3
182:17 198:10
**exist**  45:25
180:17 214:5
**existed**  232:16
**existence**
250:17
**existing**  136:1
250:7

**exists**  232:12
241:10
**exit**  97:12
214:8
**expand**  16:19
23:12
**expect**  105:13
121:13 189:21
212:18 254:17
**expected**  60:25
**expecting**
120:1
**expediency**
17:16
**expenditure**
266:20
**expenditures**
46:17 93:24
124:23,25
180:10,14
238:9 239:18
240:9
**expense**  22:2
50:19,22
124:14,21
133:15 139:18
151:14 184:21
186:8,14,20
209:2 210:14
213:19,24
227:23 228:9
235:12 243:24
244:20 259:10
**expenses**  45:20
46:13 50:3
93:18 94:2
122:23,25

123:7,9 124:8
131:24 132:9
133:7,12
139:18 140:1,3
140:5 145:24
155:8,13 190:3
190:7,11
196:19,21,25
197:17 198:4
201:23 204:1
209:19 216:8
218:7 224:6
227:22 228:4,5
234:1,19 235:2
235:9,11,20,24
235:25 236:23
236:24 237:6
239:6,12 240:9
240:16 257:17
266:22
**expensive**
252:15
**experience**
83:23 132:2
151:8,10,11
156:3 194:6,7
205:6 252:1
**expert**  6:20
13:20 14:7,7
14:13 16:19,24
17:3,5,10,20
20:19,20,20
21:2,11,13,14
22:19 24:22
25:8,11,12
100:13,18
101:15,21,25

102:6,9,23
103:11,24
105:2 106:18
107:14 116:23
117:1 122:11
123:8 131:18
133:23 134:3
134:20 135:19
136:5 139:11
145:3 157:15
158:2 179:14
179:16,19
220:11,11,12
220:20,20
237:21 243:5
243:16
**expert's**  14:2
**experts**  13:21
98:18 110:22
187:10
**expire**  141:13
**explain**  22:20
39:13,14 49:11
63:9 106:21
107:4 140:18
156:12,15
196:14
**explained**
245:4
**explaining**
16:19 111:7
116:6
**explains**  17:24
22:16 245:15
261:22
**explanation**
18:8 116:4

224:25 236:11
262:16
**explanations**
23:7
**express** 123:9
**expressed**
111:18 244:18
**expressly** 31:2
108:22 152:20
**extension**
16:13,13 23:15
162:13
**extensive**
15:12 229:25
**extent** 11:1
16:9 50:15
62:11 87:4
150:25 202:19
210:24 217:20
223:2,4,5,8
250:7 266:4
**extenuating**
127:19 132:5
**exterior** 179:7
179:9
**extra** 109:19
109:20 173:23
253:22
**extract** 239:3
**extracted**
147:16
**extraordinarily**
208:9 233:16
233:17
**eye** 217:6,8,9
266:22

**f**

**f** 1:21,25 27:8
102:16 269:1
**face** 20:16
156:23 157:6,6
**fact** 25:11,21
29:20 30:11
34:6 44:22
45:4,9 47:24
51:24 63:21
64:18 76:6
81:23 82:20
100:22 108:22
122:1 136:11
143:7 151:15
156:22 165:25
166:5 167:4
169:19 170:20
171:14 172:2
172:10 175:17
176:12 178:8
178:13 197:10
203:17 214:14
221:7 238:16
239:24 243:19
264:13
**factor** 127:10
129:7,20 130:1
132:3 140:16
140:19 141:20
142:3 144:11
229:20
**factors** 63:5
130:8 132:9,18
133:8 246:2
**facts** 32:15
36:13 47:10

226:12 235:7
**factual** 34:11
**fail** 3:9 6:14,14
21:7,9 29:1
31:5,10,14,15
66:11,11 67:3
67:7,14,17
95:21 96:25
199:15,16,25
200:4,6,8,16
200:22 201:4,9
201:14 202:21
202:24 203:1
204:25 207:6
207:10,14,24
208:11,19,24
211:1,8,19,22
211:25 214:20
214:25 215:14
217:6,14
218:23 219:3
219:23,25
220:2,5,8,10
221:17,23
222:1,23
223:16 224:1
224:21 225:3
226:4,11 228:3
229:24 230:14
231:1,19
233:17 235:7
243:6 248:19
248:21,22
249:2,14 250:1
250:10,13,15
250:19,22
251:1,3,22

252:11 254:3,6
254:8 255:11
255:18 256:5
256:11,21
257:5,14,19,24
258:14,16,19
258:21 259:2
260:5,7,11
263:7 265:25
266:7,12,15
267:1,22
**fail's** 227:20
**fails** 9:7
**failure** 209:6
212:8
**fair** 23:12,15
34:19 59:21
62:15 73:14
87:12 111:6
122:6 131:15
151:7 168:17
174:6 190:12
199:24 244:13
**fairly** 17:18
39:25
**fait** 243:7
**falana** 7:10
**fall** 88:14
221:9
**falling** 189:10
**falls** 213:24
**familiar** 96:1
178:20 192:5
**familiarity**
101:18
**familiarize**
55:9

family   224:13
fancy   257:15
far   19:1 25:19
  26:19 87:22
  98:9 136:18
  236:3
fast   238:5
fateful   241:21
fbna   182:19,25
  183:17 187:1
  188:6,6,25
  189:22 192:4
  195:21
feasibility
  180:6
feature   12:2
february   64:20
  233:2
federal   17:9
  42:7 110:18,20
fee   70:16 74:12
  74:12 79:12
  81:10,14,19,25
  83:10 85:5
  86:14,15
  123:12,16,25
  124:4,9 125:21
  180:19,22,25
  185:19 191:1,5
  191:13 213:12
  236:8
feel   97:25
  145:7 173:13
  265:15
fees   70:9,14,17
  70:20 71:1,5
  74:5 79:11

80:23 81:1,6
85:3,3,3,20
86:4 87:6,9,16
87:23,24 88:2
88:8,12 94:6,9
94:11,13
123:20,21,23
185:1 204:19
204:24 206:11
206:12,17
209:25 212:18
213:11,17
214:4 222:25
223:4,5,10
225:18 235:14
235:18,19
236:2,2,18,22
237:4,11,13,17
237:18 238:1
249:8,15,20
fell   220:15
  221:10
ferguson   1:25
fifth   3:5
fifty   80:12,14
fight   203:18
  205:16 215:21
  215:22,25
  216:15 256:24
  259:4
fighting   201:15
  210:1 223:9
  237:5 259:3
figure   9:9 22:1
  22:2 39:20
  62:12 85:5
  89:10 142:6,21

146:6,9 194:13
261:6
figuring   191:5
file   21:12 42:22
  107:6 131:5,6
  131:7,9,12
  137:5,18
  138:19,23,23
  139:6,12,14,15
  203:8 205:11
  241:19
filed   2:7,12
  11:17 55:19
  61:16 86:16
  92:20 201:17
  226:22 241:17
  242:5
files   133:18,18
  133:19,20,22
  134:2 136:7,21
  136:21 139:9
  152:17
filing   54:22
  58:11,24 59:15
  59:22
filings   7:20
  259:14
filling   187:17
filter   150:17
final   2:1,9 31:6
  113:4 117:18
finalizes
  243:21
financial   22:21
  46:22 47:5,16
  55:14 63:16
  113:11

find   35:11,12
  38:5 85:25
  109:14 158:3
  169:2 175:1
  210:9,21
  218:21 229:24
  240:8,14
  241:24
finding   24:23
  211:12 218:17
finds   218:9
fine   10:11
  11:23 25:15
  27:2 33:25
  48:12 78:24
  80:6 84:13
  90:5,5,18
  99:16 110:25
  111:1 146:6,8
  146:20 158:14
  160:18,20
  170:10 199:3
  200:25 201:8
  267:15
finish   98:13
  198:24 200:10
  201:12 256:6
finished   88:8
finishing   98:14
fire   203:21
  205:19 249:12
  251:12,13
firebomb
  251:13
firm   71:1,13
  114:10,24
  123:22 136:12

| | | | |
|---|---|---|---|
| 136:13 140:23 | 137:14 144:24 | **flagstar** 3:13 | 231:16,17 |
| 141:21 144:10 | 145:7,10,18 | 6:12 7:8 9:14 | 232:10 237:5 |
| 144:12 | 146:15 154:10 | 9:15 10:23 | 240:18 241:5 |
| **firms** 71:10 | 161:19 162:4 | 11:23 13:6,8 | 241:17,25 |
| 140:24 144:7 | 162:19 163:10 | 13:11,11 15:7 | 242:11,15 |
| 144:10,16 | 164:16 165:21 | 16:1 23:9,23 | 243:2 257:21 |
| 181:25 182:3,5 | 166:21,21 | 25:2 27:8 30:1 | 263:15 264:15 |
| 182:7,15 195:5 | 176:24 177:18 | 30:1 32:7 34:9 | 265:9,22,25 |
| **first** 7:18 16:18 | 183:14,16 | 37:3 39:22,23 | 266:18,20 |
| 21:3 23:24 | 189:21 194:23 | 40:16 43:23 | **flagstar's** |
| 25:6 28:7,16 | 195:8 196:9 | 55:24 59:3,12 | 12:19,19 26:17 |
| 28:22 29:4 | 198:3 201:15 | 63:1 64:15,21 | 56:5 58:10,15 |
| 30:4,6,11,13 | 201:22 202:3 | 66:2 71:25 | 66:25 182:24 |
| 30:14 31:2,3,5 | 204:15 207:24 | 73:19 87:25 | 222:3 225:17 |
| 31:9,18 33:6,9 | 215:17,21,23 | 88:2,4 99:25 | 226:24 227:1 |
| 33:10,12,19 | 215:24 224:11 | 103:14 109:21 | 227:15 |
| 34:17 35:4,9 | 227:6 230:24 | 115:19 117:3 | **flailed** 236:10 |
| 35:21,22 36:22 | 233:20 234:11 | 121:21 125:16 | **flare** 248:7 |
| 36:22,25 37:6 | 234:15,22 | 159:22 164:10 | **flat** 220:16 |
| 37:19 39:2,12 | 235:9 241:2,5 | 181:7,19 | 221:10 247:18 |
| 40:15,19 49:5 | 241:16 254:8 | 182:14,19 | **flatly** 234:17 |
| 51:16,20 53:21 | 262:5 265:2,6 | 183:25,25 | 246:17 |
| 54:4 55:4 | 265:9 | 188:4,25 | **flexible** 78:18 |
| 62:18,24 63:13 | **fit** 160:3 | 189:15 201:10 | **flip** 10:2,9 |
| 64:4,12 65:9 | **five** 39:17 40:2 | 202:13 203:8 | 22:12 36:5 |
| 66:13,14,15 | 62:18 144:22 | 205:23 206:7 | 239:14 |
| 68:24 72:8 | 145:6 146:22 | 208:5,15 | **flipping** 23:6 |
| 73:23 74:9 | 146:23 176:18 | 209:11,20 | 109:13 |
| 90:1 92:16 | 199:7,17 200:6 | 210:2,13,14,16 | **flow** 49:5 |
| 100:13,16,19 | 200:6,7,8 | 211:10,21 | 59:19 66:1,5 |
| 104:2,13,14 | 206:1 | 212:15 213:5 | 77:20 197:15 |
| 108:15 113:1,4 | **fix** 50:12 | 214:11 215:3,3 | 197:19 209:17 |
| 116:22,25 | 203:20 | 215:4 216:5 | 213:2 215:12 |
| 119:1,17 121:9 | **flag** 229:23 | 218:6 219:14 | 234:6 253:11 |
| 121:18,22,25 | **flagged** 204:18 | 220:20 224:18 | 253:14 |
| 122:15,22 | 207:1 216:1 | 226:5,20 | **fly** 208:14 |
| 136:8,12 | 259:5 | 230:17 231:1 | |

**focus** 70:6,8
  77:11,22 78:14
  96:8 162:19
  165:5 176:5
  179:14
**focused** 163:6
**focuses** 61:17
**focusing**
  164:16 167:7
  177:21
**folks** 7:18
**follow** 38:10
  156:21 168:6,6
**followed** 87:8
**following** 17:2
  36:1 54:11
  58:8 147:4
  167:24,25
  170:24 173:6
  174:2 176:6
  238:2 259:19
**follows** 218:4
  252:23
**fonts** 70:10
**food** 90:7
  212:22
**footnote** 35:7
  189:3
**footnotes**
  195:24
**forecast** 45:21
  46:1 59:19
  62:13 150:18
**foreclosure**
  203:9 205:24
  205:25 206:1

**foreclosures**
  210:18
**foregoing**
  269:3
**forensic** 210:6
**foreshadow**
  247:14
**forever** 266:12
**forking** 250:11
**form** 23:20
  60:10 134:12
  134:24 137:24
  156:25 161:7
  174:20 208:22
**forma** 45:3
  155:5
**formal** 177:9
  177:11,13,18
  177:19 180:7
  182:16
**formally** 11:8
**format** 110:9
  116:8 202:4
**former** 7:2
**forms** 2:3
  34:23
**formulating**
  63:19 89:8
**forth** 13:11
  22:22 23:10
  33:4 34:21
  35:19 48:17
  54:8 97:2
  114:7 171:15
  171:17 172:3
  172:11,13,14
  202:16 204:21

  224:10
**forty** 96:17
  103:2
**forward** 24:4
  45:13,16 46:5
  61:18 63:4,6
  63:15,19 66:1
  87:13 108:18
  140:20 150:7
  199:23,23,25
  206:24 227:13
  230:13 236:4
  241:16 266:8
**found** 124:5
  212:12 216:4
  228:23 262:9
**four** 23:2 24:2
  25:19 66:9
  80:12,14 96:17
  150:25,25
  151:16 166:16
  166:18 185:4
  205:24,24,25
  206:1 208:12
  210:17 215:24
  233:20 266:1,8
**fourth** 53:22
  107:23 113:1
**fowler** 5:10
  9:23 10:10
  13:2,3 15:17
  16:17,22 22:15
  23:8 24:3,17
  24:22 25:7
  144:9 159:23
  160:3,10,13,13
  160:16,23

  161:6,10,12
  162:3,19 165:4
  167:2 172:7
  174:16 175:24
  178:19 183:8
  183:24 187:4
  188:10,17
  189:25 194:3,5
  198:16,20
  245:14,24
  246:3,24 247:2
  247:21 261:19
  261:25
**fowler's** 9:20
  17:23 21:22
  22:4,15 23:11
  23:14 111:16
  124:7,13
  187:12,22
  189:3 244:16
  245:21
**fraction** 118:3
**frame** 201:19
  226:13
**framework**
  201:20
**framing**
  197:20
**frankly** 20:16
  25:21 34:24
  105:15 247:22
**free** 97:11
  128:14,21,23
  129:1 145:7
  148:18,21
  173:13 234:8

**freestanding**
13:25 208:15
208:16
**fresh** 134:14
135:5
**friday** 15:10
20:20,25 38:18
265:16,21
266:16,17
**friedman** 3:25
42:18,20,20
43:2,8,9
259:15
**front** 6:24
10:12,21 41:17
44:10 99:15
158:20 161:14
240:4
**frozen** 240:21
**frustrating**
38:5
**fti** 70:20 77:22
81:8 83:25
84:6,24
**fti's** 84:19
236:7
**fulfill** 22:21
**full** 24:10
51:16 69:14
74:17 104:2
106:22 113:23
114:2 137:23
143:6,7 146:15
157:6,16,19
168:1 173:2
208:25 209:20
234:20 236:17

**fully** 98:5
208:14
**function**
162:25
**fund** 124:24
216:8 222:24
223:23 224:5
228:10 231:3
231:14,23
232:6,10,12,19
232:20,22
238:23 241:24
254:15 255:4,4
258:17,19
264:14
**fundamentally**
66:2
**funded** 218:2
222:25 224:12
250:8
**funding** 204:24
258:22
**funds** 48:19,24
49:4,8,9,18,22
50:1 51:12,24
52:8 53:4 56:7
217:24 224:4
232:22 233:3,5
233:8 266:21
**further** 18:8
19:15 23:7
32:14 52:6
94:16 97:6,9
185:21 190:24
193:25 202:6
248:7

**furtherance**
225:13
**future** 11:22
46:20 58:2
60:25 62:10
82:5 188:19
233:5
**fx** 5:16 27:8,8
27:10,17,17
53:16 56:18
60:1,4,7 72:25
73:7 74:23,24
75:17 76:14
84:22 85:13
231:8

**g**

**g** 6:1
**gain** 25:10
**gallery** 91:18
**game** 240:25
**gap** 160:4
**garbage**
203:20
**garrett** 3:9
6:14 66:11
199:16 248:21
260:4
**gary** 6:16
**gathered**
119:12
**gee** 24:19
**general** 35:18
88:9 106:6
124:22 139:5
176:7 180:3
190:5 205:1
210:15 213:1

222:9 237:5
**generally**
14:23 46:24
52:13 60:21
132:2 176:16
**generate** 44:23
44:25 209:18
253:18 267:9
**generated** 61:5
61:10,16 62:19
68:8
**generating**
65:5 213:2,6
**generically**
86:23
**getting** 24:16
67:13 121:6
170:9 197:19
222:22
**giant** 109:25
**give** 28:20
32:12 40:2
41:11 99:5
109:11 128:3
151:7 160:8
171:25 172:1
175:12 176:13
191:12 200:17
203:3 204:6,22
211:6 212:24
218:5 229:24
230:9 240:10
247:13 248:19
**given** 17:1
50:18 60:16
83:23 143:7
160:20 174:24

179:16 209:12
209:15 210:11
211:17 224:25
**gives**   230:17
**giving**   26:16
130:22,23
201:1 223:6
247:6
**gladly**   201:3
**glasses**   217:7
**glenn**   17:18,20
**glenn's**   232:24
232:25
**go**   9:12 11:4,10
12:8 21:20
26:4,21 32:24
34:9 37:16
41:17 42:11
43:12 44:2
45:18 49:4,13
54:12 60:13
62:5 63:4,6,15
63:19,25 64:8
65:18 67:2
76:19 77:14
79:20 81:12
82:13 84:17
90:23 96:11
98:24 103:21
109:17 110:4
110:19 111:4
133:1 136:8
138:18 143:23
143:24 145:16
147:1 158:15
158:23 159:16
160:2 161:18

164:19 165:2
166:15,17
167:13,13,17
176:2 193:17
193:20,24
199:17,23,23
201:13 202:11
202:12 205:11
206:14,21
212:23 213:16
214:4 219:3,22
227:13 230:13
231:21 235:17
236:4 242:20
242:22,24,25
244:12 247:19
249:12 250:2
251:7 253:24
257:16 260:16
261:23 264:4
265:4
**goal**   206:2
214:8
**goes**   14:20
22:24 33:23
52:13 55:16
58:3 65:17
95:18 111:6
161:23 213:14
213:18 214:4
232:15 253:2
**going**   6:13,24
8:4,6,15,22
9:15,25 10:5,6
10:20 12:10
14:2 15:7,11
18:25 21:12,14

21:14,15 22:6
22:11,11 25:10
27:5 28:6,8,8
29:14 31:21,22
31:25 32:11
33:23 34:8
35:8 36:8 37:6
38:5,12 39:19
42:6,11 43:18
44:1,8 51:14
52:1,8,15
61:14,18 62:14
63:25 64:2,3
65:11,18 66:1
66:12,23 67:3
67:14 73:21
74:1,4,7,9 75:9
76:25 79:3
80:20 86:24
87:10 89:7
90:23 91:4,13
91:15 95:11,14
96:8 97:23
98:16,24 99:1
99:1,24 103:3
105:12 114:7,7
117:19 129:14
131:11 136:16
136:24 138:5
146:3,21
150:12 152:11
152:24 157:3
160:22 161:9
165:20,21
166:14 170:7
172:5 177:16
183:11 186:13

187:11 188:18
189:2,11,13
192:10,11
194:17,17
197:2,4 199:4
199:4 200:12
200:18 201:5
205:18 210:20
212:15 216:12
216:25 217:23
218:21,21
219:24 223:4
228:20 230:21
231:7 233:24
233:25 235:15
236:12 237:19
238:10 242:11
242:19 243:3
247:14 248:22
250:4 252:3,5
252:6 253:24
260:13,14,19
261:23 262:9
262:21,25
263:18 264:3,5
265:19 266:19
267:5,9,16
**goldman**
194:20
**good**   6:14
28:11 39:19
44:6,7 90:10
90:11,14 100:8
142:7 155:23
156:4 161:12
161:13 183:19
245:6,9 248:17

| | | **h** | **happen** 40:12 |
|---|---|---|---|

248:18
**goran** 6:17
**gotshal** 3:3
   6:15 70:17
   81:7 85:7 88:9
   107:18
**gotshal's** 85:3
**gotten** 26:19
   91:13
**govern** 52:5
**governance**
   226:18 227:25
   228:2 259:12
   259:16
**governed** 51:5
   113:6 164:23
   226:17
**governing** 56:5
   221:6
**government**
   90:7 160:4
**grabbing**
   258:11
**granting** 2:5
   2:10,15
**great** 6:21 15:5
   28:10 43:22
   97:10 98:14,22
   105:13 110:3
   146:21 160:25
   173:18 193:23
   200:11 219:19
   248:13 260:17
   267:20
**greater** 105:23
   207:18 252:2

