Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 25-11050-dsj

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   Broadway Realty I Co., LLC

8            Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10                  United States Bankruptcy Court

11                  One Bowling Green

12                  New York, NY  10004

13

14                  September 30, 2025

15                  10:00 AM

16

17

18

19

20   B E F O R E :

21   HON. DAVID S. JONES

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO:

25

1    HEARING re Motion Filed by Sheyne Hendricks for Relief from

2    the Automatic Stay Objection Filed by the Debtor

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by: Lindsay Peacock

Page 3

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorney for the Debtors

 4        767 Fifth Avenue

 5        New York, NY 10153

 6   BY:  PHILIP L. DIDONATO

 7

 8   KRENTSEL GUZMAN HERBERT, LLP

 9        Attorney for Sheyne Hendricks

10        13 Oak Leaf Drive

11        Belford, NJ 07718

12   BY:  JONATHAN PANARELLA

13

14   DEPARTMENT OF JUSTICE

15        Office of the United States Trustee

16        Alexander Hamilton Customs House

17        One Bowing Green

18        New York, NY 10004

19   BY:  RACHAEL SIEGEL

20

21

22

23

24

25
```

Page 4

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Okay.  The next case on the calendar
 3     is Broadway Realty One Co., LLC, number 25-11050, and we
 4     have a motion for relief from the stay is the only thing on
 5     the calendar.
 6              Who's here on Broadway Realty, please?
 7              MR. DIDONATO:  Good morning, Your Honor.  Phil
 8     DiDonato, Weil, Gotshal, on behalf of the Debtors.
 9              THE COURT:  Great.  Nice to see you.
10              And Mr. Panarella?
11              MR. PANARELLA:  Good morning, Your Honor.  Yes,
12     I'm here on behalf of Sheyne Hendricks, is actually my
13     client's name.
14              THE COURT:  Okay.  Great.  Okay, so --
15              MS. SIEGEL:  Good morning.  I'm Rachael Siegel,
16     for the United States Trustee.  Just wanted to get my name
17     on the record.
18              THE COURT:  Oh, great.  Thanks.  Sorry to almost
19     fail to give you the chance.
20              Anybody else here on Broadway Realty?
21              Okay.  Let me first ask Mr. DiDonato, I think I'm
22     right, but I want to make certain there's nothing else on
23     Broadway Realty calendared for today.  Right?  It's just the
24     lift stay motion?
25              MR. DIDONATO:  That's right, Your Honor.  And I
```

Page 5

1    was actually, I was going to propose, if it's okay with you,

2    I'm happy to let the Movant present the motion.  But I

3    thought maybe we could give you a quick update, just because

4    it's been a while since we've been in front of you.

5              THE COURT:  Sure.  Yeah, that's great.

6              MR. DIDONATO:  Okay.  Great.  And I promise I'll

7    be brief.

8              Most importantly, there's been a lot of activity

9    off the docket, with the Debtors negotiating with Flagstar

10   just to get consensual use of final cash collateral.  That

11   order was entered on September 22nd, Docket number 551.  It

12   gives the Debtors a runway using cash collateral through

13   February of next year, and will allow us to run our

14   marketing and sale process to maximize value for all

15   stakeholders here.

16             And so that process is very much underway at this

17   point.  We have an application to retain Estill that we

18   expect to file under CNO today.  We also have our bidding

19   procedures motion on file that, similarly, I think will be

20   on file today under CNO, incorporating some minor comments

21   from Ms. Siegel, from Flagstar, and a few other parties in

22   interest.

23             And so it's a positive update.  You know, we have

24   a path forward in these cases, and you know, we hope to be

25   in front of you soon again with another positive update in

Page 6

1    connection with the sale process.

2              THE COURT:  Okay.  That's great.  Can you, just

3    out of curiosity, let me know sort of roughly what percent

4    of the real estate portfolio is anticipated to be sold at

5    this point?

6              MR. DIDONATO:  So -- Sure.  So the Debtors are

7    marketing the entire portfolio, and so, you know, we are in

8    discussions with, you know, the parties who are restricted

9    at this point, for whoever's interested in whatever aspect

10   of that portfolio.  So it may be slices here and there, it

11   may be some larger than others, but the entire portfolio is

12   being marketed for sale.

13             THE COURT:  Okay.  Great.  I mean, this is a

14   significant bankruptcy case, and so I watch the indications

15   that I see, and I was curious just about that question.

