WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
**In re** : **Chapter 11**
:
**BROADWAY REALTY I CO., LLC, *et al.*,** : **Case No. 25-11050 (DSJ)**
:
**Debtors.**[1] : **(Jointly Administered)**
:
-------------------------------------------------------------x

## NOTICE OF DESIGNATION OF STALKING HORSE BID

     **PLEASE TAKE NOTICE THAT** on May 21, 2025, Broadway Realty I Co., LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The chapter 11 cases have been consolidated for procedural purposes under the lead case *In re Broadway Realty I Co., LLC.*, *et al.*, No. 25-11050 (DSJ).

     **PLEASE TAKE FURTHER NOTICE THAT** on October 1, 2025, the Bankruptcy Court entered an order [ECF No. 571] (the "**Bidding Procedures Order**"), among other things: (i) approving procedures in connection with the refinancing or sale (each, a "**Transaction**") of all or substantially all of the Debtors' portfolio of residential real estate properties (the "**Assets**"); (ii) authorizing the Debtors to designate stalking horse bidder(s) (any such bidder a "**Stalking Horse Bidder**" and, any such bid, a "**Stalking Horse Bid**") and offer such bidder certain bid

---

[1] The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/broadwayrealty. The Debtors' mailing address is located at 2 Grand Central Tower, 140 East 45th St., 12th Floor, New York, New York 10017.

protections; (iii) setting the deadline for Potential Bidders[2] to submit a proposal to purchase or refinance all or a portion of the Assets, scheduling an auction (the "**Auction**"), and scheduling a hearing with respect to the approval of the Transaction(s) (the "**Sale Hearing**"); and (iv) granting other related relief.

          **PLEASE TAKE FURTHER NOTICE THAT** on December 3, 2025, the Bankruptcy Court entered an order [ECF No. 789] (the "**Disclosure Statement Order**"), among other things: (i) approving the disclosure statement [ECF No. 782] (together with all exhibits and schedules thereto and as may be amended, modified, or supplemented, the "**Disclosure Statement**") for the Debtors' *First Amended Joint Chapter 11 Plan* [ECF No. 780] (together with all exhibits and schedules thereto and as may be further amended, modified, or supplemented, the "**Plan**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; and (ii) approving procedures for soliciting, submitting, tabulating votes on, and filing objections to, the Plan.   The Plan implements each Transaction for the Successful Bid for the Debtors' Assets.

          **PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Bidding Procedures Order, the deadline for any Potential Bidder to submit a bid to purchase all or a portion of the Assets was December 12, 2025, at 5:00 p.m. (prevailing Eastern Time).

          **PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Bidding Procedures Order, the Debtors may, upon the joint recommendation of the CROs, designate one or more  Stalking Horse Bidder(s) with respect to any of the Debtors' Assets, enter into an asset purchase agreement with such Stalking Horse Bidder(s), and provide such Stalking Horse Bidder(s) certain bid protections, including a break-up fee in an amount to be mutually agreed upon among the CROs, but not to exceed 2% of the proposed purchase price.

          **PLEASE TAKE FURTHER NOTICE THAT** the Bidding Procedures Order set December 16, 2025 at 5:00 p.m. (prevailing Eastern Time) as the deadline for the Debtors to select Stalking Horse Bid(s), which deadline was extended by the Debtors, with the consent of Flagstar Bank, N.A. ("**Flagstar**"), to December 22, 2025 at 5:00 p.m. (prevailing Eastern Time).

## Stalking Horse Bid

          **PLEASE TAKE FURTHER NOTICE THAT**, consistent with the Bidding Procedures Order, the Debtors, upon the joint recommendation of the CROs, hereby designate Summit Gold, Inc. ("**Summit**") as the Stalking Horse Bidder pursuant to and as set forth in that certain *Purchase and Sale Agreement* by and between the Debtors and Summit, dated December 22, 2025.  A copy of the Stalking Horse Agreement is attached hereto as **Exhibit A** (the "**Stalking Horse Agreement**").  The Stalking Horse Bid is subject to higher and better offers in accordance with the Bidding Procedures Order.

          **PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Stalking Horse Agreement, Summit is purchasing all of the Debtors' real properties together with certain other assets as set forth therein.  The Stalking Horse Agreement provides that the purchase price to be paid by Summit to the Debtors for the Premises (as defined in the Stalking Horse Agreement) is

---

[2]    Capitalized terms not defined herein have the meanings ascribed to them in the Bidding Procedures Order.

$451,300,000 (the "**Purchase Price**"); provided that if Flagstar does not commit to finance the Purchase Price on the principal terms set forth on **Annex 1** to the Stalking Horse Agreement by December 26, 2025 (the "**Flagstar Committed Financing**"), the Purchase Price shall be decreased to $420,070,000.[3] Pursuant to the Stalking Horse Agreement, the Debtors shall pay a Termination Payment[4] if the Debtors select a competing bid or proceed with an alternative transaction pursuant to sections 363 or 1129 of the Bankruptcy Code that would otherwise constitute or have constituted a competing bid at the Auction or any other process initiated by the Debtors if no material breach by Summit of the Stalking Horse Agreement has occurred.

**PLEASE TAKE FURTHER NOTICE THAT**, in accordance with the Bidding Procedures, the Stalking Horse Bid is seeking to assume all existing tenant leases.

## Important Dates and Deadlines

**PLEASE TAKE FURTHER NOTICE THAT**, certain key dates for the Marketing Process are set forth below and are subject to extension or modification in accordance with the Bidding Procedures and the Final Cash Collateral Order.

- *Auction*. An Auction, if necessary, has been scheduled for **January 8, 2026 at 10:00 a.m. (prevailing Eastern Time)**. The Auction shall be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153. Parties interested in submitting a bid or participating in the Auction should contact the Debtors' real estate advisors, Eastdil Secured L.L.C. (Attn: Daniel Parker (dparker@eastdilsecured.com)).

- *Sale Objection Deadline*. Objections to a Transaction, including any objection to the sale of the Assets "free and clear" of all claims and interests pursuant to section 1141(c) of the Bankruptcy Code must be (i) filed in accordance with the Bidding Procedures, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Notice Parties[5] by no later than **January 11, 2026 at 5:00 p.m. (prevailing Eastern Time)**.[6]

---

[3] The Debtors received confirmation from Flagstar and Summit, in writing, via emails dated December 22, 2025, that in connection with Section 2(a) of the Stalking Horse Agreement, Flagstar delivered a commitment to provide the Flagstar Committed Financing to Summit and Summit accepted the Flagstar Committed Financing, as of December 22, 2025.

[4] The "**Termination Payment**" means: an amount equal to 2% of the proposed Purchase Price payable on the date of consummation of a competing bid or alternative transaction.

[5] The "**Objection Notice Parties**" means: (i) the Debtors, Broadway Realty I Co., LLC, 2 Grand Central Tower, 140 East 45th St., 12th Floor, New York, NY 10017 (Attn: Ephraim Diamond, David Barse, and Adam J. Kaplan); (ii) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer; Garrett A. Fail; Matthew P. Goren; and Philip L. DiDonato); (iii) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, One Bowling Green, Suite 534 (Attn: Rachael Siegel, Esq. and Paul Schwartzberg, Esq.); and (iv) counsel to Flagstar Bank, N.A., Paul Hastings LLP, MetLife Building, 200 Park Avenue, New York, NY 10166 (Attn: Brett Lawrence, Esq., Nicholas Bassett, Esq., Justin Rawlins, Esq., and Harvey A. Strickon, Esq.).

[6] Pursuant to Bankruptcy Rule 9006, any period that would end on a Saturday, Sunday, or legal holiday is continued until the same time on the next business day.

- ***Confirmation/Sale Hearing***.  The hearing to consider confirmation of the Plan and approval of the Transaction(s) will be held at the Bankruptcy Court before the Honorable David S. Jones on **January 15, 2026 at 10:00 a.m. (prevailing Eastern Time)**.

## Additional Information

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Stretto, Inc., located at https://cases.stretto.com/broadwayrealty/.

**PLEASE TAKE FURTHER NOTICE THAT**, except as otherwise set forth in the Bidding Procedures and the Bidding Procedures Order, the Debtors are authorized to, in their reasonable business judgment, upon the joint recommendation of the CROs, and with the reasonable consent of Flagstar, in a manner consistent with their fiduciary duties, to: modify the Bidding Procedures, including to modify the requirements with regard to any Good Faith Deposit; waive terms and conditions set forth therein with respect to all Potential Bidders; extend the deadlines set forth therein; announce at the Auction modified or additional procedures for conducting the Auction; alter the assumptions set forth therein; and provide reasonable accommodations to any Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and the Auction process to promote further bids on the Assets, in each case, to the extent not materially inconsistent with the Bidding Procedures and the Bidding Procedures Order.  All parties reserve their rights to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

Dated:  December 23, 2025
          New York, New York

_/s/   Gary T. Holtzer_____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for the Debtors
and Debtors in Possession*

## **Exhibit A**

**Stalking Horse Agreement**

WEIL\100999435\8\67837.0004

**Execution Version**

---

## PURCHASE AND SALE AGREEMENT

**between**

**those certain seller entities listed on Schedule 1 attached hereto**, as Sellers

**and**

**Summit Gold Inc., a Delaware Corporation, or its affiliates**, as Purchaser

**and, solely for the purposes of Section 18,**

**Chicago Title Insurance Company**, as Escrow Agent

**Dated as of December 22, 2025**

---

# TABLE OF CONTENTS

**Page**

1.  Sale of Premises. ...............................................................................................1

2.  Purchase Price. ..................................................................................................2

3.  Apportionments and Credits. ............................................................................3

4.  Closing Date. .....................................................................................................7

5.  Permitted Encumbrances. ..................................................................................8

6.  Title. ..................................................................................................................8

7.  Representations and Warranties. .....................................................................11

8.  Costs. ...............................................................................................................20

9.  No Due Diligence Review Period. ..................................................................21

10.  Conditions Precedent to Closing. ...................................................................21

11.  Documents to be Delivered by Seller at Closing. ...........................................23

12.  Documents to be Delivered by Purchaser at Closing. .....................................25

13.  Operation of the Premises prior to the Closing Date. ......................................25

14.  As Is. ...............................................................................................................28

15.  Broker. .............................................................................................................31

16.  Casualty; Condemnation. ................................................................................31

17.  Termination; Effect of Termination; Remedies. .............................................32

18.  Escrow. ............................................................................................................36

19.  Assignment. .....................................................................................................38

20.  Labor and Employees. .....................................................................................38

21.  Post-Closing Covenants. .................................................................................40

22.  Notices. ............................................................................................................41

23.  Property Information and Confidentiality. ......................................................42

24.  Bankruptcy Provisions. ...................................................................................44

25.  Miscellaneous. ................................................................................................45

## LIST OF SCHEDULES AND EXHIBITS

Schedules

Schedule 1      List of Sellers and Premises Addresses

Schedule 2      Description of the Land

Schedule 3      Permitted Encumbrances

Schedule 4      Leases

Schedule 5      Contracts

Schedule 6      Intentionally Omitted

Schedule 7      Employees

Schedule 8      Union Contracts

Schedule 9      Litigation

Schedule 10     Environmental Notices

Schedule 11     Fines and Penalties

Schedule 12     Surveys

Schedule 13     Multiemployer Pension Plans


Exhibits

Exhibit A       Form of Deed

Exhibit B       Form of Assignment and Assumption of Leases

Exhibit C       Form of Omnibus Assignment and Assumption Agreement

Exhibit D       Form of Bill of Sale

Exhibit E       Intentionally Omitted

Exhibit F       Form of Assumption of Union Contract

Exhibit G-1     Form of Sellers' Closing Certificate

Exhibit G-2     Form of Purchaser's Closing Certificate

Exhibit H       Form of Tenant Notice Letter

Exhibit I       Form of Counterparty Notice Letters

Exhibit J       Approval Order


Annex

Annex 1         Flagstar Committed Financing

## DEFINED TERMS

| Defined Term | Section |
| --- | --- |
| A&A Agreements | 11(c) |
| Agreement | Preamble |
| Anti-Money Laundering Laws | 7(a)(i)(R) |
| Applicable Courts | 25(l) |
| Approval Order | 7(a)(i)(B) |
| Approval Order End Date | 17(a)(i)(A) |
| Approved Investment | 18(c) |
| Assumed Contracts | 1(d) |
| Assumption of Union Contract | 11(d) |
| Auction | 24(c) |
| Available Property Information | 7(a)(ii) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefit Plan | 7(a)(i)(N) |
| Bidding Procedures Order | 24(a) |
| Bill of Sale | 11(g) |
| Break-Up Fee | 24(d) |
| Broker | 15 |
| Business Day | 25(q) |
| City Transfer Tax Return | 11(o) |
| Closing | 4 |
| Closing Date | 4 |
| Code | 7(a)(i)(I) |
| Competing Bid | 24(a) |
| Confidentiality Agreement | 23(a) |
| Construction Contracts | 7(a)(i)(J) |
| Contracts | 7(a)(i)(J) |
| Contracts Exhibit | 7(a)(i)(J) |
| Cure Costs | 8(c) |
| Cure Costs Cap | 8(c) |
| Cut-off Time | 3 |
| DBSWPA | 7(a)(i)(L) |
| Debtors | Recitals |
| Deeds | 11(a) |
| Deposit | 2(b)(ii) |
| Effective Date | Preamble |
| Employee Liabilities | 20(b) |
| Employee Termination Payments | 20(c) |
| Employees | 7(a)(i)(L) |

| **Defined Term** | **Section** |
|---|---|
| End Date | 17(a)(i)(H) |
| Environmental Laws | 7(a)(i)(T) |
| ERISA | 7(a)(i)(N) |
| Escrow Agent | 2(a)(i) |
| Excluded Materials | 14(c) |
| Existing Manager | 3(h) |
| Existing PMA | 3(h) |
| Existing Surveys | 6(a)(i) |
| Extended Approval Order End Date | 17(a)(i)(A) |
| FF&E Personal Property | 1(a) |
| Fines and Penalties | 3(k) |
| HPD | 7(a)(i)(G) |
| Improvements | 1(a) |
| Initial Deposit | 2(a)(i) |
| Intellectual Property | 1(b) |
| Land | 1(a) |
| Laws | 7(a)(i)(C) |
| Lease Assignment | 11(b) |
| Lease Exhibit | 7(a)(i)(D) |
| Leases | 7(a)(i)(D) |
| Licenses | 1(a) |
| Monetary Liens | 6(b) |
| MPP Letter | 10(a)(iii) |
| Multiemployer Pension Plan | 20(d) |
| New PMA | 21(a) |
| New Unacceptable Encumbrances | 6(a)(ii) |
| Notice of Objection | 18(b)(i) |
| OFAC | 7(a)(i)(Q) |
| Omnibus Assignment | 11(c) |
| Owing Tenant | 3(b) |
| Ownership Objections | 6(a)(i) |
| Permitted Encumbrances | 5 |
| Personal Information | 23(c) |
| Portfolio Level Representations and Warranties | 7(a)(i) |
| Premises | 1(a) |
| Property Level Representations and Warranties | 7(a)(i) |
| Pre-Closing Arrears | 3(b) |
| Pre-Closing Unpaid Rents | 3(b) |
| Property Information | 14(c) |
| Purchase Price | 2 |
| Purchaser | Preamble |
| Purchaser Related Parties | 25(e)(ii) |

| Defined Term | Section |
|---|---|
| Purchaser's Closing Certificate | 7(a)(iii) |
| Purchaser's Documents | 7(b)(i)(B) |
| Purchaser's Representatives | 7(a)(v) |
| Purchaser's Supplemental Title Notice | 6(a)(ii) |
| Reimbursable Expenses | 3(c) |
| Rent Sharing Period | 3(b) |
| Rents | 3(b) |
| Replacement PMA | 21(a) |
| Second Supplemental Deposit | 2(a)(iii) |
| Security Deposits | 3(d) |
| Sellers | Preamble |
| Sellers Cure Cost Schedule | 10(a)(vii) |
| Seller's Affiliates | 25(e)(i) |
| Sellers' Closing Certificate | 7(a)(iv) |
| Sellers' Documents | 7(a)(i)(B) |
| Seller's knowledge | 7(a)(i) |
| Settlement Statement | 11(p) |
| State Transfer Tax Return | 11(o) |
| Successor Manager | 21(a) |
| Supplemental Deposit | 2(a)(ii) |
| Surety Period | 20(d) |
| Survey | 6(a)(i) |
| Surviving Obligations | 17(b) |
| Title Commitments | 6(a)(i) |
| Title Company | 6(a)(i) |
| Title Insurance | 6(a)(i) |
| Transaction Personal Information | 23(c) |
| Transactions | 4(a) |
| Transfer Report | 11(o) |
| Transferred Security Deposits | 11(e) |
| Unacceptable Encumbrances | 6(a)(ii) |
| Union | 3(j) |
| Union Contract | 7(a)(i)(M) |
| Union Employees | 3(j) |
| Unpaid Real Estate Taxes | 3(a)(i) |
| Unpaid Rents | 3(b) |

**PURCHASE AND SALE AGREEMENT** (this "Agreement"), dated as of December 22, 2025, (the "Effective Date"), by and among those certain seller entities listed on Schedule 1 attached hereto (each a "Seller", and collectively "Sellers"), and Summit Gold Inc., a Delaware Corporation, or its affiliates ("Purchaser").

<div align="center">RECITALS</div>

WHEREAS, on May 21, 2025, Sellers (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (such court, the "Bankruptcy Court"; and such cases, "Bankruptcy Cases"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, each Seller is the owner of the respective Premises located at the addresses set forth on Schedule 1 attached hereto next to such Seller's name; and

WHEREAS, Sellers and Purchaser desire to enter into an agreement whereby, subject to the terms and conditions contained herein, each Seller shall sell its respective Premises to Purchaser and Purchaser shall purchase the Premises from Sellers. Capitalized terms used herein shall have the respective meanings given to them in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows:

1. Sale of Premises.

(a) Each Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from each Seller, at the price allocated to such Premises as set forth on Schedule 1 and upon the terms and conditions set forth in this Agreement, all of each Seller's right, title and interest in and to: (i) that certain land as more particularly described on Schedule 2 attached hereto (each a "Land", and collectively, the "Land"); (ii) the buildings and all other improvements situated on such Land (for each Land, an "Improvement", and collectively, the "Improvements"); (iii) all easements, interests in rights of way, reservations, privileges, appurtenances, strips, gores and other rights of the applicable Seller pertaining or appurtenant to each Land; (iv) all fixtures and other tangible personal property attached or appurtenant to the applicable Land, the Improvements and used in connection therewith, including appliances, furniture, furnishings, equipment, machinery, carpeting, draperies and curtains, tools and supplies, and construction materials for ongoing renovations, if applicable in all cases, subject to depletion, resupply, substitution, replacement and disposition in the ordinary course of business and as otherwise provided in accordance with this Agreement (all of the assets described in this clause (iv) as it relates to a given Land or Improvement being collectively referred to as the "FF&E Personal Property"); (v) all Leases, and all guaranties thereof, in effect as of the Closing Date (including all Security Deposits); (vi) to the extent assignable or transferable, all right, title and interest, if any,

of the applicable Seller in, to and under any governmental permits, licenses and approvals, warranties and guarantees that the applicable Seller has received in connection with any work or services performed exclusively with respect to, or equipment installed in, the Improvements (collectively, the "Licenses"); (vii) any air or development rights appurtenant to each Land, if any; (viii) architectural or engineering plans or specifications; and (ix) the Assumed Contracts (all of the foregoing assets listed in clauses (i)-(ix) above as related to each Land or Improvement being sold by a Seller being hereinafter individually referred to as a "Premises", and collectively, as the "Premises"). For the avoidance of doubt, any asset, right, or interest (and any obligations, cost and expense) not expressly listed in this Section 1(a) shall remain the property of the applicable Seller and shall not be conveyed, transferred, or assigned to Purchaser pursuant to this Agreement.

(b)    The parties hereto acknowledge and agree that the value of the FF&E Personal Property is de minimis and that no part of the Purchase Price is allocable thereto.

(c)    Purchaser shall assume those certain Contracts that Purchaser elects to assume at the Closing as set forth in a written notice delivered to Sellers at least twenty-one (21) days prior to the Closing Date (the "Assumed Contracts"). Notwithstanding the foregoing, (A) any Contract that is not an Assumed Contract, if exclusively related to the Premises, shall be excluded from the definition of "Assumed Contract" and not assumed and assigned to Purchaser and (B) with respect to any Contract that is applicable to the Premises and other properties, such Contract shall be modified to remove the Premises therefrom, on or prior to the Closing Date. For the avoidance of doubt, Purchaser shall have no liabilities in connection with any contract other than Assumed Contracts.

2.    Purchase Price.

(a)    The purchase price to be paid by Purchaser to Sellers for the Premises is $451,300,000 (the "Purchase Price"); provided that if Flagstar Bank, N.A. ("Flagstar") does not commit to finance the Purchase Price on the principal terms set forth on Annex 1 by December 26, 2025 (the "Flagstar Committed Financing"), the Purchase Price shall be decreased to $420,070,000, after such time "Purchase Price" shall mean $420,070,000. For the avoidance of doubt, if Flagstar commits to provide the Flagstar Committed Financing by December 26, 2025, Purchaser shall be required to pay a Purchase Price of $451,300,000 pursuant to this Agreement. The Purchase Price shall be payable as follows:

(i)    An initial good faith deposit in the amount of TEN MILLION DOLLARS ($10,000,000.00) (together with all interest accrued thereon, if any, the "Initial Deposit"), which shall have been paid in connection with the submission of a Qualified Bid (as such term is defined in the Bidding Procedures Motion) by a bank wire transfer of immediately available funds to Chicago Title Insurance Company (in its capacity as escrow agent hereunder, the "Escrow Agent"), which Initial Deposit shall be non-refundable to Purchaser except as otherwise expressly provided in this Agreement.

(ii)    Within two (2) Business Days following the earlier of Purchaser (A) being selected as the stalking horse bidder or (B) being declared the winning bidder at the Auction, Purchaser shall deposit a supplemental deposit (together with all interest accrued thereon,

if any, the "Supplemental Deposit"), whereby the Deposit shall be, in the aggregate, an amount equal to ten percent (10%) of the Purchase Price, by a bank wire transfer of immediately available funds to the Escrow Agent, which Supplemental Deposit shall be non-refundable to Purchaser except as otherwise expressly provided in this Agreement.

(iii)    If Purchaser receives an offer for the Flagstar Committed Financing, Purchaser shall deposit a second supplemental deposit (together with all interest accrued thereon, if any, the "Second Supplemental Deposit" and, together with the Initial Deposit and the Supplemental Deposit, the "Deposit") within three (3) Business Days after the entry of the Approval Order, whereby the Deposit shall be, in the aggregate, an amount equal to twenty-five percent (25%) of the Purchase Price, by a bank wire transfer of immediately available funds to the Escrow Agent, which Second Supplemental Deposit shall be non-refundable to Purchaser except as otherwise expressly provided in this Agreement.

