**Hearing Date and Time: Jan. 15, 2026 at 10:00 a.m. (Prevailing Eastern Time)**

**PAUL HASTINGS LLP**
Harvey A. Strickon
Brett Lawrence
Justin Rawlins
Nicholas A. Bassett
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Email: harveystrickon@paulhastings.com
        brettlawrence@paulhastings.com
        justinrawlins@paulhastings.com
        nicholasbassett@paulhastings.com

*Counsel to Flagstar Bank, N.A., a national association*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **BROADWAY REALTY I CO., LLC, *et al.*,** | § | **Case No. 25-11050 (DSJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| | § | |

**FLAGSTAR BANK, N.A.'S JOINDER AND SUPPLEMENTAL REPLY**
**IN SUPPORT OF CONFIRMATION OF DEBTORS' FIRST AMENDED**
**JOINT CHAPTER 11 PLAN**

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

*Attorneys for Flagstar Bank, N.A.*

---

[1] The last four digits of Broadway Realty I Co., LLC's tax identification number is 5426. A complete list of the Debtors in these jointly administered chapter 11 cases is affixed as <u>Schedule 1</u> to Broadway Realty I Co., LLC's voluntary petition, [ECF No. 1]. The Debtors' mailing addresses are located at 2 Grand Central Tower, 140 East 45th St, 12th Floor, New York, NY 10017.

Flagstar Bank, N.A., a national association ("Flagstar"), by and through its undersigned counsel, respectfully submits this joinder and supplemental reply (the "Joinder") in support of (i) the *Debtors' Memorandum of Law in Support of Confirmation of First Amended Joint Chapter 11 Plan and Omnibus Response to Confirmation Objections* (the "Debtors' Brief")[2] and (ii) confirmation of the Debtors' *First Amended Joint Chapter 11 Plan*, dated December 1, 2025 [Docket No. 780] (the "Plan").[3]  In support of this Joinder, Flagstar respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Flagstar is, by far, the largest creditor in these chapter 11 cases, holding a secured claim (as of the petition date) of approximately $564 million in aggregate outstanding principal, plus accrued interest and other costs and fees on its loans to the 82 different Debtors.  Flagstar is, therefore, incentivized to protect, and maximize the value of, its collateral and to generally maximize the value of the estates—exactly the purpose of a chapter 11 process.

2.      To that end, Flagstar has worked closely with the Debtors and their professionals to support these chapter 11 cases, financially and otherwise.  Flagstar has funded the cases from their inception by consenting to the use of its cash collateral to, among other things, fund property operations and the costs of an extended and thorough marketing process, as well as the Debtors' professional fees and the cost of two CROs, all for the purpose of ensuring a transparent and effective value-maximizing process for the benefit of all creditors.  Moreover, Flagstar's support for these properties will continue post-confirmation.  Although Flagstar had the opportunity to eliminate its financial exposure to these properties through the sale process, it has instead committed to extend hundreds of millions of dollars of financing to Summit to support its bid.

---

[2]      The Debtors' Brief is being filed simultaneously herewith.
[3]      Capitalized terms used but not otherwise defined herein have the meanings set forth in the Debtors' Brief or the Plan, as applicable.

3.      The Objections (particularly the City's) seek the opposite outcome that Flagstar has worked so hard to obtain.  Instead of maximizing value, the City, perversely, argues that Summit (or, really, the City) should pay ***less*** for the properties.  As a purely legal matter, this ignores the rights of Flagstar and all other creditors, and would never be acceptable to Flagstar, the first lien lender without whose consent there simply cannot be a chapter 11 process.  Beyond the technical legal issues, this approach is entirely antithetical to the goals and principles of the bankruptcy process; it is also not the approach of a party that believes, and is ready to invest, in the properties.

4.      To be sure, the City's and the objecting tenants' goals are laudable.  Flagstar agrees that tenants' rights should be protected.  But none of the issues that the objectors raise is a legitimate barrier to plan confirmation, as confirmation will in no way infringe on the City's or tenants' rights.  In fact, the opposite is true: the sale to Summit will turn the page for these properties by allowing a new owner and new property manager the opportunity to address the issues that have historically concerned the City and tenants under the Debtors' management.  In the end, it appears that the City's real objective is to scuttle the Sale Transaction so that it has more time to come up with a competing bid for significantly less money, which—given the Debtors' ability to consensually use Flagstar's cash collateral to fund these chapter 11 cases can be terminated on Thursday, January 15 if the Plan is not confirmed by then—would likely lead to the conversion or dismissal of these cases, a result that would not help the City or the tenants.

