WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
| | : | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **BROADWAY REALTY I CO., LLC,** *et al.*, | : | **Case No. 25-11050 (DSJ)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------X

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN**
**AND OMNIBUS RESPONSE TO CONFIRMATION OBJECTIONS**

---

[1] The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/broadwayrealty. The Debtors' mailing address is located at 2 Grand Central Tower, 140 East 45th St., 12th Floor, New York, NY 10017.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

I.      BACKGROUND ..................................................................................... 3

A.      General Case Background........................................................................ 3

B.      Cash Collateral........................................................................................ 4

C.      Bidding Procedures ................................................................................. 5

D.      The Marketing Process and Auction....................................................... 5

E.      Plan and Disclosure Statement................................................................ 9

F.      Supporting Declarations........................................................................ 11

II.     THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY
        CODE AND SHOULD BE APPROVED ............................................. 11

A.      The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code. .......... 12

B.      The Plan's Classification of Claims and Interests Complies with Section
        1122 of the Bankruptcy Code. .............................................................. 12

C.      The Plan Complies with Section 1123(a) of the Bankruptcy Code. ...... 14

D.      The Plan Complies with Section 1123(b) of the Bankruptcy Code....... 16

        1.      Plan Permissive Provisions. ....................................................... 16

                a.      The Exculpation Provision Is Appropriate and Should be
                        Approved........................................................................ 18

                b.      The Injunction Provision Should be Approved ............ 22

                c.      Retention of Jurisdiction............................................... 23

E.      The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code. .......... 23

F.      The Plan Has Been Proposed in Good Faith in Compliance with Section
        1129(a)(3) of the Bankruptcy Code. ..................................................... 24

G.      The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. ................ 26

H.      The Debtors Have Complied With the Requirements of Section 1129(a)(5)
        of the Bankruptcy Code. ....................................................................... 26

I.      The Plan is in Best Interests of All Creditors of, and Holders of Equity
        Interests in, Each Debtor........................................................................ 27

J.      The Plan Has Been Accepted by the only Impaired Class Entitled to Vote
        on the Plan, and as to Such Class, the Requirements of Section 1129(a)(8)
        of the Bankruptcy Code Have Been Satisfied....................................... 30

K.      The Plan Provides for Payment in Full of All Allowed Priority Claims. ............. 31

L.    The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code. ........................ 32

M.    The Plan Is Feasible. ........................................................................................... 33

N.    The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code. .............. 35

O.    The Plan Satisfies the "Cram Down" Requirements under Section 1129(b)
      of the Bankruptcy Code for the Deemed to Reject Classes. ............................... 36

      1.    The Plan Does Not Discriminate Unfairly. ............................................... 37

      2.    The Plan Is Fair and Equitable. ............................................................... 38

P.    Assumption and Assignment of the Executory Contracts and Unexpired
      Leases Should be Approved .................................................................................. 40

      1.    Cure Objections. .................................................................................... 40

      2.    The Successful Bidder Has Provided Adequate Assurance of
            Future Performance. ............................................................................... 40

III.  THE CONFIRMATION OBJECTIONS SHOULD BE OVERRULED
      AND THE PLAN SHOULD BE CONFIRMED ................................................ 43

A.    The City Objections and Tenant Objections .......................................................... 44

      1.    The Plan is Feasible ................................................................................ 44

      2.    The Successful Bidder has Provided Adequate Assurance of Future
            Performance to Assume the Tenant Leases ............................................. 45

      3.    The Assets are Not Being Sold Free and Clear of Regulatory
            Restrictions .......................................................................................... 47

      4.    The Sale Transaction is not an "Insider" Transaction ............................. 48

      5.    The Scope of Section 1146 Exemption ................................................... 49

      6.    Property Taxes and Water Charges Will be Paid Under the Plan ............. 50

B.    The US Trustee Objection ................................................................................... 51

      1.    The Exculpation Provision is Appropriately Tailored .............................. 51

      2.    The Plan Amendment Provision is Expressly Limited by Section
            1127 of the Bankruptcy Code ................................................................ 54

IV.   CAUSE EXISTS TO WAIVE STAY OF CONFIRMATION ORDER .............. 54

CONCLUSION .................................................................................................................. 56

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 382 Channel Drive LLC*,
  No. 25-10694 (MG), 2025 Bankr. LEXIS 3309 (Bankr. S.D.N.Y. Dec. 22,
  2025) ..................................................................................................................................34

*In re Adelphia Bus. Sols., Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...............................................................................34

*In re Adelphia Commc'ns*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................................28

*In re Advance Watch Co., Ltd.*,
  No. 15-12690 (MG), 2016 Bankr. LEXIS 229 (Bankr. S.D.N.Y. Jan. 25,
  2016) ..................................................................................................................................34

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ...............................................................................20

*Aetna Cas. & Sur. Co. v. Clerk* (*In re Chateaugay Corp.*),
  89 F.3d 942 (2d Cir. 1996) .................................................................................................13

*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000) ..............................................................................29

*In re Azul S.A.*,
  No. 25-11176 (SHL), 2026 Bankr. LEXIS 18 (Bankr. S.D.N.Y. Jan. 6, 2026) .....................54

*In re Bally Total Fitness of Greater N.Y., Inc.*,
  No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) .......................52

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)............................................................................................................28

*In re BearingPoint, Inc.*,
  453 B.R. 486 (Bankr. S.D.N.Y. 2011)................................................................................20

*In re Beker Indus. Corp.*,
  58 B.R. 725 (Bankr. S.D.N.Y. 1986)..................................................................................42

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994), *appeal dismissed*, *Resolution Tr. Corp.*
    *v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791 (S.D.N.Y. 1995),
    *aff'd*, *Resolution Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d
    26 (2d Cir. 1995) ...................................................................................................26

*In re Brentano's*,
    29 B.R. 881 (Bankr.S.D.N.Y.1983) ......................................................................43

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) .....................................................................38

*In re Bygaph, Inc.*,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) ...............................................................42, 43

*Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*,
    103 B.R. 524 (Bankr. D.N.J. 1988) .......................................................................41

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .......................................................12, 19, 25

*In re CLST Enters., LLC*,
    No. 24-10596 (MG), 2025 Bankr. LEXIS 3293 (Bankr. S.D.N.Y. Dec. 19,
    2025) .......................................................................................................................35

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ..................................................................35

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010
    WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part*, *rev'd in part*, 627 F.3d
    496 (2d Cir. 2010) .............................................................................................19, 20

*In re Ditech Holding Corp.*,
    No. 19-10412 (JLG), 2021 WL 3716398 (Bankr. S.D.N.Y. Aug. 20, 2021) .........53

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 714 (Bankr. S.D.N.Y. 1992), *aff'd sub nom. Lambert Brussels*
    *Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham*
    *Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992) .............................................38

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................13, 24, 29, 34

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ..................................................................................23

iv

*In re Enron Corp.*,
No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15,
2004) ................................................................................................................25

*In re Evelyn Byrnes, Inc.*,
32 B.R. 825 (Bankr. S.D.N.Y. 1983) ................................................................42

*In re Finlay Enters. Inc.*,
No. 09-14873 (JMP), 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .........................40

*In re Genesis Global Holdco*, LLC
, 660 B.R. 439 (Bankr. S.D.N.Y. May 17, 2024)..............................................20, 53

*In re Great Atl. & Pac. Tea Co.*,
472 B.R. 666 (S.D.N.Y. 2012)..........................................................................41

*In re J. Reg. Co.*,
407 B.R. 520 (Bankr. S.D.N.Y 2009), *appeal dismissed sub nom. Freemen v.
J. Reg. Co.*, 452 B.R. 367 (S.D.N.Y. 2010) ....................................................26

*In re Jennifer Convertibles, Inc.*,
447 B.R. 713 (Bankr. S.D.N.Y. 2011)...............................................................42

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
*aff'd sub nom*, *Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988) .........................38

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC* (*In re
Charter Commc'ns.*),
419 B.R. 221 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, *In re Charter
Commc'ns*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd but criticized*, *In re Charter
Commc'ns*, 691 F.3d 476 (2d Cir. 2012) ......................................................25, 49

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
843 F.2d 636 (2d Cir. 1988)...........................................................................13, 34

*In re Klaynberg*,
No. 22-10165 (MG), 2023 Bankr. LEXIS 2055 (Bankr. S.D.N.Y. Aug. 21,
2023) ................................................................................................................35

*Koelbl v. Glessing (In re Koelbl)*,
751 F.2d 137 (2d Cir. 1984)..............................................................................25

*In re Lafayette Radio Elecs. Corp.*,
9 B.R. 993 (Bankr. E.D.N.Y. 1981)...................................................................42

*In re LATAM Airlines Grp. S.A.*,
    2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, *and motion to
    certify appeal denied*, 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022),
    *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 756 (S.D.N.Y.
    2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741
    (S.D.N.Y. 2022*), aff'd sub nom. In re LATAM Airlines Grp. S.A.*, 55 F.4th 377
    (2d Cir. 2022)................................................................................20, 21

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) .........................................................................25

*Manati Sugar Co. v. Mock*,
    75 F.2d 284 (2d Cir. 1935)...........................................................................25

*In re Natco Indus., Inc.*,
    54 B.R. 436 (Bankr. S.D.N.Y. 1985) ...........................................................42

*In re One Times Square Assocs. Ltd. P'ship*,
    159 B.R. 695 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (S.D.N.Y. 1994),
    *aff'd sub nom. In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994) .......................34

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ............................................................21

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)........................................................................24

*R.H. Macy & Co., Inc. v. Wongco (In re R.H. Macy & Co.)*,
    236 B.R. 583 (Bankr. S.D.N.Y. 1999), *aff'd*, 283 B.R. 140 (S.D.N.Y. 2002) .......................47

*In re Residential Cap. LLC*,
    No. 12-12020 (MG), 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013) ...................19, 21

*In re Resorts Int'l, Inc.*,
    145 B.R. 412 (Bankr. D.N.J. 1990) ...............................................................27

*In re Rock 49th Rest. Corp.*,
    No. 09-14557(ALG), 2010 WL 1418863 (Bankr. S.D.N.Y. Apr. 7, 2010)...........................42

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)...........................................................38

*In re Sanshoe Worldwide Corp.*,
    139 B.R. 585 (S.D.N.Y. 1992)......................................................................43

*In re Sapolin Paints, Inc.*,
    5 B.R. 412 (Bankr. E.D.N.Y. 1980)...............................................................42

*In re Stearns Holdings, LLC*,
  607 B.R. 781 (Bankr. S.D.N.Y. 2019)...................................................................................21

*In re Texaco Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988), *appeal dismissed sub nom. Trans World
  Airlines, Inc. v. Texaco, Inc. (In re Texaco Inc.)*, 92 B.R. 38 (S.D.N.Y. 1988) ......................27

*In re Troika Media Grp., Inc.*,
  No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Mar. 28, 2024) ............................................................52

*United States v. Energy Res. Co.*,
  495 U.S. 545 (1990)...................................................................................................................34

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
  326 B.R. 497 (S.D.N.Y. 2005)...................................................................................................52

*In re Voyager Digit. Holdings, Inc.*,
  649 B.R. 111 (Bankr. S.D.N.Y. 2023)........................................................................................52

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d
  332 (3d Cir. 2013).....................................................................................................................29

*In re Westview 74th St. Drug Corp.*,
  59 B.R. 747 (Bankr. S.D.N.Y. 1986)..........................................................................................41

*In re Wood*,
  No. 89-0111, 1991 U.S. Dist. LEXIS 20083 (W.D. Va. Nov. 11, 1991) ..................................34

*In re Worldcom, Inc.*,
  No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)...................12, 38

*In re Wythe Berry Fee Owner LLC*,
  No. 22-11340 (MG), 2024 WL 2767121 (Bankr. S.D.N.Y. May 29, 2024) ............................20

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (D. Del. 1999)........................................................................................................49

**Statutes**

11 U.S.C. § 101........................................................................................................................4

11 U.S.C. § 365................................................................................................................ *passim*

11 U.S.C. § 502.............................................................................................................4, 14, 51

11 U.S.C. § 503......................................................................................................................32

11 U.S.C. § 507................................................................................................................ *passim*

11 U.S.C. § 510 ................................................................................................................14, 39

11 U.S.C. § 1107 ......................................................................................................................3

