WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
             :
**In re**            :  **Chapter 11**
             :
**BROADWAY REALTY I CO., LLC,** *et al.,*  :  **Case No. 25-11050 (DSJ)**
             :
       **Debtors.**[1]  :  **(Jointly Administered)**
             :
-------------------------------------------------------------X

**DECLARATION OF EPHRAIM DIAMOND IN SUPPORT OF**
**CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN**

    I, Ephraim Diamond, pursuant to 28 U.S.C. § 1746, hereby declare that the

following is true and correct to the best of my knowledge, information and belief:

    1.   I am the founder and managing member of Arbel Capital Advisors LLC

("**Arbel**"), an advisory firm specializing in business restructurings and workouts, bankruptcy, and

litigation planning, including chapter 11 reorganizations and independent and fiduciary oversight

for distressed and special situations. I have over 20 years of restructuring and crisis management

experience and have appeared on behalf of debtors in numerous bankruptcy cases, including real

---

[1]  The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426. A complete list of the
Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at
https://cases.stretto.com/broadwayrealty. The Debtors' mailing address is located at 2 Grand Central Tower, 140
East 45th St., 12th Floor, New York, NY 10017.

estate bankruptcy cases, across the country, including in the Southern and Eastern Districts of New York.  On May 22, 2025, I was retained as Chief Restructuring Officer ("**CRO**") of Broadway Realty I Co., LLC and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**").  I am knowledgeable and familiar with the Debtors' businesses and financial affairs.

2.    I submit this declaration (the "**Declaration**") in support of the Debtors' request for entry of the proposed order (the "**Proposed Confirmation Order**") confirming the *First Amended Joint Chapter 11 Plan*, dated December 1, 2025 [ECF No. 780] (as may be amended, supplemented, or modified from time to time and together with all exhibits and schedules thereto, the "**Plan**").[2]  I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, and the *Disclosure Statement for First Amended Joint Chapter 11 Plan*, dated December 1, 2025 [ECF No. 782] (as amended, supplemented, or modified from time to time and together with all exhibits and schedules thereto, the "**Disclosure Statement**").  I was personally involved in the development of and negotiations regarding the Plan and its related documents.

3.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, information provided to me by the Debtors' professional advisors working under my direction, or my experience, knowledge, and information concerning the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

4.      I previously submitted a declaration, pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, in support of the Debtors' chapter 11 petitions and related relief, dated May 27, 2025 [ECF No. 10] (the "**First Day Declaration**").

### The Plan Satisfies Section 1129 of the Bankruptcy Code

5.      <u>Bankruptcy Code Section 1123(a)(5) (Adequate Means for Plan Implementation)</u>.  The Plan provides adequate means for its implementation as required by section 1123(a)(5) through, among other things: (i) consummation of the Sale Transaction in accordance with the Plan and the Purchase Agreement; (ii) the provisions governing distributions under the Plan, (iii) the appointment and authority of the Plan Administrator, (iv) the wind down and dissolution of the Debtors following consummation of the Sale Transaction in accordance with Section 5.2(d) of the Plan, (v) assumption, assumption and assignment, and rejection of executory contracts and unexpired leases in accordance with Article VIII of the Plan; and (vi) authorization for all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.

6.      <u>Bankruptcy Code Section 1123(a)(7) (Selection of Officers and Trustees in a Manner Consistent with the Interests of Creditors and Equity Security Holders)</u>.  The Debtors jointly select the Plan Administrator along with the Mortgage Lender, the Debtors' largest secured creditor and the creditor with the greatest interest in the proceeds of the retained Causes of Action for the respective Post-Emergence Entities.  Accordingly, the Plan provisions governing the manner of selection of the Plan Administrator are aligned with the interests of creditors and equity security holders and with public policy.

7.      <u>Exculpation</u>.  Section 10.6 of the Plan contains an exculpation for certain Exculpated Parties for claims arising out of conduct occurring after the Petition Date.  The exculpation provision contains a carve out for acts or omissions that are determined by a Final

Order to have constituted gross negligence, fraud, or willful misconduct.  I understand that the exculpation provision contained in the Plan is customary.  Inclusion of the exculpation provision was necessary to achieve, among other things, the consensus and settlements embodied in the Plan by and among the Debtors and the Mortgage Lender and, in each case, all Related Parties who worked on their behalf.  Based on my observations while participating in Plan negotiations, the protection provided by the exculpation provision promoted and fostered the good faith negotiations that culminated in overwhelming support for the Plan among economic stakeholders.

8.      The Exculpated Parties played a critical role in achieving a confirmable plan effectuating the sale of substantially all of the Debtors' Assets.  The support of the Exculpated Parties was essential to the successful formulation of the Plan and the Sale Transaction, all of which were the product of good faith and arm's length negotiations.  Without the work of the Debtors and their officers (including the CROs), directors, and managing members, and their retained professionals, the Debtors would not have been able to achieve a successful outcome of these Chapter 11 Cases, which among other things, resulted in substantially higher recoveries for creditors than could have been achieved outside of bankruptcy and ensured for the orderly assignment and continuation of all existing tenant leases.

