WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Garrett A. Fail
Matthew P. Goren
Philip L. DiDonato

*Attorneys for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                              :
**In re**                                     :       **Chapter 11**
                                              :
**BROADWAY REALTY I CO., LLC, *et al.*,**     :       **Case No. 25-11050 (DSJ)**
                                              :
                 **Debtors.**[1]              :       **(Jointly Administered)**
                                              :
---------------------------------------------------------------X

### DECLARATION OF DANIEL PARKER IN SUPPORT OF CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN

I, Daniel Parker, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.     I am a Managing Director at Eastdil Secured L.L.C. ("**Eastdil**"). Eastdil is a premier independent real estate investment bank with expertise in commercial real estate. Founded in 1967, Eastdil has been a leader in the real estate space for nearly sixty years, building its expertise into a knowledgeable and recognized franchise in commercial real estate and investment banking. I am over the age of 18 and competent to testify.

---

[1]    The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/broadwayrealty. The Debtors' mailing address is located at 2 Grand Central Tower, 140 East 45th St., 12th Floor, New York, NY 10017.

2.      I have approximately twenty-years of experience in the New York City multifamily real estate market, including a professional focus on the rent-stabilized housing market.  I began working in the rent-stabilized housing market in 2006, after completing a year with the New York City Teaching Fellows program, where I taught a second-grade English-as-a-Second -Language class at P.S. 005 in the Inwood neighborhood of Manhattan.  I utilized my Spanish-language skills, developed through my two-years as a service missionary for the Church of Jesus Christ of Latter-Day Saints in Mexico City, Mexico, in my first role in the rent-stabilized housing market, particularly in Washington Heights and the Bronx.  I familiarized myself with the business of owning, operating, and investing in urban housing, with a focus on the rent-stabilized market, before joining Eastdil in 2022.

3.      Eastdil's property sales team focuses on the sale of all major types of property in substantially every major real estate market across the county.  Specializing in multifamily, office, retail, land, industrial and hospitality product types, Eastdil provides access to a broad range of investors, high-level knowledge of the market and industry, and prudent advice to achieve efficient execution.  Eastdil has completed over $600 billion in property sale transactions since 2009.  These transactions cover a broad range of real estate assets.  Eastdil has specific expertise in the marketing of New York City rent-stabilized portfolios.

4.      Eastdil was engaged as the exclusive real estate advisor to Broadway Realty I Co., LLC and its debtor affiliates (collectively, the "**Debtors**.") by letter agreement dated August 15, 2025.  Our retention was approved by the Bankruptcy Court by order dated October 1, 2025 [ECF No. 572].  I am knowledgeable and familiar with the Debtors' businesses and the marketing process to sell or refinance the Debtors' portfolio of Assets (the "**Marketing Process**").

5.     I submit this declaration (the "**Declaration**") in support of the Debtors' request for entry of an order confirming the *First Amended Joint Chapter 11 Plan*, dated December 1, 2025 [ECF No. 780] (as may be amended, supplemented, or modified from time to time and together with all exhibits and schedules thereto, the "**Plan**"), pursuant to which the Debtors seek to implement a sale of their portfolio of real estate properties (together, the "**Assets**" and such sale, the "**Sale Transaction**")[2] to Summit Gold, Inc. ("**Summit**, as the "**Successful Bidder**") pursuant to the Purchase and Sale Agreement by and between the Debtor and Summit dated December 22, 2025 (the "**Purchase Agreement**" or the "**Stalking Horse Agreement**").  I was personally involved in the Marketing Process and negotiations regarding the Sale Transaction.

6.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, information provided to me by the Debtors' professional advisors, and my experience, knowledge, and information concerning the Debtors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## The Marketing Process

7.     The marketing of the Assets began in earnest soon after the Petition Date, on May 27, 2025, when the greater New York City real estate industry learned the Debtors' were soliciting a buyer for, an investment in, or a refinancing of their portfolio of residential properties, via the public chapter 11 filing and the *Declaration of Ephraim Diamond Pursuant to Local Bankruptcy Rule 1007-2 in Support of Debtors' Chapter 11 Petitions and First Day Relief* [ECF No. 10].  Even before that, though, the market was generally aware the portfolio was subject to foreclosure proceedings in New York State courts.

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to those terms in the Plan.

8.      Beginning in July 2025, Eastdil started preparing materials and strategies to maximize the value of any sale.  In August 2025, Eastdil was formally engaged by the Debtors as their exclusive real estate advisor to conduct the robust, value-maximizing Marketing Process. Although Eastdil's retention was not approved by the Bankruptcy Court until October 1, 2025, as part of the negotiations regarding cash collateral between the Debtors and the Mortgage Lender, the Debtors and the Mortgage Lender agreed to have Eastdil begin immediately preparing for the forthcoming Marketing Process.

