UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| BROADWAY REALTY I CO., LLC, *et al.*, | Case No. 25-11050 (DSJ) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF ZOHAR LEVY ON BEHALF OF SUMMIT GOLD INC.
IN SUPPORT OF (I) PURCHASER'S SELECTION AS SUCCESSFUL BIDDER AT
AUCTION, AND (II) ENTRY OF AN ORDER CONFIRMING THE DEBTORS' FIRST
AMENDED JOINT CHAPTER 11 PLAN AND GRANTING RELATED RELIEF**

I, Zohar Levy, declare under penalty of perjury:

1.          I submit this declaration (the "Declaration") on behalf of Summit Gold Inc.,

(the "Purchaser"), in my capacity as its authorized representative, in support of the Purchaser's

selection as the Successful Bidder[2] to acquire ninety-three (93) properties comprising 5,151

multifamily residential units across New York City (the "Purchased Assets") from

Broadway Realty I Co., LLC and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors"), pursuant to that certain *Purchase and Sale Agreement*, dated as of

December 22, 2025 (the "PSA").   More specifically, I submit this Declaration in support of (i) the

Purchaser being selected as the Successful Bidder at the Auction, and (ii) entry of an order

confirming the Debtors' *First Amended Joint Chapter 11 Plan*, dated December 1, 2025 [ECF No.

---

[1]   The last four digits of Broadway Realty I Co., LLC's tax identification number are 5426.  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/BroadwayRealty/.  The Debtors' mailing addresses are located at 2 Grand Central Tower, 140 East 45th St., 12th Floor, New York, New York 10017.

[2]   Capitalized terms used herein shall have the meaning ascribed to them in the *Order (I) Approving Bidding Procedures, (II) Authorizing Debtors to Offer Stalking Horse Bid Protections, (III) Approving Assumption and Assignment Procedures, and (IV) Granting Related Relief* [ECF No. 571] (the "Sale Procedures Order"), entered by the Court on October 1, 2025.

780], and to provide evidentiary support for a finding by the Court that (a) the Purchaser acted in good faith and at arm's length within the meaning of section 363(m) of title 11 of the United States Code (the "Bankruptcy Code") in connection with the negotiation and execution of the PSA and the sale transaction contemplated thereby, (b) the Purchaser is not an insider of the Debtors, (c) the Purchaser has not engaged in any collusion with the Debtors, any of the Debtors' insiders, or any other actual or potential bidders in connection with the chapter 11 process, and (d) the Purchaser has sufficient financial resources and liquidity to fund required capital expenditures and adequately perform under any assumed and assigned executory contracts through a combination of operating cash flow, reserves, and additional capital.

2.       I have been primarily responsible for the Purchaser's evaluation of, and participation in, the proposed acquisition of the Purchased Assets and, in that capacity, have been actively involved in the negotiation of the PSA and related transaction documents with the Debtors. Unless otherwise stated, all facts and statements contained in this Declaration are based upon my own personal knowledge and first-hand experience, as well as my review of relevant documents and information provided to me or verified by employees, representatives, or advisors of the Debtors or the Purchaser in the ordinary course of evaluating and consummating the transaction.

3.       I am over the age of 18 and authorized to submit this Declaration on behalf of the Purchaser.  If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4.       I am the Chief Executive Officer (CEO) of Summit Properties Ltd. ("Summit"), an international professional real estate group with holdings in the United States and Germany.  I have been involved in the evaluation and acquisition of income producing real estate properties for over 20 years.  In my role, I am responsible for the operation and acquisitions of various Summit

properties including those located in the United States.

5.       I have more than 30 years of experience in real estate as the founder and controlling shareholder of Summit.  Since the incorporation of Summit in 2006, Summit has significantly expanded its operation through public listings in the UK, acquisitions of income producing properties, lease renegotiations, property renovations, and debt restructurings.  Prior to founding the Summit group, I served as Chief Financial Officer of the Engel Group, where I developed its income producing property activities.  I hold a Bachelor of Arts (B.A.) degree in Economics and Accounting from the University of Haifa, Israel, graduating with High Honors in 1992.  I have been a Certified Public Accountant (CPA) since 1993.

