**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>    Broadway Realty I Co., LLC, et al.,<br><br>                              Debtors. | Case No. 25-11050 (DSJ)<br><br>Chapter 11 (Jointly Administered) |

**BENCH DECISION[1] AND ORDER CONFIRMING THE SECOND AMENDED JOINT**
**CHAPTER 11 LIQUIDATION PLAN OF BROADWAY REALTY I CO., LLC AND ITS**
**DEBTOR AFFILIATES**

**APPEARANCES:**

**WEIL, GOTSHAL & MANGES LLP**

*Counsel for the Debtors*

767 Fifth Avenue

New York, New York 10153

By:    Garrett Fail, Esq.

        Matthew Geron, Esq.

        Jared Friedmann, Esq.

**PAUL HASTINGS LLP**

*Counsel for Flagstar Bank, N.A.*

200 Park Avenue

New York, New York 10166

By:    Nicholas Bassett, Esq.

        Brett Lawrence, Esq.

        Justin Rawlins, Esq.

---

[1] This bench decision is a modestly more polished version of a detailed oral ruling entered on the record on January 16, 2026.  This written decision provides additional legal citations but does not materially change the substance of the oral ruling. It is intended to make the Court's ruling more readily available than it would be in transcript form, to "clean up" the discussion at times, and to add additional legal citations that were not articulated during the Court's January 16 oral ruling. The Court has already entered a confirmation order in light of its ruling, and nothing in this Bench Decision alters the finality of that order.

**CHAPMAN AND CUTLER LLP**

*Counsel for Summit Gold, Inc.*

320 South Canal Street, 27th Floor

Chicago, Illinois 60606

By: Eric S. Silvestri, Esq.

    Michael Friedman, Esq.


**OFFICE OF THE UNITED STATES TRUSTEE**

*United States Trustee*

One Bowling Green

New York, New York 1004

By: Daniel Rudewicz, Esq.

    Paul K. Schwartzberg, Esq.


**NEW YORK CITY LAW DEPARTMENT**

*Counsel for City of New York*

100 Church Street

New York, New York 10007

By: Zachary B. Kass, Esq.

    Hugh H. Shull III, Esq.

    Steven Banks, Esq.


**MORRISON & FOERSTER LLP**

*Co-Counsel for the Brooklyn Tenants*

250 West 55th Street

New York, New York 10019

By: Raff Ferraioli, Esq.


**PATTERSON BELKNAP WEBB & TYLER LLP**

2

*Co-counsel for the Objecting Tenants*

1133 Avenue of the Americas

New York, New York 10036

By: David W. Dykhouse, Esq.

    Kimberly Black, Esq.


**WILK AUSLANDER LLP**

*Co-counsel for Union of Pinnacle Tenants*

825 8th Avenue

New York, New York 10019

By: Eric Snyder, Esq.


**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

<u>**INTRODUCTION**</u>

These jointly administered Chapter 11 proceedings involve more than 80 separate debtor entities (collectively, the "**Debtors**"), each organized as an LLC and operating under the common ownership of a corporate parent. With few, if any, exceptions, each debtor entity owns and operates a residential rental building in New York City, essentially all of them with leases governed by New York City's rent stabilization laws. Collectively, Debtors are responsible for more than 5000 units of affordable housing in New York City (the "**City**"). Each debtor entity was financed by a separate, freestanding, non-recourse mortgage or similar secured loan held by the same lender, Flagstar Bank, N.A., and many or all of these loans are in default. Before this case began, Flagstar had begun foreclosure and/or receivership proceedings against all or substantially all Debtors. In response, Debtors commenced this jointly administered case in May 2025.

Following an extensive Court-approved marketing and sale process and auction, the case is now before the Court on Debtors' request for confirmation of their proposed Plan of liquidation, an integral part of which is the proposed sale of all their properties to an entity that this decision refers to as Summit or the Purchaser. The Court conducted an all-day evidentiary hearing on January 15, at which it received five declarations in evidence, heard extensive live testimony from one declarant, and gave all objectors the opportunity to introduce any evidence they wished. No objector offered any independent evidence. The Court also heard extensive oral arguments. The Court recessed and then delivered its oral ruling on January 16.

In light of the case's possible impact on tenants and concerns about conditions at Debtors' properties, the case has drawn widespread public attention, concern from tenants, and the active involvement of City elected officials and agencies.

This case's controlling issues are discussed below. In brief, for reasons stated in this Bench Decision and in the associated confirmation order which has already been entered [ECF No. 981], Debtors' Plan is confirmed and their proposed sale is approved. This Bench Decision also memorializes the Court's denial of a further stay application on the record on January 16.

## **DISCUSSION**

This Bench Decision assumes familiarity with the case's procedural and general factual background, and describes pertinent background only as necessary to inform the decision's discussion. The Court's findings of fact are interspersed throughout this decision's review of applicable law and its conclusions of law, with additional findings and conclusions set forth in the Confirmation Order.

This bankruptcy case engendered intense advocacy about conditions at debtor-owned properties and about whether it was desirable for the Purchaser to be allowed to take title to Debtors' properties. At times this discussion verged on being disconnected from the requirements of the Bankruptcy Code, but residential conditions at Debtors' properties do implicate Bankruptcy Code issues, primarily relating to section 365 of the Bankruptcy Code. The Court attentively heard and considered all issues raised, and discusses them below. And the Court emphasizes to all concerned persons how seriously it has taken and considered all tenant and governmental expressions of concern both on a human level, and as a policy matter in a city where affordable housing is scarce.

First, however, the discussion must be put into context by a review of the case's history and the issues presented by Debtors' request for plan confirmation and sale approval.

As noted, Debtors filed their bankruptcy cases in May 2025, and since then the cases have involved sustained and thorough effort to achieve classic, recognized bankruptcy purposes. I would describe that as an attempt by an insolvent debtor or a debtor in serious financial distress to use an orderly process to identify and come to terms with its financial obligations in a manner that meets all applicable legal requirements, while also using bankruptcy processes to realize the greatest possible value for creditors and the bankruptcy estate as a whole.

This court frequently sees smaller-scale and simpler cases involving a situation like the one present here. It is common for real estate to be owned by LLC entities that exist for the purpose of owning and operating buildings and attempting to profit through rent or other building revenues. Those entities frequently are debt financed, and, if their revenues are insufficient to meet financing costs, a restructuring or a bankruptcy process may prove necessary.