**green** 1:12 4:5
**groceries** 50:14
   212:22,23
**gross** 127:10
   185:8,11 191:7
**ground** 87:12
**grounds** 23:3
   170:7
**group** 71:19
   73:8 141:24
**grow** 140:24
**growth** 140:16
   140:19 141:5
   141:20 142:3
   143:11 144:11
   155:7
**guarantee**
   259:4
**guess** 7:1 22:17
   33:16 50:24
   61:19 103:2
   142:12 156:16
   194:22 198:18
   205:25 226:7
   230:9 236:14
**guesstimate**
   103:4
**guide** 89:16
**guideline**
   141:2
**guidelines**
   106:12
**guy** 213:16
**gymnastics**
   233:16

**h** 5:14 41:22
   99:11
**half** 40:5 90:11
   90:18,19 91:2
   91:8 141:7,8
   143:10,12,13
   143:14 155:18
   164:15 185:4,4
   247:18,24
**hall** 158:17
**halls** 240:24
**hand** 41:9
   43:22 82:6
   99:3 137:14
   160:7 228:25
   245:23
**handed** 99:21
   105:11 173:19
   182:24 213:5,5
**handing**
   109:24
**handle** 25:16
   88:18
**handled** 88:15
**handling** 88:19
**hands** 109:21
   160:21
**hang** 31:13,13
   48:2 67:2,12
   69:13,13 74:20
   84:10 134:22
   135:8 175:23
   186:10,10
   211:2 238:4
   249:25 263:23

240:19 241:4
**happened**
   62:12 70:1
**happens** 50:16
   98:19 159:5
   202:25 242:11
   263:15
**happily** 98:11
**happy** 10:18
   39:16 97:25
   135:11 171:22
   204:20 217:1
   223:12 225:25
   254:13
**hard** 6:22 38:6
   98:2 200:10
**harm** 36:9,10
   214:1 223:6
**harp** 221:16
**harping**
   221:15
**hastings** 3:12
   10:23 16:1
   243:2
**head** 27:11
   67:19 148:6
   175:13 176:19
   191:11
**headed** 241:25
**heading** 41:8
   147:11 152:19
**headings** 17:24
**hear** 9:17,18
   10:19 15:21,22
   20:11 25:2,21
   40:14 51:22

66:23 67:18
84:12,13,13
136:19 169:4
206:24 222:21
226:5 238:11
242:18 255:9
**heard**  11:14
67:19 69:20
72:4 100:22
202:1 203:16
224:11 227:11
243:5,6,25
244:15,24
**hearing**  2:1,7,7
2:9,12 11:1
27:3 29:25
30:11,14 31:3
31:5,19 32:11
32:17,23 33:19
35:22 36:8,16
36:22 37:1,6,7
38:3 42:13
44:16 49:25
51:20 62:24
66:13,14 68:24
97:18 98:1
99:2 100:16
204:16 215:18
223:23 228:25
239:4 263:15
**hearings**  30:4
30:6 36:23
**hearsay**  13:9
13:13,21 14:6
14:7,8 22:24
23:1 24:2,15
25:20 30:8

47:22 187:16
187:17
**heat**  160:20
253:22
**heating**  186:23
**held**  49:19
94:10,11 215:3
232:20 233:3,9
254:16,19
255:2,2,3
**help**  10:18
37:14 120:3
194:13 251:14
265:21
**helpful**  23:15
28:22
**helping**  242:23
**hereof**  33:7
**hereto**  93:9
**herring**  225:22
259:24
**hey**  255:13
**hi**  100:9
**hiding**  210:10
259:5
**high**  140:6
151:9 198:5
238:7 239:1
**higher**  128:21
128:22 151:12
151:16,20,21
154:8 184:18
184:19 244:20
244:21 245:1
247:19 260:21
260:25

**highlight**
234:10
**highly**  14:21
**hijack**  173:11
**hillside**  189:4
**hire**  24:10
253:21
**hired**  164:10
**historic**  90:25
**historical**
133:11 140:5
**historicals**
46:18 124:2
**history**  253:10
**hit**  234:24
243:4
**hitting**  157:4
**hoarded**
214:14
**hold**  30:20
202:20 255:8
**holdco**  49:5,8
49:17,21
**holders**  78:2
**holding**  71:20
72:12,16,18
73:16 225:17
**holds**  233:13
**holes**  187:12
**holistic**  242:8
**holistically**
261:2
**holtzer**  6:17
107:18
**home**  102:24
**hon**  1:22

**honestly**  224:7
267:16
**honor**  6:9,14
7:21,22 8:20
10:3,14,22
11:12 12:5,6
12:18,21 13:14
14:4,16 15:3,4
15:15,25 16:1
16:3,8,10,15
16:21 17:8,10
17:24 18:1,18
18:25 20:13,15
20:17 21:11
24:1,14,19,25
25:6,15,21
27:13,25 28:5
28:11,13,23
29:3,13,23
30:12 31:1,20
31:24 32:20
33:9,15,18
34:12,20 35:15
36:10,16,21
37:15,18,24
38:14,21,21,23
39:2,16 40:6
40:13,17,25
41:25 42:18
43:2,9,13,14
47:2,8,12,22
48:6,12,14
51:13 52:9,21
56:18 59:7
60:2 61:13,22
63:3,7,13 64:6
65:7,12,19

| | | | |
|---|---|---|---|
| 66:9,11 68:6 | 219:25 220:8 | **honor's** 16:11 | 235:10 260:20 |
| 68:15,20 69:10 | 221:14 222:1 | 264:21 | 262:4 |
| 70:4 73:20,25 | 222:11 224:1,7 | **hope** 13:3 | **ideally** 98:3 |
| 74:8 75:1,7 | 225:3,25 226:4 | 89:20 179:18 | 146:24 |
| 78:20 79:18 | 226:6,9,20 | **hopefully** | **identified** 32:9 |
| 83:6 86:19,25 | 227:8,18,23 | 90:16 162:17 | 162:21 |
| 87:3 90:2,4,12 | 228:12 229:3,8 | **hoping** 97:7 | **identify** 13:22 |
| 91:6 92:3,10 | 230:1,7,18,20 | 262:21 | 38:11,12,23 |
| 94:17,21 95:5 | 230:25 231:8 | **horizontal** | 58:7 |
| 95:9,15 97:9 | 231:17,22 | 41:16 162:16 | **identifying** |
| 97:14,20 98:20 | 232:15,17,22 | **hot** 158:20,21 | 78:4 |
| 99:13,19 100:3 | 232:25 233:15 | 267:4 | **identity** 54:7 |
| 100:3 103:16 | 235:6,13,19 | **hotter** 267:4 | **ifrs** 113:8 |
| 105:4 109:7 | 236:21 237:7 | **hour** 90:11,18 | **ifs** 221:4 |
| 110:2,18 | 237:19,24 | 90:19 91:2,9 | **ignore** 263:11 |
| 136:15 138:16 | 238:3,19 | 200:19 224:25 | **ignoring** |
| 142:8,13 | 239:22 241:1 | **hourly** 102:17 | 230:16 |
| 143:10 146:2 | 241:17 242:15 | 102:19 | **ii** 2:5,9,14 |
| 146:20 147:7 | 243:1,4,12,14 | **hours** 103:2 | **iii** 2:9 |
| 157:8 158:5,11 | 243:22,25 | 143:4 226:10 | **illinois** 218:14 |
| 159:2,22 | 244:13,15 | **house** 158:20 | 230:4 |
| 160:15,23 | 245:15,19,20 | **houston** | **imagine** 242:14 |
| 170:6,12 | 246:5,20 247:2 | 198:18 | 242:14 |
| 171:20 172:23 | 247:12 248:3 | **hudge** 232:25 | **immediate** |
| 174:15,21 | 248:15,18,21 | **hundred** | 212:8 |
| 183:9,21 | 252:12 253:12 | 118:16,16,19 | **immediately** |
| 186:16 187:2 | 253:25 255:1 | 233:21 | 10:8 109:21 |
| 187:14 192:7 | 257:6 260:5,15 | **hurdle** 32:7 | 230:11 |
| 192:10 193:16 | 260:19 261:5 | **hybrid** 2:7 | **impact** 171:19 |
| 193:25 194:2 | 261:14 262:18 | **hyde** 2:25 | 173:4,6 194:18 |
| 198:12,14 | 262:19 263:2 | 269:3,8 | 246:23 |
| 199:9,11,21 | 263:14,19 | | **impeachment** |
| 201:14 202:21 | 264:9 265:12 | **i** | 79:21,25 |
| 203:3 205:21 | 265:25 266:24 | **idea** 15:11 | 174:16 187:9 |
| 206:14 209:5 | 267:1,12,22,25 | 35:10 39:7,19 | **impermissible** |
| 211:19 215:15 | 268:1 | 42:14 146:4 | 227:24 |
| 217:20 218:23 | | 170:20 227:22 | |
| | | 234:10,13,25 | |

| | | | |
|---|---|---|---|
| implement  2:4 | inclined  23:1 | 118:6,14 | increasing |
| implication | 158:13 | 126:17 127:11 | 122:5 145:17 |
| 68:12 240:20 | include  14:7 | 133:11 140:17 | 259:22 |
| implicit  29:11 | 46:1 71:23 | 140:21 141:7 | incredibly |
| implode  208:9 | 72:2,15,17 | 144:18,20 | 200:23 222:18 |
| implore  214:10 | 81:18 83:3 | 152:13,22 | incremental |
| importance | 88:9,12 95:11 | 155:13 185:8 | 206:10 |
| 24:9 | 98:6 109:4,25 | 185:11 190:2,7 | increments |
| important  8:7 | 148:5,6 149:1 | 190:11,14 | 247:17 |
| 13:13 14:22 | 157:21 165:23 | 191:7 213:6 | incur  87:24 |
| 16:21 38:8 | 166:1 180:9 | 230:18 234:14 | incurred  86:8 |
| 74:19 165:17 | 238:9 | 257:11 | independent |
| 169:19 171:21 | included  60:8 | incomplete | 6:20 14:1 |
| 212:13 227:9 | 79:12 83:22 | 175:24 | 24:10,21 |
| 248:24 252:17 | 111:10 152:9 | inconsistent | 165:23 166:1 |
| 253:17 254:6 | includes  46:10 | 174:16 177:2,6 | 177:23 208:15 |
| 255:11 261:1 | 46:13,16 70:16 | 196:11 197:24 | 208:16 220:20 |
| 261:16 | 70:20 71:1 | 198:2 215:13 | 220:21,22 |
| importantly | 73:18 81:7,24 | 215:14 238:16 | 243:11 260:15 |
| 77:10 | 82:1 129:1 | 238:18 | indicate  124:2 |
| imposed  82:19 | 216:19 | incorporate | indicating |
| 246:24 | including  35:9 | 30:24 | 113:17 |
| improper  17:1 | 47:1 54:17 | incorporated | indication |
| 174:15 | 58:7 61:4 | 31:2 | 118:5 |
| improperly | 62:23 64:19 | incorrect  13:18 | indications |
| 16:18 | 73:8 84:1 | increase  35:23 | 130:23 |
| impugning | 86:24 128:13 | 35:24 141:3 | indiscernible |
| 258:14 | 128:20 144:10 | 142:3,5,6,10 | 20:1,21 26:12 |
| imputing | 209:19 227:20 | 143:3,18 | 32:24 43:16 |
| 220:24 | 235:25 250:11 | 205:22 234:3 | 45:19 48:1 |
| inadequate | inclusion  83:10 | 234:12,21 | 62:4 65:13 |
| 201:3 | income  61:5,11 | 246:24 247:25 | 67:11 68:20 |
| inadmissible | 62:20 64:13 | 266:9 | 69:16 74:2 |
| 14:14 | 65:4 67:22,23 | increased | 75:7 87:9 88:8 |
| inch  8:24 | 68:7,23 69:2 | 121:24 145:25 | 88:23 90:9 |
| inching  97:25 | 117:5,8,11,17 | increases | 95:8,22,23 |
| | 117:21,21 | 140:22 | 99:7 135:1 |

159:18 160:10
161:25 173:10
174:1 175:21
183:15 189:24
197:20 199:12
200:22 201:4,6
201:7,10
207:15,16
209:8 213:19
217:5,6 220:9
221:24 223:14
223:15 224:23
224:23 229:7
229:21,25
231:21,24
232:4 235:16
238:15 239:25
240:1,12 241:3
242:13 246:11
246:18 247:10
248:9 250:2,10
250:12,18
251:2 254:2,5
255:14,17
256:4,10,25
257:14,22
258:10,12,22
261:15 262:2
263:4,24 264:2
266:6 267:13
**individual**
45:22 47:15
61:25 93:18
130:16,24,25
132:16,20
133:3,12
139:13 166:24

186:24 207:21
228:18 229:17
229:18 251:16
259:7
**induce**  241:12
**indulge**  231:7
**inevitably**
240:22
**infer**  263:20
**inflate**  196:19
**inflated**  196:20
**inflation**
196:25
**inflows**  233:24
**influenced**
133:11
**inform**  163:20
**informally**  6:6
**information**
8:3,8 11:20
13:11,13,15
14:6,17 33:1
34:11 35:3
39:25 44:19
51:19 60:20
107:5 108:9
110:21 113:17
135:23 149:13
155:21 197:21
267:13
**informed**
119:2
**initial**  17:3,25
99:17 102:12
105:15 111:20
**initiated**  59:13

**initiative**  257:8
**input**  117:24
120:3 172:25
221:3
**inputs**  108:16
111:8 117:20
120:6,10 136:2
136:3 139:3,18
244:17 245:14
**inquiry**  87:12
**insight**  198:5
**inspected**
112:2,5,8,10
112:13,17,19
245:7
**install**  203:21
**instance**  50:8
230:24
**insurance**
145:25 203:1
**integrity**
220:24
**intellectually**
219:8
**intend**  89:2
130:1
**intended**  32:5
107:20 108:24
109:3 157:22
168:9,21
169:14,25
170:15,18
171:3
**inter**  222:13
**intercompany**
50:18,23,24
51:8 52:1,9,23

56:10 209:23
210:12 223:20
227:17 228:8
235:10
**interest**  58:21
199:2 202:12
209:14,16,19
212:5 216:14
**interim**  2:1
31:6 35:25
210:11 242:12
265:6
**intermediate**
72:12
**internal**  53:25
**internally**  89:8
**interns**  7:11
**interviewing**
89:16
**intimate**  205:8
**intricacies**
205:9,11
**introduce**  8:23
11:9
**introductory**
19:8 22:13
**invasion**  111:2
**invest**  58:21
249:12
**investment**
118:3 157:11
157:20 158:1
251:16
**investments**
58:17 210:19
**investor**  131:8
147:14,20

191:21,24
251:15

**invocation**
35:23

**involve** 263:10

**involved**
179:24

**involving**
76:16

**irr** 148:2,9

**irrelevant**
210:5

**ish** 183:18,18

**isolated** 173:2
180:1

**israeli** 72:3

**issue** 8:19 9:4
9:13,14,19,20
18:14 29:5
36:21 39:7
61:19,20 62:2
201:19 207:25
208:1 209:4
223:21 225:19
230:1,25
237:25 239:9
241:15 255:7
259:6,9,20,23
260:9 265:25
266:3

**issued** 17:18
139:10

**issues** 9:10,12
9:13 10:20
11:14 38:7
62:3,11 194:16
223:5 235:6

237:22,25
243:8,17,17

**it'd** 257:19

**it'll** 10:9 23:14
24:18 26:4
63:11,12
142:11 200:11
206:15 213:8
218:3 263:5

**item** 70:8,13,16
79:11 81:24
82:23 126:10
204:18 206:22
206:22,23
212:17 214:17
217:22

**items** 46:13
80:21 165:12
207:1 223:11
238:13

**iterations**
120:23 121:5

**j**

**jack** 253:13

**jacket** 91:18

**jacketed** 91:20

**january** 61:6
63:1 64:17,19

**jeopardizing**
250:17

**job** 222:12
262:15

**joel** 115:24

**join** 255:7

**joined** 6:15

**jointly** 7:24

**jones** 1:22 6:3

**jpmorgan**
48:21 49:1,1
93:21

**judge** 1:23 6:3
17:18,19 19:10
44:3 144:2
208:5 223:3
232:24 239:18
251:25 262:23

**judgment**
111:18 122:23
132:10 141:15
206:21,22
207:1 244:18
244:19 249:15
252:12,21

**judicial** 23:18
29:20 142:21
206:3 252:1

**july** 256:9

**jump** 22:6
39:11 143:7
197:18 244:1

**juncture** 37:15

**june** 1:15
20:22,25 38:20
81:3 107:17
122:11 269:25

**junior** 210:13

**jurisdiction**
153:6

**jurisdictions**
245:4 248:3

**justice** 4:3

**justification**
225:1

**justified**
204:12 249:8

**k**

**kaspar** 233:1

**keep** 8:2,9
39:25 79:3
98:16 99:1
122:9 128:1
133:20 169:23
173:10 197:20
219:24 243:4
243:22 263:1
267:7

**keeping** 7:15
77:11 119:2
137:3

**ken** 15:25
243:1

**kenneth** 3:18

**kept** 228:3

**key** 34:4 39:1

**kick** 42:10

**kind** 8:8,24
21:25 32:7
45:2 68:12
78:18 91:16,19
110:21 140:21
140:25 141:5
157:4 189:8
194:14 210:19
212:5 236:12
239:14 242:23
249:3

**kinds** 8:8 233:3

**kkr** 194:21

**knew** 119:15

**know**   7:14 8:7
8:20,25 9:1,8
10:15,17 13:12
13:15 15:1,8
15:10,14,16,17
18:19,21 20:8
21:12,13,13
22:6 24:11,19
25:14 27:2,21
29:9,21,22
30:14,19 34:1
35:1,4 37:25
39:23 44:9
45:7,12 46:5
47:19 48:6
49:23 51:8,10
53:3,6 55:10
55:21 56:5,9
56:12 58:16
59:2 60:2 67:3
68:4,22,25
69:1 73:13,15
74:10 78:24
82:2,2,4,5
83:23 85:17
86:21 88:18
89:10,14,24
91:11 95:17
97:24 98:9,24
100:25 102:3,8
102:11,24
103:2,7 109:6
110:6 116:1
117:13 119:11
119:14 120:13
120:13,14
121:20 123:11
123:15 126:23
127:25 130:15
133:1,14,24
135:22 137:1
139:6,12 140:5
141:22 142:15
143:1 144:4,4
144:7,9 148:4
148:6,7,19,21
148:22 149:3,8
149:22 153:22
154:13,15,16
154:17,17,18
154:18,19,22
155:14,15,22
156:18,21
158:22 159:17
161:6 163:14
166:14 167:10
176:17 177:4
183:9,12 187:3
187:5 189:1
190:6 194:16
197:12,23
198:23 203:4
204:11 205:14
206:6,6 207:22
209:8 211:9,11
212:8,11 219:3
222:7,11,12
224:7 225:4,9
225:14,18
226:9 227:9
229:10,12,15
230:9,15
234:25 235:1
235:20 236:5
236:12 238:4
239:14,24
240:17 243:14
244:15,16
246:5 247:3,3
247:18 251:5
253:21 257:5
259:15,21,21
262:3,4 264:1
265:6,13,17
266:7,14,19
267:8

**knowing**   10:12
14:19 216:9

**knowledge**
64:22 93:18
96:3 106:6
129:9 178:24
205:8 254:9

**knowledgeable**
43:11

**known**   7:13
37:6 99:23
126:10 209:7

**knows**   17:10
209:11 243:14

**l**

**l**   99:11,11,11
99:11

**l&t**   88:24

**l's**   196:22

**labeled**   77:15
161:25 162:9
185:16 188:5
248:9

**lack**   208:10

**lady's**   253:21

**laid**   25:16

**language**   55:16
138:8 170:13
231:15 232:23
249:3

**laptop**   9:8

**large**   8:21
125:12 141:17
142:15 159:11
194:11 251:15

**largest**   85:4
236:3 251:10
253:8,10

**late**   7:19
260:13

**latitude**   74:4

**law**   17:8,11
65:22 140:23
202:13,22,23
211:9,15
212:10,20
216:18 217:4
217:14 218:22
224:8 228:22
228:23 229:1
232:25 233:3
237:7 239:6
240:7 242:2
246:18 252:23
258:3

**lawyer**   11:7
31:17 142:20

**lawyers**   88:24
215:16

**laying**   109:21

**lead**  53:9 57:17
96:21
**leading**  33:3
60:16
**lean**  205:15
**leaning**  119:24
**learned**  158:19
**lease**  141:8,8
142:18,25
**leases**  57:11
140:23 141:12
142:13,23
**leave**  16:13
25:24 43:6
90:20,21 97:12
121:9 226:2
236:20 242:24
**leaves**  207:19
**leaving**  122:5
**led**  230:8
261:12
**ledanski**  2:25
269:3,8
**ledger**  7:8
**left**  137:14
165:5 197:7
200:2 214:16
216:8 221:11
223:9 226:7
264:2 266:2
**leg**  109:8
**legal**  88:13,21
226:17 235:6
269:20
**legally**  242:9
**legitimate**
239:6

**leitner**  136:13
141:24 144:10
144:12 188:3,4
188:24 189:3
**lend**  251:1,5
**lender**  228:16
232:21 233:13
234:13,18,19
259:10
**lender's**
237:14
**lenders**  216:6
232:13
**lending**  259:9
259:22
**lends**  24:17
249:4
**lengthy**  36:18
38:9 156:11
245:4
**lesser**  223:2
250:8
**letter**  75:19,23
79:6 84:4,8,9
84:19,24 85:16
102:12,16
103:12,22,23
104:11,14
107:16,18,19
115:20 116:3,4
116:6,15,16
117:3 121:22
145:5,19
146:15 264:6
**letting**  158:21
**level**  39:15
45:22 88:13