16             MR. DIDONATO:  Sure.

17             THE COURT:  All right.  Well, thank you.  I think

18   that satisfies me for now, as I say really to everyone, I'm

19   available if and when you need me.  This certainly appears

20   to be a case where folks are working constructively, in a

21   way that doesn't require me, and I'm fine with that, I just

22   -- you know, subject to keeping a control -- a sequence of

23   control dates and check-ins scheduled, which we've been

24   doing, so that's fine.

25             Okay.  I would say you don't have to do this real

Page 7

1   time, but check with your team, and in general, if we don't

2   have an upcoming case conference scheduled, why don't you

3   talk to the players, including Flagstar, and see about when

4   you think would be appropriate for that, and just reach out

5   to Ms. Calderon and set up a case status conference so that

6   I can be sure that I'm keeping my eyes on things.  Okay?  So

7   I don't have any particular date in mind when that's

8   appropriate, but I just want to make sure things aren't

9   sliding off the radar.  And if you discover that Judge

10  forgot that we're already coming to see him on date such-

11  and-so, then that's fine.  I just want to make sure that's

12  in place.  Okay?

13          All right.  But that takes care of case

14  administration.  I think as Mr. Panarella is gleaning, this

15  is a -- He's caught on to a large-scale bankruptcy, real

16  estate bankruptcy, and here he is, representing a personal

17  injury claimant, just trying to unleash her ability to

18  pursue recoveries.  So let me turn it over to you, Mr.

19  Panarella, on your motion.  You know, I've reviewed the

20  papers and the opposition, and so -- but whatever you want

21  to raise, you're welcome to do so.

22          MR. PANARELLA:  Thank you, Your Honor.  So I mean,

23  the papers kind of speak for themselves.  We're looking to

24  lift the bankruptcy stay as to our particular client, Sheyne

25  Hendricks, who does have, as you guessed, a personal injury

Page 8

1    action in Kings County Supreme Court.  Most, if not all

2    discovery is done in that matter.  We are agreeing to limit

3    any potential resolution to the policy limits to protect the

4    Debtor.  Through conversations we've had recently with Phil,

5    we have become aware that there is a retention policy, which

6    complicates this particular issue, as opposed to most

7    similar motions we've made in the past.

8              THE COURT:  Right.

9              MR. PANARELLA:  You know, and potential resolution

10   would be that any settlement would be negated by that

11   retention policy number of $250.  So if the case settles

12   for, for example $500, we would take $250, if it settled for

13   $1 million, we would take $750.  Whatever it ultimately was,

14   we acknowledge that there is that SIR policy, and that, you

15   know, we're hoping that maybe we can work something out that

16   allows such a mechanism.

17             THE COURT:  Okay.  Got it.  And I guess implicit

18   in that is you're not there yet, although you're open to

19   talking.  Right?

20             MR. PANARELLA:  Absolutely, Your Honor.

21             THE COURT:  Okay.  I got it.  Okay.  Thanks.

22             Let me hear from Mr. DiDonato.

23             MR. DIDONATO:  Sure, Your Honor.  So I think

24   Movant kind of flagged the key issue here is the SIR.  From

25   our perspective, you know, there are a number of pre-

Page 9

1   petition Claimants who are sort of similarly situated.  We

2   haven't had the chance to have discussions with the Insurers

3   yet, but typically where the policy has this sort of

4   endorsement in it, we haven't been able to -- You know, the

5   policy is pretty clear that it states, and we attached it to

6   our objection that the actual expenditure of defense costs

7   up to the $250,000 is a condition for the coverage actually

8   kicking in.

9          And so from our perspective, in most circumstances

10  we would be more than happy to allow the Claimant to go

11  after the insurance here.  But in these circumstances, with

12  this policy, and especially now, given that I think the

13  cases have sort of a clear path forward, where we can emerge

14  here pretty expeditiously, from our perspective, we think it

15  makes sense to deal with these claims most efficiently

16  through the claims reconciliation process after we have a

17  clearer sense of the recoveries.

18          THE COURT:  Okay.  And so I want to make -- I

19  think I understand exactly the situation, but I'm just going

20  to say it back to you to make sure I've got it right.  So

21  the applicable liability insurance coverage that the Debtors

22  carry requires the Debtors to expend essentially the first

23  $250,000 in -- is it defense costs out of pocket as a

24  condition for coverage on any resulting liability?  That's

25  how it works?

Page 10

1          MR. DIDONATO:  That's correct.  Yep.

2          THE COURT:  Okay.  Is that a per incident

3    $250,000, or is it cumulative?