(iv)    The balance of the Purchase Price at the Closing by bank wire transfer of immediately available funds to Sellers' accounts or to the account or accounts of such other party or parties as may be designated by Sellers in writing on or before the Closing Date, subject to the prorations and apportionments described herein.

(b)    The Deposit shall be held and disbursed by Escrow Agent in accordance with the terms of Section 18.  If the Closing shall occur, Sellers shall be entitled to receive the Deposit and all interest accrued thereon, if any, and such interest, if any, shall be credited against the portion of the Purchase Price payable pursuant to Section 2.

3.    Apportionments and Credits.  The following shall be apportioned between Sellers and Purchaser (or credited to Sellers or Purchaser, as indicated) at the Closing as of 12:01 a.m. Eastern Time on the Closing Date (the "Cut-off Time") (on the basis of the actual number of days elapsed over the applicable period), as if Purchaser were vested with title to the Premises during the entire day upon which the Closing occurs:

(a)    Real Estate and Personal Property Taxes.

(i)    All real estate, ad valorem and personal property taxes with respect to the Premises on the basis of the fiscal period for which assessed.  At the Closing, the Purchaser shall pay all Unpaid Real Estate Taxes as of the Closing Date and Purchaser shall receive a credit against the Purchase Price in the aggregate amount equal to any Unpaid Real Estate Taxes paid. Sellers shall receive a credit at the Closing in an aggregate amount equal to any real estate and personal property taxes paid by Sellers and attributable to periods on or after the Closing Date. Any applicable apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not yet been fixed shall be based upon the tax rate or assessed valuation last fixed.  To the extent that the actual real estate or personal property taxes for the year in which the Closing occurs differ from the amount apportioned at the Closing, the parties shall make all necessary adjustments by appropriate payments between themselves following the Closing as provided in Section 3(m).  In no event shall Sellers be charged with or be responsible for any increase in the taxes on the Premises resulting from the sale of the Premises contemplated by this Agreement, any change in use of the Premises on or after the Closing, or from any improvements

3

made or leases entered into on or after the Closing. "Unpaid Real Estate Taxes" means any and all real estate, ad valorem or other property taxes assessed against the Premises for any period prior to the Closing Date that remain unpaid as of the Closing Date, together with all related interest, fines and penalties accrued thereon.

(ii)    If, as of the Closing Date, the Premises or any part thereof shall be affected by any assessments which are or may become payable in installments, of which the first installment is a charge or lien and has become payable, Purchaser shall pay all installments due on or after the Closing Date and any installments that past due as of the Closing Date (together with all related interest, fines and penalties); provided that Sellers shall receive a credit for any installments paid by Sellers that are attributable to periods on or after the Closing Date, and Purchaser shall receive a credit for any past due installments paid by Purchaser on the Closing Date attributable to the period prior to the Closing Date.

(b)    Rents. To the maximum extent permitted by the Bankruptcy Code or applicable Law, all rents and other income under the Leases, including late charges and other charges payable by tenants (collectively, "Rents"), but only to the extent actually collected and received by Sellers as of the day immediately preceding the Closing Date. All Rents which shall not have been paid to Sellers as of the day immediately preceding the Closing Date and which are delinquent or due and payable as of the day immediately preceding the Closing Date (collectively, "Pre-Closing Arrears"), and all Rents which shall not have been paid to Sellers as of the day immediately preceding the Closing Date and which are attributable to the month of the Closing or prior months, but are not yet due and payable until a date subsequent to the Closing Date (collectively, "Pre-Closing Unpaid Rents" and, together with the Pre-Closing Arrears, "Unpaid Rents"), shall not be prorated at the Closing; provided that, Sellers shall deliver to Purchaser, at the Closing, a schedule of all such Unpaid Rents which shall identify the tenants from whom such Unpaid Rents are owed (each, an "Owing Tenant").  The parties agree that, during the period commencing as of the Closing Date and ending on the last day of the twelfth (12th) calendar month following the month in which the Closing Date occurred (such period being referred to herein as the "Rent Sharing Period"), upon receipt by any party or its affiliates of any Rents (whether or not the same are stated to be paid on account of any Unpaid Rents) from an Owing Tenant, such Rents shall be allocated as follows: (I) first to the month of the Closing, prorated in accordance with each party's period of ownership during such month; (II) then to any Rents for the period from and after the Closing Date, and (III) then to any other Pre-Closing Unpaid Rents. For the avoidance of doubt, any net proceeds received by Purchaser from the outstanding Landlord-Tenant Cases (as defined herein), which are assigned pursuant to this Agreement, shall be subject to the distribution of the preceding sentence. Upon the expiration of the Rent Sharing Period, Purchaser shall have no obligation to share any Rents received by Purchaser with Sellers.  Notwithstanding the foregoing, however, if after the expiration of the Rent Sharing Period, (x) Purchaser receives any Rents from an Owing Tenant and (y) such Owing Tenant is not then in monetary default under its Lease (i.e., Purchaser is in receipt of all Rents payable by such Owing Tenant and attributable to the period from and after the Closing Date) or in non-monetary default under its Lease, then Purchaser shall deliver to Sellers all such Rents until all Pre-Closing Arrears owed by such Owing Tenant have been paid to Sellers.  Any such Unpaid Rents which are collected by Purchaser or Sellers, as applicable, and to which the other party is entitled to receive shall be delivered by the receiving party within five (5) Business Days after receipt thereof.  Each such amount, less reasonable

collection costs, shall be adjusted and prorated as provided above. Purchaser shall use commercially reasonable efforts to collect such Unpaid Rents, including by continuing to bill each tenant during the Rent Sharing Period; provided that Purchaser shall not be obligated to institute a lawsuit or any action against any current tenant, to terminate any Lease, to apply any security deposit to such Unpaid Rents or seek to evict any tenant. Upon request, Purchaser shall provide Sellers with monthly reports setting forth the status of such collection efforts during the Rent Sharing Period. Nothing contained herein shall preclude Sellers (and its affiliates and successors in interest), from taking all steps that Sellers (and their affiliates and successors in interest) deems appropriate to collect Unpaid Rents which remain uncollected and Sellers (and their affiliates and successors in interest) hereby reserves the right to pursue all rights and remedies against any tenant owing Unpaid Rents; provided that such tenant has vacated its leased space at the Premises. Purchaser shall reasonably cooperate with Sellers, at no material out-of-pocket cost to Purchaser, in any collection efforts by Sellers hereunder.

(c)     Expenses incurred by any Seller as a landlord under the Leases, to the extent such expenses are required to be reimbursed by tenants under the Leases (including tenants' shares of property taxes and assessments, insurance, common area maintenance and other expenses of the Premises) are collectively referred to herein as "Reimbursable Expenses." Reimbursable Expenses shall be determined in accordance with the Leases, including any Lease provisions that provide for the adjustment of Reimbursable Expenses based on occupancy changes (i.e., "gross-up" provisions). In addition, to the extent that a Lease provides for base year amounts for operating expenses or taxes, such base year amounts shall be prorated in determining Reimbursable Expenses with respect to such Lease.

(d)     Security Deposits. Purchaser shall receive a credit at the Closing in the aggregate amount of all cash security deposits (together with interest accrued thereon) under the Leases that are being held by or on behalf of Sellers to the extent the same are not (or have not been) applied, refunded or otherwise forfeited prior to the Closing (the "Security Deposits"). Notwithstanding, Sellers shall have the right, prior to the Closing and following written notice to Purchaser, to apply such Security Deposits to the payment of unpaid rent and other charges, if any, from the tenant(s) against such Security Deposits in accordance with Law (including any moratoria or other tenant protection Laws or administrative orders) and Purchaser shall not be entitled to any Security Deposit or portion thereof retained by Sellers.

(e)     Utilities and Water.

(i)     To the extent paid for by Sellers, utilities, including gas, electricity, steam, telephone, trash removal, and fire protection service, and any utility credits. With respect to electric and gas charges, the applicable Seller shall use commercially reasonable efforts to obtain a reading of the meter or other consumption measuring device at the applicable Premises within five (5) Business Days prior to the Closing Date. If any Seller is unable to obtain all or any of such readings, Purchaser and such Seller agree to make the required proration after the Closing as set forth in Section 3(m). Notwithstanding the foregoing, it is understood that the parties intend to, and shall cooperate to, as of the Closing Date, simply change the account party on any utility accounts to obviate the need for an adjustment. To that end, Purchaser shall cause new accounts to be opened in Purchaser's name for such utilities as of the Closing Date and shall post any

5

required deposits in connection therewith directly with the applicable utility company, and each Seller shall close such utility accounts in its name and shall be entitled to receive a refund of all utility deposits simultaneously with Purchaser's opening of its new accounts.

(ii)    If there are water meters at any Premises, the unfixed water rates and charges and sewer rents and taxes covered by meters, if any, shall be apportioned (x) on the basis of an actual reading done or a frontage reconciliation (as applicable) dated within five (5) Business Days prior to the Closing Date or (y) if such reading has not been made, on the basis of the last available reading (provided however, that in such event, Sellers shall, if required by the Title Company, escrow such amount as the Title Company shall reasonably require pending receipt of an actual water reading in order that Purchaser shall receive an "omit" on Purchaser's title policy for such water charges). If the apportionment is not based on an actual current reading described in clause (x) above, Purchaser and Sellers shall make the required proration as set forth in Section 3(m).

(f)    Contracts, Etc. Amounts due or prepaid under the Assumed Contracts and or Licenses. Sellers shall receive a credit at the Closing in an aggregate amount equal to any amounts prepaid by any Seller at or prior to the Closing. For the avoidance of doubt, pursuant to Section 8(c), Purchaser shall pay any amounts due under the Assumed Contracts or Licenses up to the Cure Cost Cap amount for the period prior to Closing, which Cure Cost Cap shall not be subject to the prorations set forth in this Section 3(f).

(g)    Vault Charges. All vault charges, if any, on the basis of the fiscal years, respectively, for which same have been assessed.

(h)    Payables. Sellers shall receive a credit for all advance payments or deposits made by any Seller with respect to goods and services that have been ordered or scheduled, as applicable, but not delivered to, or performed at, the Premises, prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such goods and services which were ordered or scheduled prior to the Closing.

(i)    Existing PMA. Each Seller shall terminate solely with respect to such Seller, as of the Closing Date, that certain Property Management Agreement dated as of March 5, 2013 (the "Existing PMA"), by and between The Zarasai Group LTD and Pinnacle Managing Co. LLC (the "Existing Manager") in accordance with the terms and provisions of the Existing PMA, and all amounts on reserve with the Existing Manager not otherwise expressly addressed in this Agreement will be retained by Sellers, subject to adjustment as provided herein. If Purchaser enters into a management agreement with the Existing Manager, all fees, reimbursements and other payments to be made by Purchaser to the Existing Manager pursuant to any such management agreement shall be the responsibility of Purchaser and the entry into by Purchaser of any such management agreement shall not be a condition to the Closing.

(j)    Labor and Employment Costs. Wages, vacation pay, sick pay, pension, health and other employee benefit fund contributions and other fringe benefits of those Employees represented by the unions listed on Schedule 8 (the "Union" and such Employees the "Union Employees"), at any Premises shall be prorated based on the amount accrued and paid (or not yet

6

paid) as of the Cut-off Time.  So long as Purchaser has received at the Closing a credit from Sellers against the Purchase Price in an amount equal to the aforementioned expenses accrued but not yet payable under the terms of the Union Contract, Purchaser shall be responsible for payment of same; provided, however, that so long as Purchaser complies with its obligations under Section 20(d), Purchaser shall not be liable for any withdrawal liability assessed as a result of the Closing;

(k)    Violations.  At the Closing, Sellers shall provide Purchaser a credit against the Purchase Price for liquidated fines and penalties imposed as of the Closing Date with respect to any violations known by Sellers (the "Fines and Penalties") including those listed on Schedule 11 (which credit to Purchaser shall not in the aggregate be in excess of $679,000), subject to the provisions of Section 6(g) and solely to the extent the Premises are not sold "free and clear" of the Fines and Penalties pursuant to sections 363(f) or 1141(c) of the Bankruptcy Code.

(l)    Other Prorations.  Such other items of operating income or operating expense not otherwise accounted for in clauses (a) through (k) above as are customarily apportioned between sellers and purchasers of real properties of a type similar to the Premises and located in the same city as such Premises.

(m)    True-Up. If any of the items subject to apportionment under the foregoing provisions of this Section 3 or  cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date and the proper party reimbursed, which obligation shall survive the Closing for a period of ninety (90) days after the Closing Date.  Neither party hereto shall have the right to require a recomputation of a Closing apportionment or a correction of an error or omission in a Closing apportionment unless within such ninety (90) day period one of the parties hereto (i) has obtained the previously unavailable information or has discovered the error or omission, and (ii) has given notice thereof to the other party, together with a copy of its good faith recomputation of the apportionment and copies of all substantiating information used in such recomputation.  The failure of a party to obtain any previously unavailable information or discover an error or omission with respect to an item subject to apportionment hereunder and to give notice thereof as provided above within ninety (90) days after the Closing Date shall be deemed a waiver of its right to cause a recomputation or a correction of an error or omission with respect to such item after the Closing Date.

Except as set forth in Section 3(b), the provisions of this Section 3 shall survive the Closing for ninety (90) days.

4.    Closing Date.  The delivery of the Deeds and the consummation of the transactions contemplated by this Agreement (the "Transactions", and the consummation, the "Closing") shall take place thirty (30) days after the entry of the Approval Order, time being of the essence (the "Closing Date"), provided, however, Purchaser shall have the right to extend the Closing Date for up to an additional sixty (60) days, time being of the essence, upon delivery of written notice from Purchaser to Sellers no less than three (3) business days prior to the Closing Date. The Closing

shall be conducted remotely via the electronic exchange of documents or at such other location or in such other manner as may be mutually agreed to by Purchaser and Seller.

5.      Permitted Encumbrances.  Sellers shall convey and Purchaser shall accept title to the Premises subject only to those matters set forth on Schedule 3 attached hereto, free and clear pursuant to the maximum extent permitted under Section 363 of the Bankruptcy Code (collectively, the "Permitted Encumbrances").

6.      Title.

(a)      (i)      (x) No later than twenty (20) days prior to the Closing Date, Purchaser shall have obtained, at Purchaser's sole cost and expense, a commitment for an owner's fee title insurance policy with respect to each Premises (each, a "Title Commitment" and collectively, the "Title Commitments") from First American Title Insurance Company (the "Title Company"), together with copies of all instruments reflected as exceptions set forth therein (where available), and (y) prior to the Effective Date Purchaser has received a copy of the surveys for those Premises listed on Schedule 12 (which Schedule shall include the date the survey was prepared and the name of the surveyor who prepared such survey) (the "Existing Surveys").  In the event any Title Commitment discloses the existence of defects in or to title solely with respect to any Premises being owned by its applicable Seller as set forth on Schedule 1 (i.e., that the applicable Seller does not own the applicable Premises) (and not otherwise with respect to any other liens, exceptions, defects, encumbrances or matters affecting title to any Premises), Purchaser shall provide the applicable Seller with notice of the same within five (5) business days after Purchaser receives each Title Commitment (the "Ownership Objections").  Purchaser acknowledges that all other liens, encumbrances or other defects or exceptions in or to title to the Premises which are of record against the applicable Premises, including what appears in Schedule B of the Title Commitment are Permitted Encumbrances.  If able to be cured, Sellers shall use commercially reasonable efforts to cure any Ownership Objections.  Purchaser may obtain, at its own cost and expense, a title insurance policy for each Premises (as applicable, the "Title Insurance") or a new survey of each Premises or an update to the Existing Surveys (as applicable, the "Surveys"), it being understood that obtaining Title Insurance or a Survey for any Premises shall not constitute a condition to, or otherwise delay, the Closing.

(ii)      If, subsequent to the delivery of any Title Commitment or the Effective Date, whichever is later, the Title Company provides an update to any Title Commitment which discloses the existence of any new liens, encumbrances or other defects or exceptions in or to title to the Premises created by Sellers (including any update based on a Survey), other than Permitted Encumbrances, first arising after the effective date of the applicable Title Commitment subject to which Purchaser is unwilling to accept title (collectively, the "New Unacceptable Encumbrances" and, together with the Ownership Objections, the "Unacceptable Encumbrances") and Purchaser gives Sellers notice of the same ("Purchaser's Supplemental Title Notice") on the earlier of (A) five (5) Business Days after Purchaser receives notice of such New Unacceptable Encumbrances and (B) the Closing Date, Sellers may or shall (as applicable) undertake to cure or remove the same in accordance with and subject to Section 6(a)(iii) and Section 6(b).  Purchaser hereby waives any right Purchaser may have to advance as objections to title or as grounds for Purchaser's refusal to close the Transactions any New Unacceptable Encumbrance unless

8

Purchaser shall timely provide the Purchaser's Supplemental Title Notice (failure to so timely notify Sellers shall be deemed to be a waiver by Purchaser of its right to raise such New Unacceptable Encumbrance as an objection to title or as a ground for Purchaser's refusal to close the Transactions and all such New Unacceptable Encumbrances shall thereafter be deemed Permitted Encumbrances).  Sellers, in their sole discretion, may adjourn the Closing one or more times for up to sixty (60) days in the aggregate in order to eliminate any Unacceptable Encumbrances.

(iii)    Subject to Section 6(b), with respect to each Title Commitment, if Sellers are unable to cure or remove all Ownership Objections or if Sellers are unable or unwilling to cure or remove all New Unacceptable Encumbrances not waived by Purchaser, Sellers shall so notify Purchaser no later than (x) five (5) Business Days after obtaining knowledge that the applicable Seller is unable to eliminate the subject Unacceptable Encumbrances or making the determination that the applicable Seller is unwilling to eliminate the subject New Unacceptable Encumbrances, or (y) if earlier, on the Closing Date (and any failure of Sellers to so notify Purchaser shall be deemed an election by Sellers not to eliminate any of the Unacceptable Encumbrances not waived by Purchaser, subject to Section 6(b)), whereupon Purchaser shall elect by the earlier of (i) three (3) Business Days after receipt of Sellers' notification (if such notification is sent by Sellers) or (ii) the Closing Date, as its sole remedy for such inability or unwillingness of Sellers, either to (A) remove the Premises with such Unacceptable Encumbrance from the scope of the Transactions if such Unacceptable Encumbrance would have a material adverse impact on more than fifteen percent (15%) of the allocated Purchase Price of such Premises (set forth on Schedule 1 hereto), as determined by Seller in its reasonable discretion, or (B) accept title subject to such Unacceptable Encumbrances which Sellers are unable or unwilling to eliminate (in which event such Unacceptable Encumbrances shall be deemed Permitted Encumbrances) and receive no credit against, or reduction of, the Purchase Price.  Notwithstanding the foregoing, Sellers may remove or cure any Unacceptable Encumbrance by causing the Title Company to commit to remove or insure over such Unacceptable Encumbrance from Purchaser's and its lender's policies of title insurance, at any time prior to or at the Closing and in which case the same shall be deemed to constitute a Permitted Encumbrance, so as to be able to convey title in accordance with the terms of this Agreement on the Closing Date (whether or not the Closing is adjourned as provided in Section 6(a)(ii)) If Purchaser elects to remove any Premises from the Transactions pursuant to this Section 6(a)(iii), then the Purchase Price shall be reduced by the allocated Purchase Price of the applicable Premises being removed from the Transactions.

(b)    Notwithstanding anything to the contrary set forth in this Section 6 or elsewhere in this Agreement, except as set forth below, unless otherwise specifically agreed to by Sellers in a response to Purchaser's Supplemental Title Notice or otherwise required to be removed by Sellers pursuant to the terms of this Agreement, Sellers shall not be obligated to bring any action or proceeding, to make any payments or otherwise to incur any expense (other than reasonable legal fees) in order to cure or eliminate Unacceptable Encumbrances not waived by Purchaser; except that Sellers shall be required to satisfy (i) any lien(s) and ancillary documents voluntarily created or suffered by a Seller either (x) after the effective date of the applicable Title Commitment or (y) created by a Seller prior to the Effective Date but which were not filed or recorded until after the effective date of the applicable Title Commitment, and shall use commercially reasonable efforts to cause such lien to be satisfied or otherwise removed of record

9

and (ii) any mechanics' liens arising after the effective date of the applicable Title Commitment from any work or improvements at a Premises ordered by or on behalf of its respective Seller (other than liens or claims arising from any acts of Purchaser or for which Purchaser receives a credit at the Closing) which can be satisfied solely by the payment of liquidated amounts (the items described in clauses (i) and (ii)  being collectively referred to as "Monetary Liens").  Without limiting the generality of the preceding provisions of this Section 6(b), for the purposes of this Agreement (including Section 6(a) and Section 17(b)), unless otherwise specifically agreed to by Sellers (whether in a response to Purchaser's Supplemental Title Notice or otherwise), a Seller's failure or refusal to bring any action or proceeding, to make any payments or to otherwise incur any expense (except for a Seller's obligation to satisfy Monetary Liens as aforesaid) in order to eliminate Unacceptable Encumbrances not waived by Purchaser shall be deemed an inability of Sellers to eliminate such Unacceptable Encumbrances but shall not be a default by any Seller hereunder (willful or otherwise).

(c)     If on the Closing Date there are any Monetary Liens which Sellers must pay or discharge in order to convey to Purchaser such title as is herein provided to be conveyed, Sellers may, in their sole discretion, elect to use any portion of the Purchase Price to satisfy the same; provided that (i) the applicable Seller shall deliver, or cause to be delivered, to Purchaser or the Title Company, at the Closing, instruments in recordable form and sufficient to satisfy such Monetary Liens of record, together with the cost of recording or filing said instruments, or (ii) the applicable Seller, having made arrangements with the Title Company, shall deposit with the Title Company sufficient monies acceptable to the Title Company (which may be a portion of the Purchase Price) to insure the obtaining and recording of such satisfactions.  The existence of any such Monetary Liens shall not be deemed objections to title if Sellers shall comply with the foregoing requirements and the Title Company omits such Monetary Liens from Purchaser's owner's policy of title insurance and insures title in the Premises to Purchaser free and clear of such Monetary Liens.

(d)     At each Seller's election, in its sole discretion, any unpaid Monetary Liens for taxes, water and sewer charges and assessments, which are the obligation of Sellers to satisfy and discharge, shall not be objections to title if the amount thereof, plus interest and penalties thereon, if any, computed to the Closing Date, is deducted from the Purchase Price payable pursuant to Section 2, subject to the provisions contained herein for apportionment of taxes, water and sewer charges and assessments, and the Title Company insures title in the Premises to Purchaser free and clear of such Monetary Liens.