5.      For the reasons stated above and further detailed below and in the Debtors' Brief, the Court should decline that invitation and confirm the Plan.

## JOINDER AND SUPPLEMENTAL REPLY

6.    Flagstar joins in the Debtors' Brief's legal arguments in support of confirmation, as well as its responses to the various Objections.  Flagstar also makes the following additional and supplemental arguments.

**I.    Plan's Exculpation Provision Is Proper**

7.    The U.S. Trustee objects to the inclusion of Flagstar as an "Exculpated Party" and, similarly, argues that the Plan Administrator should not receive the protection of the Plan's exculpation provisions.  Both arguments are wrong.

8.    Courts in the Second Circuit permit parties that are not estate fiduciaries to benefit from broad exculpation provisions where (i) "they have been actively involved" in the cases and (ii) "have made significant contributions to the success of the cases."  *In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457, 467-68 (Bankr. S.D.N.Y. 2025); *see also In re Wythe Berry Fee Owner LLC,* No. 22-11340 (MG), 2024 WL 2767121, at *13 (Bankr. S.D.N.Y. May 29, 2024) (approving exculpation of creditor group whose participation "was instrumental to the Debtor formulating a plan on an expedited basis, and their support was essential to the successful negotiation of the Plan") (cleaned up).

9.    As discussed above, Flagstar's participation has been instrumental to the success of these chapter 11 cases—which participation can literally be measured by the millions of dollars Flagstar has put into these cases.  From the commencement of these cases, Flagstar has funded the Debtors' expenses and legal fees, post-petition operations, and the marketing and sale process that culminated in a $451 million Sale Transaction.

10.    Moreover, that amount is as large as it is only because, in addition to funding these cases, Flagstar has agreed to provide financing to the stalking horse bidder, which agreement added

an additional $31.3 million to the purchase price to be paid by Summit pursuant to its Successful Bid, and which additional funds accrue to the Estates. Flagstar has been actively involved throughout the Chapter 11 Cases and was critical to the success of the cases, and therefore it is entirely appropriate that it receive an exculpation in connection with its role.

11.    Additionally, Flagstar agrees with the Debtors that the Plan Administrator, tasked with carrying out all provisions of the Plan, is a fiduciary and that it is appropriate and necessary to include the Administrator among the Exculpated Parties.

12.    Flagstar will have sizable deficiency claims, and it is critical that an effective and competent Plan Administrator be selected to effectuate the Plan, including prosecuting all appropriate Causes of Action. The only way to recruit a capable and willing Plan Administrator is to provide the benefits of exculpation to the role, so as to ensure the administrator will not incur liability in connection with administering the Plan. It would be unfair to both the administrator, and by extension to Flagstar and all general unsecured creditors in the case, to create such an administrative role without the standard legal protections generally afforded to such positions.

## II.    Feasibility and Adequate Assurance of Future Performance

13.    Various of the Objections argue against confirmation because, they assert, the Plan is not feasible. Because this is a liquidating plan, these arguments are legally irrelevant for all the reasons the Debtors explain. *In re Finlay Enters.*, No. 09-14873 (JMP), 2010 Bankr. LEXIS 5592, at *155-56 (Bankr. S.D.N.Y. May 18, 2010) ("In the context of a liquidating plan, feasibility is established by demonstrating the debtor's ability to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases.").

14.     Other Objectors assert that the Plan does not provide sufficient adequate assurance of future performance, specifically in connection with the purchaser's ability to comply with applicable landlord/tenant laws.  Flagstar joins in the Debtors' legal arguments in this regard as well and notes that, as has been repeatedly emphasized in pleadings and comments in open court, *the Plan has no effect on tenants' rights*, which are fully respected and undisturbed.  Lastly, as a factual matter, Flagstar notes it has committed hundreds of millions of dollars of financing to the properties, even though it had the opportunity to eliminate any additional exposure.  Flagstar would not have done so if it did not believe the purchaser has a sound and viable plan.