11 U.S.C. § 1108 ......................................................................................................................3

11 U.S.C. § 1114 ....................................................................................................................12

11 U.S.C. § 1122 ................................................................................................13, 15, 23, 38

11 U.S.C. § 1123 ..............................................................................................................*passim*

11 U.S.C. § 1124 ....................................................................................................................33

11 U.S.C. § 1125 ..............................................................................................................10, 24

11 U.S.C. § 1126 ..............................................................................................................24, 31

11 U.S.C. § 1127 ..............................................................................................................54, 55

11 U.S.C. § 1129 ..............................................................................................................*passim*

11 U.S.C. § 1146 ......................................................................................................30, 49, 50

**Other Authorities**

*In re All Year Holdings Limited*,
    No. 21-12051 (MG) (Bankr. S.D.N.Y. Jan. 31, 2023), ECF No. 352 ...............................50, 52

*In re Ditech Holding Corp.*,
    No 19-10412 (JLG) (Bankr. S.D.N.Y. Sep. 26, 2019), ECF No. 1404-1 ...............................52

*In re Eastman Kodak Co.*,
    No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013) ECF No. 4966 ...............................51

*In re Evergreen Gardens Mezz LLC*,
    No. 21-10335 (MG) (Bankr. S.D.N.Y. Nov. 5, 2021), ECF No 222 ...............................50

Fed. R. Bankr. P. 2019 ................................................................................................................44

Fed. R. Bankr. P. 3017 ................................................................................................................24

Fed. R. Bankr. P. 3018 ................................................................................................................24

*In re Fusion Connect, Inc.*,
    No. 19-11811 (SMB) (Bankr S.D.N.Y. Dec. 17, 2019), ECF No. 680 ...............................50

*Genco Shipping & Trading Ltd.*,
    Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. July 2, 2014), ECF No. 322 ...............................51

Fed. R. Bankr. P. 3020 ................................................................................................3, 55

H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) .............................13, 24

*Nine W. Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019),
    ECF No. 1308 ...............................................................................................21

*In re Old Market Grp. Holdings Corp.*,
    No. 20-10161 (JLG) (Bankr. S.D.N.Y. Oct. 5, 2020), ECF No. 806 ....................................50

*In re PacificCo Inc.*,
    No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023), ECF No. 157 ....................................54

*In re Revlon, Inc.*,
    No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023), ECF No. 1746 ...................................54

*In re SAS AB*,
    No. 22-10925 (MEW) (Bankr. S.D.N.Y. Mar. 22, 2024), ECF No. 2347.........................50, 54

*In re Troika Media Grp.*,
    No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Mar. 28, 2024), ECF No. 266 ...................................54

*In re Voyager Digit. Holdings, Inc.*,
    No. 22-10953 (MEW) (Bankr. S.D.N.Y. Mar. 10, 2023), ECF No. 1116...............................52

Broadway Realty I Co., LLC and its debtor affiliates (the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), submit this memorandum of law in support of confirmation of the *First Amended Joint Chapter 11 Plan* [ECF No. 780] (as modified, amended or supplemented from time to time, and together with all exhibits and scheduled thereto, the "**Plan**") pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**")[2] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors are before the Court with the support of Flagstar Bank, N.A., their secured mortgage lender (the "**Mortgage Lender**"), as proponents of a Plan that (i) effectuates the sale of the Debtors' entire portfolio of residential properties to a non-insider, third-party, (ii) assumes, assigns, and continues all tenant leases subject to all applicable federal, state, and local statutes, rules and regulations (collectively, the "**Regulatory Restrictions**"), (iii) pays all Allowed Administrative Expense Claims, all Allowed Priority Tax Claims, and all Allowed Priority Non-Tax Claims in full, (iv) maximizes value for creditors of the Debtors' estates, (v) permits the assumption, assignment, and continuation of numerous additional executory contracts for the benefit of counterparties, and (vi) provides for the orderly and efficient wind-down of the Debtors by a Plan Administrator.

2.      The Debtors exclusively maintain the statutory right to propose a chapter 11 plan, and the Plan they proposed has been accepted by the requisite classes of creditors, satisfies all other requirements for confirmation, and should be approved by the Court.  The Plan is the result of a good-faith, public process that was approved by multiple orders of this Court, run by

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement (as defined below), as applicable.

the Debtors with the support of the Mortgage Lender, and, until days ago, proceeded uncontested without a single objection from any party in interest. All parties in interest and all other parties were on notice that the Debtors' property portfolio has been for sale since the Debtors filed their chapter 11 petitions and began soliciting interest approximately eight (8) months ago in May 2025. In various orders entered in September, October, and December 2025, the Court approved case milestones imposing deadlines for the Debtors to retain a real estate broker, to select a stalking horse, to hold an auction, and to prosecute the upcoming Confirmation Hearing. In accordance with those Court orders, the Debtors' Court-approved broker and other Court-approved legal and financial advisors reported to two, highly-experienced chief restructuring officers (not the Debtors' equity holders), and the Debtors' advisors consulted with the Mortgage Lender and its advisors throughout the multi-month, robust sales and chapter 11 plan processes. No party has provided the Debtors with a viable alternative for the Debtors' estates.

3.     The City of New York (the "**City**") does not have a consent right with respect to the transfer of the Debtors' real property outside of the bankruptcy process. Chapter 11 provides for the Debtors' control over the plan process, establishes the goal of maximizing value for creditors, and dictates the allocation of value of the Debtors' estates. There is no ability in these Chapter 11 Cases for the City or the Court to "reimagine" away any of the Debtors' rights or to reallocate recoveries for hypothetical non-creditors' communal good. The City has made clear it is not a current bidder for the properties and it has no concrete proposal; only undefined, potential "opportunities." *See* Jan. 7, 2026 Hr'g Tr. 27:18-21, 38:25.

4.     A limited number of objections were filed that focus on two confirmation issues: Plan feasibility and adequate assurance of future performance with respect to the Debtors' tenant leases. As set forth in more detail below, the objectors misapply the law with respect to

2

feasibility, which the Debtors easily satisfy in a liquidating case.  And, as set forth in the Summit Declaration (as defined below), Summit has adequately provided assurance that it can own the properties and honor the leases subject to all applicable Regulatory Restrictions.  Accordingly, for the reasons set forth below, to the extent the Objections remain outstanding, they should be overruled and the Plan should be confirmed.

5.      This memorandum is divided into four (4) parts.  Part I summarizes the factual background relevant for confirmation.  Part II addresses the requirements for confirmation under section 1129 of the Bankruptcy Code and demonstrates the Plan's satisfaction of each requirement and achievement of the objectives of chapter 11.  Part III addresses the Debtors' request for waiver of the fourteen (14) day stay imposed by operation of Rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  Part IV addresses Objections (as defined below) and establishes why any remaining objections must be overruled.

## I.     BACKGROUND

6.      The Debtors presume the Court's familiarity with the background of these cases that has been presented and entered into evidence over the course of multiple hearings.  Additional facts relevant to confirmation are set forth in the Diamond Declaration and the Parker Declaration (each as defined below) filed contemporaneously herewith and incorporated herein by reference.

### A.  General Case Background

7.      On May 21, 2025, (the "**Petition Date**") the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

8.      On July 7, 2025, the Debtors filed their schedules of Assets and liabilities and statements of financial affairs [ECF Nos. 72–235].  Pursuant to section 502(b)(9) of the Bankruptcy Code, the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to have filed proofs of claim in the Chapter 11 Cases was November 17, 2025.

**B.  Cash Collateral**

9.      The Debtors have stipulated they owe the Mortgage Lender approximately $564 million in principal amount that is secured by the Debtors' real property.  *See* Final Cash Collateral Order, ¶ F(ii).  The Mortgage Lender asserts that, with prepetition interest and other amounts, the claim amount is approximately $616 million as of the Petition Date.  From the outset of these Chapter 11 Cases, therefore, the Debtors were required to engage with the Mortgage Lender over the use of cash collateral.  After extensive litigation over the non-consensual use of cash collateral and then negotiations for consensual use, the Debtors and the Mortgage Lender reached an agreement.

10.      Integral to that agreement were conditions on the use of cash collateral tied to timing of these Chapter 11 Cases and the supervision of the marketing and sale or refinancing of the Debtors' properties.  The terms governing the Debtors' use of cash collateral are set forth in the final cash collateral order dated September 22, 2025 [ECF No. 551] (the "**Final Cash Collateral Order**").  The Final Cash Collateral Order only authorizes the Debtors to use cash collateral through February 17, 2026.  And it terminates the Debtors' ability to use cash earlier if the hearing to approve the Sale Transaction is not held on or before January 15, 2026.  *See* Final Cash Collateral Order ¶12.

11.      Pursuant to the Final Cash Collateral Order, the Debtors appointed a second, seasoned restructuring professional, Mr. David Barse, to serve alongside Mr. Ephraim Diamond as the Debtors' Co-Chief Restructuring Officer (Mr. Diamond and Mr. Barse together referred to

4

as the "**CROs**") and to share joint authority to "review and recommend" with respect to all material aspects of the Debtors' efforts and strategy to sell, transfer, market, refinance, or otherwise engage in a transaction involving all, or a portion, of their properties and other assets, or to develop a chapter 11 plan or disclosure statement.[3]

### C. Bidding Procedures

12. On October 1, 2025, the Bankruptcy Court entered an order [ECF No. 571] (the "**Bidding Procedures Order**"), which, among other things: (i) approved bidding procedures; (ii) authorized the Debtors to designate stalking horse bidder(s) (any such bidder a "**Stalking Horse Bidder**" and, any such bid, a "**Stalking Horse Bid**") and offer such bidder certain bid protections; (iii) set the December 12, 2025 deadline (the "**Bid Deadline**") for potential bidders to submit proposals to purchase or refinance all or a portion the Assets, (iv) scheduled an auction for January 8, 2026 (the "**Auction**") and (v) set the January 15, 2026 deadline for a hearing to consider approval of the sale transaction (the "**Confirmation Hearing**"). The bidding procedures were designed to promote a competitive but expedient bidding process and generate the greatest level of interest in the Debtors' Assets.

### D. The Marketing Process and Auction

13. The Debtors formally engaged Eastdil Secured L.L.C. ("**Eastdil**") on August 15, 2025, to run the marketing process (the "**Marketing Process**") with the assistance of the Debtors' other advisors and the oversight of the CROs.[4] Eastdil extended outreach to more than 14,000 potential purchasers, included a mix of investors, developers, debt funds, non-profits,

---

[3] This included, without limitation, (i) the timeline for any such transaction, (ii) the development and implementation of any sale and marketing process or other asset monetization strategy, (iii) the scope of any marketing process or other asset monetization strategy, (iv) the selection of the transaction to dispose of or refinance assets, and (v) the selection and material terms of any (a) stalking horse bid or (b) winning bid for any such transaction. *See* Final Cash Collateral Order n. 6.

[4] Eastdil's retention was approved by order of the Court dated October 1, 2025 [ECF No. 549].

religious groups, lenders, family offices, syndicators, institutional funds, high net worth individuals and distressed asset investors across the United States and abroad. *See* Parker Decl. ¶ 12.

14. Among other things, Eastdil: (i) obtained 144 executed confidentiality agreements and granted each of these potential purchasers access to a virtual data room (the "**Data Room**") populated with a substantial volume of information relating to the Debtors' business, including an offering memorandum, insurance policy loss runs, commercial leases, arrears reports, payroll information, tax information, and anonymized rent rolls; and (ii) provided 19 tours of various properties for the majority of Potential Bidder that requested them. *See id.* ¶¶ 13-14.

15. The Debtors received fourteen (14) non-binding indications of interest, but, by the December 12, 2025 Bid Deadline, the Debtors received only four (4) Bids (as defined in the Bidding Procedures Order) for all of the Debtors' properties and two (2) Bids each for one property within the portfolio. *See id.* ¶¶ 16, 18. Despite having different degrees of documentation and contingencies, all six Bids were designated by the CROs as Qualified Bids (as defined in the Bidding Procedures Order). *See id.* ¶ 18.