9.      Bankruptcy Code Section 1129(a)(3).  I understand that section 1129(a)(3) of the Bankruptcy Code requires a plan be proposed in good faith and not by any means forbidden by law.  The Debtors, with the assistance of their advisors, undertook a value-maximizing marketing process to sell or refinance their portfolio of residential properties.

10.      Pursuant to the Final Cash Collateral Order, the Debtors appointed David Barse, another seasoned restructuring professional, to serve alongside me as co-CRO to the Debtors.  Mr. Barse and I share joint authority to "review and recommend" with respect to all

4

aspects of any Transaction Decision.[3]  Mr. Barse and I were heavily involved throughout the marketing process, including evaluating Qualified Bids, negotiating the Stalking Horse Agreement, designating Summit Gold, Inc. ("**Summit**" or the "**Successful Bidder**") as the Stalking Horse Bidder, evaluating Bids submitted at the Auction, and ultimately selecting the Stalking Horse Bid as the Successful Bid.

11.     Through their advisors, the Debtors engaged in arms-length negotiations with Qualified Bidders over the terms of their proposals or purchase agreements.  These negotiations spanned several weeks and included many hours of review and due diligence conducted by sophisticated counsel and professionals.  Mr. Barse and I were actively involved in these negotiations.

12.     Ultimately, based on our joint recommendation, and with the consent of the Mortgage Lender, the Debtors designated Summit as the Stalking Horse Bidder for the entire portfolio of Assets with a purchase price of $451,300,000 ("**Summit's Bid**" or the "**Stalking Horse Bid**") pursuant to that certain *Asset Purchase Agreement*, dated December 22, 2025 (as may be modified, amended or supplemented from time to time and including all schedules and exhibits thereto, the "**Purchase Agreement**"), between the Debtors and Summit.  In making our recommendation, Mr. Barse and I considered, among other things, (i) the purchase price set forth in the applicable Bid (the "**Purchase Price**"), (ii) the amount and nature of the consideration, including any obligations to be assumed, (iii) the value to be provided to the Debtors under

---

[3]     Under the Final Cash Collateral Order, "**Transaction Decision**" means any decision related to any material aspect of the Debtors' efforts and strategy to sell, transfer, market, refinance, or otherwise engage in a transaction involving a portion or all of their properties and other assets, or to develop a chapter 11 plan or disclosure statement.  Material aspects of a Transaction Decision include, without limitation, (i) the timeline for any such transaction, (ii) the development and implementation of any sale and marketing process or other asset monetization strategy, (iii) the scope of any marketing process or other asset monetization strategy, (iv) the selection of the transaction to dispose of or refinance assets, and (v) the selection and material terms of any (a) stalking horse bid or (b) winning bid for any such transaction.

Summit's Bid, including the net economic effect upon the Debtors' estates, taking into account any Stalking Horse Bidder's right to any Termination Payment, (iv the likelihood of the Qualified Bidder being able to close the proposed Transaction (including assessment of financing commitment letters, any required regulatory or other approvals, or any contingencies to closing) and (v) the timing thereof, and the net benefit to the Debtors' estates.

13.     On January 8, 2026, the Debtors conducted the Auction for the sale of the Debtors' Assets.  Prior to the start of the Auction, the Debtors' advisors and I, in consultation with the Mortgage Lender, consulted with each of the participating Qualified Bidders in an effort to obtain the highest or otherwise best bids for the Assets.

14.     On the record at the Auction, only one party bid in an attempt to be higher or better than the Stalking Horse Bid.  That offer had two major contingencies outside of the bidder's and Debtors' control: first, it required financing from the Mortgage Lender; second, it required the City's approval for entry of each of the Debtors' 93 properties into the Article XI Tax Incentive program.  The CROs carefully evaluated the uncertainty, risks, and additional costs associated with the bid.  However, the Mortgage Lender's unwillingness to finance the proposal was fatal to the bid.  In addition, the timing for and ultimate approval for any Article XI incentives was uncertain.  Moreover, the bidder's formal documentation would likely require substantial revisions and negotiations to be acceptable to the Debtors.  In light of the fact that the Debtors only had authorization to use cash collateral through February 17, 2026 under the Cash Collateral Order, the Debtors determined that Summit's Bid remained the highest and best and, indeed the only viable offer the Debtors received.

15.     Mr. Barse and I recommended selecting Summit's Bid as the Successful Bid because it represented the only viable and actionable offer from a credible purchaser: one

capable of closing an efficient and timely sale transaction for the Debtors' Assets at a price the Debtors considered fair and reasonable. Our review of the bid made at the Auction considered key contingencies, namely: (i) reliance on financing from the Mortgage Lender that was not available and (ii) dependence on the Article XI Tax Incentive, a process which would require six to nine months for approval and was by no means guaranteed, with denial rendering the bid unactionable. We also took into account the difference in purchase price between the two bids, factoring in both the Stalking Horse Termination Fee and the ongoing costs of operating in chapter 11 while awaiting potential approval of the Article XI Tax Incentive. Ultimately, after weighing all these factors, the Debtors concluded that, due to its significant contingencies, the bid made at the Auction was neither higher nor better than Summit's Bid, which remained the only actionable bid.