9.      The Marketing Process, developed by the Debtors, in consultation with the Mortgage Lender, was conducted in accordance and within the constraints of the case milestones approved by the Bankruptcy Court orders as part of the cash collateral agreement between the Debtors and the Mortgage Lender (collectively, the "**Milestones**").  The Milestones included: (i) distribution of an offering memorandum and population of a virtual data room within one (1) business day after entry of the final cash collateral order [ECF No. 571] (the "**Final Cash Collateral Order**"; (ii) receipt of non-binding indications of interest (each an "**IOI**") by November 21, 2025; (iii) receipt of binding bids by December 12, 2025 (the "**Bid Deadline**"); (iv) selection of a Stalking Horse Bidder and finalizing an asset purchase agreement by December 16, 2025 (the "**Stalking Horse Selection Deadline**"); and (v) conducting an auction for the Assets by January 8, 2026.

10.      Eastdil was directly involved in the negotiation of the Bidding Procedures and provided specific expertise to the Debtors on the anticipated impact of the Milestones in fostering a competitive and value-maximizing process.  I personally was involved in the negotiations in which the Debtors sought a competitive and value-maximizing process for all interested parties.

11.     On or about September 16, 2025, Eastdil distributed "teaser" materials to more than 14,000 potential purchasers.  The materials contained information regarding the Assets, disclosing property level information regarding the Assets and the rent-stabilized portfolio.  Over the following weeks and months, Eastdil sent out a total of six (6) "email blasts," totaling over approximately 100,000 emails, to potential market participants regarding the Debtors' ongoing efforts to sell some or all of the Assets.  Eastdil also worked with outside commercial brokerage firms.

12.     The parties that received the communications included a mix of investors, developers, debt funds, non-profits, religious groups, lenders, family offices, syndicators, institutional funds, high net worth individuals and distressed asset investors both locally and nationally.  As a result of Eastdil's extensive outreach, Eastdil spoke directly with approximately 165 parties who sought additional information about the assets.

13.     The Debtors executed 144 confidentiality agreements with potential purchasers.  Eastdil granted each of those parties access to a virtual data room (the "**Data Room**") with a substantial volume of information relating to the Assets, including an offering memorandum, insurance policy loss runs, commercial leases, arrears reports, payroll information, tax information, and anonymized rent rolls.   The response to Eastdil's initial outreach was very strong and reflected the unique opportunity offered by the Debtors to own some or all of their extensive New York City real estate portfolio.

14.     Beginning in October 2025, Eastdil conducted 19 tours of the Debtors' properties.  The majority of those Potential Bidders expressed an interest in purchasing the entire portfolio of Assets.

15.     The Successful Bidder toured the Debtors' properties with Eastdil on October 29, 2025, October 31, 2025, and November 3, 2025.

16.     Consistent with the Milestones set forth in the Final Cash Collateral and Bidding Procedures Order, Eastdil encouraged Potential Bidders to submit IOIs by November 21, 2025 (the "**IOI Deadline**").  By the IOI Deadline, the Debtors had received fourteen (14) IOIs. Submission of an IOI was not a prerequisite to later being designated as a "Qualified Bidder" (as defined in the Bidding Procedures).

17.     The Bidding Procedures set forth several requirements for a bid to constitute a Qualified Bid, which were designed to ensure Qualified Bidders were capable of consummating a transaction and would not chill bidding.  Those requirements included, among other things, (i) proof of financial ability to perform; and (ii) assumption of all tenant leases.

18.     By the December 12, 2025 Bid Deadline established under the Bidding Procedures Order, the Debtors received four (4) bids for the entire portfolio of Assets.  The Debtors and the Mortgage Lender reviewed the bids before the Debtors designated each as a Qualified Bid. The Debtors also received two (2) bids for individual Assets, which were also designated as Qualified Bids.

19.     Eastdil, the Debtors, and the Debtors' other advisors engaged in extensive negotiations with several Potential Bidders on the terms of an asset purchase agreement for a potential Stalking Horse Bid.  Throughout the negotiation process, Eastdil encouraged Bidders to increase the proposed purchase price associated with their Bids.

20.     The Debtors and their advisors, along with the Mortgage Lender and its advisors, evaluated the Bids submitted in accordance with the Bidding Procedures, and considered several non-exclusive factors to compare the multiple Qualified Bids, including, among other

things: (i) the Purchase Price set forth in the applicable Bid; (ii) the amount and nature of the consideration, including any obligations to be assumed; (iii) the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates, taking into account any Stalking Horse Bidder's right to any Termination Payment; (iv) the likelihood of the Qualified Bidder being able to close the proposed Transaction (including (a) assessment of financing commitment letters, (b) any required regulatory or other approvals, or (c) any contingencies to closing) and the timing thereof; and (v) the net benefit to the Debtors' estates. The Debtors and their advisors negotiated terms and price with the Qualified Bidders, in an effort to maximize value for the benefit of the estates and all interested parties.

21.     The Debtors, upon the joint recommendation of the Chief Restructuring Officers, and with the consent of the Mortgage Lender, extended the Stalking Horse Selection Deadline from December 16, 2025 to December 22, 2025 to allow for further engagement and negotiation with Qualified Bidders.