6.       Summit wholly owns the Purchaser, a leading real estate investment, development, and management firm that owns many properties in the United States including dozens of properties in New York City.  Summit is deeply committed to New York and is acutely attuned to the critical need for the preservation of affordable housing and its importance to the success of New York City.  Summit is committed to long-term investment in housing and to maintaining the quality and affordability of apartments in the Purchased Assets.  Summit's goal is to invest in these buildings while preserving affordable, long-term housing for New Yorkers.

**I.       The Purchase and Sale Agreement.**

7.       The aggregate purchase price that the Purchaser will pay to the Debtors under the PSA for the Purchased Assets is $451,300,000 (the "Purchase Price").  In calculating the Purchase Price, the Purchaser has considered the following factors:

- •       the capital needs of the Purchased Assets;

- •       the reduced debt that would be supported by in-place income; and

- •       adequate reserves for operational stability, and compliance with maintaining the

Purchased Assets and existing regulatory frameworks.
The Purchaser's approach is designed to avoid over-leveraging the Purchased Assets and ensures the availability of resources required to properly operate and maintain the buildings. Consistent with the Sale Procedures Order, the Purchaser will assume all existing tenant leases subject to all applicable regulations.

8.      The Purchaser's bid was negotiated at arm's length between the Purchaser and the Debtors and their respective representatives. From the outset, I understood the PSA would be subject to competitive bidding in accordance with bid procedures approved by the Court, and that the Purchaser could be outbid through that process.

9.      The Purchaser was determined to be the Successful Bidder after a rigorous marketing process run by the Debtors' professionals and after the auction held on January 8, 2026, at the offices of the Debtors' legal advisors. I understood that, subject to the bidding procedures, the Debtors were at all times during the marketing and auction process free to deal with any other party interested in acquiring the assets subject to the PSA. I therefore believe that the Purchase Price represents the fair market value for the Purchased Assets.

**II.      Good Faith; No Insider Relationship; No Collusion.**

10.     I have been actively involved in the negotiations leading up to the proposed sale transaction. All negotiations with the Debtors and the Debtors' real estate broker as to the sale process, sale, and sale price were vigorous, extensive, and conducted at arms-length and in good faith. The respective parties were represented by separate legal counsel, and the negotiations were not tainted by fraud, collusive bidding, or other misconduct. Throughout the diligence, negotiation, and auction process, the Purchaser has fully complied with the Sale Procedures Order.

11.     Neither I nor any authorized representative of the Purchaser initiated, directed, or

controlled the Debtors' decision to commence the Chapter 11 Cases or the structure of the proposed sale process.  Rather, the Purchaser participated in the process solely in its capacity as a prospective third-party purchaser and was selected as the Successful Bidder in a market-tested auction designed to maximize value for the Debtors' estate and its stakeholders.

12.    The Purchaser is not, and has not been, an insider of the Debtors within the meaning of the Bankruptcy Code.  The Purchaser has no prior or existing relationship with the Debtors, its equity holders, officers, directors, or the current property manager, and neither has it exercised control over the Debtors' operations, governance, or decision-making at any time, including in connection with the Chapter 11 Cases.

13.    As described below, prior to this transaction, Purchaser has made certain investments in New York City real estate.  In all of those investments, Purchaser was a limited partner and/or a non-managing member.  Those investments were run and managed by Chestnut Holdings of New York, Inc. ("Chestnut"), a real estate investment and management firm which is owned by Jonathan Wiener, the brother of the Debtor's controlling shareholder.  In its capacity as the manager or general partner of those investments, Chestnut retained Denali Management Inc. ("Denali"), a firm also owned by Jonathan Wiener.  Denali manages less than 14% of the existing properties held by Summit (the "Denali Properties").  Neither Jonathan Wiener nor Denali was involved in the Purchaser's bid for the Purchased Assets, and neither will have any involvement in the Purchaser's acquisition or management of the Purchased Assets.  The Denali Properties have been actively managed by a managing member, who has overseen operations and dealings with Denali.  The Purchaser, as a non-managing member, became aware of maintenance issues and is now working with the manager and expects the management team to resolve them promptly.