When this happens there almost always follows either a negotiated restructuring of the debtor's debt obligations so that the debtor can viably continue to operate, or a sale of the property through the orderly process that bankruptcies provide. Parties often view a sale as a financially superior option that also allows for the coordinated resolution of all debts and obligations of the debtor. When that approach is followed, the debtor entity often liquidates and ceases to exist, with no legal discharge of its debt.

This case involves exactly this dynamic but with some important differences. First, rather than a single building, the Debtors are more than 80 separate corporations, each of which owns and operates one or a small number of properties, all under common corporate ownership. So, the scale of the enterprise is much larger, the dollar stakes are higher, and the impacts on tenants and communities are more pronounced, but on the other hand possibilities are opened up for possibly beneficial economies of scale through collective treatment of the properties in interest.

The other major differentiator in this case is that the Debtors' properties in all have more than 5000 residential units, essentially all subject to New York City rent stabilization laws. Debtors thus are a major and systemically important provider of affordable housing in a city that desperately needs it. As a result, the impact of this case is felt by many people, importantly including the residents of the buildings at issue, and the case has attracted understandable interest from governmental authorities including the City of New York and also from housing advocates.

At risk of excessive repetition, the Court acknowledges the importance of all of these concerns – the concerns of each individual tenant, all of whom depend on the properties at issue to provide an affordable home, and many of whom have voiced serious concerns about building upkeep and conditions, which they want addressed as a condition of sale if there must be a sale at

6

all. The City of New York (with a supporting submission from the New York State Attorney

General) has appeared in the case and aggressively sought to advance these concerns as well.

Notwithstanding the greater-than-usual public attention and impact of the case, what is

before the Court is best framed for purposes of this decision under well-established provisions of

the Bankruptcy Code, which govern the showings that Debtors must make to achieve their

objectives, and authorize if not require the relief to be afforded if statutorily specified

requirements are met.

Here, specifically, Debtors seek approval of a comprehensive sale of all of their real

estate properties to Summit. Clarifying testimony during the Hearing explained that Summit

plans to assign title to each property to a separately incorporated LLC entity, all under common

Summit ownership. Relatedly, Debtors seek confirmation of their Chapter 11 Plan, which in this

case is a plan of liquidation. What that means is that Debtors are using bankruptcy processes to

sell their properties and then, in an orderly manner, to wind down their affairs, while paying

creditors to the greatest extent possible consistent with the priority and other requirements that

the Bankruptcy Code establishes. Because the Plan calls for liquidating the Debtors, no discharge

of the debtors will result; that is available in corporate Chapter 11 cases only when the debtor

successfully confirms a plan of reorganization, as distinct from liquidation.

At a high level, the most salient aspects of the governing legal structure are as follows.

Section 363(b) of the Bankruptcy Code generally and subject to various conditions authorizes the

trustee or debtor after notice and a hearing to sell, other than in the ordinary course of business,

property of the estate. Section 363(f) allows such a sale to occur free and clear of any interest in

the property being sold if required conditions are met. And although it did not receive much

focus in argument, section 363(m) of the Code affords certain protections to good faith purchasers in such a sale.

At the same time, Debtors are seeking confirmation of their plan in conjunction with the sale approval. The two are integrally interrelated, so they must be considered collectively, and the Court has done so. Plan confirmation requires consideration of detailed statutory requirements including those set forth in section 1129 of the Bankruptcy Code and, by reference, Code sections 1122 and 1123. The Debtors bear the burden of establishing that these requirements have been satisfied.

In this case, a great deal of what Debtors are attempting to do is uncontroversial and unopposed. Debtors' applications as is customary or required in this Court were accompanied by a detailed proposed order that set forth what findings of fact and conclusions of law Debtors wanted the Court to make (backed by their evidentiary submissions and legal contentions), so that all parties in interest could understand exactly what was being sought, and could object to anything they wished.

At the January 15 hearing there was colloquy about how we should approach the issues presented, and I suggested that if no one objected, the best approach would be to consider as established the findings and conclusions set forth in the previously-docketed and served proposed order by which Debtors asked this Court to provide sale approval and confirmation, with the exception of issues that attracted objections or were challenged in pre-hearing submissions and during the lengthy January 15 hearing, and with the further exception of a few additional issues or concerns I identified during my own review. Importantly, the January 15 hearing was an evidentiary one, meaning all interested parties had the opportunity to present any evidence they considered relevant. The parties also had the opportunity to advance whatever

arguments they wished. All parties either affirmatively agreed to this approach, or, at a minimum, voiced no objection to it.

The Court carefully studied and considered all written submissions in connection with the proposed sale and confirmation. These include written legal submissions by Debtors, the secured lender Flagstar Bank, the City of New York through several successive submissions (with a supportive filing by the New York State Attorney General's Office), the Office of the United States Trustee (the "**UST**"), and three separate groups of concerned tenants, each represented by able Legal Aid, Legal Services and/or pro bono counsel. The Court also considered all evidence adduced at the hearing, including four sworn declarations submitted by Debtor representatives or affiliates that attracted no factual challenge, cross examination, or rebuttal evidence, and one declaration from Mr. Zohar Levy, Chief Executive Officer of Summit Properties Ltd., the parent company of the purchaser entity. The hearing also involved extensive cross examination of Mr. Levy. No objector proffered any affirmative evidence of their own.

First, and importantly, the Court will address the sufficiency of Debtors' showing regarding the proposed sale. In evaluating this, the Court considered all law applicable to sales under Section 363, as well as, at a minimum, the requirement of section 1129(a)(3) that the plan be proposed in good faith and not by any means forbidden by law, and the requirement of section 1129(a)(7) that a plan be in the best interest of creditors and equity interest holders of Debtors. Debtors have demonstrated through unrebutted testimony that from the start of this case they pursued a value-maximizing sale process, while also exploring whether a restructuring could be achieved without resorting to a sale. They retained real estate investment professionals who conducted a vigorous outreach and sale process, with extensive proactive outreach and publicity to attempt to attract any and all interested investors. They were open either to a collective

portfolio sale, or, in the event it would be preferable, piecemeal sales. These efforts attracted considerable interest. As is fairly routine in similar cases, the Court approved a process where Debtors could solicit interest and, subject to Court approval, select a so-called stalking horse bidder, meaning one that would commit to carry out a transaction on specified terms subject to the solicitation of higher and better offers, culminating in an auction. That process was followed and, again with court approval, a bid solicitation and auction process was conducted. Tenants, groups of tenants, community groups advancing tenant interests, and/or the City and any other governmental actor had abundant notice of this process and of the opportunity to advance a proposal to purchase or take over ownership of one or more debtor-owned properties.