127:10 238:7
239:1 258:8
**leveled**  23:8
**levels**  171:19
172:16
**liabilities**
228:10
**liability**  51:2,5
51:5,10 52:5
54:7
**liable**  202:22
**lidle**  17:17
**lien**  66:25
212:21,22,24
216:2,13
233:13 234:18
**liens**  203:21
230:15,17
241:9
**light**  23:16
25:25 34:3
68:18 207:23
249:12
**likelihood**
142:23
**likely**  105:23
**likewise**  7:8
90:10
**limit**  16:12,13
130:1,18,19
225:5
**limitation**
169:19 170:22
**limitations**
94:20
**limited**  9:19
13:1 42:24

51:2,4,5,10
52:5 54:7 66:8
108:1,5 129:22
132:6 148:24
170:21 212:11
217:24 218:14
222:3 237:10
**limits**  82:19
**line**  46:13 70:8
70:9,12,16
79:11 80:6,10
80:14,19,21,22
81:12,13,24,24
82:23 83:10
107:23 111:2
146:7 176:5
190:14 206:22
206:22,23
212:17 214:17
217:22 223:11
247:18 256:16
261:10
**lines**  138:8
**link**  136:12
**lion's**  237:4
**liquidating**
155:17
**list**  8:21 12:16
12:19 13:7
27:6,7 29:5,9
31:23 32:9
36:21 57:4
149:22 179:14
179:15 181:18
184:2 203:8
**listed**  40:1

**listen** 263:18
  267:3
**listening** 25:14
**listing** 154:23
**lists** 36:20
  176:18 235:25
**literally** 15:14
  15:19 34:20
  252:4
**litigate** 88:4
**litigating** 87:25
  88:2 214:7
**litigation** 24:4
  24:22 25:7
  31:14 32:7
  88:3,19 108:24
  110:7,12
  163:19 194:6,9
  194:24
**litigator** 187:7
**little** 23:1
  35:11,12 41:16
  74:3 81:16,18
  98:10 117:20
  136:18 144:24
  145:17 185:16
  189:19 190:24
  191:3 193:14
  200:10,20
  205:15 221:16
  225:5 226:7
  228:22 230:21
  236:10 244:11
  262:13 265:9
**live** 23:20 34:3
  34:8 42:8,16
  265:9,23

**living** 133:14
  134:6 135:4
  249:16
**llc** 1:7 6:5
  53:10,23 57:15
  218:8,17 225:6
**llcs** 71:23
  73:18 209:10
**llp** 3:3,12,20
**loan** 58:3,10,15
  58:18 59:2
  95:11 210:12
  214:18 223:1
  225:8 227:15
  230:2 231:9,11
**loans** 53:7
  54:16 55:25
  56:2,6,11
  71:24 208:16
  222:13 223:23
  226:19,20
  227:3,15,17
  228:16 232:16
**local** 33:5
  35:20 128:4
**located** 188:20
**locations**
  152:25 153:6
  155:23
**logic** 107:2
  156:21 229:13
  229:24
**logical** 228:21
  240:19 241:16
  242:4,5
**long** 13:22
  25:23 30:10

58:3 78:24
  90:6 97:24
  146:3 213:9
  217:1 219:20
  230:12 243:19
  265:2,5 267:3
**longer** 97:4
  164:12,14,14
  245:7
**look** 22:7 24:9
  24:11 25:19
  33:21 36:4
  39:18,20 48:2
  53:13 59:25
  62:9 63:18
  82:5,15 103:20
  108:11 127:9
  136:17 150:4
  150:11 154:10
  154:12,14,23
  154:23,24
  155:14,15,21
  156:1 165:4
  175:22 176:4
  178:13 179:11
  181:23 184:24
  185:21 187:25
  188:4 189:21
  190:14,24
  191:16 192:2
  197:15 206:21
  208:3 212:17
  213:4,10,21,23
  214:14,15
  219:2 230:2,10
  231:8 232:11
  232:24 233:20

233:23 234:21
  239:10,10,18
  245:19 250:5
  252:8 254:1
  257:6 258:3,24
  260:22 261:1,7
  261:24 265:13
**looked** 37:8
  94:1 125:20
  145:5 147:20
  148:23 149:15
  152:1 155:23
  157:2 177:7
  181:9,11
  191:23 193:8,8
  195:16 197:4
  197:11,12
  244:3 245:14
  263:9
**looking** 12:18
  14:23 27:6
  33:13 39:12
  45:10,13,16
  46:5 74:21,22
  87:11,13
  105:13 109:10
  118:18 119:22
  129:15 138:19
  140:20 149:15
  181:17 186:10
  187:4 198:6
  209:12 210:23
  212:3,15
  215:22 222:8
  234:11 239:14
  242:3,7

**looks** 8:24
73:16 75:22
100:10 188:13
191:25 196:1
262:25
**loop** 160:3
**loosen** 97:19
**lose** 200:18
**loss** 38:24
126:11,17,19
126:21 127:5
127:22 129:20
130:5 132:3
180:25 181:3
184:10,14
190:15,17
**lost** 26:20
109:16 128:2
245:19
**lot** 6:24 8:4
33:22 39:10
73:11,16 78:21
96:10 98:16
141:16 142:14
154:20,21
155:16,23
158:14 173:24
178:24 180:6
201:16,17,17
226:6,10,11,11
238:9 244:24
244:24 250:5
260:19 263:7
264:1 265:15
**loud** 93:1
201:1

**louder** 185:10
**love** 173:22
224:19
**low** 125:1
197:13 198:4
262:5
**lower** 133:15
153:15,15
155:10 186:8
211:5 244:20
245:3 252:13
260:21,23
261:10
**lowest** 124:4
**lump** 258:5
**luna** 3:10 6:16
28:9,11
**lunch** 90:1,3,6

**m**

**m** 41:22,23
99:11 218:13
**machinery**
203:14 205:16
**mad** 142:20
**made** 24:23
32:22 54:16
63:5,22 111:8
132:9,11
203:24 234:12
234:23 235:1
243:12 245:17
246:1 252:18
252:19 262:5
**magic** 26:13
**main** 6:13
82:24

**maintain** 55:13
186:24 202:15
204:9 212:19
217:19 227:12
245:3
**maintained**
154:18 156:5
213:9
**maintaining**
203:14
**maintenance**
91:13 218:10
**majority** 16:3
16:6 17:22
148:15,15
153:3 255:25
**make** 10:18
12:3 14:12
15:8 27:4
32:15 36:5,13
36:15 39:9
41:7 53:7
54:16 56:10
58:18,20 66:22
77:10 80:4
82:12 85:3
91:22 93:23
99:1 105:7
110:1 136:25
138:6,12
142:19 143:17
162:15 164:20
165:1 170:20
170:22 176:25
186:11 195:25
203:13,20
215:21,25

219:4,16 220:6
222:12,13,15
229:19 232:9
236:2,3 239:25
246:8 253:15
256:23 259:9
260:14,15
262:8 264:11
267:10
**makes** 8:13,17
35:5 40:3
63:18 91:1
252:19
**making** 7:13
138:2 235:4
**manage** 194:19
194:20 265:14
**managed** 213:9
**management**
2:3,4 46:22
47:17 48:18,23
52:12,19 69:2
76:17 78:13
93:15,19
123:12,16,20
123:21,22,25
124:4,9 125:21
180:19,22
185:1,3,19
190:25 191:1,5
191:13 205:6
213:12,14
255:22 256:1
**managing**
205:7 236:25
259:12,13

**manges** 3:3
6:15
**manhattan**
122:2 148:17
**manipulate**
230:24
**manner** 23:22
164:7
**march** 59:14
64:20 116:5,20
121:15 122:8
**margins**
262:11
**mark** 175:19
**marked** 72:25
182:17,18,18
**market** 21:16
22:2,23 123:4
123:5,22 127:9
127:10,14
128:4,11,12,14
128:18,19,20
128:21,23
129:2,9,11,19
130:5,6,7
131:9 132:1,1
133:16 140:10
141:16 145:11
145:20 146:16
147:18 148:1
148:18,21,24
150:4,16,21
153:13 155:8
157:12 165:24
166:2,6,25
167:5,11 168:9
168:22,23,24

169:1,2,5,8,9
169:10,18,21
169:22 170:1,4
170:16,19
171:11,15,18
172:3,11,15,21
174:3,5,7,8,9
174:20 175:1,2
175:4,5,8,11
175:14,15,17
175:19 176:7
176:10,17
177:2,14,24
178:1,3,11,15
183:1,11
185:19 190:6
190:11 193:2
194:25 195:20
196:11 197:8
197:25 198:2
202:10 203:5
212:3,4 220:19
261:13
**marketing**
175:16 176:10
251:6
**marketplace**
8:7
**markets** 122:3
133:9 148:7
**married** 7:7
**masking** 256:4
256:5
**masks** 256:10
**material** 13:22
121:14

**materials**
43:25 90:21,21
**math** 133:6
191:11 222:6
248:5,6 256:22
**mathematician**
234:3
**matter** 1:5
13:16 36:12
60:10 65:22
79:15 91:3
100:18 103:11
103:24 135:20
142:4 163:21
188:12 190:5
211:14 239:5,5
240:7 249:20
253:11 257:1
257:10
**mattering**
260:2
**matters** 7:7,19
13:23 202:5
**matthew** 6:17
**max** 91:14,15
200:20 236:16
**maximalist**
82:11,21
**maximizing**
89:18 214:9
263:8,18
**maximum**
153:7
**mayor** 212:5
**mean** 8:22 11:6
14:4,5 18:2,5
19:19 20:6

29:23 34:19,20
38:4 47:23
51:15 55:8
63:2,8 65:15
68:10 71:11
86:22 89:8
90:11 98:9,14
108:5 110:19
110:24 113:1,4
123:2 138:2
140:12 148:9
157:4 164:7
170:10 173:11
181:11 183:11
186:11 187:14
193:10 216:19
218:20 236:14
239:13 246:15
247:5 250:13
251:20,20
252:4,7,8,14
254:4 262:1,15
267:15
**meaning** 66:24
82:7 142:3
219:9
**meaningful**
228:25 241:6
**meaningfully**
141:18
**meaningless**
219:5
**means** 24:8
43:4 123:3
139:16 146:23
175:14 190:5
214:23

**meant** 82:17
130:24 131:1
165:17 196:14
**measure** 185:9
185:14
**median** 153:7
154:5
**medium**
153:15
**meet** 7:24
27:21 31:17
266:19,21
**meets** 244:23
**mega** 253:5,6
**member** 93:5,7
213:14 259:13
259:13
**members** 43:4
43:5 76:16
93:9
**memorandum**
155:4
**memorialize**
43:23
**memorialized**
56:3 161:2
**memory** 95:25
**mentally** 217:9
**mention** 19:16
170:17 228:12
267:13
**mentioned**
118:12 139:9
139:17 154:12
235:9 237:5
241:7,9

**mentioning**
245:24
**merit** 234:16
**messy** 208:9
**method** 152:16
**methodologies**
16:20 117:14
**methodology**
15:12,13,18
21:20,23 22:3
22:17 24:13
107:8,10
108:16,20
111:7,13,19
122:25 137:5
137:22 139:1
155:5 157:14
157:25 181:24
182:1,8 188:2
195:10,12,13
195:15 245:10
**methods**
187:12
**michael** 3:25
42:20
**michelle** 5:7
6:19 99:10
100:6 110:6
221:11
**microphone**
41:17
**mid** 59:19
128:5
**middle** 104:6
104:15 127:7
128:3 137:13
149:16 164:9

224:14
**midst** 90:8
146:7
**midstream**
147:1
**midway** 76:20
76:24
**million** 61:6,10
62:20 64:13
65:4 66:5
67:22 68:22
69:1 70:13
71:5 81:2 85:4
86:17 87:16
215:17 231:1
232:7 233:25
234:1,4,5,7
236:4 237:3
238:14 255:11
257:22 259:18
**mind** 64:3 89:3
94:20 98:10
103:5 165:8
172:8 235:13
243:4,23 267:6
**mine** 7:2
**mineola** 269:23
**minimum**
153:7 174:19
**minute** 19:19
32:7,19 39:17
97:22 133:17
133:18 140:15
146:22 158:6
160:16 195:19
198:22 202:18
255:13 262:22

**minutes** 40:3
78:22 79:1
115:14 139:17
147:2 158:12
193:16 199:7
199:17 200:8
200:20
**mischaracter...**
135:9
**mishmeret**
3:21 42:23
**misleading**
165:19 168:16
233:18
**missing** 210:5
210:5
**misstatement**
67:7,8
**misstates** 157:1
**misstating**
134:25
**mistake** 13:15
144:14 236:3
**mistaken** 29:3
**mitigated**
206:5
**mix** 143:19
148:17
**mode** 265:4
**model** 77:20
134:7
**modification**
247:15
**modified**
196:16 198:9
245:25

**moment** 6:22
64:24 109:12
126:14 128:3
130:20 139:22
141:20 152:2
174:17 201:19
260:5 266:15
**moment's** 37:2
**momentarily**
267:21
**monday**
265:16,20,24
266:23 267:6
**money** 50:12
65:23 70:1
93:20,24 210:5
210:5,12 215:2
215:13 216:7
217:23 218:2
219:17 223:1
223:19 228:7
233:12 238:22
240:21 249:5
253:3 254:9
256:8,8 259:22
264:2,14 266:2
266:4,9
**monies** 49:15
209:12 232:20
**month** 45:1,14
50:8 61:6,6,9
61:10 64:14
65:5 66:6
67:23 68:23
69:1 75:24
79:7,12 81:10
81:25 83:2,10

83:23 116:18
142:10 201:15
203:17 213:8
**monthly** 232:8
**months** 62:18
81:16 122:14
142:10 143:9
203:9,11 258:5
**morning** 6:14
28:11 98:8
101:1 119:14
**mortgage**
57:11 71:24
157:13
**mortgages**
73:19 210:3
**moshe** 119:7
**mother** 253:4
**motion** 2:1,7
28:14 32:22,23
33:13,14,16,17
34:13,14,14,22
34:24 35:18
38:18 39:1,2,3
39:6,6 50:17
54:22 55:19
58:11,12,25
61:15 62:7
203:8 207:17
215:5 229:18
252:4
**move** 10:8 48:8
56:15 83:6
114:1 157:10
187:25 192:11
199:25 207:2
207:10 220:6

249:10 254:3,3
**moved** 11:5
162:17
**moving** 206:24
207:4,13
245:20
**multifamily**
128:12,13
148:5,12 149:2
149:21 179:24
180:5 194:6,8
194:11,23
220:13,13
251:10
**multipage**
182:25
**multiple** 8:24
24:12 101:19
153:18 206:10
228:16,16
**multitude**
191:25
**municipal**
215:7
**mutual** 254:19
**myriad** 77:11

**n**

**n** 3:1 4:1 5:1
6:1 41:23
269:1
**n.w.** 3:14
**nail** 103:6
**nailing** 10:21
**name** 41:15,19
41:20 99:9,10
160:12

**named** 53:10
**names** 255:25
**nancy** 218:13
**narrative**
197:19
**narrow** 23:25
237:12 263:3,5
**nature** 83:4
175:16 176:11
246:9
**near** 261:21
**necessarily**
8:22 107:4
127:9 129:12
219:18 247:14
252:14
**necessary**
39:25 50:11
59:17 68:12
98:6 157:23
158:3 204:18
223:8 225:12
228:5,9 235:2
235:12,20,24
236:23,24
239:11,19
240:9 247:16
266:21,21
**necessity** 229:5
238:5
**need** 7:19 9:1
26:15 29:19
30:2 32:15
34:5,11,16
37:13 39:13
50:10,13 51:22
67:19 74:11

82:11,13,22
87:1 93:23
95:9 120:16
130:12 131:14
135:23 136:3
137:22 139:1,3
139:7 143:24
145:8 158:23
159:13 160:21
174:11 180:15
199:5 201:2,22
202:10 210:11
218:1,11
219:18 220:16
224:17,24
226:8 230:2,19
231:19 247:19
250:16 253:14
262:14 263:8
265:2,5 266:4
**needed**   37:9
82:16 139:6
159:8 192:12
**needs**   33:24
137:5 139:9
201:10 214:14
266:19
**negative**   234:5
**neither**   180:12
**net**   61:5,10
62:20 65:4
66:5 67:22
68:7 69:2
117:21 142:11
234:2 257:20
**never**   24:23
74:15 119:15

123:18,19
178:22 179:2
253:5,8,10
**new**   1:2,13 3:6
3:23 4:6 15:16
84:16 93:21
128:12 134:19
134:20 135:14
135:15,17,18
138:12 148:24
149:1 178:24
179:24 180:1
189:24 194:7,8
194:23 205:7
205:10 206:9,9
212:25 251:11
251:25 256:1
**news**   98:1
**nexus**   237:13
**nice**   98:25
240:23 262:15
**nicholas**   3:17
**nick**   10:22
**night**   7:20
18:19 19:20
21:7 22:9
110:14 267:20
**nodding**   79:3
**noi**   117:21
118:4,10,17,19
121:9 122:5,9
122:21 197:16
257:9,9
**noise**   122:18
227:9
**non**   9:4 13:21
13:22 17:11

42:10 43:4
49:22 71:20,23
72:2,12,15,18
72:20 73:9,13
73:19 74:6,15
74:17 75:21
76:2,7 77:16
78:11 79:8
83:12,18,19
84:1,2 85:9,21
86:5,9,13 94:7
204:14,14,14
205:19 207:25
208:1 223:2,6
223:24 236:9
236:19 251:12
257:22 259:20
264:7
**nonconsensual**
249:21
**nonreliability**
14:13
**nonstarter**
223:24
**normal**   133:20
163:5 175:16
176:10 252:25
**normalize**
140:25
**normally**   158:1
212:24
**norske**   17:19
**north**   218:8
**note**   16:11,21
28:17 84:11
93:25 153:25
225:10

**noted**   177:1
196:10 237:15
**notice**   29:20
36:23 37:3
42:21,22
167:23 169:21
173:1 206:3
247:12 248:6
252:1
**noticed**   189:18
**noticing**   2:14
**noting**   189:3
**notion**   234:9
**notorious**
259:6
**notwithstand...**
17:24 23:14
32:8 54:9
162:8 233:16
**now's**   146:20
**number**   6:5
27:8 28:20
29:12,15,16,18
30:21,24 32:2
40:19,21,23
46:19 56:16
66:17 71:5
73:15 78:14
87:19 103:5
109:16 118:18
118:22 126:7
129:8 142:22
149:17 183:16
183:17 184:24
185:21,22
187:1 191:6
202:8 203:24

205:2 206:15
207:3 208:12
210:8 211:5,25
212:2 215:17
222:2,2,4
224:16,17
225:5 241:3,3
243:25 247:17
256:12 258:16
260:24 261:9
261:12
**numbered**
108:23 128:2
**numbers** 46:3
137:13 253:13
**ny** 1:13 3:6,23
4:6 269:23

**o**

**o** 1:21 6:1
41:23 269:1
**o'clock** 6:4
18:19
**o'toole** 233:1
**oath** 91:8,25
146:25 147:5
**object** 16:3,8
29:11 30:1
40:16 217:23
**objected** 15:23
37:4 74:8
**objecting**
11:17 134:24
259:13
**objection** 13:1
13:6 16:9
19:17 20:4
25:3 26:2,12

27:20 29:2
30:7,8,9 31:22
32:1 35:13,13
36:11 40:17
47:2 51:13
52:16 61:13
62:15 63:2
64:3 65:7 67:6
69:10 73:20
74:1 75:1,5,10
86:19 87:2,11
134:12,23
135:9 137:1,24
138:1,6 156:25
157:1,4 170:6
216:15 231:4
234:16 254:11
255:7 256:3
**objectionable**
69:18
**objections** 11:2
12:13 26:17
37:10
**objective** 39:25
98:15 264:7
**obligated** 72:3
73:19 78:7
212:6
**obligation**
230:3 256:9
**obligations**
22:21 54:19
58:19 257:23
**observation**
68:19 229:2
**obstructionist**
39:24

**obvious** 202:5
216:9 228:24
**obviously** 8:5
9:16 10:9 13:8
15:7,9 30:15
60:25 62:10
63:17 197:1
223:8 233:25
242:15 244:21
247:2 259:19
263:9 266:3
**occasionally**
90:24
**occasions**
201:18
**occurred** 21:4
64:24 86:20
**occurrence**
233:5
**occurs** 42:8
66:1 97:23
**odd** 35:12
231:15
**offer** 28:13
37:7 201:11
208:5 222:14
222:15 223:23
**offered** 28:16
30:19 31:3
61:23 252:19
**offering** 44:14
155:3 258:16
258:19
**offhand** 56:12
84:4 102:25
**office** 11:9