4          MR. DIDONATO:  Correct, per incident.

5          THE COURT:  Okay.  Got it.  So -- Okay.  So look,

6    I think I understand the situation, and sympathetic though I

7    am to your client, Mr. Panarella, I think I have to deny the

8    motion at this time.  I'm going to do so without prejudice,

9    and at the same time, I'm going to encourage you to talk and

10   engage with the Debtors, and see if you can negotiate some

11   sort of resolution really in the bankruptcy context, that

12   might serve your client, and get you somewhere.

13          But failing that, I think it's an unfortunate

14   reality that the bankruptcy process, which brings about an

15   automatic stay, makes Creditors and Claimants wait for a

16   resolution of their entitlements, and for good reason in the

17   bankruptcy process, and that is exactly the situation you're

18   in now.  So I'm going to take a minute, and put that in more

19   legal terms.

20          So the automatic stay serves important bankruptcy

21   purposes, and is one of the key characteristics and key

22   tools that permits bankruptcy cases to function, and to

23   achieve the orderly resolution of all parties' entitlements,

24   and the reorganization or liquidation of the Debtor's

25   affairs.

1           And so the law is clear that ordinarily, to lift

2     the automatic stay, courts will look at the so-called Sonnax

3     factors, which are established by case law in a case called

4     In re Sonnax Industries Inc., 907 F.2d, and the key passages

5     at page 1286.  There's a long list of factors, but the

6     drivers here include an important factor being whether

7     there's a lack of any connection or interference with the

8     bankruptcy case.  And here there is because of the working

9     of the insurance policy, unfortunately, the Debtors who are

10    not flush with cash would need to devote substantial cash

11    and resources to their defense costs in proceeding with this

12    matter, and that would interfere with their efforts to

13    reorganize.

14          And then also, another recognized factor is

15    whether the Debtor's Insurer has assumed full

16    responsibility.  As I think you both recognize, when that's

17    the case, I'm quite willing, and courts are quite willing to

18    allow tort claimants to proceed as long as they limit their

19    potential recovery in all costs to the applicable insurance.

20    But you just don't fit in that box here.  It can be a plus

21    factor to lift the stay if the action primarily involves

22    third parties.  That's not the case here.

23          And so in interest of judicial economy, and the

24    expeditious and economical resolution of litigation, as the

25    Debtors say, they face quite a number of -- I don't know

Page 12

1    what the number is, but they refer to multiple similar

2    claims, and they need to fit all that into an ordered

3    resolution process that will serve judicial economy, and

4    also will be more efficient as a use of Debtor and Estate

5    resources.

6         And then also, whether the proceedings have

7    progressed to the point that they're ready for trial.  I

8    don't understand you to be there yet, but even if you're

9    very close to that, I'm not persuaded that it makes sense to

10   go forward at this point.

11        And then finally, the impact of the stay on the

12   parties, and the balance of harm.  I appreciate the hardship

13   on an individual person, and tort Claimant being made to

14   wait longer for the outcome of her case.  But there really

15   is a potential significant impact on the Debtors, and the

16   successful progress of their bankruptcy case, if we were to

17   allow this case and others to start going forward in a non-

18   coordinated, unrestrained fashion.  Avoiding that is one of

19   the key characteristics of bankruptcy, and I think it's

20   appropriate to protect that process here today.

21        Okay?  So that's my ruling, so therefore I'm going

22   to deny the motion, but again I emphasize without prejudice

23   to renewal.  If the prejudice to the Claimant increases, or

24   the bankruptcy case bogs down, and the degree of waiting

25   starts to become seemingly unreasonable or unviable, then

Page 13

1    this order doesn't limit your ability to pursue that relief.

2    Okay?

3              MR. PANARELLA:  Thank you, Your Honor.

4              THE COURT:  Yeah, thank you.

5              So let me ask, I guess as the prevailing party,

6    I'll just ask the Debtors to submit a simple order just

7    stating the motion is denied without prejudice for reasons

8    stated on the record, and run that past Mr. Panarella to

9    make sure he's okay with it.  Okay?  And then we'll get that

10   docketed.

11             MR. DIDONATO:  Will do.  Thank you, Your Honor.

12             MR. PANARELLA:  Thank you so much.

13             THE COURT:  Okay.  Thank you all.  Good luck.  And

14   we're adjourned on Broadway Realty.

15             MR. PANARELLA:  Thank you, Your Honor.

16             THE COURT:  Okay.  You're welcome.

17

18             (Whereupon these proceedings were concluded.)

19

20

21

22

23

24

25

Page 14

```
 1                    C E R T I F I C A T I O N

 2

 3         I, Lindsay Peacock, certify that the foregoing

 4    transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8

 9    Lindsay Peacock

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date: October 1, 2025
```