(e)     If on the Closing Date there shall be conditional bills of sale, chattel mortgages or security interests filed against the Premises (other than any Monetary Liens), the same shall not constitute objections to title provided the applicable Seller executes and delivers an affidavit to Purchaser and the Title Company to the effect either (i) that the personal property covered by said conditional bills of sale, chattel mortgages, or security interests is no longer in or on the Premises, or (ii) if such personal property is still in or on the Premises, that it has been fully paid for, or (iii) that such personal property is the property of a tenant of the Premises or Existing Manager, if applicable.

(f)     Any franchise or corporate tax open, levied or imposed against a Seller and payable by Seller pursuant to Section 2 of this Agreement that may be a lien on the Premises on the Closing Date shall not be an objection to title if the Title Company omits same from the title policy issued pursuant to the Title Commitments.

(g)     Subject to Section 3(k) and Section 6(b), Purchaser agrees to purchase the Premises subject to any and all notes or notices of violations of Law, or municipal ordinances, orders, designations, or requirements whatsoever noted in or issued by any federal, state, municipal, or other governmental department, agency, or bureau, or any other governmental authority having jurisdiction over the Premises, and any condition or state of repair or disrepair, or other matter or thing, whether or not noted, which, if noted, would result in a violation being placed on the Premises. Sellers shall have no duty to remove or comply with or repair any condition, matter, or thing whether or not noted, which resulted in a violation or which, if noted, would result in a violation being placed on the Premises, and except as set forth in Section 6(b), Sellers shall have no duty to remove or comply with or repair any of the aforementioned violations or other conditions, or to remove the same of record, and Purchaser shall accept the Premises subject to all such violations, the existence of any conditions at the Premises which would give rise to such violations, if any, and any governmental claims arising from the existence of such violations. Notwithstanding anything contained herein to the contrary, subject to Section 3(k) and Section 6(b), Sellers shall not be responsible for any violation, nor any fines or penalties associated with same, to the extent such violation is caused by or is otherwise the responsibility of any tenant pursuant to its Lease.

7.     Representations and Warranties.

(a)     (i)     Each Seller represents and warrants to Purchaser as of the Effective Date (unless as expressly stated otherwise) as follows solely as to itself:

(A)     Seller is a duly formed and validly existing limited liability company organized under the Laws of the state listed next to such Seller on Schedule 1, and is qualified under the Laws of the State of New York to conduct business therein on the Closing Date, except, in each case, where the absence of such status or qualification would not reasonably be expected to have a material adverse effect on Seller's ability to consummate the Transactions or on the ownership, use, or operation of the Premises.

(B)     Subject to entry of the Approval Order, Seller has the full legal right, power and authority to execute and deliver this Agreement, and all documents now or hereafter to be executed by Seller pursuant to this Agreement (collectively amongst the Sellers, the "Sellers' Documents"), to consummate the Transactions, and to perform its obligations hereunder and under the Sellers' Documents. As used herein, "Approval Order" shall mean  an order of the Bankruptcy Court entered in the Bankruptcy Case approving and authorizing this Agreement and the Transactions pursuant to a chapter 11 plan under section 1129 of the Bankruptcy Code, which order shall be substantially in the form attached as Exhibit J to this Agreement; provided that any material changes affecting a party hereto shall require such party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. For the avoidance of doubt, Purchaser shall

11

only be entitled to consulting rights with respect to changes to the Approval Order that may impact this Agreement, and this Section 7(a)(i)(B) shall not grant any approval or consent rights in connection with the chapter 11 plan or Approval Order occurring in connection with the Chapter 11 Cases not in connection with such Purchaser.

(C)     Subject to entry of the Approval Order, this Agreement and the Sellers' Documents do not and will not contravene on the Closing Date any provision of the certificate of formation or operating agreement of Seller, any judgment, order, decree, writ or injunction issued against Seller, or any provision of any state or federal laws or governmental ordinances, rules, regulations or orders (collectively, "Laws") applicable to Seller.  The consummation of the Transactions will not result in a violation of any Laws applicable to Seller.

(D)     To each Seller's knowledge, Schedule 4 (the "Lease Exhibit") is a list of all written leases, licenses or other occupancy agreements in Seller's possession affecting any portion of the applicable Premises and under which such Seller is the landlord (collectively and including any amendments, modifications, guarantees or supplements thereto, the "Leases").  The Lease Exhibit lists all Leases related to the Premises, and the information set forth on the Lease Exhibit with respect to rent, security deposits, delinquencies and credits is true and correct in all material respects as of the last day of the month prior to the Effective Date.  Except as indicated on the Lease Exhibit, all security deposits are held in the form of cash.  As of the Effective Date and except as indicated on the Lease Exhibit, Seller has not given any written notice to any tenant under any Lease of a monetary or material non-monetary default which remains uncured. Except for the tenants under the Leases, Seller has not granted any right or option to lease or occupy the Premises or any part thereof.  No Seller has granted any right or option to any party to purchase Seller's interest in the Premises or any part thereof which remains outstanding.

(E)     To such Seller's knowledge, there is no unrecorded ground lease encumbering any portion of the Premises owned by such Seller.

(F)     There are no commercial brokerage, leasing, commission or like agreements relating to the Leases that will be binding on Purchaser after the Closing. All commercial brokerage commissions earned in connection with any Lease have been paid in full or will be paid by Seller on or prior to the Closing Date.

(G)     Except as otherwise set forth in the applicable Title Commitment, the Bankruptcy Cases or as set forth on Schedule 9, to such Seller's knowledge, there are no (i) pending actions, suits, or other legal proceedings against such Seller or its respective Premises before any court or other governmental authority, or (ii) existing orders, applications or pending administrative or judicial complaints or proceedings which require or could result in the reduction of any rent (including complaints, actions or proceedings relating to diminution of services) below the rental set forth on the Lease Exhibit or any claims of harassment relating to any prior or current tenants of the Premises, except, in each case of the foregoing, (i) and (ii), (A) administrative

12

proceedings or proceedings with the New York City Department of Housing Preservation and Development ("HPD") or (B) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Sellers or the use and operation of the Premises, taken as a whole.

(H)    Except as disclosed in the applicable Title Commitments (including any violation searches received in connection with such Title Commitments or that are otherwise public record), to such Seller's knowledge, such Seller has not received a written notice from any governmental authority having jurisdiction over its respective Premises requiring any work, repairs, construction, alterations or installations on or in connection with any part of such Premises because of violations of any applicable building, safety or fire ordinances which have not been corrected or which will not otherwise be corrected prior to the Closing (provided that one or more notices of violation may remain of record as of the Closing Date and the same shall not, in and of themselves, constitute a breach of the foregoing representation).

(I)    Seller is not a "foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code ("Code"), as amended, or its regulations.

(J)    To such Seller's knowledge, except for (i) the Licenses, (ii) assignable purchase orders, equipment leases, advertising agreements, license agreements and other service contracts relating exclusively to the operation of its respective Premises, and (iii) assignable contracts exclusively used for the construction, repair or renovation of any Improvements (clause (iii) collectively, the "Construction Contracts" and, clauses (i) through (iii) together, the "Contracts"), listed on Schedule 5 attached hereto (the "Contracts Exhibit"), Seller has not entered into (or caused to be entered into) any Contracts relating to its respective Premises.  Except as set forth in the Contracts Exhibit or the Sellers Cure Cost Schedule, (i) all of the Contracts on the Contracts Exhibit as of the Closing Date are in full force and effect, (ii) the Seller has not given written notice of any existing monetary or material non-monetary default under any of the Contracts, and (iii) to such Seller's knowledge, no vendor is in monetary default under any of the Contracts.

(K)    True, complete and correct copies of the Leases and Contracts, in all material respects, have been made available to Purchaser.

(L)    Schedule 7 attached hereto (which shall be permitted to be updated by Sellers on or prior to the Closing Date to the extent necessary because of events occurring after the Effective Date) sets forth a complete and accurate list of all employees employed onsite at or exclusively for the Premises (including the Union Employees), by Sellers or Existing Manager, if applicable, including those providing building services as defined by the Displaced Building Service Workers Protection Act set forth in Section 22-505 of the Administrative Code of the City of New York ("DBSWPA") under any contract, as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence or otherwise inactive but still employed onsite at or exclusively for the Premises (collectively, the "Employees") and the union, if any, in which the Employees are

13

members. For purposes of clarity, Employees do not include any individuals employed by Existing Manager who perform general administrative, management or leasing services for the Premises. Schedule 7 is a true, correct and complete list (in all material respects) of all such Employees' names, job titles, dates of hire, current compensation, and employment occupation or classification, and if applicable, any leave of absence currently pending, the type of leave and expected return date, and whether or not represented by the Union, as of the date hereof. Except for the Union Employees who are listed on Schedule 7, none of the Employees are represented by a labor union in connection with his or her employment by Seller or Existing Manager, if applicable, and to such Seller's knowledge, no representation petition has been filed, nor has any proceeding been instituted by any employee, group of employees or labor union with the National Labor Relations Board or other labor relations board or commission with respect to the Premises. To such Seller's knowledge, there is no pending or threatened organizing activity, strike or other union activity at the Premises.

(M)    Except for the collective bargaining agreement listed on Schedule 8 (the "Union Contract"), neither Seller nor Existing Manager, if applicable, is a party to or otherwise bound by a collective bargaining agreement or other agreement with any labor union or employee representative covering individuals providing services onsite at the Premises. Except as set forth on Schedule 8(a), neither Seller nor Existing Manager, if applicable, has received any written notice of a claim that neither Seller nor Existing Manager, if applicable, is in default in any material respect under the Union Contract with respect to the Premises. Except as set forth on Schedule 8(b), to such Seller's knowledge, there are no pending or threatened in writing unfair labor practice charges, grievances, or labor arbitrations in respect of the Employees of Seller. Neither Seller nor Existing Manager, if applicable, is party to any written employment agreements with any Employee.

(N)    Except for the Benefit Plans identified in the Union Contract, Seller does not sponsor, maintain or contribute to any Benefit Plans. "Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (whether or not subject to ERISA), which are or have in the past five years been sponsored, maintained, contributed to for the benefit of any current or former employee providing services at the Premises. Each Benefit Plan which is an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) is qualified under Section 401(a) of the Code and the trust, if any, forming part of such plan is exempt from federal income tax under Section 501(a) of the Code. A favorable determination letter has been issued by the Internal Revenue Service pursuant to Internal Revenue Service Revenue Procedure 93-39 and its progeny with respect to each such plan and trust, and, to such Seller's knowledge, there are no facts and nothing has occurred that would adversely affect the qualification of such plan. With respect to each employee benefit plan or arrangement (including the Benefit Plans, but excluding any multiemployer plans, as defined in Section 3(37) of ERISA, to which Seller was obligated to contribute pursuant to a Union Contract), maintained or contributed to by Seller, (x) there is no actual or contingent liability of Seller under Title IV of ERISA or the Code to any person or entity, including the Pension Benefit Guaranty Corporation, the Internal Revenue Service, any such plan or the participants (or their beneficiaries) in any such plan (other than the

14

obligation to pay routine benefit claims when due under the terms of such plan), (y) the Premises is not subject to a lien under ERISA or the Code and (z) to such Seller's knowledge, there is no basis for such liability or the assertion of any such lien with respect to the Premises as the result of or after the consummation of the Transactions.

(O)    There are no condemnation or eminent domain proceedings pending or, to such Seller's knowledge, threatened against the Premises of such Seller.

(P)    Seller has not instituted, consented to, approved or otherwise permitted the institution of any proceeding or proceedings to obtain a change in the present zoning affecting or appertaining to the Premises of such Seller.

(Q)    Neither Seller nor any of its direct or indirect equity owners, nor, to such Seller's knowledge, any of their respective employees, officers or directors, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control of the Department of the Treasury ("OFAC") (including those named on OFAC's Specially Designated and Blocked Persons List) or under any similar statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) or other similar governmental action. Notwithstanding the foregoing, this provision shall not apply to any holders of equity in a publicly traded company.

(R)    Neither Seller nor any of its direct or indirect equity owners, nor, to such Seller's knowledge, any of their respective employees, officers or directors: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. "Anti-Money Laundering Laws" means Laws, regulations and sanctions, state and federal, criminal and civil, that: (1) limit the use of or seek the forfeiture of proceeds from illegal transactions; (2) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (3) require identification and documentation of the parties with whom a financial institution conducts business; or (4) are designed to disrupt the flow of funds to terrorist organizations. Such Laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act, 31 U.S.C. Section 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, as well as Laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957. Notwithstanding the foregoing, this provision shall not apply to any holders of equity in a publicly traded company.

(S)    Seller has not transferred or agreed to transfer any development or air rights pertaining to the Premises, other than as disclosed in the Permitted Encumbrances.

(T)    To such Seller's knowledge, except as set forth on <u>Schedule 10</u>, Seller has not received written notice from any governmental authority of a violation of any Environmental Laws respecting the Premises that remains outstanding.  As used in this Agreement, "<u>Environmental Laws</u>" shall mean the following, statutes or regulations promulgated pursuant thereto: (1) the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. Section 6901 et seq.; (2) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. Section 9601 et seq.; (3) the Clean Water Act, 33 U.S.C. Section 1251 et seq.; (4) the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; (5) the Clean Air Act, 42 U.S.C. Section 7401 et seq.; and (6) any similar federal, state or local Laws, regulations, rules or ordinances applicable to the Premises that are in effect relating to pollution or protection of the environment.

As used in this Agreement, the word "<u>Portfolio Level Representations and Warranties</u>" shall be deemed to mean representations and warranties set forth in <u>Section 7(a)(I)(A)</u>, <u>(B)</u>, <u>(C)</u>, <u>(I)</u>, <u>(M)</u>, <u>(N)</u>, <u>(Q)</u>, and <u>(R)</u>. As used in this Agreement, the word "<u>Property Level Representations and Warranties</u>" shall be deemed to mean representations and warranties set forth in <u>Section 7(a)(I)(D)</u>, <u>(E)</u>, <u>(F)</u>, <u>(G)</u>, <u>(H)</u>, <u>(J)</u>, <u>(K)</u>, <u>(L)</u>, <u>(O)</u>, <u>(P)</u>, <u>(S)</u>, and <u>(T)</u>.

As used in this Agreement, the words "<u>Seller's knowledge</u>" or words of similar import shall be deemed to mean, and shall be limited to, the actual (as distinguished from implied, imputed or constructive) knowledge of Ephraim Diamond and/or David Barse, without such person having any obligation to make an independent inquiry or investigation.  There shall be no personal liability on the part of Ephraim Diamond and/or David Barse arising out of any representations or warranties made in this Agreement or otherwise.

(ii)    If at or prior to the Closing, (A) Purchaser shall become aware (whether through its own efforts, by notice from any Seller or otherwise) that any of the representations or warranties made herein by any Seller are untrue, inaccurate or incorrect in any material respect and shall give Sellers notice thereof at or prior to the Closing, or (B) any Seller shall notify Purchaser that a representation or warranty made herein by any Seller is untrue, inaccurate or incorrect in any material respect, then Sellers may, in their sole discretion, elect by notice to Purchaser to adjourn the Closing one or more times for up to sixty (60) days in the aggregate in order to cure or correct any such untrue, inaccurate or incorrect representation or warranty.  If any such representation or warranty is not cured or corrected by the applicable Seller on or before the Closing Date (whether or not the Closing is adjourned as provided above), then Purchaser, as its sole remedy, shall elect either (I) to waive such misrepresentations or breaches of warranties and consummate the Transactions without any reduction of or credit against the Purchase Price, or (II) (a) with respect to  such misrepresentation of any Portfolio Level Representations and Warranties, which would constitute a material adverse effect with respect to the Sellers taken as a whole, to terminate this Agreement by notice given to Sellers prior to the

Closing Date, in which event, this Agreement shall be terminated and neither party shall have any further rights, obligations or liabilities hereunder, except for the Surviving Obligations, and Purchaser shall be entitled to a return of the Deposit, or (b) with respect to such misrepresentation of any Property Level Representations and Warranties, to remove such Premises from the scope of this Transaction in accordance with Section 17(a)(i)(B); provided that Purchaser has not previously received written notice from Sellers that Sellers have elected to terminate this Agreement as a result of a Purchaser default hereunder. Purchaser acknowledges and agrees that (x) at or prior to the Closing, Purchaser's rights and remedies in the event Purchaser becomes aware (whether through its own efforts, by notice from Sellers or otherwise) prior to the Closing that any Seller's representations or warranties made in this Agreement are untrue, inaccurate or incorrect in any material respect shall be only as provided in this Section 7(a)(ii), and (y) if the Closing does not occur as a result of Purchaser becoming aware (whether through its own efforts, by notice from Sellers or otherwise) prior to the Closing that any of Seller's representations or warranties made in this Agreement are untrue, inaccurate or incorrect in any material respect, Purchaser hereby expressly waives, relinquishes and releases all other rights or remedies available to it at Law, in equity or otherwise (including, the right to seek damages from Sellers) as a result of any Seller's representations or warranties made in this Agreement being untrue, inaccurate or incorrect in any material respect. To the extent that any of the Leases, Contracts or other Property Information actually furnished or made available to Purchaser on the electronic data site established by or on behalf of Seller or its agents or otherwise by transmittal to Purchaser in writing, in each case, as of the Effective Date, or otherwise obtained by Purchaser prior to the Effective Date (collectively, the "Available Property Information"), contain provisions or information that are inconsistent with the representations and warranties contained in this Section 7, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to such Available Property Information.

(iii)    The representations and warranties of Sellers set forth in Section 7(a)(i) as updated at the Closing pursuant to Section 7(a)(iv) shall be true, accurate and correct in all material respects upon the execution of this Agreement and shall be deemed to be repeated as being so true, accurate and correct in all material respects on and as of the Closing Date (except as they relate only to an earlier date).

(iv)    At the Closing, Sellers shall deliver to Purchaser a certificate signed by Sellers in the form of Exhibit G-1 ("Sellers' Closing Certificate") representing to Purchaser that all of the representations and warranties of Sellers set forth in this Agreement remain true and correct in all material respects as if made on the Closing Date (other than such representations and warranties, if any, that were made as to a specified earlier date, which shall be true and correct in all material respects as of such specified earlier date), or if any such representations are not so true and correct in all material respects as if made on the Closing Date (or such specified earlier date), stating with reasonable specificity in what respects they are not true and correct. It is a condition precedent to the obligation of Purchaser to complete the Closing under this Agreement that the representations and warranties made by Sellers in this Agreement shall, subject to update in Sellers' Closing Certificate as to facts and circumstances occurring with regard to the Premises between the Effective Date and the Closing Date which do not constitute a violation by any Seller

17

of an express obligation under this Agreement, remain true and correct in all material respects as if made on the Closing Date (or such specified earlier date).

(v)     Each of the Sellers and Purchaser acknowledge and agree that except for the representations and warranties expressly set forth in this <u>Section 7</u> or elsewhere in this Agreement (as modified by the Schedules), none of the Sellers or any other person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of Sellers or any of their affiliates, and Sellers hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of any Seller, its agents or representatives, including their contractors, attorneys, accountants, consultants, brokers or advisors.  Each of the Sellers and Purchaser acknowledge and agree that except for the representations and warranties expressly set forth in this <u>Section 7</u> or elsewhere in this Agreement (as modified by the Schedules), Sellers hereby disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Premises, and disclaim all liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Purchaser or Purchaser's directors, officers, employees, affiliates, partners, brokers, agents or other representatives, including, attorneys, accountants, contractors, consultants, lenders and financial advisors (collectively, "<u>Purchaser's Representatives</u>") (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by Sellers or their representatives), including omissions therefrom.  Each of the Sellers and Purchaser acknowledge and agree that, without limiting the foregoing, except for the representations and warranties of Sellers expressly set forth in this Agreement (as modified by the Schedules), Sellers do not make any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Purchaser or any Purchaser's Representatives regarding the probable success, profitability or value of the Premises.  The disclosure of any matter or item in any Schedule or other schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would reasonably be expected to result in a material adverse effect.

(b)     (i)     Purchaser represents and warrants to Sellers as of the Effective Date as follows:

(A)     Purchaser is a duly formed and validly existing corporation incorporated under the Laws of Delaware, and is qualified under the Laws of the New York to conduct business therein on the Closing Date.

(B)     Purchaser has the full legal right, power, authority and financial ability to execute and deliver this Agreement and all documents now or hereafter to be executed by it pursuant to this Agreement (collectively, the "<u>Purchaser's Documents</u>"), to consummate the Transactions, and to perform its obligations hereunder and under Purchaser's Documents.

18

(C)    This Agreement and Purchaser's Documents do not and will not contravene any provision of the certificate of formation or operating agreement of Purchaser, any agreement to which Purchaser is a party or any judgment, order, decree, writ or injunction issued against Purchaser, or any provision of any Laws applicable to Purchaser. The consummation of the Transactions will not result in a breach or constitute a default or event of default by Purchaser under any agreement to which Purchaser or any of its assets are subject or bound, will not require any consent of or filing with or notification to any governmental authorities by Purchaser and will not result in a violation of any Laws applicable to Purchaser.

(D)    There are no pending actions, suits, proceedings or investigations to which Purchaser is a party before any court or other governmental authority which may have a material adverse impact on the Transactions.

(E)    No bankruptcy, insolvency, reorganization or similar action or proceeding, whether voluntary or involuntary, is pending, or has been threatened in writing against Purchaser.

(F)    Purchaser is not acquiring the Premises with the assets of an employee benefit plan (as defined in Section 3(3) of ERISA) or, if the assets of an employee benefit plan will be used to acquire the Premises, Purchaser will deliver to Seller at the Closing a certificate containing such factual representations as shall permit Seller and its counsel to conclude that no prohibited transaction would result from the consummation of the Transactions. To Purchaser's knowledge, Purchaser is not a "party in interest" within the meaning of Section 3(3) of ERISA with respect to any beneficial owner of Seller.

(G)    Neither Purchaser nor any of its direct or indirect equity owners, nor, to Purchaser's knowledge, any of their respective employees, officers or directors, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any similar statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) or other similar governmental action.

(H)    Neither Purchaser nor any of its direct or indirect equity owners, nor, to Purchaser's knowledge, any of their respective employees, officers or directors, nor any person or entity providing funds to Purchaser: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(ii)     The representations and warranties of Purchaser set forth in Section 7(b)(i) and elsewhere in this Agreement or the Purchaser's Documents (including, the A&A Agreements) shall be true, accurate and correct in all material respects upon the execution of this Agreement, and shall be deemed to be repeated as being so true, accurate and correct in all material respects on and as of the Closing Date (except as they relate only to an earlier date).