15.     In any event, even if legally relevant (it is not), it is hard to understand the Objections' concern that the Plan is not feasible because it is likely to be followed by a subsequent liquidation or because of a lack of adequate assurance.  As noted above, Flagstar has funded a thorough and transparent sale process—all in accordance with Court-approved cash collateral and bid procedures orders.  But the Debtors' use of cash collateral will lapse if a sale is not consummated in the next few weeks, which will result in a conversion to chapter 7 or a dismissal of these chapter 11 cases, in which case Flagstar will be forced to enforce its remedies in state court.  In other words, to deny confirmation in this case is to *guarantee* liquidation, the result the Objectors ostensibly seek to avoid.[4]

## III.   <u>Fairness of Sale Transaction</u>

16.     Attempting to make it more difficult for the Debtors to obtain confirmation of their Plan, the City insinuates, without any evidentiary support, that the Sale Transaction is an insider transaction.  This argument is frivolous.  In support of its argument, the City points to (i) media

---

[4]     In chapter 7, tenants and the City would have *fewer* protections than they do in the chapter 11 process and its attendant confirmation requirements (for example, section 1129 does not apply to chapter 7, and section 365 does not apply in a state foreclosure).

reports *theorizing* about possible connections between Summit and the Debtors and (ii) the declaration filed by the New York Office of the Attorney General, which purports to establish that an entity controlled by *Jonathan* Weiner (the *brother* of Joel Weiner, the ultimate equity holder of the Debtors) was a 5% owner in other real estate projects led by the purchaser in New York. The Attorney General does not suggest, nor could it, that Jonathan Weiner's business dealings have any connection to his brother's. The "attenuated connection" alleged by the City and the Attorney General do not "establish[] a plausible basis for demonstrating that [Summit] ha[s] an insider relationship with the Debtors." *In re Worth Collection, Ltd.*, No. 20-10337 (BLS), 2024 WL 4280104, at *5 (Bankr. D. Del. Sept. 24, 2024).[5]

17.    In any event, the Sale Transaction is more than fair. Flagstar (which is clearly not an insider and has no allegiance to the Debtors' insiders) has been actively involved in the marketing and sale process. Indeed, and as the Court likely recalls, Flagstar's consent to the Debtors' use of its cash collateral to fund these chapter 11 cases was conditioned on the appointment of co-CROs and on Flagstar (and its independent professionals) having access to the CROs and the Debtors' information. Since his appointment, the joint CRO proposed by Flagstar has been kept apprised of all major developments in these chapter 11 cases and, together with his co-CRO, has made all material decisions in the sale process. *See JPMorgan Chase Bank, NA v. Charter Commc'ns Operating, LLC*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) (review and approval of settlement by independent directors countered any undue influence insider may have

---

[5]    *See also In re Senior Care Centers, LLC*, No. 3:21-CV-01357-C, 2023 WL 6519756, at *24 (Bankr. N.D. Tex. Mar. 24, 2023) ("But none of these allegations, even if supported by record evidence, would be enough, as a matter of law, to show that a genuine dispute exists over whether Neuman had a sufficiently close relationship *to SCC* to conclude that the Bridge Loan transaction was not an arms' length transaction, and that Neuman should be considered an insider of SCC. The Trustee cannot point to record evidence that Neuman made any investments directly in Granite or owned any equity interest in Granite, and the court agrees with Neuman that the Trustee's claims that Neuman's investment in 'other deals with Granite' makes Neuman a non-statutory insider is simply too attenuated under the established authorities.") (cleaned up) (emphasis in original) (subsequent history omitted).

6

had); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 109 (D. Del. 1999) (participation by bondholder and separate professionals countered any undue influence an insider may have had).  The transaction is thus fair and should be approved under whatever standard the Court decides to apply.

## **<u>CONCLUSION</u>**

For all the foregoing reasons, Flagstar respectfully requests that the Court confirm the Plan and grant such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank.]*

Dated: January 13, 2026
       New York, New York

Respectfully submitted

*/s/ Nicholas A. Bassett*

**PAUL HASTINGS LLP**
Harvey A. Strickon
Brett Lawrence
Justin Rawlins
Nicholas A. Bassett
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Emails: harveystrickon@paulhastings.com
       brettlawrence@paulhastings.com
       justinrawlins@paulhastings.com
       nicholasbassett@paulhastings.com