16. The Debtors' advisors engaged in extensive negotiations with several bidders on the terms of a purchase agreement for a potential Stalking Horse Bid and considered a number of non-exclusive factors in comparing the Qualified Bids, including, among other things, (i) the purchase price set forth in the applicable Bid (the "**Purchase Price**"); (ii) the amount and nature of the consideration, including any obligations to be assumed; (iii) the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates, taking into account any Stalking Horse Bidder's right to any Termination Payment; (iv) the likelihood of

the Qualified Bidder being able to close the proposed Sale Transaction and perform under the leases (including (a) assessment of financing commitment letters, (b) any required regulator or other approvals, or (c) any contingencies to closing) and the timing thereof; and (v) the net benefit to the Debtors' estates, among several other factors.  *See* Diamond Decl. ¶¶ 11, 12.

17.     On December 22, 2025, in accordance with the Bidding Procedures Order, and upon the joint recommendation of the CROs and the consent of the Mortgage Lender, the Debtors designated Summit Gold, Inc. ("**Summit**") as the Stalking Horse Bidder for the Debtors' entire portfolio with a Purchase Price of $451.3 million.  *See* Diamond Decl. ¶ 12.  The next day, in accordance with the Bidding Procedures Order, the Debtors filed the *Notice of Designation of Stalking Horse Bid* [ECF No. 916] (the "**Stalking Horse Notice**"), which attached the *Purchase and Sale Agreement* by and between the Debtors and Summit, dated December 22, 2025 (the "**Stalking Horse Agreement**" or  "**Purchase Agreement**").

18.     Up through the start of the Auction, Eastdil and the Debtors' other advisors continued to engage with each of the other Qualified Bidders and other interested parties that had not previously submitted Bids, in an effort to enhance deal terms and encourage a competitive bidding process.  *See* Parker Decl. ¶¶ 19, 21, 23.

19.     In the Supplemental City Objection (as defined below), the City of New York argued that the price offered by the Stalking Horse Bid was too high.  *See* Supplemental City Obj.  ¶ 10.  The City asked for time to find a bidder who would pay less to the Debtors and their secured lender.  At no point in the months-long process did Eastdil, the Debtors, or the Mortgage Lender receive a Bid from the City to refinance the Debtors or to purchase the Debtors' Assets. *See* Parker Decl. ¶ 24.  In fact, the City and the other objecting parties only raised concerns with

respect to certain of the Debtors' buildings days before the Auction. Nonetheless, the Debtors invited representatives of the City to attend the Auction. The City declined the invitation.

20.     Although certain tenants may have submitted work orders for repairs or asserted certain regulatory violations, it is important to note that approximately 81% of the Debtors' 5,200 units are free of violations. The Debtors have worked diligently both before and after the commencement of these cases to address tenant concerns in the ordinary course of business, and cleared approximately 6,500 asserted violations in 2025.

21.     At a contested conference on January 7, 2026, the Court overruled the City's last-minute request to adjourn the Auction, and the Debtors conducted the Auction on January 8, 2026. *See* ECF No. 942. For hours, the Debtors' CROs and advisors consulted with the Qualified Bidders present and consulted with the Mortgage Lender with a goal of obtaining the highest or otherwise best bids for the Assets and maximize value for the benefit of all stakeholders. *See* Diamond Decl. ¶ 13. The CROs were actively involved in those bidder consultations.

22.     On the record at the Auction, only one other Qualified Bidder bid in an attempt to be higher or better than the Stalking Horse Bid. That offer had two major contingencies outside of the bidder's and the Debtors' control: first, it required financing from the Mortgage Lender that was not presently being offered; second, it required the City's approval for entry of each of the Debtors' 93 properties into the Article XI regulatory program.[5] The CROs carefully evaluated the uncertainty, risks, and additional costs associated with the bid. Fatally for the bid,

---

[5]     Article XI provides a complete or partial exemption of the residential assessed value of the project for a term of up to forty (40) years. The Article XI exemption sizing is structured as a Gross Rent Tax ("**GRT**"), with the GRT calculated as a percentage of the gross potential residential and commercial income based on a calculation performed by the New York City Department of Housing Preservation and Development ("**HPD**"). Following approval by the Tax Incentive Programs Unit of HPD, all Article XI exemptions must be authorized by the New York City Council through the passage of a resolution. All projects under Article XI must set aside a minimum of 15% of the available units for formerly homeless individuals or families, unless adopting a 20% homeless requirement.

the Mortgage Lender was not willing to finance the proposal given the contingencies attached to the bid.  Beyond that, the timing for and ultimate approval for any City incentives could not be predicted with any level of certainty.  Furthermore, the bidder's formal documentation likely required substantial revisions and negotiation to be acceptable to the Debtors.  Considering the Debtors only had authorization to use cash collateral through February 17, 2026 under the Final Cash Collateral Order, the Debtors determined that Summit's Bid remained the highest and best and only viable offer the Debtors received.  Accordingly, upon the joint recommendation of the CROs and with the consent of the Mortgage Lender, Summit's Bid was designated as the Successful Bid.  *See* Diamond Decl. ¶¶ 14-16; *See* Parker Decl. ¶ 27.

23.    On January 9, 2026, the Debtors filed the *Notice of Successful Bid and Identity of Successful Bidder* [ECF No. 946] (the "**Notice of Successful Bidder**"), wherein the Debtors identified Summit as the Successful Bidder and its Bid the Successful Bid on the terms set forth in the Purchase Agreement.[6]

**E.  Plan and Disclosure Statement**

24.    In parallel to the Marketing Process, the Debtors filed the *Joint Chapter 11 Plan* [ECF No. 670] and a disclosure statement in support thereof [ECF No. 671] on October 27, 2025, to effectuate any ultimate refinancing or sale.  Contemporaneously therewith, the Debtors filed a motion [ECF No. 672] (the "**Solicitation Procedures Motion**") seeking, among other things, (i) approval the Disclosure Statement (as defined below) as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code and (ii) approval procedures for soliciting, submitting, tabulating votes on, and filing objections to, the Plan.

---

[6]    As set forth in the Notice of Successful Bidder, the Debtors did not select a Back-Up Bid at the Auction, but reserved the right to do so.

9

25.     The Debtors filed the *First Amended Joint Chapter 11 Plan* [ECF No. 780] with an amended Disclosure Statement [ECF No. 782] (the "**Disclosure Statement**") on December 1, 2025.

26.     The Plan implements the Sale Transaction and distributes sale proceeds to the Mortgage Lender and other creditors as set forth therein.  The Plan provides for the payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims.  The Plan contemplates the appointment of a Plan Administrator to oversee the wind-down and dissolution of the Liquidating Debtors for the completion of each Sale Transaction and to make any remaining distributions in accordance with the Plan.  Any remaining Assets that are not transferred in connection with the proposed Sale Transaction or distributed to the holder of Allowed Secured Mortgage Claims pursuant to Article IV of the Plan, shall vest in or be transferred to the applicable Liquidating Debtor and administered pursuant to Section 5.2 of the Plan.  *See* Plan §10.1.

27.     The Court entered an order [ECF No. 789] (the "**Disclosure Statement Order**") approving the Disclosure Statement and other relief requested in the Solicitation Procedures Motion on December 3, 2025.  Thereafter, the Debtors commenced solicitation of the Plan in accordance with the timeline set forth in the Disclosure Statement Order.

28.     On December 23, 2025, the Debtors filed the *Asset Purchase Agreement*, attached as Exhibit A to the Stalking Horse Notice, and subsequently supplemented that filing with the filings of *Plan Administrator Agreement* [ECF No. 925] and Notice of Successful Bidder [ECF No. 946] (collectively, and as may be amended, modified, supplemented, or restated, the "**Plan Supplement**").

10

29.     Contemporaneously herewith, the Debtors filed the Voting Certification (as defined below) demonstrating the acceptance of the Plan by Class 3 (Secured Mortgage Claims) the only voting class under the Plan.

30.     A proposed form of Confirmation Order was filed as an exhibit to the Stalking Horse Notice [ECF No. 916].

### F. Supporting Declarations

31.     In support of confirmation of the Plan, the Debtors filed the following declarations (collectively, the "**Supporting Declarations**"):

a. the *Declaration of Ephraim Diamond in Support of Confirmation of Debtors' First Amended Joint Chapter 11 Plan* filed contemporaneously herewith (the "**Diamond Declaration**");

b. the *Declaration of Daniel Parker in Support of Confirmation of Debtors' First Amended Joint Chapter 11 Plan*, filed contemporaneously herewith (the "**Parker Declaration**");

c. the *Declaration of Matthew P. Goren in Support of Confirmation of Debtors' First Amended Joint Chapter 11 Plan*, filed contemporaneously herewith (the "**Goren Declaration**"); and

d. the *Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the First Amended Joint Chapter 11 Plan*, filed contemporaneously herewith (the "**Voting Certification**").

32.     In addition, contemporaneously herewith, Summit has also filed a declaration in support of its designation as the Successful Bidder and entry of the proposed Confirmation Order (the "**Summit Declaration**").

## II.     THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED

33.     To achieve confirmation of the Plan, the Debtors must demonstrate the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence. *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31,

2003); *see also In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010). For the reasons set forth below and in the Supporting Declarations, all of the applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.[7]

### A.    The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.

34.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. The legislative history of section 1129(a)(1) explains this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also Kane v. Johns-Manville Corp*. (*In re Johns-Manville Corp.*), 843 F.2d 636, 648–49 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992). As demonstrated below, the Plan fully complies with the requirements of the Bankruptcy Code.

### B.    The Plan's Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code.

35.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Under this section, a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class

---

[7]    Sections 1129(a)(6) and 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtors. Section 1129(a)(6) concerns rate changes not relevant here. *See* 11 U.S.C. § 1129(a)(6). Section 1129(a)(13) requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code). 11 U.S.C. § 1129(a)(13). The Debtors are not subject to any retiree benefit obligations (as defined in section 1114 of the Bankruptcy Code) and, as such, section 1129(a)(13) is inapplicable to these Chapter 11 Cases. Section 1129(a)(14) relates to the payment of domestic support obligations. *See* 11 U.S.C. § 1129(a)(14). The Debtors are not individual debtors and are not subject to any domestic support obligations. Section 1129(a)(15) applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). *See* 11 U.S.C. § 1129(a)(15). Finally, section 1129(a)(16) provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of non-bankruptcy law. *See* 11 U.S.C. § 1129(a)(16). Each Debtor is a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable.

12

is substantially similar to the other claims or interests in that class.  In addition, substantially similar claims may not be classified separately when it is done for an illegitimate reason.  *See Aetna Cas. & Sur. Co. v. Clerk* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").

36.    Except for Administrative Expense Claims, Fee Claims, and Priority Tax Claims, which need not be designated as Classes under the Plan, Section 3.3 of the Plan provides for the separate classification of Claims against and Interest in the Debtors based on differences in their legal nature and/or priority of such Claims and Interest as follows:[8]

    i.    <u>Class 1 (Priority Non-Tax Claims)</u>:  Any Claim, other than an Administrative Expense Claim, Other Secured Claim, or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

    ii.    <u>Class 2 (Other Secured Claims)</u>:  Any Secured Claim, other than an Administrative Expense Claim, a Secured Mortgage Claim, or a Priority Tax Claim.

    iii.    <u>Class 3 (Secured Mortgage Claims)</u>:  Any Allowed Secured Claim held by the Mortgage Lender against the applicable Debtor(s), arising under the applicable Mortgage Loan Documents in an amount equal to the principal amount outstanding as of the Petition Date, plus all applicable prepetition fees, costs, and costs of collection, plus any and all other amounts required to be paid under and in connection with the applicable Mortgage Loan Documents.

    iv.    <u>Class 4 (General Unsecured Claims)</u>:  Any unsecured Claim against a Debtor, including any Mortgage Deficiency Claim, that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) an Other Secured Claim; (d) a Priority Non-Tax Claim; (e) a Secured Mortgage Claim; or (f) any Claim arising under section 510(b) of the Bankruptcy Code.

    v.    <u>Class 5 (Subordinated Claims)</u>: Any prepetition Claim against the Debtors that is subject to subordination pursuant to sections 509(c) or 510 of the

---

[8]    Certain Classes, as of the commencement of the Confirmation Hearing, do not contain any claims or interest holders and, accordingly, will be considered vacant and be deemed eliminated under the Plan. *See* Plan § 3.4.

13

Bankruptcy Code or otherwise or any Claim for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

vi.   Class 6 (Existing Equity Interests):  With respect to an applicable Debtor, all Interests in such Debtor.