16.     Accordingly, the Mr. Barse and I determined, in the exercise of our sound business judgement, that the best opportunity to consummate a value-maximizing transaction was to proceed with the Sale to Summit pursuant to the Purchase Agreement and the Plan.

17.     The Debtors, the Mortgage Lender, and Summit engaged in extensive good faith negotiations that ultimately culminated in the execution of the Purchase Agreement, and the agreement on terms of the Plan pursuant to which the Sale will be consummated. Mr. Barse and I were heavily involved in these negotiations, which included many hours of review and due diligence conducted by sophisticated counsel and professionals. The Plan was proposed in good faith and is the product of arms' length negotiations.

18.     <u>Bankruptcy Code Section 1129(a)(5)</u>. I understand that section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a successor to a debtor under the plan and that such appointment be consistent with the interests of creditors and equity security

holders and with public policy.  In addition, I understand that to the extent there are any insiders

that will be retained or employed by the Post-Emergence Entities, section 1129(a)(5)(B) requires

that the plan proponent disclose the identity and nature of any compensation of any such insiders.

On January 5, 2026, the Debtors filed the Plan Administrator Agreement [ECF No. 925] as a Plan

Supplement document.  The identity of the Plan Administrator, to be agreed to by the Debtors and

the Mortgage Lender, will be filed prior to the Effective Date, along with a curriculum vitae.

19.    Bankruptcy Code Section 1129(a)(7).  I understand that the Bankruptcy

Code requires that, with respect to each impaired Class of Claims and Interests, each holder of a

claim or equity interest must either (i) accept the Plan or (ii) receive or retain under the Plan

property having a present value, as of the Effective Date of the Plan, that is not less than the amount

such holder would receive or retain if the Debtors were liquidated under chapter 7 of the

Bankruptcy Code.  I have reviewed the Liquidation Analysis in Section of VII.C.1 of the

Disclosure Statement, which is incorporated herein by reference.  The Liquidation Analysis

demonstrates the best interests test is satisfied because all holders of impaired Claims and Interests

will receive property with a value not less than the value such holders would receive in a

liquidation under chapter 7 of the Bankruptcy Code.  Specifically, although holders of Claims and

Interests in the Deemed to Reject Classes will not receive a distribution under the Plan, their

treatment is not less favorable than what they would receive in a chapter 7 liquidation because they

would receive no value in a chapter 7 liquidation.  Moreover, the Plan likely provides the Secured

Mortgage Lender with a higher, more timely recovery than would be available in chapter 7 because

of the fees and expenses that would be incurred in a chapter 7 liquidation and the significant

transfer and mortgage recordation tax that the sale would otherwise be exempt from under chapter

11 pursuant to section 1146 of the Bankruptcy Code.  Accordingly, the Liquidation Analysis shows

that holders of Claims or Interests will receive or retain under the Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

20.    <u>Bankruptcy Code Section 1129(a)(11)</u>.    I understand that section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as a condition precedent to confirmation.   The Plan is premised upon the closing of the Sale Transaction.   The proceeds of the Sale Transaction will be used to make distributions to holders of Allowed Claims and Interests as provided in the Plan.

21.    In selecting the Successful Bid, the Debtors, in consultation with their advisors, evaluated Summit's ability to close the Sale Transaction and determined that Summit was capable of and willing to do so.   Moreover, Summit had already furnished a $45.1 million good faith deposit pursuant to the Purchase Agreement.

22.    To consummate the Sale Transaction, the Debtors will sell the Assets to Summit in accordance with the Purchase Agreement in exchange for Purchase Price.   Upon consummation of the Sale Transaction, the Sale Transaction proceeds will be used to, among other things, make distributions to holders of Allowed Claims as provided in the Plan.

23.    In connection with the development of the Plan, the Debtors, with the assistance of the their professional advisors, thoroughly analyzed their ability to fulfill their obligations thereunder.   As part of this analysis, the Debtors considered the estimated costs of administering and consummating the Plan, including the costs for the Plan Administrator to liquidate the Debtors' remaining assets and the Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date.   Based on this analysis, the Debtors concluded that the $451.3 million in proceeds from the closing of the Sale Transaction will provide more than sufficient funds to fulfill their obligations under the Plan.

**Plan Objections**

24.     I understand certain objections to Plan confirmation have asserted a potential connection between Summit and the Debtors, specifically a potential relationship between Jonathan Wiener and Summit.  Upon information and belief, and upon due inquiry, it is my understanding that Jonathan Wiener does not hold any equity interest in any of the Debtors, does not hold or own any assets jointly with any of the Debtors, and does not manage any of the Debtors or their properties.

25.     Based on the foregoing, the Plan embodies a rational plan for the Sale Transaction and the delivery of distributions following the Effective Date through the allocation of the proceeds of the Sale Transaction in accordance with the Plan.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.


Dated: January 13, 2026
         New York, New York




By:  */s/Ephraim Diamond*
Name: Ephraim Diamond
Title:   Chief Restructuring Officer to the Debtors