22.     On December 22, 2025, upon the joint recommendation of the CROs and with the Mortgage Lender's consent, the Debtors designated Summit as the Stalking Horse Bidder for the entire portfolio of Assets with a purchase price of $451,300,000. The complete terms of Summit's Stalking Horse Bid are set forth in the Purchase Agreement.

23.     In the period between the designation of the Stalking Horse Bid and the Auction (as defined below), Eastdil continued to engage with each of the Qualified Bidders and also solicited parties that had not submitted Bids by the Bid Deadline in an effort to enhance deal terms and ensure broad participation in the process. One new party came forward with a new bid for a portion of the portfolio of Assets and became a new Qualified Bidder during this time.

24.    Throughout the Marketing Process, the Debtors did not receive any engagement from the City of New York indicating interest in purchasing the Assets or otherwise formulating a proposal for a transaction with the Debtors.

## The Auction

25.    On January 8, 2026, the Debtors conducted an auction (the "**Auction**") for the sale of the Assets, which I attended and participated in.  Before commencing the Auction on the record, the Debtors and their advisors, in consultation with the Mortgage Lender, consulted with each participating Qualified Bidders in an effort to obtain the highest or otherwise best bids for the Assets and maximize value for the benefit of all stakeholders.  The CROs, the Mortgage Lender, and the Debtors' advisors were actively involved in those Bidder consultations throughout the day.

26.    The Auction commenced on the record with the Debtors announcing that the Stalking Horse Bid was the Initial Highest bid for the Assets on the terms set forth in the Stalking Horse Agreement previously filed with the Court.  The Debtors then requested the other Qualified Bidders to submit a topping bid, if they desired to do so.

27.    Only one party submitted a bid on the record at the Auction in an attempt to be higher or better than the Stalking Horse Bid.  That offer had two major contingencies outside of the bidder's and Debtors' control: first it required financing from the Mortgage Lender; second, it required the City's approval for entry of each of the Debtors' 93 properties into the Article XI regulatory program.  The CROs carefully evaluated the uncertainty, risks, and additional costs associated with the bid.  However, the Mortgage Lender's unwillingness to finance the proposal was determined to be fatal to the bid. In addition, the timing for and ultimate approval for any Article XI incentives was uncertain.  Furthermore, the formal documentation would require

substantial revisions and negotiation to be acceptable to the Debtors.  In light of the fact that the Debtors only had authorization to use cash collateral through February 17, 2026, under the Cash Collateral Order, the Debtors determined Summit's Bid remained the highest and best and, indeed the only viable offer the Debtors received.  Accordingly, upon the joint recommendation of the CROs and with the consent of the Mortgage Lender, Summit's Bid was designated as the Successful Bid.

28.    From my personal vantage point, the Auction was non-collusive and was conducted in good faith and at arm's length.

**Proposed Sale Transaction**

29.    The Debtors together with their advisors determined that the Successful Bid best maximizes value of the estates for the Debtors and all parties in interest.  Among other things, the Debtors considered many of the same factors noted in the Bidding Procedures and in that I listed above in paragraph 20 above when selecting the Successful Bid.

30.    Pursuant to the Purchase Agreement, the Successful Bidder will purchase the entire portfolio of Assets for a purchase price equal to $451,300,000 (subject to purchase price adjustments).[3]  The Purchase Agreement also provides that all existing tenant leases and security deposits will be transferred to Summit subject to all existing regulations, at the Sale Closing.  All tenants' rights with respect to their leases are preserved following the Sale Closing.  Summit has agreed to purchase the Assets subject to notes or notices of violations of law, all municipal

---

[3]    The Purchase Agreement provides that if the Mortgage Lender did not commit to finance the Purchase Price on the principal terms set forth therein by December 26, 2025, the Purchase Price would be decreased to $420,070,000.  The Mortgage Lender committed to provide financing by December 26, 2025 and so the Purchase Price adjustment was not triggered.

ordinances, orders, designations, or other requirements noted in or issued by any federal, state, municipal, or other government authority having jurisdiction over the Assets.

31.    The Purchase Agreement was negotiated in good faith and at arms' length. I am not aware of any fraud or misconduct by the Debtors, the Buyer, the Mortgage Lender, or any Qualified Bidder during the Marketing Process or the Auction.

32.    Based on my experience, the Debtors adequately marketed the Assets and conducted the Marketing Process in compliance with the Bidding Procedures Order in good faith and in a fair and open manner.  In addition, the Successful Bid resulting from the Auction constitutes the best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any of the other available alternatives.

33.    Because the Marketing Process was run for several months, I do not believe that more time would result in yet-undiscovered interested parties coming forward and submitting a bid for the Assets nor do I believe a higher or otherwise better bid will materialize.

34.    Accordingly, due to the reasons listed above, I believe the Debtors' determination to sell the Assets to Summit, as the Successful Bidder, as provided for in the Bidding Procedures and under the Plan is a valid and sound exercise of the Debtors' business judgment.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 13, 2026
      New York, New York

By:     /s/ Daniel Parker
Name:  Daniel Parker
Title:   Managing Director, Eastdil Secured LLC