14.    With respect to the Purchased Assets (unlike the Denali Properties), the Purchaser

will have full control over the management of these investments and the retention of new property managers. Purchaser will therefore have complete visibility into the performance of the new property managers and the condition of the Purchased Assets. The Purchaser is in the process of retaining new property management firms to manage the Purchased Assets which will have no connection to Denali, Chestnut, or any affiliate of Denali or Chestnut.

15.     The Purchaser has not entered into any agreement, arrangement, or understanding—written or oral—with the Debtors or any other party that has not been fully disclosed in the PSA. The Purchaser has not engaged in any collusion with the Debtors, any of the Debtors' insiders, or any other actual or potential bidders in connection with the sale of the Purchased Assets, the bidding procedures, or the chapter 11 process.

16.     Accordingly, I understand that the Purchaser qualifies as a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

### III.     Ability to Close.

17.     Although the PSA provides that the sale transaction is not subject to any financing contingency, the Purchaser has secured a commitment from Flagstar Bank, N.A. ("Flagstar"), the buildings' long-term lender, to provide up to $338.5 million of financing to enable the Purchaser to close on the purchase of the Purchased Assets. The Purchaser has already deposited 10% of the Purchase Price (*i.e.*, approximately $45.1 million) with the Debtor's escrow agent, the Purchaser has sufficient cash and financial resources available to pay the remaining amount of the Purchase Price and consummate the transaction contemplated by the PSA in accordance with its terms and within the timeframes set forth therein.

18.     The Purchaser has satisfied, or is prepared to timely satisfy, all deposit and funding obligations required under the PSA and the Sale Procedures Order and fully intends to consummate

the sale if approved by the Court.  The Purchaser's ability to close the transaction is not dependent on any third-party approvals or conditions other than those expressly set forth in the PSA and the orders of this Court.

### V.     Adequate Assurance of Future Performance.

19.     As part of the Summit group, the Purchaser is well-capitalized, has received a sufficient financing commitment from Flagstar, and has sufficient liquidity to deploy capital as needed to rehabilitate and maintain building systems, address life-safety issues, and improve overall housing conditions, while preserving affordability.  The Purchaser's investment has undergone a rigorous underwriting process that aligns the Purchase Price, the reduced debt obligations, and ongoing repair and maintenance costs to support sustainable operations over the long term.  The Purchaser has a long-term vision for its investment and has developed a long-term capital expenditure plan totaling $30 million over the next five years (the "Long-Term Capital Plan") to resolve the existing violations, repair and enhance existing building conditions, support ongoing compliance requirements, and invest in long-term maintenance, with the goal of improving the buildings and responsiveness to residents and implementing a stable, preventive maintenance model.

20.     Through the chapter 11 process, the Purchased Assets are expected to reduce their mortgage debt by over $275 million—representing 45% of the existing debt—while also lowering their interest rate and monthly payments.  This reduced debt will unlock additional cash flow unavailable to the Debtors that can and will be used for capital expenditures and preventative maintenance.  The Purchased Assets will be significantly better positioned to fund and enhance operations, support planned capital investments, and satisfy the reduced debt obligations at lower costs.

21.     Additionally, the Purchaser will provide direct asset management oversight, capital planning, and financial controls to ensure accountability and performance.  The Purchaser will retain new and experienced residential management firms to be responsible for day-to-day property operations.  Those firms will have significant experience in New York rent-stabilized housing and operate under the Purchaser's direct asset management oversight.  With new management firms, the Purchased Assets will be divided as follows:

- •    one management company will manage the Brooklyn portfolio, consisting of 53 buildings (2,358 units) with 4,202 the New York City Department of Housing Preservation and Development ("HPD") violations in 252 units.