During the Court-approved sale process, one other potentially actionable bid was received, but Debtors selected the stalking horse bidder's offer as the best and highest offer. Debtors' business judgment in such matters is generally subject to somewhat deferential judicial review[2], and here no one disputes Debtors' explanation of their reasons for favoring the stalking horse bid, namely, that the other bid had potentially problematic contingencies and likely would require significantly longer to be ready to close on a transaction. The Court finds that Debtors' selection of the highest and best bid was in the sound and reasoned exercise of Debtors' business judgment.

More generally, no one has raised any concerns about the proposed transaction other than those raised in the Objections, and I find Debtors have established that the transaction is proposed in good faith and is in the best interest of creditors and other parties in interest.

---

[2] This decision omits as unnecessary a detailed articulation of the standard and the law establishing it.

Having made those observations, this resolves and states the Court's approval of all aspects of the Plan and proposed transaction that are not the subject of any objections.

This Bench Decision now addresses in turn the issues raised in the objections, as well as a post-hearing stay request that the Court orally denied.

### A. Adequate Assurance Under Bankruptcy Code Section 365(b)(1)

Section 365 of the Bankruptcy Code governs a debtor's ability to assume and assign executory contracts and unexpired leases, and, in part, mandates a debtor or trustee to "cure" or provide "adequate assurance" that the debtor will "promptly cure … default[s]" of the executory contract or lease being assigned. 11 U.S.C. § 365(b)(1). And a separate although topically related provision of the Code authorizes assignments if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2)(B).

The Debtors' Plan provides that all residential leases at Debtor-owned premises are being or have been assumed by the Debtors and are being assigned to the Purchaser under the transaction contemplated by the Plan. At the January 15 hearing, Mr. Levy clarified that the Purchaser has created or will create a series of LLCs or similar entities, each of which will exist for the purpose of owning one specific property, and each of which will hold title just to that property. The Purchase and Sale Agreement authorizes the use of this ownership structure.

The City and various tenant groups object that Debtors have not satisfied the requirement of Bankruptcy Code section 365(b)(1) that Debtors either cure "defaults" or provide "adequate assurance" that "defaults" will be "promptly cure[d]." None of the parties provided a legal showing as to whether housing violations constitute "defaults" under the applicable leases. Nonetheless, the Court's working assumption for purposes of this decision is that some number

of "defaults" exist in the form of breaches of a warranty of habitability or similar lease terms or implied provisions. In assessing these issues, the Court also takes into account the requirements of section 365(f) as to assignees' ability to perform under contracts or leases that are assigned to them.

The objecting parties observe that, collectively, the premises being transferred are the subject of numerous violations as determined by City officials. The objecting parties have also questioned whether Debtors have shown or can show that Summit has the financial or operational capability or the will to make necessary repairs to the buildings. The objectors point to a New York real estate portfolio partially owned by Summit (in the form of an affiliated but separate corporation), with that Summit property portfolio reportedly having numerous violations, giving rise to concerns that Summit will not adequately manage the properties it now proposes to acquire. Some objectors also expressed concern that Summit has limited experience running rent-subsidized residential real estate in New York.

In response, Debtors emphasize that many of their properties, and perhaps 80% of the units they control, have no violations. They also state that they have been making concerted efforts to clear existing violations. But tenants raise serious concerns, and, at any rate, Debtors' own performance does not answer the question whether there is adequate assurance that any existing lease defaults will be cured if and when the sale to Summit closes and Summit becomes responsible for the properties.

The requirement to provide "adequate assurance" that the purchaser will "promptly cure" defaults is a Bankruptcy Code requirement that operates independently of State and City laws and regulations that may apply. At least most of the case law interpreting this section does not involve the dynamic that is present here, where a landlord is transferring title subject to the

leasehold interests of existing tenants. A more typical dispute involves a debtor who wants to assume and assign a lease in which the debtor is the tenant, for example a failing debtor-retailer that wants to sell a valuable tenancy (likely at below-market rent) to someone else who will run a store in the location in question, and the typical default that must be cured is nonpayment of rent. So, the body of case law is not precisely tailored to the situation before the Court. But in general, what section 365 requires is, in the statute's words, "adequate assurance" that "defaults" under the leases or contracts being transferred will be "cured." These terms are inexact, almost surely intentionally so.

"There is no general definition of the term 'adequate assurance.' Its meaning is left to be developed based on the facts and circumstances of each case. *See, e.g.*, *In re Fleming Cos., Inc.*, 499 F.3d 300 (3d Cir. 2007); *In re UAL Corp.*, 635 F.3d 312, 323 (7th Cir. 2011); *In re Great Atl. & Pac. Tea Co.*, 472 B.R. 666, 674-75 (S.D.N.Y. 2012)," Collier on Bankruptcy ¶ 365.06[3][a]. The case law consistently counsels a flexible approach and a pragmatic assessment of the circumstances present and the "test is not one of guaranty but simply whether it appears that [underlying obligations] will be paid . . . ." *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986); *see also In re Great Atl. & Pac. Tea Co.*, 472 B.R. 666, 674-75 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance'; rather, '[i]t must simply appear that the rent will be paid and other lease obligations met….The emphasis is on protection.'") (citation omitted); *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 719 (Bankr. S.D.N.Y. 2011) ("A debtor need not prove that it 'will thrive and make a profit' but only that it appears that it will meet its obligations.") (citation omitted). Further, assurance of future performance under section 365(f)(2)(B) "is to be 'defined by commercial rather than legal standards'" *In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980) (citation omitted),

13

and there is a strong policy "favoring assumption and assignment as a means of continuing performance and realizing value and thereby assisting the debtor in its rehabilitation or liquidation." *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983).