**officer** 46:22
47:6,16 93:7
**officially**
159:18
**offset** 234:1
**ofs** 221:4
**oh** 6:25 7:5
11:9 19:14,18
25:9 26:6,13
26:18 33:10,15
36:1 41:6 42:6
43:10 84:13,14
90:22 91:2
96:17 109:8
143:5,13
144:14 158:22
159:19 161:4
170:18 175:23
186:18,21
195:18 207:4
231:18 235:15
242:19 257:9
263:23 266:11
**oka** 201:8
**okay** 6:21 7:12
7:17 9:6,24
10:11 12:3,7
12:22,24 15:2
19:5,14,25
20:11 21:6
25:2,25 26:4
26:20,25 27:4
27:14,16,23,24
28:1,10,19,24
29:2,10,14
31:4,13,21,25
37:16 40:1,7

| | | | |
|---|---|---|---|
| 40:11,18,18 | 143:21,24 | 267:2,10,17 | 64:13 65:4 |
| 41:1,2,6 42:25 | 145:22 146:21 | **old**   50:13 91:14 | 67:22,23 68:7 |
| 43:12,22 44:12 | 146:24 147:4 | 212:25 253:21 | 68:23 69:2 |
| 44:22 45:24 | 153:24 158:10 | 266:9 269:21 | 93:22 95:2 |
| 48:9,13 57:3,7 | 159:3,6,8,12 | **older**   205:9 | 96:5 117:21 |
| 57:21 59:9 | 159:25 160:5 | **om**   154:24 | 123:3 184:21 |
| 62:14 64:2,19 | 160:25 161:4,5 | 155:3 | 204:13,14,14 |
| 64:23 65:3 | 162:21,22 | **omissions**   58:4 | 204:14 213:23 |
| 67:18,25 68:17 | 165:1 166:10 | **once**   24:14,15 | 223:6,6 227:14 |
| 69:22 70:11 | 167:13 168:17 | 42:16 129:14 | 228:5 235:3 |
| 71:16,16 72:22 | 172:5 173:9 | 252:18 258:9 | 240:9 256:10 |
| 73:5 74:20 | 176:2 183:6,22 | **one's**   25:10 | 257:2,5,9 |
| 75:15 76:12 | 186:18,25 | 223:10 253:24 | 266:5 |
| 77:3 79:20 | 187:23 189:7 | 259:16 | **operation** |
| 80:3,6,17,18 | 190:13 192:2 | **ones**   35:8 | 218:11 |
| 84:14 87:15 | 192:19 193:5 | 189:17 249:17 | **operations** |
| 89:23 90:3,10 | 193:20,23,23 | 249:23 250:8,8 | 88:22 209:17 |
| 90:17,19 91:7 | 194:1 195:4,8 | **onesies**   251:8 | 238:23 240:21 |
| 91:9,19,24 | 197:4 198:13 | 252:2 | **operators** |
| 94:18 96:6,9 | 198:15,21 | **ongoing** | 129:10 |
| 96:17 97:7,10 | 199:19 200:1 | 194:22 237:1 | **opine**   174:7 |
| 97:10,15 98:16 | 200:15,25 | **open**   30:21 | **opinion**   14:13 |
| 99:3,12,20,20 | 204:23 207:14 | 158:20 175:15 | 18:8 23:16 |
| 100:2 102:16 | 216:17 217:1 | 176:10 259:6 | 25:8 108:3 |
| 103:8,20 104:2 | 219:2,22,23 | 263:16 267:7 | 124:21 127:13 |
| 104:6,24,25 | 221:17 224:20 | **opening**   17:15 | 157:24 165:23 |
| 105:5,20 | 237:23 239:3 | 64:4 | 166:1,6 168:9 |
| 109:17,24 | 240:17 242:10 | **operate**   130:14 | 168:22,23 |
| 110:3,4 114:17 | 248:10,13,17 | 251:9 | 169:8,9,17 |
| 114:20,23 | 248:19 250:16 | **operates**   144:8 | 170:16,18 |
| 115:1 116:11 | 250:25 254:3 | **operating** | 171:15 172:3 |
| 118:21,22 | 258:23,23 | 48:19,25 49:5 | 172:11 175:5 |
| 124:17 127:7 | 260:3,10 | 50:2 51:6,11 | 175:17 176:11 |
| 128:3 130:18 | 262:20,20 | 51:25 52:5,7 | 177:24,25 |
| 130:21 131:18 | 263:23 264:4 | 53:4,6,22 | 178:8,9 |
| 132:6,8 136:24 | 264:25 265:18 | 54:21 55:1,21 | **opinions**   15:16 |
| 142:9 143:16 | 265:19 266:25 | 61:5,10 62:20 | 22:19 23:3 |

25:15 178:10
178:12,17
193:7
**opportunity**
30:15 100:1
248:20
**opposed** 48:4
**opposing** 43:19
109:4
**opposition**
211:10
**option** 199:1
241:8,12
244:20,21
**options** 78:2
251:7
**oral** 34:8
138:20 265:14
267:9
**order** 2:8,12
50:17 52:2
54:6 82:12,19
137:22 140:21
152:21 154:19
154:22 156:5
255:5
**orders** 2:2 12:3
**ordinary** 2:4
44:23 45:4
88:15,22
236:25
**org** 74:23
**organizational**
72:8 73:8,24
96:25 97:1,3
**oriented** 123:5
140:10 141:16

**original** 34:22
39:9
**originally**
34:25 235:1
**ouch** 109:8
**outflows**
233:24
**output** 172:25
**outreach** 241:6
**outset** 235:10
**outside** 75:2
88:19 95:6
96:2 267:5
**outstanding**
55:25 58:3
**overall** 13:5
14:24 132:17
173:6 263:17
264:7
**overestimate**
253:14,16
**overfunded**
250:8
**overlay** 241:2
**overrule** 52:16
64:2 136:24
137:1 138:5
157:3
**overruled** 26:2
62:14 83:8
114:4 134:13
174:18
**overstated**
238:8
**overview** 238:7
239:1

**owe** 259:18
**owes** 243:17
**own** 21:15,16
24:10 63:9
71:24 151:4
152:17 172:21
209:18 210:23
216:1 220:25
221:8 226:17
226:19 227:25
228:1 255:24
**owned** 129:10
**owner** 155:16
194:13
**owners** 145:23
145:24 146:17
154:21
**ownership**
154:18

**p**

**p** 3:1,1 4:1,1
6:1 41:22
**p&ls** 44:25
**p.m.** 268:3
**page** 5:2,15
16:13,16 53:21
53:25 54:1,12
56:25 57:1,5,6
57:10,19,20
58:17 59:7
76:19,20,24
77:11,14,15,17
77:22 80:6,9
80:19 81:12
92:22 96:14,16
103:20 104:2
104:13 107:15

107:17 108:23
111:25 114:8
114:17 127:3
127:25 128:1,2
128:4 129:15
137:10,13
138:9 144:22
144:23,24
145:19 146:15
147:10,21,23
147:24 149:16
150:6,13,15,25
150:25 151:16
151:17 152:19
152:24,25
153:15 161:19
161:24 162:5
162:20 164:17
164:25 165:4
165:10 166:13
166:13,16,17
166:18 167:14
174:1 176:5
178:2 179:15
180:2 181:15
183:18 184:3,5
184:9,9,20,20
184:24 187:21
188:14 189:25
191:16,17
192:6 195:1,5
195:9,18,24
196:4,6 231:12
231:12,25
232:1,2 245:19
245:21,22
246:1

| | | | |
|---|---|---|---|
| **pages** 16:11,12 | 104:14,22 | **part** 6:12 7:13 | 32:15 50:7 |
| 17:23 18:21 | 105:15 106:1,1 | 14:14 22:7 | 70:7 83:2 |
| 21:20 57:2 | 106:7 107:19 | 30:2,3,5,19 | 88:14 89:12 |
| 108:23 161:21 | 107:23 108:12 | 32:14 36:15 | 94:2,3 95:1 |
| 165:9 | 108:15 114:8 | 38:25 39:5 | 113:2 146:13 |
| **paid** 50:9 | 114:17 115:8,9 | 44:15 48:18,23 | 155:16 170:12 |
| 64:18,20 86:16 | 115:15 121:23 | 48:24 49:24 | 227:19 237:11 |
| 94:2 103:10 | 125:6 127:3,3 | 51:20 60:17,17 | 245:16 |
| 206:4 209:2,14 | 127:4,7 128:4 | 60:21 65:20 | **particularly** |
| 209:16 210:8 | 128:7 129:15 | 66:16 75:2 | 10:12 15:1 |
| 216:11 218:3 | 129:16,17,25 | 93:11 101:12 | 17:1 91:17 |
| 249:20 | 145:7 146:15 | 114:1 131:6,7 | 145:25 |
| **painful** 39:12 | 153:21,24 | 153:3 156:9 | **parties** 8:2 |
| **painstakingly** | 167:17 168:14 | 157:21 162:4 | 9:11 11:19 |
| 36:17 | 170:19 171:5 | 162:20 163:10 | 13:8 32:1 |
| **pair** 168:13 | 176:22,24 | 164:16 166:7,8 | 36:19 95:13 |
| **pap** 168:3 | 218:6 219:4 | 166:21 168:13 | 183:19 201:14 |
| **paper** 9:3 | 232:11,18 | 168:20 170:19 | 232:7 267:14 |
| 201:17 206:3 | 235:22,22 | 171:5 176:24 | **partner** 28:9 |
| 239:23 | 261:19 264:19 | 181:21 182:10 | **partners** 6:16 |
| **papers** 154:19 | **paragraphs** | 188:11 189:15 | **partnership** |
| 154:22 159:7 | 5:18 16:5,5,6 | 194:15 212:13 | 218:14 |
| 160:21 202:2 | 16:18 18:6 | 213:19 229:20 | **parts** 9:15 |
| 202:16 204:19 | 19:2,7,8,11 | 251:9 252:8 | **party** 17:14 |
| 207:7 227:10 | 22:10,18 23:25 | 257:2 264:9 | 54:17,18 92:25 |
| 230:6 237:7 | 25:4 26:3 | **partial** 66:12 | 93:2,9,12 96:7 |
| 251:4 | 40:15,20,23 | **participant** | 205:5,14 |
| **paperwork** | 73:22 153:18 | 43:1,7 123:5 | **pasquale** 3:18 |
| 156:5 | 176:20 207:17 | 133:16 | 5:9,11 6:7,7,9 |
| **paragraph** | 218:20 264:19 | **participants** | 6:9,10,11 |
| 16:16 19:3,7 | **paraphrasing** | 42:10,22 43:4 | 10:14,16 12:21 |
| 22:13,14,14 | 138:5 | 91:20 99:21 | 12:23 15:22,25 |
| 23:7,10 32:23 | **parent** 243:13 | 123:22 127:9 | 16:1 18:4,9,12 |
| 34:14 35:7,18 | **parenthetical** | 131:9 132:1 | 18:18,24 19:10 |
| 36:1 45:19 | 104:15 | 147:18 | 19:13,16,20,23 |
| 54:4 92:17 | **parsing** 43:7 | **particular** 8:4 | 20:1,3,9,13 |
| 96:21 104:3,6 | | 9:21 16:4 | 25:6,13,19 |

28:4 98:15
100:2,3,7,12
103:9,16,17
105:4,9 109:7
109:10,15,18
109:23 110:5
110:23 111:5
114:1,5 118:24
134:17 135:11
135:16 136:21
137:2 138:12
138:16,17
144:1 146:8,10
146:12,20
147:6,7,8
157:8,9 158:5
158:8 159:11
159:15,17,20
159:22 160:1
160:15 170:6
174:15 182:20
183:21 186:12
194:2,4 197:22
198:12 199:9
199:20,24
238:11 240:18
242:19 243:1,1
244:2,6,8,13
246:14,19
247:1,7,11,21
247:24 248:2,8
248:12,15
262:25 267:12
267:19,25
**passage** 59:5
**past** 60:18,22
60:24 61:3

62:9,10,13
63:15,18
107:17 144:7
**path** 59:17
89:17 113:14
157:7 168:6
169:15 175:2,9
215:23 241:16
**patience** 6:2
**patient** 242:19
**paul** 3:12
10:23 16:1
243:1
**pave** 242:12
**pay** 49:12,12
50:3 62:25
64:14 82:8,9
82:18 126:19
196:25 203:19
206:7,8,8
209:18 213:12
213:25 214:1,2
215:7 216:11
216:12 217:22
217:25 219:11
221:1 223:12
223:18 227:22
232:13 234:19
249:14 255:4
266:17,17
**paying** 104:20
206:9 213:16
223:12 235:11
243:23
**payment**
103:13 104:3,7
225:9

**payments**
50:16 82:13
232:9
**payroll** 50:9
133:14,15,17
139:17,18,21
140:1,4,5,8,10
197:1,2,5
266:4,14
**peer** 24:5,16,20
24:21
**pending** 55:9
91:4
**people** 7:15
78:18 90:6,25
91:14 97:21
98:24 198:21
198:22 200:18
203:20 223:9
224:14 251:7
**people's**
160:21
**perceiving**
68:17
**percent** 76:8,8
83:1,1 118:17
118:19 119:24
123:12,15,16
123:20,24
124:2,4,10,16
125:21 126:20
126:20,23,24
126:25,25
127:16,17,18
127:22 128:8
128:15,19
129:11 132:2

140:16 142:4
151:16,20
154:1,1,2,6,6,9
180:19,21,25
184:13,16
185:18 190:15
190:20 191:10
191:13,15
196:20 197:13
197:14 207:18
211:4,6,11,12
211:17 222:4
222:18,24,24
223:1,17
245:16 246:5
247:19,19,19
247:24,24
249:11,17,23
252:21 258:9
258:11
**percentage**
148:22 184:10
185:15 191:5
236:6
**perfect** 41:24
**perform** 84:1
110:10
**performance**
60:19,22,24,25
61:3 62:10,10
63:16,16
**performed**
22:25 76:6
86:17 87:7
113:8 144:18
**performing**
78:10 79:7

| | | | |
|---|---|---|---|
| 86:8 | **persuaded** | 77:1,5,15 | **pleased** 40:14 |
| **period** 35:25 | 221:20 | 104:12 116:1,2 | **pleasure** |
| 81:2 101:17 | **persuasive** | 119:10 123:16 | 118:23 |
| 113:4 142:19 | 252:9 262:10 | **pivot** 36:2 | **plug** 46:19 |
| 175:16 176:11 | **pertain** 149:20 | **pivoting** 78:16 | **plugin** 46:4 |
| 208:25 209:13 | **pertaining** | **place** 69:11 | **plural** 10:1 |
| 225:24 233:23 | 183:1 | 77:12 109:16 | 172:21 |
| 234:3,6 242:12 | **pertains** | 128:2 129:8 | **plus** 216:3 |
| **permanence** | 188:19 | 158:13 193:18 | **pocket** 216:8 |
| 223:18 | **pertinent** | 197:1 219:2 | 224:16 238:22 |
| **permeates** | 52:16 | 257:3 | 257:22 |
| 226:14 | **petition** 35:24 | **plan** 35:2 87:5 | **podcasts** |
| **permissible** | 60:16 63:25 | 183:5 215:24 | 193:12 |
| 143:18 | 65:1,3,23 68:2 | 227:23 | **podium** 28:9 |
| **permission** | 68:9 76:5 | **plans** 88:4 89:8 | **point** 8:3 10:23 |
| 50:1,5,11 | 86:18 230:11 | **play** 98:5 | 13:9 15:1 |
| 52:23 99:14 | 233:19 | **player** 6:13 | 29:23 32:19 |
| 226:23 227:19 | **petitions** 33:6 | **pleadings** | 33:16 35:6,14 |
| 260:8 | 59:23 225:11 | 203:4 | 37:13 42:9 |
| **permit** 17:14 | **phone** 259:16 | **please** 29:1 | 43:11 54:14 |
| 53:4,7 | **photos** 154:24 | 39:22 41:9,15 | 60:17 64:19 |
| **permitted** | **pick** 170:25 | 44:11 53:14 | 67:4 78:19,22 |
| 110:11 | 210:7 244:19 | 55:4,5 56:22 | 89:20 119:24 |
| **perpetual** | 253:25 256:24 | 72:6,23 75:14 | 142:7 157:4 |
| 213:2 | 258:16 | 90:22 92:25 | 187:2 199:4 |
| **person** 48:4 | **picked** 260:21 | 94:25 96:14 | 202:18 203:24 |
| 58:6,18,22 | **picture** 74:17 | 97:14 98:23 | 203:24 205:2 |
| 93:6 98:25 | 238:13 | 99:3,9 103:14 | 206:15 210:6 |
| 205:15 206:7 | **piece** 13:13 | 104:22 106:21 | 211:14 213:9 |
| 240:23 259:22 | 15:13 162:10 | 107:24 108:11 | 213:24 214:15 |
| **personally** | 166:12 167:13 | 115:9,10,18 | 214:16,16 |
| 112:2 179:6,7 | 206:16 239:5 | 129:18 145:6,8 | 219:14 221:21 |
| **personnel** | 254:16 | 145:23 160:6 | 228:21 229:3 |
| 43:24 | **pieces** 21:25 | 160:11,22 | 229:14 230:19 |
| **perspective** | **pin** 23:4 | 182:21 193:21 | 230:20 232:17 |
| 205:3 214:17 | **pinnacle** 46:22 | 220:2 222:19 | 234:25 235:14 |
| 259:11 | 47:17 76:17,21 | 226:5 244:2 | 239:25 243:12 |

246:8 251:17
252:12,17
254:1,11
255:15 259:17
261:4 263:14
264:11
**pointed**  195:8
254:13 259:8
**pointer**  253:22
**points**  52:25
122:2 150:20
151:4,21
184:19 187:16
187:17,18
191:20 192:21
192:23 234:22
234:24 243:4
244:17 256:12
259:12,23
260:14
**poke**  187:12
**polite**  217:10
**pop**  262:25
**porters**  203:19
**portfolio**
120:12 194:11
205:7 210:16
221:13,19
251:15 263:9
**portfolios**
251:10 252:1
**portion**  18:25
23:9 42:13
83:18 85:4
87:23 88:1
128:15 164:23
209:2,2 232:9

**portions**  15:23
17:12
**pose**  172:6
**posed**  110:25
**position**  36:6
64:25 82:12
119:11 124:3
200:16 209:24
212:16 214:11
214:15 224:16
240:20
**positions**  82:11
82:21
**positive**  61:5
66:1,5 215:12
230:12 234:2,2
257:18,25
**possession**
66:25,25 215:5
216:2,3 255:19
255:19
**possessions**
198:16
**possibility**
105:16
**possible**  11:1
178:17,25
214:9 228:6
**possibly**  13:18
124:5 225:24
228:9
**posting**  217:23
**postpetition**
78:11 215:9
217:25 259:25
**potential**  78:1
89:9 126:17

**potentially**
29:5 32:6 52:1
**practical**
222:16
**practically**
45:21
**practice**  87:8
106:11 120:5,9
125:7 133:21
163:15
**pre**  266:1
**precise**  103:5
186:17
**precision**  71:9
**precluded**
17:20
**precludes**
221:6
**precondition**
233:11
**predicate**
74:11,14
**preemptive**
111:2
**prefer**  97:17
**preference**
10:12
**prefunded**
215:7 255:4
**prejudice**
32:13 34:10
36:11 38:25
214:20
**prejudiced**
39:23
**prejudicial**
34:6 37:15

**preliminaries**
33:22
**preliminary**
15:8 96:20
231:4
**premise**  205:12
**premised**
135:13
**premium**
150:20
**prepaid**  215:3
**preparation**
149:25
**prepare**  30:15
82:4 113:16
114:9,24 115:4
117:8 134:19
135:17,18,23
180:4
**prepared**  7:25
9:22 30:17
37:8 45:2
61:25 74:22
116:5 133:22
134:2,9 161:14
163:18,20
183:24,25
**preparing**
16:22 18:20
59:12 60:15,18
60:21 82:10
116:23 135:19
181:6
**prepetition**
61:17 63:5
65:9 86:20
95:21 215:9,19

223:7 225:6,7
254:21 259:17
**prescribed**
206:20
**present** 7:4
34:7 38:6
44:18 83:21
116:11 227:13
**presentation**
9:3 108:5
243:9 246:9
**presented**
116:8 152:17
168:9,18 265:3
**presenting**
25:12 34:10
**presents** 108:1
208:22
**preserve** 54:6
202:14 203:18
204:18
**preserves**
205:18
**press** 43:4
**pressures**
22:23
**presumably**
49:23 51:7
**presume** 85:25
**pretty** 12:2
35:18 124:15
142:15 211:3
243:15 265:18
**prevent** 227:17
239:19
**previewing**
217:21

**previously**
32:3 48:16
58:2 79:5
145:6
**pri** 192:4
**prices** 156:1
**primes** 216:13
**principal**
209:19
**principle** 240:7
**principled**
239:5
**print** 8:23
**prior** 23:16,16
46:4 54:21
59:22 64:8
68:13 86:18
87:8 92:19
136:12 144:10
152:1 172:6
178:19
**priority** 50:21
**privilege** 111:3
**privity** 254:18
**pro** 45:3 155:4
236:18 266:20
**probably**
12:17 23:19
76:8 79:1
116:19 149:6
179:20 191:12
223:14
**probing** 86:23
**problem** 25:23
39:14 96:2
223:3 252:20
264:10

**procedural**
39:7
**procedurally**
183:13
**procedure** 17:2
17:9
**procedures**
36:17
**proceed** 6:3
7:18 42:16
89:24 90:1
92:1 161:5
183:22 198:23
199:6,8,15,16
201:8
**proceeding**
22:9 25:15
47:20 101:22
102:1 203:9
**proceedings**
23:19 53:17
59:13 63:4
108:24 110:7
119:12 123:19
268:3 269:4
**proceeds**
214:22
**process** 18:15
39:5 48:24
108:3 117:6,7
117:12,15
118:10 119:21
120:6,11,17
126:5 132:15
132:16,18
133:1,2 140:9
156:13 161:23