(iii)    If at or prior to the Closing, (A) Sellers shall become aware (whether through its own efforts, by notice from Purchaser or otherwise) that any of the representations or warranties made herein by Purchaser are untrue, inaccurate or incorrect in any material respect and shall give Purchaser notice thereof at or prior to the Closing, or (B) Purchaser shall notify Sellers that a representation or warranty made herein by Purchaser is untrue, inaccurate or incorrect in any material respect, then Purchaser may, in its sole discretion, elect, by notice to Sellers, to adjourn the Closing one or more times for up to thirty (30) days in the aggregate (but under no circumstances shall any such adjournment extend the Closing Date to occur after the End Date) in order to cure or correct any such untrue, inaccurate or incorrect representation or warranty.  If any such representation or warranty is not cured or corrected by Purchaser on or before the Closing Date (whether or not the Closing is adjourned as provided above), then Sellers, as their sole remedy, shall elect either (x) to waive such misrepresentations or breaches of warranties and consummate the Transactions, or (y) to terminate this Agreement by notice given to Purchaser prior to the Closing, in which event, this Agreement shall be terminated and the Deposit shall be retained by Sellers as provided in Section 17(a)(i)(C).

(iv)    At the Closing, Purchaser shall deliver to Sellers a certificate signed by Purchaser in the form of Exhibit G-2 ("Purchaser's Closing Certificate") representing to Sellers that all of the representations and warranties of Purchaser set forth in this Agreement remain true and correct in all material respects as if made on the Closing Date (other than any such representations and warranties, if any, that were made as to a specified earlier date, which shall be true and correct in all material respects as of such specified earlier date), or if any such representations are not so true and correct in all material respects as if made on the Closing Date (or such specified earlier date), stating with reasonable specificity in what respects they are not true and correct.  It is a condition precedent to the obligation of Sellers to complete the Closing under this Agreement that the representations and warranties made by Purchaser in this Agreement shall remain true and correct in all material respects as if made on the Closing Date or such specified earlier date), subject to update in Purchaser's Closing Certificate as to facts and circumstances occurring between the Effective Date and the Closing Date which do not constitute a violation by Purchaser of an express obligation under this Agreement.

8.     Costs.

(a)     Sellers shall pay or cause to be paid (i) the fees of any counsel or other party representing or engaged by Sellers in connection with the Transactions, (ii) the commission to Broker, (iii) all applicable state, county and city transfer taxes payable by reason of the conveyance of each Land and the Improvements to Purchaser, including all costs associated with any state and local recordation taxes; provided that Sellers shall each use commercially reasonable efforts to cause such taxes to be exempted by the Approval Order, and (iii) to the extent not exempted by the Approval Order, all applicable transfer taxes payable to any governmental authority by reason

of the conveyance of the Land and Improvements to Purchaser, including all costs associated with any state and local recordation taxes; provided that Seller shall use commercially reasonable efforts to cause such taxes to be exempted by the Approval Order.

(b)    Purchaser shall pay the fees of any counsel or other party representing or engaged by Purchaser in connection with the Transactions.  At the Closing, Purchaser shall also pay one hundred percent (100%) of the following costs and expenses: (i) all title insurance costs, fees, expenses and premiums for and related to the Title Commitments and the Title Insurance policy to be issued to Purchaser at or following the Closing, and all endorsements thereto; (ii) all costs of obtaining any and all documents from the Title Company and all title and other searches and all other title insurance company charges; (iii) all costs associated with Purchaser's due diligence studies and investigations of the Premises; (iv) all costs related to obtaining the Surveys; (v) all recording fees for documents to be recorded in connection with the Transaction (except for documents to be recorded in connection with satisfying any Monetary Liens as provided in Section 6); and (vi) any escrow fees (if any) of the Title Company.

(c)    Cure Costs. All Cure Costs (except for such cure costs pursuant to Section 6 in connection with the removal, curing or other satisfaction the requirements under 363(f) of the Bankruptcy Code of any Ownership Objections), including all actual or pecuniary losses that have resulted from any defaults under such Assumed Contracts, shall be paid by Purchaser (in an aggregate amount not to exceed $500,000 (the "Cure Costs Cap")), upon or before the Closing and Sellers shall not have any liability therefor (except for any amounts in excess of the Cure Costs Cap.  "Cure Costs" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption and assignment by any Seller, who is a debtor. Notwithstanding any ongoing dispute, contest or lack of final resolution regarding the amount or allocation of Cure Costs, Purchaser shall remain obligated to consummate the Closing in accordance with the terms of this Agreement and any such dispute shall not serve as a basis for Purchaser to delay or refuse to consummate the Closing; provided that Purchaser shall reserve its rights to assume or reject any Assumed Contracts that is subject to a dispute.

9.    No Due Diligence Review Period.  Purchaser acknowledges that (a) prior to the Effective Date, Purchaser completed the performance of all of Purchaser's due diligence examinations, reviews and inspections of all matters pertaining to the purchase of the Premises, including all permits, licenses, management agreements, Leases, Contracts, and all physical, environmental and compliance matters and conditions respecting the Premises, (b) Purchaser is not entitled to any additional due diligence period in connection with the Premises or the Transactions, and (c) Purchaser has no right to terminate this Agreement in connection with any due diligence objections.

10.    Conditions Precedent to Closing.

(a)    Purchaser's obligation under this Agreement to purchase the Premises is subject to the fulfillment of each of the following conditions:

(i)      the Portfolio Level Representations and Warranties contained herein shall be true, accurate and correct in all material respects as of the Closing Date (other than such representations and warranties, if any, that were made as to a specified earlier date, which shall be true and correct as of such specified earlier date) (subject to the provisions of <u>Section 7(a)(ii)</u> and <u>Section 7(a)(iv)</u>);

(ii)      Sellers shall be ready, willing and able to deliver title to each Premises in accordance with the terms and conditions of this Agreement;

(iii)      Seller shall have requested and used commercially reasonable efforts to obtain a letter from the administrator under the Multiemployer Pension Plan calculating Seller's withdrawal liability as of the end of the most recent plan year (the "<u>MPP Letter</u>"); provided that the delivery of the MPP Letter shall not be a condition to the Closing;

(iv)      Sellers shall have delivered all the documents and other items required pursuant to <u>Section 11</u>, and shall have performed in all material respects all other covenants, undertakings and obligations, and complied with all conditions required by this Agreement to be performed or complied with by the Sellers, at or prior to the Closing;

(v)      <u>Approval Order</u>.  The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall not be subject to any stay;

(vi)      <u>No Prohibition</u>.  There shall be no order, writ, judgment, injunction, temporary restraining order, decree, stipulate determination, or award entered by or with any government authority in existence that prohibits the sale of the Premises or the Transactions; and

(vii)      <u>Cure Cost Schedule</u>. Sellers shall have delivered the schedule of Cure Costs (the "<u>Sellers Cure Cost Schedule</u>") to Purchaser by no later than ten (10) Business Days before the Closing Date, or such other date as Purchaser may agree to in writing.

(b)      Each Seller's obligation under this Agreement to sell the Premises to Purchaser is subject to the fulfillment of each of the following conditions:

(i)      the representations and warranties of Purchaser contained herein shall be true, accurate and correct in all material respects as of the Closing Date (other than such representations and warranties, if any, that were made as to a specified earlier date, which shall be true and correct in all material respects as of such specified earlier date) (subject to the provisions of <u>Section 7(b)(iii)</u> and <u>Section 7(b)(iv)</u>);

(ii)      Purchaser shall have delivered the funds required hereunder and all the documents to be executed or delivered by Purchaser set forth in <u>Section 12</u> and shall have performed in all material respects all other covenants, undertakings and obligations, and complied with all conditions required by this Agreement to be performed or complied with by Purchaser, at or prior to the Closing;

(iii)      <u>Approval Order</u>. The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall not be subject to any stay; and

(iv)    No Prohibition.  There shall be no order, writ, judgment, injunction, temporary restraining order, decree, stipulate determination, or award entered by or with any government authority in existence that prohibits the Transactions.

11.    Documents to be Delivered by Sellers at Closing.  On or prior to the Closing, Sellers shall execute, acknowledge or deliver (or caused to be delivered), as applicable, the following to Purchaser, or Purchaser's designee or the Escrow Agent:

(a)    an original deed for each Premises conveying title to such Premises substantially in the form of Exhibit A attached hereto (with such changes required to make such form of Deed factually correct) (each a "Deed" and, collectively, the "Deeds");

(b)    an Assignment and Assumption of Leases substantially in the form of Exhibit B attached hereto (the "Lease Assignment");

(c)    an Omnibus Assignment and Assumption Agreement substantially in the form of Exhibit C attached hereto (the "Omnibus Assignment") (the Lease Assignment and the Omnibus Assignment are herein referred to collectively as the "A&A Agreements") assigning without warranty or representation all of each Seller's right, title and interest, if any, in and to the Assumed Contracts;

(d)    an Assumption of Union Contract substantially in the form of Exhibit F attached hereto (the "Assumption of Union Contract") whereby Purchaser shall assume from each Seller, all of such Seller's liabilities and obligations under the Union Contract from and after the Closing Date;

(e)    to the extent in Sellers' possession or reasonable control and not already located at each Premises, all original (or, if originals are unavailable, copies of) Leases and any guaranties and other documents relating thereto, together with a schedule of all Security Deposits thereunder and the accrued interest on such Security Deposits payable to tenants (the "Transferred Security Deposits").  With respect to any Transferred Security Deposits which are letters of credit, Sellers shall (i) deliver to Purchaser at the Closing such original letters of credit, (ii) execute and deliver such other instruments as the issuers of such letters of credit shall reasonably require to transfer such letters of credit to Purchaser, and (iii) reasonably cooperate with Purchaser to change the named beneficiary under such letters of credit to Purchaser;

(f)    with respect to the applicable tenant files, and books and records relating to the operation, leasing or ownership of the Premises, Purchaser shall collect such books, records and correspondence from each Seller and each Seller shall make such records available;

(g)    a bill of sale substantially in the form of Exhibit D attached hereto (the "Bill of Sale") conveying, transferring and selling to Purchaser without warranty or representation all right, title and interest of each Seller in and to all FF&E Personal Property;

(h)    to the extent in Sellers' possession or control and not already located at the Premises, keys to all entrance doors to, and equipment and utility rooms located in, the Premises;

23

(i)    to the extent in Sellers' possession or control and not already located at the Premises or previously provided to Purchaser, copies of all Licenses;

(j)    to the extent in Sellers' possession or control and not already located at the Premises, executed originals (or, if originals are unavailable, copies of) all Assumed Contracts and all warranties in connection therewith which are in effect on the Closing Date and which are assigned by Seller;

(k)    to the extent in Sellers' possession or control and not already located at the Premises, copies of all plans and specifications, if any, related to any ongoing repair or renovation of the Improvements;

(l)    a list of Sellers' outstanding accounts receivable as of the Cut-off Time;

(m)    a duly executed Internal Revenue Service Form W-9 for each Seller. Purchaser acknowledges and agrees that upon Sellers' delivery of such affidavit, Purchaser shall not withhold any portion of the Purchase Price pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder;

(n)    owner's affidavits required by the Title Company, and in the form reasonably approved by Seller. Sellers shall also deliver to the Title Company and Purchaser such evidence as may be reasonably required by the Title Company with respect to the authority of the person executing the Deeds and the other documents required to be executed by or on behalf of any Seller;

(o)    (i) a New York State Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP-584 for the conveyance of the Premises (the "State Transfer Tax Return"), (ii) a New York City Department of Finance Real Property Transfer Tax Return for the conveyance of the Premises (the "City Transfer Tax Return"), and (iii) a New York State Real Property Transfer Report, Form RP-5217NYC (the "Transfer Report");

(p)    an agreed upon settlement statement ("Settlement Statement");

(q)    Sellers' Closing Certificate;

(r)    letters to all tenants under the Leases in the form of Exhibit H attached hereto and letters to all counterparties under the Assumed Contracts in the form of Exhibit I attached hereto;

(s)    if applicable and to the extent received, the MPP Letter;

(t)    the final Cure Cost Schedule, together with evidence that all Cure Costs set forth on such final Cure Costs Schedule have been paid or funded into escrow with Title Company for disbursement at Closing; provided, that, Seller may elect to pay any outstanding Cure Costs owed with proceeds received from the Purchase Price;

(u)    Tenant Estoppel Certificates, if any and to the extent received;

24

(v)     all other documents as may be expressly required by this Agreement to be delivered by any Seller or as reasonably required by the Title Company to effect or confirm the Transactions;

(w)     any assignments and other transfer documents necessary to vest in Purchaser any intellectual property, trade names, trade marks, domain names, social media handles, marketing collateral, and/or any appurtenant, if any;

(x)     to the extent assignable, assignment of any Landlord-Tenant Cases,  and

(y)     any assignments and other transfer documents necessary to vest in Purchaser any air/development rights referenced in Section 1(a)(vii) of this Agreement, if any.

12.     Documents to be Delivered by Purchaser at Closing.  On or prior to the Closing, Purchaser shall execute, acknowledge or deliver (or cause to be executed, acknowledged or delivered), as applicable, the following to the Escrow Agent:

(a)     the portion of the Purchase Price payable at the Closing pursuant to Section 2 by wire transfer of immediately available funds, subject to apportionments, credits and adjustments as provided in this Agreement:

(b)     the Bill of Sale;

(c)     the A&A Agreements;

(d)     the Assumption of Union Contract;

(e)     the State Transfer Tax Return, the City Transfer Tax Return and the Transfer Report;

(f)     any and all documents required of Purchaser by HPD, duly executed by Purchaser;

(g)     the Settlement Statement;

(h)     Purchaser's Closing Certificate; and

(i)     all other documents as may be expressly required by this Agreement to be delivered by Purchaser or as reasonably required by the Title Company to effect or confirm the Transactions.

13.     Operation of the Premises prior to the Closing Date.  Between the Effective Date and the Closing Date, each Seller shall operate and maintain its respective Premises in the ordinary course of business subject to reasonable wear and tear and further subject to destruction by casualty or condemnation.  In connection therewith, between the Effective Date and the Closing Date:

(a)    (i)    Subject to this Section 13, each Seller may enter into, amend, or modify or renew any Leases or terminate any of the Leases or accept the surrender of any tenancies or demised premises.  Notwithstanding the foregoing, if any Seller shall desire to rent any vacant residential unit at its respective Premises or renew any existing residential Lease (other than one which pursuant to the terms of which the legal rent is charged or required by law), such Seller shall notify Purchaser in writing (which may be made by e-mail to Purchaser as set forth in Section 22, stating the rent at which such Seller proposes to rent such unit. Any Leases entered into by such Seller shall not be "net" leases.  Further, notwithstanding the foregoing or anything to the contrary contained herein, each Seller, in its sole discretion, may enter into any modification, amendment, or supplement to a Lease solely for the purpose of settling any unpaid or past due Rents with the applicable tenants solely for the period prior to the Closing, with the amount of any resulting settlement to be (i) finally determined in such Seller's sole and absolute discretion, and (ii) due and payable by the settling tenants to such Seller provided any such settlement payments are remitted by such tenants prior to the Closing Date and such settlement does not modify the Lease for any period following Closing.  Any such settlement payments made by such tenants to Purchaser shall be remitted by Purchaser to Seller, or as otherwise directed by Sellers or their representatives or their affiliates, within five (5) Business Days of Purchaser's receipt thereof, and Purchaser's obligation to remit any such settlement payments to Sellers shall survive the Closing.  Any and all arrears for Unpaid Rents that remain outstanding after the Closing Date shall be subject to the collection mechanism set forth in Section 3(b) hereof.

(ii)    Each Seller shall conduct its leasing activities at its respective Premises in a manner that is consistent with past practices; provided, that no Seller shall enter into any Lease or modification to an existing Lease with respect to any commercial space at the applicable Premises without Purchaser's prior written consent.

(b)    Sellers make no representations and assumes no responsibility with respect to the continued occupancy of the Premises or any part thereof by any tenant.  The removal of a tenant whether by summary proceedings or otherwise prior to the Closing Date shall not give rise to any claim on the part of Purchaser.  Purchaser agrees that it shall not be grounds for Purchaser's refusal to effect the Closing that any tenant is a holdover tenant or in default under its Lease on the Closing Date and Purchaser shall accept title subject to such holding over or default without credit against, or reduction of, the Purchase Price.

(c)    Sellers shall not modify, extend, renew or cancel (except as a result of a default by the other party thereunder and other than in the ordinary course of business) any Assumed Contracts, or enter into any new Contract related to any Premises without Purchaser's prior consent, in each case, which consent shall not be unreasonably withheld or delayed; provided, however, that Purchaser's consent shall not be required to the aforestated actions for any Contracts entered into in the ordinary course of business if such Contract may be terminated at any time on not more than thirty (30) days' prior notice by the applicable Seller, or its successor, without the payment of a penalty.

(d)    With respect to all tax years prior to the tax year in which the Closing occurs, Sellers are hereby authorized to commence, continue and control the progress of, and to make all decisions with respect to, any proceeding or proceedings, whether or not now pending,

for the reduction of the assessed valuation of the Premises, and, in their sole discretion, to try or settle the same, subject to Purchaser's consent, not to be unreasonably withheld, conditioned or delayed.  With respect to the tax year in which the Closing occurs, prior to the Closing, Sellers may commence and continue to prosecute any proceeding for the reduction of the assessed valuation of the Premises, and to try or settle the same, subject to Purchaser's prior consent in its sole discretion.  From and after the Closing any such proceeding shall be assigned to Purchaser and taken over by Purchaser's counsel. Any and all such proceedings for tax years after the tax year in which the Closing occurs will be undertaken and prosecuted under Purchaser's control. All tax refunds and credits attributable to any tax year prior to the tax year in which the Closing occurs shall belong to and be the property of Sellers.  All tax refunds and credits attributable to any tax year subsequent to the tax year in which the Closing occurs shall belong to and be the property of Purchaser.  All net tax refunds and credits attributable to the tax year in which the Closing occurs shall be divided between Sellers and Purchaser in accordance with the apportionment of taxes pursuant to the provisions of this Agreement, after deducting therefrom a pro rata share of all expenses, including reasonable counsel fees and disbursements and consultant's fees incurred in obtaining such refund, the allocation of such expenses to be based upon the total refund obtained in such proceeding and in any other proceeding simultaneously involved in the trial or settlement. Purchaser agrees to reasonably cooperate with Sellers in connection with the prosecution of any such proceedings and to take all steps, whether before or after the Closing, as may be reasonably necessary to carry out the intention of the foregoing, including, the delivery to Sellers, upon demand, of any relevant books and records, including receipted tax bills and cancelled checks used in payment of such taxes, the execution of any and all consents or other documents, and the undertaking of any act necessary for the collection of such refund by Sellers; provided, that in no event shall Purchaser be required to assume or incur any unreimbursed out-of-pocket expense or liability related thereto.  The provisions of this Section 13(d) shall survive the Closing. For the avoidance of doubt, nothing in this Section 13(d) shall limit Purchaser's obligations with respect to Unpaid Real Estate Taxes, including all related interest, fines and penalties, which shall be borne by Purchaser.

(e)    Sellers shall maintain in full force and effect all insurance in place for the Premises as of the Effective Date.  Sellers shall promptly provide Purchaser with copies of all written notices received by any Seller from its insurance carrier or any governmental authorities with respect to the Premises.

(f)    Sellers shall not remove or permit to be removed from the Premises any material portion of any FF&E Personal Property except for: (i) worn-out, broken, damaged or obsolete items if, to the extent necessary for the continued operation of the Premises, they are replaced with FF&E Personal Property of substantially equal quality and utility; and (ii) such FF&E Personal Property as may be used or consumed in the ordinary course of business.  Sellers shall not undertake any renovation of any residential units at the Premises (other than painting or other customary cosmetic or preparation work in connection with the preparation of any units for occupancy by tenants) or enter into any Construction Contract for the renovation of any residential units at the Premises without Purchaser's prior written consent.

(g)    Sellers shall cause Existing Manager to continue to operate the Premises subsequent to the Effective Date, in a manner that is consistent with the operation of the Premises immediately prior to the Effective Date.

(h)    Sellers shall not knowingly subject the Premises to any additional liens, encumbrances, covenants or easements unless required by a governmental authority or necessary to maintain the Premises in accordance with current and past practices and such additional lien, encumbrance, covenant or easement does not materially and adversely affect the present use of the Premises.

(i)    Notwithstanding anything to the contrary contained in this Agreement, Sellers shall have no obligation to Purchaser to make or perform any capital improvements, repairs or replacements or incur any other expenditures; provided that Sellers shall have the right to do so if the same is incurred in the ordinary course of business or otherwise required in order to meet any Seller's obligations under any Leases, Licenses or applicable Laws.

(j)    Sellers shall promptly deliver notice of any casualty or actual or threatened condemnation related to any Premises and Sellers shall deliver notice to Purchaser of all material correspondence, violations, actions, suits, claims and other proceedings affecting the Premises (or any portion thereof), or the use, possession or occupancy of the Premises (or any portion thereof) or of any casualty damage or any proposed taking of any Premises.

(k)    At Purchaser's request, Sellers shall use commercially reasonable efforts to obtain tenant estoppel certificates (to the extent received by Sellers, the "Tenant Estoppel Certificates") from the commercial tenants identified by Purchaser in writing after the Effective Date. Any Seller's failure to receive any requested estoppel certificate shall not be a default by such Seller under this Agreement or a condition to closing pursuant Section 10.

(l)    Sellers shall use commercially reasonable efforts to assign the outstanding litigation cases between any Seller, as landlord, and the applicable defaulting tenant (the "Landlord-Tenant Cases"); provided, however, that if any Landlord-Tenant Case is not assigned to Purchaser on or before the Closing, Sellers shall assign such Landlord-Tenant Case to Purchaser within thirty (30) days after the Closing Date.  Notwithstanding the foregoing, Seller's failure to assign any Landlord-Tenant Case shall not be in default by such Seller or a condition to closing pursuant to Section 10.

14.    As Is.

(a)    Purchaser agrees to accept each Premises, subject to any facts, circumstances, defects and problems that may exist, on an **"AS-IS-WHERE-IS AND WITH ALL FAULTS"** basis and Purchaser is not relying on any representations or warranties of Seller or any other person with respect to the Premises, except for such representations and warranties as are expressly set forth in Section 7 of this Agreement. The foregoing is not intended to conflict with the provisions of Section 5 and Section 6 hereof, which shall govern with respect to "title" to the Premises.