37.   The classification scheme of the Plan is rational and complies with the Bankruptcy Code.  The Plan incorporates a classification and "waterfall" distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code.  All Claims against and Interests within a Class have the same or similar rights against each respective Debtor.  The Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.  Each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.

38.   The classification of Claims against and Interests in the Plan, therefore, complies with section 1122 of the Bankruptcy Code.

### C.   The Plan Complies with Section 1123(a) of the Bankruptcy Code.

39.   Section 1123(a) of the Bankruptcy Code sets forth seven (7) applicable requirements that the proponent of a chapter 11 plan must satisfy.[9]  *See* 11 U.S.C. § 1123(a).  The Plan fully complies with each such requirement:

i.   Section 1123(a)(1) (Designation of Classes of Interests):   Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate classes of claims and equity interests subject to section 1122 of the Bankruptcy Code. *See* 11 U.S.C. § 1123(a)(1).  The Plan designates six (6) Classes of Claims and Classes of Interests as required by section 1123(a)(1). *See* Plan, § 3.3.

ii.   Section 1123(a)(2) and 1123(a)(3) (Specify Unimpaired and Impaired): Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify which classes of claims or interests are unimpaired by the plan. *See* 11 U.S.C. § 1123(a)(2).  Section 1123(a)(3) of the Bankruptcy Code requires a plan to

---

[9]   Section 1123(a)(8) only applies in a case in which the debtor is an individual and, thus, is inapplicable.

14

specify the treatment of impaired classes of claims or interests. *See* 11 U.S.C. § 1123(a)(3). The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan and the treatment of each such Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively. *See* Plan, § 3.3.

iii.   Section 1123 (a)(4) (Same Treatment Within Classes): Section 1123(a)(4) of the Bankruptcy Code requires that a plan provides the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members. *See* 11 U.S.C. § 1123(a)(4). Except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4).

iv.   Section 1123(a)(5) (Adequate Means for Plan Implementation): Section 1123(a)(5) of the Bankruptcy Code requires a plan provide "adequate means for the plan's implementation[.]" 11 U.S.C. § 1123(a)(5). As set forth in further detail below, the Plan provides adequate means for its implementation as required by section 1123(a)(5) through, among other things: (a) consummation of the Sale Transaction in accordance with the Plan and the Purchase Agreement; (b) the provisions governing distributions under the Plan, (c) the appointment and authority of the Plan Administrator, (d) the wind down and dissolution of the Debtors following consummation of the Sale Transaction in accordance with Section 5.2(d) of the Plan, (e) assumption, assumption and assignment, and rejection of executory contracts and unexpired leases in accordance with Article VIII of the Plan; and (f) authorization for all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan. *See* Diamond Decl. ¶ 5.

v.   Section 1123(a)(6) (Provide for the Inclusion in the Charter of the Debtor of a Provision Prohibiting the Issuance of Nonvoting Equity Securities): Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of nonvoting equity securities, and requires amendment of a debtor's charter to so provide. This section also requires that a corporate charter provide an appropriate distribution of voting power among the classes of securities possessing voting power. The Plan is a liquidating plan and does not provide for the issuance of equity or other securities by the Debtors. Accordingly, the requirements of section 1123(a)(6) do not apply to the Plan.

vi.   Section 1123(a)(7) (Selection of Officers and Trustees in a Manner Consistent with the Interests of Creditors and Equity Security Holders): Section 1123(a)(7) of the Bankruptcy Code requires a plan to "contain only provisions that are consistent with the interests of creditors and equity

15

security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee[.]" 11 U.S.C. § 1123(a)(7). Pursuant to Section 5.2(b) of the Plan, the Plan Administrator will be selected by the Debtors and the Mortgage Lender and granted the authority to, among other things, control and effectuate the Claims reconciliation process, make distributions in accordance with the Plan, and exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the remaining Assets of the Debtors, all as more fully set forth in Section 5.2(b) of the Plan. *See* Diamond Decl.¶ 6. The Plan Administrator Agreement was filed as a Plan Supplement document on January 5, 2026 [ECF No. 925].[10] Accordingly, the provisions of the Plan are consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7).

**D.      The Plan Complies with Section 1123(b) of the Bankruptcy Code.**

**1.      Plan Permissive Provisions.**

40.      Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b):

> i.      Section 1123(b)(1) (Impair or Leave Unimpaired any Class of Claims or Interests): Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests[.]" 11 U.S.C.§ 1123(b)(1). Article IV of the Plan describes the treatment for each Class. Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are not impaired by the Plan (together, the "**Unimpaired Classes**"). Class 3 (Secured Mortgage Claims), Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), and Class 6 (Existing Equity Interests) (collectively, the "**Impaired Classes**") are impaired and are receiving appropriate treatment under the Plan.
>
> Section 1123(b)(2) (Treatment of Executory Contracts or Unexpired Leases): Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases, subject to section 365 of the Bankruptcy Code. With respect to the Debtors' executory contracts and unexpired leases, Section 8.1 of the Plan provides that, in connection with the Sale Transaction, all executory contracts and unexpired leases to which the Debtors are a party shall be deemed rejected, unless such contract or

---

[10]    The identity of the initial Plan Administrator, to be agreed to by the Debtors and the Mortgage Lender, will be filed with the Court prior to the Effective Date in accordance with the Plan.

lease (a) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (c) is the subject of a motion to assume filed by the Debtors on or before the Effective Date; or (d) is specifically designated as a contract or lease to be assumed or assumed and assigned on the Assumption Schedule. In accordance with the Bidding Procedures Order, all tenant leases will be assumed and assigned to the Successful Bidder in accordance with the Purchase Agreement subject to all existing Regulatory Restrictions.

In accordance with the Bidding Procedures Order, on December 22, 2025, counterparties to each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned under the Plan were each served with an individualized Cure Notice (as defined below), which included the proposed Cure Costs for each contract thereon.[11]  *See* Affidavit of Service, dated January 6, 2026 [ECF No. 938] (the "**Cure Notice Affidavit**"). The deadline to object to Cure Amounts expired on January 11, 2026 at 5:00 p.m. (prevailing Eastern Time). No objections to the Debtors' proposed cure amounts were filed.

The Purchase Agreement provides that Summit shall deliver a schedule of contracts to be assumed no later than twenty-one (21) days prior to closing the Sale Transaction, and related cure costs by no later than ten (10) business days before closing of the Sale Transaction. *See* Purchase Agreement §§ 1(c), 10(a)(vii).

ii.     Section 1123(b)(3)(A) and (B) (Retention of Claims and Interests): Section 1123(b)(3) of the Bankruptcy Code permits a plan to provide for the settlement of adjustment of any claim or interest of the debtor or the estate and the retention and enforcement of such claims and interests. As permitted by section 1123(b)(3)(A) of the Bankruptcy Code, the Plan provides for the retention of Causes of Action, which may be pursued by the Plan Administrator. *See* Plan § 5.9.

iii.    Section 1123(b)(4) (Provide for the Sale of Estate Property):  Section 1123(b)(4) of the Bankruptcy Code permits a plan to provide for the sale of all or substantially all of the property of the estate. As permitted by section 1123(b)(4) of the Bankruptcy Code, the Plan provides for the sale of substantially all of the Debtors' Assets to the Successful Bidder and provides for the allocation and distribution of the proceeds in accordance

---

[11]    The Confirmation Hearing Notice served on the Debtors' existing tenants set forth that all tenant leases would be assumed and assigned to the Successful Bidder with a $0 cure amount and included clear and unambiguous instructions regarding the deadline and procedures for filing any objections to the proposed assumption and assignment of tenant leases. *See* Affidavits of Service [ECF Nos. 814, 921, and 922].

17

with the Plan.   The Purchase Agreement which governs the sale of substantially all of the Debtors' Assets is further detailed below.

iv. <u>Section 1123(b)(5) (Modify or Leave Unaffected Rights of Holders of Secured and Unsecured Claims)</u>:   Section 1123(b)(5) of the Bankruptcy Code permits a plan to modify the rights of secured claim claims or unsecured claims, or to leave unaffected the rights of holders of any class of claims.   As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of holders of Claims against and Interests in the Impaired Classes and leaves unaffected the rights of holders of Claims in the Unimpaired Classes.

v. <u>Section 1123(b)(6) (Appropriate Provisions Not Inconsistent with the Bankruptcy Code)</u>:   As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."   11 U.S.C. § 1123(b)(6).   In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan (a) contains certain Exculpation and Injunction Provisions (as defined below) consistent with the applicable provisions of the Bankruptcy Code and Second Circuit law, as described in greater detail herein, and (b) provides that the Court will retain jurisdiction over all matters arising in and related to these Chapter 11 Cases.   *See* Plan §§ 10.5, 10.6; Article XI.   Of note, this is a liquidating plan under which there are no Debtor or third-party releases.

**a.    The Exculpation Provision Is Appropriate and Should be Approved.**

41.    For the avoidance of doubt, there are no Debtor releases and no third-party releases in the Plan.   In addition, as this is a liquidating plan, the Debtors are not receiving a section 1141 discharge under the Plan.

42.    Section 10.6 of the Plan contains a limited and customary exculpation (the "**Exculpation Provision**") for certain limited parties, including, the Debtors, their officers, directors and managing members, the Mortgage Lender, and the professionals retained in the Chapter 11 Cases.  The Exculpation Provision carves out acts or omissions that are determined by a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct.  As the Court is well aware, the Exculpated Parties played an integral role in negotiating the Sale Transaction and formulation of the Plan.  *See* Diamond Decl.¶ 6.

43.     Exculpation provisions are permissible when they are important to a debtor's plan or where the exculpated party has provided substantial consideration to a debtor's reorganization.  *See In re Chemtura*, 439 B.R. at 610-11 (citing *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217–19 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part*, *rev'd in part*, 627 F.3d 496 (2d Cir. 2010)); *see also In re Residential Cap. LLC*, No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan that contained exculpations for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors.").  In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.  *See In re BearingPoint, Inc*., 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers[.]"); *In re DBSD N. Am.*, 419 B.R. at 217 (same).

44.     Courts have specified certain parties that generally are appropriate candidates for exculpation, including parties to a consensual plan or parties to unique transactions who "made substantial contributions to the reorganization process and whose inclusion in the exculpation provision was a critical component in forming the plan." *In re Genesis Global Holdco*, LLC, 660 B.R. 439, 529 (Bankr. S.D.N.Y. May 17, 2024) (approving exculpation of non-estate fiduciaries in a Chapter 11 liquidation); *In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2024 WL 2767121 (Bankr. S.D.N.Y. May 29, 2024) (approving exculpation provision of non-

19

estate fiduciaries where their participation was essential in formulating and negotiating the plan,
Purchase Agreement, and settlement agreement).

45. It is well established in this district that exculpation is not limited to estate
fiduciaries. *See, e.g.*, *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr.
S.D.N.Y. 2019); *see also In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *50 (Bankr.
S.D.N.Y. June 18, 2022), *corrected*, *and motion to certify appeal denied*, 2022 WL 2962948
(Bankr. S.D.N.Y. July 26, 2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 756
(S.D.N.Y. 2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y.
2022), *aff'd sub nom. In re LATAM Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022). The *LATAM*
court helpfully explained that exculpation may cover parties who are not estate fiduciaries when these
parties have played significant roles in the case that justify such treatment:

> Exculpated Parties who are not estate fiduciaries are entitled to benefit
> from a broad exculpation provision. They have been actively involved
> in all aspects of these Chapter 11 Cases and have made significant
> contributions to the success of these cases. In the absence of gross
> negligence or intentional wrongdoing on their parts, the Court will
> extend the Exculpation clause to the Exculpated Parties who are not
> estate fiduciaries, to bar claims against them as set forth in the
> Exculpation clause, and based on the negotiation, execution, and
> implementation of agreements and transactions that were approved by
> the Court.

*Id*. at * 50.