- •    a second management company will manage 39 buildings (2,793 units) with 2,276 HPD violations in 168 units.

This structure is designed to ensure focused execution, regulatory compliance, and responsive resident services, with particular emphasis on the Brooklyn buildings, which account for the majority of violations in the portfolio.

22.     Lastly, as part of its diligence, the Purchaser has reviewed the information relating to violations published by HPD and personally visited each of the properties comprising the Purchased Assets.  Based on the Purchaser's review of the HPD information, only 420 units out of more than 5,000 units have violations.  In addition, the Property Condition Reports for the properties indicate that the Purchased Assets require approximately $10 million to address and resolve all existing violations and the capital expenditures backlog during the first year.

23.     The Purchaser has also developed an immediate action plan annexed hereto as Schedule 1 (the "Immediate Action Plan") that prioritizes immediate violations to be resolved and repaired as follows:

- •    Within 60 days from the closing date: the Purchaser intends to cure approximately 50% of total violations, focusing on Class C violations, common areas, pest remediation, and readily accessible items.

- Within 180 days (subject to obtaining reasonable access) from the closing date: the Purchaser intends to cure the remaining 50% of violations, including more complex in-unit repairs and access-dependent items.

All cured violations will be promptly documented and submitted to New York City Department of Housing Preservation and Development for dismissal.

24.     In addition, both the Immediate Action Plan and the Long-Term Capital Plan provide for ongoing maintenance and address other existing violations on both a short- and long-term basis.  For example, a total of 978 violations is designated as "NO ACCESS," representing approximately 15% of total violations.  These violations require coordinated tenant engagement and structured access efforts, which may require involvement and coordination with New York City.  The Purchaser is prepared to work with New York City to gain access to each affected property in order to perform the necessary repairs.  The Purchaser's plans will improve building conditions for residents, provide responsive service, and maintain high occupancy.

25.     Any delay in the entry of the Approval Order (as defined in the PSA) will delay the closing of the transactions and prevent Summit from resolving problems that tenants face daily.

26.     As noted above, while the reduced debt level, combined with lower interest, will provide substantial—and, in the Purchaser's view, sufficient—cash flow to fully implement both the Immediate Action Plan and the Long-Term Capital Plan, the Purchaser is nevertheless prepared to fund any shortfalls, if required, through additional bridge financing or equity infusions to ensure the Purchased Assets remain in compliance with City regulations.  Accordingly, I believe the Purchaser has sufficient resources and capital available to honor and perform all obligations under the existing resident leases and comply with all regulatory obligations related to the Purchased Assets.

27.     Based on the foregoing, I believe the Purchaser has established adequate assurance

of its future performance in connection with the transactions contemplated by the PSA.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: January 13, 2026

_/s/ Zohar Levy_____
Zohar Levy

## SCHEDULE 1

**IMMEDIATE ACTION PLAN**

**Remediation Plan**

**of**

**Summit Gold Inc.**

Summit Gold Inc. (the "Company") proposes to implement an immediate, structured management transition and violation remediation plan designed to stabilize the portfolio, cure existing New York City Department of Housing Preservation and Development (HPD) violations, and improve living conditions for residents.

## 1. Management Structure.

The portfolio will be divided between two independent, experienced third-party property management companies to ensure sufficient operational capacity and focused oversight:

- One company will manage the Brooklyn portfolio, consisting of 53 buildings with 2,358 units with 4,202 HPD violations across 252 units ("Portfolio I");

- A second company will manage 39 buildings with 2,793 units with 2,276 HPD violations across 168 units ("Portfolio II").

This structure concentrates enhanced resources on the Brooklyn assets, which account for the majority of current violations, while maintaining strong, accountable coverage across the remainder of the properties. *See* Exhibits 1 and 2 for additional detail on the distribution of buildings, units, and violations by management company.