Here, the Court is satisfied and finds that Summit's remediation plan as described in the Levy Declaration satisfies the Bankruptcy Code's adequate assurance requirements. Summit has articulated what appears to be a well-considered and reasoned approach to prioritizing the most pressing conditions and taking significant action in a compressed time frame. The Court credits the declaration and live testimony of Mr. Levy. His declaration details that Summit's bid amount was determined by taking into account the "capital needs" of the assets being purchased, the needed "reserves for operational stability" and for "maintaining the Purchased Assets and existing regulatory frameworks." Levy Decl. at ¶ 7. Mr. Levy also credibly testified that Summit estimates needing to devote $30 million over the next five years for building needs of which an anticipated $10 million will be used to promptly address existing violations and building issues. Mr. Levy says that is an "estimate" not a "cap," and that Summit plans to aggressively address issues with the buildings' condition. Mr. Levy further testified that Summit is investing $113 million of its own funds as equity into this portfolio, and that the substantially lower debt component of Summit's financing will cut financing costs by 45% compared to Pinnacle's costs, which will free up cash flows or rent revenue so that Summit will be much more able to address building conditions than Pinnacle has been. As the Court noted during the hearing, that "is a big deal" that gives economic reassurance that Summit's professed intentions will not be thwarted by insufficient funding. The Court also credits Mr. Levy's description of not just Summit's financial wherewithal, but Summit's substantial analysis of Debtors' property portfolio and what is needed to rectify deficiencies at those properties. This effort included a comprehensive review of

14

violations, backed by visits to each property at issue, which resulted in Summit's development of

what it calls an "immediate action plan" aimed at promptly addressing existing violations, with

priority focus on violations that pose a hazard.

In response to concerns raised about other Summit-owned properties in New York, Mr.

Levy further explained that in its existing New York city portfolio, a Summit entity is a limited

partner or non-managing member that has not directly run the properties. The management of

those properties, according to Mr. Levy, is overseen by a separate entity, Chestnut Holdings of

New York Inc., which in turn retains another firm called Denali Management Inc.[3] to manage the

properties. By contrast Mr. Levy states that Summit intends to take a more active role in running

the properties it plans to acquire from Debtors, and that it will use entirely different, carefully

selected, experienced and qualified management companies. More specifically, Mr. Levy testifies

via his declaration that Summit will "have full control over the management of these

investments," meaning the Debtors' properties being sold, and "is in the process of retaining new

property management firms . . . which will have no connection to Denali, Chestnut, or any

affiliate of Denali or Chestnut." Levy Decl. ¶ 14. The Court credits Mr. Levy's explanation that

he and Summit sought and are retaining experienced and qualified management firms, one of

which is under contract with other discussions underway, with Summit having considered,

among other things, management firms' reputations, their references, and the rate of or incidence

of violations in properties managed by the firms. Mr. Levy testified that the one identified

---

[3] Concerningly to many objectors, the Chestnut and Denali entities are owned by Jonathan Wiener, who reportedly is the brother of Joel Wiener, a direct or indirect owner or control person at Debtors. This close relationship and ties to Summit have given rise to serious concerns. This decision will discuss that issue at more length shortly in dealing with objections that the transaction is an insider transaction not conducted at arm's length.

management company has a significantly lower average number of violations per apartment unit than is typical in the City's rental housing stock overall.

Although many objectors demand binding guarantees, a more specific and binding schedule, granular milestones and commitments, dedicated monetary reserves, and/or greater speed than Mr. Levy spelled out as Summit's plan, those requests exceed the requirements of the Bankruptcy Code and are best directed, if at all, to the City in the exercise of its regulatory authority. Rather, the transaction, Summit's finances, and its ability to spell out a reasoned and comprehensive approach meet the Code's "adequate assurance" requirements that any existing "defaults" in apartment leases will be cured and Summit will perform under the leases going forward.

Overall, the Court found Mr. Levy a credible witness and extensive cross examination elicited no reason to question his honesty or the accuracy of his testimony. Noteworthy was extensive questioning, including from the Court, about what confidence or "assurance" leaseholders could have about conditions at each individual building given the property-by-property ownership structure that Summit contemplates. Mr. Levy testified in substance that Summit through this transaction will have "deleveraged" this portfolio by reducing its debt load by 45%, meaning more than $275 million, such that Summit will have much lower carrying costs and commensurately greater ability to pay for needed repairs, given the fairly static rent revenues of each property. Mr. Levy also persuasively testified that Summit is investing $113 million of its own capital as equity in the properties, funds that he repeatedly confirmed were not obtained through borrowing. Summit's counsel and other plan proponents argued that the fact of this capital investment and Mr. Levy's stated intention to own the property for the long haul is inconsistent with the idea that Summit would fail to maintain the buildings or otherwise cure

defaults. Mr. Levy stated an intention to have Summit fund bridge loans as needed to meet high

expenses at given properties, rather than allow an individual property to slide into disrepair if

expenses exceeded rent rolls in that particular building.

Mr. Levy did not, however, state that any parent Summit entity was guaranteeing or

reserving funds on account of needs that may arise at a given property in excess of that own

individual building's and owning LLC's revenues and ability to pay. What was stated was an

intention but not a guarantee or ironclad commitment.

However, as the preceding review of "adequate assurance" law shows, no "guarantee" or

certainty is required, and the evidence including Mr. Levy's testimony provides the statutorily

required level of assurance.

Moreover, additional assurance exists because, at the hearing, Flagstar made an

additional financial commitment—a revolving credit line of $3 million for costs associated with

curing violations at any individual building. The Court does not hold that Flagstar's

supplementary financing is required for a finding of adequate assurance. Nonetheless, considered

on top of Summit's other commitments and plans, the promised credit line is a valuable

additional measure establishing that there is adequate assurance of cure as to each lease being

transferred, even if a given building has disproportionately costly needs.

Taking all these facts into account, none of which have been undermined or rebutted by a

contrary evidentiary showing, the Court is satisfied that Summit, through Mr. Levy's declaration,

has described a serious and reasonable-sounding plan to rectify violations and poor conditions at

the properties at issue.  Additionally, the very public nature of Summit's promises coupled with

the City's approach to this case gives the Court confidence that Summit will abide by its commitment and that the City will monitor and police Summit's performance.

The Court acknowledges the City's and some tenants' requests for additional measures, including: (i) an increase in the revolving credit line offered by Flagstar to cure violations; (ii) a court-ordered work plan with rights of consultation; (iii) an expedited cure period relative to Summit's proposed timeline; and (iv) immediate identification of the second management firm Summit intends to retain. These are understandable tenant or regulatory desires. However, those additional measures are not mandated by the Bankruptcy Code provisions concerning assignment of contracts and leases, which, again, call not for guarantees but for "adequate assurance" of "cures" of "defaults" and of the assignee's future performance. Under the Bankruptcy Code, as noted, these are flexible terms to be construed and applied according to the facts of the unique case at hand.