166:8,9 194:20
252:10 253:15
**produce**
138:21,24
141:18
**produced**
182:19 188:25
189:17
**producing**
213:6
**product**
142:11 243:20
**professional**
70:9,14,16
79:11 80:23
81:1 85:5
87:16 88:16
94:6,9,11,13
106:11 132:10
163:15 204:19
204:24 206:11
206:12,17
209:25 212:18
213:11 214:4
222:25 223:4,5
223:10 224:6
225:18 235:14
235:18 236:2,2
236:22 237:1
237:11 238:1
249:7,14,20
251:14 264:6
**professionals**
81:5 88:20,23
89:16,21 214:5
249:23 253:2

| | | | |
|---|---|---|---|
| **proffer** 10:7 | **properties** 8:6 | 203:10 205:9 | 218:11 219:20 |
| **proffered** | 25:22 71:24 | 205:10,24 | 227:12,12 |
| 51:15 | 88:22 101:5,8 | 206:2 209:13 | 228:19,19 |
| **proffering** | 101:9,12,16,19 | 210:7 211:7 | 232:23 233:6 |
| 9:25 | 105:17,21,23 | 217:19 220:14 | 233:12,14,14 |
| **proffers** 32:2 | 108:18,19 | 222:5,5,9 | 234:7,14 |
| **progress** 98:4 | 112:2,5,9,14 | 223:9 226:19 | 238:19,21 |
| 119:2 | 112:17 113:5 | 230:18 235:3 | 240:10 249:5 |
| **prohibit** | 114:12 116:5 | 236:25 240:23 | 251:17 252:10 |
| 227:16 | 119:1 122:7,19 | 245:6,7,9 | 264:14 |
| **project** 63:14 | 122:24 123:13 | 246:4 251:11 | **proposal** |
| 88:9 140:21 | 123:21 125:17 | **property** 44:23 | 227:20 252:18 |
| **projected** | 128:13,24 | 44:24,25,25 | 252:19 |
| 46:17 70:17,20 | 129:4 130:9,13 | 45:5,5,9,9,15 | **propose** 10:4 |
| 85:4 87:15 | 130:15 131:13 | 45:15,25,25 | 50:17 |
| 257:17 | 131:20 132:4 | 46:1,2,5,7,7,16 | **proposed** |
| **projecting** | 132:12,19 | 46:16 47:1,1 | 32:10 50:17 |
| 70:13 81:1 | 133:10 134:5 | 72:19 84:2 | 81:7 85:2 |
| 142:16 257:17 | 135:19 136:9 | 88:13 108:19 | **proposing** |
| **projections** | 139:19,25 | 108:19 113:18 | 256:8 |
| 63:19 | 140:13 144:18 | 117:4,22,25 | **proposition** |
| **prominent** | 147:17 148:5 | 118:11,17,25 | 228:24 233:3 |
| 192:23 | 148:11,12 | 120:7,11 122:7 | 242:7 246:6 |
| **promise** | 149:2,4 153:1 | 122:24 123:3,6 | 263:8,18 |
| 100:10 213:12 | 153:2 154:16 | 123:8 129:9,19 | **protect** 202:9 |
| 240:18 | 155:1,6,22,24 | 130:4,7,11,25 | 212:7 213:20 |
| **promised** | 155:25 156:3,7 | 131:15 133:4,4 | 216:22 |
| 242:24 | 161:18 166:6 | 133:5,7 135:18 | **protected** |
| **pronounce** 6:8 | 166:24 169:18 | 138:25 139:14 | 213:20 218:11 |
| 189:23 | 171:16 172:4 | 141:12 145:3 | **protecting** |
| **propcos** | 172:11,21 | 149:5,7 154:15 | 203:6,12,23 |
| 104:16 105:6,8 | 174:8 178:20 | 154:25 155:15 | 212:1 |
| 244:8 | 178:23 179:3,6 | 175:14 176:9 | **protection** |
| **proper** 23:9 | 180:5,15 181:8 | 178:14 179:24 | 66:2 201:23 |
| **properly** 7:15 | 184:7 188:5 | 196:2 210:8,8 | 202:14 203:13 |
| 13:23 130:12 | 194:7,9,22 | 212:9 213:6,7 | 204:2,6,8 |
| | 202:6,15 | 214:21 216:13 | 208:22 209:6 |

211:21 212:9
217:13,16,18
218:1,7,16
219:5 230:13
234:15 235:4
239:7,13
240:13 241:6
241:15,16
250:7,17,18
256:17,18
265:7
**prove** 240:15
249:5
**provide** 43:19
71:18 77:10
80:5,5 96:25
107:14 113:20
120:2 134:7
155:2 166:5
174:6 182:20
201:22 202:25
204:2 219:5
239:12 241:5
241:14
**provided** 22:9
55:5 90:24
106:15 132:21
133:23,24,25
134:2 161:8
172:19 182:23
220:19 232:11
237:13
**provides**
166:23
**providing**
75:20 101:16
156:8,8 174:8

174:9 177:14
217:16,17
228:7
**proving** 83:24
**provision** 54:1
54:20,24 55:18
58:10,14,24
92:24,25 96:4
231:11 254:14
**provisional**
242:11
**provisions**
52:8 54:8,11
55:2,22 93:3
97:3
**proviso** 12:7
**public** 24:7
43:5 242:23
**publicly** 27:7
224:12,14
**pull** 131:8
229:19
**punitive**
216:14
**purchase**
58:18
**pure** 23:2
**purportedly**
62:1 63:21
**purpose** 10:25
11:22 34:7
57:22,25 112:9
113:11 140:18
158:4 165:6,8
165:13 205:1
215:6 252:5

**purposeful**
137:1
**purposes** 24:8
28:25 30:10
31:11 32:11
37:5 77:1
82:10 83:21
104:10 111:23
123:8 134:10
134:20 149:24
149:24 150:13
182:11 183:20
204:23 216:10
**pursuant**
16:23 33:5
35:20 210:3
**pursue** 206:6
**pursuing**
263:10
**push** 23:23,24
32:18
**pushback**
228:25
**put** 10:7 11:18
23:3 48:3,11
68:14 74:16
87:11,13,19,21
93:21 95:24
99:14 102:22
118:15 167:23
183:4,5,8,10
183:13,16
188:23,24
190:6 197:6,8
197:16 209:10
213:4 215:16
215:16 216:10

216:23,25
220:25 236:11
236:15 239:23
255:12 257:5
**putnam** 237:8
**putting** 169:21
173:1 189:13
264:23
**pwc** 148:2,9

**q**

**q1** 116:7
**qualifications**
243:11
**qualified**
220:11 243:10
**qualify** 237:17
238:10
**qualifying** 43:8
239:6
**qualitative**
118:7
**quality** 167:7
**quantify**
180:13,16
**quantitative**
118:7
**quarter** 113:1
113:1,4,5
116:22,25
119:1 121:9,18
122:1,15,22
145:10
**quarters** 243:3
**queens** 151:19
**question** 30:22
34:19 48:3,10
48:11 51:22,23

| | | r | 120:3 122:6,9 |
|---|---|---|---|
| 52:6 53:1,3 | **questioned** | | 126:20,21 |
| 55:9 62:5,15 | 44:2 | **r**  1:21 3:1 4:1 | 128:10 129:11 |
| 63:9 64:11 | **questioning** | 6:1 41:22 | 133:9 141:5 |
| 66:24 67:18,20 | 26:3 56:17 | 269:1 | 147:11 149:17 |
| 67:25 68:1,7 | 173:12 197:21 | **rachael**  4:8 | 150:4,16,21 |
| 68:10,18 69:12 | **questions**  7:22 | 11:12 | 151:22,25 |
| 69:14 74:12,12 | 19:4 34:3 | **radio**  263:19 | 153:7,14 154:2 |
| 78:23 80:17 | 37:24 63:17,25 | **rail**  230:4 | 154:11 155:1,2 |
| 82:13 86:25 | 65:9,18 66:8,9 | **raise**  12:15 | 155:3,7,9,9,10 |
| 88:17 94:4,22 | 66:10 68:16 | 30:8 41:9 99:3 | 155:11,12,14 |
| 95:6,9,16,18 | 71:12 80:21 | 122:1,9 145:24 | 155:18,22 |
| 95:25 96:10,11 | 92:12 93:14 | 146:17 160:6 | 156:8,8,23 |
| 96:12 97:6 | 94:6,16,22 | 215:2 | 192:6 197:8,14 |
| 104:25 110:25 | 95:2 105:14 | **raised**  32:3,5 | 197:15,16 |
| 111:1 113:12 | 111:24 130:19 | 121:19 254:8 | 245:3,13 |
| 115:1,10 120:8 | 138:4 144:3 | **raises**  243:16 | 246:24 248:2 |
| 121:23 124:15 | 158:8 170:11 | 243:17 244:17 | 260:9,21 261:5 |
| 132:14 134:1 | 173:12 174:23 | **raising**  12:2 | 261:6 |
| 135:11,13,14 | 193:25 194:5 | 13:24 75:4 | **rates**  14:10 |
| 135:15 137:25 | 195:4 200:23 | 145:9 | 119:18,20,23 |
| 138:13 142:2 | 201:6 207:8,11 | **ran**  196:15,15 | 120:10 121:17 |
| 143:5 146:10 | 225:25 245:5 | 197:2 | 121:25 122:1 |
| 156:25 159:6 | 246:21 | **random**  114:11 | 127:8 129:10 |
| 164:21 170:8 | **quick**  55:10 | 115:5 | 141:19 144:17 |
| 171:21,22,25 | 260:14 | **range**  124:14 | 144:22,25 |
| 172:7,18 | **quickly**  13:2,3 | 125:2 154:1 | 145:2,9,17 |
| 173:23 174:11 | 40:5 146:8 | 185:4 186:14 | 147:9 150:5,11 |
| 174:22 176:6 | 214:8 245:20 | **rapidly**  84:16 | 151:5,9,11,11 |
| 176:13 179:8 | 248:23 | **rare**  243:15 | 151:12,12,15 |
| 196:5 197:23 | **quite**  20:16 | **rata**  236:18 | 151:17 152:1,3 |
| 201:25 206:21 | 34:23 98:10 | 266:20 | 152:7,8,16 |
| 208:18 216:20 | 142:20 201:6 | **rate**  13:5 14:25 | 153:25 154:8 |
| 216:21,22 | 262:9 | 22:3 98:4 | 155:12 157:12 |
| 220:4,24 | **quote**  17:12 | 102:17,19 | 157:13 178:15 |
| 229:23 249:17 | 193:14 | 117:25,25 | 191:18 192:15 |
| 249:18 253:20 | | 118:2,3,4,11 | 193:8 197:13 |
| 259:25 265:6,9 | | 118:17 119:24 | |

202:12 212:5
244:23,25
245:2,3,16,17
260:18 262:19
**rather**  14:1
79:2 98:7
252:3 260:15
**rationale**  107:5
**rcx**  5:3
**rdx**  5:3
**reach**  90:16
123:8 131:14
132:18 145:3
**reached**  156:18
225:8
**reaching**  130:8
**reaction**  23:25
25:3 241:19
**read**  19:1 22:8
23:7 34:13
47:5,7 54:4,12
55:4,6 80:16
92:15,25 96:4
96:19,20,24
104:22,22,24
107:24 109:15
115:9 129:17
135:3 144:15
145:8,22
146:14 156:20
165:20,22
166:22 176:24
176:25 181:12
181:20,21
184:3 188:2
189:15 196:9,9
211:15 232:24

247:5
**reader**  156:18
167:23 170:20
170:25 173:1
**reading**  138:2
138:3 176:25
**readmitted**
39:5 42:12
**ready**  6:25
10:18 11:10
26:5 28:4,6
38:6 41:3
160:6 193:21
199:17 200:16
211:5 267:6
**real**  149:13
161:25 203:2
206:23 213:2
214:21 216:14
216:19 218:12
232:13
**realities**  46:3
**reality**  22:23
142:17,22
211:17
**realize**  234:4
**realized**  142:5
142:6 219:1
**really**  9:14,19
16:20 19:7
22:19 29:19
36:9 37:12
38:24 39:22
65:15 91:2
137:14 142:21
146:23 198:4
204:17 217:5

217:10 229:23
234:12 238:5
239:11 241:1
264:24 265:8
267:3
**realty**  1:7 6:5
53:10,23 57:15
230:5
**reason**  34:25
37:3 39:4
62:16 83:4
145:18 209:7
215:8 242:5
251:5,6 252:3
253:18 256:1
**reasonable**
87:12 156:2
**reasonableness**
62:1,6 86:23
117:11 144:20
152:13,21
261:25 262:7
**reasonably**
178:14
**reasoning**
108:2
**reasons**  145:16
151:13 158:19
200:9 202:16
210:17 225:14
245:5
**rebut**  17:22
219:13 248:20
**rebuttal**  16:5,7
17:11 18:25
24:3 200:20
201:5 226:1

235:13
**rebutted**
205:20
**rebutting**  19:2
**recall**  30:6
32:5 55:20
56:8 79:14,15
79:23 84:4,5
89:1 92:12
93:14 96:19,21
102:16 103:12
105:17 112:13
191:4 195:5
196:5 245:24
261:11
**recap**  223:5
**receipt**  233:25
**receipts**  93:21
**receivables**
205:8 209:24
**receive**  13:23
18:18 23:2
29:14 40:19
115:4 161:1
**received**  12:10
12:11,16 15:10
21:2 26:1,14
27:5,9,14 28:1
30:13 36:25
40:22 123:18
**receiver**  205:4
208:6
**receivership**
59:13 241:18
**receiving**  19:9
225:17

**recent** 30:21
30:24 44:10
61:3 83:23
112:25 113:3
147:16 232:25
**recently** 17:18
112:8 194:10
197:12
**recess** 40:10
91:10 147:3
158:25 193:19
200:14 242:21
**recite** 12:9
174:23
**recognize**
14:17 56:23,24
72:7 85:12,16
183:8
**recognized**
36:17
**recollection**
79:22 81:23
104:19 105:1
121:24
**recommend**
204:11
**recommends**
247:20
**reconcile**
117:16 154:8
155:1,21
156:23 219:7
**reconciled**
154:2 156:6
245:2
**reconciliation**
117:12,19

118:12 245:11
**reconsider**
36:7
**reconvene**
201:3
**record** 11:19
11:24 12:12
13:15 16:2
20:10 28:12,15
28:17 30:2,3,5
30:7 33:19
34:5 36:16
40:1,5,11
41:16,21 48:7
53:15 60:2
66:20 67:8
71:13 72:24
75:16 84:22
85:13 93:1
99:9 107:24
115:12 129:17
137:3 144:4
145:23 147:1,4
158:23 160:12
165:22 183:19
193:17,20
196:9 198:8
200:15 221:19
235:21 242:20
248:22 260:15
261:18 262:9
269:4
**records** 55:14
112:16 254:23
**recoveries**
217:3

**recreate** 155:4
**recross** 33:25
94:18,23
198:13
**red** 181:20
188:11 225:22
259:23
**redeploy** 258:6
**redirect** 18:3
23:21 34:1
89:25 90:3
91:4 92:2,5
97:8 100:1
158:10,11
159:1 194:1,3
**reduce** 189:10
**reduced** 140:8
140:10,11
**reduction**
245:12
**redundantly**
183:16
**refer** 39:8
71:16 92:16,23
104:13 121:22
136:11
**reference**
23:21 35:25
36:11 48:8
57:8,14 73:2
77:16,19 78:1
79:20 80:6
92:9 95:20
107:20 114:9
124:11 175:8
188:19 236:2

**referenced**
49:16 82:4
150:6 187:21
188:22
**references**
19:17 20:1,9
137:17
**referred** 25:7
131:2,3 167:14
187:10
**referring**
114:23 115:7
115:12,13
136:8 150:9
182:3,5 188:22
232:8
**refers** 16:9
115:3,15,16
189:4
**reflect** 12:11
123:5 174:13
**reflected** 117:3
153:5 196:24
**reflecting**
128:10
**reflects** 128:14
128:15
**refresh** 80:1
81:23 104:19
104:25 121:23
121:24 185:24
191:23
**refreshing**
79:22
**refute** 126:2
**regard** 7:19
18:14

regarding  33:2
  119:23 179:3
  189:4 195:5
  196:5 229:5
regardless
  263:15
regs  143:7
reinforce
  187:11
rejected
  234:17
relate  13:10
related  2:5,10
  2:15 88:17,21
  155:13 182:6
  206:12
relates  78:11
  86:20 94:7
  165:9 185:1
  192:14
relating  150:1
  150:2
relation  130:4
relationship
  243:19
relatively  13:3
release  225:17
relevance  48:3
  63:3,9 65:8
  73:25 75:2
  86:20,22 87:3
  136:16,20
relevant  63:13
  74:5,7,12,25
  75:11 135:23
  220:15 221:5,5
  252:18

reliability
  14:13 150:14
reliable  149:24
relied  32:6
  63:20 65:21
  149:9
relief  2:5,10,15
  33:6 34:24
  44:15 49:24
  52:21 210:10
  242:1
relies  215:12
rely  13:21 14:7
  29:22 39:21
  177:7 207:7
  210:24 217:11
  267:16
relying  34:17
  37:14 99:23
  148:1 202:19
  218:22
remain  41:9
  91:7,8,25
  136:25 146:24
  147:5 160:5
remainder
  19:9 97:18
remains  8:8
remedy  17:15
remember  11:8
  31:12 45:13
  59:20 84:8
  85:22 102:3
  112:10,15
  116:13,14,19
  142:20 149:22
  173:15 174:2

175:10 176:15
  195:23 196:8
  196:12 224:10
  239:3 245:8,8
reminder
  147:5
remotely  42:10
  43:1
render  58:6
  219:4
rendering  25:8
renew  141:7,8
  142:25
renewal  141:4
  141:4 143:19
renewals
  142:18
renews  142:9
renovations
  82:14,16
rent  123:23
  126:15,15
  127:15 129:9
  140:17,22,24
  140:25 141:1,1
  141:2,5 142:3
  142:5,18,24
  143:6,11,11
  145:11,20
  148:5,11,13,16
  149:2,20 153:4
  154:20 155:7
  182:6,9 194:11
  194:21 195:14
  196:17,21
  205:10 220:13
  234:18,19,20

240:24 251:11
  253:2 258:5
rental  230:18
  234:14 257:10
rents  49:11,11
  49:13,13 57:11
  93:20 128:21
  128:23 145:24
  146:17 149:14
  155:7 196:19
  213:13 214:23
  215:1 259:25
reopening  64:7
reorg  252:6
repair  50:10
  240:21
repairs  45:20
  46:1,14 50:4
repay  160:4
  256:15
repeat  34:21
  35:1,10 48:22
  115:10 138:10
  261:17
repeated  63:22
repeatedly
  157:5 209:10
repeating
  52:24
rephrase
  135:11
replacement
  181:5 185:22
  185:25 186:2
  212:24 230:15
  241:9

| | | | |
|---|---|---|---|
| **replies** 16:12 | 106:22,23,25 | 157:19 158:2 | 131:14 148:1 |
| **reply** 9:16 15:6 | 107:1,1,3,6,9 | 159:23 160:16 | 192:3 195:15 |
| 15:9,10,15,18 | 107:12,15,17 | 162:13 163:23 | 195:23 244:25 |
| 15:18,19,23 | 107:20 108:10 | 163:24 164:16 | **repossess** |
| 16:4,9,10,11 | 108:12,16,20 | 164:18,24 | 233:5 |
| 16:15 17:1,4 | 108:23,24 | 166:13,23 | **representation** |
| 17:12,22 19:17 | 109:2,3,10 | 167:8 168:1,16 | 191:10 255:9 |
| 19:17,19,21,23 | 110:7,10 | 171:18 172:16 | **representative** |
| 20:3,3 22:8 | 111:11,15,17 | 174:6 175:12 | 93:8 |
| 24:6,24,24 | 111:20 112:1,6 | 176:18 177:5 | **represented** |
| 25:16 26:1 | 116:23 117:1 | 180:9,13 | 64:24 86:16 |
| 27:20 99:17 | 117:15 122:11 | 181:16 187:10 | **representing** |
| 105:12 110:15 | 122:18 123:8 | 187:21 188:25 | 74:15 85:8 |
| 111:6 114:6,14 | 124:7,13 | 189:3,23 | 236:9 237:1 |
| 125:6,14 127:2 | 126:21 127:25 | 193:15 195:2 | **represents** |
| 129:14 153:19 | 128:2,11 | 196:4 198:8 | 58:1 74:6 |
| 153:21,24 | 130:20 131:17 | 210:24 220:14 | 128:12 |
| 156:15 201:21 | 131:18,19 | 221:8,9 222:17 | **request** 16:12 |
| 203:4 204:20 | 132:12,23 | 243:25 244:16 | 44:15 60:20 |
| 207:16 209:11 | 133:19,23 | 245:11,15,22 | 115:4,5 180:16 |
| 210:15 211:9 | 134:3,10,20 | 246:9,10 247:6 | 215:5 |
| 212:13 218:5,6 | 135:20 136:22 | 255:16 259:8 | **requested** |
| 218:20 245:11 | 137:4,18,19,23 | **report's** | 113:23 180:17 |
| 254:10,18 | 138:20,20,21 | 192:18 | 222:13 |
| 261:4 | 138:24 139:6 | **reported** | **requesting** |
| **replying** | 139:10,11 | 123:20 152:4 | 50:1 229:18 |
| 176:15 | 144:15,23,23 | 155:9,11 | **require** 224:8 |
| **report** 13:20 | 145:3 147:10 | 255:18 | 225:7 227:15 |
| 15:10,11,14 | 147:21 149:15 | **reporting** | 227:16 239:7 |
| 16:17,19 17:5 | 149:25 150:15 | 22:21 24:7 | **required** |
| 17:6,15,17,21 | 150:15 151:1 | **reports** 16:24 | 107:11 168:3 |
| 17:23 18:1,20 | 151:15,24 | 17:4,10 106:24 | 202:8 213:20 |
| 20:19,20,20 | 153:5,16 | 114:9,11,21,24 | 233:9 |
| 21:3,12,13,14 | 155:11 156:12 | 115:1,3,6,12 | **requirement** |
| 22:4,15 105:11 | 156:13,18,22 | 115:16,17 | 38:11 43:3 |
| 105:24 106:16 | 156:23 157:6 | 125:16,24 | **requirements** |
| 106:18,18,19 | 157:15,15,16 | 126:4 130:12 | 106:14 226:25 |