        (b)     Subject to the terms of the Approval Order, this Agreement contains all the terms of the agreement entered into between the parties as of the Effective Date, and Purchaser acknowledges that, except for such representations and warranties as are expressly set forth in this Agreement, neither Sellers nor any Seller's Affiliates, nor any of their agents or representatives, has made any representations or held out any inducements to Purchaser, and Sellers hereby specifically disclaim any representation, oral or written, past, present or future, other than representations which are expressly set forth in this Agreement. Without limiting the generality of the foregoing and except as may otherwise be expressly set forth in this Agreement, Purchaser has not relied on any representations or warranties, and neither Sellers nor any Seller's Affiliates, nor any of their agents or representatives, has or is willing to make any representations or warranties, express or implied, as to: (i) the status of title to the Premises; (ii) the Leases; (iii) the Contracts or the Existing PMA; (iv)  the Licenses; (v) the current or future real estate tax liability, assessment or valuation of the Premises; (vi) the potential qualification of the Premises for any and all benefits conferred by any Laws, whether for subsidies, special real estate tax treatment, insurance, mortgages or any other benefits, whether similar or dissimilar to those enumerated; (vii) the compliance of the Premises in its current or any future state with applicable Laws or any violations thereof, including those relating to access for the handicapped, environmental or zoning matters, and the ability to obtain a change in the zoning or a variance in respect to the Premises' non-compliance, if any, with zoning Laws; (viii) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition or otherwise; (ix) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Premises from any source, including, any government authority or any lender; (x) the current or future use of the Premises; (xi) the present and future condition and operating state of any FF&E Personal Property and the present or future structural and physical condition of the Improvements (or its conformance to any existing plans or specifications), their suitability for rehabilitation or renovation, or the need for expenditures for capital improvements, repairs or replacements thereto; (xii) the viability or financial condition of any tenant or Existing Manager, if applicable; (xiii) the status of the leasing market in which the Premises is located; or (xiv) the actual or projected income or operating expenses of the Premises.

        (c)     Purchaser acknowledges that Sellers have afforded Purchaser the opportunity for investigations, examinations and inspections of the Premises and all Property Information. Purchaser acknowledges and agrees that: (i) the Property Information delivered or made available to Purchaser and Purchaser's Representatives by Sellers or any Seller's Affiliates, or any of their agents or representatives, may have been prepared by third parties and may not be the work product of Sellers or any Seller's Affiliates; (ii) neither Sellers nor any Seller's Affiliates have made any independent investigation or verification of, or has any knowledge of, the accuracy or completeness of, the Property Information; (iii) the Property Information delivered or made available to Purchaser and Purchaser's Representatives is furnished to each of them at the request, and for the convenience of, Purchaser; (iv) except as may be expressly set forth herein, Purchaser is relying solely on its own investigations, examinations and inspections of the Premises and those of Purchaser's Representatives and is not relying in any way on the Property Information furnished by Sellers or any Seller's Affiliates, or any of their agents or representatives; (v) except as may be expressly set forth herein, Sellers expressly disclaim any representations or warranties with respect to the accuracy or completeness of the Property Information and Purchaser releases Sellers and any Seller's Affiliates, and their agents and representatives, from any and all liability with respect

thereto; and (vi) any further distribution of the Property Information is subject to <u>Section 23</u>.  As used in this Agreement, the term "<u>Property Information</u>" shall mean (A) all information and documents in any way relating to the Premises, the operation thereof or the sale thereof (including Leases, Contracts and Licenses) furnished to, or otherwise made available from time to time (including by access to an electronic data site which may be updated from time to time) for review by, Purchaser or Purchaser's Representatives, by Sellers or any Seller's Affiliates, or their agents or representatives, including their contractors, attorneys, accountants, consultants, brokers or advisors, and (B) all analyses, compilations, data, studies, reports or other information or documents prepared or obtained by Purchaser or Purchaser's Representatives containing or based, in whole or in part, on the information or documents described in the preceding clause (A), or otherwise reflecting their review or investigation.  Purchaser acknowledges that the Property Information furnished or otherwise made available to Purchaser shall not include any e-mails or any proprietary or confidential documents, including reports or studies that have been superseded by subsequent reports or studies, or any of the following confidential and proprietary materials (collectively, the "<u>Excluded Materials</u>"):   (1) information contained in financial analyses or projections (including Sellers' or any Seller's Affiliates' budgets, valuations, cost-basis information, strategic plans and capital account information); (2) material that is subject to attorney-client privilege or that is attorney or accountant work product; (3) appraisal reports or letters; (4) organizational, financial and other documents relating to Sellers or any Seller's Affiliates (other than any evidence of due authorization and organization required under this Agreement); (5) material that Sellers are legally required not to disclose other than by reason of legal requirements voluntarily assumed by Sellers after the Effective Date; (6) preliminary or draft reports or studies that have been superseded by final reports or studies; (7) letters of intent, purchase agreements, marketing materials, loan documents or other documents, instruments or agreements evidencing or relating to each Seller's acquisition of its respective Premises or any prior financing or attempted sale of such Premises or any portion thereof (except the existing mortgages); (8) any agreements to which any Seller or any Seller's Affiliates are a party, other than those which will bind any portion of the Premises after the Closing or will be assumed by Purchaser hereunder; (9) internal work product, internal memoranda, internal analysis or any other materials of Sellers or any Seller's Affiliates relating to any Seller or the Premises; (10) any privileged or proprietary information regarding Sellers, any Seller's Affiliates or the Premises; and (11) any proprietary information regarding the Premises that is not directly related to the current ownership, maintenance, or operation of the Premises.

(d)      Purchaser or anyone claiming by, through or under Purchaser, hereby fully and irrevocably releases Sellers and any Seller's Affiliates, and their agents and representatives, from any and all claims that it may now have or hereafter acquire against Seller or Seller's Affiliates, or their agents or representatives, for any cost, loss, liability, damage, expense, action or cause of action, whether foreseen or unforeseen, arising from or related to any construction defects, errors or omissions on or in the Premises, the presence of pollutants, contaminants, environmentally hazardous, toxic or dangerous materials, substances or wastes, or any other conditions (whether patent, latent or otherwise) affecting the Premises, except for claims against a Seller based upon any obligations and liabilities of such Seller expressly provided in this Agreement.  Purchaser further acknowledges and agrees that this release shall be given full force and effect according to each of its expressed terms and provisions, including those relating to unknown and suspected claims, damages and causes of action.  As a material covenant and

condition of this Agreement, Purchaser agrees that in the event of any such construction defects, errors or omissions, the presence of pollutants, contaminants, environmentally hazardous, toxic or dangerous materials, substances, or wastes any other conditions affecting the Premises, Purchaser shall look solely to the applicable Seller's predecessors in interest or to such contractors and consultants as may have contracted for work in connection with the Premises for any redress or relief, except for claims against such Seller based upon any obligations and liabilities of such Seller expressly provided in this Agreement.  Purchaser further understands that some of Sellers' predecessors in interest or such contractors and consultants may have dissolved or may no longer exist and Purchaser may have no remedy against such predecessors, contractors or consultants.

(e)     Purchaser's election (or deemed election) to proceed with the Closing shall be deemed an acknowledgment by Purchaser that Purchaser has inspected the Premises, is thoroughly acquainted with and accepts its condition, and has reviewed, to the extent necessary in its discretion, all the Property Information.  Sellers shall not be liable or bound in any manner by Purchaser for any oral or written "setups" or information pertaining to the Premises.

(f)     The provisions of this Section 14 shall survive the termination of this Agreement and the Closing.

15.     Broker.  Purchaser and Sellers represent and warrant to each other that Eastdil Secured (the "Broker") is the sole broker with whom it has dealt in connection with the Premises and the Transactions.  Each party hereto agrees to indemnify, defend and hold the other harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which the other may sustain, incur or be exposed to, by reason of any claim or claims by any broker, finder or other person, except (in the case of Purchaser as indemnitor hereunder) the Broker, for fees, commissions or other compensation arising out of the Transactions if such claim or claims are based in whole or in part on dealings or agreements with the indemnifying party.  The obligations contained in this Section 15 shall survive the termination of this Agreement and the Closing.

16.     Casualty; Condemnation.

(a)     Damage or Destruction. The risk of loss or damage to each Premises until the Closing Date by fire, flood, windstorm, hurricane or other casualty or by an act of terrorism or other risk insured against is assumed by Sellers.  If a "material" part of any Premises is damaged or destroyed by fire, flood, windstorm, hurricane or other casualty or by an act of terrorism, Sellers shall notify Purchaser of such fact and, except as hereinafter provided, Purchaser shall have the option to remove the Premises that incurred such material casualty from the scope of the Transactions upon notice to Sellers given not later than ten (10) Business Days after receipt of Sellers' notice of such casualty, together with a description of the damage and copies of Sellers' certificates of insurance. If (i) Purchaser does not remove such Premises from the Transaction, or (ii) there is damage to or destruction of only an "immaterial" part ("immaterial" is herein deemed to be any damage or destruction which is not "material") of the Premises, Purchaser shall be obligated to consummate the Closing as provided in this Agreement and, at the Closing, Sellers shall, unless the applicable Seller has repaired such damage or destruction prior to the Closing, (x) pay over to Purchaser the proceeds of any insurance collected by the applicable Seller, plus the

amount of any applicable deductible, less the amount of all costs actually incurred by such Seller in connection with the repair of such damage or destruction, and (y) assign and transfer to Purchaser all right, title and interest of Seller in and to any uncollected insurance proceeds which such Seller may be entitled to receive from such damage or destruction; provided, that such Seller shall be permitted to retain, and not be obligated to assign, any uncollected insurance proceeds which exceed the allocated  Purchase Price of such applicable Premises.  A "material" part of any Premises shall be deemed to have been damaged or destroyed if the cost of repair or replacement of such Premises shall be greater than twenty-five percent (25%) of the allocated portion of the Purchase Price of such Premises (set forth on Schedule 1 hereto) as reasonably estimated by an independent engineer selected by Seller which is reasonably satisfactory to Purchaser.  If Purchaser elects to remove any Premises from the Transactions pursuant to this Section 16(a), then the Purchase Price shall be reduced by the allocated purchase price of the applicable Premises being removed from the Transaction.

(b)      Condemnation.  If, prior to the Closing Date, all or any "significant" portion of any Premises is taken by eminent domain or condemnation (or is the subject of a pending taking which has not been consummated), Sellers shall notify Purchaser of such fact, and deliver all information in Sellers' possession regarding such fact to Purchaser, whereupon Purchaser shall have the option to remove the Premises that incurred such material taking from the Transactions upon notice to Sellers given not later than ten (10) Business Days after receipt of Sellers' notice.  If Purchaser does not elect to remove  such Premises from the Transactions, or if only an "insignificant" portion ("insignificant" is herein deemed to be any taking which is not "significant", as such term is herein defined) of the Premises is taken by eminent domain or condemnation, at the Closing, Sellers shall assign and turnover, and Purchaser shall be entitled to receive and keep, all awards or other proceeds for such taking by eminent domain or condemnation.  A "significant" portion of the condemned Premises means (i) more than twenty-five percent (25%) of the rentable square feet of the applicable Premises or (ii) any material means of access to the building has been taken. If Purchaser elects to remove any Premises from the Transactions pursuant to this Section 16(b), then the Purchase Price shall be reduced by the allocated purchase price of the applicable Premises being removed from the Transaction.

(c)      The provisions of this Section 16 supersede any Law applicable to the Premises governing the effect of fire or other casualty in contracts for real property. The parties hereto hereby waive the provisions of Section 5-1311 of the New York General Obligations Law.

17.     Termination; Effect of Termination; Remedies.

(a)      Termination Events.

(i)      Notwithstanding anything to the contrary in this Agreement, (x) this Agreement may be terminated, and the Transactions may be abandoned at any time prior to the Closing or (y) solely with respect to Section 17(a)(i)(B)(I) and Section 17(a)(i)(G), this Agreement may be terminated solely with respect to the applicable Premises, as follows:

(A)      by Purchaser upon delivery of written notice to Sellers, if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the

Approval Order on or before 5:00 p.m., Eastern Time, on February 28, 2026 (the "Approval Order End Date"); provided, that if as of the Approval Order End Date all of the conditions set forth in Section 10(a), other than a failure to satisfy the conditions set forth in Section 10(a)(v)), shall have been satisfied or, with respect to those conditions to be satisfied at the Closing, except to the extent the satisfaction of such conditions at such time has been waived by the applicable party for purposes of the applicable automatic extension, then Sellers may, in their sole discretion, elect to extend the Approval Order End Date for a period not to exceed thirty (30) days (the "Extended Approval Order End Date" and, if so extended, the Extended Approval Order End Date shall be the "Extended Approval End Date") by delivering written notice to Purchaser, as applicable, no later than such then-scheduled Approval Order End Date; provided further, that Purchaser will be entitled to terminate this Agreement pursuant to this Section 17(a)(i)(A) if such person's material breach of, or material failure to fulfill any obligation under, this Agreement or any other Purchaser Document has been the principal cause of the failure of the conditions contained in Section 10 to be satisfied on or prior to such time on the Closing Date. For the avoidance of doubt, nothing herein shall override the requirements of the parties and the scheduling of the Closing Date as set forth in Section 4 of this Agreement. Further, for the avoidance of doubt, if the Approval Order has been entered by the Approval Order End Date or Extended Approval Order End Date, Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 17(a)(i)(A);

(B)    by Purchaser, (I) solely with respect to the subjected Premises, upon delivery of written notice to Sellers, if there has been a material breach of any Property Level Representations and Warranties made by the applicable Seller which owns the applicable Premises, in this Agreement or in any other Purchaser's Documents or Sellers' Documents, which material breach (i) would result in a diminution of value of fifteen percent (15%) or more of the allocated portion of the Purchase Price of such Premises (set forth on Schedule 1 hereto), as determined by Seller in its reasonable discretion, and (ii) either (A) cannot be cured by the Closing Date, or (B) if capable of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from Purchaser of such breach or (2) the date that is three (3) days prior to the Closing Date, or (II) solely with respect to the Portfolio Level Representations and Warranties, upon delivery of written notice to Sellers, if there has been a material breach of any Property Level Representation and Warranty, which material breach (i) would give rise to the failure of a condition set forth in Section 10(a) to be satisfied, (ii) would constitute a material adverse effect with respect to the Sellers taken as a whole, and (iii) either (A) cannot be cured by the Closing Date, or (B) if capable of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from Purchaser of such breach or (2) the date that is three (3) days prior to the Closing Date;

(C)    by Sellers upon delivery of written notice to Purchaser, if there has been a breach of any representation, warranty, covenant or agreement made by Purchaser in this Agreement or in any other Purchaser's Documents or Sellers' Documents, which breach (i) would give rise to the failure of a condition set forth in Section 10(b) to be satisfied and (ii) either (A) cannot be cured prior to the Closing Date, or (B) if capable

33

of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from Sellers of such breach or (2) the date that is three (3) days prior to the Closing Date;

(D)    by Sellers if the governing body of any Seller determines in good faith after consultation with outside counsel that its continued performance under this Agreement or any other Purchaser's Documents or Sellers' Documents would be inconsistent with its fiduciary duties under applicable Law;

(E)    by Sellers upon delivery of written notice to Purchaser, if (i) the conditions set forth in <u>Section 10(a)</u> have been satisfied (other than those conditions that by their terms are to be satisfied at the Closing; <u>provided</u> that each of which is capable of being satisfied if the Closing were to occur at such time), (ii) Sellers are prepared to complete the Closing, and (iii) Purchaser does not complete the Closing by the Closing Date;

(F)    by Purchaser upon delivery of written notice to Sellers, if (i) the conditions set forth in <u>Section 10(b)</u> have been satisfied (other than those conditions that by their terms are to be satisfied at the Closing; <u>provided</u> that each of which is capable of being satisfied if the Closing were to occur at such time), (ii) Purchaser is prepared to complete the Closing, and (iii) Sellers do not complete the Closing by the Closing Date; or

(G)    by Purchaser, prior to the Closing Date solely with respect to any Premises that Purchaser elects to remove in accordance with <u>Section 6</u> (Title) and <u>Section 16</u> (Casualty; Condemnation);

(H)    by either Seller or Purchaser upon delivery of written notice to the other, if the Closing shall not have occurred on or before 5:00 p.m., Eastern Time, on June 15, 2026 (the "<u>End Date</u>"), provided that neither Seller or Purchaser will be entitled to terminate this Agreement pursuant to this <u>Section 17(a)(i)(H)</u> if such party's material breach of, or material failure to fulfill any obligation under, this Agreement or any other Sellers' Document or Purchaser's Document, as applicable, has been the principal cause of the failure of the conditions contained in <u>Section 10</u> to be satisfied on or prior to such time on the End Date; or

(I)    by Seller, or if Purchaser is not named the "Back-Up Bidder" at the Auction, Purchaser, if (i) Seller enters into a definitive agreement with respect to a Competing Bid or (ii) the Bankruptcy Court enters an order approving a Competing Bid.

(b)    <u>Effect of Termination; Remedies</u>.

(i)    If this Agreement is terminated pursuant to <u>Section 17(a)</u>, this Agreement shall thereupon become null and void and of no further force and effect, except for those rights, obligations and liabilities which are expressly stated in this Agreement to survive the termination of this Agreement, which for the avoidance of doubt are (i) <u>Section 18</u> (*Escrow*), (ii) <u>Section 23</u> (*Property Information and Confidentiality*), (iii) this <u>Section 17</u> (*Termination; Effect of Termination; Remedies*), (iv), <u>Section 24</u> (*Competing Transaction*) and (v) <u>Section 25</u>

34

(*Miscellaneous*) (collectively, the "Surviving Obligations"); provided that nothing in this Section 17 shall be deemed to release any party from any liability for any (x) knowing and intentional breach of this Agreement prior to the date of termination or (y) willfully and knowingly committed fraud against the non-breaching party with the specific intent to deceive and mislead, as determined by the Bankruptcy Court; provided further that nothing contained in this Section 17(b) shall be construed so as to bestow any right of termination upon a party for the failure of a condition to be satisfied unless such party is expressly entitled to the satisfaction of such condition as provided in Section 10(a) or Section 10(b).

(ii)    Notwithstanding Section 17(b)(i), in the event of a termination of this Agreement pursuant to Section 17(a)(i)(A) (expiration of Approval Order End Date) and Section 17(a)(i)(H) (the End Date), then Purchaser shall be entitled to an amount equal to the Deposit (together with all accrued investment income thereon (if any)) to be delivered in accordance with Section 18. Notwithstanding the foregoing, if this Agreement is terminated pursuant to Section 17(a)(i)(A) (expiration of Approval Order End Date) and Section 17(a)(i)(H) (the End Date) solely due to Purchaser's material breach of its obligations, Seller shall be entitled to an amount equal to the Deposit (together with all accrued investment thereon (if any)) to be delivered in accordance with Section 18.

(iii)    Notwithstanding Section 17(b)(i), (x) in the event of a termination of this Agreement pursuant to Section 17(a)(i)(B)(II) (whereby Purchaser, who is entitled to the satisfaction of the conditions in Section 10(a), elects not to waive any such unsatisfied conditions, whereby title would otherwise close as provided in this Agreement if so waived), Purchaser shall be entitled to an amount equal to the Deposit (together with all accrued investment income thereon (if any)) to be delivered in accordance with Section 18, and (y) in the event of a removal of any Premises pursuant to Section 17(a)(i)(B)(I) (whereby Purchaser, who is entitled to the satisfaction of the conditions in Section 10(a), elects not to waive any such unsatisfied conditions, whereby title would otherwise close as provided in this Agreement if so waived), Purchaser shall be entitled to a credit against the Purchase Price equal to the allocated portion of the Purchase Price of such Premises (set forth on Schedule 1 hereto) being removed from the scope of the Transaction.

(iv)    Notwithstanding Section 17(b)(i),  in the event of a termination of this Agreement pursuant to Section 17(a)(i)(C) (whereby Sellers, who are entitled to the satisfaction of the conditions in Section 10(b), elect not to waive any such unsatisfied conditions, whereby title would otherwise close as provided in this Agreement if so waived) or Section 17(a)(i)(E), then Sellers shall be entitled to an amount equal to the Deposit (together with all accrued investment income thereon (if any)) to be delivered in accordance with Section 18. Sellers' retention of the Deposit shall be deemed liquidated damages for all loss, damage and expenses suffered by Sellers, it being agreed that Sellers' damages are extremely difficult and impracticable to ascertain and that the amount of the Deposit represents the parties' reasonable estimate of such damages, to ascertain.

(v)    Notwithstanding Section 17(b)(i), in the event of a termination of this Agreement pursuant to Section 17(a)(i)(D) and Section 17(a)(i)(I), Purchaser shall be entitled to an amount equal to the Deposit (together with all accrued investment income thereon (if any)) to be delivered in accordance with Section 18, together with payment of the Break-Up Fee.

35

(vi)    Notwithstanding Section 17(b)(i), in the event of a termination of this Agreement pursuant to Section 17(a)(i)(F), then Purchaser shall be entitled to an amount equal to the Deposit (together with all accrued investment income thereon (if any)) to be delivered in accordance with Section 18. If the Closing fails to occur by reason of Sellers' willful and intentional refusal to perform its obligations (as contrasted to Sellers' inability, subject to Section 6(b)) hereunder and this Agreement may be terminated pursuant to Section 17(a)(i)(F), the Purchaser shall be entitled to seek specific performance from Sellers, provided that Purchaser shall not be entitled to both a return of the Deposit and specific performance; provided, further, that Purchaser has not previously received written notice from Sellers that Sellers have elected to terminate this Agreement pursuant to Section 17(a)(i)(C) or Section 17(a)(i)(E). As a condition precedent to Purchaser exercising any right it may have to bring an action for specific performance as set forth in this Section 17(b)(v), Purchaser must commence such an action within sixty (60) days after obtaining actual knowledge of the occurrence of such default.  Purchaser agrees that its failure to timely commence such an action for specific performance within such sixty (60) day period shall be deemed a waiver by it of its right to commence such an action.

(vii)    Each of Purchaser and Sellers acknowledge that the agreements contained in this Section 17(b) are an integral part of the Transactions, and that without these agreements, neither Purchaser nor Sellers would have entered into this Agreement; accordingly, if Purchaser or Sellers take or fail to take any action that prevents the Escrow Agent from making the payment due to Sellers or Purchaser, as applicable, (including, in the case of Seller, the failure to pay any applicable Break-Up Fee) and, in order to obtain such payment, Purchaser or Sellers, as applicable, commence an action which results in a judgment against the other party hereto, for any such payment, the non-prevailing party shall pay the costs and expenses of the prevailing party (including reasonable attorney's fees and disbursements) in connection with such action, together with interest through the date such payment was actually received.

(viii)    Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy. The parties agree that, except as set forth in Section 23(d), the remedies set forth in this Section 17 shall be the sole and exclusive remedies available to the parties in the event of termination.