46. Courts in this and other districts have approved exculpation provisions
similar in scope and application for estate fiduciaries and non-estate fiduciaries. *See, e.g., In re
Stearns Holdings, LLC,* 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019) (approving exculpation of
some prepetition lenders who were "essential to the promotion of good-faith plan negotiations that
might not otherwise have occurred…"); *In re Oneida Ltd*., 351 B.R. 79, n.22 (Bankr. S.D.N.Y.
2006) (approving exculpation provision that covered prepetition lenders, DIP lenders, creditors'
committees and their members, and the respective affiliates of each, except in cases of gross

20

negligence, willful misconduct, fraud, or criminal conduct); *Nine W. Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019), ECF No. 1308 (approving exculpation provision that covered, among other parties, prepetition lenders, DIP lenders, and debtors' sponsor); *In re Residential Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 6066, at ¶ 291 (approving exculpation of certain prepetition lenders who "played a meaningful role . . . in the mediation process, and through the negotiation and implementation of the Global Settlement and Plan").

47.     The Exculpated Parties played a critical role in achieving a confirmable plan effectuating the sale of substantially all of the Debtors' Assets.  The support of the Exculpated Parties was essential to the successful formulation of the Plan and the Sale Transaction, all of which were the product of good faith and arm's length negotiations.  Without the work of the Debtors and their officers (including the CROs), directors, and managing members, and their retained professionals, the Debtors would not have been able to achieve a successful outcome of these Chapter 11 Cases, which among other things, resulted in substantially higher recoveries for creditors than could have been achieved outside of bankruptcy and ensured for the orderly assignment and continuation of all existing tenant leases.  *See* Diamond Decl. ⁋ 8.  The Mortgage Lender's support throughout the Marketing Process was also essential to the result achieved in these cases.  As an initial matter, the Mortgage Lender's consent to the Debtors' use of Cash Collateral, allowed the Debtors to run the Marketing Process and seek a value-maximizing, actionable bid for the Debtors' assets. Further, the Mortgage Lender executed the financing commitment that allowed Summit to submit the Successful Bid.  Finally, the Mortgage Lender was integral to the negotiations and engagement with the Potential Bidders prior to and at the Auction.  As described in greater detail below, the Plan Administrator will perform essential

services for the implementation of the Plan and the wind down of the Debtors' estates following the closing of the Sale Transaction. *See infra* ¶ 130.

48. The Exculpation Provision was necessary to achieve, among other things, the consensus embodied in the Plan by and among the Debtors and the Mortgage Lender and its professional advisors. *See* Diamond Decl.¶ 7. The protection it provides promoted and fostered the good faith negotiations that culminated in the support that the Plan enjoys.[12] *See id.* ¶ 7. Accordingly, the Debtors submit that the Exculpation Provision set forth in the Plan is reasonable, appropriate, and entirely consistent with applicable law and should be approved.

### b.   The Injunction Provision Should be Approved

49. Section 10.5 of the Plan provides an injunction provision, which implements the Debtors' Exculpation Provision, in part, by permanently enjoining all persons and entities from commencing or continuing in any manner any claim that was exculpated pursuant to such provisions (the "**Injunction Provision**"). The Injunction Provision is integral to the Plan, is in the best interests of the Debtors, is an appropriate exercise of the Debtors' business judgment, and is in accordance with section 1123(b)(6) of the Bankruptcy Code. The injunction replaces the automatic stay following the Effective Date of the Plan to ensure that parties in interest do not take actions inconsistent with the Plan to the detriment of, and in a manner unfair to, other parties in interest. If necessary, parties can seek relief from the injunction from the Bankruptcy Court as they could today with respect to the automatic stay.

---

[12]   *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (protection against legal exposure may be critical to settlement negotiations involving complex issues and multiple parties).

50. Accordingly, the Debtors respectfully submit that the Injunction Provision is proper, appropriate in scope, and necessary for the implementation of the Plan, and as such, the Injunction Provision should be approved.

### c. Retention of Jurisdiction

51. Section 1123(b)(6) of the Bankruptcy Code is a "catchall" provision which permits inclusion in a plan of any appropriate provision as long as such provision is not inconsistent with applicable provisions of the Bankruptcy Code. The Plan provides that "the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases[.]" *See* Plan § 11.1 This provision is consistent with the applicable provisions of the Bankruptcy Code and should be approved.

52. Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code. The Plan, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### E. The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.

53. Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Drexel Burnham Lambert*, 138 B.R. at 759.

54. The Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, and the Disclosure Statement Order, by, among

23

other things, providing notice of the Confirmation Hearing to all known holders of Claims or Interests through the filing and mailing of such notice, as evidenced by the Affidavits of Service dated January 5, 2026 [ECF Nos. 814, 921, and 922], in addition to providing notice through publication in *The Wall Street Journal*, as evidenced in the publication affidavit dated December 19, 2025 [ECF No. 823].  With respect to each Debtor, the only voting class, Class 3, was sent Solicitation Materials, as required by the Disclosure Statement Order, including: (i) the Confirmation Hearing Notice; (ii) a USB flash drive containing the Plan (with its exhibits, to the extent such exhibits were filed with the Court before the distribution of the Solicitation Materials), the Disclosure Statement (with all exhibits), and the Disclosure Statement Order; (iii) a Ballot and return envelope; (iv) a postage-prepaid, preaddressed return envelope; (v) a link to the Case Website containing the Plan and the Disclosure Statement.

55.     For the reasons stated, the Debtors have satisfied the requirement of section 1129(a)(2) of the Bankruptcy Code.

**F.     The Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code.**

56.     Section 1129(a)(3) of the Bankruptcy Code requires a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Second Circuit has defined the good faith standard as "requiring a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)).  "Good faith is 'generally interpreted to mean that there exists *a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code*.'"  *In re Chemtura*, 439 B.R. at 608 (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)) (emphasis added).  "Whether a

24

[chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan." *Id.* (internal quotation marks omitted).[13]

57.     The Debtors' months-long value maximizing sale and Marketing Process and negotiations with their Mortgage Lender following extensive litigation is clearly in the record of these Chapter 11 Cases.  As set forth in the Supporting Declarations, the Debtors, with the assistance of their advisors and consultation with the Mortgage Lender, ran a months-long value-maximizing Marketing Process to sell or refinance their portfolio of residential properties.  *See* Diamond Decl.¶ 9; *See* Parker Decl. ¶ 8.   Having adequately tested the market for a Sale Transaction, the Debtors determined, in the exercise of their sound business judgement, and upon the joint recommendation of the CROs and the consent of their Mortgage Lender, that the best opportunity to consummate a value-maximizing transaction was to proceed with the Sale Transaction with the Successful Bidder pursuant to the Purchase Agreement and the Plan.

58.     Accordingly, the Plan was proposed in good faith as required by section 1129(a)(3).

---

[13]     Extensive good faith negotiations also are evidence of the Debtors' satisfaction of section 1129(a)(3). *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC* (*In re Charter Commc'ns.*), 419 B.R. 221, 260 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, *In re Charter Commc'ns*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd but criticized*, *In re Charter Commc'ns*, 691 F.3d 476 (2d Cir. 2012) (arms' length negotiations are indicative of good faith finding in plan considerations); *In re Enron Corp.*, No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *80 (Bankr. S.D.N.Y. July 15, 2004) (confirming plan and finding good faith requirement satisfied in part because plan resulted from "extensive arm's-length discussions."); *In re Best Prods. Co.*, 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994) , *appeal dismissed*, *Resolution Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, *Resolution Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26 (2d Cir. 1995) (court found that the plan was proposed in good faith where the plan was the product of extensive negotiation and the proposed settlement was the product of arms' length bargaining).

**G.     The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.**

59.     Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re J. Reg. Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y 2009), *appeal dismissed sub nom. Freemen v. J. Reg. Co.*, 452 B.R. 367 (S.D.N.Y. 2010); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475–76 (Bankr. D.N.J. 1990); *In re Texaco Inc.*, 84 B.R. 893, 907–08 (Bankr. S.D.N.Y. 1988), *appeal dismissed sub nom. Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco Inc.)*, 92 B.R. 38 (S.D.N.Y. 1988).

60.     Pursuant to the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* entered on October 6, 2025 [ECF No. 577], the Court authorized and approved procedures for the payment of certain fees and expenses of professionals retained in these Chapter 11 Cases. Pursuant to Section 2.2 of the Plan, all payments for services provided to the Debtors during the Chapter 11 Cases must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code. Moreover, Section 11.1 of the Plan provides that the Court shall retain jurisdiction to hear and determine all Fee Claims. The Plan therefore complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**H.     The Debtors Have Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code.**

61.     Section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the

26

plan, as a successor to a debtor under the plan and that such appointment be consistent with the

interests of creditors and equity security holders and with public policy. In addition, to the extent

there are any insiders that will be retained or employed by the reorganized debtors, section

1129(a)(5)(B) requires that the plan proponent disclose the identity and nature of any

compensation of any such insiders. *See* 11 U.S.C. § 1129(a)(5). The identity of the Plan

Administrator, to be agreed to by the Debtors and the Mortgage Lender, will be filed prior to the

Effective Date, along with a curriculum vitae. *See* Diamond Decl. ⁋ 18. Accordingly, the Debtors

have complied with section 1129(a)(5) of the Bankruptcy Code.

I.      **The Plan is in Best Interests of All Creditors of, and Holders of Equity Interests in, Each Debtor.**

62.     Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the

best interests of creditors and equity interest holders in the Debtors – commonly referred to as the

"best interests" test. The best interests test focuses on potential individual dissenting creditors

rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.
P'ship,* 526 U.S. 434, 441 n.13 (1999). It requires that each holder of a claim or equity interest in

an impaired class either accept the plan or receive or retain under the plan property having a present

value, as of the effective date of the plan, not less than the amount such holder would receive or

retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

63.     Under the best interests test, "the court must measure what is to be received

by rejecting creditors . . . under the plan against what would be received by them in the event of

liquidation under chapter 7. In doing so, the court must take into consideration the applicable rules

of distribution of the estate under chapter 7, as well as the probable costs incident to such

liquidation." *In re Adelphia Commc'ns*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (explaining

law on classification of claims as interpreted within the Second Circuit); *appeal dismissed sub*

27

*nom. Off. Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd sub nom. Off. Comm. of Equity Sec. Holders v. Off. Comm. of Unsecured Creditors (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420 (2d Cir. 2008). The Court must evaluate the liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (internal quotation marks and citation omitted); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012) , *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), *and aff'd*, 729 F.3d 311 (3d Cir. 2013) ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation"), (internal citation omitted).  As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.  *See In re Drexel Burnham Lambert*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

64.     The best interests test does not apply to the holders of Claims in the Unimpaired Classes as they are unimpaired and, therefore, have accepted the Plan.  Similarly, the best interests test does not apply to Class 3 (Secured Mortgage Claims) because the holder of Claims in that Class has voted to accept the Plan.  The best interests test is satisfied with regard to Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), and Class 6 (Existing Equity Interests) (collectively, the "**Deemed to Reject Classes**") because there would be no recovery available to these classes in a liquidation under chapter 7 of the Bankruptcy Code.

28

65.     As set forth in the Liquidation Analysis in Section of VII.C.1 of the Disclosure Statement, the best interests test is satisfied because all holders of impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  Specifically, although holders of Claims and Interests in the Deemed to Reject Classes will not receive a distribution under the Plan, their treatment is not less favorable than what they would receive in a chapter 7 liquidation because they would receive no value in a chapter 7 liquidation.  *See* Diamond Decl. ¶19.  Further, the Deemed to Reject Classes would also not get anything outside of chapter 11 as the value received for the Debtors' Assets would be less outside of chapter 11 as explained below.

66.     Moreover, the Plan provides the Secured Mortgage Lender with a higher, more timely recovery than would be available in chapter 7 because of the fees and expenses that would be incurred in a chapter 7 liquidation and the significant transfer and mortgage recordation tax that the sale would otherwise be exempt from under chapter 11 pursuant to section 1146 of the Bankruptcy Code.  *See* Diamond Decl. ¶19.  Under chapter 7, there is the possibility of delay due to the necessity of the chapter 7 trustee becoming familiar with the Assets.  This delay alone could cause Bids already obtained to be lost.  Further, in a chapter 7 liquidation, Allowed Administrative Expense Claims incurred by the Debtors during the Chapter 11 Cases, which may constitute Allowed Claims in any chapter 11 case, would continue to have priority over any prepetition unsecured claims.  Moreover, the conversion to a chapter 7 would also require entry of a bar date for filing claims that would be more than 90 days following conversion of the cases to chapter 7. In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, and delayed distributions.  Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

29

**J.      The Plan Has Been Accepted by the only Impaired Class Entitled to Vote on the Plan, and as to Such Class, the Requirements of Section 1129(a)(8) of the Bankruptcy Code Have Been Satisfied.**

67.      Section 1129(a)(8) of the Bankruptcy Code requires as follows: "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11 U.S.C. § 1129(a)(8).