## 2. Violations Remediation Implementation.

The Company will prioritize:

- Class C (immediately hazardous) violations, including heat/hot water, lead, vermin, and life-safety issues; and

- Clear easily addressable violations, easy to clear/common areas/cooperative tenants

Key early actions include:

- Immediate engagement of licensed pest control contractors across all properties. Pest-related (vermin) violations represent approximately 13–14% of total violations portfolio-wide and approximately 44% of Class C violations. Systematic treatment of these conditions is expected to result in a material and early reduction in the total violation count.

- Paint and plaster violations, which represent approximately 20% of total violations, will be addressed through dedicated building staff budgets. These non-structural items can be cured efficiently once access is obtained and are expected to materially reduce the overall

1

violation count in the early phases of remediation. In addition, approximately 12% of Class C violations relate to window guards and doors, which can be cured promptly.

- Lead-based paint violations require a more detailed and careful approach. These violations affect 83 units and account for approximately 20% of Class C violations. Licensed lead specialists will conduct in-unit assessments to determine remediation needs. Where needed, the Company will identify temporary relocation alternatives for affected tenants. Assessment and planning for both remediation and relocation can commence immediately following court approval of the transaction, and prior to the Company assuming management of the properties, in coordination with applicable regulations and HPD requirements.

- Implementation of a top-down and bottom-up remediation program, addressing Class C violations as described above while simultaneously curing "easy addressable" violations that can be addressed quickly, thereby immediately improving residents' quality of life.

**3. Remediation Timeline.**

- Within 60 days of the closing date: the Company targets curing approximately 50% of total violations, with emphasis on Class C violations, common-area conditions, pest remediation, and other readily accessible items.

- Within 180 days (subject to obtaining reasonable access) of the closing date: the Company targets curing the remaining 50% of violations, including more complex in-unit repairs and access-dependent items.

All cured violations will be promptly documented and submitted to HPD for dismissal in accordance with HPD procedures.

**4. Access Constraints.**

A total of 978 violations, representing approximately 15% of total violations across the entire portfolio, are currently designated "No Access." These items will require coordinated tenant engagement and structured access protocols. The Company will deploy standardized notice and scheduling procedures, multilingual communications, and flexible appointment windows, and will engage, as needed, with tenant leaders and City stakeholders to facilitate lawful access and timely remediation.

## Exhibit 1 – Portfolio I Violation Analysis

| No. of buildings | 53 | | | Violations | Units |
|---|---|---|---|---|---|
| Total Resi Units | 2,358 | | Repairs | 887 | 161 |
| Units with violations | 252 | 10.7% | Paint/Plaster | 821 | 158 |
| Violation/Unit Ratio | 1.78 | | Vermin | 569 | 161 |
| Class C | 1,249 | | Lead | 202 | 48 |
| Class B | 2,222 | | Water Leaks | 240 | 103 |
| Class A | 719 | | Others | 1483 | 213 |
| Class I | 12 | | | | |
| Total | 4,202 | | | | |
| No Access | 575 | | | | |

### Violation Breakdown By Type



### Violation Breakdown by Class



## Exhibit 2  -  Portfolio II Violation Analysis

| | | | | | Vioations | Units |
|---|---|---|---|---|---|---|
| No. of buildings | 39 | | | | | |
| Total Resi Units | 2,793 | | Repairs | | 526 | 106 |
| Units with violations | 168 | 6.0% | Paint/Plaster | | 503 | 102 |
| Violation/Unit Ratio | 0.81 | | Vermin | | 275 | 81 |
| Class C | 679 | | Lead | | 147 | 35 |
| Class B | 1,278 | | Water Leaks | | 132 | 57 |
| Class A | 319 | | Others | | 693 | 131 |
| Class I | - | | | | | |
| Total | 2,276 | | | | | |
| No Access | 403 | | | | | |

### Violation Breakdown By Type



### Violation Breakdown by  Class