In the instant case, the Court is faced with a set of Debtors who are unable to pay their heavy secured debt obligations, who are likely to face foreclosure with the attendant uncertain outcome if their bankruptcy process does not succeed, and whom many objectors contend fail to meet the needs of numerous tenants, although the Debtors defend their performance. The Court does not adjudicate how good or bad a landlord Debtors are, but it is clear that the volume of issues and complaints being raised cannot be fixed immediately.

Having said that, the Court is satisfied that Summit evinces every good intention to run this portfolio properly, and Summit has shown more than adequate financial wherewithal to do so given the amount of their equity investment and their reduced financing costs as compared to Pinnacle. Further, Summit showed that it is already far along in an appropriate search for capable and experienced local management teams to run these properties, which addresses the concern

that Summit itself is not experienced at running New York residential property. Finally, Summit has articulated a plan to take appropriate steps at a pace that seems responsive to the needs of the buildings. This process unavoidably will take time, but that is consistent with the scale of Debtors' operations and the magnitude of assessment and work that appears to be required. The Court is satisfied that Summit's commitments, resources, and plan, especially when enhanced by Flagstar's supplemental financing offer, meet the requirements of Section 365(b) and 365(f).

In sum, the Plan proponents have made a strong showing that they meet the "adequate assurance" requirements of section 365. Meanwhile, the objectors' further demands go far beyond what the Bankruptcy Code requires. Therefore, and for the reasons described above, the Court overrules all objections under section 365 of the Bankruptcy Code.

### B.  Plan Feasibility Under Section 1129(a)(11) of the Bankruptcy Code

Section 1129(a)(11) imposes as a condition of granting confirmation that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement is often referred to as "feasibility." "The feasibility standard as set forth in section 1129(a)(11) requires a court to determine whether "a plan is workable and has a reasonable likelihood of success." *In re Young Broad. Inc.,* 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (internal citation omitted). The feasibility standard does not require a guarantee of success, but rather "the plan proponent need only demonstrate that there exists the reasonable probability that the provisions of the Plan can be performed." *In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citation omitted).

19

The objectors contend that the Plan is not feasible because the Debtor failed to provide adequate information about Summit's financial ability to consummate the sale and that Summit "may not have sufficient resources or willingness to rehabilitate the Properties or be able to maintain a profitable business based on the income stream from the rent stabilized or rent controlled apartments in the Properties." City Objection at 2.

The objectors' feasibility arguments largely are misplaced as a statutory matter and are more properly considered under the adequate assurance requirement discussed above. This is because, as the language of section 1129(a)(11) makes clear, the plan "feasibility" requirement focuses on the debtor or any successor under a confirmed plan, such as a reorganized debtor. The Debtors here are liquidating pursuant to the terms of the Plan, which by definition means there will be no ongoing or operating successor to the Debtors and, therefore, there can be no subsequent liquidation or reorganization of a Debtor successor that is not contemplated in the current plan. "In the context of a liquidating plan, feasibility is established by demonstrating the debtor's ability to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. Notably, there is no requirement that such payments will be guaranteed." *In re Finlay Enters.,* No. 09-14873 (JMP), 2010 Bankr. LEXIS 5592, at *155-156 (Bankr. S.D.N.Y. May 18, 2010).

Here, as stated, the Plan contemplates a Sale Transaction, proceeds from which will be used to fund the distributions outlined in the Plan. The evidence supports the viability of the proposed transaction, including that 10 % of the Purchase Price has been deposited in an escrow account and that Summit has secured financing of $338.5 million

from Flagstar Bank, with Summit adding $113 million of its own funds as an equity investment. *See* Levy Decl. Thus, the Debtors have met their burden of showing good reason to anticipate that their contemplated transactions will close and will permit them to carry out the contemplated wind-down of the estates. No more is required by section 1129(a)(11).

Finally, even if the concerns raised by the objectors did go to the Plan's feasibility, for reasons discussed in the preceding adequate assurance section Debtors have established the reasonable probability that Summit will be able to perform as it projects, which is all that section 1129(a)(11) requires even of debtors and their successors.

## C. Insider Transaction

Many objectors raised concerns about the identity of the Purchaser, arguing that Summit is an insider and, thus, does not qualify as a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The objectors understandably suspected a close relationship between the Debtors and Summit based on reports of family ties between Jonathan Wiener, who owns Chestnut Holdings and Denali, the property management firms that Summit uses for its current New York properties, and the Debtors' controlling shareholder, Joel Wiener; many objections contended that or at least seriously questioned whether the brother of Debtors' principal had an unacknowledged major stake or role in Summit.

The significance of this in part is that Debtors ask the Court to find that Summit is entitled to the statutory protections afforded to qualifying purchasers by Section 363(m) of the Bankruptcy Code. Under that provision, "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not

affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m). "[G]ood faith is shown by the integrity of [purchaser's] conduct during the course of the sale proceedings ... [and] is lost by fraud, collusion between the purchaser [and] the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Kaspar,* No. 22-10382, 2024 WL 4797909, at *6 (Bankr. S.D.N.Y. Nov. 14, 2024), *aff'd*, No. 24-CV-9314 (JMF), 2025 WL 1784812 (S.D.N.Y. June 27, 2025) (citation omitted).

The Bankruptcy Code includes a statutory definition of "insider." Pursuant to section 101(31), an "insider" includes … (B) if the debtor is a corporation – (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor or (vi) relative of a general partner, director, officer, or person in control debtor." 11 U.S.C. § 101(31).

Here, evidence adduced by Debtors and Summit cause the Court to find that Summit does not fall under any of the enumerated definitions of an "insider" pursuant to section 101(31), nor under any other standard that could affect the applicability of section 363(m). The Levy Declaration establishes that Mr. Levy and not Jonathan Wiener is the founder, controlling shareholder, and CEO of Summit Properties Ltd., which "wholly owns" the Summit purchaser entity. The Court credits Mr. Levy's testimony that Jonathan Wiener had no role in the transaction and that Mr. Levy never discussed it with him, and, further, that Summit will not use the services of Mr. Wiener or his companies to manage properties Summit plans to acquire from Debtors. Although the Court understands the concerns raised, the evidence supports a conclusion that this was not an "insider" transaction.