238:3 241:22
263:12
**requires** 242:2
**reserve** 11:19
29:18 124:21
124:24 125:3
125:11,25
126:4 181:4
185:25 186:2
199:4 201:5
216:5 226:1
255:3,4 265:4
**reserves**
125:23 151:13
181:5 185:22
197:13 216:4
231:5
**reserving**
207:6
**residential**
179:24 180:1,5
190:15 194:6,8
220:12,13
251:10
**resolution** 15:4
**resolutions**
225:11
**resolve** 67:6
**resolved** 9:12
38:7 223:21
225:20
**respect** 9:11
20:17 25:13
62:12 93:10
103:24 106:2
130:7,19
131:24 133:23

134:3 157:25
167:3,20
180:24 188:3,4
194:7,8 221:21
225:22 240:15
243:8 244:17
260:18
**respectfully**
237:24
**respective**
208:17 232:14
**respond** 16:17
88:3 225:3
263:6
**response** 30:16
51:21 61:20,22
111:16 156:11
245:4,5
**responses** 23:8
**responsibility**
104:3 227:6
**responsible**
103:13 104:7
203:1 213:21
**rest** 23:6 107:5
151:22
**restate** 53:1
**restated** 53:22
**restrict** 253:6
**restricted**
106:19,23,25
107:3,6,11
110:6,11
111:10 131:19
132:11 137:4
137:17 138:19
139:10 157:15

163:24 166:22
246:10
**restriction**
164:5,7
**restrictions**
56:6,10 95:12
97:1
**restrictive** 82:3
82:7 83:4
137:18
**restructure**
242:8
**restructuring**
80:22 81:25
257:7,8
**result** 59:15
118:11 122:6
150:19 173:7
202:23 209:1
221:2 247:16
**resulted** 152:7
**resulting**
118:18
**results** 24:16
177:1,7 196:11
197:24 198:1
244:21
**resume** 40:5
91:8 147:6
158:24 179:12
**retailer** 212:21
212:24 252:25
**retained** 25:11
102:6 107:6
178:23 179:5
**retainer**
102:13,14

244:4
**retention**
86:15 178:19
179:23
**retentions**
179:19
**return** 118:3
214:9 251:16
**revamp** 194:14
**reveal** 157:6
**revenue** 61:15
122:23 131:24
132:9 133:7
140:15 142:16
181:1 244:20
**revenues** 22:1
93:17 94:3
257:3,6
**review** 24:5,20
60:21 94:13
113:17 125:19
125:20 150:19
161:17,21,23
161:25 162:6,9
162:13,21,23
163:11,18,24
164:17 165:6,8
165:9,11,13,23
166:1,7,8,9,16
166:17 167:3,6
167:7,10,12
180:12 181:9
182:14,16
194:19,21
201:20 214:10
214:21

| | | | |
|---|---|---|---|
| **reviewed** 22:22 | 71:2,6 72:16 | 133:20 134:8 | 184:17,23 |
| 24:16,21 60:18 | 74:21,23 77:12 | 134:11 135:10 | 186:15,21 |
| 125:14 137:7 | 82:3 83:24 | 135:20 136:9 | 187:6,13,22 |
| 181:7 225:19 | 90:1 93:6 | 136:13 137:6,8 | 189:8 191:12 |
| 245:1 | 95:13 99:3,18 | 137:20,23 | 193:24 198:20 |
| **reviewing** | 100:11,20,23 | 139:1,8,19,23 | 200:12 201:5 |
| 218:20 | 101:3,9,22 | 140:1,9,16 | 201:11,13 |
| **reviews** 181:10 | 102:1 103:11 | 141:9,12,15 | 202:3 206:2 |
| 188:17 203:4 | 103:25 105:24 | 142:4,11,25 | 207:19 208:24 |
| **revising** | 106:8,16,19 | 143:3,3,5,18 | 210:20 211:3 |
| 122:21 | 107:12,15,21 | 144:19,20 | 214:24 215:14 |
| **revisit** 17:6 | 108:6,13,25 | 145:3,12,14,20 | 217:21 218:21 |
| **revisiting** 64:4 | 109:4 110:8,13 | 146:16 147:12 | 222:14 233:4,7 |
| **rewrite** 256:11 | 110:25 111:8 | 147:14,18,21 | 233:10 238:23 |
| **richard** 3:8 | 111:11,14,18 | 148:2,5,9,12 | 238:24 239:24 |
| 6:16 7:21 | 111:20,22 | 148:16,24 | 240:5 242:18 |
| **right** 6:2,21 | 112:3,6,9,12 | 149:9,18 | 244:10 245:23 |
| 9:24 13:17,21 | 113:6,12,13,18 | 150:10,21 | 245:25 249:1 |
| 14:3,9,12,15 | 115:15,21 | 151:1,4,9,18 | 249:13 250:21 |
| 14:20 18:6,8 | 117:5,11,22,25 | 151:20,25 | 251:19 252:16 |
| 18:17 19:12,18 | 118:8 119:3 | 152:7,11,14,22 | 260:24 261:10 |
| 20:24 25:9,18 | 120:17,21,23 | 153:2,8,19 | 264:22 267:2 |
| 26:6,14 27:11 | 121:11,15 | 154:6 156:12 | 267:17 |
| 27:13 28:2 | 122:3,8,12,16 | 157:17,20 | **rights** 11:20 |
| 29:12 30:3 | 122:19,24 | 158:2 160:7 | 92:25 93:2 |
| 31:17 33:21 | 123:10,13,17 | 161:5,18 163:4 | 207:6 216:5 |
| 35:17 36:4,14 | 124:1,5,10,15 | 164:8 165:1 | 223:18 |
| 36:24 38:4,9 | 124:18,23 | 166:10,11 | **ripping** 160:5 |
| 38:19 39:11 | 125:3,8,16 | 167:7,23 168:5 | **rise** 40:9 |
| 41:1,9 42:6 | 126:5,11,21 | 168:23 170:4,5 | **risk** 64:4 146:2 |
| 43:10 44:16,20 | 127:5,13,23 | 171:1,6,7 | 196:16 197:15 |
| 45:11,22 46:17 | 128:16,24 | 173:7,8 174:25 | 216:9 |
| 48:21 50:15 | 129:1,5,12,22 | 175:22 176:15 | **road** 188:20 |
| 52:3,15 53:11 | 129:23 130:3,9 | 177:21 178:20 | 189:24 244:24 |
| 60:13 62:23 | 130:24 131:19 | 178:21 179:8 | 269:21 |
| 63:1,23 66:20 | 131:25 132:12 | 179:18 180:15 | **robust** 30:15 |
| 66:21 68:24 | 132:17 133:6 | 181:23 183:25 | 250:6 |

| | | | |
|---|---|---|---|
| **role** 91:21 100:18 | **rush** 22:10 | **satisfied** 209:20 210:4 | 186:19 190:14 195:9 202:13 |
| **roll** 126:15 142:14 196:18 196:21 217:8 266:8,12 | **s** | **satisfy** 226:24 250:16 | 202:22 203:19 204:5 212:10 |
| | **s** 1:22 3:1 4:1 5:14 6:1 | **satisfying** 235:8 | 212:17 217:14 217:22 220:21 |
| **rolling** 217:9 | **s.d.n.y.** 17:17 | **saw** 144:15 179:9 193:15 | 232:11,19 233:9 235:25 |
| **rolls** 142:4 217:6 | **sachs** 194:20 | 209:15 227:14 254:14 | 244:14 248:6 249:16 255:1 |
| **room** 42:11 | **sad** 91:19 | **saying** 20:17 | 255:13 257:7 |
| **roswell** 218:13 | **sadly** 81:20 | 21:22 30:6 | **scenario** 213:2 |
| **roughly** 118:22 | **sake** 204:11 | 40:3 128:25,25 | **schedule** 16:23 |
| **round** 250:22 251:4 | **salaries** 139:21 | 167:6,10 168:20 169:23 | 267:7 |
| **row** 81:6 | **salary** 213:17 | 174:13 175:1 | **schedules** 57:4 |
| **rows** 253:16 | **sale** 154:12 155:24 156:1 | 210:10 217:9 | **scheduling** 2:9 265:1 |
| **rubber** 244:23 | 191:18 205:19 251:12,13 | 218:9 223:10 224:9 228:3 | **school** 194:25 |
| **rule** 17:8,14 33:5 35:20 | **salerno** 183:24 195:20 | 233:22 239:18 249:3,7 250:5 | **scope** 32:4 51:14,17,18 |
| 137:3,7 218:15 226:15 247:15 | **sales** 106:2,5 117:9,10,17 | 250:14 261:19 | 61:14 73:21 75:2,5 94:20 |
| **rules** 16:11 17:9 18:24 | 144:19 147:16 148:7 149:13 | **says** 16:16 24:6 24:14 32:25 | 95:6 96:2 237:10 263:3,6 |
| 110:18,21 | 149:17,18,20 150:1,5,8 | 33:1 53:21 54:2 57:1,10 | **scott** 5:10 159:23 160:13 |
| **ruling** 25:13 30:12 34:4 | 152:4,8,9,12 152:16,18,19 | 57:22,25 58:4 58:17,18 77:5 | 161:10 194:3 |
| 64:8 265:14 | 152:25 153:1,8 153:11,16 | 80:22 104:6,15 115:16 125:15 | **screened** 7:15 7:16 |
| **run** 109:20 140:1,3 158:17 | 154:1,5 175:11 206:13 252:10 | 128:7 135:2 138:19 165:5 | **scrutinize** 246:7 |
| 199:13 201:9 251:9 267:10 | 261:2,3,7 | 166:22 167:19 169:25 170:15 | **se** 181:9 |
| **running** 7:14 88:10 102:24 | **sample** 115:5 | 171:11 174:3 176:25 177:8 | **seal** 11:18 |
| 120:15 | **sampling** 125:15 | 177:14 185:3 | **searched** 150:16 |
| **runs** 249:16 265:8 | **sat** 201:17 | | **seat** 265:1 |
| | **satisfactory** 238:12 | | |

**seated**  41:15
99:8 160:11
**sec**  74:20
134:22 175:23
**second**  10:9
12:14 30:20
37:7 44:16
49:25 52:10
76:19,24 77:9
94:5 103:20
104:2 107:23
145:18 150:9
150:13 162:10
162:19 166:12
167:13,17
177:23 192:7
202:18 205:21
208:1 218:5
230:22 232:18
235:14,22
241:17 242:20
249:25
**secret**  241:17
**section**  9:20
11:21 52:11
54:5,13 55:5,6
55:13 57:25
58:17 59:8
92:23 96:19,20
96:24 97:2,5
119:17 149:17
151:24 152:3,5
152:10,18
166:18 182:6
196:6 212:14
227:2 230:16
231:13,13

232:1,5,6
237:10 239:22
261:3
**sections**  21:21
**secured**  205:14
218:17 228:16
233:13 234:13
237:14
**securities**
54:19 58:20
224:15
**security**  57:11
202:25 255:23
**see**  7:4 16:12
21:11 26:5
27:6 29:19
33:23 40:2
43:19 53:21
54:2 55:16
56:24 57:4,8
57:10,22 58:8
58:22 65:8
76:20,22 77:5
77:16,20,23
78:2,5 80:5,23
81:21 87:7
90:20 91:1,17
98:18,19 104:4
104:7,14,17
106:2 111:1,3
112:16 114:10
119:7,18
120:25 121:7
124:14 125:4
127:11 128:5,8
129:16 137:13
138:8,22

141:12 143:13
146:7,21 154:2
154:20 159:5
160:6 165:6,13
166:18,25
167:20 168:10
168:12 170:16
170:18 171:7
171:11 174:4
175:20 176:22
177:2,9,18
179:15 182:1,2
185:5,22 190:2
190:3,15,25
191:18 200:12
203:3 209:15
210:2 217:7,8
218:7 223:13
247:18 248:3
251:15,18,23
251:24 252:16
253:4 254:10
254:12,12,12
255:6 259:23
267:21
**seeking**  2:12
49:25 52:22
260:1
**seeks**  11:21
**seem**  27:11
37:12 198:17
**seeming**
211:17
**seems**  68:11
85:1 208:8,11
219:25 240:19

**seen**  53:19 84:9
84:19,20,24,25
85:17 120:21
124:18 178:25
253:5
**segregate**  58:7
**select**  178:16
**selection**
114:11
**selections**
16:20
**self**  187:7
**sell**  156:4
194:14 206:2
210:7 251:8,15
252:3
**selling**  155:16
251:12
**seminal**  237:9
**send**  40:3
**sending**  121:4
**sense**  8:14,17
13:18 35:5
39:10 63:18
146:22 219:4
219:16 229:19
252:19 259:9
**sensitive**  38:8
**sensitivity**
162:10,12
163:2 164:4
167:14,15,16
167:18,21
168:18,21
169:12,17,19
171:3,14 172:2
172:10,13,20

| | | | |
|---|---|---|---|
| 174:5,9 175:3 | 226:17,19,19 | 54:8 93:13 | **shortly** 63:12 |
| 176:21 177:1,5 | 227:3,3 229:6 | 97:2 106:12 | **show** 95:14 |
| 177:11,25 | 229:6 242:9 | 143:4 147:20 | 137:5 139:1,3 |
| 180:21 181:6 | **separately** | 151:17 171:15 | 173:3 216:17 |
| 187:22 196:11 | 183:11 230:3 | 172:3,10,13 | 216:23,25 |
| 196:16,17 | 254:24 255:3 | 202:16 215:3 | 217:21 227:1 |
| 197:24 198:1,3 | **separateness** | 215:19 224:10 | 236:22 239:11 |
| 221:4,10 | 54:2,5 227:15 | 232:10 233:19 | **showed** 74:19 |
| 261:21 | 227:16 263:12 | 253:19 254:20 | 198:4 245:1 |
| **sent** 76:21 | **september** | 254:21 | 259:3,4 |
| 116:13 120:22 | 92:18 | **sets** 23:10 | **showing** |
| **sentence** 22:14 | **sequence** 9:24 | 34:20 108:18 | 182:17 217:18 |
| 55:4 77:9 | 10:2 207:13 | 171:17 172:14 | **shown** 9:2 |
| 107:24 108:15 | **series** 184:20 | 262:2 | 137:22 195:19 |
| 114:20,23 | **serious** 91:3 | **setting** 151:4 | 245:25 |
| 128:7 129:16 | 201:11,24 | 235:6 | **shows** 72:11 |
| 129:17 130:2 | **servant** 242:23 | **settings** 22:18 | 74:16 124:8 |
| 137:15 145:22 | **serve** 17:15 | **seven** 26:24 | 221:4 246:7 |
| 147:11 165:12 | 101:15,21,25 | 27:1 59:8 | **showstopper** |
| 165:13,15,18 | 102:6 103:10 | 149:16 150:14 | 230:25 238:1 |
| 165:22 166:22 | 243:16 | 150:15 155:18 | 264:21 |
| 167:19 168:8 | **served** 110:15 | 184:24 205:4 | **shut** 67:12 |
| 168:11,20 | **service** 62:25 | 247:9,10 258:1 | 213:25 |
| 169:25 170:3 | 64:14,18,21 | **several** 59:22 | **shy** 13:19 |
| 170:15 171:2 | 102:9 149:12 | 80:21 | **side** 7:8 12:9 |
| 177:14,17 | **services** 3:21 | **shackled** | 30:22 190:14 |
| 181:23 186:11 | 42:24 71:18 | 164:12,14 | 199:18,22 |
| 186:13,19 | 75:20 84:1 | **share** 237:4 | 200:19 217:23 |
| 195:8 196:9,14 | 86:17 88:12,21 | **sharing** 243:20 | 239:14 245:23 |
| 197:23 232:18 | 103:24 104:20 | **sharply** 237:10 | 246:1 247:12 |
| **sentences** | 105:2 | **sheet** 252:16 | 248:6 262:5 |
| 235:23 | **serving** 100:13 | **shift** 85:2 | **side's** 11:2 |
| **separate** 54:6 | 102:22 | **shockingly** | **sides** 12:4 |
| 55:15 126:24 | **set** 6:3 13:11 | 236:7 | **siegel** 4:8 11:11 |
| 130:12 131:12 | 16:23 22:11 | **short** 36:23 | 11:12,13,16 |
| 131:14 171:10 | 33:4 35:19 | 39:19 71:16 | 223:14 |
| 209:9,9 226:16 | 42:17 48:17 | | |

signature
269:6
signed   107:19
108:13
significantly
146:1
signs   113:10
silence   263:19
similar   17:18
55:2,22 85:1
85:18 95:12
97:2 147:17
175:20 176:1
191:14 239:17
simplicity
230:10
simply   37:15
143:6 172:19
196:17 234:10
simultaneously
71:19 83:25
85:8
single   57:22,25
73:10 85:4
140:11 202:1
235:21 264:6
sir   41:7 44:11
56:22 64:11
72:23 80:17
84:24
sit   102:8
148:19 158:13
179:1 238:4
sitting   53:20
86:11 158:19
257:22 264:15

situation   50:6
50:15 228:15
234:17 238:12
six   26:24 27:1
57:1 118:18,19
188:19 226:10
skepticism
246:17
skipped   246:8
slack   3:8 5:8
5:12 6:16 7:21
7:21 8:19 9:10
10:3 11:3 12:5
12:18,24 14:4
14:16 15:3,6
20:15,24 21:2
21:5,8,10
23:24 24:1
25:4,7 26:8,11
26:16,19,22,25
27:19 28:8
29:23 32:17,19
32:22 33:1,10
33:15 34:12,19
38:22 39:16
40:6 98:12,13
98:20 99:13,19
110:2,18
134:12,23,24
135:2,7,10
136:15 137:24
138:2 146:2,11
156:25 158:11
159:1,2,16
161:3,9,11
162:18 164:19
165:3 169:7

170:11,14
171:20,24
172:2,9 173:10
173:14,21,25
174:12,21,23
175:6 176:2,3
182:22 183:4,7
183:9,23
185:13 186:16
186:19,22
187:2,14,24
188:7,9,23
189:7,12 192:7
192:10,13
193:16,24,25
198:14,23
199:11 260:4,8
260:13,18
261:14,16
262:18 268:1
slack's   172:17
slice   86:24
211:14
slight   32:13
slightly   127:20
204:4
slip   88:14
slow   210:22
248:24 250:2
small   70:10
222:4
smithville
218:17
sold   155:15
203:10 212:23
251:17

solely   40:20
133:22 134:3
244:11
solemnly   41:10
99:4 160:7
solicitous
250:4
solutions
269:20
solve   135:15
solved   158:22
solves   252:20
somebody   8:22
40:4 109:19
112:19 254:19
somebody's
9:8
somewhat
97:25 146:23
157:5
sonya   2:25
269:3,8
soon   199:6
sooner   98:7
sorry   7:18
12:21 18:5
26:18,20 29:7
33:8,8,15 36:2
41:2,6 48:22
51:9 56:22
57:5,6 59:5
68:6 76:23
81:12 83:15,17
84:12 88:6
95:8 96:17
103:21 109:7
109:11,16,25

110:13 114:13
125:23 127:25
128:2 129:24
130:24 135:1
138:1 142:1,19
143:23 144:14
159:20 160:25
169:4 182:18
186:5,17
187:20 195:19
199:11 221:15
235:15 244:1
250:1 257:1,14
267:4
**sort** 22:13,23
22:25 39:15
43:5 98:17
103:3 104:15
111:2 144:24
230:9 235:4
238:1 239:6
251:20 255:16
265:14
**sought** 31:5,6
34:24 52:17
**sound** 137:8
138:3
**sounds** 74:12
259:3
**source** 14:18
**sources** 119:23
152:16 193:12
224:4
**southern** 1:2
230:4 251:25
253:5

**space** 159:9
**speak** 41:18
73:24 153:6
162:15 201:4
243:18
**speaking** 89:9
91:21 132:6
**specific** 23:8
23:10 26:2
84:25 112:7
181:13 220:14
**specifically**
20:6 30:6
31:19,20 38:11
85:17 112:6
175:2 193:14
227:16 231:4
**speculate**
202:11
**speculative**
251:20
**speed** 222:19
222:20 237:21
260:12
**spell** 41:21
99:9
**spend** 206:18
213:11 219:6
240:20 253:15
257:21 266:3
**spending** 83:12
83:17 96:10
97:24 203:17
239:19 257:21
**spends** 235:2
**spent** 85:19
98:16 157:2