18.    Escrow.  Escrow Agent shall hold the Deposit in escrow and shall dispose of the Deposit only in accordance with the following provisions:

(a)    Escrow Agent shall deliver the Deposit to Sellers or Purchaser, as the case may be, subject to Section 18(b)(i), as follows:

(i)    to Sellers, upon completion of the Closing; or

(ii)    to Sellers, after receipt of Sellers' demand in which Sellers certify either that (A) termination has occurred pursuant to Section 17(a)(i)(C), or Section 17(a)(i)(E), or (B) this Agreement has been otherwise terminated or cancelled, and Sellers are thereby entitled to receive the Deposit; or

(iii)    to Purchaser, after receipt of Purchaser's demand in which Purchaser certifies either that (A) termination has occurred pursuant to <u>Section 17(a)(i)(A)</u>, <u>Section 17(a)(i)(B)(II)</u>, <u>Section  17(a)(i)(D)</u>, <u>Section 17(a)(i)(F)</u>, and <u>Section  17(a)(i)(I),</u> or (B) this Agreement has been otherwise terminated or cancelled, and Purchaser is thereby entitled to receive the Deposit.

(b)    Upon delivery of the Deposit, Escrow Agent shall be relieved of all liability hereunder and with respect to the Deposit.  Escrow Agent shall deliver the Deposit, at the election of the party entitled to receive the same, by a bank wire transfer of immediately available funds to an account designated by such party.

(i)    Upon receipt of a written demand from Sellers or Purchaser under <u>Section 18(a)(ii)</u> or <u>Section 18(a)(iii)</u>, Escrow Agent shall send a copy of such demand to the other party.  Escrow Agent shall not honor the written demand until more than five (5) Business Days after Escrow Agent has given a copy of such demand to the other party. Within five (5) Business Days after the date of receiving same, but not thereafter, the other party may object to delivery of the Deposit to the party making such demand by giving a notice of objection (a "<u>Notice of Objection</u>") to Escrow Agent.  After receiving a Notice of Objection, Escrow Agent shall send a copy of such Notice of Objection to the party who made the demand; and within thirty (30) days thereafter, in its sole and absolute discretion, Escrow Agent may elect either: (A) to continue to hold the Deposit until Escrow Agent receives a written agreement of Purchaser and Seller directing the disbursement of the Deposit, in which event Escrow Agent shall disburse the Deposit in accordance with such agreement; or (B) to take any and all actions as Escrow Agent reasonably deems necessary or desirable, in its sole and absolute discretion, to discharge and terminate its duties under this Agreement, including depositing the Deposit into the Applicable Court, consistent with <u>Section 25(l)</u>, and bringing any action of interpleader or any other proceeding; or (C) in the event of any litigation between Seller and Purchaser, to deposit the Deposit with the clerk of the court in which such litigation is pending.

(ii)    If Escrow Agent is uncertain for any reason whatsoever as to its duties or rights hereunder (and whether or not Escrow Agent has received any written demand under <u>Section 18(a)(ii)</u> or <u>Section 18(a)(iii)</u>, or Notice of Objection under <u>Section 18(b)(i)</u>), notwithstanding anything to the contrary herein, Escrow Agent may hold and apply the Deposit pursuant to <u>Section 18(b)(i)(A)</u>, <u>Section 18(b)(i)(B)</u> or <u>Section 18(b)(i)(C)</u> and may decline to take any other action whatsoever.  In the event the Deposit is deposited in the Bankruptcy Court by Escrow Agent pursuant to <u>Section 18(b)(i)(B)</u> or <u>Section 18(b)(i)(C)</u>, Escrow Agent shall be entitled to rely upon the decision of such court.  In the event of any dispute whatsoever among the parties with respect to disposition of the Deposit, absent Escrow Agent's willful default, misconduct or gross negligence, Purchaser and Seller shall pay the reasonable attorneys' fees and costs incurred by Escrow Agent (which said parties shall share equally) for any litigation in which Escrow Agent is named as, or becomes, a party.

(c)    Notwithstanding anything to the contrary in this Agreement, within one (1) Business Day after its receipt of any portion of the Deposit, Escrow Agent shall place the Deposit in an Approved Investment.  The interest, if any, which accrues on such Approved Investment shall be deemed part of the Deposit; and Escrow Agent shall dispose of such interest as and with

the Deposit pursuant to the terms of this Agreement. Escrow Agent may not commingle the Deposit with any other funds held by Escrow Agent. As used herein, the term "Approved Investment" means (i) any interest-bearing demand account or money market fund with any institution approved by both Sellers and Purchaser, or (ii) any other investment approved by both Sellers and Purchaser. Discounts earned shall be deemed interest for the purpose hereof.

(d)     Escrow Agent shall have no duties or responsibilities except those set forth herein, which the parties hereto agree are ministerial in nature. Sellers and Purchaser acknowledge that Escrow Agent is serving without compensation, solely as an accommodation to the parties hereto, and except for Escrow Agent's own willful default, misconduct or gross negligence, Escrow Agent shall have no liability of any kind whatsoever arising out of or in connection with its activity as Escrow Agent. Sellers and Purchaser jointly and severally agree to and do hereby indemnify and hold harmless Escrow Agent from all loss, cost, claim, damage, liability, and expense (including, reasonable attorneys' fees and disbursements whether paid to retained attorneys or representing the fair value of legal services rendered to itself) which are actually incurred by reason of its acting as Escrow Agent, provided the same is not the result of Escrow Agent's willful default, misconduct or gross negligence.

(e)     Any Notice of Objection, demand or other notice or communication which may or must be sent, given or made under this Agreement to or by Escrow Agent shall be sent in accordance with the provisions of Section 22.

(f)     Simultaneously with the execution and delivery of this Agreement, Purchaser and Sellers shall furnish Escrow Agent with their true Federal Taxpayer Identification Numbers so that Escrow Agent may file appropriate income tax information returns with respect to any interest in the Deposit or other income from the Approved Investment. The party ultimately entitled to any accrued interest in the Deposit shall be the party responsible for the payment of any tax due thereon.

(g)     The provisions of this Section 18 shall survive the termination of this Agreement and the Closing.

19.     Assignment. This Agreement may not be assigned by Purchaser in whole or in part and any assignment or attempted assignment by Purchaser shall constitute a default by Purchaser hereunder and shall be null and void; provided that Purchaser may assign this Agreement, in whole or in part, to one or more of its affiliates without the prior written consent of Seller.

20.     Labor and Employees.

(a)     At the Closing, Purchaser shall be obligated to assume, adopt and accept the Union Contract, including any and all obligations under the Union Contract to employee benefit plans, and to execute and return to Sellers the Assumption of Union Contract annexed hereto as Exhibit F. Purchaser shall also be obligated, or shall cause its property manager, managing agent or third party contractor, to offer employment to all of the Employees, and to the extent required by the DBSWPA, retain the Employees for at least ninety (90) days post-Closing, and otherwise comply with Purchaser's requirements under the DBSWPA.

(b)        Purchaser shall indemnify and hold Sellers harmless from any actual liability, claims, actions, damages, judgments, penalties, out-of-pocket costs and expenses, including reasonable attorneys' fees, related to any claims (A) arising out of Purchaser's failure to abide by its obligations under this Section 20, and (B) arising in connection with any Employee Liabilities accruing, or arising out of events occurring, on or after the Closing. By virtue of this Section 20, the parties have availed themselves of the exception in Section 505(f) of the DBSWPA with respect to the Employees.  For the avoidance of doubt, however, Purchaser agrees to abide by any and all obligations to which it may be deemed bound under the DBSWPA. For purposes of this Section 20(b), "Employee Liabilities" shall mean all claims, obligations and liabilities, actual or contingent, with respect to or by or on behalf of the Employees, including (a) for worker's compensation claims based on any real or alleged occurrence, state unemployment insurance, state disability insurance or similar private or public unemployment or disability compensation arrangements, (b) for claims under applicable Laws governing labor relations or employment, including termination thereof (including federal, state and local anti-discrimination Laws, the federal and state WARN Act, or retaliation Laws, the Worker Adjustment and Retraining Notification Act of 1988 and any state or local equivalents, ERISA, the Occupational Health and Safety Act, the National Labor Relations Act, the Fair Labor Standards Act, the New York State Labor Law, the New York City Human Rights Law, the New York City Administrative Code, the DBSWPA, and federal and state COBRA), and (c) claims arising under or related to the Union Contract or the employee benefit funds referenced therein.

(c)        In the event a Seller must pay any termination, severance, accrued vacation, pension withdrawal liability or other wage or benefit payments due to or on behalf of any Employees arising out of a claim that Purchaser did not assume the Union Contract or that Purchaser (or any third party it engages) did not offer employment to all of the Employees (and in each case, any additional penalties, damages or liability associated therewith) (collectively, the "Employee Termination Payments"), Purchaser shall reimburse Sellers for such Employee Termination Payments.

(d)        The parties intend to comply with Section 4204(A) of ERISA, and to take any other action required or desirable, so that no withdrawal liability is imposed upon Sellers as a result of the Transactions or any subsequent action or omission of Purchaser or any affiliate of Purchaser.  To that end, Purchaser agrees and covenants: (i) to contribute for any portion of the plan year of the sale on and after the Closing Date and the Surety Period, to the plans set forth on Schedule 13 (the "Multiemployer Pension Plan") for substantially the same number of contribution base units, as defined in Section 4001(a)(11) of ERISA, for which any Seller was obligated to contribute prior to the Closing Date, and (ii) unless a waiver is in effect pursuant to Section 4204(c) of ERISA, to provide to and for the benefit of the Multiemployer Pension Plan, for the five plan years commencing with the first plan year to begin after the Closing Date (the "Surety Period"), either a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, a letter of credit or an amount held in escrow by a bank or similar financial institution, in either case in an amount equal to the greater of (A) the average annual contribution that the applicable Seller was required to make with respect to the covered operations for the three plan years preceding the plan year in which the Closing Date occurs, or (B) the annual contribution that such Seller was required to make with respect to the covered operation for the plan year preceding the plan year in which the Closing Date occurs, which bond, letter of credit or such

amount held in escrow shall be paid to the Multiemployer Pension Plan, if at any time during the Surety Period, Purchaser, or any successor in interest thereto, withdraws from the Multiemployer Pension Plan or fails to make any contribution to the Multiemployer Pension Plan when due.  If a waiver is not in effect pursuant to Section 4204(c) of ERISA, Purchaser shall deliver to the Multiemployer Pension Plan by the first day of the plan year following the Closing Date, with copies to Sellers, either the bond or evidence of the establishment of an escrow described in the preceding sentence.  If Purchaser or any successor in interest thereto shall withdraw from the Multiemployer Pension Plan in either a complete or partial withdrawal, as such terms are used in Sections 4203 and 4205 of ERISA, and withdrawal liability is imposed under Section 4201 of ERISA, Sellers acknowledge that the applicable Seller shall be secondarily liable to the Multiemployer Pension Plan for any withdrawal liability that it would have had to the Multiemployer Pension Plan in the absence of Section 4204 of ERISA; provided, however, that the preceding clause of this sentence will be void and of no effect, if the parties obtain a variance from the requirements of Section 4204(a)(1)(C) of ERISA.  The parties will reasonably cooperate in obtaining a variance from the requirements of Sections 4204(a)(1)(B) and 4204(a)(1)(C) of ERISA.  To the extent that any obligation is imposed on Purchaser herein, Purchaser agrees to require each of its successors in interest and assigns to specifically assume and accept the obligations assumed by it under this Section 20.  Purchaser agrees to indemnify and hold Sellers harmless from and against any and all losses, costs, liens, claims, liabilities or damages (including reasonable attorneys' fees and disbursements) arising from or relating to a breach of its obligations under this Section 20, Purchaser's or Purchaser's affiliate's failure to employ or termination of any of the Union Employees, or any complete or partial withdrawal liability arising as a result of the Transaction or any act or omission of Purchaser or any affiliate thereof.

(e)    At the Closing, Purchaser shall guarantee to the Multiemployer Pension Plan that Purchaser will pay any withdrawal liability attributable to the Sellers as secondary liability in the event Purchaser withdraws from the Multiemployer Pension Plan during the Surety Period and does not pay its withdrawal liability.

(f)    The provisions of this Section 20 shall survive the Closing.

21.    Post-Closing Covenants.

(a)    Purchaser shall arrange for management of each of the Premises from and after the Closing Date and, in connection therewith, shall either retain the Existing Manager pursuant to a property management agreement entered into between Purchaser and Existing Manager (a "Replacement PMA") or shall engage a new property manager pursuant to a property management agreement between Purchaser and such new property manager (a "New PMA") (Existing Manager, in its capacity as the property manager under a Replacement PMA, or any other property manager retained by Purchaser being referred to herein as the "Successor Manager").

(b)    Sellers shall reasonably cooperate with Purchaser in connection with the transition of management of the Premises to the Successor Manager.  Purchaser shall arrange to have a Replacement PMA or a New PMA become effective on and as of the Closing Date.

40

(c)     Until the earlier to occur of three (3) months following the Closing and the completion of the winding down of the Debtor's estates, if any party becomes aware that any Assumed Contract which should have been transferred, conveyed, assigned or delivered to Purchaser pursuant to the terms of this Agreement was not transferred, conveyed, assigned or delivered to Purchaser as contemplated by this Agreement, then Sellers shall, or shall cause their affiliates to, (i) promptly transfer, convey, assign or deliver such Contract to Purchaser (or its designated affiliate), in each case for no additional consideration and consistent with the terms of this Agreement, (ii) execute all instruments, agreements or documents as may be reasonably necessary for the purpose of transferring the relevant interests in the Contract (or part thereof) held by the applicable Seller to Purchaser, (iii) do all such further acts or things as may be reasonably necessary to validly effect the transfer and vest the relevant interest in such assets (or part thereof) in Purchaser.

(d)     From and after the Closing, if Sellers or any of their affiliates receive any mail, packages, invoice, service request information, data, document or other correspondence or communications, or receives any monies or checks or other funds or proceeds relating to a Assumed Contract or Lease, or if Purchaser or any of its affiliates receive any mail, packages, invoice, service request information, data, document or other correspondence or communications, or receive any monies or checks or other funds or proceeds relating to Sellers' or their affiliates' business, properties or assets (other than the Premises or Assumed Contracts), such party shall promptly following the receipt thereof, remit such mail, packages, correspondence, communications, monies, receivables, funds, request, information, data, document or proceeds to the other party (and any such amounts shall be treated as received by and held in trust by the relevant party).

22.    <u>Notices</u>.

(a)     All notices, elections, consents, approvals, demands, objections, requests or other communications which Sellers, Purchaser or Escrow Agent may be required or desire to give pursuant to, under or by virtue of this Agreement shall be in writing and shall be deemed duly given or made (i) when personally delivered, (ii) when delivered by e-mail transmission with receipt confirmed or (iii) upon delivery by overnight courier service, in each case addressed as follows:

If to Sellers:

Broadway Realty I Co., LLC
Grand Central Tower,
140 East 45th Street, 12th Floor
New York, NY 10017
Attention:  Ephraim Diamond, David Barse
E-mail:  Ephraim@arbelcapital.com; Dbarse@dmbholdings.com


With Copy To:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Thomas Henry; Gary Holtzer; Gavin Westerman
E-mail:  thomas.henry@weil.com; gary.holtzer@weil.com;
gavin.westerman@weil.com

If to Purchaser:

Summit Gold Inc.
1350 Avenue of the Americas
New York, New York 10019
Attention:  Zohar Levy
E-mail:  ZoharL@smt.co.il


with a copy to:

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, New York 10019
Attention:  Michael Friedman
E-mail:  friedman@chapman.com

If to Escrow Agent:

Chicago Title Insurance Company
711 Third Avenue, 8th Floor
New York, NY 10017
Attn:  Mark Krivelevich
E-mail:  mark.krivelevich@ctt.com

(b)    Sellers, Purchaser or Escrow Agent may designate another addressee or change its address for notices and other communications hereunder by delivery of at least five (5) days' prior written notice of such change to the other parties in the manner provided in this Section 22.  A notice or other communication may be sent by a party's attorney on the party's behalf.  A notice or other communication sent in compliance with the provisions of this Section 22 shall be deemed received on (i) the date it is delivered to the other party if sent by a nationally recognized overnight delivery service or hand delivery or (iii) upon receipt of confirmation of transmission of e-mail notice if sent by e-mail.

23.    Property Information and Confidentiality.

(a)    It is understood by the parties that the Confidentiality Agreements, by and among Sellers and their affiliates and Purchaser or certain of its affiliates, dated September 19, 2025 and October 10, 2025 (together, the "Confidentiality Agreement") will survive the execution

and delivery of this Agreement and will terminate pursuant to the terms of the Confidentiality Agreement. For the avoidance of doubt the Confidentiality Agreement shall apply to each Purchaser party hereto.

(b)      Purchaser acknowledges that the Confidential Information (as defined in the Confidentiality Agreement) (including Leases, Contracts and Licenses) provided to it in connection with this Agreement and the Transactions, including information provided in connection with a visit to the Premises, is subject to the Confidentiality Agreement and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Purchaser, Purchaser's Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the obligations under the Confidentiality Agreement shall terminate. If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms; provided, that the term of the Confidentiality Agreement as set forth therein shall be amended to refer to two (2) years from the date of termination of this Agreement. For the avoidance of doubt, the provisions in the Confidentiality Agreement which by their terms survive the termination of the Confidentiality Agreement shall continue in full force and effect in accordance with their terms (as modified by the previous sentence).

(c)      The parties hereto confirm that the Personal Information disclosed by Sellers to Purchaser in connection with this Agreement (the "Transaction Personal Information") is necessary for the purposes of enabling Purchaser to determine if Purchaser shall proceed with the Transactions. Purchaser shall not use or disclose the Transaction Personal Information for any purposes other than those related to determining if it shall proceed with the Transactions, the performance of this Agreement, or the consummation of the Transactions, or any other similar purposes or as required or permitted by Law. Purchaser shall take steps to protect the Transaction Personal Information in a manner consistent with Purchaser's current policies, practices or procedures. If the Closing does not occur, Purchaser shall return to Sellers or, at Sellers' request, securely destroy the Transaction Personal Information promptly following termination of this Agreement and no later than three (3) Business Days. As used in this Agreement, "Personal Information" means all information that identifies or could be used to identify an individual person, in addition to any definition for "personal information" or any similar term provided by applicable Law.

(d)      Except as required by Sellers in connection with the reporting obligations of Sellers and their affiliates in Israel, no party nor any affiliate of such party, or Purchaser's Representatives or representative of Sellers, as applicable, shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Agreement or the Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), except as a party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by order of the Bankruptcy Court (in which case the disclosing party, to the extent practicable, shall (i) advise the other parties before making such disclosure and (ii) provide each such other party a reasonable opportunity to review and comment on such release or announcement and

consider in good faith any comments with respect thereto). Notwithstanding the foregoing, nothing contained herein shall prevent a party from disclosing information concerning this Agreement to its attorneys, accountants, lenders, rating agencies, insurers, and current or prospective equity investors and their advisors, in each case, subject to customary confidentiality obligations.

(e)    Notwithstanding anything to the contrary in this Agreement, any breach of this Section 23 by Purchaser shall not constitute a failure of condition to Sellers' obligation to sell the Premises to Purchaser in accordance with this Agreement, and Sellers shall not be entitled to terminate this Agreement on account of any such breach of this Section 23.

(f)    In addition to any other remedies available to Sellers, Sellers shall have the right to seek equitable relief, including, injunctive relief, against Purchaser or Purchaser's Representatives in order to enforce the provisions of this Section 23.

(g)    The provisions of this Section 23 shall survive the termination of this Agreement and the Closing.

24.    Bankruptcy Provisions.

(a)    Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of all or any part of the Premises (each, a "Competing Bid"), as determined in Seller's sole and exclusive discretion. From the Effective Date through the completion of the Auction with respect to the Premises, the Sellers are permitted to and to cause representatives and any Seller's Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates and Purchaser's Representatives) in connection with a Competing Bid. In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Premises to prospective purchasers and termination of this Agreement pursuant to Section 17(a)(i)(D) or Section 17(a)(i)(I). "Bidding Procedures Order" means the order of the Bankruptcy Court entered on October 1, 2025 (ECF No. 571), establishing certain procedures governing the marketing and sale process of the assets of Seller and its debtor affiliates in the Bankruptcy Cases.

(b)    Bankruptcy Court Filings.

(i)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Approval Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Premises

hereunder.  In the event the entry of the Approval Order shall be appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

(c)    <u>Back-up Bidder</u>.    Sellers and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction (as defined in the Bidding Procedures Order) if and only if (i) Purchaser submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by the Sellers, and (ii) Sellers give notice to Purchaser on or before the Approval Order End Date stating that the Sellers (A) failed to consummate the sale with the winning bidder, and (B) has terminated the purchase agreement with the winning bidder, Purchaser shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Purchaser at the Auction.

(d)    <u>Approval of Break-Up Fee and Expense Reimbursement</u>.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Purchaser, subject to and in accordance with the terms hereof, the Bidding Procedures Order and the Approval Order, a break-up fee in an amount equal to two percent (2%) of the Purchase Price (the "<u>Break-Up Fee</u>").    The Break-Up Fee shall be paid on the date of consummation of a Competing Bid or an alternative transaction pursuant to Sections 363 or 1129 of the Bankruptcy Code that would otherwise constitute or have constituted a Competing Bid at the Auction or any other process initiated by Sellers if no material breach by Purchaser of this Agreement has occurred.

25.    <u>Miscellaneous</u>.

(a)    Subject to the terms of the Approval Order, this Agreement shall not be altered, amended, changed, waived, terminated or otherwise modified in any respect and no consent or approval required pursuant to this Agreement shall be effective, unless the same shall be in writing and signed by or on behalf of the party to be charged.

(b)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and permitted assigns.

(c)    All prior statements, understandings, representations and agreements between the parties, oral or written, are superseded by this Agreement, which alone fully and completely expresses the agreement between them in connection with the Transactions and which is entered into after full investigation, neither party relying upon any statement, understanding, representation or agreement made by the other not embodied in this Agreement.  This Agreement shall be given a fair and reasonable construction in accordance with the intentions of the parties hereto, and without regard to or aid of canons requiring construction against Seller or the party drafting this Agreement.