68.      Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject a plan of reorganization:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

69.      As set forth above, holders of Claims or Interests in the Unimpaired Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, as to such Classes, the requirement of section 1129(a)(8)(B) has been satisfied.

70.      As set forth in the Voting Certification, the Plan has been accepted by the holder of Class 3 Secured Mortgage Claims, the only impaired class receiving any property under the Plan.  Thus, as to such Class, the requirement of section 1129(a)(8)(A) has been satisfied.

71.      Holders of Claims against and Interests in the Deemed to Reject Classes are presumed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.  As to these Classes, the Plan may be confirmed over their dissent under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.  *See* § O *infra* ¶¶ 36–40.

30

**K.      The Plan Provides for Payment in Full of All Allowed Priority Claims.**

72.      Section 1129(a)(9) of the Bankruptcy Code requires that, unless the holder of a particular claim agrees to a different treatment with respect to such claim, holders of allowed claims entitled to priority under section 507(a) of the Bankruptcy Code must receive cash payments on the effective date under the plan.

73.      The Plan complies with section 1129(a)(9) of the Bankruptcy Code.  The Debtors will appoint a Plan Administrator who will make distributions to holders of Allowed Claims that are entitled to receive distributions under the Plan.  In accordance with the Plan, the Plan Administrator will adequately reserve funds to pay those claims in full.  *See* Plan § 5.2(b).

74.      The Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in Cash, on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, unless otherwise required by a Final Order; *provided* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.  *See* Plan, § 2.1.

75.      Moreover, the Plan provides that, except to the extent that a holder of an Allowed Priority Non-Tax Claim against any Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the applicable Debtor(s) or the Liquidating Debtor, (i) each such holder shall receive payment in Cash in an amount equal to the amount of such Allowed Claim, payable on the later of the Effective

31

Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. *See* Plan, § 4.1.

76.     The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code. Pursuant to Section 2.3 of the Plan, unless a holder agrees to less favorable treatment, holders of Allowed Priority Tax Claims (a) will be paid Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the first business day after the date that is thirty (30) calendar days after the date such Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Claim is due and payable in the ordinary course as such obligation becomes due; or (b) other such treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1129(a)(9)(A), (B), and (C) of the Bankruptcy Code.

**L.     The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.**

77.     Section 1129(a)(10) of the Bankruptcy Code requires, if a class of claims is impaired, the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). Class 3 (Secured Mortgage Claims) is impaired and has voted to accept the Plan, without including the acceptance of the Plan by any insiders in such Class. *See* Voting Certification. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**M.      The Plan Is Feasible.**

78.      Section 1129(a)(11) of the Bankruptcy Code requires the Court determine that the Plan is feasible as a condition precedent to confirmation.  Specifically, it requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan may be implemented and has a reasonable likelihood of success.  *See In re Advance Watch Co., Ltd.*, No. 15-12690 (MG), 2016 Bankr. LEXIS 229 (Bankr. S.D.N.Y. Jan. 25, 2016); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 843 F.2d 636, 649 (2d Cir. 1988).

79.      The key element of feasibility is whether there is a reasonable probability that the provisions of a chapter 11 plan can be performed.  The purpose of the feasibility test is to protect against speculative plans.  *See In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) (internal citation omitted), *aff'd*, 165 B.R. 773 (S.D.N.Y. 1994), *aff'd sub nom. In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994) ("The purpose of the feasibility test has been described as protection against visionary or speculative plans."); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) (same).  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.  *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003).

80.      The feasibility standard is greatly simplified when a liquidating chapter 11 plan, such as the Plan before the Court, is tested against section 1129(a)(11).  *See In re 382 Channel Drive LLC*, No. 25-10694 (MG), 2025 Bankr. LEXIS 3309, *27 (Bankr. S.D.N.Y. Dec. 22, 2025) ("[L]ogic      and authorities      suggest      that      the feasibility analysis      under

[liquidating] plans will vary somewhat from that used in 'true' reorganizations")[14] (quoting *In re Wood*, No. 89-0111 (JHM), 1991 U.S. Dist. LEXIS 20083, *3 (W.D. Va. Nov. 11, 1991)); *see also* 7 Collier on Bankruptcy P 1129.02 (16th 2026) ("Liquidating plans provide somewhat different considerations."). Some courts even find section 1129(a)(11) is *automatically* satisfied in the context of a liquidating plan. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 432–33 (Bankr. S.D. Tex. 2009) (collecting cases). Even for those Courts that do not adopt this interpretation, in the context of a liquidating plan, feasibility is established by demonstrating the debtor is able to satisfy the conditions precedent to the plan effective date and otherwise has sufficient funds to administer and consummate the Plan. *See e.g.*, *In re Klaynberg*, No. 22-10165 (MG), 2023 Bankr. LEXIS 2055, *42-43 (Bankr. S.D.N.Y. Aug. 21, 2023) (finding a liquidating plan feasible under 1129(a)(11) where the trustee anticipated there would be sufficient cash "to meet the obligations under the [p]lan."); *In re CLST Enters., LLC*, No. 24-10596 (MG), 2025 Bankr. LEXIS 3293, at *28 (Bankr. S.D.N.Y. Dec. 19, 2025) (finding the requirements of 1129(a)(11) met where the proceeds of a property sale would be sufficient "to make all payments as required by the [p]lan.").

81. The effectiveness of the Plan is premised upon the Sale Transaction closing. The proceeds of the Sale Transaction will be used to make the distributions to holders of Allowed Claims and Interests as provided in the Plan. *See* Diamond Decl. ¶ 20, 22. As established in the Diamond Declaration, the Plan embodies a rational plan for the closing of the Sale Transaction, the appointment of the Plan Administrator, and the delivery of distributions following the Effective Date through the allocation of the sale proceeds in accordance with the Plan. *See* Diamond Decl.

---

[14] In *382 Channel Drive*, the debtor's proposed plan called for a sale of the debtor's assets and an appointment of a plan administrator to make all post-confirmation payments. *See* 2025 Bankr. LEXIS 3309 at *8–9. The court determined that the proposed plan met the requirements of 1129(a)(11) as the debtor believed the sale of the assets would "be sufficient to make all payments as required by the [p]lan." *Id.*, at *28.

¶ 25. Specifically, the Plan sets forth certain Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date. These payments include, among others, distributions to the Mortgage Lender on account of its Class 3 Claims and payments to holders of Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Other Secured Claims. *See* Plan § 2.1, 2.2, 2.3, 4.1, and 4.2.

82.    As set forth in further detail below, the Objections misstate the law with respect to the feasibility requirement under section 1129(a)(11). The requirements of section 1129(a)(11) apply only with respect to the Debtors and their Plan. It does not require a shoqing or impose any requirements, financial or otherwise, with respect to the Successful Bidder's ability to own and operate the purchased assets following the closing of the Sale Transaction in order to satisfy the requirements for confirmation. As set forth below and in the Diamond Declaration, upon the Sale Closing, the Debtors will have sufficient funds to make all payments required under the Plan in accordance with the distribution waterfall set forth therein. *See* Diamond Decl. ¶ 23. Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

N.    **The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.**

83.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]" 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2). In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Plan provides that the Debtors shall pay all such Statutory Fees that are due and payable. After the Effective Date, the Plan

35

Administrator shall pay any and all Statutory Fees when due and payable.  *See* Plan § 5.2(b)(ii).

The Debtors shall file all monthly operating reports due prior to the Effective Date when they

become due, using UST Form 11-MOR.  After the Effective Date, the Plan Administrator shall

file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.

Notwithstanding anything in the Plan to the contrary, the Debtors shall remain obligated to pay

Statutory Fees to the Office of the United States Trustee for Region 2 (the "**US Trustee**") and file

such reports until the earliest of that particular Debtor's case being closed, dismissed, or converted

to a case under chapter 7 of the Bankruptcy Code.

> **O.     The Plan Satisfies the "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for the Deemed to Reject Classes.**

84.     Section 1129(b) of the Bankruptcy Code provides a mechanism (known

colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the

plan is not accepted by all impaired classes of claims and equity interests.  Under section 1129(b),

the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims

or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with

respect to such dissenting class or classes.

85.     By its express terms, section 1129(b) of the Bankruptcy Code is only

applicable to a class of creditors that rejects a plan.  *See* 11 U.S.C. § 1129(b) ("[T]he court . . .

shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not

discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that

is impaired under, *and has not accepted*, the plan.") (emphasis added).  As stated, holders of

Claims and Interest in Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), and

Class 6 (Existing Equity Interests) are deemed to reject the Plan.  The Plan may be confirmed as

to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**1.      The Plan Does Not Discriminate Unfairly.**

86.      Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes.  Rather, it prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310–11 (Bankr. S.D.N.Y. 2016) ("Courts generally will approve placement of similar claims in different classes provided there is a 'rational' or 'reasonable' basis for doing so" and "satisfies the flexible requirements of section 1122 because a valid business, factual, and/or legal reason exists for separately classifying the various classes of claims and interests created under the Plan. . . . [W]here claims or interests of the same priority are separately classified, such claims or interests are either dissimilar or another good business reason exists for such classification.") (citation omitted); *In re WorldCom Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom*, *Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988)).  As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and treatment was rational where members of each class "possess[ed] different legal

37

rights"), *aff'd sub nom. Lambert Brussels Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).

87.    The Plan does not discriminate unfairly (or at all) with respect to holders of Claims and Interests in the Deemed to Reject Classes—Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), and Class 6 (Existing Equity Interest)—because the Claims against and Interests in each of those Classes are legally distinct in their respective legal nature from Claims against and Interests in all other Classes.  All similarly situated Claims and Interests will receive substantially similar treatment under the Plan.

88.    As discussed above, the Plan properly classified unsecured claims into Class 4 (General Unsecured Claims).  This Class will not receive or retain property under the Plan on account of their Claims.  There is no other Class similarly situated to Class 4 and receiving better treatment than Class 4 under the Plan.

89.    Class 5 consists of Subordinated Claims.  *See* Plan § 4.5.  Class 5 is the only Class of prepetition Claims against the Debtors that are subject to subordination pursuant to section 510 of the Bankruptcy Code.  The fact that such Claims are subordinated permits holders of such Claims to receive different treatment than Claims that are not subordinated.  Therefore, there is no other Class that is similarly situated to Class 5 and receiving better treatment than Class 5.

90.    Further, the Plan properly classified existing equity interests into Class 6. The interests in Class 6 (Existing Equity Interests) are being cancelled pursuant to the Plan.  There is no other Class that is similar situated to Class 6 and receiving better treatment than Class 6. Under the Plan, therefore, there is no unfair discrimination as to similarly situated classes.

**2.    The Plan Is Fair and Equitable.**

91.    To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) that each holder of the

38

non-accepting class will receive or retain on account of such claim property of a value equal to the allowed amount of such claim, or (ii) that a holder of a claim or interest that is junior to the claims of the non-accepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(B).

92.     To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) that a holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.   *See* 11 U.S.C. § 1129(b)(2)(C).

93.     The "fair and equitable" rule is satisfied as to the holders of Claims against and Interests in Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), and Class 6 (Existing Equity Claims) as no holder of claims or interests junior to any of such classes will receive or retain any property under the Plan on account of such junior claims or interests. *See In re Finlay Enters. Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan).  Moreover, no senior creditor will receive more than a one hundred percent recovery under the Plan.  As such, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to each of the Deemed to Reject Classes and may be confirmed notwithstanding the deemed rejection by such Classes.

**P.      Assumption and Assignment of the Executory Contracts and Unexpired Leases Should be Approved.**

**1.      Cure Objections.**

94.      Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under an executory contract or unexpired lease of nonresidential real property that will be assumed must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  Nothing in the Plan seeks to thwart that requirement.  Rather all existing tenant leases will be assumed and assigned to Summit subject to existing Regulatory Restrictions.  All rights of the tenants under their leases are preserved.