The notion that this could be an improper "insider" transaction working to the detriment of creditors also is belied by the highly visible nature of this case, which ensures as a practical matter that anyone interested in owning and operating Debtors' portfolio of rent stabilized properties had ample notice and opportunity to pursue a transaction. The likelihood of a sale has been acknowledged since the May 2025 commencement of this case and was the subject of a series of steps including the October 1, 2025 Bid Procedures Order, adopted on notice to all parties in interest. The evidence is that those procedures were followed, and not just in a pro forma way, with heavy marketing and outreach efforts by Debtors' retained real estate investment professionals and active engagement with many inquiring prospects. Further, the auction rules themselves barred collusion or bad faith participation, and the Court has sworn statements that the bidding rules were followed, and the transaction occurred without collusion. The Court is satisfied by this unopposed evidence, particularly because of two additional factors: first, the open auction process that was followed means that a disadvantageous insider transaction likely would have been defeated by a superior offer; and second, the participation and support of Flagstar, which is motivated to maximize returns and is not an insider, as well as the two CROs,[4] one of whom is a Flagstar designee, provide further assurance of the bona fides of the sale process. For these reasons, the Court is persuaded that the Debtors conducted via qualified professionals and independent fiduciaries a good-faith, bona fide, intensive marketing and sale process conducted at arm's length, and in accordance with the court-approved bidding procedures. Accordingly, the Court concludes both that Summit is not an insider as defined by section 101(31) and that Summit is entitled to the protections of § 363(m).

### D.  Exculpation Provision

---

[4] Chief Restructuring Officers

The UST filed an objection to confirmation, in large part contending that the Plan included an overbroad "exculpation" provision. The Court agrees to the very limited extent that pre-petition conduct cannot properly be exculpated in the circumstances of this case, because no meaningful work relating to the development of a plan occurred before the bankruptcy case was filed. The Court otherwise overrules the UST's objection.

Section 1123(b)(6) of the Bankruptcy Code permits a plan to "include any other appropriate provision not inconsistent with the applicable provisions of this title." The Debtors' Plan includes injunction and exculpation provisions. "Both the injunction and exculpation provisions have been found appropriate by Courts when they are fair and equitable, necessary to successful reorganization, and integral to the plan." *In re CLST Enterprises, LLC,* No. 24-10596 (MG), 2025 WL 3708328, at *6 (Bankr. S.D.N.Y. Dec. 19, 2025).

Exculpation clauses are commonly accepted in this jurisdiction as critical features of plans designed to prevent disgruntled stakeholders from suing case participants for their work in developing a successful bankruptcy case resolution. There is no dispute that some form of exculpation is necessary and appropriate in the vast majority of Chapter 11 cases, at least substantial ones. And this case has the complexity, broad impact, and broad participation that makes exculpation not just appropriate, but a practical necessity.

The exculpation provision in Section 10.6 of the Plan exculpates certain parties including the Debtors and their professionals, Flagstar, and the Plan Administrator from liability relating to the Chapter 11 cases. The UST contends that (i) the provision improperly includes non-estate fiduciaries, namely Flagstar and the Plan Administrator; (ii) the provision improperly exculpate[s] and release[s] parties for any conduct taken

upon the advice of counsel, elevating an affirmative defense to a complete limitation of liability; and (iii) the provision should be limited to acts or omissions occurring from the Petition Date to the Effective Date

As counsel for the UST appropriately acknowledged, the UST's arguments are largely contrary to case law in this jurisdiction, and the Court follows that body of case law, which strongly counsels rejecting the UST's position almost entirely. As well-established case law of this Court recognizes, "[e]xculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Glob. Holdco, LLC,* 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc.,* 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). This Court has repeatedly found it appropriate for exculpation provisions to include non-estate fiduciaries who "made substantial contributions to the reorganization process and whose inclusion in the exculpation provision was a critical component in forming a plan …." *In re Genesis Glob. Holdco, LLC,* 660 B.R. at 529 (citing *In re Stearns Holdings,* LLC, 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019)); *see also In re Klaynberg,* 2023 WL 5426748, at *17 (Bankr. S.D.N.Y. Aug. 21, 2023); *In re Azul S.A.,* No. 25-11176 (SHL), 2026 WL 40912, at *6 (Bankr. S.D.N.Y. Jan. 6, 2026).

Here, based on its nationwide programmatic position that exculpation should be limited to estate fiduciaries notwithstanding the precedent described immediately above, the UST objects to the inclusion as Exculpated Parties of Flagstar and the Plan Administrator. The Court disagrees. Both of those parties have played or will play

integral roles in these Chapter 11 cases, and both are entitled to be exculpated under the prevailing body of law in this jurisdiction.

First, Flagstar has made substantial contributions to the progress of the case from its beginning, including through its consent to Debtors' use of cash collateral for the administration of the case and Flagstar's participation in the formulation of the Plan, as well as its agreement to partially finance the sale of Debtors' real estate portfolio. These are not small or routine matters. Flagstar had a strong argument from the case's inception that Debtors were statutorily ineligible to use any of Debtors' cash because those funds were encumbered by Flagstar's liens, such that, without Flagstar's consent and negotiation of terms by which the case could progress, the stay may well have been lifted or the case dismissed. The likely result would have been foreclosure sales that would not have been accompanied by the Bankruptcy Code requirements that are the subject of this decision, and that may well have led to a far worse outcome for Debtors, creditors, and tenants alike.

Similarly, the Plan Administrator, whose powers and responsibilities are detailed in the Plan, will be charged with ensuring that the Plan is implemented as intended and directed by the Court's confirmation order. That role is central to the case's success and is entitled to exculpation. *See In re Voyager Digital Holdings, Inc.,* 649 B.R. 111, 136 (Bankr. S.D.N.Y. Jan. 6, 2026) (approving an exculpation provision that included a Plan Administrator). For these reasons, the Court finds that Flagstar and the Plan Administrator are appropriate Exculpated Parties.