201:15 209:13
213:1 225:23
252:24 253:1
260:19 266:2
**spillover** 98:5
**spirit** 13:24
**splitting** 83:13
**spoke** 11:22
112:12 220:10
**spoken** 179:2
**spot** 41:8
**sprawling** 32:6
**spreadsheet**
115:5,7 116:4
116:8,11,13,17
116:21 120:23
121:2,5,8,10
121:25 122:15
130:16,25
131:1,2 132:20
134:15 135:22
136:1,12
139:13,16
248:9
**spreadsheets**
113:16,21,22
114:3 115:2,13
115:16 130:22
132:21 134:10
134:19 135:17
135:18 136:17
139:14
**sprinkled**
142:18,23
**sprinting**
267:21

**squelch** 84:17
**stabilization**
140:9 142:25
205:11 220:13
**stabilize**
122:23,25
123:2 139:18
**stabilized**
118:5 123:3,23
126:14 127:15
129:9 140:17
140:22,25
141:6 145:11
145:20 148:5
148:11,13,16
149:2,21 153:4
154:20 155:7
186:19 190:2
194:11,22
195:14 251:11
**stabilizing**
123:7
**staff** 43:11
139:21 200:9
**stage** 210:2
**stairs** 253:24
**stakeholders**
89:4,18
**stamp** 77:1
195:21
**stamped** 188:6
**stand** 9:23 34:9
41:8 97:13
98:21,23 159:4
159:23 198:16
216:15 221:12
224:5 236:8

256:11
**standard**  12:2
  120:5,9 125:7
  138:18
**standards**
  106:10 113:9
  163:15 164:21
  167:25 220:15
**standing**  11:10
  41:9 62:1
  160:5
**standpoint**
  15:16 34:20
  262:13
**stands**  23:13
  27:8
**stare**  9:8 40:4
**start**  6:25 9:25
  10:6 20:17
  80:22 98:8,9
  105:14 117:1
  134:8,14,20
  153:21 166:14
  197:19 226:9
  256:21,24
  258:1
**started**  59:11
  59:16,18 60:12
  60:20 68:11
  123:19 136:9
  224:11 237:7
  256:13
**starting**  23:6
  80:10 84:16
  135:25 147:9
  152:24 179:15
  194:12,19

214:15 218:25
  230:11 257:3
  257:25
**starts**  21:20,22
  76:21 107:25
  114:20 128:5
  129:18 135:4,5
  135:5 145:23
  166:13 167:14
**state**  41:15
  99:9 160:11
  179:1 195:14
  206:4,9
**stated**  62:16
  108:22 109:2
  122:2 151:9
  177:8 193:1
  196:23 236:16
**statement**  23:2
  35:19 63:22
  105:21 106:2,7
  110:24 129:22
  129:25 195:14
  231:4 234:8
**statements**
  55:14 113:11
  196:24
**states**  1:1,11
  4:3,4 11:13,16
  55:13 103:12
  107:3,6 140:2
  177:4
**stating**  218:14
**status**  7:23
  18:16 36:18
  50:19 123:4

**stay**  97:17,19
  159:5 195:18
  241:20 242:1
  253:17,18
**steady**  128:8
**step**  97:11
  117:15 158:15
  201:18 230:19
  249:10,10
**steps**  168:6
**stick**  31:16
  32:16 98:2
  166:16
**stock**  58:19
  146:9
**stop**  67:17,17
  69:15 98:2
  181:20 200:10
  201:12 208:25
  225:10 246:21
  248:14 262:18
**store**  212:22
**story**  188:19
**straight**  34:9
**strange**  177:7
**strategic**
  263:10
**strategies**
  194:13
**strategy**  89:3,6
  89:12
**streamline**
  10:25
**streams**  77:12
**street**  3:14
  112:18 183:2

**strenuously**
  14:22
**stressing**  65:20
**stretch**  193:18
  266:15,17
**stretto**  2:13
  70:22,24 81:8
**stricken**  20:9
**strike**  19:6
  20:7 22:18
  51:9 83:6
  111:2 114:1
  172:5
**strikes**  22:24
  164:8
**strong**  9:17
  187:7
**struck**  65:10
**structure**  33:2
  73:24 116:1
  177:17 238:7
**stuck**  265:22
**stuff**  90:24
  143:24 203:22
  248:24 253:21
**stuff's**  197:2
**subcon**  209:22
  229:19 250:15
  253:7,8
**subject**  31:21
  60:10 71:24
  94:13 112:2,5
  113:13 118:12
  120:25 133:9
  140:22 154:15
  154:15,25
  155:6,22

166:23 225:18
226:19
**submission**
19:20
**submit** 16:17
38:17 40:14
216:24 237:25
**submitted** 17:7
17:20 20:19
38:13
**subscribe**
206:16
**subscription**
149:12
**subsection**
59:8
**subsequent**
38:3
**subset** 101:8
221:22
**subsidiaries**
71:21 72:11,15
72:18 73:9,13
74:17
**substance** 8:16
23:20 34:5
48:10
**substantial**
87:23 88:1
**substantially**
97:2 229:9
**substantive**
207:21
**substantively**
229:17
**subtract** 234:4

**sudden** 24:23
**suer** 99:10
**suffer** 58:4
91:22 212:4
214:1
**sufficient**
138:21,23
200:4 209:18
211:4 232:11
**suggest** 119:17
200:19
**suggested** 8:1
8:10
**suggesting**
119:20 211:7,8
230:14
**suggests** 103:4
246:25
**suit** 160:5
**suite** 269:22
**summarized**
111:15
**summarizes**
107:1
**summon**
267:10
**suntrust** 237:8
**super** 103:5
**superpriority**
91:16 219:10
**supers** 133:14
203:19
**supplement**
34:8 186:12
**supplemental**
17:16,21 33:14
33:16 34:13,14

35:18 38:17
39:1,2,6 40:21
51:14,18 61:14
73:21 105:12
136:22 204:5,7
207:17
**supplementing**
17:10 31:15
**support** 28:14
33:5 38:17
105:20 106:7
137:18,19
138:19 139:7,8
139:10 187:18
201:25
**supported**
174:10 258:3
**supports** 17:11
**suppose**
156:20
**supposed**
38:22 90:22
171:6
**surcharge**
205:1,16
213:18 219:9
219:11,14,16
219:17
**surchargeable**
204:1 207:2
209:3 212:2
216:21 218:7
256:12
**sure** 11:15 12:3
21:13 27:4
29:22 32:16,21
36:5 47:6 48:2

61:2 63:4
77:10 78:20
79:24 80:4
99:23 106:24
110:1 114:13
120:9 121:20
124:15 132:24
132:25 136:25
138:6 140:11
143:17 144:3
145:24 146:11
162:15 164:20
165:1 170:20
170:22 178:16
186:11 188:16
195:25 203:13
203:20 211:5
211:17 220:6
224:18 229:22
230:15 247:13
267:8,16
**surf** 218:8
**surmise** 173:20
**surprise** 10:5
69:24,24 126:3
126:8
**surprised**
120:14
**surprising**
228:23
**surprisingly**
228:22
**survey** 131:8
192:18,19,20
192:21 193:15
**surveys** 147:14
147:20 148:4

148:23 149:1
191:21,22,24
191:25
**suspenders**
204:12
**suspicion**
246:16
**sustain** 31:22
31:25 74:1
75:9 87:10
170:7
**swear** 41:10
99:4 160:7
**sweep** 49:14
256:2
**swept** 254:21
**sworn** 33:6
**system** 2:3,4
42:8 48:18,23
49:12 93:15,19
186:23 256:1

**t**

**t** 5:14 269:1,1
**t's** 218:8
**tab** 44:9 52:11
53:13 56:14,22
59:25 72:6,22
72:24 74:21
75:14,17 76:11
84:21 85:11
92:7 95:3,4,13
109:8 119:5
**table** 97:13
217:12 223:23
**tabs** 8:24
**tacked** 265:10

**tactic** 255:13
**tagging** 236:9
**take** 15:24
24:25 29:19
32:19 39:17,19
58:4 59:25
82:21 86:2
89:25 91:18
93:20 97:22
130:4 143:10
143:12,12
145:8 146:8,22
154:10 158:12
159:7,11
160:22 175:22
176:4 179:11
184:24 185:21
189:9 190:13
191:6 198:16
198:22,22
199:8,16 206:3
210:2 211:12
212:18 216:7
216:13 217:11
221:23 222:1
222:19 224:25
230:19 231:10
234:3 252:1
260:20 265:1
265:19 267:20
**taken** 12:8
69:14,21
173:15 214:11
223:3
**takes** 161:7
**talk** 11:4 12:12
18:15 39:22

61:15 84:10,16
85:2 102:3
117:19 133:17
133:18 140:15
144:17 146:25
150:9,12
158:12 199:4
201:13,24
202:3 230:23
249:2 265:1,5
**talked** 10:24
66:18 88:25
96:7 175:7
192:17 204:16
236:24 250:2
259:9,21 260:2
265:17
**talking** 8:16
16:2 20:22
21:1,24 62:2,3
63:3 85:19
96:10 99:17
114:3 129:1
136:16 139:5
139:13 143:17
166:9 167:9
170:3,4 197:12
201:12 206:11
222:5 225:23
229:4,16 238:5
248:14 249:2
253:3 265:12
**talks** 52:12
77:25 78:4
168:17 217:14
231:13,22
232:8 235:23

261:19 264:20
**tapped** 266:9
**targeted**
173:23
**task** 180:3
**tax** 203:21
215:13 230:20
230:23,24
231:2,11,14
232:7 237:25
254:9 256:7,9
257:23 258:24
264:11
**taxes** 50:4
145:25 196:22
196:23 206:4
215:7,23
216:20 218:12
232:13 255:4,5
**team** 39:20,22
76:17,22 77:5
194:21 199:21
205:6
**tee** 38:6
**teeny** 160:4
**tell** 23:4 32:24
44:8 71:9
73:10 86:3,3
86:11 87:19
90:22 95:11
98:7 188:14
207:13 246:22
263:19 265:20
266:6
**telling** 13:19
84:5 89:1
240:6 256:20

| | | | |
|---|---|---|---|
| **template** 135:3 | **testify** 61:23 | **thank** 6:11,21 | 262:19,23,23 |
| 157:21 | 221:5 255:21 | 6:23 8:13 | 263:2 265:3 |
| **templates** | **testifying** | 11:12 12:22 | 267:1,2,11,17 |
| 134:16 | 100:16 220:20 | 15:4,25 20:13 | 267:19,22,23 |
| **temporarily** | **testimonial** | 25:14 40:6,7 | 267:25 268:1,2 |
| 40:8 | 42:13 | 40:25 41:1,2 | **thankfully** 7:9 |
| **ten** 39:17 200:5 | **testimony** 8:11 | 41:14,24 42:4 | **thanks** 6:2 |
| **tenants** 49:12 | 10:6 17:2,6,20 | 42:5 43:2,9,13 | 20:14 26:4,20 |
| 50:13 126:19 | 25:12 30:19 | 43:23 44:3 | 28:2 40:18 |
| 141:7 142:25 | 32:10 34:6 | 48:14 56:19 | 41:1 42:25 |
| 205:8 237:2 | 35:21 37:7,10 | 59:9 60:5 70:3 | 43:12 89:23 |
| **tentative** 23:22 | 38:7 41:10 | 80:15 91:6,9 | 97:7 99:2,12 |
| **term** 100:22 | 42:8,15 47:8 | 92:3 93:13 | 99:20 110:4 |
| 102:3 133:24 | 48:1,4 52:18 | 94:4,4,16 97:6 | 143:23 146:24 |
| 143:2 254:15 | 64:12 65:8 | 97:11,16 99:8 | 158:10 160:2 |
| **terms** 20:18 | 66:12,13,15,16 | 100:3,11 | 176:2 198:19 |
| 48:4 157:13 | 66:19,22 67:8 | 105:10 110:3 | 219:2 220:8 |
| 216:19 241:3 | 67:9 80:16 | 110:14 118:22 | 226:3 248:19 |
| 257:15 259:7 | 91:3 96:22 | 125:1 130:18 | 248:21 260:12 |
| 259:17 | 97:11,16 99:4 | 135:25 136:7 | 262:20 264:25 |
| **test** 117:11 | 99:15,22,24 | 139:16 140:18 | **theirs** 9:14 |
| 261:20,25 | 101:1 135:14 | 143:16 147:7 | 264:16 |
| **tested** 22:23 | 136:22 147:1 | 153:24 157:8 | **thick** 8:24 |
| 261:13 | 159:4 160:7 | 158:8 159:3,3 | **thin** 262:13 |
| **testified** 47:24 | 161:7,7 163:14 | 159:6,12 | **thing** 7:1 31:17 |
| 48:16 51:24 | 174:14 179:15 | 160:14,23 | 41:17 55:7 |
| 61:25 62:9,18 | 179:16 190:10 | 162:16 165:2 | 90:15 124:20 |
| 63:20 67:21 | 198:17 201:18 | 169:11 173:18 | 135:21 146:13 |
| 68:2,3,23 | 203:19 205:20 | 174:21 185:12 | 164:9 177:23 |
| 69:25 79:5 | 206:25 208:24 | 188:8 189:10 | 178:4 185:17 |
| 86:21 87:5 | 210:15 220:10 | 194:1 195:1 | 191:16 208:23 |
| 95:25 157:14 | 221:2 235:21 | 198:13,15,17 | 236:10 241:5 |
| 167:22 213:14 | 236:20 243:5,6 | 199:9 200:12 | 260:25 263:25 |
| 227:11 243:12 | 261:11,18 | 201:14 218:19 | **things** 7:6 34:3 |
| 258:4 260:25 | 262:9 | 225:3 226:2,4 | 41:17 82:18 |
| 261:7 262:7 | **text** 120:20 | 242:19 248:16 | 97:22 112:1 |
| | | 260:11,13 | 140:16 147:15 |

152:6 167:24
175:16 176:11
177:17 180:7
187:11 189:9
191:23 193:3
210:1 213:21
217:11,15
225:4,12
237:15 241:2
243:22 247:10
251:12 252:3
257:15 263:6
**think**   6:6 7:17
7:24,25 8:1,13
9:11,18 10:3,4
10:24 11:3
13:12,23 14:8
14:22 16:20
18:9,13,14
19:7 22:7,24
22:25 23:11,14
23:19 24:1
25:21 26:8
31:21 32:1,6
33:19 34:5
35:13 37:12
38:8 40:13,20
41:3 50:21,21
51:13 52:15
61:14 62:15
63:11,12 66:2
67:15 69:10
73:21 74:19
78:19 79:22
81:8,15 82:7
84:7 85:24
86:21 87:10

90:2,6,15
91:24 95:5,10
98:12,13
100:25 108:7
109:15 110:18
110:20,25
111:1 112:19
121:3,19,19
134:18,18,23
134:25 135:2,2
136:11,17
139:22 141:17
144:4,23
154:14 156:7
157:1,1,4,5,23
160:18,25
161:3,5 167:22
171:23,24
172:17 173:3
173:19 174:18
174:25 175:11
175:23 176:16
178:2,7 179:18
180:9,14
181:20 182:12
183:18 185:16
186:12,16
187:2,8,11,15
189:9,17 190:9
192:12,19
193:3,4,10,10
193:13 196:8
198:25 199:5
199:14,15
200:2,23 201:5
201:18 202:4,4
204:19 207:20

207:24,25
208:1 210:21
211:3,8,11
212:2 216:14
216:15,17
217:24 218:19
219:7,19
220:10,16
221:11,18
222:2,5,7
223:13 225:13
225:23 226:12
229:4 230:19
236:13,14
237:4 238:6,8
239:9 240:8,14
241:25 242:17
243:7,22
244:10,23
246:7,8,16
248:8,13,15,22
248:23,24
249:15 252:25
254:6 255:5,6
255:13 256:20
257:6 258:23
260:19 261:1
261:16 262:10
262:14,15
263:20 264:9
265:6,8 267:6
**thinking**   12:9
45:8 160:2
**thinks**   23:9
225:20 231:1
**third**   13:7
54:17 92:25

93:2,11 95:13
96:7 107:19
144:24 178:4
192:3 205:5
212:13 237:9
**thirds**   181:17
**thirty**   80:11
**thorny**   15:1
**thought**   19:15
165:1 197:8
228:20 229:25
255:12
**thousand**
118:16,18,19
233:21
**threats**   224:23
**three**   7:9 10:4
13:10 21:25
23:2 24:1
25:19 66:9
68:15 81:16
94:21 112:3
115:9,15 144:9
164:18 165:4
177:17 179:5,7
181:18,18,23
181:25 182:7
188:22 195:5
205:24 206:15
207:3 232:3
243:3
**throw**   90:23
**thumbnail**
204:22,22
**tidy**   90:22 91:1
**tie**   97:19
174:11

| | | | |
|---|---|---|---|
| **ties**  187:20 | **times**  101:20 | **told**  46:25 61:4 | **totality**  208:3 |
| **tight**  120:15 | 120:14,16,16 | 69:4 85:24 | 213:22 |
| 263:1,5 | 142:14 190:10 | 89:19 98:1 | **totally**  188:18 |
| **time**  21:3 | 196:21 243:25 | 102:2 151:3,16 | **totals**  126:23 |
| 28:12 30:9 | **timing**  20:18 | 158:16 162:3 | **touching**  18:13 |
| 31:11 33:22 | 78:17 97:23 | 180:17 200:18 | **toured**  101:19 |
| 38:8 45:3 | 121:6 238:6 | 210:17 255:20 | 154:16 |
| 59:12 60:17 | 266:2 | 265:7 | **towards**  16:16 |
| 65:3 82:5 83:2 | **title**  119:15 | **tomorrow**  98:1 | 45:8 89:18 |
| 83:12 85:19 | **titled**  92:24 | 98:4 199:1 | 119:24 162:17 |
| 86:1,4,8 94:1 | **today**  6:13,17 | 201:3 265:8,15 | 220:3 |
| 98:16 100:13 | 6:18 11:17 | 267:14 | **towne**  237:8,9 |
| 100:16,19 | 16:22 20:22 | **tomorrow's** | **track**  26:20 |
| 101:17 102:22 | 25:22 28:25 | 267:15 | 93:22 150:6 |
| 116:22 119:22 | 30:18 38:15 | **tone**  103:4 | **tracks**  148:8 |
| 121:7 123:1 | 49:25 50:10 | 222:19 | **traction**  25:10 |
| 126:18 134:7 | 62:2 66:16,20 | **took**  16:21 | **traded**  224:14 |
| 134:14 135:21 | 86:4 97:16 | 20:18 46:21 | **trained**  187:6 |
| 145:8,14 146:9 | 98:3,9,13 | 69:8 79:15 | **transactions** |
| 146:20 155:10 | 102:8 146:16 | 100:23 131:22 | 149:14 192:24 |
| 157:2 158:14 | 148:19 159:4 | 147:10 196:17 | 263:10 |
| 173:24 200:17 | 179:1 180:12 | 196:19,20 | **transcribed** |
| 201:2,9,10 | 190:10 198:24 | 197:8,16 | 2:25 |
| 203:11 209:13 | 201:12 206:25 | 244:15 262:4,5 | **transcript** |
| 210:1 213:24 | 208:18 209:8 | **top**  53:21 | 38:20 47:11 |
| 219:1 223:18 | 210:7 212:3,9 | 57:12 114:8,17 | 48:7 76:25 |
| 225:20,23 | 213:6 222:14 | 128:1 129:15 | 80:2 84:11 |
| 226:1,7 240:18 | 224:5 226:16 | 147:24 148:6 | 173:20 269:4 |
| 241:7 242:13 | 226:18 243:5 | 162:9 175:12 | **transfer**  93:24 |
| 245:8 254:8 | 246:2 | 176:19 183:1 | 206:4,5 212:8 |
| 260:19 264:24 | **today's**  11:1 | 238:10 264:23 | **transferring** |
| 265:10,11 | 36:8 53:17 | **topic**  22:14 | 228:8,10 |
| 267:5 | 263:15 | 68:16 | 235:12 |
| **timeline** | **together**  68:15 | **topics**  78:16 | **transition** |
| 120:15 | 104:16 105:7 | **total**  78:25 | 242:13 |
| **timely**  218:1 | 213:5,18 238:2 | 102:10,24 | **translates** |
| | 251:12,14 | 103:7 126:17 | 19:11 |

**translating**
  256:19
**transparently**
  236:1
**trash**  90:24,25
**treated**  11:18
  215:8
**treatment**
  215:13 238:17
  238:18 258:24
**trended**  196:25
**trial**  209:21
**tried**  156:16
  175:12
**trouble**  233:10
**true**  47:23
  59:11,15 66:3
  125:10 145:14
  146:16,18
  175:7 177:19
  177:24 179:23
  192:15 202:20
  234:6 249:6
  254:18 255:19
  256:10 260:22
  262:6 263:11
  269:4
**truly**  16:5
**trust**  3:21
  42:23 49:19
  232:19 255:2,2
  257:22
**trustee**  4:4
  11:13,16
  223:10,10
  255:21