(d)    <u>Survival</u>. Except (i) as set forth in <u>Section 3</u> (*Apportionments and Credits*), <u>Section 13(a)</u> (*Lease Modifications*), <u>Section 13(d)</u> (*Tax Assessed Property Value*), <u>Section 14</u> (*As

45

*Is*), Section 15 (*Broker*), Section 17(b)(i) (*Surviving Obligations*), Section 18 (*Escrow*), Section 20 (*Labor and Employees*), Section 21 (*Post-Closing Covenants*), Section 23 (*Property Information and Confidentiality*), and Section 25(e) (*Exculpation*), Section 25(l) (*Applicable Courts*), and Section 25(r) (*Waiver of Jury Trial*) or the Sellers' Documents (including, without limitation, the Deeds and the A&A Agreements) and (ii) for any covenant that by its terms is to be performed (in whole or in part) by any party following the Closing (which covenants shall survive the Closing in accordance with their terms), none of the representations, warranties, or covenants of any party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing. For the avoidance of doubt, the Surviving Obligations shall survive termination of this Agreement pursuant to this Agreement. Except as otherwise expressly provided herein and except for any Surviving Obligation, Purchaser's acceptance of the Deeds shall be deemed a discharge of all of the obligations of Sellers hereunder and as such all of Sellers' representations, warranties, covenants and agreements herein shall merge in the documents and agreements executed at the Closing and shall not survive the Closing.

(e)    Exculpation.

(i)    Purchaser agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, member, owner, principal, parent, subsidiary, financial advisors, legal advisors, consultants, accountants, or other affiliate or representatives of any Seller, or any officer, director, employee, trustee, shareholder, partner, member, owner, or principal of any such parent, subsidiary or other affiliate or their representatives (collectively, any "Seller's Affiliates"), arising out of or in connection with this Agreement or the Transactions. Purchaser agrees to look solely to Sellers and their assets for the satisfaction of any liability or obligation arising under this Agreement or the Transactions, or for the performance of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates with respect to any matters arising out of or in connection with this Agreement or the Transactions. Without limiting the generality of the foregoing provisions of this Section 25(e)(i), Purchaser hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Seller's Affiliates, and hereby unconditionally and irrevocably releases and discharges Seller's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Purchaser against Seller's Affiliates, in connection with or arising out of this Agreement or the Transactions.

(ii)    Each Seller agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, member, owner, principal, parent, subsidiary, financial advisors, legal advisors, consultants, accountants, or other affiliate or representatives of Purchaser, including, any officer, director, employee, trustee, shareholder, partner or principal of any such parent, subsidiary or other affiliate or their representatives (collectively, "Purchaser Related Parties"), arising out of or in connection with this Agreement or the Transactions. Each Seller agrees to look solely to the Deposit prior to the Closing or, if the Closing has occurred, to the Premises, for the satisfaction of any liability or obligation arising under this Agreement or the Transactions, or for the performance

46

of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of the Purchaser Related Parties with respect to any matters arising out of or in connection with this Agreement or the Transactions. Without limiting the generality of the foregoing provisions of this Section 25(e), each Seller hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against the Purchaser Related Parties regarding the Transactions, and hereby unconditionally and irrevocably releases and discharges the Purchaser Related Parties from any and all liability whatsoever which may now or hereafter accrue in favor of Seller against the Purchaser Related Parties, in connection with or arising out of this Agreement or the Transactions.

(iii)    The provisions of this Section 25(e) shall survive the termination of this Agreement and the Closing.

(f)    Each of Sellers and Purchaser agrees that, wherever this Agreement provides that it must send or give any notice, make an election or take some other action within a specific time period in order to exercise a right or remedy it may have hereunder, time shall be of the essence with respect to the taking of such action, and its failure to take such action within the applicable time period shall be deemed to be an irrevocable waiver by it of such right or remedy. Except as otherwise expressly provided herein, any agreement, approval, consent or other determination shall not be effective unless it is in writing and shall be in the sole and absolute discretion of such party.

(g)    No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by either party of any condition hereunder for its benefit (unless the time specified herein for exercise of such right or remedy has expired) shall constitute a waiver of any other or further right or remedy nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

(h)    Neither this Agreement nor any memorandum thereof shall be recorded or filed and any attempted recordation or filing hereof shall be void and shall constitute a default.

(i)    This Agreement may be executed in one or more counterparts, each of which so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument. Delivery of an executed signature page of this Agreement by .PDF or other electronic format attached as an e-mail attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

(j)    Each of the Exhibits and Schedules referred to herein and attached hereto is incorporated herein and made a part hereof by this reference.

(k)     The caption headings in this Agreement are for convenience only and are not intended to be a part of this Agreement and shall not be construed to modify, explain or alter any of the terms, covenants or conditions herein contained.

(l)     This Agreement and all of the documents executed and delivered in connection herewith, and all actions, suits, proceedings, claims or other litigation (whether arising in contract or tort or otherwise) brought by either against the other on any matter that may be based on, arising out of or in any way related or connected with this Agreement or the negotiation, execution, termination, performance or nonperformance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in this Agreement), shall be governed by and construed in accordance with the Laws of the State of New York, without regard to its conflicts of law principles. To the fullest extent permitted by applicable Law, the parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; provided, however, upon the closing of the Bankruptcy Cases, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court with jurisdiction in the county in which the Premises is located (together with the Bankruptcy Court, the "Applicable Courts"). Sellers and Purchaser each further agrees that service of any process, summons, notice or document by U.S. registered mail to such parties address set forth above shall be effective service of process for any action, suit, proceeding, claim or other litigation in New York with respect to any matters to which it has submitted to jurisdiction as set forth in the immediately preceding sentence. Sellers and Purchaser each irrevocably and, to the fullest extent permissibly by applicable Law, unconditionally waives any objection to the laying of venue of any action, suit, proceeding, claim or litigation with respect to this Agreement or any of the documents executed and delivered in connection herewith in the Applicable Courts, and further irrevocably and unconditionally waives and agrees not to plead or claim in any court that any such action, suit, proceeding, claim or litigation brought in any Applicable Court has been brought in an inconvenient forum.  The provisions of this Section 25(l) shall survive termination of this Agreement and the Closing.

(m)     If any provision of this Agreement shall be unenforceable or invalid, the same shall not affect the remaining provisions of this Agreement and to this end the provisions of this Agreement are intended to be and shall be severable.

(n)     Anything else in this Agreement to the contrary notwithstanding, in any action, suit, proceeding, claim or other litigation arising out of this Agreement, the prevailing party shall be entitled to collect from the non-prevailing party all of its attorneys' fees.  For the purposes of this Agreement, the party who receives or is awarded a substantial portion of the damages or claims sought in any action, suit, proceeding, claim or other litigation shall be deemed the "prevailing" party and attorneys' fees shall mean the reasonable fees charged by an attorney or a law firm for legal services and the services of any legal assistants, and costs of litigation, including fees and costs at trial and appellate levels.  The provisions of this Section 25(n) shall survive termination of this Agreement and the Closing.

(o)     Time is of the essence in the performance of all obligations by Purchaser and Sellers under this Agreement and with respect to each and every provision of this Agreement. If the date of the performance of any term, provision or condition of this Agreement shall happen to fall on a Saturday, Sunday or other non-Business Day, the date for the performance of such term, provision or condition shall be extended to the next succeeding Business Day immediately thereafter occurring.

(p)     Notwithstanding any provision in this Agreement to the contrary, neither Sellers nor Purchaser shall be responsible or liable for any special, consequential, exemplary or punitive damages for any breach or default hereunder. The provisions of this Section 25(p) shall survive termination of this Agreement and the Closing.

(q)     "Business Day" means a day other than a Saturday, a Sunday, or a legal holiday on which national banks located in the State of New York are not open for general banking business.

(r)     Waiver of Jury Trial. SELLERS AND PURCHASER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT EACH MAY HAVE TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, CLAIM OR OTHER LITIGATION (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER THAT MAY BE BASED ON, ARISING OUT OF OR IN ANY WAY RELATED OR CONNECTED WITH THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, TERMINATION, PERFORMANCE OR NONPERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN THIS AGREEMENT) OR ANY OTHER DOCUMENT EXECUTED AND DELIVERED BY EITHER PARTY IN CONNECTION HEREWITH (INCLUDING ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THE PROVISIONS OF THIS SECTION 25(r) SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND THE CLOSING.

(s)     Nothing set forth in this Agreement shall be construed to create a joint venture between Purchaser and Seller.

(t)     The terms and provisions of this Agreement are intended solely for the benefit of Sellers and Purchaser and such parties' respective permitted successors, assigns, or delegates.  Nothing contained in this Agreement is intended to benefit any third party, or create any third party beneficiary, and no third party other shall have any right, claim or benefit by virtue of the provisions of this Agreement.

(u)     Interpretation.

(i)     references to this Agreement are references to this Agreement and to the Exhibits and Schedules attached or delivered with respect hereto or expressly incorporated

49

herein by reference; each Schedule is hereby incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full;

(ii)    references to "Sections" are references to sections of this Agreement;

(iii)    references to any party shall include references to its respective successors and permitted assigns;

(iv)    the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement;

(v)    references to any agreement (including this Agreement) are references to that agreement as amended, consolidated, supplemented, novated or replaced in accordance with the terms and conditions therein from time to time;

(vi)    unless the context requires otherwise, references to any Law are references to that Law as of the date of this Agreement, and shall also refer to all rules and regulations promulgated thereunder;

(vii)    the word "including" (and all derivations thereof) means "including, without limitation," and any lists or examples following the word "including" or the phrase "including, without limitation," are intended to be nonexclusive examples solely for the purpose of illustration and without the intention of limiting the text preceding such lists or examples;

(viii)    the word "or" when used in this Agreement is not exclusive and shall mean "and/or";

(ix)    references to time are references to Eastern Time (as in effect on the applicable day) unless otherwise specified herein;

(x)    the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural;

(xi)    the terms "date hereof," "date of this Agreement," and similar terms shall mean the date set forth in the preamble to this Agreement;

(xii)    the phrases "Sellers have delivered," "Sellers have provided," "Sellers have made available" and phrases of similar import shall mean that, Sellers have made the document or information in question available to Purchaser at least one (1) Business Day prior to the Effective Date;

(xiii)    references to the "ordinary course of business" shall mean the ordinary course of business consistent with Sellers' past practice; and

(v)    references to "day" shall mean calendar day, unless otherwise specified herein.

(w)    <u>Mortgage Tax Savings</u>.    At Purchaser's option, Sellers shall request the holder of any existing mortgage encumbering the Premises to assign the same to Purchaser's lender or otherwise modify any existing mortgage so as to realize any mortgage recording tax savings available to Purchaser, and use commercially reasonable efforts to effectuate any such assignment or modification.  If the holder of any existing mortgage encumbering the Premises agrees to such assignment or modification, Purchaser shall pay the reasonable costs and expenses of the holder and the holder's counsel in connection with such assignment or modification  Notwithstanding the foregoing, in no event shall any such assignment of any existing mortgage to Purchaser's lender or the modification of any existing mortgage be a condition precedent to Purchaser's obligations to close hereunder, nor shall any delay or failure be considered a default by Sellers, permit Purchaser to adjourn or delay the Closing, or entitle Purchaser to receive an abatement or reduction of the Purchase Price.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.

**SELLERS:**

BROADWAY REALTY I CO., LLC AND THE ENTITIES LISTED ON SCHEDULE 1 HERETO

By: _Ephraim Diamond_
Name: Ephraim Diamond
Title:  Chief Restructuring Officer

By: _David Barse_
Name: David Barse
Title:  Chief Restructuring Officer

*[signatures continue on following page]*

**[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.

**PURCHASER:**

Summit Gold Inc.,
a Delaware corporation

By: _Zohar Levy_____
Name: Zohar Levy
Title: Authorized Signatory

**[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.

Acceptance by Escrow Agent:

Chicago Title Insurance Company hereby acknowledges that it has received the foregoing Purchase and Sale Agreement and agrees to act as Escrow Agent thereunder and to be bound by and perform the terms thereof as such terms apply to Escrow Agent.

Dated as of the Effective Date.

**ESCROW AGENT:**

[ _____ ]

By: _____

    Name: Jennifer Beltrami
    Title: Underwriting Counsel

**[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]**

# EXHIBIT A

## FORM OF DEED

## BARGAIN AND SALE DEED

THIS INDENTURE, made the [___] day of [_____], 202[__] between
[_____, a _____] ("Grantor"), in favor of
[_____, a _____] ("Grantee").

**WITNESSETH**, that Grantor, in consideration of TEN DOLLARS ($10.00), paid by Grantee, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby grant and release unto Grantee and its successors and assigns forever

ALL that certain plot, piece or parcel of land, with the building and improvements thereon erected, situate, lying and being in the County of New York, State of New York, and more particularly described as follows:

See Exhibit A attached hereto and incorporated herein by this reference (the "Premises").

TOGETHER with all right, title and interest, if any, of Grantor in and to any streets and roads abutting the Premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of Grantor in and to the Premises; TO HAVE AND TO HOLD the Premises unto Grantee and its heirs, successors and assigns forever.

AND Grantor, in compliance with Section 13 of the New York Lien Law, covenants Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

IN WITNESS WHEREOF, Grantor has duly executed this Indenture as the day and year first above written.

[Signature and notarial acknowledgment appear on the following page.]

Exhibit A

**GRANTOR:**

[_____],

a [_____]

By: _____

Name:

Title:

**[NOTARY BLOCK TO BE UPDATED PURSUANT TO LOCATION OF SIGNER]**

STATE OF NEW YORK    §

COUNTY OF NEW YORK  §

On the _____ day of _____ in the year 202[_], before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____

(Signature of Notarial Officer)

(Seal, if any)

**<u>EXHIBIT A</u>**

**LEGAL DESCRIPTION**

## EXHIBIT B

### FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES

**ASSIGNMENT AND ASSUMPTION OF LEASES**, dated [_____], 202[_], by and between [●], a [●] ("Assignor"), and [●], a [●]  ("Assignee").

### RECITALS:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated [_____], 202[_], between Assignor and Assignee, [as successor in interest to [_____]], as the same may have been heretofore amended (the "Agreement"), Assignor has this day sold and conveyed to assignee the real property more particularly described in Schedule 1 attached hereto and made a part hereof (the "Premises").

**NOW, THEREFORE**, in consideration of the agreements hereinafter set forth and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest, if any, as landlord, in and to (i) the leases, licenses and other occupancy agreements affecting the Premises and all guaranties thereof set forth on Schedule 2 attached hereto and made a part hereof (collectively, the "Leases"), and (ii) the Security Deposits (as defined in the Agreement).

**TO HAVE AND TO HOLD** the same unto Assignee, its successors and assigns, forever, from and after the date hereof, subject to the terms, covenants, conditions and provisions of the Leases; and

**ASSIGNEE HEREBY ACCEPTS** the foregoing assignment, assumes and agrees to perform all of the obligations of Assignor under the Leases (including all obligations respecting any Security Deposits) from and after the date hereof.

Except as set forth in the Agreement, this Assignment and Assumption of Leases is made without any covenant, warranty or representation by, or recourse against, Assignor or Assignor's affiliates of any kind whatsoever; provided, that nothing herein shall limit or impair Assignee's rights under the Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, this Assignment and Assumption of Leases has been executed on the date and year first written above.

**ASSIGNOR:**

[_____],
a [_____]

By: _____
    Name:
    Title:

**ASSIGNEE:**

[_____],
a [_____]

By: _____
    Name:
    Title:

EXHIBIT B-2

## <u>SCHEDULE 1</u>

## LEGAL DESCRIPTION

## **SCHEDULE 2**

**LEASES**

EXHIBIT B-4

## EXHIBIT C

### FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT

**OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated [_____], 202[_], by and between [●], a [●] ("Assignor"), and [●], a [●] ("Assignee").

### RECITALS:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated [_____], between Assignor and Assignee, as the same may have been heretofore amended (the "Agreement"), Assignor has this day sold and conveyed to Assignee the real property more particularly described in Schedule 1 attached hereto and made a part hereof (the "Premises"). All initially capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Agreement.

**NOW, THEREFORE**, in consideration of the agreements hereinafter set forth and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest, if any, in and to (i) all Licenses and (ii) all Contracts set forth on Schedule 2 attached hereto and made a part hereof (collectively, the "Assumed Contracts").

**TO HAVE AND TO HOLD** the same unto Assignee, its successors and assigns, forever, from and after the date hereof, subject to the terms, covenants, conditions and provisions of the Licenses and the Assumed Contracts; and

**ASSIGNEE HEREBY ACCEPTS** the foregoing assignment and assumes and agrees to perform all of the obligations of Assignor under the Licenses and the Assumed Contracts from and after the date hereof.

Except as set forth in the Agreement, this Omnibus Assignment and Assumption Agreement is made without any covenant, warranty or representation by, or recourse against, Assignor or Assignor's affiliates of any kind whatsoever; provided, that nothing herein shall limit or impair Assignee's rights under the Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT C-1

**IN WITNESS WHEREOF**, this Omnibus Assignment and Assumption Agreement has been executed on the date and year first written above.

**ASSIGNOR:**

[_____],
a [_____]

By: _____
    Name:
    Title:

**ASSIGNEE:**

[_____],
a [_____]

By: _____
    Name:
    Title:

EXHIBIT C-2

## SCHEDULE 2

## ASSUMED CONTRACTS

EXHIBIT C-4

**EXHIBIT D**

**FORM OF BILL OF SALE**

**BILL OF SALE**

**KNOW ALL PERSONS BY THESE PRESENTS,**

That [●], a [●] ("Seller"), for and in consideration of the agreements hereinafter set forth and other good and valuable consideration paid to Seller by [●], a [●] ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, does hereby sell, grant, convey and transfer to Purchaser all of Seller's right, title and interest, if any, in and to all FF&E Personal Property.

**TO HAVE AND TO HOLD** the same unto Purchaser, its successors and assigns, forever, from and after the date hereof.

Except as set forth in the Agreement (defined herein), this Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Seller or Seller's Affiliates of any kind whatsoever; provided, that nothing herein shall limit or impair Purchaser's rights under the Purchase and Sale Agreement (the "Agreement") dated [_____], between Seller and Purchaser. All initially capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Agreement.

This Bill of Sale is dated [_____], 202[__].

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT D-1

**IN WITNESS WHEREOF,** Seller and Purchaser have executed this Bill of Sale as of the date first written above.

**SELLER:**

[_____],
a [_____]


By: _____
    Name:
    Title:

**PURCHASER:**

[_____],
a [_____]


By: _____
    Name:
    Title:

## **EXHIBIT E**

## **Intentionally Omitted**

## EXHIBIT F

### FORM OF ASSUMPTION OF UNION CONTRACT

THIS ASSUMPTION OF UNION CONTRACT (this "<u>Assumption</u>") is made and entered into as of _____, 202[_], by and between [●], a [●] (the "<u>Seller</u>"), and [●], a [●] ("<u>Purchaser</u>").

WHEREAS, Purchaser and Seller entered into that certain Purchase and Sale Agreement dated as of [●], 202[_], pursuant to which Purchaser agreed to acquire fee title [***insert property address***] (the "<u>Building</u>") from Seller (the "<u>PSA</u>");

WHEREAS, Seller is bound by a collective bargaining agreement, the [***insert name and date of collective bargaining agreement***] (the "<u>CBA</u>"), governing the terms and conditions of employment of the individuals who perform building service work at the Building;

WHEREAS Purchasers have agreed in the PSA that they shall assume and be bound by the CBA effective on and after the Closing Date;

NOW, THEREFORE, IT IS AGREED:

1. Effective as of the date hereof, (a) the Seller hereby expressly assumes all of the obligations and liabilities of Seller under the CBA and agrees to be bound by Section 21(c) of the PSA, and (b) Purchasers hereby expressly assume all of the obligations and liabilities of Seller under the CBA and agrees to be bound by Section 20(d) of the PSA. All obligations and liabilities of Purchasers under the CBA shall be joint and several for all purposes.

2. Purchasers agree to assume and be bound by the CBA effective on and after the Closing Date;

3. This Assumption shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4. This Assumption may be executed in counterparts, each of which shall be deemed an original and all of which counterparts taken together shall constitute one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

EXHIBIT F-1

**SELLER:**

[_____],
a [_____]


By: _____
     Name:
     Title:

**PURCHASER:**

[_____],
a [_____]


By: _____
     Name:
     Title:

EXHIBIT F-2

**EXHIBIT G-1**

**FORM OF SELLERS' CLOSING CERTIFICATE**

**(*insert property address*)**

THIS CLOSING CERTIFICATE is made on the [●] day of [●], 202[_], by and between [●], a [●] (the "Sellers"), and [●], a [●] ("Purchaser").

R E C I T A L S :

A.    Sellers and Purchaser are parties to that certain Purchase and Sale Agreement dated [_____], as at any time amended or assigned (the "PSA").

B.    The PSA requires the delivery by Sellers of this Closing Certificate under Section 7(a)(iv) and Section 11(q) thereof.

NOW THEREFORE, except as set forth on Exhibit "A" attached hereto, each Seller, with respect to itself, does hereby represent and warrant to Purchaser that each of the representations and warranties of each Seller contained in the PSA are true, correct and complete in all material respects as of the date hereof as if made on and as of the date hereof (except for those representations and warranties made as of a specific date (if any) which are true, correct and complete in all material respects as of such date).

IN WITNESS WHEREOF, the undersigned has executed this Closing Certificate as of the day and year first above written.

*Signature page to follow.*

EXHIBIT G-1-1

SELLERS:

[_____],
a [_____]

By: _____
Name:
Title:

**EXHIBIT G-2**

**FORM OF PURCHASER'S CLOSING CERTIFICATE**

**(*insert property address*)**

THIS CLOSING CERTIFICATE is made on the [●] day of [●], 202[_], by and between [●], a [●] (the "Seller"), and [●], a [●] ("Purchaser").

R E C I T A L S :

A.      Seller and Purchaser are parties to that certain Purchase and Sale Agreement dated [_____], as at any time amended or assigned (the "PSA").

B.      The PSA requires the delivery by Purchaser of this Closing Certificate under Section 7(b)(iv) and Section 12(h) thereof.

NOW THEREFORE, except as set forth on Exhibit "A" attached hereto, Purchaser does hereby represent and warrant to Seller that each of the representations and warranties of Purchaser contained in the PSA are true, correct and complete in all material respects as of the date hereof as if made on and as of the date hereof (except for those representations and warranties made as of a specific date (if any), which are true, correct and complete in all material respects as of such date).

IN WITNESS WHEREOF, the undersigned has executed this Closing Certificate as of the day and year first above written.

*Signature page to follow.*

EXHIBIT G-2-1

PURCHASER:

[_____],
a [_____]

By: _____
Name:
Title:

EXHIBIT "A"

## <u>EXHIBIT H</u>

## **FORM OF TENANT NOTICE LETTER**

_____, 202[_]

Re:     [*insert property address*]

[To Whom It May Concern]:

You are hereby notified as follows:

1.      That as of the date hereof, [●], a [●] ("**<u>Seller</u>**") has transferred, sold, assigned, and conveyed all of its interest in and to the above described property (the "**<u>Property</u>**") [●], a [●], ("**<u>New Owner</u>**"). New Owner has assumed all obligations of landlord under your lease from and after the date above.