95.      No objections were filed to the Debtors proposed cure amounts for any of the executory contracts or leases to be assumed or assumed and assigned under the Plan.  This Court previously approved the Debtors' procedures for the assumption and assignment of executory contracts and unexpired leases and the determination of the amount necessary to cure any defaults thereunder in the Bidding Procedures Order.  Following entry of the Confirmation Order, the Debtors will file the Assumption Schedule listing the executory contracts and unexpired leases to be assumed and assigned to the Successful Bidder in accordance with the Purchase Agreement.  As set forth in the Purchase Agreement, all Cure Costs will be borne by the Successful Bidder up to $500,000, with the balance, if any, to be borne by the Debtors.  *See* Purchase Agreement § 8(c).

**2.      The Successful Bidder Has Provided Adequate Assurance of Future Performance.**

96.      Further, pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2)(B).

40

97.     The meaning of adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Adequate protection "does not mean absolute insurance that the debtor will thrive and make a profit," and the "test is not one of guaranty but simply whether it *appears* that [underlying obligations] will be paid . . . ." *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986) (emphasis added); *see also In re Great Atl. & Pac. Tea Co.*, 472 B.R. 666, 674–75 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance'; rather, it must simply appear that the rent will be paid and other lease obligations met . . . . The emphasis is on protection."); *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 719 (Bankr. S.D.N.Y. 2011) ("A debtor need not prove that it 'will thrive and make a profit' but only that it appears that it will meet its obligations.") (citation omitted); *In re Rock 49th Rest. Corp.*, No. 09-14557(ALG), 2010 WL 1418863, at *10 (Bankr. S.D.N.Y. Apr. 7, 2010) ("A debtor in possession need not prove that it will 'thrive or make a profit,' or provide 'an absolute guarantee of performance'") (citations omitted); *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("No guarantee is required but the lessor must be given adequate assurance of future performance . . . "); *In re Beker Indus. Corp.*, 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard."); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive).

98.     Assurance of future performance "is to be defined by commercial rather than legal standards" *In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980) (citations omitted). There is also a strong Congressional policy "favoring assumption and assignment as a

41

means of continuing performance and realizing value and thereby assisting the debtor in its rehabilitation or liquidation." *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983).

99. Demands for adequate assurance cannot be unreasonable and confer more than what the applicable contracts or leases originally provide. *See In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981) ("The Bankruptcy Code requires only that the lessor be given the performance for which he has contracted . . . [and] cannot be granted any greater rights than what the lease provides."). Most cases address the requirements for adequate assurance of future performance that must be provided to landlords rather than tenants. In fact, "[i]t appears that this provision [Section 365(f)(2)(B)] was primarily designed to protect landlords, and the 'chief determinant' of adequate assurance is whether the rent will be paid." *In re Sanshoe Worldwide Corp.,* 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Bygaph, Inc.*, 56 B.R. at 605; *In re Brentano's*, 29 B.R. 881, 883 (Bankr.S.D.N.Y.1983).

100. The City's request for adequate assurance is a novel ask given that it is not a contract counterparty and has no consent right with respect to the Sale Transaction. The transfer of residential buildings is commonplace. As set forth herein, neither the City nor any particular or individual tenant is entitled as a condition to the assumption and assignment of their leases to demand the Successful Bidder unconditionally guarantee post-closing performance under the tenant leases or require a schedule for every asserted repair or complaint, insist that a cash reserve be imposed and set aside to fund all hypothetical future repairs, or insist on being provided a line-item budget by the Successful Bidder. There simply is no basis under the leases or the Bankruptcy Code for imposing any of these requirements as conditions to assume or assign the existing tenant leases.

101. Nonetheless, the City and the Debtors' tenants should rest assured. As set forth in the Summit Declaration, Summit is well-capitalized, supported by a financing commitment provided by the Mortgage Lender. As noted above, one of the key considerations for designating the Summit Bid as the Successful Bid was the likelihood of closing the proposed transaction in a timely manner. Further, upon closing the Sale Transaction, the portfolio is expected to meaningfully reduce its mortgage debt by over $275 million, 45% of the existing debt, while lowering its interest rate and monthly payments. This unlocks additional cash flow that can be utilized for capital expenditures and preventative maintenance. *See* Notice of Successful Bid, Ex. A. Summit will retain new and experienced residential management firms to be responsible for day-to-day property operations. Those firms will have significant experience in New York rent-stabilized housing and operate under the Summit's direct asset management oversight.

102. For the reasons set forth above, contract counterparties have received "adequate assurance of future performance" within the meaning of section 365(f) of the Bankruptcy Code.

## III. THE CONFIRMATION OBJECTIONS SHOULD BE OVERRULED AND THE PLAN SHOULD BE CONFIRMED

103. The following seven (7) objections to confirmation of the Plan were filed (the "**Objections**"):

a. *Limited Objections of the City of New York to Confirmation of the Debtors' First Amended Plan and to Sale of Properties* [ECF No. 919] (the "**City Objection**");

b. *Supplemental Objection to Motion for Confirmation of Plan and Sale of Properties and Request for Thirty Day Adjournment* [ECF Nos. 923 & 924] (the "**Supplemental City Objection**");

c. *Restated Supplemental Objection to Confirmation of Plan and Sale of Properties* [ECF No. 951] (the "**Restated Supplemental City Objection**" and, together with the City Objection and Supplement City Objection, the "**City Objections**");

43

d. *Objection to Proposed Sale Order and Confirmation of Stalking Horse Agreement* [ECF No. 953] (the "**Tenant Union Objection**");[15]

e. *Objection, Joinder, and Reservation of Rights in Response to (i) Proposed Sale of Debtors Assets and (ii) Assumption and Assignment of Tenant Leases* [ECF No. 954] (the "**Interested Tenant Objection**");

f. *Objection to the Proposed Sale of The Debtors' Assets* [ECF No. 956] (the "**Brooklyn Tenant Objection**" and, together with the Interested Tenant Objection and Tenant Union Objection, the "**Tenant Objections**"); and

g. *Objection of the United States Trustee to Confirmation of the First Amended Joint Chapter 11 Plan* [ECF No. 939] (the "**UST Objection**").

104.   The Debtors and Summit have agreed to make certain clarifying revisions to the Confirmation Order in response to the Objections and other informal comments received by parties in interest, including from counsel to certain tenants. To the extent not addressed by such revisions, the Objections are not supported by the facts in the record nor the applicable law and should be overruled.

### A.   The City Objections and Tenant Objections

#### 1.   The Plan is Feasible

105.   The City Objections and Tenant Objections assert the Plan is not feasible under section 1129(a)(11) of the Bankruptcy Code because the Debtors have not provided any information regarding Summit, and that Summit "may not have sufficient resources or willingness" to maintain the buildings. *See* Supplemental City Obj. ¶¶ 8–9; *see also* Tenant Union Obj. ¶ 17. Additionally, in the Restated Supplemental City Objection, the City states "Summit must prove its ability and intent to cure…violations and pay its other expenses…" to establish feasibility. *See* Restated Supplemental City Obj. ¶¶ 20.

---

15   While the Tenant Union Objection proport to represent nearly all tenants across over 5,000 units in 93 buildings, there has been no disclosure provided by this group or their counsel as required under Bankruptcy Rule 2019. Thus, it is unclear which Tenants this group and their counsel actually represent.

106.    These objections fundamentally misstate the "feasibility" standard for a liquidating plan.  As set forth above, the standard applies to the Debtors and their Plan only, and does not impose any requirements or require a showing with respect to Summit's ability to operate in the future.  Section 1129(a)(11) does not require a showing of how, and when the Successful Bidder will comply with every rule and regulation governing the Assets after closing of the Sale Transaction.  The relevant standard only requires a showing that Summit can consummate the Sale Transaction and that the conditions precedent to the Plan's Effective Date can be satisfied.

107.    Notwithstanding the City's and the Objecting Tenants' contention that Summit should be required to provide an independent cost assessment, a line-by-line budget, and a cash reserve fund, this is not required to satisfy the feasibility standard or any other requirement for confirmation of the Plan.  *See* Restated Supplemental City Objection ⁋21 & 23.  The City, despite having the opportunity to do so, fails to provide any citation or other basis to support this position in any of its three objections.  Further, neither the City Objections nor the Tenant Objections assert any basis for asserting a consent right over the Sale Transaction.

108.    Summit has filed substantial disclosures regarding its ability to consummate the Sale Transaction.  *See* Summit Decl.  The Plan adequately provides for prompt distribution of Allowed Claims by the Plan Administrator and winddown budget.  Accordingly, the Plan, which is a liquidating plan, easily satisfies the feasibility standards under section 1129(a)(11) and the other objections should be overruled.

**2.    The Successful Bidder has Provided Adequate Assurance of Future Performance to Assume the Tenant Leases**

109.    Both the City Objection and the Tenant Objections assert that Summit has not provided adequate assurance of future performance under the tenant leases. The City Objections assert a cure objection on behalf of tenants on account of hypothetical breaches of

tenant leases, and notes that Summit has not provided any information regarding its ability to cure those hypothetical breaches.  *See* Supplemental Obj. ¶ 13.  This objection is not properly asserted by the City, as the City has no standing to assert tenants' claims, and should be overruled.  The City is not party to the tenant leases, and provides no basis for asserting this objection on behalf of the tenants.  All rights and remedies available to the tenants and the City with respect to any alleged breaches of the tenant leases are preserved.

110.     Summit has provided adequate assurance of future performance. *See supra* ¶¶ 97-–103.    As described above, the Summit Declaration provides information regarding its financial wherewithal to consummate the Sale Transaction and its ability to perform under tenant leases and comply with applicable regulatory obligations.  Summit has represented that it will have sufficient cash flows to operate the buildings following closing in accordance with applicable regulations.  These disclosures satisfy the standards required by section 365(f) of the Bankruptcy Code.

111.     Further, the Debtors are not obligated by section 365 of the Bankruptcy Code to demonstrate how and when potential future defaults may be addressed following assumption and assignment of their contracts.  *See R.H. Macy & Co., Inc. v. Wongco (In re R.H. Macy & Co.)*, 236 B.R. 583, 591 (Bankr. S.D.N.Y. 1999), *aff'd*, 283 B.R. 140 (S.D.N.Y. 2002) ("[b]y its terms, section 365(b)(1) requires that the trustee cure present defaults, not defaults that are not yet in existence.").  Nonetheless, Summit is taking the properties "as is" and has stated its commitment to comply with all regulatory obligations and invest in the buildings.  *See* Summit Decl.  There simply is no requirement under section 365 of the Bankruptcy Code or otherwise to require Summit to provide a schedule for remediation of alleged regulatory violations, an independent cost assessment and line-item budget for the Assets, or information related to prior

housing related litigation history as a condition to take assignment of the tenant leases under the Plan. *See* Restated Supplemental City Obj. ¶¶ 18, 23; *see also* Tenant Union Obj. ¶ 15.

112.    Accordingly, the objections should be overruled.

### 3.    The Assets are Not Being Sold Free and Clear of Regulatory Restrictions

113.    The City Objections and the Tenant Objections request clarifying language be added to the Plan and Confirmation Order to make clear that the Sale Transaction is not seeking to transfer the Assets free and clear of "certain governmental interests, including . . . all violations, whether reduced to judgment or otherwise." City Obj. ¶ 2.

114.    The Bidding Procedures and Purchase Agreement are sufficiently clear that the Debtors are not seeking to strip any governmental interests relating to the Assets through the Sale Transaction. As this Court noted at the case conference held on January 7, 2026, "[i]t's been abundantly clear from the very start of the case that any transaction would be entirely subject to existing tenancy . . . every step of the way, it's been made utterly clear that there is to be no eviction or alteration of terms of leases flowing from the transaction contemplated." *See* Jan. 7, 2026 Hr'g Tr. 26:11–16.

115.    The Purchase Agreement specifically provides that the Assets are transferred subject to all applicable Regulatory Restrictions. Section 6(g) of the Purchase Agreement provides a covenant that Summit agrees to purchase the Assets "subject to any and all notes or notices of violations of Law, or municipal ordinances, orders, designations, or requirements whatsoever noted in or issued by any federal, state, municipal, or other governmental department, agency, or bureau, or any other governmental authority" with jurisdiction over the Assets. Purchase Agreement §6(g).