The Court also rejects as inaccurate the UST's second argument, which is that the exculpation provision makes reliance on counsel "an absolute bar against any kind of

liability." UST Objection at 9. As Debtors confirmed and emphasized, the provision

makes clear that an advice-of-counsel defense will be available to be raised, and the

provision includes an express reasonableness requirement, providing that "such entities

shall be entitled to reasonably rely upon the advice of counsel with respect to their duties

and responsibilities pursuant to this Plan." *See* Section 10.6, Second Amended Plan. As

Judge Lane explained in a recent decision, language stating that parties may rely on

advice from counsel is "commonly included in confirmed plans in this jurisdiction." *In re*

*Azul S.A.,* No. 25-11176 (SHL), 2026 WL 40912, at *6 (Bankr. S.D.N.Y. Jan. 6, 2026)

(collecting cases). Further, the Plan's inclusion of a reasonableness requirement in its

authorization of an advice-of-counsel defense undermines the UST's characterization of

the provision as imposing an absolute bar against liability, and makes the Plan fit readily

within the range of exculpation provisions commonly approved in this Court.

Accordingly, the Court overrules the UST's objection to the Plan's language concerning

an available advice-of-counsel defense.

  The UST's third objection concerns the temporal scope of the exculpation

provision, and as already mentioned the Court agrees with it to a limited extent.

  Specifically as to whether prepetition conduct can be exculpated, courts in this

district have approved "exculpations of prepetition conduct that are tailored to the

debtor's reorganization …." *In re LATAM Airlines Grp. S. A.,* No. 20-11254 (JLG), 2022

WL 2206829, at *49 (Bankr. S.D.N.Y. June 18, 2022), *corrected,* No. 20-11254 (JLG),

2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *aff'd sub nom. In re Latam Airlines*

*Grp., S.A.,* 643 B.R. 756 (S.D.N.Y. 2022), and *aff'd sub nom. In re LATAM Airlines Grp.*

*S.A.,* 55 F.4th 377 (2d Cir. 2022).

Here, however, the Court concludes that the temporal scope of the exculpation provision needs to be limited by excluding conduct that predates the petition date in this case. This change has already been implemented by revisions to the Plan and the Confirmation Order. The case was filed with foreclosure or receivership imminent in state-court proceedings, and it was not a pre-packaged reorganization or even a case in which significant progress toward a plan had been achieved when Debtors' bankruptcy petitions were filed. In fact, as noted, at the start of the case Debtors and Flagstar had an intense dispute about whether Debtors were entitled to use cash collateral, in light of Flagstar's understandable doubt that its liens on cash were adequately protected. Given that background and history, and the lack of any indication that work or progress toward confirmation had meaningfully occurred before the petition date, the Court does not see a reasonable basis to exculpate anyone for conduct prior to the cases. Rather, the work of these cases, beginning with the commencement of the cases and the path toward reorganization, does not stretch back to before the filing of the petitions. Debtors' counsel expressed agreement to this limitation at the January 15 hearing. Therefore, the Court approved a modification of the exculpation provision to set the Petition Date as the earliest point for which exculpation is granted.

The Court overrules the remainder of the UST's objection to the temporal scope of exculpation, which is aimed at the inclusion of post-effective date activity. This Court has repeatedly held that conduct that relates to Court-authorized processes or acts such as the administration of a plan can be covered by the exculpation provision. *See In re Genesis Glob. Holdco, LLC,* 660 B.R. at 528 ("Notwithstanding the UST's view [that exculpation provision should not extend past the effective date], exculpation may be

28

appropriate even for actions taken after the effective date"); *In re Voyager Digital Holdings, Inc.,* 649 B.R. at 136 (overruling UST objection that exculpation provision should not cover court-approved distributions and transactions that would occur as part of the implementation of the Plan.). The Court adopts and follows this and similar precedent of this Court. In this as in many cases, after the Effective Date, individuals will engage in conduct that is required or directed or contemplated by this Court's orders, in furtherance of Plan implementation and estate administration. Those individuals' Court-mandated and Court-authorized conduct in connection with the Plan is entitled to be protected via exculpation (subject to the already-present carveout for certain conduct such as fraud and gross negligence) even after the Effective Date has passed.

For the stated reasons, the Court overrules the UST's objection to the Plan's exculpation provision, subject to the modification discussed above to exclude prepetition conduct from the reach of that provision.

### E. Plan Modification

The UST's second objection relates to the scope of plan modification rights the Plan reserves for Debtors. The UST contended that the Plan "arguably" provides the Debtors with broader unilateral plan-modification discretion than the Bankruptcy Code permits. The Plan originally required that any such modification to the Plan be "in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law …." Section 12.6 of the Plan. At the January 15 hearing, Debtors' counsel agreed to delete the phrase "otherwise provided by law" from this provision and the UST confirmed that resolved its concern. To the extent that is not so, the objection is

overruled, because the provision's express term that Debtors' discretion is limited to what the Code authorizes makes the provision unquestionably statutorily authorized.

### F.  Sale of Debtors' Assets Free and Clear of Liens Under Section 363(f)

Some objectors expressed concern that the Plan's and the Purchase Agreement's contemplation of a sale "free and clear" of liens and similar burdens on title could be understood to attempt to evade "certain governmental interests, including violations," that cannot be stripped and that remain within the City's authority. Debtors repeatedly disavowed any such effect, both in their papers and at the Confirmation Hearing. The Court also noted at the hearing that it is the Court's understanding that the Sale Transaction contemplated by the Plan is subject to the City's regulatory authority, including but not limited to the pendency of any violations and the Purchaser's obligation to cure those violations.

The Court believes Debtors' clarification on the record resolved these objections. To the extent that is not so, any such objection is overruled. The transaction explicitly is subject to all existing leasehold interests and does not excuse Summit from meeting applicable City or other regulatory requirements. Summit has also explicitly acknowledged that existing violations must be and will be addressed.

### G.  Payment of Property Taxes and Water Charges

In its objection, the City argued that the Plan should be clarified or have a requirement added that property taxes and water charges must be paid at or before the closing of the sale transactions that the Plan contemplates. This issue was resolved on the record by Debtors' Counsel's representation at the Confirmation Hearing that there is nothing in the Plan excusing property tax and water charge payments, and, further, that there are adequate measures and assurances in place that those obligations will be paid consistent with applicable law.

To the extent the City's objection has not been formally withdrawn, it is overruled in light of Debtors' representation.