**trustee's**  11:9
**truth**  13:16
  14:9,10 29:21
  41:11,12,12
  99:5,6,6 160:8
  160:8,9
**try**  8:22 13:19
  40:5 98:13
  99:1 133:22
  146:6 187:7
  205:5 226:7
  227:7 242:22
  248:7 257:16
  267:7
**trying**  10:25
  16:25 17:4
  30:23 67:5
  68:14 87:4
  109:13 134:18
  135:13 136:23
  203:17 220:1
  222:18 242:8
  248:14 261:5
**tuesday**  266:22
**tune**  230:25
**turn**  7:17
  15:19 17:23
  28:9 44:9,11
  56:25 57:10,19
  75:14 84:21
  85:11 92:7,22
  94:25 95:4
  98:18 103:14
  104:2 107:15
  114:6 115:18
  119:5 120:19
  121:21 127:2

  143:8,9 145:7
  164:17 166:12
  174:1 176:20
  181:15 184:5,9
  184:20 188:14
  189:25 195:1
  195:18 196:4
  207:14 214:7
  226:8 237:19
  260:8
**turned**  95:1
**turning**  56:20
**turnover**
  124:22
**turns**  212:23
**twenty**  232:3
**two**  6:17 9:13
  21:21 22:10
  26:2 43:20
  46:22 68:12,14
  68:14 78:22
  93:5 94:22
  106:24 107:23
  117:13 126:24
  127:17,21,25
  128:2 133:14
  140:23 141:4,8
  143:1,14,17,19
  144:7 148:23
  149:1 158:12
  172:24 178:10
  178:12,13
  181:17 185:4
  193:3,16
  196:15 201:18
  202:8 212:3
  217:15,15

  222:2 224:17
  234:11,22
  235:23 241:2,3
  260:14 262:22
  264:18
**twosies**  251:8
  252:2
**type**  107:8
  236:25
**types**  45:20
  154:21
**typical**  125:2
  133:2 157:13
  181:25 185:3
  216:6 254:15
**typically**  125:4
  141:21 166:1
  175:20 239:23

---

**u**

**u.s.**  1:23 11:9
  42:7 223:9,10
  255:21
**ultimately**  89:2
  129:18,19
  145:2 198:6
  218:18
**unable**  145:24
  146:17
**unchanged**
  121:10
**uncharitable**
  236:14
**under**  11:17,21
  17:8 54:5
  75:13,20,23
  91:8,25 106:15
  117:20 118:6

| | | | |
|---|---|---|---|
| 128:4 137:3 | 242:16 254:1 | **united** 1:1,11 | 113:7,14 117:8 |
| 146:24 147:5 | 265:11 | 4:3,4 11:13,16 | 117:10 118:4 |
| 151:24 152:5 | **understanding** | **units** 124:22 | 119:17 120:3 |
| 152:19,19 | 27:19 29:24 | 125:12 126:16 | 123:1 124:21 |
| 164:5,11 | 50:20 63:15 | 126:18 129:8 | 125:7,10 |
| 165:25 168:25 | 64:16,17 94:9 | 140:22 142:15 | 127:18,19 |
| 175:15,15 | 132:14 138:22 | 148:14,16 | 131:10 133:2 |
| 176:10,10 | **understands** | 149:21 153:4 | 134:7,16 |
| 201:23 204:12 | 138:6 | **universe** 222:3 | 135:22 137:4 |
| 212:7 213:19 | **understood** | 257:16 | 139:15 141:22 |
| 216:18 227:2 | 64:6 84:6 | **unjustified** | 152:4,12,16 |
| 237:17 249:9 | 139:15 | 22:16 | 155:5 157:16 |
| 259:18 | **underwrite** | **unknown** | 157:22 158:4 |
| **underlie** | 123:22 133:16 | 62:11 221:22 | 163:18 168:3,6 |
| 133:19 | **undisputed** | **unquestiona...** | 169:15 175:2,8 |
| **underlying** | 205:23 232:15 | 250:13 | 180:18,24 |
| 14:15 107:8 | **unencumbered** | **unreasonably** | 181:3 188:11 |
| **underneath** | 241:9 | 39:24 | 189:11 191:15 |
| 77:19 147:11 | **unenthusiastic** | **unrelated** | 192:18,19 |
| **undersecured** | 25:3 | 88:12 | 198:6 201:16 |
| 198:7 | **unfairly** 32:6 | **unsettled** | 202:23 203:12 |
| **understand** | **uniform** | 62:11 | 204:8,23 |
| 6:6 12:19 | 106:10 163:15 | **upcoming** | 206:19 208:10 |
| 21:24 26:11 | **unimpaired** | 140:25 | 215:1,24 |
| 35:14 38:24 | 7:10 | **update** 77:10 | 216:20 218:9 |
| 41:16 51:4 | **union** 183:2 | 122:18 135:22 | 222:9 226:23 |
| 56:2 61:19 | **unique** 129:19 | **updating** 121:8 | 227:1 229:18 |
| 75:4 83:15 | 130:7,11 | 136:1,3 | 231:3,6 233:11 |
| 85:7 108:22 | **unit** 124:21 | **upper** 122:2 | 233:11 234:8 |
| 109:2 126:6 | 125:2,7,11,25 | **upside** 257:7 | 238:19 241:4 |
| 130:14 131:12 | 126:4 139:23 | **urge** 187:7 | 242:12 243:15 |
| 134:1 135:25 | 139:23 142:5 | 260:12 | 249:22 256:7,8 |
| 137:3 139:16 | 155:25 156:2 | **use** 2:8 28:15 | 256:16 257:15 |
| 142:2 143:24 | 186:6,14,15,22 | 31:6 35:5,11 | 260:2 264:13 |
| 150:12 156:20 | 197:5 261:3,8 | 38:2 46:4 50:1 | 264:17 265:7 |
| 161:6,6 181:13 | 261:12 | 54:22 58:25 | **used** 19:24 |
| 194:17 216:6 | | 89:2 108:9,24 | 22:4,17,21 |

85:25 86:2
102:4 107:8
108:2,17
122:22 123:15
123:20 124:24
125:21 126:3
129:3 144:13
180:21 182:7
184:21 185:18
185:24 186:2,8
187:12 190:20
190:21 191:13
191:20 192:20
193:13,13
196:22 218:16
230:23 245:3
255:5
**user** 113:8
157:23 158:4
**users** 109:3,3
**uses** 107:2
113:9 202:14
204:13
**using** 2:2 24:12
117:5 134:11
138:14 155:5
183:12 185:14
197:10,11
211:5 217:16
217:17,17
234:19 238:22
249:3 256:7,8
**uspap** 106:12
106:15,24
107:20,21
113:6 137:3,7
137:9 138:18

163:8,11,14
164:5,11,12,15
164:21,23
165:25 168:24
168:25 169:2,6
169:9,10,22,23
169:24,25
170:1,17 171:4
171:7,10
172:13 175:5
**usually** 120:15
239:24
**utilities** 145:25
217:20,22,24
218:1 266:5
**utility** 253:3
**utilized** 127:9

| **v** |
|---|

**v** 233:1 234:15
237:8
**v&cl** 127:10,14
127:15 128:15
130:1 132:7
**v&cls** 129:22
**vacancy**
126:10,16,20
127:4,8,21
128:7,10,15,22
129:1,5,10,20
130:5 132:3
180:25 184:10
184:14 190:17
192:6
**vacant** 126:16
126:18 129:8
**valid** 202:1
206:23

**valley** 230:5
**valuable** 223:8
**valuation** 8:5
14:1 21:25
24:16 62:3
108:18 113:3
116:17,25
117:18 121:10
121:25 136:4
156:9 177:9,12
177:13,18,20
182:1 183:1
194:20 195:20
203:5 227:7
**valuations**
8:16 22:20
24:12 101:5,11
101:16 113:10
115:7 134:7
167:4,11
221:12
**value** 21:17
89:18 107:3,3
107:5 108:4,17
115:13 116:6
116:19 117:14
117:16,16
118:5,7,11,14
118:19 122:10
123:6,21
130:13 131:10
131:15,20
133:3,5 135:23
135:24 152:21
155:5,25 156:8
156:10 157:24
165:24 166:2,6

166:23,25
167:5,6,25
168:9,22,23,24
168:24 169:1,2
169:5,8,9,10
169:18,22
170:2,4,16,19
171:11,15
172:3,11,14,15
172:22,25
174:3,5,7,8,20
175:1,2,3,3,4,4
175:5,8,11,14
175:17,19
176:7,17
177:14,24
178:1,3,11
194:18 197:17
202:9,10,11,15
205:12,19,22
206:10 210:3
210:18 214:9
217:19 220:18
220:18,19,25
221:3 251:11
251:13 252:2,5
252:9,14,15
258:4,4,6,7
259:7 261:12
263:8,9,17
**values** 8:6 14:5
14:10 105:23
105:24 108:10
113:18 116:4,8
116:21 117:4,8
118:25 120:7
120:12,13,17

| | | | |
|---|---|---|---|
| 120:23 121:8 | 162:3,9 175:17 | 66:21 67:18 | 261:17 262:8 |
| 122:7,14 123:9 | 176:8 210:16 | 70:6 72:6 | 263:6,14,19,25 |
| 130:8,19,23 | 246:16 252:20 | 76:10 77:14 | 264:11 265:1 |
| 132:18 145:3 | **viewed**  214:12 | 78:16,18 85:2 | **wanted**  11:24 |
| 145:10 156:6 | **views**  113:18 | 87:7 89:17,24 | 65:10 77:9 |
| 178:15 198:4 | **visited**  178:22 | 89:25,25 90:6 | 102:2 111:20 |
| 212:3,4 244:21 | 179:5,7 | 90:13,22 91:12 | 115:11 121:6 |
| 245:18 | **visits**  179:9 | 91:18 97:12 | 159:17 163:4 |
| **valuing**  24:6 | **voice**  103:4 | 98:2,7 103:5 | 165:1 205:23 |
| 136:9 | | 110:1 126:6 | 216:17 246:8 |

| w |
|---|

| | | | |
|---|---|---|---|
| **variable**  130:6 | **w**  3:8 | 136:25 142:21 | 253:12 255:7 |
| 173:5 | **wait**  9:22 | 144:3 146:7 | 267:12 |
| **variables** | 19:19 31:23 | 160:16 164:20 | **wanting**  142:2 |
| 130:14 | 87:1 202:18 | 165:19 168:15 | 198:24 |
| **variance** | 207:4 255:13 | 169:14 170:22 | **wants**  12:14 |
| 253:19 | 255:17 256:6,6 | 170:24 173:12 | 14:7 32:17 |
| **varies**  132:5 | 256:6,19 | 173:24 186:11 | 34:9 158:17 |
| **variety**  154:21 | **waiting**  42:11 | 188:16 191:16 | 193:18 199:23 |
| **various**  49:5 | 68:4 265:23 | 194:16 198:21 | 204:10 212:15 |
| 89:15 121:4 | **walk**  50:13 | 198:22,23,25 | 251:1 |
| 122:24 148:1 | 211:22 217:10 | 199:2,6,6,7,8 | **warm**  91:12 |
| 152:25 160:21 | **walking** | 199:15,16,25 | **warning** |
| 190:10 235:25 | 240:23 253:24 | 200:2,6,10,25 | 169:16 |
| 244:17 | **walks**  213:15 | 201:1,2 207:9 | **warrants**  58:1 |
| **vary**  133:12 | **walkthrough** | 207:10,12,13 | **washington** |
| **vast**  255:24 | 262:14 | 207:22 208:13 | 3:15 |
| **vc**  190:15 | **want**  8:14 | 210:20 213:25 | **waste**  173:24 |
| **vehicle**  17:14 | 10:15 11:18 | 216:7,11 | **wasting**  217:24 |
| **vendor**  223:7 | 12:15 13:14 | 217:10 220:7 | **watch**  43:1,5 |
| **verify**  149:23 | 19:5 20:5,8 | 222:15,21 | **watching** |
| 150:3,14 | 23:5 24:25 | 223:13 226:9 | 42:10 |
| **veritext**  269:20 | 25:6 28:24 | 228:12,12 | **water**  50:9 |
| **versus**  86:5,9 | 29:22 34:1,2 | 234:9 238:6 | 82:24 160:19 |
| 94:7 150:5 | 34:10 35:1 | 240:19 248:10 | 203:20 213:25 |
| 206:8 212:4 | 36:5 39:21,23 | 249:14 250:3,9 | 214:1,2 |
| **view**  13:8 14:3 | 39:24 43:6 | 251:12,17 | **way**  8:1,14 |
| 14:6 15:1,9,13 | 48:9 55:8 | 252:12 257:12 | 18:24 23:7 |

| | | | |
|---|---|---|---|
| 25:16 34:5 | 209:10 210:9 | 88:12 236:6 | **withdraw** |
| 41:7 49:11,11 | 210:10,13 | **weill** 70:17 | 133:21 |
| 55:11 71:13 | 222:12 223:3 | **weinberg** | **withdrawing** |
| 75:13 82:21 | 223:21 225:7,9 | 120:2 | 12:20 68:18 |
| 85:25 87:13 | 225:15 226:9 | **weinberger** | 113:2 |
| 98:24 105:14 | 226:13 241:6 | 47:24 119:7,9 | **withdrawn** |
| 110:13 144:6 | 242:5 244:24 | 119:16,20 | 13:7,9 27:1,10 |
| 144:11 145:17 | 248:22 250:19 | 120:5,10,22 | 102:21 120:1 |
| 170:22 173:6 | 259:24 | 121:2 | 126:2 |
| 174:2 179:20 | **weather** | **welcome** 14:23 | **witness** 5:3 |
| 181:17 182:9 | 198:18,19 | 91:25 97:17 | 6:20 10:9 25:8 |
| 183:22 184:6 | **wednesday** | 98:22 159:4,5 | 25:11 26:5 |
| 192:20 204:10 | 20:22 | **went** 36:22 | 30:17 36:20 |
| 215:15 221:23 | **week** 20:22 | 66:9 68:23 | 41:8 42:2 |
| 222:2 227:13 | 38:18 59:19 | 69:2,5 216:18 | 43:21,24 44:1 |
| 235:19 236:15 | 60:10 81:2 | 219:9 233:20 | 52:10 56:20 |
| 239:9,10,22 | 83:2 89:20 | 235:7 | 60:3 61:23 |
| 241:24 242:4 | 194:12,19 | **whatsoever** | 63:14 65:19 |
| 251:12 254:22 | 266:8,22 | 202:11 243:11 | 66:6 69:20 |
| 256:10 262:1,1 | **weeks** 59:22,24 | **when's** 266:13 | 74:21 77:3 |
| **ways** 19:6 | 70:12 81:15 | **whichever** | 83:17 84:12,14 |
| 255:16 | 215:24 233:20 | 204:10 | 87:5 95:6 |
| **wayside** | 233:24 257:17 | **whisper** | 97:13 98:20,23 |
| 189:10 221:10 | 266:1,8 | 158:16 | 100:14,18 |
| **we've** 6:7 | **weighing** 25:1 | **wide** 77:20 | 101:15,21,25 |
| 26:19 50:20 | **weight** 14:21 | 140:1,3 158:20 | 102:9 103:7 |
| 72:3 89:8,9 | 26:4 151:7 | 221:13,19 | 105:2,6 118:20 |
| 91:13 94:2 | **weil** 3:3 6:15 | **wiener** 115:21 | 118:23 134:14 |
| 99:13 131:22 | 7:2,6,21 66:11 | 115:23,24 | 135:6 137:25 |
| 136:7 146:3 | 81:7 85:3,7,20 | 264:8 | 138:6,10 142:8 |
| 157:2 163:14 | 86:4,16,24 | **willing** 263:16 | 142:13,24 |
| 170:12,13 | 87:16 88:9 | **win** 221:23 | 143:10,15,20 |
| 178:2 187:3,8 | 101:23 102:5 | 222:1 | 143:22 146:5 |
| 187:15 190:9 | 107:18 189:9 | **windows** | 159:7,8,13 |
| 190:18 192:11 | 237:2 | 202:25 | 160:23 169:5 |
| 202:16 204:15 | **weil's** 85:16 | **wit** 196:11 | 172:23 173:8 |
| 204:19 209:6 | 87:6,23 88:2 | | 173:19 174:25 |

| | | | y |
|---|---|---|---|

176:1 185:11
188:21 189:6
193:22 243:16
**witness's**  23:3
96:3
**witnesses**  6:18
10:5 28:4
38:23
**wl**  17:17,19
**wolf**  234:15
**woman**  90:9
**wonderful**
7:10 90:25
**wondering**
240:3 267:5
**word**  19:6,24
85:24 86:2,2
119:17 129:18
139:15 145:23
160:19 181:11
183:1 188:11
245:2
**wording**
239:17
**words**  12:11
22:20 26:13
27:15 32:12
61:17 65:3
96:11 114:20
138:14 176:4
237:10
**work**  7:5,11
18:24 21:16
23:13 24:5,9
24:11,16,19,24
76:1,6 77:12
78:10 79:7

83:12,18 86:8
87:7 89:10
94:7 99:14
101:12 106:13
107:6 112:25
113:3,6 117:1
119:2 131:5,6
131:7,9,12
132:21 133:18
133:18,19,20
133:22 134:1
134:15 136:7
136:21 137:5
137:17 138:19
138:22,23
139:5,9,12,14
139:15 144:13
168:8,17
178:24 181:19
181:21 188:11
189:16 194:23
200:21 204:3
221:7 243:20
261:24 265:10
**worked**  7:7
38:6 140:24
141:23,24
144:7 253:7
**working**  6:22
7:9 41:2 59:18
59:21 77:20
84:7,7 89:11
89:15,17
116:17,21
180:3 194:12
243:13,18

**workload**
83:14
**workout**  78:2
**works**  7:2
116:1 119:10
136:21 142:2
**workstreams**
77:16 78:14
**world**  256:14
**worried**  111:3
**worse**  40:3
198:20 216:10
**worth**  143:6
**wrap**  200:16
242:23
**wrapping**
221:13
**wrestling**
231:20
**write**  120:25
181:24
**writing**  119:16
**written**  34:7
252:4
**wrong**  13:20
20:16 34:13
65:22,22 97:24
167:6 208:15
234:15 256:3
**wrote**  77:7
115:20

| x |
|---|

**x**  1:4,10 5:1,14
26:14

**y**  26:14
**yeah**  8:13 10:3
10:17 11:6
15:21,22 18:23
19:21,22 20:2
21:10 22:6
26:22 28:8
29:23 32:17
33:13 37:16,16
38:1,1 39:11
39:18,18 42:19
47:9 48:2
52:15 62:5,14
63:8,12 65:11
65:14,14,24
68:4 74:10,10
75:4,6,9 79:3
79:24 80:2
81:20 83:8
87:3 88:7
89:10 90:5
95:17,24
109:13,25
110:24 115:11
132:16 135:8
135:12 136:19
136:24 138:4,5
139:15 141:19
146:11 159:20
160:20 170:18
173:22 174:13
174:25 176:9
183:15 187:19
189:1,2 190:8
193:10 197:20
198:21 199:13

200:1,7,7,9,25
207:8 208:13
211:13 219:22
224:24 229:22
231:25 232:5
239:25 244:10
246:12 247:5
247:23 248:1,4
248:10 249:13
250:3,15 254:7
257:12 258:15
258:20 259:2
260:6 264:16
266:6,13
267:15
**year**  24:12
46:4,12 50:13
82:17 116:7
121:18 140:21
140:23 141:1,4
141:4,8,8
142:7,17,23
143:1,1,1,11
143:11,14,14
143:17,19
194:10
**year's**  143:6
**years**  24:7,20
101:2 132:2
134:6,11 136:8
136:17 243:14
253:9
**yep**  147:16,16
159:21 161:5
211:24
**yesterday**  6:25
8:1,21 38:10

**yield**  177:1
196:11 197:24
198:1
**yields**  118:5
**york**  1:2,13 3:6
3:23 4:6
128:12 148:24
149:1 178:25
179:24 180:1
189:24 194:7,8
194:23 205:7
205:10 206:9,9
251:11,25
**yorkers**  84:16

**z**

**z**  26:14 99:11
**zarasai**  71:19
72:11 73:8,24
74:18 84:2
85:8 101:1,5,8
101:12,17,21
101:24 103:10
104:16,19
105:1,7,8
113:5 116:7,9
116:11 117:5
119:1,2 120:12
131:1 243:13
243:23 244:4
244:11 263:22
**zarasai's**  71:20
**zell**  5:7 6:19
9:15,18 10:1,1
10:9,13,19
12:13,14 15:6
15:23 16:9
17:4 19:4 22:4

22:8 23:12
24:5 25:22
98:21,22 99:3
99:7,10,10,21
99:23 100:6,8
100:13 103:10
103:18 105:10
105:10 106:10
111:6 112:25
115:20 118:6
120:21 134:25
135:2 144:2
146:25 147:5,9
156:11 157:7
159:3,7 180:9
184:18 185:14
185:24 186:8
187:12 190:21
191:13,23
192:14,24
193:2,5 196:18
222:17 244:15
244:19,25
245:2,13 258:4
259:8 260:19
**zell's**  15:12,18
16:4,15,19,21
17:12,22 20:18
21:15,19 22:20
23:10 24:4,19
99:17 167:4,11
171:18 172:16
180:8,18,24
181:3 184:16
187:18 192:17
192:22 211:15
220:10 221:12

243:8 245:18
246:6
**zelle**  210:23
**zero**  65:23,25
66:6,14,21
67:9 216:17
230:11 233:19
233:20 255:16
255:18 257:25
**zone**  158:16
250:23
**zoom**  42:22
199:1,2 267:10