2.      Future notices and rental payments with respect to your leased premises at the Property should be made to New Owner in accordance with your lease terms at the following address:

[_____]
[_____]
[_____]
Attention:  [_____]
E-mail:  [_____]

3.      Your security deposit, if any, has been transferred to New Owner and as such New Owner shall be responsible for holding the same in accordance with the terms of your lease.

*Signature page to follow.*

EXHIBIT H-1

Very truly yours,


SELLER:


[_____],
a [_____]

By: _____
Name: _____
Title: _____

EXHIBIT H-2

NEW OWNER:

[_____],
a [_____]

By: _____
    Name:
    Title:

## **EXHIBIT I**

**FORM OF COUNTERPARTY NOTICE LETTER**

_____, 202[_]

Re:        [*insert property address*]

[To Whom It May Concern]:

You are hereby notified as follows:

1.        That as of the date hereof, [●] ("**Seller**") has transferred, sold, assigned, and conveyed all of its interest in and to the above described property (the "**Property**") to [●] (collectively, "**New Owner**"). New Owner has assumed all obligations under your contract set forth below from and after the date above.

- [_____], dated [_____]

2.        Future notices with respect to your contract at the Property should be made to New Owner in accordance with your contract terms at the following address:

[_____]
[_____]
[_____]
Attention:  [_____]
E-mail:  [_____]

*Signature page to follow.*

EXHIBIT I-1

Very truly yours,


SELLER:


[_____],
a [_____]

By: _____
Name: _____
Title: _____

EXHIBIT I-2

NEW OWNER:

[_____],
a [_____]

By: _____
    Name:
    Title:

EXHIBIT I-3

**<u>EXHIBIT J</u>**

**Approval Order**

(See attached)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                        :
In re                                                   :       **Chapter 11**
                                                        :
**BROADWAY REALTY I CO., LLC.,** *et al.*,              :       **Case No. 25-11050 (DSJ)**
                                                        :
            **Debtors.** [1]                            :       **(Jointly Administered)**
                                                        :
-------------------------------------------------------------X

## [PROPOSED] ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN AND GRANTING RELATED RELIEF

Upon the filing by Broadway Realty I Co., LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") of the *First Amended Joint Chapter 11 Plan*, dated December 1, 2025 (ECF No. 780) (as may be further amended, supplemented, or modified from time to time and together with all exhibits and schedules thereto, the "**Plan**"), attached as **Exhibit A** hereto, and the Court previously having approved the *Disclosure Statement for First Amended Joint Chapter 11 Plan*, dated December 1, 2025 (ECF No. 782) (as amended, supplemented, or modified from time to time and together with all exhibits and schedules thereto, the "**Disclosure Statement**"), and the procedures related to the solicitation of acceptances and rejections of the Plan, in each case, pursuant to the *Order (I) Approving Proposed Disclosure Statement and the Form and Manner of Notice of Hearing Thereof, (II) Establishing Solicitation and Voting Procedures With Respect to Debtors' Proposed First*

---

[1]    The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426.  A complete list of the Debtors in these Chapter 11 Cases is set forth on **Annex 1** to the Plan (as defined below) and may also be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/broadwayrealty. The Debtors' mailing address is located at 2 Grand Central Tower, 140 East 45th St, 12th Floor, New York, New York 10017.

*Amended Chapter 11 Plan, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Debtors' Proposed First Amended Chapter 11 Plan; and (V) Granting Related Relief*, dated December 3, 2025 (ECF No. 789) (the "**Disclosure Statement Order**")[2]; and the Debtors having served the Disclosure Statement, the Plan, the Solicitation Packages, the Ballots, the applicable Notices of Non-Voting Status, and the Confirmation Hearing Notice (each as defined in the Disclosure Statement Order) on the holders of Claims and Interests in accordance with the Disclosure Statement Order as set forth in the *Affidavit of Service* (ECF No. [●]); and the Debtors having filed the documents comprising the plan supplement on [●], 2026 (ECF No. [●]) (as may be amended, modified, or supplemented from time to time and together with all exhibits and schedules thereto, the "**Plan Supplement**"); and this Court having considered the record in these Chapter 11 Cases, the stakeholder support for the Plan evidenced on the record and in the *Declaration of [●] of Stretto, Inc., Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan* (ECF No. [●]) (the "**Voting Certification**"), the briefs and arguments regarding confirmation of the Plan, the evidence regarding confirmation of the Plan, including the evidence set forth in the Declaration of [●] (the "**[●] Declaration**") (ECF No. [●]) filed in support of the Plan's confirmation, and a hearing on confirmation of the Plan having been held on January [15], 2026 (the "**Confirmation Hearing**"); and after due deliberation:

---

[2]   Capitalized terms used in this order (this "**Order**") but not otherwise defined herein have the meanings ascribed to such terms in the Plan, the Disclosure Statement Order, or the applicable Definitive Document (as defined in the Plan).

## IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and venue is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The Plan complies with the applicable provisions of the Bankruptcy Code and thereby satisfies all of the requirements for confirmation, including those set forth in section 1129 of the Bankruptcy Code.

C.    The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Plan, which seeks to implement a sale of substantially all of the Debtors' Assets pursuant to that certain *Asset Purchase Agreement*, dated [●], 2025 (as may be modified, amended or supplemented from time to time and including all schedules and exhibits thereto, the "**Asset Purchase Agreement**"), between the Debtors and [●] (the "**Purchaser**"), a copy of which is attached as Exhibit [1] to the [*Notice of Successful Bidder*] (ECF No. [●]), was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of all parties in interest.  The Plan was solicited in good faith and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order. The Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies, including the Mortgage Lender.  The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for this Court to approve the Transaction(s) contemplated in the Asset Purchase Agreement.

---

[3]    All findings of fact and conclusions of law announced by this Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Order to the extent not inconsistent herewith.  Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law.  Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

D.    The Plan does not "discriminate unfairly" and is "fair and equitable" with respect to Class 4 – General Unsecured Claims, Class 5 – Subordinated Claims, and Class 6 – Existing Equity Interests (each, a "**Rejecting Class**"), which are impaired and are deemed to reject the Plan, because no Class senior to any Rejecting Class is being paid more than in full and the Plan does not provide a recovery on account of any Claim or Interest that is junior to any Rejecting Class unless and until such Rejecting Classes are paid in full.

E.    As demonstrated by the [●] Declaration and other evidence proffered or adduced at the Confirmation hearing and the representations of counsel made on the record at the Confirmation Hearing, (i) the Debtors, the Purchaser, and each of their respective counsel and other advisors complied with the Bidding Procedures and Bidding Procedures Order in all respects; (ii) the Debtors and their advisors adequately marketed the Debtors' Assets and conducted a robust and extensive sale process to solicit and develop the highest or otherwise best offer for the Debtors' Assets; (iii) adequate notice and a full, fair, and reasonable opportunity was given to all persons to make a higher or otherwise better offer to purchase some or all of the Debtors' Assets, including the Premises (as defined in the Asset Purchase Agreement); (iv) the Bidding Procedures were substantively and procedurally fair to all persons, including all bidders and potential bidders; and (v) no person submitted a higher or otherwise better bid for the Debtors' Assets than the Purchaser. The Debtors' determination that the Asset Purchase Agreement is the highest or otherwise best offer for the Debtors' Assets constitutes a valid and sound exercise of the Debtors' business judgment.  Taking into consideration all relevant factors and circumstances, consummation of the Transaction(s) contemplated in the Asset Purchase Agreement will provide a greater recovery for the Debtors' creditors than would be provided by

any other practically available alternative, including liquidation under chapter 7 of the Bankruptcy Code.

       F.   The Asset Purchase Agreement and the transactions contemplated therein were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms'-length, without collusion or fraud, and in good faith.  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under the applicable provisions of the Bankruptcy Code.  Purchaser is a good faith purchaser for value and, as such, is entitled to all the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law.  The sale of the Debtors' Assets contemplated by the Asset Purchase Agreement is undertaken by Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Debtors' Assets shall not affect the validity of such sale (including the assumption and assignment of any Assumed Contract or Lease (as defined in the Asset Purchase Agreement)), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

       G.   The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101 of the Bankruptcy Code.  The transfer of assets to the Purchaser, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, will constitute a legal, valid, and effective transfer of those assets, and, following the entry of this Order, closing of the transaction contemplated by the Asset Purchase Agreement will vest the Purchaser with all right, title, and interest of the Debtors to the Premises free and clear of all liens (including as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims

5

(as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to, the commencement of the Debtors' Chapter 11 Cases, and in each case, whether imposed by agreement, understanding, law, equity, or otherwise (each an "**Encumbrance**" and, collectively, "**Encumbrances**") to the maximum extent permitted by applicable law.

H.    The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and creditors, if the sale of the Premises to the Purchaser were not free and clear of all Encumbrances, or if the Purchaser would, or in the future could, be liable for any such Encumbrances.

I.    Those holders of Encumbrances who did not object to the sale are deemed to have consented pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code. Those holders of Encumbrances who did object are adequately protected, to the extent to which they are entitled, by having their Encumbrances, if any, attach to the cash proceeds of the sale (in order of priority) ultimately attributable to the Premises against or in which they claim an Encumbrance.

J.      The Plan, including the various documents and agreements set forth in the Plan Supplement, provides adequate and proper means for the implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, through, among other things, (i) the sale of the Premises to the Purchaser pursuant to the Asset Purchase Agreement, (ii) the provisions governing distributions under the Plan, (iii) the wind down and dissolution of the Post-Emergence Entities, (iv) the appointment of the Plan Administrator, (v) authorization for all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.

K.      [Subsequent to solicitation, the Debtors made certain modifications to the Plan.  All such modifications since the entry of the Disclosure Statement Order are consistent with all of the provisions of the Bankruptcy Code, including sections 1122, 1123, 1125, and 1127 of the Bankruptcy Code.  None of the aforementioned modifications adversely affects the treatment of any holder of a Claim or Interest under the Plan.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code, none of the modifications require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code.  Prior notice regarding the substance of any modifications to the Plan, together with the filing with the Court of the Plan as modified, and the disclosure of the Plan modifications on the record at or prior to the Confirmation Hearing constitute due and sufficient notice of any and all such modifications.  Further, in accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan modifications.  No holder of a Claim shall be permitted to change its vote as a consequence of the Plan modifications unless otherwise agreed to by the holder of

the Claim and the Debtors and such change is approved by the Court in accordance with Bankruptcy Rule 3018(a).  The modifications to the Plan are hereby approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Plan as modified shall constitute the Plan submitted for confirmation.][4]

L.   As evidenced by the Voting Certification and the relevant affidavits of service[5] filed with the Bankruptcy Court, due, proper, timely, adequate, and sufficient service and notice of the Plan, including, without limitation, notice of (i) all exculpations and injunctions thereunder, (ii) the deadline and procedures for objecting to the Transaction, and (iii) the deadline and procedures for filing objections to the assumption, assumption and assignment, or rejection of any executory contracts and unexpired leases under the Plan (including, without limitation, the deadline and procedures for filing any objections to the assumption, assumption and assignment, or rejection of any executory contracts or unexpired leases).

M.   The filing and notice of the Plan Supplement, as evidenced by the applicable affidavits of service (ECF Nos. [●]), was proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required.

---

[4]   [**NTD**: To be included if necessary / applicable.]

[5]   The relevant affidavits of service include [●], [●], [●], and [●] (ECF Nos. [●]-[●]).  [Bullets to be replaced with the affidavits of service for the confirmation hearing notice, the solicitation packages, the cure notices, and the confirmation hearing publication certification when available.]

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED THAT:**

**A.** **Confirmation of the Plan And Approval of Sale Free and Clear of Encumbrances**

1.      The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

2.      The Plan and each of its provisions is approved and the Plan is confirmed pursuant to section 1129 of the Bankruptcy Code. The documents contained in or contemplated by the Plan and the Plan Supplement, including, without limitation, the Asset Purchase Agreement and all other documents in connection with the Transaction(s), are authorized and approved in all respects.  The terms of the Plan, including the Plan Supplement, and all exhibits thereto are incorporated by reference into and are an integral part of this Confirmation Order.

3.      Any and all objections to and reservations of rights in respect of the Plan that have not been withdrawn, waived or resolved prior to the Confirmation Hearing are hereby denied and overruled on the merits with prejudice, other than any Adjourned Cure Objections (as defined below).

4.      The Asset Purchase Agreement and any amendments, modifications and supplements thereto, are integral to the Plan and are approved by the Court.   The Debtors, the Post-Emergence Entities, and the Plan Administrator, as applicable, are authorized to take all reasonable actions required under the Plan and the Plan Supplement to effectuate the Plan and the Transaction(s) contemplated therein.

9

5.      The Premises shall be transferred to the Purchaser, or his assignee or designee, and upon Closing (as defined in the Asset Purchase Agreement) shall be, free and clear of Encumbrances, to the maximum extent permitted by applicable law, with all such Encumbrances attaching to the net proceeds of the sale in the order of their priority, with the same validity, force and effect which they may have as against the Premises.  The transfer of the Premises to the Purchaser pursuant to the Asset Purchase Agreement and this Order constitutes a legal, valid, binding and effective transfer of the Premises, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Premises free and clear of all Encumbrances and no successor liability shall be imposed and is forever barred to the maximum extent permitted by applicable law.

6.      The terms of the Plan, including the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of the Plan and this Order. The terms of the Plan and the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of this Court that all such documents are approved in their entirety.

7.      Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases, and complied with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  The solicitation of votes on the Plan and the Solicitation Packages complied with the solicitation procedures in the Disclosure Statement Order, were

10

appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.   The Debtors solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

8.      This Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan.

9.      Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept for filing and/or recording any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Transaction(s) contemplated by the Plan and this Order.

10.     Pursuant to section 1146 of the Bankruptcy Code, (i) the transfer of the Premises to the Purchaser, or its designee, and the making or delivery of any instrument of transfer in connection with or furtherance of the Plan, and any financing by the Purchaser, (ii) the issuance, transfer or exchange of any securities, instruments, or documents pursuant to, in implementation of or as contemplated in the Plan and the Asset Purchase Agreement, (iii) the creation of any lien, mortgage, deed of trust or other security interest, (iv) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with the Transaction(s) embodied in the Asset Purchase Agreement, and (v) the issuance, renewal, modification, or

11

securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, this Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (a) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (b) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code, and (c) any similar tax on the recording of deeds, transfers of property or ownership interest in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to this Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax, as well as cancel and discharge of record all liens, judgments, encumbrances, claims, and other adverse interests in or against the Premises.  All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Premises any taxes from which the Transaction(s) effectuated pursuant to the Plan and this Confirmation Order are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes,

12

and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.  The New York City Register's Office is hereby authorized and directed to record any deed, mortgage of the Premises, and any modification, restatement, amendment or assignment of any mortgages and any other similar conveyance, indenture, or other documents contemplated under the Plan without the payment of any of the aforementioned exempt taxes or any other stamp tax, transfer tax or similar tax, and without the presentation of affidavits, instruments, or returns otherwise required for recording or filing pursuant to the provisions of section 1146(a) of the Bankruptcy Code.  Subject to the consent rights (if any) of the Mortgage Lender, the mortgages encumbering the Premises shall be assigned to the Purchaser's lender(s) in accordance with the Asset Purchase Agreement and such assignments are hereby authorized and approved.

11.     Pursuant to Bankruptcy Rule 3020(c)(1), the Injunction and Exculpation provisions in Sections 10.5 and 10.6 of the Plan are appropriate under the circumstances of these cases and are hereby approved and will be immediately effective on the Effective Date without further order or action by this Court or any other Entity.

**B.      Executory Contract and Unexpired Lease Matters**

12.     Notwithstanding anything to the contrary herein, the assumptions, assumptions and assignments, or rejections of executory contracts and unexpired leases provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code are approved, and the Debtors are hereby authorized to assume, assume and assign, or reject the executory contracts and unexpired leases as set out in the Plan, the Plan Supplement, and the Definitive Documents.

13.     The Debtors are authorized, in their sole discretion, to adjourn to a date to be determined any objection filed by a contract counterparty relating to the Cure Amount associated with an executory contract or unexpired lease (an "**Adjourned Cure Objection**").

13

The assumption, assumption and assignment, or rejection of any contract identified in the [*Notice of Cure Amounts and Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases* (ECF No. [●])] and any subsequent assumption notice filed prior to the Confirmation Hearing (collectively, the "**Assumption and Assignment Notices**") shall be effective upon the Effective Date notwithstanding any pending Adjourned Cure Objection.

14.     Notwithstanding anything herein or under the Plan to the contrary, all existing tenant leases at the Premises are hereby assumed and assigned to the Purchaser in accordance with the Bidding Procedures and as set out in the Asset Purchase Agreement (the "**Tenant Leases**").  The assumption and assignment of the Tenant Leases (i) is integral to the Transaction(s) contemplated by the Asset Purchase Agreement, (ii) limits the disruption to the counterparties to the Tenant Leases, and (iii) is in the best interest of the Debtors, their Estates and creditors, and other parties in interest.

15.     No provision of any executory contract or unexpired lease, including any Assumed Contract or Lease (as defined in the Asset Purchase Agreement), that purports to prohibit, restrict, or condition the assignment of any such executory contract or unexpired lease in connection with the Transactions or otherwise under the Plan shall have any force or effect. Pursuant to section 365(f) of the Bankruptcy Code, any executory contract or unexpired lease, including any Assumed Contract or Lease (as defined in the Asset Purchase Agreement) shall be assigned and transferred to, and remain in full force and effect, notwithstanding any provision of the executory contract or unexpired lease or other restriction prohibiting their assignment or transfer.

C.     **Miscellaneous**

16.     The Debtors shall cause to be served a notice of the entry of this Order and occurrence of the Effective Date, substantially in the form attached hereto as **Exhibit B**

(the "**Notice of Effective Date**"), upon all creditors no later than five (5) business days after the Effective Date, or as soon as reasonably practicable thereafter. The Debtors shall cause the Notice of Effective Date to be published in the national edition of *The Wall Street Journal* within seven (7) business days after the Effective Date, or as soon as reasonably practicable thereafter.

17.     In the event of a conflict between this Order, on the one hand, and the Plan, the Plan Supplement or any other instrument or document created or executed pursuant to the Plan or any order (other than this Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing) or the other Definitive Documents, on the other hand, this Order shall govern and control in all respects.

18.     The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen (14) days after entry of the order are hereby waived. This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), or 7062.

19.     Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article XI of the Plan.

20.     Except as otherwise may be provided in the Plan or herein, notice of all

subsequent pleadings in the Chapter 11 Cases after the Effective Date shall be limited to the

following parties:  (i) the Debtors and their counsel; (ii) the Mortgage Lender; (iii) the U.S.

Trustee; (iv) the Purchaser; and (v) any party known to be directly affected by the relief sought.

Dated: _____, 2026
　　　　New York, New York

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　THE HONORABLE DAVID S. JONES
　　　　　　　　　　　　　　　　UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Plan**

**Exhibit B**

**Notice of Effective Date**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
                                                    :
**In re**                                           :        **Chapter 11**
                                                    :
**BROADWAY REALTY I CO., LLC.,** *et al.,*          :        **Case No. 25-11050 (DSJ)**
                                                    :
         **Debtors.** [1]                           :        **(Jointly Administered)**
                                                    :
----------------------------------------------------------------X

### NOTICE OF (I) ENTRY OF ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN AND (II) OCCURRENCE OF EFFECTIVE DATE

PLEASE TAKE NOTICE that on [●], 2026, the United States Bankruptcy Court

for the Southern District of New York (the "**Bankruptcy Court**") entered an order

(the "**Confirmation Order**") (ECF No. [●]) confirming the *First Amended Joint Chapter 11*

*Plan* (together with the plan supplement, all schedules, and exhibits thereto, and as may be

modified, amended, or supplemented from time to time, the "**Plan**")[2] filed by [Broadway Realty

---

[1]    The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426.  A complete list of
       the Debtors in these Chapter 11 Cases is set forth on **Annex 1** to the Plan (as defined below) and also may be
       obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/broadwayrealty.
       The Debtors' mailing address is located at 2 Grand Central Tower, 140 East 45th St, 12th Floor, New York,
       New York 10017.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan,
       the Disclosure Statement Order, or the applicable Definitive Document (as defined in the Plan).

I Co., LLC and its debtor affiliates[3]], as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order, the Plan, and the Plan Supplement can be viewed free of charge at the website for the Debtors' claims and noticing agent, Stretto: https://cases.stretto.com/broadwayrealty/.  Additionally, copies of such documents may be obtained by accessing the Bankruptcy Court's website: www.nysb.uscourts.gov.  A PACER password and login are needed to access documents on the Bankruptcy Court's website, and can be obtained at http://www.pacer.psc.uscourts.gov.  The Confirmation Order, the Plan, and the Plan Supplement are also available for inspection during regular business hours in the office of the Clerk of the Bankruptcy Court at the following address: United States Bankruptcy Court, One Bowling Green, New York, NY 10004-1408.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [_____], and as a result, the Plan has been substantially consummated.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Section 8.3 of the Plan, each executory contract and unexpired lease of the Debtors not previously assumed, rejected, or assumed and assigned by the Debtors during the Chapter 11 Cases shall be treated as follows: [(i) in the case of a Refinancing Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (A) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (B) previously expired or terminated pursuant to its own terms or by

---

3    [**NTD**: If Transaction is for less than all of the Debtors, Defined term of Debtors to be limited to Debtors for applicable Transaction.]

agreement of the parties thereto; (C) is the subject of a motion to reject filed by the Debtors on or before the Effective Date; or (D) is specifically designated as a contract or lease to be rejected by the Debtors; or (ii) in the case of a Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties, shall be deemed rejected, unless such contract or lease (A) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (B) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (C) is the subject of a motion to assume filed by the Debtors on or before the Effective Date; or (D) is specifically designated as a contract or lease to be assumed or assumed and assigned on the Assumption Schedule.]

**PLEASE TAKE FURTHER NOTICE** that in accordance with Section 8.3 of the Plan, in the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified as a General Unsecured Claim. Any counterparty to a contract or lease that is rejected by the Debtors must file and serve a proof of claim on the applicable Debtor or Post-Emergence Entity that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding the foregoing, all existing tenant leases at the Premises are shall be assumed and assigned to the Purchaser in accordance with the Bidding Procedures and as set out in the Asset Purchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof are binding on every holder of a Claim against or Interest in any of the Debtors, whether or not

3

the Claim or Interest of such holder is impaired under the Plan and whether or not such holder

accepted the Plan.


Dated: _____, 2026
         New York, New York

<div style="margin-left:50%;">

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for Debtors*
*and Debtors in Possession*

</div>