116.    The Bidding Procedures similarly state:

> A Transaction for any of the Asset(s) will not impact the existing tenant leases at any of the Debtors' properties. The Debtors' properties may be subject to [Regulatory Restrictions]. During the marketing process, the Debtors' buildings will continue to operate, and tenant services will continue to be provided, uninterrupted and in the ordinary course. In accordance with these Bidding Procedures, any Potential Bidder that seeks to purchase or refinance all or a portion of the Assets will be required to do so subject to the existing tenant leases and applicable Regulatory Restrictions.

Bidding Procedures [ECF No. 571-1]. This language was negotiated with representatives of tenants of certain Debtor properties, and clearly provides that the Assets will be transferred subject to applicable Regulatory Restrictions.

117. Notwithstanding the foregoing, the Debtors are willing to consider additional clarifying language for the Confirmation Order to address this objection. To the extent that the parties are unable to reach agreement on further language, these objection should be overruled.

### 4. The Sale Transaction is not an "Insider" Transaction

118. The City Objections and the Tenant Objections allege, without evidence, that the Sale Transaction is an "insider transaction" subject to heightened scrutiny. *See* Restated Supplemental City Obj. ¶ 12; *see also* Tenant Union Obj. ¶ 20. Of note, the City admits it has no "direct knowledge" of any connection between the Debtors and Summit that would render the transaction subject to heightened scrutiny. Restated Supplemental City Obj. ¶ 12. As established in the Supporting Declarations, there is no such connection. As set forth in the, Diamond Declaration, upon information and belief, and following due inquiry, Jonathan Wiener (a) does not hold any equity interest in any of the Debtors, (b) does not hold or own any assets jointly with any of the Debtors, and (c) does not manage any of the Debtors or their properties. Diamond Decl.¶ 24. Moreover, as set forth in Summit Declaration, Jonathan Wiener has no connection with the Summit

48

Bid and will have no involvement in the go-forward management of the Debtors' properties following consummation of the Sale. *See* Summit Declaration.

119. Even if the Court were to use a heightened level of scrutiny, the Plan would still be confirmable because the Debtors' Marketing Process was conducted with the participation of the Mortgage Lender and under the oversight of the two independent CROs. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 109 (D. Del. 1999) (finding that participation by bondholder and their own separate professionals countered any undue influence an insider may have had over the debtor); *JPMorgan Chase Bank, NA v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns Operating, LLC*), 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) (finding that review and approval of settlement by independent directors of Debtors countered any undue influence insider may have had).

120. The Court should not give credence to these allegations, which are based on unsupported press reports and innuendo, and should overrule the objections.

**5. The Scope of Section 1146 Exemption**

121. Section 12.5 of the Plan exempts, "to the fullest extent permitted by section 1146 of the Bankruptcy Code," among other things, any mortgage recording or similar tax. *See* Plan § 12.5. Additionally, the Confirmation Order enjoins any taxing authority from taking actions to collect taxes from which the Sale Transaction is exempt, "to the greatest extent provided by law." *See* Confirmation Order ¶ 10. The City objects to the proposed exemption on the grounds that the Plan language is too broad. *See* City Obj. ¶¶ 5–9. Specifically, the City argues that section 1146(a) only exempts mortgage recording taxes that are for the Debtors' own financing, and "not for a purchaser's mortgage financing for purchases from a debtor's estate." *Id.*, at ¶ 7.

122. This objection should be overruled. First, the Plan specifically limits the scope of the exemption to what is permitted by section 1146 and other applicable law. If a party,

including Summit, seeks an exemption for a tax that is not covered by section 1146(a), it would fall outside the scope of the Plan language. Similar tax exemption language has been approved in other cases in this district. *See In re All Year Holdings Limited*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Jan. 31, 2023), ECF No. 352 (exempting mortgage recording tax from any mortgage "in furtherance of, or in connection with, the Plan"); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Nov. 5, 2021), ECF No 222 (same); *In re SAS AB*, No. 22-10925 (MEW) (Bankr. S.D.N.Y. Mar. 22, 2024), ECF No. 2347 (same); *In re Old Market Grp. Holdings Corp.*, No. 20-10161 (JLG) (Bankr. S.D.N.Y. Oct. 5, 2020), ECF No. 806; *In re Fusion Connect, Inc.*, No. 19-11811 (SMB) (Bankr S.D.N.Y. Dec. 17, 2019), ECF No. 680 (same).

123.    Second, the Purchase Agreement provides that the Debtors shall request the Mortgage Lender to assign the current mortgages to Summit, but the assignment of the current mortgages shall not be a condition precedent to close, nor shall failure to assign be a default by any Debtor. *See* Purchase Agreement § 25(w). The Debtors understand that the Mortgage Lender intends to assign the existing mortgages in connection with the Purchase Agreement. Accordingly, the Debtors do not believe any modifications to the Plan are necessary in the circumstances. To the extent any objections remain, however, the Debtors will consider clarifying revisions to the Confirmation Order to address this issue.

### 6.    Property Taxes and Water Charges Will be Paid Under the Plan

124.    The City asserts that the Plan and Confirmation Order should make clear that real property taxes and water and sewer charges will be paid in full. City Obj. ¶ 10. The Plan clearly provides for the payment in full of allowed Priority Tax Claims[16] on or prior to the Effective

---

[16]    As defined in the Plan, "Priority Tax Claims" means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Date. *See* Plan § 2.3. As noted above, the Plan also provides for payment in full of all allowed Administrative Expense Claims. *See id*. § 2.1. Further, both property taxes and water and sewer charges are paid by the Debtors in the ordinary course in advance at the start of the applicable billing period. Accordingly, the Plan is sufficiently clear with respect to these Claims, and this objection should be overruled.

### B.       The US Trustee Objection

#### 1.       The Exculpation Provision is Appropriately Tailored

125.   The US Trustee asserts the Exculpation Provision (i) improperly includes non-estate fiduciaries, (ii) should not provide that Exculpated Parties are entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan, and (iii) should be limited temporally to only cover acts or omissions from the Petition Date to the Effective Date. For the reasons set forth herein, each of these objections to the Exculpation Provision should be overruled.

126.   First, as set forth above, Courts in this and other districts have approved exculpation provisions similar in scope and application for estate fiduciaries and non-estate fiduciaries. *See*, *e.g.*, *Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. July 2, 2014), ECF No. 322, at ¶ 24(d), (approving exculpation provision in plan providing exculpation for non-estate fiduciaries); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013) ECF No. 4966, at Ex. B ¶ 12.7 (confirmation order overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-estate fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases").

127.   Courts in the Second Circuit evaluate exculpation provisions based on a number of factors, including whether the provision is integral to the proposed plan. *See In re Bally*

51

*Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding exculpation, release, and injunction provisions were "integral to the structure of the [p]lan"); *see also Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (approving exculpation provision where it was necessary to effectuate plan…and noting that excising similar exculpation provisions "would thus tend to unravel the entire fabric of the [p]lan").

128.    For this reason, Courts routinely approve plans and plan administrator agreements that exculpate plan administrators.  *See In re Troika Media Grp., Inc.*, No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Mar. 28, 2024)], ECF No. 266-1, at 35; *In re Voyager Digit. Holdings, Inc.*, No. 22-10953 (MEW) (Bankr. S.D.N.Y. Mar. 10, 2023), ECF No. 1116, at 9; *In re Ditech Holding Corp.*, No 19-10412 (JLG) (Bankr. S.D.N.Y. Sep. 26, 2019), ECF No. 1404-1, at 12; *In re All Year Holdings Ltd.*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Jan. 31, 2023), ECF No. 352, at 54.

129.    Here, the Exculpated Parties will continue to play a critical a role in ensuring that the Sale Transaction is consummated and the Plan is implemented following the Sale Closing.  Courts have noted that exculpated parties  "who will carry out specific activities that are not only approved by [the] confirmation order, but also are required by that Order…are entitled to know that they will not incur liability just for doing what [the Court has] approved and required[.]" *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 136 (Bankr. S.D.N.Y. 2023).  As set forth in the Plan, the Plan Administrator will perform essential functions following the Effective Date, including (i) controlling and effectuating the Claims reconciliation process, (ii) making distributions, (iii) directing and controlling the winddown of the Liquidating Debtors, and (iv) prosecuting all Causes of Action remaining with the Liquidating Debtors and determining

52

whether and when to compromise, settle, abandon, or otherwise dispose of such Causes of Action. These functions are essential to the consummation of the Plan and wind down of the Estates following the Sale Closing. The Plan Administrator will perform critical services on behalf of the Debtors' estates and creditors, and accordingly, is appropriately included in the Exculpation Provision.

130.     Courts in this district have routinely recognized exculpation provisions that apply to conduct post-Effective Date when such exculpated actions relate to the administration of a confirmed plan. *See In re Genesis*, 660 B.R. at 528 (noting that "exculpation may be appropriate even for actions taken after the effective date"); *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) ("The Exculpation Provision expressly covers acts falling under the 'administration of the Plan'—which by definition occurs post-Effective Date.")

131.     The UST Objection also asserts that the Exculpation Provision improperly shields the Exculpated Parties based upon reliance on the advice of counsel. *See* UST Obj. § B. As an initial matter, the Plan does not offer reliance on the advice of counsel as an absolute bar, but instead merely preserves the right of the Exculpated Parties to assert such defense. *See* Plan § 10.6 ("such entities *shall be entitled* to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan") (emphasis added).

132.     This objection has been raised by the US Trustee and overruled in recent cases before this Court. *See, e.g.*, *In re SAS AB,* No. 22-10925 (MEW) (Bankr. S.D.N.Y. Mar. 22, 2024), ECF No. 2347 (approving exculpation providing that "such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan"); *In re PacificCo Inc.*, No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023), ECF No.

53

157 (same); *see also, In re Azul S.A.*, No. 25-11176 (SHL), 2026 Bankr. LEXIS 18, *23–24 (Bankr. S.D.N.Y. Jan. 6, 2026) ("But this type of language is commonly included in confirmed plans in this jurisdiction.") (collecting cases).

133.   Accordingly, to the extent any objection remains with respect to the Exculpation Provision, it should be overruled.

### 2. The Plan Amendment Provision is Expressly Limited by Section 1127 of the Bankruptcy Code

134.   The US Trustee argues that the Plan "arguably provide[s] the Debtors with broader discretion in modifying the Plan than is provided under the Bankruptcy Code." *See* US Trustee Obj.  For amendments beyond mere technical amendments, the Plan is clear on this point.  Amendments may be made, pursuant to Section 12.6 of the Plan "*in a manner provided for by section 1127 of the Bankruptcy Code* or as otherwise permitted by law."  Plan § 12.6 (emphasis added).  There is no reasonable read of this language that suggests the Plan seeks authority to modify the plan beyond the scope of what is expressly permitted by the Bankruptcy Code.  Further, similar relief has been granted in other cases. *See e.g., In re Troika Media Grp.*, No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Mar. 28, 2024), ECF No. 266 (the court confirmed a chapter 11 plan that allowed the debtors to "amend or modify the plan" upon order of the bankruptcy court, after entry of the confirmation order.); *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023), ECF No. 1746 (the court confirmed a chapter 11 plan which reserved the debtors' right to "modify the plan … without additional disclosure," subject to section 1127 and the consent right of several parties.).

### IV. CAUSE EXISTS TO WAIVE STAY OF CONFIRMATION ORDER

135.   As is commonplace, the Debtors request that the Court direct that the Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay

imposed by operation of Bankruptcy Rule 3020(e).  Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee Notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr. P. 3020(e), advisory committee's note to 1999 amendment.

136.    Under the circumstances, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay following entry of the Confirmation Order.  The Debtors' prompt emergence from chapter 11 will enable the Sale Transaction to close sooner, thereby providing parties in interest with their respective recoveries expeditiously.  Furthermore, each day that the Debtors remain in chapter 11 they incur additional administrative and professional costs.  Based on the foregoing, the requested waiver of the 14-day stay is in the best interests of the Debtors' estates and their creditors and will not prejudice any parties in interest.

[*Remainder of page intentionally left blank*]

## CONCLUSION

137.   For the reasons set forth above, the Debtors request that the Court (i) confirm the Plan in accordance with section 1129 of the Bankruptcy Code, and (ii) grant the Debtors such other relief as is just and proper.

Dated: New York, New York
         January 13, 2026

/s/ Gary T. Holtzer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for the Debtors
and Debtors in Possession*

56