**H.  The Scope of the Section 1146 Exemption**

The City also objected to what it contended was an overbroad Plan provision regarding whether transactions under the Plan qualify for exemption from certain taxes under section 1146 of the Bankruptcy Code. The City acknowledged that Debtors have said existing mortgages may be assigned to the purchaser, such that it was possible no tax would be due, but they sought at a minimum clarification.

This issue was resolved at the Confirmation Hearing, and to the extent it is not fully resolved, any remaining objection on this basis is overruled. Debtors represented on the record that the transactions will be structured in a way that will not require use of the section 1146 exemption. Further, the Court modified the Confirmation Order to ensure that the order, in all respects, was consistent with the requirements and limitations of section 1146.

**I.  Any Other Objection Not Specifically Addressed Is Overruled**

The Court has considered all objections raised to confirmation and the sale. To the extent any objection is not specifically addressed in this Bench Decision and/or the Confirmation Order, and as the Confirmation Order already provides, all such objections are overruled.

**J.  Debtors' Request for Waiver of the 14-day Stay of Effectiveness of the Confirmation Order Is Denied**

Although not the focus of Plan objections, Debtors sought a waiver of the 14-day stay that ordinarily follows entry of confirmation orders. When asked at the hearing, the City opposed this request. Ordinarily I will waive the post-confirmation stay requirement if it is clear there will be no appeal, so that valuable time is not lost before the parties can begin implementing a

confirmed plan. However, the purpose of the stay is to permit an orderly appeal process and to avoid the possible mooting of an appeal before an objector can obtain court review or relief from the confirmation order, and if any objector wants to preserve the possibility of appeal I ordinarily will not waive the stay period, at least unless there is a showing of a compelling need. I will follow the latter approach here and decline to waive the stay in view of the City's position, and because there is no indication of any exigent need for the order to be immediately effective.

### K. Denial of Stay Request

At the conclusion of the Court's oral ruling on January 16, one tenant group orally moved for a stay, or an extension of the rule-mandated 14-day stay, pending appeal of the Court's decision. The City did not formally apply for a stay but noted that it might later apply for a stay. The Court asked if other objectors wished to join the application for an extension of the stay, and no other objector said yes. Debtors, Flagstar, and Summit opposed the extension of the stay.

On January 16, after hearing oral argument on this stay application, the Court denied the stay request in a brief oral ruling, which this Bench Decision and Order memorializes and supplements.

An application for a stay pending appeal from a bankruptcy court's decision is governed by Bankruptcy Rule 8007. Fed R. Bankr. P. 8007. "The decision as to whether or not to grant a stay of an order pending appeal lies within the sound discretion of the court." *In re Sabine Oil & Gas Corp.,* 551 B.R. 132, 142 (Bankr. S.D.N.Y. 2016). In determining whether to grant a stay pending appeal, courts consider the following four factors: (1) whether the movant will suffer irreparable injury absent a stay; (2) whether a party will suffer substantial injury if a stay is issued; (3) whether the movant has demonstrated a substantial possibility, although less than a

likelihood, of success on appeal; and (4) the public interests that may be affected. *In re Adelphia Commc'ns Corp.,* 361 B.R. 337, 346 (S.D.N.Y. 2007) (citing *Hirschfeld v. Board of Elections in the City of N.Y.,* 984 F.2d 35, 39 (2d Cir. 1993)). The movant bears a heavy burden of proof as "[s]tays pending appeal are the exception, not the rule, and are granted only in limited circumstances." *In re Taub,* No. 08-44210, 2010 WL 3911360, at *2 (Bankr. E.D.N.Y. Oct. 1, 2010) (citing *In re Paolo Gucci,* 105 F.3d 837, 840 (2d Cir. 1997)). The Supreme Court has observed that the "most critical" factors are (i) whether the movant will suffer irreparable injury absent a stay and (ii) whether the movant has made a strong showing that he is likely to succeed on the merits. *See Nken v. Holder,* 556 U.S. 418, 434(2009).

As the Court determined on the record, there has been no persuasive showing that any potential appellant will suffer irreparable injury absent a stay. The decision already is stayed for the next 14 days, and representations during the hearing indicate that the closing is some time away, and that the proposed transaction may not even close in the absence of a final, non-appealable order. Further, as the Court explained on the record, the granting of a further stay would cause substantial injury to numerous parties. These include Flagstar, which is being delayed in recovery of hundreds of millions of dollars it is owed and continues to have its collateral and the value of its eventual recovery eroded by Debtors' expenditures of cash collateral; an open-ended extension of Flagstar's current situation would cause it expenses and reduced recoveries that would be unlikely ever to be recouped. A stay also would or might substantially harm Debtors and Summit by delaying (and possibly jeopardizing) their contemplated transaction, thus requiring Debtors to continue operating properties at a possible loss, and frustrating Summit's desire to close and to begin operating its investment, while also causing Summit not to realize some of the revenues it will begin to receive once the transaction

closes. There also is some possibility that Debtors' tenants would be harmed by such a delay, because, to the extent Debtors are not meeting tenant needs as their landlord, that situation likely will persist or worsen if the Summit transaction cannot close and Summit is delayed from launching its plan to promptly address problematic building conditions.

Further, as was extensively discussed on the record without accurately stating the applicable standard, objectors have not demonstrated a substantial possibility of success on appeal. The remaining requests expressed by objectors are, in the Court's view, far outside the realm of what could plausibly be required of assignees under Section 365, and the Court sees no other live or viable issue for appeal.

I reiterate my thanks expressed on the record to all parties and all counsel. Insolvency professionals including those in this case are exceptionally skilled at making the best of challenging situations. And in particular, I appreciate the efforts of the City and its counsel, and I acknowledge with gratitude the capable and vigorous efforts of Legal Aid, Legal Services, and pro bono counsel assisting various tenants to ensure their rights and interests were effectively put before the Court.

## CONCLUSION

For the reasons stated above, Debtors' Plan as modified is confirmed and the proposed property sale to Summit is approved. This Bench Decision serves as a memorialization and better statement of the Court's oral ruling that was rendered on January 16.  The Confirmation Order was entered on the same day. No further order is required and objectors' time to appeal (other than to the extent they have an appeal right from this Bench Decision and Order's denial of a

stay application) began to run upon entry of the Confirmation Order.

SO ORDERED.

Dated: New York, New York
        January 19, 2026

_____s/ David S. Jones_____
Honorable David S. Jones
United States Bankruptcy Judge